Harold J. McElhinny*
Kevin M. Coles*
Elizabeth G. Balassone*
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105-2482
Telephone: (415) 268-7000
Facsimile:  (415) 268-7522
Email:  HMcElhinny@mofo.com
Email:  KColes@mofo.com
Email:  EBalassone@mofo.com

Colette Reiner Mayer*
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA  94304-1018
Telephone: (650) 813-5600
Facsimile:  (650) 494-0792
Email:  CRMayer@mofo.com

Attorneys for Plaintiffs

*Pro hac vice motions forthcoming*

Additional counsel listed on signature page

## IN UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| JANE DOE #1; JANE DOE #2; NORLAN FLORES, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Jeh Johnson, Secretary, United States Department of Homeland Security, in his official capacity; R. Gil Kerlikowske, Commissioner, United States Customs & Border Protection, in his official capacity; Michael J. Fisher, Chief of the United States Border Patrol, in his official capacity; Jeffrey Self, Commander, Arizona Joint Field Command, in his official capacity; Manuel Padilla, Jr., Chief Patrol Agent-Tucson Sector, in his official capacity,<br><br>Defendant. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**CLASS ACTION** |

**INTRODUCTION**

1.      Plaintiffs are civil detainees confined in a U.S. Customs and Border Protection ("CBP") facility within the Tucson Sector of the U.S. Border Patrol ("Border Patrol"), a division of CBP.  During their confinement, Plaintiffs and many others like them—men, women, and children—have been subjected to inhumane and punitive conditions.  They have been packed into overcrowded and filthy holding cells with the lights glaring day and night; stripped of outer layers of clothing and forced to suffer in brutally cold temperatures; deprived of beds, bedding, and sleep; denied adequate food, water, medicine and medical care, and basic sanitation and hygiene items such as soap, sufficient toilet paper, sanitary napkins, diapers, and showers; and held incommunicado in these conditions for days.  These conditions exist in all of the short-term detention facilities that CBP currently operates and maintains in its Tucson Sector and thus Plaintiffs and putative class members are harmed no matter where they are detained within the Sector.  Plaintiffs bring this action challenging these harsh and degrading conditions in Tucson Sector CBP facilities on behalf of themselves and all those similarly situated.

2.      Plaintiffs and putative class members have been or will be apprehended at or near the U.S. border with Mexico and detained.  Border Patrol apprehended more than 200,000 people in its Tucson Sector in the past two years alone, among them individuals seeking asylum, mothers with infants, and U.S. citizen children.  Many of the individuals CBP detains have fled dangerous conditions in their home countries, and are seized following a lengthy, difficult, and perilous journey.  They arrive exhausted, thirsty and hungry, and often are suffering from dehydration, heat stroke, diarrhea, bleeding and blistered feet, and other health conditions requiring medical attention.  A substantial number of the women are recent victims of sexually assault. Many other adults and children arrive traumatized by the dangers they have escaped and the harms they have suffered during their journey to the United States.[1]  The

---

[1] *See A Treacherous Journey: Child Migrants Navigating the U.S. Immigration Sys.*, Ctr. for Gender & Refugee Studies & Kids in Need of Defense (Feb. 2014),

conditions in the holding cells—including the inadequate supply of water and food, the extremely cold temperatures and the lack of access to medical care and medicines—further endanger those already suffering from exposure-related medical impairments and other pre-existing conditions.

3.     In Border Patrol's Tucson Sector ("Tucson Sector"), Defendants detain apprehended individuals overnight—and often for multiple nights—in unsanitary holding cells that are neither designed nor equipped for extended detention, and certainly not for sleeping.  Per Defendants' own guidelines, holding cell use should be limited to a period of no more than twelve hours.  In practice, the vast majority of detainees are held far longer.  Defendants' regular use of these filthy, cold, and often overcrowded holding cells for longer-term detention is dangerous, inhumane, and punitive.

4.     As a result of Defendants' policy and practice of using Tucson Sector holding cells for overnight and even multiple night confinement, the named Plaintiffs and putative class members are denied the ability to get adequate sleep—if any at all. Defendants do not equip holding cells with beds and generally do not provide detainees mattresses or other bedding.  Defendants leave holding cell lights on at all hours, and detained individuals must attempt to sleep on cold concrete floors and hard benches. The cells are often so overcrowded that not all detainees are able to lie down and instead must sit or stand through the night.

5.     Border Patrol holding cells are notoriously referred to as "hieleras," the Spanish term for "freezers" or "iceboxes," because they are so cold.  Defendants expose Tucson Sector detainees to painfully low temperatures without proper clothing

---

http://www.uchastings.edu/ centers/cgrs-docs/ treacherous-journey-cgrs-kind-report.pdf; *Invisible Victims: Migrants on the Move in Mexico*, Amnesty Int'l (2010), *available at* https://fusiondotnet.files.wordpress.com/2014/09 /amr410142010eng.pdf; Erin Siegal & Deborah Bonello, *Is rape the price to pay for migrant women chasing the American Dream?*, Fusion (Sept. 10, 2014), http://fusion.net/story/17321/is-rape-the-price-to-pay-for-migrant-women-chasing-the-american-dream/; Jude Joffe Block, *Women crossing the border face sexual assault with little protection*, PBS News Hour (Mar. 31, 2014), *available at* http://www.pbs.org/newshour/updates/ facing-risk-rape-migrant-women-prepare-birth-control/

or blankets.  Indeed, CBP officials force detainees to remove extra layers of clothing before entering the frigid cells.  CBP officials regularly ignore detainees' complaints about the cold cells, and it has been reported that officials threaten to make the cells even colder as punishment for complaining about the temperature.

6.      Defendants systematically deny Plaintiffs and putative class members' basic hygiene items.  Detainees in Tucson Sector holding cells have no access to soap, showers, towels, toothpaste, or toothbrushes.  Cells are dirty and not regularly or properly cleaned and are not equipped with waste receptacles.  Women are not regularly provided an adequate supply of sanitary napkins, and women with babies are not given enough diapers to keep them clean.  Shortages of toilet paper are not promptly remedied.  Without soap, detainees cannot adequately wash their hands before eating and after using the toilet, exacerbating the squalor and increasing the risk of illness and transmission.

7.      Plaintiffs and putative class members often are dehydrated, hungry, and sick as a result of walking in the desert, but Defendants do not provide them with sufficient access to clean drinking water or food.  Sometimes detainees receive no food or drinking water at all.  What Defendants do provide for detainees to eat is exceedingly minimal, cold, and/or expired, and is consistently described by detainees as being nearly inedible.

8.      Many detainees arrive at CBP custody with serious medical conditions, often resulting from walking for days in the desert.  Defendants do not adequately screen for dangerous or life-threatening medical conditions, do not provide detainees access to qualified medical personnel in response to detainees' ongoing or emergent medical issues, and fail to provide medically appropriate administration of medicines to detainees.  When one detainee asked agents to help her seven-year-old U.S. citizen daughter, who was in pain from what she believed was an ear infection, an agent told her, "There is no medicine here."  By failing to screen detainees for medical conditions, including communicable illnesses, before placing them in squalid, overcrowded

holding cells, Defendants endanger the health of detainees and increase the risk that illnesses can spread amongst detainees.

9.      Defendants do not allow detained individuals out of the holding cells for the duration of their detention, except for official questioning, and detainees are effectively cut off from the outside world.  Defendants also deny access to phones to secure or communicate with legal counsel or to call loved ones.  Held virtually incommunicado, and under conditions that amount to an inherently coercive environment, detainees often are pressured by agents into giving up their legal rights by signing legal documents they do not understand, often in a language they cannot read— documents that can lead to deportation without further legal process afforded under the law.  For example, many are discouraged or impeded from seeking asylum or similar protection despite their fear of returning to serious harm in their countries of origin.

10.      The inhumane and dangerous conditions in the Tucson Sector facilities result in irreparable, ongoing physical and psychological harm to Plaintiffs and putative class members and serious risk of future harm.

11.      The overall conditions of Defendants' holding cells deny the humanity of those held within their walls, with such intolerable results as the denial of prescribed pain medication to a pregnant woman with a broken foot; the failure to provide medical attention to another woman suffering heavy vaginal bleeding; children as young as four years old stripped of warm clothing and left crying through the night from cold and hunger; detainees sick, exhausted, and shivering, pleading for guards to turn up the temperature; and the repeated response of agents that these conditions are the price to be paid for coming to United States.  In the words of one detainee: "It felt like we were being treated like animals and not as human beings."  Other detainees characterized the experience as "inhumane and degrading," "humiliating," and "like a form of torture." Still another described "[t]he lack of food and sleep, and the cold and overcrowding" as "constant and punishing."

1    12.    As set out below, these harsh, excessive, and punitive conditions are

2 publicly documented and well-known to Defendants.  Defendants nonetheless have

3 been intentionally indifferent to these conditions and the irreparable harm and risk of

4 harm they cause to Plaintiffs and many thousands of other vulnerable individuals like

5 them.  Defendants have not remedied these problems or made the changes needed to

6 ensure that Plaintiffs and putative class members experience humane, lawful conditions

7 for so long as they are detained.  Court intervention is therefore required.

8                          **JURISDICTION AND VENUE**

9    13.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331

10 and 1346.  Defendants have waived sovereign immunity for purposes of this suit

11 pursuant to 5 U.S.C. § 702.  The Court has authority to grant declaratory relief under 28

12 U.S.C. §§ 2201 and 2202.

13    14.    Venue is proper in this District under 28 U.S.C. §§ 1391(b) and (e).  All

14 Defendants are sued in their official capacity.  All of the events giving rise to this

15 Complaint occurred within this District.

16                                   **PARTIES**

17    15.    Plaintiff Jane Doe #1 is currently detained in the Tucson Border Patrol

18 Station facility in Tucson, Arizona.

19    16.    Plaintiff Jane Doe #1 came to the United States out of fear for her life and

20 fears death if she is returned to her home country.

21    17.    Plaintiff Jane Doe #1 has been detained in CBP custody for

22 approximately thirty hours total.  Plaintiff Jane Doe #1 has spent one night in Border

23 Patrol detention.

24    18.    Prior to arrival to the Border Patrol's Tucson facility, Plaintiff Jane Doe

25 #1 was detained in Border Patrol's facility in Casa Grande for approximately twenty-

26 four hours.

27    19.    Upon arrival to that facility, Plaintiff Jane Doe #1 was forced to remove

28 her sweatshirt before being placed in a holding cell.

20.     Plaintiff Jane Doe #1 was not screened for medical conditions or illnesses.  She does have a concern with an abrasion on her left foot, but has had no opportunity to have it looked at by a medical professional.

21.     The temperature of the holding cell in which Plaintiff Jane Doe #1 was detained is extremely cold.  She was detained with her sister, and they held each to keep warm.  Plaintiff Jane Doe #1 said that if she had been detained alone without her sister she does not know how she could have kept warm at the Casa Grande facility.

22.     The holding cell in which Plaintiff Jane Doe #1 was detained is furnished only with approximately two concrete benches.  She tried to sleep on the concrete bench, but almost fell off so had to sleep on the floor.

23.     Plaintiff Jane Doe #1 was not provided access to showers, toothpaste, or toothbrush at either the Casa Grande facility or the Tucson facility.  There was no soap at the Casa Grande facility.  There was only the ability to use hand sanitizer when one of the guards took Plaintiff Jane Doe #1 out of the cell to be interviewed and there was hand sanitizer in his office.

24.     In Casa Grande, there was a toilet in the cell and there was no privacy because the guards can see inside.  Plaintiff Jane Doe #1 knows the guards can see inside while they are using the restroom because when one guard took her out of the cell to interview her he said to her that she should be sure to use the hand sanitizer because she used the bathroom.  Plaintiff Jane Doe #1 asked if he could see her when she was using the restroom and understood that he could.  The guard made her feel like an animal because she felt like he was saying to her "put on alcohol so you won't contaminate us."

25.     One of the women who was being held in the cell with Plaintiff Jane Doe #1 at the Tucson Border Patrol facility told Plaintiff Jane Doe #1 that she got her period yesterday and she kept knocking on the door to try to get a sanitary napkin from the guards, but the guards would not give her anything, and they wouldn't even come to the door.  The other woman told Jane Doe #1 that she had to use toilet paper and it

1   wasn't until today that another group of women arrived to the cell and she was able to

2   ask again and finally got a sanitary napkin.

3       26.   Plaintiff Jane Doe #1 was not provided access to a bed or bedding.  She

4   had to sleep on the cold concrete floor in order to sleep.  She only got about five hours

5   sleep, if that, because the lights were kept on all day and all night at the Casa Grande

6   facility.  The guards would come in and ask them questions when they were trying to

7   sleep—it was very tense.

8       27.   Plaintiff Jane Doe #1 was provided only a thin aluminum blanket.  That

9   blanket was insufficient to provide warmth to Plaintiff Jane Doe #1.

10      28.   Plaintiff Jane Doe #1 has been provided only a small amount of food

11  while detained by Border Patrol.  She was given two packets of cookies and a small

12  juice box when she arrived at the Casa Grande facility, later she was given a small

13  burrito, which tasted very bad.  Finally, before leaving for the Tucson facility, she was

14  given another small burrito and a juice box. As a result, Plaintiff Jane Doe #1 is

15  extremely hungry.

16      29.   In the Border Patrol facility in which Plaintiff Jane Doe #1 was held, the

17  only water provided to Jane Doe #1 came from a small faucet on top of the toilet in the

18  cell.  There was a sign that said "drinking water here."  You had to push a button to get

19  the water, but it tasted awful.  The only way that Plaintiff Jane Doe #1 could handle

20  drinking the water was to alternate with a sip or two of juice because it tasted awful.

21  Plaintiff Jane Doe #1 said she forced herself to do this out of necessity.

22      30.   When Plaintiff Jane Doe #1 was first apprehended by Border Patrol in

23  the desert in Arizona, she was tied hand to hand with the other individuals she was

24  detained with.  The Border Patrol officers made Plaintiff Jane Doe #1 and the other

25  individuals sit in the hot desert for almost two hours.  During this time, the Border

26  Patrol officers were taking photos with their dog and letting the dog run freely between

27  the detained women and men.  There were about four or five Border Patrol officers,

28  and one dog.  It was very scary and the dog was really aggressive.   One of the

individuals detained asked why the Border Patrol officers were taking photos and they said it was for the dog's Facebook page.  During this order, Plaintiff Jane Doe #1 was getting dehydrated.

31.     While they were being held in the desert sun, one of the Border Patrol officers asked the group if they were hungry, when they said yes, the officer mocked them by saying "oh, we are about to go to the store."

32.     After being in the sun with the dog, Plaintiff Jane Doe #1 was transported with about 9 other people in one van.  It was so crowded in the van that one of them sat on the floor.  They were basically piled on top of each other.  They were transported to the Casa Grande facility.

33.     After arriving to Border Patrol custody, Plaintiff Jane Doe #1 signed legal documents that Plaintiff Jane Doe #1 did not understand.

34.     On June 8, after approximately 24 hours in detention, Plaintiff Jane Doe #1 was transferred to Border Patrol's Tucson facility.  Plaintiff has been detained in the Tucson facility for approximately three additional hours.  The conditions in the Tucson facility are substantially similar to those Plaintiff Jane Doe #1 experienced in the Casa Grande facility, as described above, except that the temperature at the Tucson facility is even colder and more uncomfortable.

35.     Plaintiff Jane Doe #2 is currently detained in the Tucson Border Patrol Station facility in Tucson, Arizona.

36.     On June 7, 2015, at approximately 11:00 a.m., Plaintiff Jane Doe #2 was apprehended along with her sister and a group of approximately ten people by Border Patrol agents in southern Arizona.

37.     After being apprehended, the group was handcuffed and left in the hot sun for two hours.  They were not provided with food or water.  The agents' service canine was let loose and allowed to circle and approach the group unrestrained.  The dog stepped on Plaintiff Jane Doe #2.  Agents took pictures with their cell phones, laughed, and joked that the photographs were "for the dog's Facebook account."

38.     Plaintiff Jane Doe #2 and the rest of the group were placed in a Border Patrol vehicle and driven to Border Patrol's facility in Casa Grande, Arizona.  Plaintiff Jane Doe #2 was detained in that facility for approximately twenty-four hours.

39.     Prior to arrival to the Casa Grande facility, Plaintiff was forced to remove her outer layers of clothing.  She was detained wearing only a short-sleeved shirt, pants, and shoes.

40.     At the Casa Grande facility, Plaintiff Jane Doe #2 was not screened for medical conditions or illnesses.  An agent simply asked her if she was "okay."

41.     The temperature of the holding cell in which Plaintiff Jane Doe #2 was detained was very cold.  Plaintiff Jane Doe #2 was not given additional clothing and was only provided with a thin aluminum blanket.

42.     The holding cell in which Plaintiff Jane Doe #2 was detained was furnished only with concrete benches.

43.     Plaintiff Jane Doe #2 was not provided access to a bed or bedding.  She slept on the concrete floor of the cell.

44.     Plaintiff Jane Doe #2 was not provided access to showers, toothpaste, a toothbrush, soap, towels, or cleaning supplies.

45.     In the Border Patrol facility in which Plaintiff Jane Doe #2 was held, the lights were kept on all night.  The lights and the lack of beds made it very difficult for Plaintiff Jane Doe #2 to sleep.

46.     Plaintiff Jane Doe #2 has been provided little food while detained by Border Patrol.  Plaintiff Jane Doe #2 has sporadically received burritos, cookies, and juice and has been hungry as a result.

47.     In the Border Patrol facility in which Plaintiff Jane Doe #2 was held, the only water provided to Plaintiff Jane Doe #2 came from the sink above the toilet.  There were no cups from which to drink and the water had a bad taste.

48.     On June 8, 2015, after one night and approximately twenty-four hours in detention in the Casa Grande facility, Plaintiff Jane Doe #2 was transferred to Border

1   Patrol's Tucson facility.  Plaintiff has been detained in the Tucson facility for

2   approximately three hours.

3         49.     Plaintiff's hold room in the Tucson facility is even colder than the room

4   in which she was held in Casa Grande.  In most other respects, the conditions in the

5   Tucson facility are substantially similar to those Plaintiff Jane Doe #2 experienced in

6   the Casa Grande facility, as described above.  Plaintiff Jane Doe #2 has no access to

7   beds or bedding, soap, towels, toothpaste, or a toothbrush.  Plaintiff Jane Doe #2 has

8   not been able to shower or bathe since she was detained.

9         50.     Plaintiff Jane Doe #2 has been detained in CBP custody for

10   approximately thirty hours in total.  Plaintiff Jane Doe #2 has spent one night in Border

11   Patrol detention.

12         51.     Plaintiff Jane Doe #2 fears returning to her home country.

13         52.     Plaintiff Norlan Flores is a thirty-four-year-old Nicaraguan native who

14   has resided in Tucson, Arizona for approximately nine years.  Plaintiff Flores has twice

15   been detained by Border Patrol agents in a holding cell in the Tucson Border Patrol

16   Station.  Based upon these past detentions, he fears that at any time he again could be

17   detained by Border Patrol agents in a holding cell at the Tucson Border Patrol Station.

18         53.     Plaintiff Flores was first detained in a CBP holding cell for three days in

19   or around 2007.  The cell in which he was held was extremely cold and had no beds or

20   bedding; consequently he was able to sleep very little during the entire three days.

21   Plaintiff Flores also was very hungry throughout his entire detention; he never received

22   a meal, but instead was periodically given only juice and crackers.  Despite being very

23   thirsty, he could not drink very much water because the tap water—the only water

24   available—tasted so bad and the Border Patrol agents provided no drinking cups.

25   Because there was no soap in the holding cell, Plaintiff Flores was unable to wash his

26   hands after he used the toilet or before he ate.  Plaintiff Flores was not given access to

27   showers or towels and he could not bathe for three days.  He was not given a

28

toothbrush or toothpaste and could not brush his teeth while detained.  Plaintiff Flores was never given the opportunity to speak with an attorney or with his consulate.

54.    In 2011, Plaintiff Flores was the victim of an assault.  In 2012, he began the process of applying for a U Nonimmigrant visa as the victim of a crime who had cooperated with the authorities, by formally asking the local Sheriff's Department to certify his Petition for a U visa—the requisite first step to obtaining such a visa.  In or about August, 2014, Plaintiff Flores received the necessary certification from the Sheriff's office.  He then filed the U Nonimmigrant visa petition with the United States Department of Homeland Security ("DHS").  Recently, his petition was approved and he received a U Nonimmigrant visa, which allows him to live and work in the United States.

55.    On August 10, 2014, while returning to the hospital following the birth of his daughter, Plaintiff Flores was arrested by the Tucson Police for a minor traffic violation.  Border Patrol agents arrived at the scene and took him to the Tucson Border Patrol Station.

56.    Plaintiff Flores was held at the Tucson Border Patrol Station for approximately 36 hours in four different holding cells.  None of the cells had beds or bedding; consequently he and others had to attempt to sleep sitting up or—if the cell was not too crowded—lying on the floor.  Plaintiff Flores got little to no sleep during his 36 hour detention.  He was held for 24 hours with about 130 other men all crowded together "like sardines" in a cell with a posted occupancy of roughly half that number.  At times, there was no room for Plaintiff Flores to lie down in this cell.

57.    The lights were kept on all night in each of the cells in which Plaintiff Flores was held, and each cell was extremely cold.  Border Patrol agents ordered Plaintiff Flores to hand over all but one layer of clothing when he arrived.  With only a t-shirt, pants and shoes—and a thin aluminum sheet that did not keep him warm— Plaintiff Flores spent much of the time shivering from the cold.

58.     During Plaintiff Flores' detention in the Tucson Border Patrol Station, none of the cells had soap, towels, or showers.  He was unable to wash even his hands after using the toilet or before eating, and could not shower the entire time.  Because Plaintiff Flores was not given a toothbrush or toothpaste, he could not brush his teeth.

59.     All of the cells were filthy and smelled terrible.  There was garbage on the floor of all of the cells and no trash bins.  The only time the cell was cleaned during his detention was by several inmates who had been offered an extra burrito in exchange for cleaning the cell.  Even after that cleaning, the cell was filthy and littered with trash. In one cell, there was no toilet paper.  In the last cell, in which 130 people were held, one of the three toilets did not work, and men had to wait in line to use the remaining two.  The foul smell was overpowering.

60.     For more than eight hours, Plaintiff Flores received only crackers and juice.  Eventually, Border Patrol agents gave each detainee a small burrito, but the conditions in the cell were so terrible—due to the filth, the stench, the overcrowding, and the cold—that Plaintiff Flores was not able to eat.  Some of the other detainees in the cell complained of stomach pain and of feeling sick, but the Border Patrol agents ignored them.

61.     Access to water was extremely limited.  In the first cell, there was no water.  Later, there was a water container, but no cups, and when the water ran out, agents did not replenish it for hours at a time.  Plaintiff Flores had to refashion a used juice container into a cup in order to drink water.

62.     Plaintiff Flores was not screened for any medical conditions at any point during his detention.  Several other detainees were vomiting and suffering from diarrhea but they did not receive medical attention.

63.     At the time he was detained, Plaintiff Flores was in possession of a valid Form G-28 "Notice of Entry of Appearance as Attorney," signed by his immigration attorney.  Nonetheless, he was not able to speak or meet with his attorney while detained in Border Patrol custody.

64.     Plaintiff Flores remains very apprehensive about being detained again by Border Patrol.  Although his U visa was approved, there is a backlog of available visas, so Plaintiff Flores is still waiting to obtain the visa.  Unless or until he has finally obtained the visa and then applied for and received permanent residency status—which won't be for at least another three and a half years—Plaintiff Flores believes he could be detained by Border Patrol again.[2]

65.     Defendant Jeh Johnson, the Secretary of DHS, is charged with enforcing and administering the immigration laws.  He oversees each of the component agencies within DHS, including CBP and its subdivision the Border Patrol, and has ultimate authority over all policies, procedures, and practices relating to CBP facilities, including holding cells within Border Patrol facilities.  He is responsible for ensuring that all individuals held in CBP custody are detained in accordance with the Constitution and all relevant laws.  Defendant Johnson is sued in his official capacity.

66.     Defendant R. Gil Kerlikowske is Commissioner of CBP.  In that capacity, Defendant Kerlikowske has direct authority over all CBP policies, procedures, and practices relating to CBP facilities, including holding cells within Border Patrol facilities.  He is responsible for ensuring that all individuals held in CBP custody are detained in accordance with the Constitution and all relevant laws.  Defendant Kerlikowske is sued in his official capacity.

67.     Defendant Michael J. Fisher is Chief of the Border Patrol.  In that capacity, Defendant Fisher has direct responsibility for policies, procedures, and practices relating to Border Patrol facilities, including the holding cells in such facilities.  He is responsible for ensuring that all individuals held in Border Patrol custody are detained in accordance with the Constitution and all relevant laws.  Defendant Fisher is sued in his official capacity.

---

[2] *See* Press Release, *ACLU Obtains Judgment Against Arizona Sheriffs & Pinal Cnty. Based On Officers' Use of S.B. No.1070 "Show Me the Papers" Law*, ACLU (December 18, 2014), https://www.aclu.org/news/aclu-obtains-judgment-against-arizona-sheriffs-and-pinal-county-based-officers-use-sb-1070-show.

1      68.     Defendant Jeffrey Self is Commander of the Arizona Joint Field

2  Command of CBP.  In that capacity, Defendant Self has direct responsibility for

3  policies, procedures, and practices relating to Border Patrol facilities, including their

4  holding cells, in the Tucson Sector.  He is responsible for ensuring that all individuals

5  held in Border Patrol custody in the Tucson Sector are detained in accordance with the

6  Constitution and all relevant laws.  Defendant Self is sued in his official capacity.

7      69.     Defendant Manuel Padilla, Jr. is the Chief Patrol Agent for the Border

8  Patrol's Tucson Sector.  In that capacity, Defendant Padilla has direct responsibility for

9  policies, procedures, and practices relating to Border Patrol facilities, including their

10  holding cells, in the Tucson Sector.  He is responsible for ensuring that all individuals

11  held in Border Patrol custody in the Tucson Sector are detained in accordance with the

12  Constitution and all relevant laws.  Defendant Padilla is sued in his official capacity.

13                          **FACTUAL BACKGROUND**

14      70.     CBP maintains and operates detention facilities in its Tucson Sector,

15  including facilities in Bisbee ("Brian A. Terry Station," also known as the "Naco

16  Station"), Casa Grande ("Casa Grande Station"), Douglas ("Douglas Station"), Nogales

17  ("Nogales Station"), Sonoita ("Sonoita Station"), Tucson ("Tucson Station"), Why

18  ("Ajo Station"), Willcox ("Willcox Station"), and Three Points ("Three Points

19  Substation"), among other detention facilities, all of which are located in Cochise,

20  Pima, Pinal, and Santa Cruz Counties of Arizona.[3] These facilities, which include

21  Border Patrol Sector Headquarters, Stations, Substations, Ports of Entry, and Forward

22  Operating Bases, contain holding cells (or "hold rooms") in which individuals

23  apprehended by CBP and Border Patrol agents are confined pending processing and

24  transport or release.

25      71.     Of the 479,371 Border Patrol apprehensions along the U.S.-Mexico

26  border reported for Fiscal Year 2014, approximately 18 percent occurred in the Tucson

27  ───────────────

28  [3] *See Tucson Sector Arizona*, United States Customs & Border Protection,
http://www.cbp.gov/border-security/along-us-borders/border-patrol-sectors/tucson-sector-arizona.

Sector.  Border Patrol has reported more than 200,000 Tucson Sector apprehensions during the past two years alone.  Every year, Border Patrol confines tens of thousands of the men, women, and children it apprehends in its Tucson Sector holding cells.

72.     Plaintiffs are among those detained by the Tucson Sector Border Patrol. They and those they seek to represent are all civil detainees.  Plaintiffs and putative class members all have been or will be apprehended by Border Patrol agents, most often based upon alleged suspicion that they are noncitizens unlawfully present in the United States.  All have been or will be confined in Tucson Sector holding cells while Border Patrol agents complete initial processing.

73.     Individuals apprehended and detained by CBP in the Tucson Sector are subject to transfer to and detention in multiple CBP facilities prior to being transferred to another agency, repatriated, or released.  In some cases, detainees are held for extended periods, including overnight, in Border Patrol vehicles or Port of Entry holding cells without sinks or easy access to toilets, while awaiting transfer to the next facility.

74.     After processing, detained individuals are either released, repatriated, transferred to another CBP facility, or transferred to the custody of another agency—either to Immigration and Customs Enforcement ("ICE") for civil removal proceedings, to the United States Marshals Service for possible federal criminal proceedings, or, if the detainee is an unaccompanied minor, to the Office of Refugee Resettlement ("ORR") within the Department of Health and Human Services.  This process regularly takes multiple days.  Throughout these days and nights, detainees are confined to holding cells.

75.     Defendants have promulgated extensive policies and procedures related to the operation of holding cells, from detailed design and construction requirements to detention standards governing the provision of food, water, and medical care, among other protocols.  Defendants are responsible for the promulgation and implementation of those policies and procedures.  Defendants also are responsible for oversight and

1   monitoring of compliance with applicable laws, policies, and procedures as well as for

2   the training and supervision necessary to ensure compliance.

3   76.   Detention policies and procedures implemented or followed in the

4   Tucson Sector facilities must be consistent with national policies and standards.  These

5   national policies are described in numerous documents including a June 2, 2008

6   Memorandum regarding "Hold Rooms and Short Term Custody" issued by CBP

7   (hereafter "2008 Memorandum") and a CBP Security Policy and Procedures

8   Handbook, HB1400-02B (hereafter "2009 CBP Handbook").[4]

9   77.   CBP's policies "implement[] security policies and standards published in

10   a number of relevant source documents including numerous Public Laws, Presidential

11   Directives, regulations, rules, Interagency Security Committee security design criteria,

12   and U.S. Department of Homeland Security (DHS) Management Directives (MD)

13   regarding integrating, managing, and governing various Security functions."  (2009

14   CBP Handbook, Foreword by Acting Commissioner Jayson Ahern.)

15   78.   While Defendants' national policies set minimum standards for detention

16   conditions in holding cells, they do not satisfy constitutional requirements.

17   Defendants' policies and procedures are a cause of irreparable bodily and

18   psychological harm to Plaintiffs and putative class members. In practice, Defendants

19   fail to follow even the inadequate policies they have promulgated, further increasing

20   the harm and risk of harm to Plaintiffs and others like them.

21   79.   The conditions experienced by the Plaintiffs are standard in holding cells

22   in all short-term holding CBP facilities currently operated within the Tucson Sector and

23   thus have been or will be experienced by all putative class members.

24   80.   Defendants have subjected each of the Plaintiffs to prolonged detention

25   for one or more nights.

26

27   [4] Memorandum, *Hold Rooms and Short Term Custody*, U.S. Customs & Border Patrol
    (June 2, 2008), *available at* https://www.documentcloud.org/documents/818095-bp-
    policy-on-hold-rooms-and-short-term-custody.html; *Security Policy & Procedures
28   Handbook, HB1400-02B*, U.S. Customs & Border Patrol at p. 492 (Aug. 13, 2009),
    *available at* https://publicintelligence.net/cbp-security-procedures-handbook/.

81.     Defendants deny all of the Plaintiffs access to a bed, mattress, or other adequate bedding.

82.     None of the Plaintiffs has been able to sleep adequately due to the extreme cold, lack of beds, the bright lights left on at all times, and other conditions.

83.     Defendants deny all of the Plaintiffs access to hygiene supplies including, soap, towels, sanitary napkins, diapers, toothbrushes, and toothpaste.

84.     None of the Plaintiffs has been permitted to bathe or shower.

85.     None of the Plaintiffs were adequately screened for medical conditions.

86.     None of the Plaintiffs has been provided nutritionally adequate food or clean drinking water.

87.     Over the past year, Plaintiffs' counsel conducted interviews with, and took declarations from, more than 75 individuals (hereinafter "former detainees") who, collectively, were detained in all eight of the Tucson Sector CBP facilities at various times in 2014 and 2015.

88.     The descriptions of the holding cells by the former detainees are consistent in all material respects with the Plaintiffs' descriptions of the holding cells in which they are detained.  All of these individuals describe CBP detention facilities in which men, women, and children—including asylum seekers, pregnant women, and U.S. citizens, some of them toddlers and infants—are held in conditions that are dangerous, inhumane, and punitive.

### A.     Defendants Detain a Large Number of Individuals in Overcrowded Holding Cells.

89.     CBP defines a holding cell (also referred to as a "hold room") as an area such as a detention cell, a search room, or an interview room in which detained persons are temporarily held pending processing or transfer.[5]  Holding cells vary in dimension but are generally rectangular, concrete, and minimally furnished.  They are equipped with concrete, metal, or wooden benches affixed to the floors and walls, but have no

---

[5] 2008 Memorandum § 3.3.

beds or other furniture.  Toilets and sinks are located within the cells and only partially shielded from view by short metal or concrete partitions.

90.     According to CBP's policies, the minimum square footage for multiple occupancy rooms is thirty-seven square feet for the first occupant and seven square feet of unencumbered space for each additional occupant.  "(Unencumbered is usable space that is not encumbered by fixtures or furnishings)."  (2009 CBP Handbook at pp.492-93.)  On information and belief, signs displaying maximum hold room capacity are posted in many, if not all, holding cells.

91.     Notwithstanding Defendants' policies specifying the size and maximum occupancy of holding cells, Defendants regularly permit the number of detainees in holding cells to exceed the specified capacity, resulting in severe overcrowding and often making it impossible for all detainees in the holding cell to sit or lie down.  As one former detainee explained, "We were like cigarettes stuffed" in the cell.  Another detainee explained that it was so crowded that, if a detainee used the restroom, he would lose his spot on the floor and have to stand.  Some detainees are left with no other option but to lie on the floor next to the toilets.

92.     Defendants detain unreasonably large numbers of individuals in these holding cells, in violation of Defendants' own guidelines and despite available alternatives.

93.     The overcrowded conditions exacerbate the serious harms and risks of harm from the constitutionally inadequate conditions and punitive practices described in detail below.

**B.      Plaintiffs and Putative Class Members are Kept Overnight in Holding Cells That Are Not Equipped for Overnight Sleeping.**

94.     Although CBP policy indicates that adult detainees should be held for no more than twelve hours and be moved "promptly,"[6] most detainees are held for much longer.

_____

[6] See, e.g., 2008 Memorandum § 6.2.1; id. § 6.2.2 (encouraging agents to "make every effort to promptly move the detainee(s)"); id. §§ 6.2.1, 6.2.2 (advising that detainees

95.     CBP data provided in response to a Freedom of Information Act ("FOIA") request indicates that from January 1, 2013 to June 30, 2013, 72,198 individuals were detained in its Tucson Sector facilities.  Of these, 58,083 individuals, or 80.4 percent of the total number, were in Border Patrol custody for 24 hours or longer.  Over 24,832, or 34.4 percent, were held for 48 hours or more, and 7,839, or 10.9 percent, were held for 72 hours or more.

96.     CBP policies and practices, including the agency's "Consequence Delivery System" ("CDS"),[7] guarantee that large numbers of detainees will be forced to spend multiple nights in inhumane and degrading conditions.  For example, consistent with the agency's CDS policy, Border Patrol screens Tucson Sector detainees for referral to "Operation Streamline" proceedings,[8] in which dozens of individuals enter guilty pleas on federal unauthorized entry charges in a single hearing.  In Tucson, these proceedings are held every weekday afternoon.  Thus, any individual who is apprehended on a Friday and referred for Operation Streamline proceedings will spend a minimum of three nights in Border Patrol custody, while individuals detained during a weekend will spend at least one and often two nights in custody, prior to referral for a Monday hearing.  In Tucson, thousands of individuals are referred for these proceedings annually.

"*should not* be held for more than 12 hours," and that "every effort will be made to promptly process, transfer, transport, remove, or release those in custody as appropriate and as operationally feasible") (emphasis added).

[7] Border Patrol's "Consequence Delivery System" ("CDS") applies "targeted enforcement techniques," including but not limited to criminal prosecution, to unauthorized border crossers.  According to the Border Patrol, the CDS is designed to "apply the appropriate post-arrest consequences…to break the smuggling cycle and end the subject's desire to attempt further illegal entry."  *See 2012-2016 Border Patrol Strategic Plan*, U.S. Customs & Border Patrol, at p. 17, *available at* http://www.cbp.gov/sites/default/files/documents/bp_strategic_plan.pdf.

[8] Operation Streamline "is a partnership program among CBP, U.S. Attorneys, and District Court judges in certain border districts to expedite criminal justice processing.  The program permits groups of criminal defendants to have their cases heard at the same time . . . and arranges in most cases for aliens facing felony charges for illegal re-entry to plead guilty to misdemeanor illegal entry charges."  *Border Security between Ports of Entry*, Congressional Research Service at p. 8 (Dec. 18, 2014), *available at* https://www.fas.org/sgp/crs/homesec/R42138.pdf.

97.     All of the Plaintiffs were detained overnight.  The named Plaintiffs' experiences in the holding cells are consistent with those of former detainees, all of whom were held overnight and some of whom also were held for extended periods in holding cells at Ports of Entry ("POE") or in vans or buses awaiting transfers.

**C.     Plaintiffs and Other Detainees Are Subjected to Conditions that Deprive Them of Sleep.**

98.     Defendants' policy is to deny detainees access to beds.  Despite the fact that most detainees are held overnight and often for multiple days and nights, Tucson Sector holding cells are not equipped with beds.

99.     The 2009 CBP Handbook lists among the "requirements" of a hold room: "No beds; a hold room is not designed for sleeping."

100.    Because there are no beds, Plaintiffs and others detained by Border Patrol overnight or for multiple nights must attempt to sleep on the limited number of metal, wood or concrete benches, or if none are available, to sleep sitting or lying on the filthy, frigid, concrete floor.

101.    Additionally, Defendants have a practice of denying detainees, including Plaintiffs, access to mattresses, pillows, and other bedding in violation of Defendants' own policies.  CBP's policies state: "Detainees requiring bedding will be given clean bedding.  Only one detainee will use this bedding between cleanings.  This bedding will be changed every three days and cleaned before it is issued to another detainee. Vinyl or rubber-coated mattresses will be disinfected before being reissued."[9]

102.    Defendants generally provide detainees with a single, thin aluminum sheet to serve as a blanket, and nothing else.

103.    None of the Plaintiffs or former detainees had access to a bed while confined in any of the CBP facilities in which they were held, and the vast majority of former detainees—including women detained with children—were forced to spend the night on a cold cement floor or a hard bench with no mattress and no bedding.  One

---

[9] 2008 Memorandum § 6.11.

mother recounted staying awake all night to ensure that her five-year old daughter—who was sleeping on a concrete bench—would not roll over and onto the floor.

104.   Defendants consistently maintain holding cells at extremely cold temperatures, causing detainees pain and discomfort and significantly impeding their ability to sleep.  A former detainee compared his attempt to sleep on the cold concrete floor to "trying to sleep on ice."  The single, thin aluminum sheets Defendants provide to detained individuals are insufficient to serve as bedding.  Most former detainees said that the aluminum sheet provided was insufficient to provide protection from the extreme cold, which made sleep difficult or impossible.  Nearly all former detainees who requested additional aluminum sheets were refused, even when their originally-issued sheets were damaged.

105.   In addition, as outlined above, Defendants regularly permit the number of detainees in holding cells to exceed the specified capacity, resulting in severe overcrowding and often making it impossible for detainees in the holding cell to sit or lie down.  Former detainees describe holding cells as so overcrowded that there is no available space or room to move, forcing some detainees to lie on the floor surrounding the toilets; others are forced to stand through the night.  One detainee recalled not being able to sleep for two nights because there was no place to sit or lie down: "My back became sore from standing.  There were people all around me, including at my feet."  Another detainee gave his space on the floor to an injured man and as a result, he "had to try and sleep standing."

106.   Defendants leave hold room lights on at all times, including overnight, further impairing Plaintiffs' and other detainees' ability to sleep.

107.   Because detainees are denied beds and instead are forced to attempt to sleep on cold, hard surfaces, and are subjected to extremely cold temperatures without sufficient clothing or blankets, in holding cells that are noisy and overcrowded, and because the lights are often left on twenty-four hours a day, it is difficult or impossible for detainees to sleep.  For those detainees who are able to sleep, it is often only fitfully

and for short periods.  The deprivation of sleep both creates a risk of and actually causes physical and psychological harm to Plaintiffs and putative class members.

### D. Plaintiffs and Putative Class Members are Subjected to Painful and Punitively Cold Temperatures.

108.    Defendants maintain extremely cold temperatures in CBP holding cells, yet per Defendants' policy, Border Patrol agents only allow Plaintiffs and other detainees to wear one layer of clothing and provide them with only a thin aluminum sheet that is insufficient to provide adequate warmth.

109.    Border Patrol strips detainees who arrive at CBP facilities—including young children—of any jackets, sweaters, or additional layers of clothing before they enter the holding cells.  Border Patrol agents regularly refuse detainees' requests for additional layers of clothing or blankets, despite the extreme cold.

110.    The sudden exposure to extremely cold temperatures is particularly harmful—physically and psychologically—to individuals who are already suffering from impairments, such as heat stroke and dehydration.

111.    The intentionally low temperatures in the holding cells—or "ice boxes" as they are uniformly called by detainees—are brutal for those confined to these spaces. As one detainee vividly recounted: "I now understand why dogs sleep in a little ball, to keep warm, but I couldn't even keep warm by doing that."  Parents describe their young children crying through the night because of the frigid temperature.  One former detainee described being detained after presenting herself and her four children at the Nogales Port of Entry: "We were so cold that my bones hurt and we were all shivering…My children were crying because of the cold and my ten year old and eight year old, who are both U.S. citizens, started to get sick because of the cold and developed a cough."  Another former detainee expressed that he contemplated accepting deportation solely to escape the extreme cold.

112.    Detainees' requests that Border Patrol agents turn up the temperature often are ignored, mocked, or result in threats of retaliation by the agents.  In some

instances, agents threaten to turn down the temperature even further if detainees complain or request that the temperature be turned up.[10]  Similarly, agents have used the temperature in the holding cells as a means of controlling behavior.  For example, agents have threatened to turn down the temperature if detainees did not stop talking among themselves, were too "loud," or asked for more food.  Some former detainees described feeling the cell become colder following threats such as these.

113.   Defendants' practice of maintaining punitive and painfully cold temperatures in Tucson Sector holding cells both creates a risk of and actually causes physical and psychological harm to Plaintiffs and putative class members.

### E.   Plaintiffs and Other Detainees Are Held in Filthy Cells and Not Given Regular Access to Basic Hygiene Products.

114.   CBP policy requires that all detainees "will be held in facilities that are safe, secure and clean.  Detainees will be provided food, water, properly equipped restrooms and hygiene supplies."[11]

115.   Despite this policy, Defendants have a practice of denying those detained in Tucson Sector facilities access to basic hygiene necessities such as soap, towels, toothpaste, toothbrushes, and showers.  None of the Plaintiffs or former detainees had access to soap, towels, toothpaste, or toothbrushes in any of the CBP facilities in which they were held; similarly, none were able to bathe while detained.

116.   Defendants' written policy specifically states that detainees shall be provided with soap after using the restroom.[12]  Yet, the Tucson Sector-wide practice is *not* to provide soap to detainees in holding cells.  Consequently, detainees are unable to

---

[10] The intentional manipulation of temperatures by Border Patrol officials as a form of abuse was documented by the humanitarian aid organization No More Deaths ("NMD") in 2011.  *Culture of Cruelty: Abuse & Impunity In Short-Term U.S. Border Patrol Custody*, No More Deaths (2011), *available at* http://forms.nomoredeaths.org/abuse-documentation/a-culture-of-cruelty/appendix-official-documents/ (noting reports of agents "turning on the air conditioning or placing fans outside the cells after receiving complaints about cold cells") (hereafter "*Culture of Cruelty*").

[11] 2008 Memorandum § 5.1.

[12] 2008 Memorandum § 6.10.

1  wash their hands with soap even after using the toilet and before and after eating.  One

2  former detainee recounted that, not only was there no soap, but the sole sink in the

3  holding cell did not work.   Another explained that because there was no way for the

4  many people who had spent days walking in the desert to bathe, the "conditions

5  became disgusting with so many people packed into a cell in this way."

6    117.   Defendants have a practice of denying individuals detained in Tucson

7  Sector facilities, including Plaintiffs, access to showers and other bathing facilities.

8  Even Defendants' own policy provides that detainees held more than seventy-two

9  hours should be provided with showers.[13]   In practice, however, Defendants generally

10  fail to provide *any* individuals held in Tucson Sector facilities with an opportunity to

11  bathe.  Detainees, many of whom have been apprehended after days in the desert and/or

12  with serious health conditions, are unable to change clothes or to properly wash

13  themselves for days on end.  Former detainees have described the odors resulting from

14  the lack of hygiene as unbearable; in the words of one man, the smell was "awful, just

15  very ugly."

16    118.   Female detainees who are menstruating often are not provided with a

17  sufficient supply of sanitary napkins or a hygienic means for their disposal.  Women

18  needing additional napkins have been denied access to more.

19    119.   Adults with infants and toddlers are often not given an adequate supply of

20  diapers.  For example, one woman reported waiting nineteen hours for fresh diapers for

21  her child.  Another did not receive clean diapers for over twenty-eight hours while in

22  detention, and was forced to remove her two-year-old daughter's soiled diaper—with

23  nowhere to dispose of it—and had to "just be very attentive to whether or not [her

24  daughter] wanted to go to the bathroom."

25    120.   Detainees, including Plaintiffs, are not provided toothpaste or

26  toothbrushes.  As a result, detainees cannot brush their teeth during the entire time they

27  are in CBP custody.

28
_____

[13] 2008 Memorandum § 6.14.

1      121.   Detainees are often not provided an adequate supply of toilet paper.

2  Former detainees report that, upon running out of toilet paper, Border Patrol agents

3  have delayed in bringing more—in one case, for as long as eight hours.

4      122.   The harms caused by the absence of basic hygiene products are

5  exacerbated by the overcrowded and unsanitary conditions in the holding cells.

6      123.   CBP policy requires that "[s]upervisors will ensure that detention cells

7  are regularly cleaned and sanitized."[14]  This policy notwithstanding, Defendants have a

8  practice of failing to clean or sanitize holding cells regularly.  Defendants also fail to

9  make cleaning and sanitation supplies available.  Holding cells are often dirty and

10  littered with garbage and discarded food wrappers; piles of trash accumulate because

11  there are no waste bins, and cells are subject to only cursory and infrequent cleaning.

12  One woman recalled that there were "diapers, toilet paper and other trash strewn

13  around the bathroom area" when she arrived, and explained that she and others could

14  not clean the cell because there were no trash receptacles.

15      124.   CBP policy requires one working toilet for every fifteen detainees.[15]  In

16  practice, Defendants regularly pack large numbers of individuals into holding cells

17  such that the ratio of detainees to toilets far exceeds CBP's own guidelines.  One

18  woman described being in a cell with approximately fifty women and children, and

19  only one toilet.  As a result, there can be long queues for the limited toilet facilities

20  available.  Defendants also fail to clean and maintain holding cell toilets adequately.

21  Holding cell toilets frequently do not work, leaving even fewer available toilets for

22  detainees to use.  These unsanitary toilets are close to where the detainees eat and try to

23  sleep.

24      125.   While held in Border Patrol custody, detainees are not permitted to leave

25  the holding cells for the duration of their detention other than for official questioning,

26  further exacerbating the impact of the holding cells' filthy conditions on detainees.

27

28  [14] 2008 Memorandum § 6.16.

[15] 2009 CBP Handbook at p. 493.

1   There are no areas for exposure to natural light and air, recreation, or other outside

2   visits.

3       126.    As a result of Defendants' failure to clean or sanitize the filthy,

4   unsanitary, and overcrowded facilities, and to provide detainees with hygiene supplies

5   and access to showers in which to bathe, Plaintiffs and putative class members are at

6   risk of—and actually have suffered—psychological and physical harm, such as

7   infections and other communicable illnesses.

8       **F.    Plaintiffs and Other Detainees Are Denied Adequate Medical
            Screening and Access to Necessary Medical Care.**

9

10      127.    Although Defendants' policies state that detainees should be given access

11  to qualified medical personnel,[16] Defendants do not mandate or provide a medical

12  screening of all detainees for health problems—including for communicable diseases or

13  mental illness—prior to confining them.

14      128.    Many detainees have pre-existing medical conditions and/or recently

15  acquired medical conditions resulting from walking in harsh desert environments,

16  including dehydration, heat stroke, diarrhea, bleeding and blistered feet, and other

17  health conditions requiring immediate medical care.  Defendants nonetheless do not

18  adequately screen for or provide treatment for dangerous, communicable, and

19  potentially life-threatening conditions.

20      129.    Defendants do not mandate medically appropriate administration of

21  medicines to detainees in the holding cells, including prescription medicine.  All

22  medications are taken from detainees prior to their being confined.  Border Patrol

23  agents fail to provide access to medically qualified personnel consistently so that

24  detainees can obtain alternative medication prescribed in the United States.   One

25  former detainee arrived with a preexisting heart condition and asked for access to

26  prescribed medicine to deal with his condition.  Defendants refused his request.

27

28  _____
[16] 2008 Memorandum § 6.7.

130.   Another detainee asked agents to help her seven-year-old U.S. citizen daughter, who reported pain from what she believed was an ear infection.  An agent told her, "There is no medicine here."  A detainee with a fever reported her symptoms to an agent.  The agent responded, "I am not a doctor," and added that even if he had medicine he would not give it to her.

131.   Another detainee, an eight-months-pregnant woman with a broken ankle, received prescription pain medication from a local medical provider.  Upon return to the detention facility, however, agents confiscated the woman's medication and did not administer it as prescribed, despite her pained cries for help.  Agents told her not to cry because she "was just going to be deported."

132.   Defendants do not mandate or provide appropriate responses to detainees' ongoing or emergent medical issues.  Several former detainees have described that they asked to see a doctor and were refused.  One detainee, a pregnant woman, notified agents that she was pregnant; agents responded by mocking her, poking her abdomen, and denying she was pregnant.  Even when the woman was finally referred to a provider, she did not receive a medical examination.

133.   Another woman, a victim of sexual assault, reported heavy vaginal bleeding but did not receive any medical attention until after she was transferred to ICE custody five days later.  The same woman observed another detainee with swollen feet and in great pain, and another who was feverish and shaking, neither of whom received medical attention while she was detained with them.  Another described a six-year-old child vomiting through the night without receiving any medical attention.

134.   The inadequacy of necessary and emergency medical care for detainees confined in CBP holding cells has been documented repeatedly.  In 2011, the Tucson-based humanitarian organization No More Deaths ("NMD") reported that, following interviews with over 12,000 individuals released from Border Patrol custody, the majority of those who needed emergency medical care or medications were denied

treatment.[17]  A 2009 report on the treatment of unaccompanied children in CBP

custody from the Women's Refugee Commission discussed the inadequacy of

emergency medical treatment, including the case of a detained five-month old baby

who, when finally taken by CBP to the hospital, was diagnosed with hypothermia and

pneumonia.[18]  In 2014, the ACLU submitted complaints to DHS on behalf of children

in CBP detention whose medical care was ignored or overlooked, including several

who required hospitalization.[19]

135.    Defendants' failure to ensure appropriate screening for, response to, and

treatment of detainees' medical and mental health conditions has both harmed Plaintiffs

---

[17] *Culture of Cruelty* at pp. 20-21.

[18] *Halfway Home: Unaccompanied Children in Immigration Custody*, Women's Refugee Commission & Orrick Herrington & Sutcliffe LLP at p. 11 (Feb. 2009), *available at* https://womensrefugeecommission.org/resources/download/196 ("Carmen was apprehended by Border Patrol crossing the river with her five-month-old daughter Lily.  She was placed into a cell with no dry clothes or blankets for her or the baby.  Carmen requested something to keep the baby warm since it was so cold in the cell and all she had was wet clothing.  The agents refused.  By morning Lily was turning blue.  Carmen begged the agents for help.  Finally they looked at baby Lily and took her to the emergency room.  Carmen was placed in shackles.  Doctors at the emergency room said that Lily was suffering from hypothermia and that she had contracted pneumonia.  They gave her antibiotics and kept her in the hospital for twenty-four hours.  During that time Carmen was shackled and nurses were not allowed to give her any food.") (hereafter "*Halfway Home*").

[19] *See Letter Re: Systemic Abuse of Unaccompanied Immigrant Children by U.S. Customs & Border Protection*, ACLU, at pp.12-13 (June 16, 2014), *available at* http://www.acluaz.org/sites/default/files/documents/DHS%20Complaint%20re%20CBP%20Abuse%20of%20UICs.pdf ("CBP apprehended H.R. and his paternal aunt near Rio Grande City, Texas.  At the time of his apprehension, H.R. was seven years old and was severely developmentally disabled and suffering from severe malnourishment.  CBP detained H.R. for approximately five days without any medical treatment.  After being transferred to ORR custody, H.R. was hospitalized immediately, underwent surgery, and remained hospitalized for 42 days.  His treating physicians and therapists diagnosed H.R. as suffering from a 'global developmental delay,' 'autism disorder,' and 'severe malnutrition.'  His examination revealed that at seven years of age he weighed only twenty-five pounds, the average weight of an 11-month old child.") (hereafter "*ACLU Report*"); *see also* Jessica Bakeman, *New York quietly expands role in caring for immigrant children*, Capital New York (Oct. 20, 2014), *available at* http://www.capitalnewyork.com/article/albany/2014/10/8554559/new-york-quietly-expands-role-caring-immigrant-children ("When the children arrive at New York-area airports from the federal facilities, they often require extensive medical care for broken bones that healed improperly or illnesses such as appendicitis and pneumonia, nonprofit officials said . . . 'Some of them have not eaten for long periods of time,' said Henry Ackermann, chief development officer at [ORR subcontracted] Abbott House . . . 'They come to us malnourished.  They come to us sometimes with unset broken arms or legs, with bronchial or respiratory issues.'").

and putative class members and created a direct and serious risk of harm to the physical and mental health of detainees.  This risk of harm is compounded by Defendants' policies and practices that result in unsanitary and hazardous conditions in holding cells, including but not limited to, overcrowding, absence of beds and bedding, insufficient food and clean drinkable water, and the lack of soap for hand-washing.

### G.   Plaintiffs and Putative Class Members are Deprived of Adequate Food and Water.

136.   Defendants do not provide sufficient or adequate food to detainees, notwithstanding Defendants' policy requiring that detainees "will be provided snacks and juice every four hours" and "a meal" if their detention is anticipated to exceed 8 hours.[20]

137.   In practice, Defendants do not provide detainees with "meals" at all; rather, Defendants generally provide detainees peanut butter crackers or cookies and juice, or small—often cold—bean burritos, and nothing else.  This food is provided erratically, and some detainees receive no food at all.  As a result, Tucson Sector detainees, many of whom are apprehended after days in the desert without sufficient food, frequently experience intense hunger for the duration of their detention.

138.   Detainees who are transferred between CBP facilities may not receive food in transit and may wait twenty-four hours or more before receiving any food.  One former detainee described not being given food for days while another only received a packet of crackers and an orange once a day for three days.  Several women were so desperate to feed their children that they resorted to giving them broken crackers they found on the floor.

139.   Defendants regularly provide food portions that are not adequate to satisfy detainees' hunger.  The food is often of such poor quality that detainees are unable to eat it, or report feelings of nausea and stomach pain after trying to eat it.  Former detainees report receiving snacks with packaging dates indicating they have

---

[20] 2008 Memorandum § 6.8.

expired, and describe the food as "disgusting," "awful," "cold," looking "like it was bad," smelling "bad," tasting "old," and barely edible.  Many detainees cannot "stomach" the food given its condition and the dirty and foul-smelling condition of the cells.

140.    Those who are particularly vulnerable suffer even more—pregnant women report suffering from severe hunger as a result of the minimal food made available to them.  One woman five months pregnant at the time of her detention, was "very hungry" but found the crackers and juice she was given to be inedible.  When she examined the packaging, she noticed they were marked as having expired several months prior.

141.    Defendants' policy further provides, "Regardless of time in custody, juveniles will be provided with meal service, and at least every six hours thereafter, two of the three meals must be hot."  In practice, Defendants do not provide regular hot meals, or any meals, to juveniles or young children; rather, children and adolescents receive the same cold snacks as other detainees on the same irregular and unreliable schedule.  Several former detainees describe children in holding cells crying from hunger.

142.    Many detainees have traveled through the desert for days prior to being apprehended and are moderately or severely dehydrated upon arrival at the Tucson Sector facilities.  Others suffer from gastrointestinal disorders and diarrhea as a result of drinking contaminated water in the desert.  Defendants nonetheless deny detainees access to adequate amounts of clean drinking water, notwithstanding Defendants' policy requiring that potable drinking water be available.[21]

143.    Detainees report not being given access to clean water for hours at a time.  Multiple former detainees did not receive water for an entire day.  Sometimes the only available water source comes from faucets mounted atop the holding cell toilets, faucets that are not regularly or thoroughly cleaned.  Moreover, multiple detainees—

---

[21] 2008 Memorandum § 6.9.

1   none of whom have been able to wash their hands with soap after using the toilet—

2   regularly handle the faucets to obtain drinking water, increasing the risk of

3   contamination.

4         144.   Defendants do not provide sufficient drinking cups, forcing detainees to

5   share cups or to re-use discarded juice containers provided periodically in order to

6   drink water.

7         145.   The absence of adequate food, nutrition, and potable water both creates a

8   risk of and actually causes physical and psychological harm to Plaintiffs and putative

9   class members.

10        **H.     Plaintiffs and Putative Class Members are Unable to Communicate
               with Family or Attorneys.**

11

12        146.   The psychological harms and high anxiety levels resulting from the

13   punitive conditions under which Plaintiffs and other individuals are held in the Tucson

14   Sector, described above, are exacerbated by Defendants' practice of holding detainees

15   incommunicado and denying them access to the outside world while confined.  The

16   deliberatively punitive, harsh conditions and severe restrictions on outside

17   communication also serve to facilitate the coercive practices for which the agency is

18   notorious.[22]

19   _____

20   [22] For example, CBP and Border Patrol's widespread practice of coercing detained
     individuals into signing removal papers in southern California was the subject of the
21   class action lawsuit *Lopez-Venegas v. Napolitano*, No. 13-3972 (S.D. Cal. settlement
     agreement filed Aug. 18, 2014).  In a recent settlement in that case, the agencies agreed
22   to "supplement their existing procedures" in southern California with additional due
     process protections.  Richard Marosi, *Feds to Allow Some Immigrant Deportees to
23   Return Under New Settlement*, L.A. Times (Aug. 27, 2014), *available at* http://
     www.latimes.com/local/la-me-deport-return-aclu-20140828-story.html.  In addition,
24   detainees regularly sign paperwork relating to criminal prosecution without access to
     counsel, as well as "Hold Harmless and Release Agreements," wherein, to have any
25   chance of recovering their confiscated property, detainees must release and forever
     discharge the government from liability for losing that property.  *See* Ted Robbins,
26   *Some Deportees Return to Mexico, But Their Stuff Stays In the U.S.*, NPR (Dec. 10,
     2014), *available at* http://www.npr.org/2014/12/10/369893574/some-deportees-return-
27   to-mexico-but-their-stuff-stays-in-the-u-s; Daniel E. Martínez, et al., *Bordering on
     Criminal: The Routine Abuse of Migrants in the Removal System, Part II: Possessions
28   Taken and not Returned*, Immigration Policy Center (Dec. 2013), *available at*
     http://www.immigrationpolicy.org/sites/default/files/docs/ipc/Border%20-%20Possessi
     ons%20FINAL.pdf ("The combination of a lack of oversight and the frequency of lost

1     147.    Tucson Sector detainees are generally not provided an opportunity to

2    make any phone calls.  Border Patrol agents routinely deny requests to use the phone,

3    often telling detainees they can only make a call after transfer to a subsequent facility.

4     148.    Defendants' widespread practice, which is uniform within the Tucson

5    Sector, contravenes their own policy stating that detainees held for more than twenty-

6    four hours "will be given access to a telephone" for the purpose of contacting an

7    attorney or other party and that those held longer than twenty-four hours will be given

8    access to a phone at least once per day while in custody.[23]

9     149.    Defendants also deny attorneys the opportunity to speak or meet with

10    clients detained in Tucson Sector facilities.  Attorneys who attempt to contact clients in

11    Tucson Sector facilities have been informed by Border Patrol agents that they must

12    wait for the detained individual to be transferred to the custody of another agency.

13     150.    While denying detained individuals access to attorneys, Tucson Sector

14    Border Patrol agents regularly coerce detainees into signing immigration-related

15    documents without first providing them with the opportunity to consult an attorney or

16    even to read the document in a language they speak.  In so doing, these agents

17    frequently fail to adequately screen detainees to determine if they fear persecution in

18    their home country or otherwise intend to apply for asylum.[24]   Agents demand

belongings creates the appearance of corruption, if not conditions that are rife for exploitation.")

[23] 2008 Memorandum § 6.21.

[24] CBP agents have a mandatory duty to screen arriving individuals subject to expedited removal from the United States (a classification which includes the vast majority of detainees) for a fear of persecution in their home country or an intention to apply for asylum. *See* C.M. Miller, *CBP Inspector's Field Manual*, U.S. Customs & Border Patrol, at p. 114 (Feb. 10, 2006), *available at* https://shusterman.com/pdf/ cbpinspectorsfieldmanual.pdf; *see also* 8 C.F.R. § 235.3(b)(4); 8 U.S.C. § 1225(b)(1)(A)(ii) (authorizing statute). There is a long, well-documented history of CBP failing to comply with this legally mandated process.  *American Exile: Rapid Deportations That Bypass the Courtroom,* ACLU at p. 38 (Dec. 2014), *available at* https://www.aclu.org/files/assets/120214-expeditedremoval-0.pdf ("Lucila O. fled domestic violence in Nicaragua and was arrested by Border Patrol agents in Texas: 'I told them I was afraid. . . . [The agent] just told me, "You are getting deported. . . . Even if you are afraid you are going to get deported."  Ericka E. F., a 33-year-old woman from Honduras, fled gang violence and sexual and physical violence from her partner and was arrested in Texas: 'I crossed in Laredo and I told them I needed asylum. I needed to stay here to protect myself. . . . I told him I was fleeing for

signatures on documents that are neither read to nor understood by the detainees, many of whom forfeit any opportunity to seek relief from removal from the United States as a result.

151. Among other forms of coercion, Border Patrol officials threaten detained individuals with continued or indefinite detention if they refuse to sign, or pull detainees from cells in the middle of the night to sign paperwork. One woman describes being interrogated and signing documents four separate times in the course of a single night. Another former detainee stated that a Border Patrol agent threatened to sign the form himself if the detainee did not sign. Another described being pressured to sign a removal order despite conveying her fear of return to her home country. Agents rejected her fear of return and told her that she was only in the United States to work and would not be able to see a judge.

152. Compounding the lack of access to any means of communication with attorneys or the outside world, detainees have no meaningful mechanism for lodging complaints regarding holding cell conditions and the mistreatment they experience while detained. Moreover, DHS and CBP complaint and accountability mechanisms

---

protection because of the violence. They said women always come here with lies. I told them it was true. [The officer] just laughed and laughed.'"); *Letter Re: Inadequate U.S. Customs & Border Protection (CBP) screening practices block individuals fleeing persecution from access to the asylum process*, Nat'l Immigrant Justice Center at pp. 3-4 (Nov. 13, 2014), *available at* http://immigrantjustice.org/sites/immigrantjustice.org/files/images/Right%20to%20Asylum%20-%20CRCL%20Complaint%20Cover%20Letter%20-%2011.13.14%20FINAL%20PUBLIC.pdf ("[A] significant number of the individuals who are deported under expedited removal orders despite having valid claims to asylum are women or young adults with domestic violence claims or individuals with sexual-orientation based claims. CBP's failure to properly screen these individuals can be fatal, sending individuals back into environments where they are targeted for extreme violence."); *You Don't Have Rights Here: U.S. Border Screening & Returns of Central Americans to Risk of Serious Harm*, Human Rights Watch (Oct. 2014), *available at* http://www.hrw.org/sites/default/files/reports/us1014-web-0.pdf (Virtually all of those we interviewed who had been apprehended at or near the border were deported summarily, via expedited removal or reinstatement of removal. Many said they had expressed their fears to US Border Patrol officials charged with screening for fear of return before being deported, but fewer than half of these were referred by US Border Patrol for a further assessment of whether they had a 'credible' or 'reasonable' fear of returning to Honduras.").

1    are highly ineffective; the majority of complaints lodged against CBP are not

2    investigated or acted upon, and officials are rarely disciplined for abuse.[25]

3        153.    Defendants' practice of holding individuals in harsh conditions while

4    severely restricting access to outside counsel compounds detainees' psychological

5    trauma, and makes individuals more susceptible to coercive tactics, such as forcing

6    them to sign legal documents they do not understand, including removal papers.

**I.    Defendants Are Aware of the Unhealthy and Punitive Conditions in Tucson Sector Holding Cells and Have Failed to Take Remedial Action.**

9        154.    Defendants repeatedly have been put on notice of the inhumane and

10   unhealthy conditions in CBP detention facilities and thus are aware or should be aware

11   of these conditions.  Despite this, Defendants have failed to take remedial action.

12   Numerous civil rights complaints to DHS, as well as human rights reports, media

13   accounts,[26] lawsuits, and proposed legislation have documented the unlawful,

---

[25] *See, e.g.*, Garrett M. Graff, *The Green Monster: How the Border Patrol Became America's Most Out-of-Control Law Enforcement Agency*, Politico (Nov./Dec. 2014), *available at* http://www.politico.com/magazine/story/2014/10/border-patrol-the-green-monster-112220.html#.VW4iv2ktGUl (DHS oversight agencies have been criticized for failing to investigate civil rights complaints, which they classify as lower priority, "non-mission-compromising corruption."); Andrew Becker, *Border Agency's Former Watchdog Says Officials Impeded His Efforts*, Wash. Post (Aug. 16, 2014), http://www.washingtonpost.com/politics/border-agencys-former-watchdog-says-officials-impeded-his-efforts/2014/08/16/ce143288-2304-11e4-8593-da634b334390-story.html (former head of CBP Internal Affairs describing CBP as an agency "rife with coverups and corruption" where officials have "distorted facts to try to hide any missteps"); Damien Cave, *Complaints of Abuse by Border Agents Often Ignored, Records Show*, New York Times (May 5, 2014), http://www.nytimes.com/2014/05/06/us/ complaints-of-abuse-by-border-agents-often-ignored-records-show.html?module= search&mabReward =relbias:r&-r=0 (noting that 97 percent of the 809 abuse complaints filed against Border Patrol agents between January 2009 and January 2012 resulted in the classification "no action" taken).

[26] *See, e.g.*, Ed Pilkington, *It Was Cold, Very Cold: Migrant Children Endure Border Patrol"Ice Boxes"*, Guardian (Jan. 26, 2015), *available at* http://www.theguardian.com/ us-news/2015/jan/26/migrant-children-border-patrol-ice-boxes ("Tatiana was 16 at the time of her detention, a child herself.  'The room was so cold you almost couldn't breathe, it made your nose hurt,' she said.  There was no bedding, not even a blanket, and she slept fitfully with [her infant son] Rafael in her arms.  After a few days the baby caught a cold and stopped eating solids, and for a couple of days he wouldn't even take his mother's milk.  His weight fell from 23lbs when he arrived at the border station to 15lbs."); Ed Pilkington, *Freezing Cells and Sleep Deprivation: The Brutal Conditions Migrants Still Face After Capture*, Guardian (Dec. 12, 2014), *available at* http://www.theguardian.com/us-news/2014/dec/12/migrants-face-brutal-conditions-after-capture-sleep-deprivation ("Among those subjected to harsh treatment . . . are

unconstitutional, and punitive conditions of confinement in CBP holding cells—both in the Tucson Sector and in other similar CBP facilities—beginning as early as 2009 and continuing to date.

155.    Public reports by academic institutions and human rights organizations, based on thousands of interviews with former CBP detainees, as well as numerous civil rights complaints submitted to DHS by multiple advocacy organizations and individuals, have consistently described harsh conditions in these facilities, including denial of food, water, and medical care; overcrowding; severe temperatures; and physical and verbal abuse.

156.    In 2008, NMD published a report describing grossly inadequate detention conditions and verbal and physical abuse by CBP officials, including denial of access to bathrooms, clean clothing, and blankets; former detainees described being detained in holding cells for days without adequate food and water.[27]

---

numerous migrant children.  Children have described temperatures in the cells that turned their lips blue and made their fingers numb."); Brianna Lee, *Child Migrants Report Freezing in "Icebox," U.S. Border Patrol Centers*, Int'l Business Times (Aug. 1, 2014), http://www.ibtimes.com/child-migrants-report-freezing-icebox-us-border-patrol-centers-1646428; John Burnett, *Amid Wave Of Child Immigrants, Reports of Abuse By Border Patrol*, NPR (July 24, 2014), *available at* http://www.npr.org/2014/07/24/ 334041633/amid-wave-of-child-immigrants-reports-of-abuse-by-border-patrol; Molly Redden, *Why Are Immigration Detention Facilities So Cold?*, Mother Jones (July 16, 2014), http://www.motherjones.com/politics/2014/07/why-are-immigration-ice-detention-facilities-so-cold; *Border Patrol Lockups Called Inhumane*, Courthouse News (May 22, 2014), *available at* http://www.courthousenews.com/2014/05/22/ 68102.htm; Alfonso Chardy, *Immigrants Recount Horror of Being Detained in "Iceboxes" Before Transfer to South Florida*, Miami Herald (Apr. 19, 2014), *available at* http://www.miamiherald.com/news/local/community/miami-dade/ article1963111.html; Peter O'Dowd & Rachael Bale, *Cold Storage: Migrants Refer to Border Cells as Freezers*, Fronteras (Nov. 18, 2013), *available at* http:// www.fronterasdesk.org/content/9237/cold-storage-migrants-refer-border-cells-freezers; Cindy Carcamo & Richard Simon, *Immigrant Groups Complaint of "Icebox" Detention Cells*, LA Times (Dec. 5, 2013), http://articles.latimes.com/2013/dec/05/ nation/la-na-ff-detention-centers-20131206; Brian  Epstein, *Crossing the Line: Part II*, Need to Know on PBS (July 20, 2012), *available at* http://www.pbs.org/wnet/need-to-know/video/video-crossing-the-line/14291/; Brad Poole, *Report Alleges Border Patrol Abuse of Illegal Immigrants*, Reuters (Sept. 21, 2011), *available at* http:// www.reuters.com/article/2011/09/21/us-usa-mexico-study-idUSTRE78K6NV20110921.

[27] *See Crossing the Line: Human Rights Abuses of Migrants in Short-Term Custody on the Arizona-Sonora Border*, No More Deaths (Sept. 2008), *available at*

1   157.    At the time of the NMD report's release, numerous organizations sent

2   letters to DHS leadership and Members of Congress calling attention to the abuses

3   described in the report and urging reforms to CBP detention practices.  More than six

4   years—and many reports and complaints—later, CBP still has failed to implement

5   needed reforms and ensure that its facilities meet even minimum standards.

6   158.    Other organizations have reported similar conditions in CBP holding

7   cells.  A 2009 report by the Arizona-based Florence Immigrant and Refugee Rights

8   Project ("FIRRP") based on interviews with 124 unaccompanied children found 85

9   percent of the children interviewed were held in excessively cold rooms; a majority

10  were forced to sleep on the floor; one in three received inadequate food; one in four

11  were not offered water, while nearly one in three had to share water; and roughly half

12  were denied the opportunity to call an attorney, consular official, or family member.[28]

13  The children's average length of detention was sixty-five hours.[29]  FIRRP submitted

14  administrative complaints to DHS on behalf of the children interviewed, along with the

15  children's declarations describing abuse and mistreatment in Border Patrol custody.[30]

16  159.    A 2009 Women's Refugee Commission ("WRC") report described

17  facilities in which unaccompanied children were denied access to beds, showers, and

18  phones, and detained for days and even weeks in frigid, overcrowded holding cells.[31]

19  WRC noted that, at that time, the U.S. government reported sixteen percent of

20  unaccompanied children were detained for over seventy-two hours before being

21  transferred to a shelter.[32]

22

23  http://forms.nomoredeaths.org/wp-content/uploads/2014/10/CrossingTheLine-full.compressed.pdf

24  [28] *Seeking Protection, Enduring Prosecution: the Treatment & Abuse of*
25  *Unaccompanied Undocumented Children in Short-term Immigration Detention*,
    Florence Immigrant & Refugee Rights Project (Aug. 2009), *available at* http://
26  www.firrp.org/media/BPAbuseReport.pdf.

    [29] *Id.* at p. 13.

27  [30] *Id.* at p. 7.

28  [31] *Halfway Home*, at pp. 9-11.

    [32] *Id.* at 9.

160.    In 2011, NMD published a second report on abuses in CBP custody, based on interviews with 12,895 individuals released from Border Patrol custody from 2008 to 2011.[33]  Of the individuals interviewed, 5,763 reported overcrowding, 3,107 reported unsanitary conditions, and 2,922 reported experiencing extreme cold.  Only twenty percent of individuals detained for more than two days reported receiving adequate food.

161.    A 2013 report by Americans for Immigrant Justice ("AI Justice") also describes conditions in Border Patrol holding cells consistent with those in the Tucson Sector—unbearably cold, unsanitary, and inhumane: temperatures that caused detainees' fingers and toes to turn blue and their lips to chap and split; a lack of blankets despite the cold; no beds or mattresses so that detainees were forced to try to sleep on benches or on the floor; a lack of basic hygiene supplies such as toothbrushes, soap, combs or ample sanitary napkins; an inability to shower or change clothing; and inadequate food and water.  AI Justice describes Border Patrol agents coercing detainees into signing certain documents they do not understand, without translation and under threat of continued detention.[34]

162.    In May 2014, AI Justice filed a federal lawsuit against the U.S. government on behalf of a female asylum seeker detained for many days in overcrowded Border Patrol holding cells without beds, mattresses or other bedding; denied medical care, hygiene supplies and the ability to bathe; and subjected to extreme temperatures.[35]

163.    In June 2014, the ACLU submitted complaints to DHS on behalf of 116 children alleging abuse and mistreatment in Border Patrol detention, including many who were deprived of beds and bedding and forced to sleep on the floors in unsanitary,

---

[33] Culture of Cruelty, at p. 5.

[34] *The "Hieleras": A Report on Human & Civil Rights Abuses Committed by U.S. Customs & Border Protection Agency*, Americans for Immigrant Justice, at p. 3 (Aug. 2013), *available at* http://www.aijustice.org/the-hieleras-a-report-on-human-civil-rights-abuses-committed-by-u-s-customs-and-border-protection-agency.

[35] *Quinonez Flores v. United States*, No. 14-3166 (E.D.N.Y. filed May 20, 2014).

1   overcrowded, and frigid holding cells.[36]  Several were hospitalized after prolonged

2   detention in Border Patrol custody.[37]  Several others reported that Border Patrol agents

3   told them that the harsh conditions in the holding cells were their punishment for

4   coming to the United States; others were forced to stand in stress positions as

5   punishment.  One child arriving at a Border Patrol detention facility reports being told

6   by officials, "Welcome to hell."[38]

7       164.    In response to the ACLU's complaint, DHS and CBP announced an

8   investigation and commenced several rounds of inspections of select Border Patrol

9   facilities, including one in Nogales, Arizona.[39]  Less than four months after announcing

10  that investigation, however, and notwithstanding its acknowledgment of "recurring

11  problems" in those facilities, the DHS Office of Inspector General ("OIG") reported it

12  would be "curtailing routine inspections."[40]  OIG noted that CBP's "E3" data system,

13  which is intended as a tool for CBP to track compliance with its detention guidelines,

14  was subject to frequent system outrages resulting in inconsistent compliance reporting.

15  OIG concluded that because of this the system is "not a reliable tool for CBP to [use to]

16

17  _____

    [36] See ACLU Letter, at pp.1-2.

18  [37] Id. at pp. 13-14 ("M.R. is a 15-year-old girl who traveled from Guatemala with her
    two-year-old son, seeking the support of her family in the United States.  M.R. recalls
19  one official who asked, "What are you looking for in the United States? No one told
    you to come here."  M.R. reports that CBP officials gave her the same cold meals daily
20  and that she had to sleep on a hard floor with only an aluminum 'space blanket.'  Along
    with other detainees, M.R. was made to clean the bathrooms at the facility.  On several
21  occasions, she had to wait hours to receive clean diapers for her son.  Both M.R. and
    her son became sick while in CBP custody, but M.R.'s requests for medical attention
22  were ignored or dismissed for approximately five days, until she and her son were
    finally taken to a hospital.  M.R. says that just thinking about the CBP holding facility
23  in which she was detained makes her feel shaky and nauseous.").

24  [38] Id. at p. 11.  See also id. at p. 8 ("R.D. fled to the United States at age 17 after being
    sexually abused by a gang member in her home country.  While trying to cross the
25  border, she cut her hand on a fence.  After Border Patrol apprehended her, an agent
    looked at her hand and squeezed the wound, causing her great pain.  The agent told her,
26  "'It's good that you are hurt, you deserve to be hurt for coming to the US illegally.'").

    [39] See Unaccompanied Immigrant Children, C-SPAN (June 12, 2014), available at
27  http://www.c-span.org/video/?320151-1/unaccompanied-immigrant-children.

28  [40] Press Release, Improvements Continue at Detention Centers, Dep't of Homeland
    Security, Office of Inspector General (Oct. 6, 2014), available at
    https://www.oig.dhs.gov/assets/pr/2014/oigpr_100214.pdf.

1    provide increased accountability for [unaccompanied children's] safety and well-

2    being."[41]  OIG did not indicate whether any action would be taken in response to the

3    deficiencies identified.

4        165.    These children's complaints are consistent with the allegations contained

5    in a series of Health and Human Services ("HHS") Special Incident Reports leaked to

6    members of the press in June 2014.  Those reports included nearly 80 complaints by

7    children of abuse and mistreatment in Border Patrol holding cells in Arizona and Texas

8    from 2011 to 2013.  One child described being detained for five days in 2012 in an

9    overcrowded Tucson holding cell where there was not enough space to sleep; another

10   reported being detained in Tucson for five days and denied requests for food.  Upon

11   information and belief, those allegations were communicated to DHS.

12       166.    Recent Congressional action with respect to the inhumane conditions in

13   CBP's detention facilities demonstrates awareness of these conditions at the highest

14   levels of government.  In June 2013, Senator Barbara Boxer added an amendment to a

15   Senate immigration reform bill, S.B. 744, requiring improved CBP detention standards,

16   including holding cell capacity limits, adequate climate control, "[s]leeping

17   arrangements" for detainees held overnight, and access to hygiene items and medical

18   care, among other reforms.[42]  In December 2013, Senator Boxer re-introduced the same

19   legislation as the Humane Short Term Custody Act, citing reports of harsh CBP

20   detention conditions and noting, "CBP has written 'detention standards' for short term

21   custody, but there is evidence to suggest that these standards are not consistently

22

23   [41] Memorandum *re: Oversight of Unaccompanied Alien Children*, Inspector General
     John Roth (July 30, 2014), http://1.usa.gov/1r3Myd1  https://www.oig.dhs.gov/
24   assets/Mgmt/2014/Over-Un-Ali-Chil.pdf; *see also Unaccompanied Juveniles in INS
     Custody, Report No. I-2001-009, Executive Summary*, Dep't of Justice, Office of the
25   Inspector General (Sept. 28, 2001), *available at* http://www.justice.gov/oig/reports/
     INS/e0109/exec.htm ("[D]eficiencies in the handling of juveniles continue to exist in
26   some INS districts, Border Patrol sectors, and headquarters that could have potentially
     serious consequences for the well-being of the juveniles.").

27   [42] Border Security, Economic Opportunity & Immigration Modernization Act, Senate
     Amend. 1260 to S.B. No. 744 (submitted June 13, 2013) 113th Congress (2013-2014) ,
28   *available at* https://www.congress.gov/amendment/113th-congress/senate-
     amendment/1260./text.

followed."[43]  In September 2013, Representative Lucille Roybal-Allard introduced the Protect Family Values at the Border Act, which included similar reforms related to CBP detention conditions.[44]  To date, none of these legislative proposals have become law.

167.    CBP officials including Defendant Kerlikowske have publicly admitted to knowledge of the punitive and inadequate conditions in the holding facilities.  In July 2014, in a press interview regarding a complaint filed on behalf of 116 unaccompanied children who experienced similar degrading conditions in Border Patrol holding cells—including complaints of "being put in excessively uncomfortable rooms, being left with the lights on all night so that they couldn't sleep, being denied medical care"—Kerlikowske stated that the complaints about the facility conditions were "absolutely spot on."[45]  He also acknowledged that detainees, at least children, should not have to sleep on a concrete floor.[46]

168.    The deplorable and unconstitutional conditions in Tucson Sector holding cells are the direct result of Defendants' policies and practices.  Those conditions result in serious risks to the health and well-being of Plaintiffs and putative class members. They are inhumane and punitive, and bear no relationship to any legitimate governmental purpose.

169.    Detainees in the Tucson Sector are civil detainees, yet they face much harsher conditions of confinement than criminal pre-trial detainees; the conditions are also worse than those to which convicted persons in local jails and prisons are subject and thus are *per se* punitive.

---

[43] Press Release, *Boxer Introduces Bill to Ensure Humane Treatment at Customs & Border Protection Detention Facilities*, U.S. Senator Barbara Boxer (Dec. 12, 2013), *available at* https://www.boxer.senate.gov/press/release/boxer-introduces-bill-to-ensure-humane-treatment-at-customs-and-border-protection-detention-facilities/.

[44] H.R. No. 3130, *available at* https://www.govtrack.us/congress/bills/113/hr3130.

[45] Transcript: *Commissioner Kerlikowske's Full Interview*, NPR (July 18, 2014), *available at* http://www.npr.org/2014/07/18/332086063/transcript-commissioner-kerlikowskes-full-interview.

[46] *Id.*

170.   Defendants have failed to employ reasonable alternatives and less harsh methods in the operation of these facilities.  As a result, CBP detainees, all of whom are civil detainees awaiting administrative processing, are held for extended periods in conditions that are far more restrictive than necessary and thus the conditions amount to prohibited punishment of detainees.

171.   Given the Defendants' familiarity with the conditions in Tucson Sector detention facilities—including lack of beds, mattresses and other bedding; overcrowded and filthy cells; very cold temperatures; inadequate food and drinking water; the absence of any showers or hygiene items and the lack of adequate medical screening, —their adoption of practices and policies that perpetuate these conditions reflects an intention to punish persons believed to be unlawfully present in the United States.  This punitive intent is also reflected in the CBP's policy of "Consequence Delivery," whereby Defendants seek to deter unauthorized immigration by inflicting specified "consequences,"—punishment— including criminal prosecution and prison terms, on unauthorized immigrants.[47]

172.   The harsh conditions and mistreatment that define Tucson Sector detention operations are themselves a form of punishment.  As a Border Patrol spokesman stated, in response to complaints of overcrowding and punitive holding cell conditions in Texas, "That's basically one of the consequence[s] of entering the country illegally."[48]  Agents frequently communicate the same point to detainees directly.  Brutal hold room conditions also make it more likely that detainees will be coerced into "accepting" other consequences—such as criminal prosecution through

---

[47] *See* Jeremy Slack et al., *In Harm's Way: Family Separation, Immigration Enforcement Programs and Security on the US-Mexico Border*, Journal on Migration & Human Security, Vol. 3 No. 2, at pp. 109-128 (2015), *available at* http://jmhs.cmsny.org/ index.php/jmhs/article/ download/46/38 (Border Patrol's Consequence Delivery System "mark[s] a shift from the deterrent strategy that, in the 1990s relied heavily on the dangers of the natural terrain to dissuade unauthorized border crossers, to one that actively punishes, incarcerates, and criminalizes them.") (internal citation omitted).

[48] Amy Bracken, *Immigrants, Legal Groups Allege Harsh Treatment at U.S. Borders*, PRI (Aug. 1, 2014), *available at* http://www.pri.org/stories/2013-08-01/immigrants-legal-groups-allege-harsh-treatment-us-border.

Operation Streamline or deportation without an opportunity to see a judge and without the opportunity to seek relief available to them under the law—in order to be released from Border Patrol's holding cells.

173.   There are no legal justifications for treating detainees in an inhumane and punitive manner, or for holding them in grossly inadequate and unsafe conditions in facilities that are not equipped for overnight or prolonged detention.  Defendants' policies and practices with respect to CBP detention conditions serve no legitimate purpose.

174.   Inhumane conditions in CBP holding cells are longstanding and well-documented.  Defendants are aware of and intentionally indifferent to these conditions and to the serious risk of and actual harm imposed upon all Plaintiffs and putative class members as a result of these conditions.

175.   Plaintiffs have suffered irreparable harm as a result of being detained under these conditions.

## INJUNCTIVE RELIEF

176.   Plaintiffs are entitled to a preliminary and permanent injunction. Defendants have acted and threaten to act to deprive Plaintiffs and others they seek to represent of their constitutional rights.  Plaintiffs and others similarly situated have suffered irreparable physical and psychological injuries and the loss of fundamental due process rights and have been and will continue to be subjected to serious risks of these same irreparable harms as the result of confinement in Border Patrol's Tucson Sector facilities.  Defendants have been and are aware of all of the conditions and deprivations complained of herein and have condoned or been intentionally indifferent to such conduct.  Plaintiffs have no plain, adequate, or speedy remedy at law.

## CLASS ACTION ALLEGATIONS

177.   Plaintiffs bring this action on behalf of themselves and all other persons who are similarly situated, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2).

178.   Plaintiffs seek to represent a class consisting of:

> All individuals who are now or in the future will be detained for one or more nights at a CBP facility, including Border Patrol facilities, within the Border Patrol's Tucson Sector ("the Class").

179.   The putative class is so numerous that joinder of all members is impracticable.  CBP documents, produced in response to a FOIA request, indicate that 72,198 individuals were detained at Tucson Sector detention facilities between January 1, 2013 and June 30, 2013.  Of these, 58,083 individuals, or 80.4 percent of the total number, were in Border Patrol custody for 24 hours or longer.  In the past two fiscal years, more than 200,000 people were apprehended by Border Patrol in the Tucson Sector alone.[49]  A sizeable percentage of those detained after apprehension spent at least one night—and many spent more—in Border Patrol custody.

180.   There are multiple questions of law and fact common to the putative class, including:

a.   Whether Defendants' policies and practices of failing to provide detainees with beds or bedding; overcrowding holding cells; illuminating them around the clock; maintaining the temperature at an unreasonably cold setting and failing to provide blankets to detainees; and failing to provide adequate food and water to detainees—which factors alone or in combination interfere with Plaintiffs' and putative class members' ability to sleep—violate the Due Process Clause of the Fifth Amendment and the Administrative Procedure Act.

b.   Whether Defendants' policies and practices of overcrowding the holding cells; maintaining the cells at unreasonably cold temperatures; failing to adequately clean the cells; failing to regularly maintain working toilets; and failing to provide detainees with soap to wash their hands after using the toilet or before eating, with toothbrushes or toothpaste, or with showers or any opportunity to bathe—which

---

[49] *United States Border Patrol, Sector Profile—Fiscal Year 2013, available at* http://www.cbp.gov/sites/default/files/documents/U.S.%20Border%20Patrol%20Fiscal%20Year%202013%20Profile.pdf.

factors alone or in combination deprive Plaintiffs and putative class members of shelter that satisfies safety and sanitation standards—violate the Due Process Clause of the Fifth Amendment and the Administrative Procedure Act.

c.      Whether Defendants' policies and practices of failing to adequately screen detainees for possible medical problems upon admission; provide for the administration of prescription drugs that are confiscated from detainees or provide appropriate substitute medication; consistently and adequately provide access to qualified medical personnel for detainees in need of medical care; and adequately and consistently provide for the emergency medical needs of detainees—which factors alone or in combination deprive Plaintiffs and putative class members of a safe and healthy environment—violate the Due Process Clause of the Fifth Amendment and the Administrative Procedure Act.

d.      Whether Defendants' policies and practices of providing Plaintiffs and putative class members insufficient quantities of food; of following erratic meal schedules; of providing food that is cold and nutritionally and calorically inadequate; of providing food that is often expired and/or inedible; of not uniformly providing Plaintiffs and putative class members with sufficient clean drinking water and of failing to provide individual drinking cups when water is made available—which factors alone or in combination deprive Plaintiffs and putative class members of the need for adequate food and water—violate the Due Process Clause of the Fifth Amendment and the Administrative Procedure Act.

e.      Whether Defendants' policies and  practices of setting the thermostat in the holding cells at unreasonably low temperatures so that Plaintiffs and putative class members are always cold, suffer pain and have difficulty sleeping; of confiscating all but one layer of clothing from Plaintiffs and class members before placing them in custody; of refusing to provide them with blankets while they are detained, other than inadequate, thin aluminum sheets—which factors alone or in combination deprive Plaintiffs and putative class members of the basic need for

warmth—violate the Due Process Clause of the Fifth Amendment and the Administrative Procedure Act.

181.    The claims of the Plaintiffs are typical of the claims of the putative class. Each of the Plaintiffs, like all putative class members, is subject to the conditions of confinement challenged here.

182.    All of the Plaintiffs will fairly and adequately represent the interests of all members of the putative class because they seek relief on behalf of the class as a whole and have no interests antagonistic to other members of the class.  The Plaintiffs are represented by counsel from Morrison & Foerster LLP, the ACLU Foundation of Arizona; the National Immigration Law Center; the American Immigration Council, and the Lawyers' Committee for Civil Rights of the San Francisco Bay Area.  Counsel are very experienced in class action and other complex litigation in both the detention and immigration arenas and concerning constitutional law.[50]

183.    Defendants have acted on grounds that apply generally to the putative class, so that final injunctive relief or corresponding declaratory relief is appropriate with respect to the class as a whole.

## CLAIMS FOR RELIEF

### FIRST CLAIM
### (Violation of the Due Process Clause of the Fifth Amendment
### to the United States Constitution: Deprivation of Sleep)

184.    All of the foregoing allegations are repeated and incorporated as though fully set forth herein.

---

[50] For a small but representative sampling of the cases handled by counsel in this case, *see Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014), *reh'g denied*, 784 F.3d 571 (9th Cir. 2015 (en banc); *Orantes-Hernandez v. Meese*, 685 F. Supp. 1488 (C.D. Cal. 1988), *aff'd, Orantes-Hernandez v. Thornburgh*, 919 F.2d 549 (9th Cir. 1990); *Orantes-Hernandez v. Holder*, 321 F. App'x 625 (9th Cir. 2009); *A.B.T. v. United States Citizen & Immigration Servs.*, No. 11-2108, 2013 U.S. Dist. LEXIS 160453 (W.D. Wash. Nov. 4, 2013); *de Abadia-Peixoto v. United States Dep't of Homeland Sec.*, No. 11-CV-4001 (N.D. Cal. docketed Aug. 15, 2011).

185.    Defendants have a practice of detaining Plaintiffs and putative class members for one or more nights in holding cells located within Tucson Sector facilities.

186.    The holding cells within the Tucson Sector facilities are neither designed for overnight detention nor equipped to detain individuals overnight and do not meet Plaintiffs' basic human needs.

187.    Defendants have a practice of not providing beds, mattresses, or other bedding to Plaintiffs and other detainees forced to spend one or more nights in a Tucson Sector holding cell.

188.    As a result of Defendants' practices, the only option available to Plaintiffs and putative class members is to attempt to sleep on benches or directly on the cold, concrete floor each night that they are held in a Tucson Sector holding cell.

189.    Defendants also have practices of overcrowding holding cells; illuminating them around the clock; maintaining the temperature at an unreasonably cold setting and failing to provide blankets to detainees; and failing to provide adequate food and water to detainees.

190.    These additional adverse conditions—alone or in combination—further serve to deprive Plaintiffs and class members of sleep during their periods of detention.

191.    Defendants' failure to provide Plaintiffs and putative class members with a bed during their overnight detention violates the Due Process Clause of the Fifth Amendment to the United States Constitution.  The additional adverse conditions, which—alone or in combination—interfere with Plaintiffs and putative class members' ability to sleep, further violate the Due Process Clause of the Fifth Amendment.

192.    By their practices described herein, Defendants subject Plaintiffs and putative class members to a risk of and actual harm and to punishment.  Defendants' policies and practices are inflicted upon Plaintiffs and putative class members with the intent to punish them and are excessively harsh in relation to any non-punitive or legitimate purpose.  Moreover, any non-punitive purpose that Defendants may have

1   could be accomplished through alternative methods consistent with the constitutional

2   rights of Plaintiffs and class members.

3         193.   The conditions of confinement imposed by Defendants are more

4   restrictive than necessary.

**SECOND CLAIM**
**(Violation of the Due Process Clause of the Fifth Amendment**
**to the United States Constitution: Deprivation of Hygienic & Sanitary Conditions)**

8         194.   All of the foregoing allegations are repeated and incorporated as though

9   fully set forth herein.

195.   Defendants have practices of detaining Plaintiffs and putative class members in holding cells under conditions that are unsanitary and therefore hazardous to their health.  In accord with these policies and practices, Defendants overcrowd the holding cells; maintain the cells at unreasonably cold temperatures; fail to adequately clean the cells; fail to regularly maintain working toilets; and fail to provide detainees with soap to wash their hands after using the toilet or before eating, with toothbrushes or toothpaste, with showers or any opportunity to bathe, and with individual cups with which to drink water.

196.   Defendants' practices of detaining Plaintiffs and putative class members under unsanitary and hazardous conditions—alone or in combination—violate the Due Process Clause of the Fifth Amendment to the United States Constitution.

197.   Defendants' policies and practices place the health of Plaintiffs and putative class members at risk during their confinement in the Tucson Sector facilities and after they have left these facilities.  Defendants' policies and practices are inflicted upon Plaintiffs and putative class members with the intent to punish them and are excessively harsh in relation to any non-punitive or legitimate purpose.  Moreover, any non-punitive purpose that Defendants may have could be accomplished through alternative methods consistent with the constitutional rights of Plaintiffs and putative class members.

198.    The conditions of confinement imposed by Defendants are more restrictive than necessary.

### THIRD CLAIM
### (Violation of the Due Process Clause of the Fifth Amendment to the United States Constitution: Deprivation of Adequate Medical Screening and Care)

199.    All of the foregoing allegations are repeated and incorporated as though fully set forth herein.

200.    Defendants deprive Plaintiffs and putative class members detained in Tucson Sector holding cells of adequate and necessary medical screening and medical care.

201.    Defendants do not mandate or provide adequate medical screening of all detainees for health problems—including for communicable diseases or mental illness—prior to confining them.  Defendants also fail to provide for the proper administration of prescription drugs that are confiscated from detainees or provide appropriate substitute medication; fail to consistently and adequately provide access to qualified medical personnel for detainees in need of medical care; and fail to adequately and consistently provide for the emergency medical needs of detainees.

202.    The absence of adequate procedures for the medical needs of Plaintiffs and putative class members—including adequate medical screening—is hazardous to their health.  This hazard is compounded by Defendants' practices of failing to provide detainees with adequate food and clean drinking water; overcrowding the holding cells; maintaining cells at unreasonably cold temperatures; failing to adequately clean the cells; failing to regularly maintain a sufficient number of working toilets; failing to provide detainees with soap to wash their hands after using the toilet or before eating; with toothbrushes or toothpaste; with showers or any opportunity to bathe; with an adequate supply of sanitary napkins and diapers; and with individual cups with which to drink water.

203.    Defendants' practices of detaining Plaintiffs and putative class members under unhealthy and hazardous conditions—alone or in combination—violate the Due Process Clause of the Fifth Amendment to the United States Constitution.

204.    Defendants' policies and practices place the health of Plaintiffs and putative class members at risk during their confinement in the Tucson Sector facilities and after they have left these facilities.  Defendants' policies and practices are inflicted upon Plaintiffs and putative class members with the intent to punish them and are excessively harsh in relation to any non-punitive or legitimate purpose.  Moreover, any non-punitive purpose that Defendants may have could be accomplished through alternative methods consistent with the constitutional rights of Plaintiffs and putative class members.

205.    The conditions of confinement imposed by Defendants are more restrictive than necessary.

**FOURTH CLAIM**
**(Violation of the Due Process Clause of the Fifth Amendment to the**
**United States Constitution: Deprivation of Adequate Food and Water)**

206.    All of the foregoing allegations are repeated and incorporated as though fully set forth herein.

207.    Defendants deprive Plaintiffs and putative class members detained in Tucson Sector holding cells of adequate food and clean drinking water.

208.    Defendants holding cell practices ignore that, prior to their apprehension by Border Patrol agents, Plaintiffs and putative class members often have been walking for days through the desert without enough food or water.  They typically are famished and suffering from moderate to severe dehydration.

209.    Pursuant to Defendants' practices, provision of food to Plaintiffs and putative class members is erratic and inadequate.  Food is sometimes withheld for an entire day; on other occasions, detainees might be served one or two snacks per day. Detainees are fed small portions that consist of either a child-size box of juice or a

child-size packet of crackers or a small burrito.  The food is cold and nutritionally and calorically inadequate.  In addition to the inadequate portions, the food is often expired and/or inedible.

210.   Defendants have a policy and practice of not always providing Plaintiffs and putative class members with sufficient clean drinking water.  In some instances, no water is provided for an entire day.  Some detainees have to drink water out of sinks that are placed on top of the toilets and that are not regularly and thoroughly cleaned. In other holding cells, detainees are given a single jug of water to share amongst themselves.  They are usually not provided with individual drinking cups; instead, multiple detainees must share a cup or detainees must attempt to refashion their discarded juice boxes to drink water.

211.   Defendants' above practices—alone or in combination—violate the Due Process Clause of the Fifth Amendment to the United States Constitution.

212.   Defendants' policies and practices place the health of Plaintiffs and putative class members at risk during their confinement in the holding cells and after they have left these cells.  Defendants' policies and practices are inflicted upon Plaintiffs and class members with the intent to punish them and are excessively harsh in relation to any non-punitive or legitimate purpose.  Moreover, any non-punitive purpose that Defendants may have could be accomplished through alternative methods consistent with the constitutional rights of Plaintiffs and putative class members.

213.   The conditions of confinement imposed by Defendants are more restrictive than necessary.

### FIFTH CLAIM
### (Violation of the Due Process Clause of the Fifth Amendment to the United States Constitution:  Deprivation of Warmth)

214.   All of the foregoing allegations are repeated and incorporated as though fully set forth herein.

215.    Defendants have a practice of setting the thermostat in the holding cells at unreasonably low temperatures so that Plaintiffs and putative class members are always cold.  The cold temperature causes Plaintiffs and putative class members pain and interferes with their sleep, especially because they are forced to sleep on frigid benches or concrete floors.  Defendants' policy and practice is to confiscate all but one layer of clothing from Plaintiffs and putative class members before placing them in custody, and refusing to provide them with blankets while they are detained, other than inadequate, thin aluminum sheets.

216.    Defendants' practices—alone or in combination—violate the Due Process Clause of the Fifth Amendment to the United States Constitution.

217.    Defendants' policies and practices have harmed Plaintiffs and putative class members and place them at risk of continued harm during their confinement in holding cells and after they have left these cells.  Defendants' practices are inflicted upon Plaintiffs and putative class members with the intent to punish them and are excessively harsh in relation to any non-punitive and legitimate purpose.  Moreover, any non-punitive purpose that Defendants may have could be accomplished through alternative methods consistent with the constitutional rights of Plaintiffs and putative class members.

218.    The conditions of confinement imposed by Defendants are more restrictive than necessary.

**SIXTH CLAIM**
**(Violation of the Administrative Procedure Act:**
**Agency Action Unlawfully Withheld)**

219.    All of the foregoing allegations are repeated and incorporated as though fully set forth herein.

220.    The Administrative Procedure Act ("APA"), 5 U.S.C. § 706(1), requires a court to "compel agency action unlawfully withheld or unreasonably delayed."

221.    CBP has promulgated extensive policies and procedures in the 2008 Memorandum and the CBP Security Policy and Procedures Handbook (HB1400-02B) and elsewhere related to the operation of holding cells, including the minimum space per detainee as well as the provision of food, water, and medical care.

222.    CBP has failed to enforce those procedures.

223.    CBP's failure to enforce constitutes final agency action.

224.    Plaintiffs and putative class members have suffered legal wrongs and have been adversely affected and aggrieved by CBP's failure to act.

### PRAYER FOR RELIEF

225.    Plaintiffs and the class they seek to represent have no adequate remedy at law to redress the wrongs suffered as set forth in this Complaint.  Plaintiffs and the putative class have suffered and will continue to suffer irreparable injury as a result of the unlawful acts, omissions, policies, and practices of Defendants, as alleged herein, unless Plaintiffs and the putative class are granted the relief they request.  The need for relief is critical because the rights at issue are paramount under the United States Constitution and the laws of the United States.

**WHEREFORE**, the Named Plaintiffs and the class they seek to represent request that this Court grant them the following relief:

226.    Declare that the suit is maintainable as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2);

227.    Adjudge and declare that the acts, omissions, policies, and practices of Defendants, and their agents, employees and officials, described herein, are in violation of the rights of Plaintiffs and the class members they seek to represent under the Administrative Procedure Act and the Due Process Clause of the Fifth Amendment, which grants constitutional protection to the Plaintiffs and the class they represent;

228.    Preliminarily and permanently enjoin Defendants, their agents, employees, and officials from subjecting Plaintiffs and the class members they seek to

1    represent to the illegal and unconstitutional conditions, acts, omissions, policies, and

2    practices set forth above;

3        229.    Order Defendants and their agents, employees, and officials to eliminate

4    the risk of harm that Plaintiffs and members of the class suffer due to the inadequate,

5    unsafe, and unhealthy conditions described above.  Defendants' plan shall include at a

6    minimum the following:

7        230.    The provision of a bed and bedding to all detainees held overnight in any

8    Tucson Sector CBP facility;

9        231.    Adequate access to soap, toothbrushes and toothpaste, paper towels,

10    sanitary napkins, diapers, showers and towels if held overnight, and sanitation which

11    satisfies constitutionally adequate standards for all detainees;

12        232.    The provision of clean drinking water and nutritionally adequate meals

13    prepared and served in a safe and sanitary manner;

14        233.    Uniform enforcement of constitutionally adequate standards with respect

15    to cell occupancy rates, temperature control, and all federal fire, health and safety

16    standards;

17        234.    Policies and practices that reliably and adequately screen for medical,

18    dental, and mental health conditions that need immediate treatment;

19        235.    Timely and competent responses to health care emergencies;

20        236.    Court-ordered monitoring as appropriate;

21        237.    Award Plaintiffs the costs of this suit, and reasonable attorneys' fees and

22    litigation expenses pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412;

23        238.    Retain jurisdiction of this case until Defendants have fully complied with

24    the orders of this Court and there is a reasonable assurance that Defendants will

25    continue to comply in the future absent continuing jurisdiction; and

26

27

28

1       239.   Award such other and further relief as the Court deems just and proper.

2

3     Dated: June 8, 2015              By:   */s/ Harold J. McElhinny*

4                                             Harold J. McElhinny*
                                              Kevin M. Coles*
5                                             Elizabeth G. Balassone*
                                              MORRISON & FOERSTER LLP
6                                             425 Market Street
                                              San Francisco, CA  94105-2482
7                                             Telephone: (415) 268-7000
                                              Facsimile:  (415) 268-7522
8                                             Email:  HMcElhinny@mofo.com
                                              Email:  KColes@mofo.com
9                                             Email:  EBalassone@mofo.com

10                                            Louise C. Stoupe*
                                              Pieter S. de Ganon*
11                                            MORRISON & FOERSTER LLP
                                              Shin-Marunouchi Building, 29th Floor
12                                            5-1, Marunouchi 1-Chome
                                              Tokyo, Chiyoda-ku  100-6529, Japan
13                                            Telephone: +81-3-3214-6522
                                              Facsimile:  +81-3-3214-6512
14                                            Email:  LStoupe@mofo.com
                                              Email:  PdeGanon@mofo.com
15

16                                            Colette Reiner Mayer*
                                              MORRISON & FOERSTER LLP
17                                            755 Page Mill Road
                                              Palo Alto, CA  94304-1018
18                                            Telephone: (650) 813-5600
                                              Facsimile:  (650) 494-0792
19                                            Email:  CRMayer@mofo.com

20

21    Dated: June 8, 2015              By:   _____
                                              */s/ Linton Joaquin*
22                                            Linton Joaquin*
                                              Karen C. Tumlin*
23                                            Nora A. Preciado*
24                                            NATIONAL IMMIGRATION LAW CENTER
                                              3435 Wilshire Boulevard, Suite 2850
25                                            Los Angeles, CA  90010
                                              Telephone: (213) 639-3900
26                                            Facsimile:  (213) 639-3911
27                                            Email:  joaquin@nilc.org
                                              Email:  tumlin@nilc.org
28                                            Email:  preciado@nilc.org

1

2

3

Dated: June 8, 2015

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By:  _____ */s/ Mary Kenney*
Mary Kenney*
Emily Creighton*
Melissa Crow*
AMERICAN IMMIGRATION COUNCIL
1331 G Street NW, Suite 200
Washington, DC 20005
Telephone: (202) 507-7512
Facsimile:  (202) 742-5619
Email:  mkenney@immcouncil.org
Email:  ecreighton@immcouncil.org
Email:  mcrow@immcouncil.org

Dated: June 8, 2015

By:  _____ */s/ James Duff Lyall*
Victoria Lopez (Bar No. 330042)**
Daniel J. Pochoda (Bar No. 021979)
James Duff Lyall (Bar No. 330045)**
ACLU FOUNDATION OF ARIZONA
3707 North 7th Street, Suite 235
Phoenix, AZ  85014
Telephone: (602) 650-1854
Facsimile:  (602) 650-1376
Email:  vlopez@acluaz.org
Email:  dpochoda@acluaz.org
Email:  jlyall@acluaz.org

Dated: June 8, 2015

By:  _____ */s/ Travis Silva*
Travis Silva*
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS OF THE SAN FRANCISCO BAY
AREA
131 Steuart Street, Suite 400
San Francisco, CA  94105
Telephone: (415) 543-9444
Facsimile:  (415) 543-0296
Email:  tsilva@lccr.com

Attorneys for Plaintiffs

*Pro hac vice motions forthcoming*
***Admitted pursuant to Ariz. Sup. Ct. R. 38(f)*