```
 1

 2                    UNITED STATES DISTRICT COURT

 3                        DISTRICT OF ARIZONA

 4   Unknown Parties, et al.,      )
                                   )
 5              Plaintiffs,        )   4:15-cv-00250-DCB
                                   )
 6        vs.                      )
                                   )   Tucson, Arizona
 7   Johnson, et al.,              )   August 13, 2015
                                   )   9:30 a.m.
 8              Defendants.        )
     _____)

 9

10

11                   TELEPHONIC MOTION HEARING

12

13

                 BEFORE THE HONORABLE DAVID C. BURY
14                UNITED STATES DISTRICT JUDGE
                        405 W. CONGRESS
15                 TUCSON, ARIZONA 85701

16

17

18

19

20              Cindy J. Shearman, RDR, CRR
                405 W. Congress, Suite 3500
21                  Tucson, AZ 85701
                      520-205-4286
22

23       Proceedings Reported by Realtime Court Reporter
         Transcript prepared by computer-aided transcription
24

25
```

UNITED STATES DISTRICT COURT

1                    A P P E A R A N C E S

2

   For the Plaintiffs:
3
   Harold J. McElhinny
4  Morrison & Foerster, LLP
   425 Market Street
5  32nd Floor
   San Francisco, CA 94105
6  (Appearing telephonically)

7
   For the Defendants:
8
   Sarah B. Fabian
9  Dillon Fishman
   Assistant United States Attorney
10 US Department of Justice
   P.O. Box 868, Ben Franklin Station
11 Washington, DC 20044
   (Appearing telephonically)
12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                     P R O C E E D I N G S

2              (Call to order of court, 9:30 a.m.)

3              CLERK:  In the civil matter 15-250-DCB, Unknown

4    Parties, et al., versus Johnson, et al., on for a motion

5    hearing.

6         Counsel, please state your appearances.

7              MR. McELHINNY:  Good morning, Your Honor.  This is

8    Harold McElhinny with Morrison and Foerster on behalf of the

9    plaintiffs.

10             THE COURT:  Good morning.

11             MS. FABIAN:  Good morning, Your Honor.  This is Sarah

12   Fabian and Dillon Fishman on behalf of the defendants.

13             THE COURT:  All right.  So, counsel, why don't we have

14   one spokesperson per side.  And when you say something, give

15   your name first.

16        Ms. Fabian, are you going to be the spokesperson?

17             MS. FABIAN:  I will, Your Honor.

18             THE COURT:  All right.  So that will avoid any

19   confusion here on who is speaking.

20        This is a motion to -- the plaintiffs' motion for expedited

21   discovery.  And there was some problem here in getting you a

22   hearing, I understand, and getting this matter resolved.  I'm

23   sorry for that.  But we'll see what we can do this morning.

24        I would like to -- well, first, Ms. Fabian, let me ask you

25   a question about the access to the secured areas.  Is there any
```

09:32:13

09:32:50

1    reason why, since you want to view and take some photographs,

2    that presence would exceed ten minutes?

3              MS. FABIAN:  Your Honor, I believe that might be a

4    question for the plaintiff to determine what they're actually

5    looking for.

6              THE COURT:  Oh, I'm sorry.

7              MS. FABIAN:  But I would say if their presence would

8    not exceed ten minutes, that would certainly minimize the

9    burden that the request would place on the facilities.

10             THE COURT:  I apologize.  I got my cast of characters    09:34:00

11   turned around.

12       Mr. McElhinny, would ten minutes in any secured area

13   suffice?

14             MR. McELHINNY:  Your Honor, I think that might be a

15   little bit short.  And the reasons I say that are, A, in

16   addition to the photographs, we would like to take measurements

17   and, frankly, I'm not a photographer and I just don't know how

18   long it would take to set up and do that.

19             THE COURT:  Well, I mean, measurements, don't they

20   have a floor plan that can be produced?                            09:34:31

21             MR. McELHINNY:  We don't know the answer to that, Your

22   Honor.

23             THE COURT:  Well, measurements would cover the entire

24   expanse of the area and be difficult to do.  I can't imagine --

25   Ms. Fabian, is there a floor plan that's available that would

1   show or could the facility take measurements?  I could see why

2   that's needed.  So we'll start there, but, secondly, how it's

3   done and when doesn't seem -- I mean, it doesn't seem like

4   plaintiffs ought to have their representatives in there, while

5   detainees are there in the secured area, with some tape

6   measure.  I mean, that doesn't make any sense to me.  Why can't

7   we get around that?

8          MS. FABIAN:  Your Honor, I would say -- I see no

9   reason.  I can certainly check with my clients on the floor

10  plans.  I imagine that those are there or that my clients would

11  be willing to take measurements.

12      I think all of this highlights that there are -- I think

13  there are a number of ways, if we could be made to understand

14  the information that plaintiff actually -- this is the first

15  time that I'm understanding that they're looking for

16  measurements.  If we could understand the information that

17  plaintiffs are in need of, I think there are a lot of ways we

18  could talk about how we could provide that in ways other than

19  access to the secure system -- the secured areas, and there

20  are, in fact, tours available at -- which we had already

21  offered to plaintiffs that would allow them to view the secured

22  areas without actually entering the secured areas.

23      So there certainly are ways we could discuss, if plaintiffs

24  identified the information they're looking for, ways we could

25  discuss getting them that information.  My clients are already

1   beginning to look at days that we think they might be looking

2   for to see what we might be able to provide.

3            THE COURT:  All right.  Well, maybe you can gather by

4   my tone, I'm going to allow them to do certain expedited

5   discovery and so I appreciate your attitude of cooperation

6   here.

7        But let's, since we're expediting all of this, and it would

8   take time to have the plaintiffs file some detailed description

9   of what they intend to do, let's right now, I can see an issue

10  with secured areas as opposed to other areas, like a storage        09:37:05

11  room or whatever.  So let's isolate that for a moment.

12       And, Mr. McElhinny, what exactly -- now, let's back up a

13  minute.  You intend to do this at four separate facilities,

14  correct?

15           MR. McELHINNY:  That is correct, Your Honor.

16           THE COURT:  You intend to do the same thing at all

17  four facilities?

18           MR. McELHINNY:  That is correct, Your Honor.

19           THE COURT:  One thing you would want to do is have

20  access for, what, five representatives?  I don't know why you    09:37:41

21  need five.  Why do you need five?

22           MR. McELHINNY:  We have three experts that we're

23  proposing.  One of them is a -- is a, what I would call a

24  classic detention expert, a jail conditions expert.

25           THE COURT:  A classic detention expert?

1          MR. McELHINNY:  Well, as Your Honor knows, there have

2     been -- there's a large amount of litigation over jails and

3     custody, and there are experts in this field who are familiar

4     with the standards that are generally applied.

5          THE COURT:  He's known as a classic expert?

6          MR. McELHINNY:  You will find him a classic expert

7     when you meet him.

8          THE COURT:  I gotcha.  All right.  Go ahead.

9          MR. McELHINNY:  The second one is a sanitarian and

10    that is a person who will opine over the -- obviously the                09:38:32

11    sanitary conditions, whether or not the cells are clean, how

12    the bathrooms are maintained, whether or not drinking water is

13    available.

14         THE COURT:  Gotcha.

15         MR. McELHINNY:  The third one is a medical expert

16    and -- slash nutritionist so we want to look at the food and

17    water that's available and the medical condition.

18         THE COURT:  All right.

19         MR. McELHINNY:  And the examinations that are done

20    upon them.  That's three people.  The fourth person is the             09:39:01

21    photographer.

22         THE COURT:  Uh-huh.

23         MR. McELHINNY:  And the other person is one lawyer on

24    our side.

25         THE COURT:  Gotcha.  All right.  What would you intend

 1    to do precisely in a so-called secured area of a detention

 2    facility?

 3              MR. McELHINNY:  The only thing specifically we needed

 4    to do were to take pictures of the -- of the holding cell

 5    itself, probably pictures of the bathroom itself, and if we can

 6    get some measurements -- again, I want to make sure, I'm just

 7    as eager to work this out.  What I don't want to see happen

 8    obviously is, when we get before Your Honor on an injunction,

 9    challenges to the adequacy of the factual basis for expert

10    opinions based on the fact that they didn't do things they

11    should have done.

12              THE COURT:  All right.  Now, I'm trying to visualize

13    here.  Five people going into a secured area for ten minutes

14    must not be a insurmountable problem, Ms. Fabian, because you

15    have cleaning people go in there for the same period of time,

16    right?

17              MS. FABIAN:  Yes, Your Honor.  I think ten minutes

18    does sound like a reasonable amount of time.  I would add,

19    though, that -- and this is something I just don't know from my

20    clients as far as photographs.  Obviously the cells sound like

21    there wouldn't be any law enforcement sensitive information

22    there.  There would be privacy concerns.  We may have to work

23    out issues with dealing with the proprietary of photographs of

24    certain areas but what they've described so far, the cells and

25    the bathrooms, I don't envision there being any problems.

09:39:50

09:40:32

1      I would say that it does beg the question if they're filing

2  a preliminary injunction motion if photographs are necessary.

3  We can certainly provide photographs of a representative cell

4  area in a Border Patrol station and we have submitted a

5  declaration with a description, you know, acknowledging that

6  there's a half wall in the bathroom area.  So there may still

7  yet be other ways to obtain that information, but ten minutes

8  otherwise does sound like a reasonable time.

9      THE COURT:  All right.  And four facilities sounds

10  pretty reasonable as opposed to all eight, right, Fabian?        09:41:28

11      MS. FABIAN:  Four facilities is doable, yes, Your

12  Honor.

13      THE COURT:  All right.  And I'm going to assume that

14  either you can provide a -- an accurate, current floor plan

15  that shows all the measurements that may be of interest to the

16  plaintiffs or that those measurements can be provided with

17  someone's avowal that they took those measurements and they are

18  accurate.

19      MS. FABIAN:  Yes, Your Honor.  I would suggest that

20  doing the measurements that plaintiff needs would probably be   09:42:11

21  the better way just because there may, again, be some law

22  enforcement sensitive or security concerns with providing full

23  floor plans but that's certainly something we can do.

24      THE COURT:  Is that acceptable, Mr. McElhinny?

25      MR. McELHINNY:  It is, Your Honor.

1          THE COURT:  All right.  That takes care of the secured

2     areas.

3        Now, you want to be in each facility for a whole day?  What

4     in the world -- so you're looking at food, sanitation -- well,

5     why do you need a whole day at each facility?

6          MR. McELHINNY:  How is my credibility working with you

7     so far, Judge?

8          THE COURT:  Both of you are doing well so far.

9          MR. McELHINNY:  Our sanitarian wants to go through

10    their garbage.                                                    09:42:56

11          THE COURT:  Really?

12          MR. McELHINNY:  Really.  Because one of those -- the

13    classic ways that that -- experts on food in facilities in

14    terms of whether it's edible, in terms of whether it's good, in

15    terms of whether it's nutritious is they look at the amount

16    that is thrown away.

17          THE COURT:  Hmm, cool.

18          MR. McELHINNY:  We want to look at the places where

19    the food is prepared.  We want to look at -- we want to look at

20    how dishes, bedding, if there is bedding, are stored.  And we    09:43:21

21    want to look at the trash to see whether any of it's used or

22    whether it's thrown away.

23          THE COURT:  So I'm hearing about an hour's worth of

24    time so far.

25          MR. McELHINNY:  In fairness, Your Honor, we asked for

1    a day because we thought that was a limited period.  We don't

2    want to be there longer than we have to be.

3         THE COURT:  What do you think, Ms. Fabian?

4         MS. FABIAN:  Your Honor, certainly a shorter period is

5    obviously easier to accommodate.  With regard to some of those

6    issues, I would say on the food, and I need to confirm this

7    with the facilities, Border Patrol facilities tend to have

8    contracts and so there are contracts that provide usually

9    caloric requirements for the food that's delivered from

10   outside, outside companies.  So I would need to find out a         09:44:19

11   little bit but if I could instead -- that we could provide,

12   that way we could provide more information about the food

13   rather than -- I just don't know that we have actual food prep

14   facilities at these areas.

15      With regard to some of those other things, they seem like

16   things that would be doable in a relatively short period of

17   time.  I would need to follow up with my clients and find out

18   the best way to do that.

19        THE COURT:  Well, I can't see a problem if somebody

20   really wants to do that, going through garbage.                    09:44:52

21      All right.  What else?  How come you need a whole day,

22   Mr. McElhinny?

23      Ms. Fabian, maybe we're getting into an argument over

24   nothing here.  Is a whole day sufficient to you if, in good

25   faith -- I can't imagine they're going to get in there and

1    waste a lot of time.  In other words, they could finish this in

2    a half a day and get out of there.  But setting a specific time

3    period other than just saying they can have access to so and so

4    facility on a given date and leave it at one day, meaning to

5    me, what, eight to five or something like that, we may be

6    arguing about nothing here.  They can probably do this in less

7    than one day and get out.

8            MS. FABIAN:  Your Honor, I think actually what's going

9    to save time, what would be helpful is if we have a full list

10   of the things they want to see.  I agree with you, setting some        09:46:04

11   time limit, an arbitrary time limit, makes senses and moves

12   this forward.  It's more understanding the things they want to

13   see.  What I imagine would be a challenge for my client is

14   that, you know, they have access to the facility and poke into

15   anything they'd like to see.

16           THE COURT:  Yeah, I don't want there to be any more

17   challenges so, Mr. McElhinny, what -- you better provide a list

18   right now of what you want to do in each facility on our record

19   here.

20           MR. McELHINNY:  All right.  We want to do the things         09:46:38

21   that I have listed.  And we want to measure the temperature.

22           THE COURT:  Where and how?  Do you know where and how

23   you would want to do that?  I mean, is that an actual secured

24   area, I guess?

25           MR. McELHINNY:  To a certain extent, Your Honor, I'm

1    shooting in the dark here.  My understanding, which we need to

2    confirm, is that the temperature is set for the entire building

3    and that it is consistent throughout the building.  And if

4    that's true, then we don't need to be in the secured area.  If

5    it turns out that there are -- that there's a separate

6    air-conditioning unit or availability in the secured area, then

7    we would like to find out what temperature is being set there.

8              THE COURT:  All right.  You can do that.  Go ahead.

9              MR. McELHINNY:  That is my list of inspections.

10             THE COURT:  Well, okay.  So you want to look at the        09:47:36

11   garbage --

12             MR. McELHINNY:  I knew that would get your attention.

13             THE COURT:  Do they or do they not, Ms. Fabian, have

14   food preparation facilities here as opposed to a catered

15   situation where they bring in the food and take out the trays

16   kind of thing?

17             MS. FABIAN:  Your Honor, I can't confirm that

18   specifically for these four facilities.  Generally the practice

19   of Border Patrol facilities is that the food is provided by a

20   food contract.  And so there may be some limited prep area        09:48:11

21   where it's prepared for distribution, but my strong belief

22   would be that in these facilities we're going to find that the

23   food is simply brought in by an outside contractor.

24             MR. McELHINNY:  Sarah, this is one of the confusions.

25   I think counsel is arguing in good faith based on what the

1    procedures and standards are supposed to be.  We have

2    substantial question about whether or not those procedures and

3    standards are followed.

4         MS. FABIAN:  I also -- I'll just add also that I have

5    been to a number of these facilities and that has been the case

6    in all the facilities.  I'll also add that at each facility,

7    the Border Patrol for each individual tracks the provision of

8    meals and snacks and juice to each individual under it.  So

9    there are sort of set meal times and then meals provided at

10   other times for individuals who may come sort of at off hours.      09:49:0

11        THE COURT:  And is that system documented?

12        MS. FABIAN:  It is documented, Your Honor, and I have

13   talked to my clients about, you know, the ability to turn -- to

14   provide some of that information.  We're already gathering that

15   information for the three named plaintiffs in anticipation that

16   that would be requested.  To gather it for every individual is

17   obviously going to be -- would be a very time-consuming process

18   of pulling each record and then redacting other

19   immigration-type information, but it is documented.

20        THE COURT:  All right.  We'll get to the documents in      09:49:38

21   just a minute.  Okay.

22     What else on physical inspection of the facility,

23   Mr. McElhinny?  Have you provided the list?

24        MR. McELHINNY:  I have provided the list, Your Honor.

25        THE COURT:  All right.  And is it fair that I hold you

1     to it?

2             MR. McELHINNY:  That is fair, Your Honor; I expected

3     that.

4             MS. FABIAN:  And to make sure that I have everything

5     so I can go to my clients and set that up, can I just list what

6     I understand the list would be:  the garbage areas, food prep

7     areas, if any, any bedding, I guess that would be if there's a

8     bedding storage area, or bedding present, and then a

9     measurement of the temperatures; is that accurate?

10            MR. McELHINNY:  That is accurate.  I'm sorry.  That is    09:50:23

11    accurate.  I think the question was for the secured areas.

12    Obviously, we want to inspect where initial -- where people are

13    initially taken, where the medical screening, if any, is done,

14    where the initial questioning is done before the person is put

15    in the secured facility.  We want to be able to track what

16    happens to an immigrant from the time they arrive at the

17    station until the time that they leave.

18            THE COURT:  That wasn't on your list before.  I mean,

19    it's reasonable.

20            MR. McELHINNY:  I'm sorry.  I thought my list was        09:51:02

21    while we were in the secured area.

22            THE COURT:  No, I was asking about the whole -- I

23    asked you about the secured area first and got from you what I

24    thought you wanted to do.  Then I don't think they keep

25    garbage, for example, in a secured area, so I was talking about

1    the rest of the facility.  What exactly you want to do during

2    this day's presence?

3              MS. FABIAN:  I would actually, in fact, Your Honor,

4    flip that description back on plaintiffs and say that all of

5    the things they're describing they'd like to view, that is what

6    occurs in a secured area.  That is where the aliens are held,

7    their intake occurs, medical screening occurs.  All of that

8    occurs in the secured areas.  The other things that they've

9    just listed are the things that I understand are for -- I mean,

10   for temperature, of course, occurs everywhere, but the rest of

11   it really occurs outside the secured area, certainly the

12   garbage.

13             THE COURT:  Well, now they need more than ten minutes

14   in the secured area, right?

15             MS. FABIAN:  And that's, I think, Your Honor, the

16   challenge that we've had is trying to discuss this with

17   plaintiff and to understand what they need.  I mean, to view an

18   individual going through initial screening and initial

19   processing, we have privacy concerns and, as you say, an

20   individual could be going through processing for any number of

21   hours, and at that stage we don't know if they're a gang

22   member, if they're -- you know, there could be small children.

23   So that process could take a long time and I agree that

24   certainly would, if someone wanted to view the entire process

25   of screening, would require access for a full day.

1          It also would be a process of watching someone sitting and

2     working with a border agent because I would be uncomfortable

3     saying that they could really stay on top and listen to the

4     process.

5          MR. McELHINNY:  This is Harold McElhinny.  I apologize

6     if we misspoke.  We don't want to follow any particular person,

7     we just want to see the building.

8          MS. FABIAN:  I would suggest a possible other

9     solution, at least in part, is that there is the ability to

10    access a -- it's more of an administrative oversight area where     09:53:15

11    the supervisors stand in these facilities and from those areas

12    there are windows but they're not actually in the secured

13    areas.  But they can view most of the secured area from that --

14    from those supervisors' separated area.

15       Now, there's some, I would say, lesser concerns with

16    spending too much time in there because there's a lot of

17    sensitive information and things can't get done in that area

18    while other individuals are there, but it is another option.

19    And that was the tour we had initially offered plaintiffs'

20    counsel on our meet and confer is to see those unsecured areas     09:53:52

21    and to access that area which would provide visual access to

22    the secured area.

23          THE COURT:  What about a -- in this ten minutes

24    physically in the secured area where the detainees are, the

25    walk-through for ten minutes with photographs, including rest

1    rooms, and then the balance of the time observation from this

2    window?

3        Mr. McElhinny, will that work?

4            MR. McELHINNY:  That will work, Your Honor.  Again,

5    I'm sorry I can't be more specific.  I don't know how long it

6    will take the photographer to set up.

7            THE COURT:  Okay.  Now, I gotcha.  But we're talking

8    -- Ms. Fabian, don't put a clock on them.  I mean, you know,

9    we're talking roughly ten minutes.  I mean, you know, if it's

10   15, well, it's no big deal.  Let them get in and get out.                09:54:52

11   That's the -- that's the point we made, not to be so disruptive

12   to your process, not to violate any privacy privilege concerns,

13   and McElhinny knows that.  So you accommodate him for around

14   ten minutes to be physically present in the secured area.  Then

15   observation is -- if there's a window looking in, can they hear

16   what's being said?

17           MS. FABIAN:  No, Your Honor.  It's entirely separate

18   and it's really windowed in.  I would describe it sometimes as

19   sort of a prow of a ship.  It's sort of rounded and it sort of

20   overlooks the rounded facility around it.  They're really able              09:55:52

21   to view the majority of the secured area but you cannot hear or

22   access that area.

23           THE COURT:  From that window, for example, they're not

24   seeing any naked bodies or they're not looking into a rest room

25   with somebody using the facility or something like that,

1    there's privacy concerns?

2            MS. FABIAN:  No, Your Honor.  That would only be a

3    concern if they were pointing actually into the back of the

4    cells.  If they're doing that for photography reasons, we would

5    have that empty at that time.

6            THE COURT:  All right.  What else on your list, given

7    the entire facility?

8            MR. McELHINNY:  That's my entire facility list, Your

9    Honor.

10           THE COURT:  All right.  So that -- all that can be          09:56:33

11   done, right?  Ms. Fabian?

12           MS. FABIAN:  That sounds good based on the information

13   we've been provided, Your Honor.

14           THE COURT:  Now, let's talk about the documents.  Have

15   any documents been -- not that they had to be or should be, but

16   have any documents been produced so far?

17           MS. FABIAN:  No, Your Honor.

18           THE COURT:  All right.  So you wanted to photograph

19   the holding cells, facilities, produce documents to show

20   current detainee inprocessing and detention practices and          09:57:13

21   procedures.  And that would be for -- what is that,

22   Mr. McElhinny, is that a -- is that a manual kind of a thing

23   you're talking about, a series of operating procedures?

24           MR. McELHINNY:  Ironically, Your Honor, we're sort of

25   shooting in the dark because it's my information, actually,

1   that the Border Patrol and the government keep most of these

2   documents confidential and don't make them public.  We have

3   provided to you examples of redacted versions that we have

4   found on the Internet or that came to us as a result of a --

5           THE COURT:  Oh, yeah.

6           MR. McELHINNY:  But what we would like -- and, again,

7   to give you a little bit of a background here, there's a

8   parallel case going on we brought to your attention, the Flores

9   case, and that's a unique case but it deals with a settlement

10  agreement and it deals with infants.                              09:58:15

11      And Judge Gee in the federal district just issued an order

12  there and the government's response to that has been to come in

13  and say:  We want a rehearing because the regulations have all

14  changed.  The facts -- you didn't get the facts right.  So we

15  don't want that kind of a problem here.

16      And what we're seeking on the manual side is a complete set

17  of what the government concedes are the standards and

18  regulations that govern all aspects of running these detention

19  facilities.

20          MS. FABIAN:  Your Honor, if I could respond briefly to   09:58:53

21  some of that.  I think the Flores case is completely -- it's

22  not applicable here.  Flores is about a contract -- it's not

23  about -- it's an agreement and it has nothing to do with the

24  constitutional claims the plaintiffs are making here so any

25  order by Judge Gee -- and the government's response with regard

1   to the Border Patrol facilities in <u>Flores</u> was to say:  Judge

2   Gee's finding are limited to Texas, and then for any nationwide

3   ruling we need to have -- engage in more discovery.  So I think

4   that's just not relevant to what we're looking at here.

5       I would say with regard to the manuals, that it might be --

6   our suggestion would be, and this is what we've tried to ask

7   plaintiff during the meet and confer, if plaintiff can identify

8   -- we have five areas where plaintiffs have raised claims.  And

9   those five areas are very specific, you know, food,

10  temperature, availability of bedding.  If plaintiff can tell us    09:59:48

11  things that they might need or information -- and I understand

12  we're still talking about for a preliminary injunction --

13          THE COURT:  Right.

14          MS. FABIAN:  -- we're not talking about discovery, so

15  if plaintiffs tell us what information their experts rely on

16  and that would be the standard for looking at the experts in

17  making our assessment of those five areas, that we have always

18  been willing to work with plaintiffs and find out what

19  information we have that would give them the information they

20  need.                                                               10:00:18

21      I imagine in a preliminary injunction they're not trying to

22  get all of the information, they just need something that would

23  show their experts what they need to make their opinions.  And

24  we are -- have been and remain willing to discuss sort of

25  citing that information, if they can tell us what information

1    their experts need.

2          MR. McELHINNY:  In fairness, Your Honor, this is not

3    something we should have to shoot in the dark and try to guess

4    what documents are out there.  These agents act under control

5    of a set of regulations, manuals, written directives.  I don't

6    know what they are but, in theory, the government does -- in

7    theory, the chief Border Patrol officer for the Tucson sector

8    knows what regulations apply to these detention facilities that

9    cover all of the aspects of a detainee's good health and well

10   keeping and humane treatment.  And it should not be two seconds    10:01:15

11   of a burden for that chief agent to turn around at his or her

12   desk and pull those governing manuals that they refer to every

13   day and produce them.  I'm supposed to guess what written

14   directives have come that govern?  I can't do that.

15         THE COURT:  Except one thing she's saying is that

16   there are specific allegations in the complaint and maybe

17   you're entitled only to those portions of any manual or

18   regulations that pertain to those specific allegations.

19       Are you in agreement with that?

20         MR. McELHINNY:  I'm willing to agree to that for this    10:02:00

21   point.  But, again, I don't think that's real in this sense.

22   Our allegations cover the fact that they are overcrowding

23   people in a holding facility, that they are not providing them

24   food and water, that they are not providing them medical

25   screening, that they are keeping them beyond the time limits

1    set for particular facilities.

2         THE COURT:  Yeah, you make all those allegations,

3    right?

4         MR. McELHINNY:  I do, Your Honor.  And so, I mean, if

5    Your Honor -- I mean, if they want to take the time to pull out

6    of their regulations the sections that cover all of our

7    allegations, for now I guess that's okay.  I'm not sure that

8    makes sense.

9         MS. FABIAN:  Well, Your Honor, if I can be heard on

10   some of those points.  There are broad allegations in the                    10:02:53

11   complaint regarding those areas.  I would point the Court,

12   though, to the five constitutional claims the plaintiffs raise,

13   which are much more specific.  None of those really directly

14   address overcrowding in cells or the time, other than they sort

15   of tangentially address those.  And I think you'll see -- our

16   motion to dismiss this case under Rule 12 is due tomorrow and

17   we'll be filing that and I think our position is, really, the

18   allegations made by the named plaintiffs, you don't see really

19   any of those claims that plaintiffs are now making.

20        And so when the Court has the opportunity to rule on these            10:03:21

21   motions, which will be fully briefed and before the Court in

22   22 days from now after we file our motion tomorrow, I think

23   these issues are going to significantly narrow.  And so I would

24   be -- it is not be -- actually, our position is that they will

25   be fully resolved because there's not going -- this case is

1    going to be moot after the Court rules on those motions.  So I

2    think --

3             THE COURT:  Before I forget, have you got any

4    jurisdictional challenge?

5             MS. FABIAN:  We do, Your Honor.  Our position would be

6    that class certification is not appropriate in this case.

7    There are individualized claims, so asserting whether any

8    individual plaintiff, individual alien has experienced a

9    constitutional violation with regard to the conditions that he

10   or she experienced, it's really an individualized analysis, and    10:04:15

11   you'll see that in the cross verification motion that's fully

12   briefed now and before the Court.

13      And then what we raised in our motion to be filed tomorrow

14   is that, in that case, the causes of action for the named

15   plaintiffs are moot because none of the named plaintiffs are in

16   Border Patrol custody at this time and none of them allege any

17   more than a passing theory that they may return to Border

18   Patrol custody and so that would moot their claim to the extent

19   -- and because they are seeking injunctive relief with regard

20   to the conditions at Border Patrol.                               10:04:51

21            THE COURT:  McElhinny?

22            MR. McELHINNY:  Your Honor, this is -- again, this is

23   pretty standard.  We're here today -- I mean, this is actually

24   happening every night in these facilities.  It continues to

25   happen.  There were no denials in the papers about the way

1   people --

2          THE COURT:  It's not happening to the named

3   plaintiffs.

4          MR. McELHINNY:  Your Honor, again, when we get to the

5   mootness issue, which you will see, in hundreds of these cases

6   in the Ninth Circuit, when you're dealing with temporary

7   holding facilities in which the turnover is quick, the courts

8   routinely find the mootness doctrine doesn't apply because of

9   what's happening at the time that the complaint was filed is a

10  case where it's capable of repetition.  It's a case where           10:05:45

11  there's strong public issues, public interest issues, and the

12  courts won't let the government get out of these kinds of

13  claims by turning people -- the named plaintiffs over quickly.

14  The mootness almost never works in these cases.  We have strong

15  authority on that.  We will get there.  We may get there when

16  we come before you on the preliminary injunction.

17         THE COURT:  All right.  I forgot where we were.

18         MR. McELHINNY:  Well, that's the point.  The point is

19  what we want to be able to do is to make a record before you as

20  to what is actually happening every night in these cells.           10:06:2?

21  Because once you see that, you will stop it.  I'm sorry.  And

22  in order to do that, in order to do that, we would like an

23  agreed set -- we would like the government to take a position

24  about what they are required to do by their own regulations by

25  turning over a complete set to us.

1          THE COURT:  Well, of course, I don't know what is out

2    there in terms of is there a single manual, are we talking

3    about a truckload of documents here?  I mean, I'm having a hard

4    time thinking that this is so burdensome, Ms. Fabian, if it's a

5    question of a single manual with some representation about the

6    effective date of the provisions and regulations, why that

7    can't be easily produced with perhaps a protective order in

8    place as to what plaintiffs can do with that manual.

9          MS. FABIAN:  And I'd say with all due respect, Your

10   Honor, the words that were given here are regulations and          10:07:46

11   manuals.  I mean, regulations that cover Border Patrol are

12   found in the Code of Federal Regulations, so the -- when we're

13   talking about manuals again, are they asking for a manual --

14   they're talking about intake procedures, and the only claim I

15   see in their complaint that remotely addresses intake

16   procedures is whether there is medical processing, and even

17   that it's not really clear how that relates.

18        But to the extent that we broadly read their claims,

19   there's no medical intake procedures, there's -- if they're

20   asking for a manual on medical intake procedures, that's         10:08:22

21   certainly something I could identify and talk to my client

22   about what governs that.

23        If we're just talking about a manual that governs all

24   things that Border Patrol do in their facilities, I think

25   that's just overly broad and it really doesn't address the

1   claims that exist in this case.

2       I would also note that no named plaintiff alleges that he

3   or she had any medical injury when they entered the facility.

4   The only one who alleges any injury is an abrasion on her foot,

5   and there's no further allegations about that causing any harm.

6       So our challenge is, to be asked to sort of say give us all

7   manuals that govern everything you do, it is a broad request

8   and it seems that we're -- we're early in the case, we're

9   procedurally premature here when we're talking about a

10  preliminary injunctive motion.  If they want information for        10:09:19

11  their experts, their experts know what information they rely on

12  and we're happy to try to provide that.

13          THE COURT:  Well, CFR notwithstanding, is there or is

14  there not a book, whether you call it a manual or whatever it

15  is, is there a book of procedures maintained at the facility

16  that directs and dictates how inmates are to be housed and

17  processed?  Is there or isn't there?

18          MS. FABIAN:  I don't know the answer to that

19  specifically, Your Honor.  I do know, and plaintiffs referenced

20  in their complaint and provide, there is the handbook of -- and   10:09:59

21  I don't have the name in front of me right now, but there is

22  the sort of hold room procedures manual that has -- we have --

23  understand plaintiffs have a copy of.  But that is not -- but

24  is there a manual in each facility that governs all operations

25  of that facility?  I don't know the answer to that.  I don't

1   believe so.  But I don't know the answer.  We can certainly ask

2   our clients if there's a single manual that governs operations

3   at the facility.

4       But they do already have that procedures manual.  If

5   there's portions of it that are redacted that they have

6   specific questions on, we can certainly -- I just, I don't know

7   the availability of that otherwise.

8       THE COURT:  Well, is this too broad for you, that the

9   defendants produce any written directives or regulations

10  followed and maintained by the detention centers pertaining to      10:10:57

11  any and all specific allegations in the complaint?

12       MS. FABIAN:  Your Honor, the --

13       THE COURT:  Did you just say there are any or there

14  aren't any?  I mean, with respect to, you know, when they go to

15  the bathroom.  There isn't any such.  You know, whether the

16  lights are on all night, there aren't any such directives or

17  written policies.  What's wrong with that?

18       MS. FABIAN:  The only change I'd ask for, Your Honor,

19  is rather than the allegations contained in the complaint,

20  because there's a 56-page complaint that has a lot of            10:11:39

21  allegations that are not grounded actually in alleged fact,

22  they're simply sort of broad-based allegations, so I think our

23  position would be that that might be doable if we based it in

24  the five areas in which plaintiffs have raised constitutional

25  claims rather than broadly saying, "the allegations in the

1  complaint".

2          MR. McELHINNY:  But with all due respect, Your Honor,

3  you can see now a little bit about what we're up against here.

4  Exhibit A to the Cole declaration in support of our motion is a

5  memorandum which is redacted heavily but the subject is hold

6  rooms and short-term custody.  It was issued by the Customs and

7  Border Protection on June 2, 2008.  Exhibit B is a book called

8  CPB Security Policy and Procedures Handbook, again redacted,

9  issued August 13, 2009.

10     It's not that difficult and counsel is trying to make it      10:12:38

11  sound complicated and difficult and is trying to win her motion

12  to dismiss on this discovery motion and we just think it --

13  it's going to be much easier if they just give us the memos.

14          THE COURT:  I'm trying to hold passion to a minimum

15  here.  Let's back up.

16     Why don't you, Mr. McElhinny, describe right now for our

17  record a concise description of what you want in this category,

18  that category being manuals and standard operating procedures.

19          MR. McELHINNY:  I would like the current version of

20  any memorandum that sets out procedures for hold rooms and      10:13:30

21  short-term custody and a current version of a security policy

22  and procedures handbook for detention.  And any written

23  memoranda that have been issued to supervising agents that

24  govern feeding, medical screening, sleeping, temperature.

25  That's my list.

1            THE COURT:  All right.  Ms. Fabian, why can't you do

2     that?

3            MS. FABIAN:  Can I ask is that for the four facilities

4     that we're talking about now for the purposes of this

5     preliminary injunction motion?

6            THE COURT:  Yes.

7            MR. McELHINNY:  Your Honor, if I may, this is, again,

8     where the government, unfortunately, in the <u>Flores</u> case, the

9     chief officer of the Rio Grande Valley issued -- submitted a

10    declaration to Judge Gee in which he testified under oath that          10:14:3?

11    the Border Patrol provides -- applies the same standards and

12    procedures in all areas of the Border Patrol area.  That's what

13    he said under oath.  Now that they lost that case, they're

14    taking the position that they may be different in the Rio

15    Grande Valley.

16       But if there is a procedure that governs the Tucson sector,

17    I would like to be able to get that, even if it doesn't call

18    out one of the specific four facilities.

19            MS. FABIAN:  Your Honor, I would just respond, I did

20    help with the preparation of that declaration and I don't have          10:15:1?

21    the exact wording in front of me, but I can say that there are

22    several policies and procedures that apply to the Border Patrol

23    in all sectors.  There are also things, like temperature, you

24    can imagine, doesn't apply nationwide because in Minnesota

25    we're going to have different temperatures than we need in the

1    Rio Grande Valley.  So in -- and we're talking here about very

2    specific conditions.

3        And so I am in good faith saying that I just would want to

4    make sure if we're talking about those four facilities, that

5    there might be nationwide or broader policies that apply and

6    there might also be building specific or just sector specific

7    information that applies.  I don't believe it's accurate to say

8    that we're backing out from <u>Flores</u>.  I understand all the

9    challenges with <u>Flores</u> and I'm intimately aware of them but it

10   is a different case and it does involve -- it was, in fact, a         10:16:07

11   lot of the separations involved the surge on the southwest

12   border last year and that's not something that as a state we're

13   facing in Arizona.  So there may be some differences in the

14   policies, and that's all I'm trying to clarify.

15           MR. McELHINNY:  Let me be helpful.  Let's say that the

16   wording is any policies that apply to these four stations.

17           THE COURT:  That's fair.  All right.  You understand

18   is you've got to -- you got a grip, Ms. Fabian, on his list?

19           MS. FABIAN:  I do, Your Honor.  I think, hopefully,

20   that's all the information they're seeking here.                      10:16:46

21           THE COURT:  If either one of you have a problem with

22   it, you can call Cindy, my court reporter, and have it read

23   back to you.

24           MS. FABIAN:  Okay.  Thank you, Your Honor.

25           THE COURT:  All right.  The next category is all logs

1   -- all logs and systems for tracking compliance with detention

2   standards over the past six months, including any manuals or

3   guidance as well as maintenance logs, supply logs, blah, blah,

4   blah.  That's pretty broad.

5       And, Ms. Fabian, have you dealt with that category yet?

6           MS. FABIAN:  No, Your Honor, except to say, as I said

7   before, there are, you know, certainly -- well, with regard to

8   two of the areas that the plaintiffs have raised claims, the

9   medical and food, that information is contained by each

10  individual file and I have asked my clients to go ahead and        10:17:49

11  start preparing those for the named plaintiffs, which would be

12  something we could turn over.

13      In terms of a six-month time period, the challenges are

14  obviously there are thousands of individuals who go through

15  these facilities and each file would have to be pulled and

16  redacted.  So it's not something that is not possible, it's

17  something that -- the narrower scope is -- I mean, we're

18  talking -- the legal issues will be keyed up for the Court in

19  22 days.  If we're doing things faster than that at this stage,

20  then I just -- the smaller the scope, the more likely we can      10:18:21

21  get material, but it would be sort of filed based on

22  individuals.

23      Those are the only logs that I'm aware of at this time.  I

24  can certainly follow up with my client on others, but those two

25  areas, medical and food, are the two areas that I'm familiar

1   with.

2          THE COURT:  Well, Mr. McElhinny, you weren't

3   requesting all these logs for every prisoner or detainee in the

4   last six months, were you?

5          MR. McELHINNY:  Again, let me step back, Your Honor.

6   I don't know what logs they maintain.  And so what I'm coming

7   at this is an element of proof.  I want to be able to prove to

8   you for some period of time that's current how many detainees

9   were kept in a holding cell that is intended to be used for no

10  more than 12 hours.  And how many people were kept there for          10:19:21

11  days at a time without meals, without bedding, and without

12  showers.

13         THE COURT:  Yeah, that's not -- that's a different

14  kind of a log, isn't it?  That would be a log showing, say, on

15  any given night how many people were in the -- were being

16  detained, right?

17         MR. McELHINNY:  That doesn't tell me that but it

18  doesn't tell me when they came in and when they left.  So, yes,

19  if they have 100 people in a cell that is designed for, you

20  know, 40, that's a problem.  But if they have one person in          10:20:03

21  that cell, as we have alleged in declarations, for a week at a

22  time without a shower and without a regular meal, that's a

23  different problem.

24         THE COURT:  Well, what's wrong with limiting this to

25  the three named plaintiffs and the specific dates they were

1    detained, you get all that information on those dates, and with

2    respect to those individuals.  For example, if on

3    February 22nd, plaintiff so and so was detained there for

4    20 hours, to provide the logs for that date for that plaintiff,

5    but showing how many prisoners were detained that date and, et

6    cetera.  I mean, to go beyond that, you are getting into a very

7    burdensome production, at least at this stage.

8            MR. McELHINNY:  In fairness, Your Honor, we don't know

9    that because we don't know what they have.  We don't know, for

10   example, if they maintain a log that simply says this is the          10:21:18

11   number of people we kept for more than 12 hours.  Because we

12   don't know if they have the log exceptions to their standards.

13   They may have, you know, a list of --

14           THE COURT:  Well --

15           MR. McELHINNY:  -- problems or violations.  We just

16   don't know that.  The problem with the specifics that you've

17   recommended is, one, our plaintiffs, we have a currency

18   problem, which is, as we've now seen, when you go in with a

19   fixed date, the government takes the position that that's --

20   all that information was outdated.  You started here, that that      10:21:56

21   happened during the surge.  It's not a real problem.  It's not

22   continuing.  You don't need injunctive relief.  For our

23   injunction motion, we would like to get you current

24   information.

25           MS. FABIAN:  And to respond to that, Your Honor, I

1   would say the injunction motion, from what it sounds like, they

2   want the injunction that would enter the ultimate relief in

3   this case and they want to fully prove up their case before

4   these legal issues have been resolved.

5       We have the named plaintiffs, we don't have a certified

6   class, and we understand that we're -- we understand the need

7   for sort of viewing the records of the named plaintiffs and,

8   like I said, if we -- I offered -- I offered plaintiffs before,

9   we keep logs of the temperature or we could keep a log of the

10  temperature for a week, and that's certainly something we can          10:22:44

11  do in the other areas.  And the medical records, as I said, are

12  kept by individual and that's a challenge and raises some

13  privacy concerns as well.

14      On the other claims, I can look and see if there are

15  straightforward logs that are kept.  We've already submitted a

16  declaration that does talk about the lighting.  We've

17  acknowledged that the lights are kept on for operational

18  purposes given the nature of the facility.  We have submitted a

19  declaration about the availability of bedding at the facility,

20  that that's another operational reality of these short-term          10:23:18

21  facilities.  So some of this information we've submitted our

22  own declaration acknowledging the factual scenarios and we

23  contend that these aren't constitutional violations, as you'll

24  see in our motion, but we --

25          MR. McELHINNY:  This is the problem, Your Honor, I

1   have.  It seems logical to me that these institutions have a

2   record of when detainees were fed.  And it seems illogical to

3   me that that's going to be of some individual detainee's record

4   because they're going to have notes of deliveries, they're

5   going to have contracts, they're going to have documents that

6   say what the food was.  And, you know, I worked in an

7   institution myself.  They have -- they have hourly logs that

8   show what is happening in the institution on a general basis.

9   They have to have those.

10         MS. FABIAN:  And I think that --                    10:24:17

11         MR. McELHINNY:  But we can't narrow this because we're

12  not getting any help from the government at all other than wait

13  until all of our motions are decided months from now.

14         THE COURT:  Well, what about logs for these plaintiffs

15  on those days and a log that would show the number of

16  prisoners, when and what they were fed on today's date?

17         MS. FABIAN:  Your Honor, I did look into this

18  question -- just to help out with this one, I did look into the

19  question of whether there was a facility-wide log of feeding,

20  as I mentioned before, and I need to check with the specific    10:24:56

21  facilities.  There are contracts for the food provision, and

22  those contracts, my understanding, is they're basic caloric

23  requirements for an individual.  I don't know if the contracts

24  also have timing.

25     The reason food is tracked on an individual basis is

1    because individuals are coming and going from these facilities

2    at all times and if there's a regular schedule, someone might

3    end up being held and not being fed for a significant period of

4    time.  So individuals are fed at Q four hours of entry into the

5    facility and that may be off the schedule.

6        All that said, I am aware that at Tucson station there is

7    -- I could track on a given day what time the meals -- the

8    regular meal service occurred and that wouldn't -- that

9    wouldn't account for individuals who may have come and gone at

10   different hours and been fed at different hours for various

11   operational reasons.  But I could, at Tucson station, on a

12   given day tell you what time the regular meal service and

13   snacks were provided.  I do know that.

14           THE COURT:  I heard you talking about cell occupancy

15   for the most part, Mr. McElhinny.

16           MR. McELHINNY:  I'm not, Your Honor.  I'm talking

17   about the fact that they stay there for three days without

18   getting food.

19           MS. FABIAN:  And there's no allegation --

20           MR. McELHINNY:  And the government, if I understand

21   it, has just said that other than in Tucson, they do not have

22   records of when individuals are fed.

23           MS. FABIAN:  I'm sorry if that answer was unclear.  We

24   have records for all individuals.  In Tucson station -- and I

25   don't know that it's not the case in the other stations, that's

10:25:43

10:26:13

```
 1    the only one that's gotten back to me in the short time frame I
 2    have here -- is in Tucson station they can tell me also on a
 3    given day what time the general meal service is.
 4        At all stations for any individual I could pull a record of
 5    the times that that individual received food and what they
 6    received and whether they refused meal service.  So that record
 7    is available for all individuals.  But facility-wise, the only
 8    one I'm aware of is that it's available at Tucson.  It's not to
 9    say I can't find out if it's available at the other stations.
10            THE COURT:  Well --                                    10:27:10
11            MR. McELHINNY:  The problem with the specific -- the
12    problem with the specific dates, Your Honor, of course, is they
13    may conform to that date.
14            MS. FABIAN:  I can certainly see if it's available for
15    a date last week or -- I don't know that.  I'm trying to
16    remember the way it was explained to me but I can certainly see
17    if there's -- you pick a date relatively recently, I can
18    certainly see if we have records for that given date.  But I
19    can ask my client.
20            THE COURT:  You're tending to lose me here just        10:27:46
21    because we're starting to get kind of vague on what you want.
22    And so you're going to have to do a little better.  I just
23    offered a compromise to limit this to the plaintiffs and their
24    detention dates and to pick at random another date.
25            MR. McELHINNY:  May I -- may I propose this, Your
```

```
 1    Honor, which is even less burdensome?

 2              THE COURT:  All right.

 3              MR. McELHINNY:  The government produce a list of which

 4    logs they maintain on a daily basis in these institutions, just

 5    the list.

 6              THE COURT:  Well, what are you going to do with it

 7    after that?

 8              MR. McELHINNY:  Well, if we get a list that says

 9    extraordinary circumstances, if there's a list of departations

10    from standards, for example, if there's a narrow list that          10:28:40

11    turns out that there's a log that is more narrow than is

12    entered on each individual's file, then we may come back to you

13    for that.  But if there isn't, then we're done.

14              MS. FABIAN:  I just --

15              MR. McELHINNY:  I can't be more specific with you

16    because I don't know what logs they keep.

17              THE COURT:  Sounds good to me.

18              MS. FABIAN:  And I just want to clarify.  You mean

19    logs that would relate to the claims that plaintiffs are

20    raising in the case?  And I only ask because I don't know what    10:29:16

21    logs are out there.  If there's -- the way --

22              THE COURT:  They're not asking you --

23              MS. FABIAN:  Logs in these areas?

24              THE COURT:  No.  He's not asking you to produce the

25    logs, he's asking you to produce a list of logs maintained.
```

UNITED STATES DISTRICT COURT

1          MS. FABIAN:  Of all logs, okay.

2          THE COURT:  Yeah.

3          MS. FABIAN:  I can ask my client about that.

4          THE COURT:  All right.  So we're going to do all this.

5          MR. McELHINNY:  I've got one other thing, Your Honor,

6     and it's sort of the crown jewel if I can raise it.

7          THE COURT:  Go ahead.

8          MR. McELHINNY:  I am told that the government has

9     maintained, and we have specifically asked them to maintain --

10    actual videotapes of the holding cells.                      10:29:5

11         THE COURT:  All right.

12         MR. McELHINNY:  So they show at any particular period

13    of time how many people were in there, what the sleeping

14    accommodations were; an actual recorded video history of what

15    has happened in those holding facilities.

16         THE COURT:  Gotcha, but you're talking about on what

17    dates?

18         MR. McELHINNY:  I'll take them for the last three

19    weeks.  I would like them for six months but I'll take them for

20    the last -- I don't know whether they changed in response to    10:30:2

21    our complaint.  I'll take them for a month.  There's no burden

22    here.  The burden is us having to go through them.  They're

23    videotapes; they're just stored.

24         THE COURT:  That's certainly a reasonable request,

25    Ms. Fabian.

1      MS. FABIAN:  I need to find -- I don't know the way

2  they're maintained.  I don't know -- I would need to find out

3  more information about what we actually have.  But I can find

4  out what we would be able to produce on that subject.  I just

5  don't know whether they're -- in what manner they're maintained

6  or how difficult it would be to actually download it and

7  provide those.

8      THE COURT:  All right.  I'm glad you mentioned that.

9  I'm going to order the defendants not to record or record over

10 or otherwise destroy any such surveillance tapes presently in       10:31:12

11 their possession and to preserve those which are presently in

12 their possession which have not been recorded over or otherwise

13 destroyed.

14    You understand that?

15      MS. FABIAN:  Yes, Your Honor.  And I would ask if we

16 could -- if you could put that in a regular order that comes

17 out just so I have the exact -- the other side can call your

18 court reporter.  If that can be in any written order so that I

19 can specifically provide Your Honor's language to my client,

20 that would be helpful.  I can certainly call the court reporter     10:31:52

21 if that's too much to ask but I just want to make sure that I

22 get the exact request from Your Honor to my client.

23      THE COURT:  All right.  We've got two things now to

24 produce.  One is a list of logs; two is a list of video

25 surveillance tapes.

1       How long do you need to produce those lists?

2               MS. FABIAN:  Your Honor, I would ask for two weeks

3       just because it will take some time to consult with my clients

4       and we're talking about four facilities that sort of operate

5       with different management.  So if I could have two weeks to do

6       that, that would be --

7               THE COURT:  Well, no, because I'm only going to give

8       you 22 days to comply with all of this.

9               MS. FABIAN:  Okay.

10              THE COURT:  So what is today anyway?  Oh, Thursday,          10:32:50

11      the 13th.  You provide those lists, Ms. Fabian, on or before

12      close of business on Thursday, August the 20th, and accommodate

13      the plaintiffs with respect to all other discovery that we have

14      discussed today within 22 days of tomorrow's date.  Those

15      22 days include holidays and weekends, okay?

16              MS. FABIAN:  Okay, Your Honor.

17              THE COURT:  Anything else?  I'm going to get you some

18      kind of a written order but it's -- to be cautious here, if

19      there's some significant dispute as to what you said or what I

20      said, you should contact Cindy, okay?                               10:33:53

21              MS. FABIAN:  Okay, Your Honor.

22              MR. McELHINNY:  Your Honor, may I put one other thing

23      on the record?

24              THE COURT:  Sure.

25              MR. McELHINNY:  There are privacy issues in this case;

1   we understand that those have to be protected.  We understand a

2   protective order is probably needed.  And up until we have that

3   protective order agreed to and in place from Your Honor, we

4   will agree to an attorney's eyes only usage of all of this.  We

5   may not feel that's appropriate but we don't want any of this

6   held up over negotiations over a protective order.

7          THE COURT:  You want to propose and submit a

8   protective order, Ms. Fabian?

9          MS. FABIAN:  I can certainly do that, Your Honor.  I

10  can tell you that the concerns that we have that is without a          10:34:50

11  class certified, we're looking at providing records for

12  individuals who are not class members or not otherwise

13  represented by the attorneys, but we can see what language

14  might be able to work with those issues.  I mean, we can also

15  see about redacting names and identifying information that

16  might also cover that issue.

17         THE COURT:  Gotcha.  Okay, counsel?  Our hour is up.

18         MR. McELHINNY:  Nothing further, Your Honor.

19         THE COURT:  All right.  Thank you very much.

20         MS. FABIAN:  Thank you, Your Honor.                            10:35:27

21         THE COURT:  All right.  Good-bye.

22         MR. McELHINNY:  Thank you, Your Honor.

23      (Whereupon, the matter was concluded at 10:35 a.m.)

24

25

1                    C E R T I F I C A T E

2


3          I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5


6     /s Cindy J. Shearman                August 13, 2015
     CINDY J. SHEARMAN, RDR, CRR              DATE
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT