1   Harold J. McElhinny*
    Kevin M. Coles*
2   Elizabeth G. Balassone*
    MORRISON & FOERSTER LLP
3   425 Market Street
    San Francisco, CA 94105
4   Telephone: (415) 268-7000
    Facsimile: (415) 268-7522
5   Email: HMcElhinny@mofo.com
    Email: KColes@mofo.com
6   Email: EBalassone@mofo.com

7   Attorneys for Plaintiffs

8   * Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

9   Additional counsel listed on next page

10

11              IN THE UNITED STATES DISTRICT COURT

12              FOR THE DISTRICT OF ARIZONA

13

14  Jane Doe # 1; Jane Doe # 2; Norlan Flores,      Case No. 4:15-cv-00250-TUC-DCB
    on behalf of themselves and all others
15  similarly situated,
                                                    **BRIEF IN SUPPORT OF**
16                          Plaintiffs,             **PLAINTIFFS' MOTION FOR**
                                                    **PRELIMINARY INJUNCTION**
17           v.
                                                    **CLASS ACTION**
18  Jeh Johnson, Secretary, United States
    Department of Homeland Security, in his         **Oral Argument Requested**
19  official capacity; R. Gil Kerlikowske,
    Commissioner, United States Customs &           **(Assigned to the**
20  Border Protection, in his official capacity;    **Honorable David C. Bury)**
    Michael J. Fisher, Chief of the United States
21  Border Patrol, in his official capacity;        Action Filed: June 8, 2015
    Jeffrey Self, Commander, Arizona Joint
22  Field Command, in his official capacity;        **PARTIALLY REDACTED**
    Manuel Padilla, Jr., Chief Patrol Agent-
23  Tucson Sector, in his official capacity,

24                          Defendants.

25

26

27

28

1    Colette Reiner Mayer*
    MORRISON & FOERSTER LLP
2    755 Page Mill Road
    Palo Alto, CA  94304-1018
3    Telephone: (650) 813-5600
    Facsimile:  (650) 494-0792
4    Email:  CRMayer@mofo.com

Travis Silva*
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS OF THE SAN FRANCISCO
BAY AREA
131 Steuart Street, Suite 400
San Francisco, CA  94105
Telephone: (415) 543-9444
Facsimile:  (415) 543-0296
Email:  tsilva@lccr.com

Louise C. Stoupe*
Pieter S. de Ganon*
MORRISON & FOERSTER LLP
Shin-Marunouchi Building, 29th Floor
5-1, Marunouchi 1-Chome
Tokyo, Chiyoda-ku  100-6529, Japan
Telephone: +81-3-3214-6522
Facsimile:  +81-3-3214-6512
Email:  LStoupe@mofo.com
Email:  PdeGanon@mofo.com

Victoria Lopez (Bar No. 330042)**
Daniel J. Pochoda (Bar No. 021979)
James Duff Lyall (Bar No. 330045)**
ACLU FOUNDATION OF ARIZONA
3707 North 7th Street, Suite 235
Phoenix, AZ  85014
Telephone: (602) 650-1854
Facsimile:  (602) 650-1376
Email:  vlopez@acluaz.org
Email:  dpochoda@acluaz.org
Email:  jlyall@acluaz.org

Linton Joaquin*
Karen C. Tumlin*
Nora A. Preciado*
NATIONAL IMMIGRATION LAW
CENTER
3435 Wilshire Boulevard, Suite 2850
Los Angeles, CA  90010
Telephone: (213) 639-3900
Facsimile:  (213) 639-3911
Email:  joaquin@nilc.org
Email:  tumlin@nilc.org
Email:  preciado@nilc.org

Mary Kenney*
Emily Creighton*
Melissa Crow*
AMERICAN IMMIGRATION COUNCIL
1331 G Street NW, Suite 200
Washington, D.C. 20005
Telephone: (202) 507-7512
Facsimile:  (202) 742-5619
Email:  mkenney@immcouncil.org
Email:  ecreighton@immcouncil.org
Email:  mcrow@immcouncil.org

Attorneys for Plaintiffs

* Admitted pursuant to Ariz. Sup. Ct. R. 38(a)

** Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

1

## <u>TABLE OF CONTENTS</u>

2

**Page**

3  TABLE OF AUTHORITIES ...................................................................................ii

I.      INTRODUCTION ............................................................................2

4

II.     BACKGROUND ...............................................................................3

5
        A.    The Conditions of Confinement in Tucson Sector Stations are
6              Inhumane and Punitive. ...........................................................3

7       B.    Defendants' Policies and Procedures, Recently Amended,
              Formalize and Systematize the Harm ........................................7

8
III.    LEGAL STANDARD .......................................................................8

9  IV.    ARGUMENT ....................................................................................9

        A.    Plaintiffs are Likely to Succeed On Their Claim That
10             Defendants Violate Their Fifth Amendment Due Process
              Rights............................................................................................9

11             1.    Governing Law.............................................................9

12             2.    Failure to Provide Beds and Deprivation of Sleep.........10

               3.    Failure to Provide Warmth .........................................13

13             4.    Failure to Provide a Safe and Sanitary Environment.....14

14             5.    Failure to Provide Adequate and Sufficient Food...........16

15             6.    Failure to Provide Potable Water ................................17

16             7.    Failure to Provide Adequate Medical Screening and
                     Care ...........................................................................18

17      B.    Plaintiffs are Likely to Succeed on Their Claim That
              Defendants Have Failed to Enforce Mandatory Statements of
18             Policy. ..........................................................................................20

19             1.    Governing Law.............................................................20

               2.    Defendants Fail to Abide by the TEDS Standards..........21

20      C.    Plaintiffs Will Suffer Irreparable Harm If This Court Does Not
              Grant An Injunction....................................................................22

21
        D.    The Balance of Equities Tips Sharply in Plaintiffs' Favor. .........23

22      E.    A Preliminary Injunction Serves the Public Interest...................23

V.     CONCLUSION ...............................................................................24

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*Albright v. Oliver*,
 510 U.S. 266 (1994) ............................................................................................. 21

*Alliance for the Wild Rockies v. Cottrell*,
 632 F.3d 1127 (9th Cir. 2011) ................................................................................ 9

*Anela v. City of Wildwood*,
 790 F.2d 1063 (3d Cir. 1986) ............................................................................... 10

*Angov v. Lynch*,
 788 F.3d 893 (9th Cir. 2015) .................................................................................. 4

*Antonelli v. Sheahan*,
 81 F.3d 1422 (7th Cir. 1996) ................................................................................ 12

*Atkins v. County of Orange*,
 372 F. Supp. 2d 377 (S.D.N.Y. 2005) ................................................................. 14

*Board v. Farnham*,
 394 F.3d 469 (7th Cir. 2005) ................................................................................ 15

*Bowers v. City of Philadelphia*,
 No. 06-CV-3229, 2007 WL 219651 (E.D. Pa. Jan. 25, 2007) ................................. 11, 15

*Campbell v. Cauthron*,
 623 F.2d 503 (8th Cir. 1980) ................................................................................ 17

*Dawson v. Kendrick*,
 527 F. Supp. 1252 (S.D. W.Va. 1981) ................................................................. 14

*Defenders of Wildlife v. Tuggle*,
 607 F. Supp. 2d 1095 (D. Ariz. 2009) ................................................................. 20

*DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*,
 489 U.S. 189 (1989) ............................................................................................... 9

*Estate of Prasad ex rel. Prasad v. County of Sutter*,
 958 F. Supp. 2d 1101 (E.D. Cal. 2013) ............................................................... 19

*Farris v. Seabrook*,
 677 F.3d 858 (9th Cir. 2012) .................................................................................. 9

*Fischer v. Winter*,
564 F. Supp. 281 (N.D. Cal. 1983) .................................................................. 16

*Flynt Distributing Co., Inc. v. Harvey*,
734 F.2d 1389 (9th Cir. 1984) ..................................................................... 9

*Foster v. Runnels*,
554 F.3d 807 (9th Cir. 2009) ...................................................................... 16

*Friendly House v. Whiting*,
846 F. Supp. 2d 1053 (D. Ariz. 2012) ........................................................ 23

*Gates v. Cook*,
376 F.3d 323 (5th Cir. 2004) ..................................................................... 16

*Gibson v. Cty. of Washoe, Nev.*,
290 F.3d 1175 (9th Cir. 2002) ................................................................... 18

*Graves v. Arpaio*,
48 F. Supp. 3d 1318 ........................................................................... 18, 19

*Harris v. Bd. of Supervisors, L.A. Cty.*,
366 F.3d 754 (9th Cir. 2004) ................................................................ 22, 23

*Helling v. McKinney*,
509 U.S. 25 (1993) .......................................................................... 15, 18

*Henderson v. DeRobertis*,
940 F.2d 1055 (7th Cir. 1991), *cert. denied*, 503 U.S. 966 (1992) ............................ 14

*Hernandez v. County of Monterey*,
-- F. Supp. 3d. --, No. 5:13-CV-2354-PSG,
2015 WL 3868036 (N.D. Cal. Apr. 14, 2015) ...................................................... 19, 22

*Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982), *abrogated on other grounds*
*by Sandin v. Conner*, 515 U.S. 472 (1995) ................................................... 19

*Jones v. Blanas*,
393 F.3d 918 (9th Cir. 2004) .......................................................... 10, 14, 17

*Jordan v. Gardner*,
986 F.2d 1521 (9th Cir. 1993) ................................................................. 24

*Keenan v. Hall*,
83 F.3d 1083 (9th Cir. 1996), *amended on other grounds*,
135 F.3d 1318 (9th Cir. 1998) ......................................................... 12, 14, 17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*King v. Frank*,
   328 F. Supp. 2d 940 (W.D. Wis. 2004) ............................................................ 12

*Klein v. City of Laguna Beach*,
   381 F. App'x 723 (9th Cir. 2010) ...................................................................... 9

*Knop v. Johnson*,
   667 F. Supp. 467 (W.D. Mich. 1987),
   *aff'd in pertinent part*, 977 F.2d 996 (6th Cir. 1992) ...................................... 14

*Lareau v. Manson*,
   651 F.2d 96 (2d Cir. 1981) .................................................................. 10, 15, 18

*Madrid v. Gomez*,
   889 F. Supp. 1146 (N.D. Cal. 1995) ................................................................ 18

*Majors v. Jeanes*,
   48 F. Supp. 3d 1310 (D. Ariz. 2014) ............................................................... 22

*Melendres v. Arpaio*,
   695 F.3d 990 (9th Cir. 2012) ..................................................................... 22, 24

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) ........................................................................................... 20

*Pure Wafer, Inc. v. City of Prescott*,
   14 F. Supp. 3d 1279 ......................................................................................... 22

*Rhodes v. Chapman*,
   452 U.S. 337 (1981) ........................................................................................... 8

*River Runners for Wilderness v. Martin*,
   593 F.3d 1064 (9th Cir. 2010) .......................................................................... 20

*Rodriguez v. Robbins*,
   715 F.3d 1127 (9th Cir. 2013) .............................................................. 22, 23, 24

*Rosado v. Alameida*,
   349 F. Supp. 2d 1340 (S.D. Cal. 2004) ..................................................... 23, 24

*Sandlin v. Conner*,
   515 U.S. 1237 (1974) ....................................................................................... 19

*Shorter v. Baca*,
   -- F. Supp. 3d. --, No. 12-cv-7337-DOC,
   2015 WL 1809282 (C.D. Cal. Apr. 21, 2015) ................................................. 19

1
2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Sierra Forest Legacy v. Rey*,
   577 F.3d 1015 (9th Cir. 2009)........................................................................ 8

*Smith v. Sullivan*,
   553 F.2d 373 (5th Cir. 1977)........................................................................ 17

*Thompson v. City of Los Angeles*,
   885 F.2d 1439 (9th Cir. 1989)...................................................................... 10

*Toussaint v. McCarthy*,
   597 F. Supp. 1388 (N.D. Cal. 1984), *aff'd in part*, *rev'd in part on other
   grounds*, 801 F.2d 1080 (9th Cir. 1986) ................................... 12, 13, 14, 15

*U.S. v. Raines*,
   362 U.S. 17 (1960) ...................................................................................... 24

*United States v. Wilson*,
   344 F. App'x 134 (6th Cir. 2009) ................................................................ 14

*University of Texas v. Camenisch*,
   451 U.S. 390 (1981) ...................................................................................... 9

*V.L. v. Wagner*,
   669 F. Supp. 2d 1106 (N.D. Cal. 2009) ...................................................... 22

*Wakefield v. Thompson*,
   177 F.3d 1160 (9th Cir. 1999)...................................................................... 19

*Winter* v. *Nat. Res. Def. Counsel*,
   555 U.S. 7 (2008).......................................................................................... 23

*Wong Wing v. United States*,
   163 U.S. 228 (1896) ..................................................................................... 10

*Young v. Quinlan*,
   960 F.2d 351 (3rd Cir. 1992)........................................................................ 16

*Zadvydas v. Davis*,
   533 U.S. 678 (2001) ..................................................................................... 10

*Zepeda v. U.S. INS*,
   753 F.2d 719 (9th Cir. 1984).................................................................. 22, 23

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSTITUTION

U.S. CONST. amend. V ................................................................. 9, 10, 12, 24

U.S. CONST. amend. VIII ......................................................................... *passim*

STATUTES

5 U.S.C.
    § 551(4) ................................................................................. 20
    § 706(1) ............................................................................. 2, 20

RULES
    Fed. R. Civ. P. 65 ....................................................................... 1

OTHER AUTHORITIES

Nina Bernstein, *U.S. to Reform Policy on Detention for Immigrants*, N.Y. Times,
    August 5, 2009, *available at* http://www.nytimes.com/2009/08/06/
    us/politics/06detain.html?pagewanted=all&_r=1  ................................... 1

Pope Francis, *Address to the Joint Session of the United States Congress*, Sept. 24, 2015,
    *available at* https://w2.vatican.va/content/francesco/en/speeches/2015/september/
    documents/papa-francesco_20150924_usa-us-congress.html. .................................. 1

*Tucson Sector Arizona*, U.S. Customs & Border Protection, *available at*
    http://1.usa.gov/1vuFTNw  ................................................................. 4

U.S. President Barack Obama, *Remarks by the President in Address to the Nation on
    Immigration*, Nov. 20, 2014, *available at* https://www.whitehouse.gov/the-press-
    office/2014/11/20/ remarks-president-address-nation-immigration  ....................... 1

U.S. Dep't of State, *Report on Int'l Prison Conditions*, May 22, 2013, *available at*
    http://www.state.gov/j/drl/rls/209944.htm. ......................................... 3, 11

In his recent address to Congress, Pope Francis appealed to Americans' shared history.  "We, the people of this continent, are not fearful of foreigners, because most of us were once foreigners.  I say this to you as the son of immigrants, knowing that so many of you are also descended from immigrants."[1]  Pope Francis called on the United States to treat the "thousands of persons [that] are led to travel north in search of a better life for themselves and for their loved ones" in a way that is "humane, just and fraternal."[2]  Publicly, at least, the government concurs.  "Scripture tells us," President Obama said in his much-touted speech on immigration, "that we shall not oppress a stranger, for we know the heart of the stranger—we were strangers once, too."[3]

Yet oppress is not too strong a word for what the federal government does, day in and day out, to immigrants detained at short-term civil detention facilities along the southern border.  In U.S. Border Patrol "stations" in Arizona, the government—which years ago pledged to transform immigration detention into a "truly civil detention system"[4]—routinely and systematically denies immigrants the minimal civilized measure of life's necessities.  It forces immigrants to sleep on cold, trash-strewn concrete floors; it detains immigrants for days in crowded cells without soap, showers, or hot water; it punishes immigrants who complain by lowering cell temperatures and threatening to confiscate food.  These actions are as shameful as they are unconstitutional.

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs Jane Doe #1, Jane Doe #2, and Norlan Flores and putative Class Members (together "Plaintiffs") hereby move for a preliminary injunction (1) enjoining Defendants and their agents and employees from

---

[1] Pope Francis, *Address to the Joint Session of the United States Congress*, Sept. 24, 2015, *available at* https://w2.vatican.va/content/francesco/en/speeches/2015/september/documents/papa-francesco_20150924_usa-us-congress.html.

[2] *Id.*

[3] U.S. President Barack Obama, *Remarks by the President in Address to the Nation on Immigration*, Nov. 20, 2014, *available at* https://www.whitehouse.gov/the-press-office/2014/11/20/ remarks-president-address-nation-immigration.

[4] *See, e.g.*, Nina Bernstein, *U.S. to Reform Policy on Detention for Immigrants*, N.Y. Times, August 5, 2009, *available at* http://www.nytimes.com/2009/08/06/us/politics/06detain.html?pagewanted=all&_r=1.

1  subjecting Plaintiffs to conditions of confinement in Tucson Sector stations that violate

2  Plaintiffs' Due Process rights by depriving Plaintiffs of sleep, warmth, a safe and sanitary

3  environment, and medical screening and care; and (2) compelling Defendants, pursuant to

4  5 U.S.C. § 706(1), to enforce certain minimal standards related to Plaintiffs' detention.

5  ## I.    INTRODUCTION

6        Tucson Sector stations are designed for the short-term civil detention and

7  processing of immigrant detainees, "not . . . for long-term care and detention."  (ECF No.

8  39-1, Ex. 1 ¶ 11.)  Because they were not intended to be long-term detention centers—

9  and, specifically, because they were "not intended for sleeping" (Ex. 81 at USA00091)—

10  detention that exceeds 12 hours inevitably creates harsh and punitive conditions that

11  violate the constitutional rights of the detained individuals.[5]  Yet detention for days on end

12  is the norm.  Between June 10, 2015, and September 28, 2015, over 1000 people were

13  detained for longer than 48 hours.  (Declaration of Joseph Gaston ("Gaston Decl.") ¶ 20.)

14  Defendants' repeated statements that these stations are "short-term facilities" for the

15  purpose of "brief initial processing," portray what stations are supposed to be, not what

16  they are.  (ECF No. 52 at 2, 8-9.)

17        This gap between purpose and practice creates the harm.  Detained individuals are

18  deprived of sleep, warmth, sanitation, food and water because Tucson Sector stations are

19  neither meant nor equipped to keep detained individuals for more than a few hours, let

20  alone for days.  Aside from a steel door, cement benches, and a metal "sink/toilet unit,"

21  Tucson Sector "hold rooms" are bare, concrete cells.  (Declaration of Eldon Vail ("Vail

22  Decl.") ¶ 208.)  There are no beds; there is no bedding.  Bright overhead lights are kept on

23  day and night.  There are no kitchens to prepare meals, no showers, no recreational

24  spaces.  Designed to be temporary "waiting rooms," they are being used as makeshift

25  dormitories—only without the most fundamental component of a dormitory:  beds.

26

27        [5] Twelve hours is not arbitrary.  Chief Padilla himself testified that "border patrol seeks to
   process and transfer all aliens out of their custody within 12 hours from apprehension." (ECF No.
28  39-1, Ex. 1 ¶ 11.)

The harm is compounded because Border Patrol agents were never supposed to be, nor were they trained to be, jailers.  Their job, as they themselves note, is the "apprehension, processing, and temporary custody of aliens."  (ECF No. 39-1, Ex. 1 ¶ 3.)  The reality, however, is that Tucson Sector stations have become jails and Tucson Sector agents have become jailers.  The result is a national embarrassment.

The fix is clear:  Defendants should process and transfer detained individuals promptly or hold them in facilities that are designed for detention.  What Defendants may not do is continue to detain Plaintiffs under conditions of confinement that are degrading, punitive, and unconstitutional—conditions that the U.S. government routinely condemns when they occur elsewhere in the world.[6]

Plaintiffs will continue to suffer irreparable injury if preliminary relief is not granted.  The evidence—which includes video stills, photos, station logs, detainee declarations, and expert opinion—demonstrates that Plaintiffs are likely to succeed on the merits of their claims.  Defendants' mistreatment of Plaintiffs is profoundly inequitable and serves no conceivable public interest.  The relief Plaintiffs respectfully seek from this Court is appropriate and urgent.

## II.    BACKGROUND

### A.    The Conditions of Confinement in Tucson Sector Stations are Inhumane and Punitive.

Detained individuals are apprehended following lengthy, grueling, and perilous journeys across the Sonoran Desert.  (Vail Decl. ¶ 122.)  They are, overwhelmingly, exhausted, hungry, and thirsty.  (*Id.* ¶ 140.)  Many are sick or injured and in need of immediate medical care.  (*Id.*)  Some fled their native land out of fear for their safety or the safety of their loved ones.  (*Id.* ¶ 152.)  Others have U.S. citizen children and spouses.  (*Id.* ¶ 152.)  Those detained include parents with young children (Declaration of Kevin Coles ("Coles Decl.") ¶ 37; Vail Decl. ¶ 61) and pregnant women (Vail Decl. ¶ 61).

---

[6] *See, e.g.*, Dep't of State, *Report on Int'l Prison Conditions*, May 22, 2013, *available at* http://www.state.gov/j/drl/rls/209944.htm.

They are "question[ed] in the field" (ECF No. 39-1, Ex. 1 ¶ 7) before being brought to one of eight Tucson Sector stations: the Brian A. Terry Station (formerly Naco Station), Casa Grande Station, Douglas Station, Nogales Station, Sonoita Station, Tucson Station, Ajo Station, and Willcox Station.[7]  If these stations functioned as designed, CBP agents would "expeditiously process individuals before they are either [*sic*] transferred, removed, or released."  (ECF No. 39-1, Ex. 1 ¶ 18.)  Instead, these "tired, poor, huddled masses," *Angov v. Lynch*, 788 F.3d 893, 909 (9th Cir. 2015), are imprisoned for days in bare concrete cells, often for many days (Gaston Decl. ¶ 20).

Detained individuals are not medically screened on arrival (Vail Decl. ¶ 138; Declaration of Joe Goldenson M.D. ("Goldenson Decl.") ¶¶ 18-23), their medication is confiscated (Vail Decl. ¶ 139; Goldenson Decl. ¶¶ 47-52), and those who ask for medical assistance are ignored or rebuffed (Vail Decl. ¶ 139; Goldenson Decl. ¶¶ 43-46).  As a matter of policy, they are stripped of all outer layers of clothing, they are not permitted to wash or change, and they are locked into cells—all of them, including pregnant women and children.  (Vail Decl. ¶¶ 104-105, 116, 123; ECF No. 39-1, Ex. 1 ¶ 12; Powitz Decl. ¶ 92.)

They are usually, but not always (Vail Decl. ¶ 106), given "Mylar blankets" (ECF No. 39-1, Ex.1 ¶ 15).  These paper-thin sheets of plastic are demonstrably inadequate to keep them warm in cells that, at times, drop to 58.8° Fahrenheit.  (Vail Decl. ¶ 107.) Surveillance video footage shows detainees huddled together, wrapped head-to-toe in these flimsy plastic sheets, even during the hot Arizona summers:

---

[7] *See Tucson Sector Arizona*, U.S. Customs & Border Protection, *available at* http://1.usa.gov/1vuFTNw.

1

2

3

4

5

6

7

8

9

10

11

12



13  (Ex. 173 (photograph dated September 22, 2015); Vail Decl. ¶ 106; Powitz Decl. ¶ 95.)

14  Detainees look cold, because, as they have testified, they *are* cold.  (Vail Decl. ¶¶ 107-

15  108; Powitz Decl. ¶ 100.)  This cold is exacerbated because cells are made of concrete and

16  metal.  Unless they stand for 24 hours or more, they must sit or lie on heat-draining

17  concrete floors and benches.  (Vail Decl. ¶¶ 47, 109.)  When detainees request more heat,

18  guards refuse or, sometimes, make the cells *colder*.  (Vail Decl. ¶ 108; Powitz Decl.

19  ¶ 100.)

20  　　　　Some spend days in cells so crowded that they must sit or lie on every inch of floor

21  space:  next to toilets, wastebaskets, overlapping with one another.  (Coles Decl. ¶ 109;

22  Vail Decl. ¶¶ 32, 33, 52.)  Some are forced to try to sleep sitting upright.  (Vail Decl.

23  ¶¶ 34, 35, 52.)  They are given no beds, cots, or mattresses.  (Vail Decl. ¶¶ 54, 56; Powitz

24  Decl. ¶ 46, 48.)  Stations have mats, but not nearly enough for the number of detainees

25  regularly kept overnight.  (Vail Decl. ¶ 57, 60, 62; Powitz Decl. ¶ 47, 48.)  Moreover,

26  Defendants provide mats only to juveniles (Vail Decl. ¶ 58; *see also* Ex. 87 at

27  USA00634), which explains surveillance video footage showing detainees lying on

28

1    concrete floors while mats go unused in adjacent cells.  (Vail Decl. ¶ 59; Coles Decl.

2    ¶ 59.)  Hold room lights are always on (Vail Decl. ¶ 63; ECF No. 39-1, Ex. 1 ¶ 8; Powitz

3    Decl. ¶ 49), and detainees can be seen shielding their faces under Mylar sheets (Vail Decl.

4    ¶ 64).

5           Hold rooms often lack potable water because none is provided or because the

6    drinking fountains (or "bubblers") attached to the toilet/sink units do not work properly.

7    (Vail Decl. ¶¶ 80, 83, 85.)  Detainees are often (and inexplicably) not given cups, despite

8    ample disposable cups on site.  (Vail Decl. ¶¶ 77, 79; Powitz Decl. ¶ 75.)  As a result,

9    detainees are forced to share drinking cups (Vail Decl. ¶ 77; Powitz Decl. ¶ 75) or recycle

10   used juiceboxes (Vail Decl. ¶ 80).  Surveillance footage from Casa Grande Station shows

11   at least a dozen different detainees drinking from the same one-gallon plastic water jug

12   over the course of five days.  (*Id.* ¶ 81.)  Even though the cell in question was twice

13   cleaned by maintenance, no attempt was made to clean the jug.  (*Id.* ¶ 82.)

14          Defendants regularly fail to feed detainees: between June 10, 2015, and

15   September 28, 2015, there were 1,400 instances in which someone was not fed for 24 or

16   more hours.  (Gaston Decl. ¶ 45.)  When they are fed, detainees are given some

17   combination of a microwavable burrito, crackers, and juice for every meal and every

18   snack.  (Vail Decl. ¶ 90; Powitz Decl. ¶ 74.)  Aside from baby food and formula, Tucson

19   Sector stations stock no other food.  (Vail Decl. ¶ 91.)  Despite providing irregular and

20   nutritionally inadequate "meals," Border Patrol agents threaten to confiscate detainees'

21   food to keep detainees quiet.  (*Id.* ¶ 100.)

22          Detainees are confined with perfect strangers, but are afforded no privacy.  Toilets

23   are inadequately shielded from view by "low screening walls" and agents constantly

24   monitor detainees through surveillance cameras mounted in each cell (ECF No. 39-1,

25   Ex. 1 ¶ 14; Vail Decl. ¶ 50; Powitz Decl. ¶ 63).  Because hold rooms are often

26   overcrowded, there are insufficient toilets, and these are often in disrepair.  (Vail Decl.

27   ¶ 51; Powitz Decl. ¶¶ 51-52.)

28          Detainees are only sometimes provided with soap, but never towels, toothbrushes,

1    or toothpaste, and only rarely hot water and showers.  (Vail Decl. ¶¶ 116, 117, 119, 120,

2    122; Powitz Decl. ¶¶ 58-60.)  As a result, detainees are unable to wash their hands at any

3    time, even after using the toilet or before eating.  (Vail Decl. ¶ 115; Powitz Decl. ¶¶ 64,

4    73.)  Hold rooms are cleaned infrequently. (Powitz Decl. ¶¶ 23, 27, 28, 29.)  Surveillance

5    footage from Casa Grande station indicates that they are cleaned once every 48 hours, if

6    that (Vail Decl. ¶ 52), forcing mothers to care for their children on cell floors surrounded

7    by days of accumulated trash (Powitz Decl. ¶ 30):



19   (Ex. 148.)

20        **B.     Defendants' Policies and Procedures, Recently Amended, Formalize
              and Systematize the Harm.**

22        Until very recently, the conditions of confinement in CBP stations nationwide were

23   governed by CBP's 2008 Hold Rooms and Short Term Custody Policy ("2008 Policy").

24   (Ex. 87.)  The 2008 Policy recognized that CBP stations were designed for short-term

25   detention.  "Whenever possible," it reads, "a detainee should not be held for more than 12

26   hours." (*Id.* at USA000325.)  Two months ago, however, Defendants issued new policies

27   and procedures.  The newly minted *National Standards on Transport, Escort, Detention,*

28   *and Search* ("TEDS standards") have all but abandoned the pretense that CBP stations are

1  used for short-term detention.  Now, Defendants have decided, "[d]etainees should

2  generally not be held for longer than 72 hours" in these same facilities.  (Ex. 95 at

3  USA00631.)

4          While significantly lengthening the duration of permissible detention, the TEDS

5  standards permit even worse conditions for detainees.  The 2008 Policy stated that

6  "[d]etainees requiring bedding will be given clean bedding."  (Ex. 87 at USA000330.)

7  Despite now endorsing overnight detention, the TEDS standards permit only juveniles to

8  have beds or bedding.  (Ex. 95 at USA000634.)  Adults are supposed get "clean blankets

9  . . . upon request," but only "when available."  (*Id.*)  The 2008 Policy guaranteed detainees

10  soap to wash their hands after using the toilet or before eating.  (Ex. 87 at USA000330.)

11  But under the TEDS standards—and despite assurances from Chief Patrol Agent Padilla

12  that the Tucson Sector "takes the health and safety of aliens within [its] custody seriously

13  (ECF No. 39-1, Ex. 1 ¶ 15)—soap "*may* be made available" but only when "operationally

14  feasible."  (Ex. 95 at USA000634 (emphasis added).)  The list goes on.

15          If there was ever any doubt that, as a matter of policy and practice, Defendants can

16  and will detain Plaintiffs under conditions that deny Plaintiffs "the minimal civilized

17  measure of life's necessities," *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981), the TEDS

18  standard erases it.  Defendants have given themselves permission to hold Plaintiffs for at

19  least three days and three nights in constantly illuminated cells that lack beds, blankets,

20  soap, adequate food, potable water, and hot running water; and Defendants have done so

21  despite scores of federal judicial opinions condemning these very conditions.

22  **III.   LEGAL STANDARD**

23          A movant is entitled to a preliminary injunction if she shows that she is likely to

24  succeed on the merits; that she is likely to suffer irreparable harm in the absence of

25  preliminary relief; that the balance of equities tips in her favor; and that an injunction is in

26  the public interest.  *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1021 (9th Cir.

27  2009) (citation omitted).  A movant also may rely upon an "alternate formulation" of this

28  standard under which "serious questions going to the merits and a balance of hardships

1    that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so

2    long as the plaintiff also shows that there is a likelihood of irreparable injury and that the

3    injunction is in the public interest." *Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012)

4    (citation omitted).  Under this second "sliding scale" approach, "the elements of the

5    preliminary injunction test are balanced, so that a stronger showing of one element may

6    offset a weaker showing of another." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d

7    1127, 1131 (9th Cir. 2011).  "The same standard applies regardless of whether the movant

8    seeks to maintain the status quo or to halt an ongoing deprivation of rights." *Klein v. City*

9    *of Laguna Beach*, 381 F. App'x 723, 725 (9th Cir. 2010) (citation omitted).  In addition,

10   because a preliminary injunction is granted on less formal procedures than a full trial on

11   the merits, *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981), a court may

12   consider otherwise inadmissible evidence in making its ruling, *Flynt Distributing Co.,*

13   *Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984).

14   **IV.    ARGUMENT**

15       **A.    Plaintiffs are Likely to Succeed On Their Claim That Defendants**
             **Violate Their Fifth Amendment Due Process Rights.**
16

17           **1.    Governing Law**

             Defendants are constitutionally obligated to care for individuals whom, like
18
     Plaintiffs, Defendants detain against their will:
19

20               [W]hen the State takes a person into its custody and holds him
                 there against his will, the Constitution imposes upon it a
21               corresponding duty to assume some responsibility for his
                 safety and general well-being.  The rationale for this principle
22               is simple enough: when the State by the affirmative exercise
                 of its power so restrains an individual's liberty that it renders
23               him unable to care for himself, and at the same time fails to
                 provide for his basic human needs—e.g., food, clothing,
24               shelter, medical care, and reasonable safety—it transgresses
                 the substantive limits on state action set by the Eighth
25               Amendment and the Due Process Clause.

26   *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989)

27   (citations omitted).

28           Because Plaintiffs are civil detainees held pursuant to civil immigration laws,

1    *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001), their protections derive from the Fifth

2    Amendment, which shields any person in the custody of the United States from conditions

3    that amount to punishment without due process of law. *Wong Wing v. United States*,

4    163 U.S. 228, 237 (1896).

5            Civil detainees "are entitled to conditions of confinement that are not punitive."

6    *Jones v. Blanas*, 393 F.3d 918, 933 (9th Cir. 2004).  Several principles follow from this

7    assertion.  First, if a particular condition of confinement violates the Eighth Amendment,

8    it necessarily violates the Fifth Amendment. *Id.*  Conditions that do not violate the Eighth

9    Amendment, however, may nonetheless violate the Fifth.  Second, civil detainees may not

10   be subjected to conditions "intended to punish" or "excessive in relation to [their non-

11   punitive] purpose" or "employed to achieve objectives that could be accomplished in so

12   many alternative and less harsh methods." *Id.* at 932–34 (citations omitted).  Third, if

13   civil detainees are confined under conditions inferior to pretrial detainees or the

14   involuntarily committed—and of course the criminally convicted—those conditions are

15   presumptively punitive and unconstitutional. *Id.* at 933.  Fourth, "to prevail on a

16   Fourteenth [or Fifth] Amendment claim regarding conditions of confinement, the confined

17   individual need not prove 'deliberate indifference' on the part of government officials."

18   *Id.* at 934.

19                    **2.      Failure to Provide Beds and Deprivation of Sleep**

20           Detention facilities (and prisons) must provide detainees held overnight with beds

21   *and* mattresses.  The absence of *either* violates detainees' due process rights.

22   *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1448 (9th Cir. 1989); *accord Anela v.*

23   *City of Wildwood*, 790 F.2d 1063, 1069 (3d Cir. 1986).  Indeed, the use of floor

24   mattresses—*i.e.*, mattresses without bed frames—is unconstitutional "without regard to

25   the number of days a prisoner is so confined." *Lareau v. Manson*, 651 F.2d 96, 105 (2d

26   Cir. 1981).  Photographs demonstrate that floor sleeping is ubiquitous in Tucson Sector

27   hold rooms (Vail Decl. ¶¶ 32, 33, 47, 52, 59, 73), despite Defendants' policy that "hold

28   rooms are not designed for sleeping" (Ex. 81 at USA000091.)  While Plaintiffs' claim

succeeds on this ground alone, other conditions compound the problem.

First, hold rooms are overcrowded, forcing Plaintiffs to sleep next to toilets, sitting upright, and packed together head to toe:



(Ex. 188; Vail Decl. ¶¶ 32-33, 47, 52.)  One detainee, who gave his spot on the floor to an injured man, was one of fifteen people forced to stand all night.  (Vail Decl. ¶ 35.) Requiring detainees to sleep in shifts is not only inhumane and punitive, it has been roundly condemned by the U.S. government when it occurs in Ukraine, Haiti, and other countries.[8]  A strikingly analogous situation was condemned as unconstitutional by the court in *Bowers v. City of Philadelphia*, No. 06-CV-3229, 2007 WL 219651 (E.D. Pa. Jan. 25, 2007).  There, "[b]ecause of the overcrowded conditions . . . detainees were forced to sleep overlapping one another and on every inch of the concrete floors [and] huddled with their heads next to the toilets [and] on metal benches . . . if there was room."  *Id.* at *10, *24; *see also id.* at *35 (issuing preliminary injunction).  On this basis, too, Plaintiffs are likely to succeed on the merits of their due process claims.

---

[8]*Report on Int'l Prison Conditions*, U.S. Dep't of State, May 22, 2013, *available at* http://www.state.gov/j/drl/rls/209944.htm.

1    Second, there is constant noise throughout the night.  (Vail Decl. ¶¶ 65-66.)  Courts

2    have held that sleep-interrupting noise constitutes a due process violation.  *Toussaint v.*

3    *McCarthy*, 597 F. Supp. 1388, 1409–10 (N.D. Cal. 1984), *aff'd in part*, *rev'd in part on*

4    *other grounds*, 801 F.2d 1080, 1110 (9th Cir. 1986); *accord Antonelli v. Sheahan*, 81 F.3d

5    1422, 1433 (7th Cir. 1996) ("noise [that] occur[s] every night, often all night, interrupting

6    or preventing . . . sleep" gives rise to due process claim).  Third, hold cells are constantly

7    illuminated.  (ECF No. 39-1, Ex. 1 ¶ 8.)  This, too, violates due process—particularly

8    where, as here, the light interferes with sleep.  *Keenan v. Hall*, 83 F.3d 1083, 1090 (9th

9    Cir. 1996), *amended on other grounds*, 135 F.3d 1318 (9th Cir. 1998) ("[T]here is no

10   legitimate penological justification for requiring [inmates] to suffer physical and

11   psychological harm by living in constant illumination.  That practice is

12   unconstitutional."); *King v. Frank*, 328 F. Supp. 2d 940, 946–47 (W.D. Wis. 2004)

13   (constant illumination leading to sleep deprivation may violate Eighth Amendment).

14        Together these and other conditions, including failure to provide adequate warmth,

15   *infra*, deprive Plaintiffs of sleep, in violation of their Fifth Amendment due process rights.

16   Such failures are not driven by necessity.  In many instances, Defendants have unused

17   hold rooms that could be used to alleviate overcrowding in adjacent rooms, but which

18   Defendants choose not to use:

19

20

21

22

23

24

25

26

27

28



(Ex. 170.)

### 3. Failure to Provide Warmth

While temperatures in Tucson Sector hold rooms are supposed to range from 68 to 72 degrees Fahrenheit (*e.g.*, Ex. 115 at USA01896 ("Cell temps checked [68-72 degrees]?")), Defendants' own logs indicate that hold room temperatures drop as low as 58.8 degrees (Ex. 111 at USA01461), while others register 62 degrees with "[m]ultiple subjects complaining that it is cold" (Ex. 114 at USA01838-39).

58.8 degrees is cold even to the fully clothed, which detainees are not because Defendants routinely and systematically confiscate their outer layers of clothing upon intake.  (Vail Decl. ¶ 104.)  Despite their legal "obligation to ensure that [detainee] clothing is adequate," Defendants do not replace confiscated clothing.  *Toussaint*, 597 F. Supp. at 1411 (citation omitted).  Instead, Defendants give—or at least are supposed to give—detainees a single Mylar sheet (ECF No. 39-1, Ex. 1 ¶ 15), though in practice some detainees get nothing (Vail Decl. ¶¶ 55, 106).  Regardless, these Mylar sheets do little to

1    protect detainees against the cold (*Id.* ¶¶ 55, 106, 107; Powitz Decl. ¶ 101), especially

2    since these paper-thin sheets are all that stands between detainees and a concrete bench,

3    floor, or wall.  *See United States v. Wilson*, 344 F. App'x 134, 137, 143 (6th Cir. 2009)

4    (cell furnished with only concrete bench and concrete floors stated Eighth Amendment

5    claim for subjection to cold).

6         This combination of concrete and metal furnishings and Defendants' failure to

7    provide proper blankets and "clothing that is at least minimally adequate for the

8    conditions under which [Plaintiffs] are confined," *Knop v. Johnson*, 667 F. Supp. 467,

9    475–77 (W.D. Mich. 1987), *aff'd in pertinent part*, 977 F.2d 996, 1012 (6th Cir. 1992),

10   unconstitutionally deprives Plaintiffs of warmth, *Henderson v. DeRobertis*, 940 F.2d

11   1055, 1059 (7th Cir. 1991), *cert. denied*, 503 U.S. 966 (1992).  Plaintiffs' are likely to

12   succeed on their claim for deprivation of warmth.

13        Moreover, Defendants' punitive use of hold room temperature—despite the clear

14   statement in the TEDS standard that "[u]nder no circumstances will officers/agents use

15   temperature controls in a punitive manner" (Ex. 95 at USA000633)—also violates

16   Plaintiffs' due process rights.  Specifically, agents lower hold room temperatures to

17   punish detainees who speak to one another or who request that cell temperatures be raised.

18   (Vail Decl. ¶ 108; Powitz ¶ 100.)  Because civil detainees may not be punished, any

19   punishment is *per se* a due process violation.  *Jones*, 393 F.3d at 934.  Plaintiffs are also

20   likely to succeed on the merits of their constitutional claim on this alone.

### 4.    Failure to Provide a Safe and Sanitary Environment

22        "A sanitary environment is a basic human need that a penal institution must

23   provide for all inmates." *Toussaint*, 597 F. Supp. at 1411.  This obligation attaches all the

24   more for institutions of civil confinement like Border Patrol's Tucson Sector stations.

25        The right to a sanitary environment includes a "right to personal hygiene supplies

26   such as toothbrushes and soap," *Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996), and

27   to "sanitary napkins for female prisoners," *Atkins v. County of Orange*, 372 F. Supp. 2d

28   377, 406 (S.D.N.Y. 2005); *see also Dawson v. Kendrick*, 527 F. Supp. 1252, 1288–89

(S.D. W.Va. 1981) ("The failure to regularly provide prisoners with clean bedding, towels, clothing and sanitary mattresses, as well as toilet articles including soap, razors, combs, toothpaste, toilet paper, access to a mirror and sanitary napkins for female prisoners constitutes a denial of personal hygiene and sanitary living conditions."). Detainees, however, are routinely and systematically denied soap (Vail Decl. ¶¶ 117, 122)—a denial that is formalized in Defendants' own policies and procedures (Ex. 95 at USA000634).  They also are routinely and systematically denied sanitary napkins and diapers for babies and small children (Vail Decl. ¶ 125), both of which Defendants concede they are obligated to provide (Ex. 95 at USA000634), as well as toothbrushes and toothpaste.  And they are routinely and systematically denied access to showers and hot running water—deprivations that have been deemed unconstitutional for "the most antisocial and violent of the inmates" in California's prison system, *Toussaint*, 597 F. Supp. at 1394, 1411, but which Defendants regularly impose on ill, pregnant, and juvenile immigrants.

Lacking access to soap and warm water, detainees are unable to wash their hands before eating or after using the toilet.  (Powitz Decl. ¶ 64; Vail Decl. ¶ 122.)  This significantly increases the likelihood that infectious diseases common to prisons and other custodial institutions will be transmitted among detainees.  (Powitz Decl. ¶¶ 54, 64, 70, 71, 89; Vail Decl. ¶ 122); *see also Bowers v. City of Philadelphia*, 2007 WL 219651, at *15 (describing likely spread of disease under conditions of confinement akin to those in Tucson Sector hold rooms).  Plaintiffs need not, of course, wait until they contract a communicable disease to seek relief: the Eighth (and therefore Fifth) Amendment "protects against future harm of inmates."  *Helling v. McKinney*, 509 U.S. 25, 33 (1993); *accord Lareau v. Manson*, 651 F.2d at 109 ("it is unnecessary to require evidence that an infectious disease has actually spread in an overcrowded jail before issuing a remedy.").  Indeed, pretrial detainees have a constitutional right "to receive necessary and proper personal hygiene items as preventative of future medical and physical harm."  *Board v. Farnham*, 394 F.3d 469, 482 (7th Cir. 2005).

1    The right to a sanitary environment also includes access to functioning toilets,

2    which must be made available in reasonable proportion to the total number of detainees.

3    In *Fischer v. Winter*, a ratio of 15 detainees to one toilet was deemed constitutionally

4    insufficient.  564 F. Supp. 281, 297, 302 (N.D. Cal. 1983).  But that is precisely the ratio

5    mandated by Defendants' policy, Exhibit 81 at USA000090 (noting requirement of "1

6    toilet per 15 detainees"), and, in practice, the situation is far worse: In some hold rooms,

7    over 40 detainees were forced to share one toilet (Vail Decl. ¶ 51; Powitz Decl. ¶ 52).

8    Although "[n]o one in civilized society should be forced to live under conditions

9    that force exposure to another person's bodily wastes," *Gates v. Cook*, 376 F.3d 323, 334

10   (5th Cir. 2004), such exposure is not uncommon in Tucson Sector hold rooms.  (Vail

11   Decl. ¶¶ 32, 51, 52.)  Cleaning is infrequent and irregular; hold rooms lack cleaning

12   supplies and often trash cans (Vail Decl. ¶ 52; Powitz Decl. ¶¶ 27-31, 90), which are

13   routinely removed from hold rooms for "safety reasons" (ECF No. 39-1, Ex. 1 ¶ 14).

14   The unsanitary conditions of confinement in Tucson Sector hold rooms are not

15   only inhumane, but also inimical to detainees' physical health.  (Powitz Decl. ¶ 31, 39, 40,

16   41, 50, 70, 71, 89.)  Because such sanitary deprivations have been "found to be *cruel and*

17   *unusual* under contemporary standards of decency," *Young v. Quinlan*, 960 F.2d 351, 364

18   (3rd Cir. 1992) (emphasis added), Plaintiffs are substantially likely to demonstrate that

19   these deprivations violate due process.

20           **5.       Failure to Provide Adequate and Sufficient Food**

21   Prison officials are "obligat[ed] to provide inmates with nutritionally adequate

22   meals on a regular basis." *Foster v. Runnels*, 554 F.3d 807, 816 (9th Cir. 2009).

23   Defendants' own regulations formalize this and other requirements: adults must be given

24   food at mealtimes and snacks in between (Ex. 95 at USA000635); juveniles and pregnant

25   women must receive additional food and must receive it more often (*id.* at USA000639).

26   To ensure that Defendants adhere to these requirements, they are obligated to document

27   "[a]ll meal service . . . in the appropriate electronic system(s) of record."  (Ex. 95 at

28   USA000635.)

Defendants' electronic system of record—the so-called "e3DM" data—demonstrates that Defendants fail not only to abide by their own regulations, but also by minimal constitutional standards.  Defendants regularly fail to feed detainees, sometimes for over 24 hours at a time.  (Gaston Decl. ¶¶ 44, 45, 49).  When detainees are fed, they receive for *every* meal and *every* snack some combination of a microwavable burrito, juice, and crackers.  (*Id.* ¶¶ 41, 46; Vail Decl. ¶¶ 90, 91, 92, 93, 101).  This diet—sporadic as it is—is neither nutritionally adequate nor "well-balanced," *Smith v. Sullivan*, 553 F.2d 373, 379–380 (5th Cir. 1977) (articulating requirement); and is comparable to, if not nutritionally worse than, diets that courts have found inadequate in prisons, *Campbell v. Cauthron*, 623 F.2d 503, 508 (8th Cir. 1980) (finding inadequate "two sweet rolls and coffee for breakfast, and frozen 'TV' dinners for the noon and evening meals").  No wonder, then, that Plaintiffs testify to being constantly hungry.  (Vail Decl. ¶ 94.)

As with hold-room temperature, Defendants use food punitively.  (*Id.*  ¶ 100-101.)  This violates Defendants' own policies (Ex. 95 at USA00635 ("[f]ood and water should never be used as a reward, or withheld as punishment")), and it violates the Constitution, *Jones*, 393 F.3d at 932–34.  Plaintiffs are likely to succeed on the merits of their claim.

## 6.    Failure to Provide Potable Water

Defendants own regulations require that "[f]unctioning drinking fountains or clean drinking water along with clean drinking cups must always be available to detainees." (Ex. 95 at USA00635.)  Access to adequate water is likewise protected by the Constitution.  *Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996).

Detainees in Tucson Sector stations are regularly and systematically denied adequate drinking water because hold room drinking fountains or "bubblers" do not function properly (when they function at all) and detainees are given no substitute.  (Vail Decl. ¶¶ 76-85; Powitz Decl. ¶ 85.)  Just as often, hold rooms have water, but detainees are not given clean cups (Vail Decl. ¶¶ 77, 79, 81; Powitz Decl. ¶ 75), forcing them to share drinking cups or other receptacles (Vail Decl. ¶¶ 77, 80-82).  In other words, detainees either receive insufficient potable water or they are presented with a "Hobson's

1   choice" between water contaminated with the bodily fluids of other detainees and no

2   water at all.  Forcing detainees to share drinking cups threatens detainee health; this risk is

3   exacerbated by Defendants' failure to medically screen incoming detainees ((Powitz Decl.

4   ¶ 78, 80); s*ee infra* IV.A.7).  *Helling v. McKinney*, 509 U.S. at 33–34 (Eighth Amendment

5   protects against future harm posed by unsafe drinking water).  The absence of potable

6   water and clean drinking cups violates the Constitution.  Plaintiffs are likely to succeed on

7   this claim as well.

## 7.   Failure to Provide Adequate Medical Screening and Care

9       Chief Padilla testified that "Tucson Sector takes the health and safety of aliens

10   within their custody seriously."  (ECF No. 39-1, Ex. ¶ 15.)  Not true.

11      First, Defendants fail to medically screen incoming detainees, despite clear case

12   law in this and other Circuits that denying, delaying, or mismanaging intake screening

13   violates the Constitution.  *Gibson v. Cty. of Washoe, Nev.*, 290 F.3d 1175, 1188–90 (9th

14   Cir. 2002); *Lareau v. Manson*, 51 F.2d at 109.  This affirmative duty to screen applies

15   both to short-term detention facilities housing civil detainees and to penitentiaries housing

16   convicts.  *Graves v. Arpaio*, 48 F. Supp. 3d 1318, 1340–1344 (D. Ariz. 2014) (jail);

17   *Madrid v. Gomez*, 889 F. Supp. 1146, 1257 (N.D. Cal. 1995) (prison).

18      Yet in most cases "medical screening" in Tucson Sector stations is conducted—if

19   and when it is conducted—by border patrol agents "in the field," not by a nurse, doctor, or

20   other qualified or specially trained personnel.  (ECF No. 39-1, Ex. 1 ¶ 9; Vail Decl.

21   ¶¶ 138, 139.)  Defendants' own policies confirm this: "If an *officer/agent* suspects . . . that

22   a detainee may have a contagious disease, the detainee should be separated whenever

23   operationally feasible."  (Ex. 95 at USA00634 (emphasis added).)  This contradicts both

24   commonly accepted standards in similar facilities throughout the nation (Goldenson Decl.

25   ¶¶ 12-17; 24-30), as well as the constitutional minimum courts have required court orders

26   in similar cases.  *See, e.g.*, *Graves*, 48 F. Supp. 3d at 1340.  Beyond Defendants' written

27   policies, numerous detainees have declared that their attempts to obtain medical attention

28   for injuries that occurred prior to apprehension were rebuffed by the agents executing

1    Defendants' medical screening "policy."

2          Second, Defendants fail to maintain a medical treatment program capable of

3    "responding to emergencies" that arise after detainees are placed in the holding cells.

4    *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982), *abrogated on other grounds by*

5    *Sandin v. Conner*, 515 U.S. 472 (1995); *see also Shorter v. Baca*, -- F. Supp. 3d. --, No.

6    12-cv-7337-DOC, 2015 WL 1809282, at *16 (C.D. Cal. Apr. 21, 2015) (jail officials

7    violated Eighth (and thus Fifth) Amendment by denying pretrial detainee emergency

8    dental care); *cf. Estate of Prasad ex rel. Prasad v. County of Sutter*, 958 F. Supp. 2d 1101,

9    1114 (E.D. Cal. 2013) (failure to maintain around-the-clock medical personnel in jail

10   constitutes deliberate indifference).  By law, Defendants must permit detainees "to make

11   their medical problems known to the medical staff" in the detention facility and such staff

12   must be "competent to deal with the [detainees'] problems."  *Hoptowit*, 682 F.2d at 1253.

13   Such around-the-clock access to medical staff is standard throughout similar facilities.

14   (Goldenson Decl. ¶¶ 13, 16.)

15         Third, Defendants' practice of confiscating incoming detainees' medication,

16   creates an impermissible and heightened risk that detainees will experience a medical

17   emergency.  *Hernandez v. County of Monterey*, -- F. Supp. 3d. --, No. 5:13-CV-2354-

18   PSG, 2015 WL 3868036, at *17 (N.D. Cal. Apr. 14, 2015).  It is standard in similar

19   detention facilities through the United States to have in place a policy maximizing a

20   detainee's ability to continue prescribed medication.  (Goldenson Decl. ¶ 47.)  Numerous

21   courts have held that such efforts are constitutionally required in the jail setting.

22   *Hernandez*, 2015 WL 3868036, at *12 ("It is critical for correctional facilities to maintain

23   continuity of treatment for newly admitted inmates."); *Graves*, 48 F. Supp. 3d at 1341

24   (reviewing procedures implemented under court order to ensure that arriving detainees are

25   promptly continued on prescription medications); *cf. Wakefield v. Thompson*, 177 F.3d

26   1160, 1164–65 (9th Cir. 1999) (prison officials violate Eighth Amendment by failing to

27   supply, at time of release into the community, a prisoner with sufficient medication to

28   permit him to consult with community-based doctor).  Accordingly, Plaintiffs are likely to

1    succeed on their claim that Defendants' denial of adequate medical screening and care

2    violates their due process rights.

3        **B.    Plaintiffs are Likely to Succeed on Their Claim That Defendants Have
             Failed to Enforce Mandatory Statements of Policy.**

4            **1.    Governing Law**

5

6        A party can sue under the APA to compel an agency to abide by its own statement

7    of policy when such a statement constitutes "agency action."  5 U.S.C. § 706(1) (requiring

8    court to "compel agency action unlawfully withheld or unreasonably delayed.").

9    "'[A]gency action' is defined in [5 U.S.C.] § 551(13) to include 'the whole or a part of an

10   agency rule, order, license, sanction, relief, or the equivalent or denial thereof, *or failure*

11   *to act*.'"  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004).  The APA defines the

12   term "rule" as "an agency statement of . . . future effect designed to implement, interpret,

13   or prescribe law or policy."  5 U.S.C. § 551(4).  An agency statement that meets this

14   definition constitutes agency action.  *See, e.g.*, *Defenders of Wildlife v. Tuggle*, 607 F.

15   Supp. 2d 1095, 1114 (D. Ariz. 2009) (Bury, J.) (agency's "Standard Operating Procedure"

16   was a "rule" under APA).

17       Such a statement has the force and effect of law, and can be enforced under the

18   APA, when it (1) prescribe[s] substantive rules—not interpretive rules, general statements

19   of policy or rules of agency organization—and (2) conforms to certain procedural

20   requirements.  *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1071 (9th Cir.

21   2010) (citation omitted).  "To satisfy the first requirement, the rule must be legislative in

22   nature, affecting individual rights and obligations; to satisfy the second, it must have been

23   promulgated pursuant to a specific statutory grant of authority and in conformance with

24   the procedural requirements imposed by Congress."  *Id.*

25       The TEDS standard constitutes a "rule" and enforceable guidance under the *River*

26   *Runners* standard.  It is "an agency-wide policy that sets forth the first nationwide

27   standard which govern CBP's interaction with detained individuals. . . . In addition to

28   transport, escort, detention and search provisions, TEDS also includes requirements

1   related to: sexual abuse and assault prevention and response; care of at-risk individuals in

2   custody; and personal property." (Ex. 95 at USA00620.)  Each and every one of these

3   "requirements" affects the individual rights of all detainees in Border Patrol stations,

4   including—but certainly not limited to—their right to "bodily integrity." *Albright v.*

5   *Oliver*, 510 U.S. 266, 272 (1994).  It also sets out agency and CBP agent obligations.

6   (Ex. 95 at USA00621, USA00626, USA00633 (CBP agents must, *inter alia*, "perform

7   their duties in a non-discriminatory manner," "safeguard detainees during a search," and

8   "grant detainees telephone access.").)  Finally, it states specifically the statutory,

9   regulatory and other authority under which it was promulgated.  (*Id.* at USA000620.)  It

10  clearly satisfies the *River Runner* standard.

11              **2.       Defendants Fail to Abide by the TEDS Standards.**

12          Having formalized their inhumane and punitive practices, Defendants fail even to

13  meet the modest goals articulated in the TEDS standards, much less the preceding 2008

14  Policy.  (Vail Decl. ¶ 72.)  Defendants are obligated to provide "clean bedding . . . to

15  juveniles" (Ex. 95 at USA00634), "clean drinking cups" (*id.* at USA00635), and "toilet

16  paper and sanitary napkins" (*id.* at USA00634).  But Defendants fail to do so.  (Vail Decl.

17  ¶¶ 51, 77, 79, 80, 81, 125; Powitz Decl. ¶¶ 60, 75.) Defendants are obligated to an

18  "maintain hold room temperature within a reasonable and comfortable range."  (Ex. 95 at

19  USA00633.)  But Defendants fail to do so.  (Vail Decl. ¶¶ 107, 108; Powitz Decl. ¶¶ 91,

20  95, 96, 101, 102, 105.)  Defendants are obligated to "regularly and professionally clean[]

21  and sanitize[]" hold cells.  (Ex. 95 at USA00633.)  But Defendants fail to do so. (Vail

22  Decl. ¶ 52, Powitz Decl. ¶¶ 18, 23, 29, 30, 32, 42, 90.)  Defendants are obligated to make

23  drinking water "always . . . available" and provide meals regularly.  (Ex. 95 at

24  USA00635.)  But Defendants fail to do so.  (Vail Decl. ¶ 152.)  Finally, although

25  Defendants may *not* "use temperature controls in a punitive manner" (Ex. 95 at

26  USA00633), and use "[f]ood and water . . . as punishment" (*id.* at USA00635), this is

27  precisely what Defendants do (Vail Decl. ¶¶ 100, 108; Powitz Decl. ¶ 100).

28          Plaintiffs are likely to succeed on the merits of their claim that Defendants are

1     obligated but fail to enforce certain minimal standards related to Plaintiffs' detention.

2          **C.    Plaintiffs Will Suffer Irreparable Harm If This Court Does Not Grant**
           **An Injunction.**

3

4          "It is well established that the deprivation of constitutional rights 'unquestionably

5     constitutes irreparable injury.'"  *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)

6     (citation omitted); *Majors v. Jeanes,* 48 F. Supp. 3d 1310, 1317 (D. Ariz. 2014) (same).

7     Where, as here, a movant demonstrates a likelihood of success on a constitutional claim,

8     "it follows . . . 'that irreparable harm is *likely*, not just possible' in the absence of

9     preliminary injunctive relief." *Rodriguez v. Robbins*, 715 F.3d 1127, 1144–45 (9th Cir.

10    2013) (citation omitted).  Having shown a constitutional deprivation, Plaintiffs need

11    establish nothing else: "'[W]hen an alleged deprivation of a constitutional right is

12    involved, most courts hold that no further showing of irreparable [harm] is necessary.'"

13    *Pure Wafer, Inc. v. City of Prescott*, 14 F. Supp. 3d 1279, 1302 (D. Ariz. 2014) (citation

14    omitted).

15         Lest there be any doubt, however, the harm to Plaintiffs—which includes suffering,

16    risk of exposure to disease, the denial of food, medicine, and other necessities—is

17    manifestly irreparable.  *Hernandez*, 2015 WL 3868036, at *15 (holding that suffering, risk

18    of tuberculosis, and no medical access constitutes irreparable harm); *Harris v. Bd. of*

19    *Supervisors, L.A. Cty.*, 366 F.3d 754, 766 (9th Cir. 2004) (same for pain, infection,

20    medical complications); *V.L. v. Wagner*, 669 F. Supp. 2d 1106, 1121 (N.D. Cal. 2009)

21    (same for denial of food, medication, and other necessities).

22         Defendants' apparent reluctance to acknowledge, much less remedy, the conditions

23    in Tucson Sector stations makes it not just likely but certain that the irreparable harm will

24    continue.  *Zepeda v. U.S. INS*, 753 F.2d 719, 727 (9th Cir. 1984).  Defendants' statements

25    to this Court that Tucson Sector stations are "short-term facilities" ignores reality (ECF

26    No. 52 at 2), and demonstrates that Defendants do not intend to change their ways absent

27    an order from this Court.  Indeed, all that Defendants have done is formalize their

28    policies—a transparent, but unsuccessful attempt at *post hoc* "legalization."

1

   **D.     The Balance of Equities Tips Sharply in Plaintiffs' Favor.**

2         This Court "'must balance the competing claims of injury and must consider the

3   effect on each party of the granting or withholding of the requested relief.'"  *Winter* v.

4   *Nat. Res. Def. Counsel*, 555 U.S. 7, 24 (2008) (citation omitted).  Here, the answer is

5   clear: the harm to Plaintiffs' outweighs any conceivable hardship to Defendants.

6         Detained individuals continue to be harmed by the deprivation of sleep, warmth,

7   adequate food and water.  The health risk posed by the lack of medical screening, soap,

8   and clean hold rooms alone tips against any administrative government hardship.  On

9   Plaintiffs' side is their physical well-being and human dignity; on Defendants' is some

10  speculative and relatively minimal financial or administrative burden.  "[F]aced with [ ] a

11  conflict between financial concerns and preventable human suffering, [the court has] little

12  difficulty concluding that the balance of hardships tips decidedly in plaintiffs' favor."

13  *Harris*, 366 F.3d at 766 (alterations in original) (citation omitted); *accord Rosado v.*

14  *Alameida*, 349 F. Supp. 2d 1340, 1348 (S.D. Cal. 2004) ("When adjudicating a

15  preliminary injunction motion, the Ninth Circuit expects lower courts to protect physical

16  harm to an individual over monetary costs to government entities.").

17        Defendants' hardship, moreover, is really no hardship at all, because Defendants

18  are *already required* to follow the Constitution.  "[The government] cannot suffer harm

19  from an injunction that merely ends an unlawful practice or reads a statute as required to

20  avoid constitutional concerns."  *Rodriguez*, 715 F.3d at 1145; *see also Zepeda*, 753 F.2d at

21  727 ("[T]he INS cannot reasonably assert that it is harmed in any legally cognizable sense

22  by being enjoined from constitutional violations.").  When the government's so-called

23  burden is weighed against the "the major hardship posed by needless prolonged detention"

24  of immigrants, the balance tips toward an injunction.  *Rodriguez*, 715 F.3d at 1145.

25        **E.     A Preliminary Injunction Serves the Public Interest.**

26        "The public interest inquiry primarily focuses on the impact on non-parties, as

27  opposed to parties."  *Friendly House v. Whiting*, 846 F. Supp. 2d 1053, 1062 (D. Ariz.

28  2012) (citation omitted).  How our own government treats immigrants concerns us all,

1    including—if we are to believe what it has said publicly—the government itself.

2         The Supreme Court has articulated, and the Ninth Circuit has reaffirmed, "the

3    highest public interest in the due observance of all the constitutional guarantees." *U.S. v.*

4    *Raines*, 362 U.S. 17, 27 (1960); *Melendres*, 695 F.3d at 1002 ("it is always in the public

5    interest to prevent the violation of a party's constitutional rights").  Stopping Defendants'

6    mistreatment of immigrants in government-operated detention facilities in Arizona serves

7    the public interest.  And so does "a preliminary injunction that ensures that federal statutes

8    are construed and implemented in a manner that avoids serious constitutional questions."

9    *Rodriguez*, 715 F.3d at 1146.  The preliminary injunction sought here would merely

10   guarantee that Defendants cease to interpret and execute their authority to act under color

11   of federal law in ways that violate the Fifth Amendment.

12        Defendants, moreover, can claim no public interest in denying immigrants the

13   minimal civilized measure of life's necessities—in denying them sleep, warmth, medical

14   care, food and water.  While the public has an interest in "assuring that public funds are

15   appropriately expended," there is nothing "inappropriate" about ensuring that detained

16   individuals are not mistreated.  *Rosado*, 349 F. Supp. 2d at 1348–49.  To the contrary,

17   where, as here, the fisc is balanced against preventable constitutional harm, the latter must

18   prevail, *id.* at 1349.  Likewise for government claims of "security," *Jordan v. Gardner*,

19   986 F.2d 1521, 1527 (9th Cir. 1993), and "logistical difficult[y]," *Rodriguez*, 715 F.3d at

20   1146.

21        An injunction is in the public interest.

22   **V.    CONCLUSION**

23        For the foregoing reasons, Plaintiffs respectfully ask this Court to enjoin

24   Defendants, their agents and their employees from detaining Plaintiffs and putative class

25

26

27

28

1   members under conditions that are punitive, inhumane, and unconstitutional pending final

2   resolution of this suit.

3

4   Dated:    December 4, 2015          By:   */s/ Harold J. McElhinny*

5

6                                          Harold J. McElhinny*
                                           Kevin M. Coles*

7                                          Elizabeth Balassone*
                                           MORRISON & FOERSTER LLP

8                                          425 Market Street
                                           San Francisco, CA  94105-2482

9                                          Telephone: (415) 268-7000

10                                         Facsimile:  (415) 268-7522
                                           Email:  HMcElhinny@mofo.com

11                                         Email:  KColes@mofo.com

12                                         Colette Reiner Mayer*

13                                         MORRISON & FOERSTER LLP
                                           755 Page Mill Road

14                                         Palo Alto, CA  94304-1018
                                           Telephone: (650) 813-5600

15                                         Facsimile:  (650) 494-0792

16                                         Email:  CRMayer@mofo.com

17                                         Louise C. Stoupe*

18                                         Pieter S. de Ganon*
                                           MORRISON & FOERSTER LLP

19                                         Shin-Marunouchi Building, 29th Floor
                                           5-1, Marunouchi 1-Chome

20                                         Tokyo, Chiyoda-ku  100-6529, Japan

21                                         Telephone: +81-3-3214-6522
                                           Facsimile:  +81-3-3214-6512

22                                         Email:  LStoupe@mofo.com

23                                         Email:  PdeGanon@mofo.com

24

25

26

27

28

Linton Joaquin*
Karen C. Tumlin*
Nora A. Preciado*
NATIONAL IMMIGRATION LAW CENTER
3435 Wilshire Boulevard, Suite 2850
Los Angeles, CA  90010
Telephone: (213) 639-3900
Facsimile:  (213) 639-3911
Email:  joaquin@nilc.org
Email:  tumlin@nilc.org
Email:  preciado@nilc.org

Mary Kenney*
Emily Creighton*
Melissa Crow*
AMERICAN IMMIGRATION COUNCIL
1331 G Street NW, Suite 200
Washington, DC 20005
Telephone: (202) 507-7512
Facsimile:  (202) 742-5619
Email:  mkenney@immcouncil.org
Email:  ecreighton@immcouncil.org
Email:  mcrow@immcouncil.org

Victoria Lopez (Bar No. 330042)**
Daniel J. Pochoda (Bar No. 021979)
James Duff Lyall (Bar No. 330045)**
ACLU FOUNDATION OF ARIZONA
3707 North 7th Street, Suite 235
Phoenix, AZ  85014
Telephone: (602) 650-1854
Facsimile:  (602) 650-1376
Email:  vlopez@acluaz.org
Email:  dpochoda@acluaz.org
Email:  jlyall@acluaz.org

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Travis Silva*
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
OF THE SAN FRANCISCO BAY AREA
131 Steuart Street, Suite 400
San Francisco, CA  94105
Telephone: (415) 543-9444
Facsimile:  (415) 543-0296
Email:  tsilva@lccr.com


Attorneys for Plaintiffs

* Admitted pursuant to Ariz. Sup. Ct. R. 38(a)
** Admitted pursuant to Ariz. Sup. Ct. R. 38(f)