1  Harold J. McElhinny*
2  Kevin M. Coles*
   Elizabeth G. Balassone*
   MORRISON & FOERSTER LLP
3  425 Market Street
   San Francisco, CA 94105
4  Telephone: (415) 268-7000
   Facsimile: (415) 268-7522
5  Email: HMcElhinny@mofo.com
   Email: KColes@mofo.com
6  Email: EBalassone@mofo.com

7  Attorneys for Plaintiffs

8  * *Admitted pursuant to Ariz. Sup. Ct. R. 38(f)*

9  Additional counsel listed on next page

10

11                IN THE UNITED STATES DISTRICT COURT

12                  FOR THE DISTRICT OF ARIZONA

13

14  Jane Doe #1; Jane Doe #2; Norlan Flores,     Case No. 4:15-cv-00250-TUC-DCB
    on behalf of themselves and all others
15  similarly situated,
                            Plaintiffs,
16                                               **DECLARATION OF ELDON VAIL
          v.                                     IN SUPPORT OF PLAINTIFFS'
17                                               MOTION FOR PRELIMINARY
    Jeh Johnson, Secretary, United States        INJUNCTION**
18  Department of Homeland Security, in his
    official capacity; R. Gil Kerlikowske,
19  Commissioner, United States Customs &
    Border Protection, in his official capacity;
20  Michael J. Fisher, Chief of the United States
    Border Patrol, in his official capacity;
21  Jeffrey Self, Commander, Arizona Joint
    Field Command, in his official capacity;
22  Manuel Padilla, Jr., Chief Patrol Agent-
    Tucson Sector, in his official capacity,
23
                            Defendants.
24

25

26

27

28

1   Colette Reiner Mayer*                    Travis Silva*
    MORRISON & FOERSTER LLP                  LAWYERS' COMMITTEE FOR CIVIL
2   755 Page Mill Road                       RIGHTS OF THE SAN FRANCISCO
    Palo Alto, CA  94304-1018                BAY AREA
3   Telephone: (650) 813-5600                131 Steuart Street, Suite 400
    Facsimile:  (650) 494-0792               San Francisco, CA  94105
4   Email:  CRMayer@mofo.com                 Telephone: (415) 543-9444
                                             Facsimile:  (415) 543-0296
5                                            Email:  tsilva@lccr.com

6   Louise C. Stoupe*
    Pieter S. de Ganon*                      Victoria Lopez (Bar No. 330042)**
7   MORRISON & FOERSTER LLP                  Daniel J. Pochoda (Bar No. 021979)
    Shin-Marunouchi Building, 29th Floor     James Duff Lyall (Bar No. 330045)**
8   5-1, Marunouchi 1-Chome                  ACLU FOUNDATION OF ARIZONA
    Tokyo, Chiyoda-ku  100-6529, Japan       3707 North 7th Street, Suite 235
9   Telephone: +81-3-3214-6522               Phoenix, AZ  85014
    Facsimile:  +81-3-3214-6512              Telephone: (602) 650-1854
10  Email: LStoupe@mofo.com                  Facsimile:  (602) 650-1376
    Email: PdeGanon@mofo.com                 Email:  vlopez@acluaz.org
11                                           Email:  dpochoda@acluaz.org
                                             Email:  jlyall@acluaz.org
12  Linton Joaquin*
    Karen C. Tumlin*
13  Nora A. Preciado*
    NATIONAL IMMIGRATION LAW
14  CENTER
    3435 Wilshire Boulevard, Suite 2850
15  Los Angeles, CA  90010
    Telephone: (213) 639-3900
16  Facsimile:  (213) 639-3911
    Email:  joaquin@nilc.org
17  Email:  tumlin@nilc.org
    Email:  preciado@nilc.org
18
    Mary Kenney*
19  Emily Creighton*
    Melissa Crow*
20  AMERICAN IMMIGRATION COUNCIL
    1331 G Street NW, Suite 200
21  Washington, D.C. 20005
    Telephone: (202) 507-7512
22  Facsimile:  (202) 742-5619
    Email:  mkenney@immcouncil.org
23  Email:  ecreighton@immcouncil.org
    Email:  mcrow@immcouncil.org
24
    Attorneys for Plaintiffs
25
    * Admitted pursuant to Ariz. Sup. Ct. R. 38(a)
26  ** Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

27

28

I, ELDON VAIL, hereby declare:

**I.      INTRODUCTION**

1.      I have personal knowledge of the facts stated herein and, if called as a witness, could and would competently testify thereto.

2.      I am a former corrections administrator with nearly thirty-five years of experience working in and administering adult and juvenile institutions.  Before becoming a corrections administrator, I held various line and supervisory level positions in a number of prisons and juvenile facilities in Washington State.  I have served as the Superintendent (Warden) of 3 adult institutions, including facilities that housed maximum, medium and minimum-security inmates.

3.      I served for seven years as the Deputy Secretary for the Washington State Department of Corrections (WDOC), responsible for the operation of prisons and community corrections.  I briefly retired, but was asked by the former Governor of Washington, Chris Gregoire, to come out of retirement to serve as the Secretary of the Department of Corrections in the fall of 2007.  I served as the Secretary for four years, until I retired in 2011.

4.      Since my retirement I have served as an expert witness and correctional consultant for cases and disputes twenty-eight times in fourteen different states.  A true and correct copy of my current resume is attached as Attachment A to this report, which lists my work experience, publications, and service as an expert witness and correctional consultant.

5.      As a Superintendent, Assistant Director of Prisons, Assistant Deputy Secretary, Deputy Secretary and Secretary, I have been responsible for the safe and secure operations of adult prisons in the State of Washington, a jurisdiction that saw and continues to see a significant downward trend in prison violence with very little class action litigation.  As an expert witness and consultant I have been called upon to address security issues and conditions of confinement in adult prisons and jails in other states.  I am experienced in sound correctional practice.

**II.     ASSIGNMENT**

6.     I have been asked by Plaintiffs' counsel to offer my opinions regarding the conditions of confinement in Tucson Sector Border Patrol Station Hold Rooms ("Hold Rooms").

**III.     MATERIALS RELIED UPON**

7.     I personally inspected all four of the Border Patrol Stations made available to Plaintiffs for inspection—Tucson, Casa Grande, Douglas and Nogales—on September 8 through September 11, 2015.  At each station, I was accompanied by sanitarian expert Robert W. Powitz and a photographer.  I was also accompanied at each station by two of Plaintiffs' attorneys, including Colette Mayer and Nora Preciado at Tucson, Louise Stoupe and Nora Preciado at Casa Grande, Kevin Coles and James Lyall at Douglas, Nogales and an abbreviated second visit to Tucson.

8.     I reviewed surveillance video screenshots from an additional 3 stations—Sonoita, Brian A. Terry, and Willcox—which I did not personally inspect.  The conditions at these stations appear to be very similar to those at the four stations that I visited.  (Exs. 168-169, 154-157, 190-191.)[1]

9.     I have read the declaration of Robert W. Powitz and believe his account of our inspections and descriptions of the various facilities to be accurate.

10.     I have read the declaration of Joseph Gaston and have based my opinion on the reports prepared at the request of Plaintiffs' counsel, which analyze "e3DM" data produced by Defendants.  I understand the e3DM data purports to reflect certain records logged by Defendants with respect to the detention of individuals at each of the eight Border Patrol Stations within the Tucson Sector.

11.     I have been provided with all documents produced by Defendants in this case to date, Bates numbers USA000001 through USA0002186.

---

[1] All exhibits referenced in this declaration are to the Appendix of Exhibits In Support of Plaintiffs' Motion for Preliminary Injunction.

12.     I have also been provided with copies of photographs taken during our Border Patrol station inspections.

13.     I have reviewed approximately 50 of the declarations of former detainees who were detained in U.S. Customs and Border Protection facilities within the Tucson Sector of the U.S. Border Patrol submitted in support of Plaintiffs' Motion for Class Certification.

14.     I have also reviewed screenshots of surveillance video from Tucson, Casa Grande, Douglas and Nogales Stations that was produced by Defendants.

15.     I have been provided with certain declarations and other documents filed in this case and *Flores v. Lynch*, No. CV 85–4544–RJK–Px (C.D. Cal. filed July 11, 1985) that relate to CBP hold rooms.

**IV.   OPINIONS**

16.     It is my opinion that the operation of the CBP detention facilities in the Tucson sector does not comply with the national standards for correctional facilities in several respects outlined in more detail below.

17.     The American Correctional Association (ACA) is the primary body that promulgates standards for the operation of jails.  These standards were developed by ACA with the involvement of the National Sheriffs' Association, the American Jail Association, the National Institute of Corrections and the Federal Bureau of Prisons and they describe the mandatory standards for the safe operation of detention facilities.  A true and correct copy of these standards is attached to the Appendix of Exhibits as Exhibit 195.  The CBP makes no reference to these standards and fails to meet them in many respects.

18.     Other bodies also establish standards for the operation of jails and detention facilities. The United States Department of Justice National Institute of Corrections (NIC) has developed standards for the safe, secure and humane operation of jails.  A true and correct copy of these standards is attached to the Appendix of Exhibits as Exhibit 196.

19.     The United Nations has established a Body of Principles for the Protection of all Persons Under Any Form of Detention or Imprisonment as well as Standard

1    Minimum Rules for the Treatment of Prisoners. CBP makes no reference to these
2    principles and standards to guide the operation of its detention facilities.  True and correct
3    copies of these standards are attached to the Appendix of Exhibits as Exhibits 197 and
4    198.

5    　　　　20.　　CBP has promulgated standards that serve as "mandatory minimum
6    requirements for CBP managers to implement and improve the security posture for their
7    designated CBP area of responsibilities."  (*See* CBP Security Policy and Procedures
8    Handbook, HB 140-02B, August 13, 2009 ("2009 CBP Handbook"), Appendix 8.10,
9    attached to the Appendix of Exhibits as Exhibits 81 and 102 (produced by Defendants at
10   USA00088-105 and USA00681-698).)  The guidelines set out in the 2009 CBP Handbook
11   remain in place today.

12   　　　　21.　　The CBP also has internal standards and guidelines that govern their
13   interactions with detainees that were recently modified. Formerly, issues such as bedding,
14   medical screening and hygiene were governed by CBP's 2008 Hold Rooms and Short
15   Term Custody Policy ("2008 Policy"), attached to the Appendix of Exhibits as Exhibit 85.

16   　　　　22.　　Similarly, attached to the Appendix of Exhibits as Exhibit 86 is a true and
17   correct copy of a document produced by Defendants on or about September 4, 2015 and
18   Bates labeled USA000322-345, which appears to be a CBP memorandum dated October
19   18, 2012, with subject heading "Hold Rooms and Short Term Custody Policy," which
20   "serves as a reminder of the [June 2, 2008] Hold Rooms and Short Term Custody Policy,
21   which in turn "covers all persons . . . who are arrested by Border Patrol Agents and are
22   detained in hold rooms at Border Patrol stations, checkpoints, and processing facilities."

23   　　　　23.　　The new standards recently issued by CBP "replace separate policies that
24   have evolved over the years since CBP's formation in 2003" are lauded as "agency-wide
25   policy that sets forth the first nationwide standards which govern CBP's interaction with
26   detained individuals".  (*See* National Standards on Transport, Escort, Detention, and
27   Search ("TEDS standards") published on October 5, 2015, excerpts attached to the
28   Appendix of Exhibits as Exhibit 95.)

24.     Neither the TEDS standards (which lower CBP's standards from the preexisting level), their historical antecedents or the 2009 CBP Handbook make reference to ACA or NIC standards or the United Nations principles and in fact in several areas violate those standards and principles.  As described in more detail below, the result is that many of the actual practices of the CBP facilities are unsafe and inhumane and put detainees at risk of significant harm.  Further, these conditions serve no legitimate penological or custodial purpose.

### A.     Hold Rooms Designed For Short Term Confinement Only

25.     It is my professional opinion that the Hold Rooms were designed and intended for short-term confinement, meaning detentions of less than 10 hours.

26.     Defendants admit that Tucson Sector stations are "not designed for long-term care and detention."  (ECF No. 39-1, Ex. 1 ¶ 11.)

27.     Defendants also describe these stations as "short-term facilities" that "serve the limited purpose of overnight processing" or "brief initial processing."  (ECF No. 52 at 2, 8–9.)

28.     According to CBP officials, including Defendants here, "Border Patrol seeks to process and transfer all aliens out of their custody within 12 hours from apprehension."  (ECF No. 39-1, Ex. 1 ¶ 11; *see also* Request for Judicial Notice ("RJN"), Ex. A (Declaration of Chief Border Patrol Agent Kevin W. Oaks ¶ 14, ECF. No. 121-1, *Flores v. Lynch*, No. CV 85–4544–RJK–Px (C.D. Cal. filed July 11, 1985)).).

29.     Similarly, the design and construction of the facilities suggest that they were intended for very short detentions only.  The 2009 CBP Handbook, describes the physical requirements of the Hold Rooms and states, among other requirements, the amount of unencumbered floor space that each detainee is intended to have in the Hold Rooms.  (Exs. 81.)  The 2009 Handbook mandates that each detainee should be provided with 37 square feet of unencumbered space for a single occupant hold room, and 7 additional square feet for each additional detainee.  It also states that hold rooms have "[n]o beds; a hold room is not designed for sleeping."  (*Id.* at USA000091.)  Facilities of the type

described in the Handbook, however, are inadequate for long-term detention and further support my conclusion that the facilities were not intended to hold detainees over 10 hours.

30.    Detainees are held in the facilities for much longer than the time period for which they were designed.  For example, according to Plaintiffs' analysis of "e3DM" data produced by Defendants, of the 17,006 individuals detained in Tucson Sector facilities between June 10, 2015 to September 28, 2015, at least 14,021 were detained for over 12 hours; 6,541 over 24 hours; 2,841 over 36 hours; 1,064 over 48 hours; and 157 over 72 hours.  (Decl. of Joseph Gaston in Support of  Mot. for Preliminary Injunction (Gaston Decl.") ¶ 20.)

**B.    Lack of Space**

31.    It is my opinion that the hold rooms at the CBP facilities have maximum occupancy numbers that are overstated for housing detainees any length of time, but are particularly problematic when individuals are detained for over 10 hours.  As a result, there is evidence that the hold rooms are regularly overcrowded.

32.    Surveillance video from Tucson Station reveals that Defendants routinely pack so many individuals into holding cells that detainees are commonly forced to lie down on the concrete floors beneath the toilet stalls.  Others are crammed so tightly, they look like sardines in a can, with no room to move in any direction without rolling over someone else:

1
2
3
4
5
6
7
8



9   (Ex. 188).

10      33.     Surveillance video from other hold rooms similarly shows detainees

11   crowded into cells and forced to lie on concrete floors to sleep or rest.  (Exs. 151, 152,

12   158; *see also* Exs. 130, 170, 172-73, 176-88); Declaration of Kevin Coles In Support of

13   Plaintiffs'  ("Coles Decl.") ¶ 36, 37.)

14      34.     The surveillance video also shows that people are often kept in these

15   crowded conditions overnight.   (Coles Decl. ¶ 36.)

16      35.     Consistent with this, former detainees describe having to sit or stand for all

17   or part of the nights because there was insufficient room for everyone in the cell to lie

18   down.  (*See*, *e.g.*, ECF No. 2-1, Ex. 6 ¶ 8 (he and 15 others stood all night because there

19   was not enough room to lie down); ECF No. 2-2, Ex. 33 ¶ 6 (sandwiched between others

20   and unable to lie down); ECF No. 2-3, Ex. 50 ¶ 17 (forced to sleep on his side on the floor

21   to make room for others to lie down).)

22      36.     This overcrowding problem is compounded by the fact that many of the

23   holding cells I encountered in my inspections were irregularly designed in shape, often

24   with multiple narrow concrete benches and toilet stalls.   (Exs. 52, 54, 56, 60, 62, 68, 75;

25   *see also* Exs. 7, 19,-20.)  Despite the dimensions of the cell perimeter walls, the actual

26   useable space available to detainees is restricted, in some cases severely.  Cells with stated

27
28

1   occupancy numbers as high as 48, such as Cell 18 in Tucson, did not even have enough

2   floor space to fit more than a couple beds.  (Exs. 60-62.)

3        37.     During my inspection of Tucson, Casa Grande and Douglas Stations, I

4   found room occupancy numbers posted above or near each holding cell door.

5        38.     There were no occupancy numbers posted at the Nogales Station.  We were

6   informed that occupancy numbers had been painted over.

7        39.     Defendants produced their own capacity numbers for hold rooms at each of

8   the four stations we inspected.

9        40.     Defendants produced various floor plans and sketches with measurements

10   for some of the walls and fixtures in holding cells at each of those four stations.

11        41.     From my review of these floor plans and sketches, I believe that

12   Defendants' hold room occupancy numbers were likely calculated by applying the 2009

13   CBP Handbook standard of 35 square feet for the first detainee plus 7 additional square

14   feet for each additional detainee.

15        42.     CBP's unencumbered space requirements are significantly below the

16   American Correctional Association's National Core Jail Standards ("Core Jail Standards")

17   requirements.  A true and correct copy of excerpts of these standards is attached to the

18   Appendix of Exhibits as Exhibit 199.  Even for confinement in multiple-occupancy cells

19   for less than ten hours per day, the Core Jail Standard 1-CORE-1A-07 requires at least 25

20   square feet of unencumbered space per occupant.

21        43.     It is my professional judgment that the CBP Handbook standard is

22   completely inadequate for longer-term detentions (lasting more than 10 hours), where

23   detainees reasonably require room to lie down, sleep, and walk around.

24        44.     Longer-term facilities (over ten hours) have larger minimum space

25   requirements.  For example, the Core Jail Standards state that "between two and sixty-four

26   occupants and provide 25 square feet of unencumbered space per occupant.  *When*

27   *confinement exceeds ten hours per day, at least 35 square feet of unencumbered space is*

28   *provided for each occupant*."  (Ex. 199, 4-ALDF-1A-10, at 3 (emphasis added).)

1    45.    There is widespread consensus among corrections officials, based on their

2    experience and supported by considerable research that goes back at least 30 years, that

3    overcrowded facilities create conditions of confinement that increase the risk to safety and

4    security for prisoners.  That consensus is consistent with my own correctional experience.

5    Dr. Craig Haney, a University of California professor who has researched and testified as

6    an expert in prison overcrowding cases, wrote in an article in the Washington University

7    Journal of Law and Policy.

8    
> There is widespread agreement among correctional experts
> that chronic idleness in prison produces negative
> psychological and behavioral effects…Thus, overcrowding
> means that there is less for prisoners to do, fewer outlets to
> release the resulting tension, a decreased staff capacity to
> identify prisoner problems, and fewer ways to solve them
> when they do occur. The increased risk of victimization is a
> likely result. [2]

13    46.    The conditions here serve no legitimate penological or custodial interest and

14    in fact are likely to make the facilities unsafe as such conditions will increase tension

15    among the detainees as they contend for space to simply lie down, sleep or use the

16    bathroom with having someone in the immediate proximity. Based on my experience and

17    review of literature, I believe the lack of space in these holding cells creates an

18    unjustifiable risk of harm to detainees.

19    47.    The effects of overcrowding and lack of space in CBP facilities are

20    extensive. There is simply not enough space to move around in the holding cell when they

21    approach or exceed their stated capacity. There is not enough space to sometimes sit or

22    find a place to sleep. Unless they stand for 24 hours of more— a difficult, if not

23    impossible undertaking —detainees must sit or lie on heat-draining concrete floors and

24    benches. It is very likely, and consistent with detainee declarations, that adequate sleep is

25    impossible to achieve in these conditions.

---

27    [2] (Dr. Craig Haney, *The Wages of Prison Overcrowding: Harmful Psychological Consequences and Dysfunctional Correction Reactions*, Washington University Journal of Law & Policy, Volume 22, January 2006, pages 275-276, Exhibit 201.)

48.     There are also no activities or diversions for the detainees while they await decisions on their next destination to distract them from the conditions.

49.     The effects of overcrowding are made worse the longer they must be endured. However, the CBP facilities have some unique and troubling designs that can quickly result in conditions that place great stress on detainees.

50.     The location of and access to toilets is one exacerbating factor and seems unnecessarily humiliating for detainees. While the designs of every CBP facility I inspected were different, access to even a modicum of privacy while using the toilet was absent in all of them.  Every detainee in the room can view the toilet activities of others. Moreover, the surveillance cameras mounted in each cell make clear to the detainees that they are being watched not only by every other detainee in the room but also by the CBP agents.  Some of the surveillance cameras even have a direct view into the toilet stall. (Exs. 143, 144 (for surveillance video); Exs.7, 8 (for photos of the toilet stall shown in the video).)  This lack of privacy makes overcrowding even more of an issue. (*See* ECF No. 2-3, Ex. 50 ¶ 9 (closed his eyes when using bathroom because he was so embarrassed).)

51.     Similarly, overcrowding has a direct effect on hygiene.  Many of the toilets we inspected were leaking and stained with built up grime from over use as there are simply not enough of them for the capacity of the detainees in some of the holding cells.[3] (Ex. 11; Ex. 43; Ex.77.)  One detainee reported that there was only one toilet for approximately 40 people.  (ECF No. 2-1, Ex. 6 ¶¶ 7, 10; *id.*, Ex. 7 ¶¶ 9, 14 (2 toilets for 60 people); *id.*, Ex. 16 ¶¶ 3, 12 (the sole toilet was backed up and did not flush while a mother and two children were detained); ECF No. 2-3, Ex. 38 ¶¶ 17, 20 (approximately 90 people detained with only three of four toilets that functioned); ECF No. 2-1, Ex. 2 ¶¶ 5, 9 (52 people in a cell with only 2 of 3 toilets working); *id.*, Ex. 1 ¶¶ 4, 6 (2 of 3 toilets working in cell with 45 people); *id.*, Ex. 17 ¶¶ 6, 13 (60 to 70 people in cell with only 2 of

---

[3] The ACA prison standard 4-4137 requires one toilet for every twelve male prisoners and one toilet for every eight female prisoners, standards which, in my observation, are frequently exceeded in CBP holding cells.  (*See* Ex. 195,  4-ALDF-4C-12, at 54.)

1    4 toilets working).)  Additionally, detainees frequently run out of toilet paper and CBP

2    delays in resupplying them.  (*Id.* Ex. 6 ¶ 10; ECF No. 2-3, Ex. 44 ¶ 25.)

3          52.     Although CBP apparently has no policies with respect to how often the Hold

4    Rooms must be cleaned, surveillance footage from Casa Grande station shows hold rooms

5    being cleaned once per 48 hours, if that.  (Coles Decl. ¶ 41.)  There are no cleaning

6    supplies in the hold rooms and, according to detainees, the rooms often lacked a trash can.

7    (ECF No. 2-1, Ex. 8 ¶ 11; *id.*, Ex. 16 ¶ 25; *id.*, Ex. 43 ¶ 15.) This means, effectively, that

8    the Hold Rooms are hardly ever clean and that the areas around the toilets are generally

9    dirty.  (ECF No. 2-1, Ex. 8¶ 11 (diapers, toilet paper and other trash was strewn around

10   the bathroom area); ECF No. 2-3, Ex. 35 ¶ 24 (1 toilet backed up and smelled terrible).)

11   Unfortunately, this fact does not stop the overcrowding of the cells which makes it

12   necessary for some detainees to lie down very close to those toilets in order to find a place

13   to sleep:

14
15
16    
17
18
19
20

21   (Ex. 173, 174; Ex. 152; *see also* ECF No. 2-2, Ex. 32 ¶ 10 (people were so tightly packed

22   into the cell some had to sleep in the bathroom area);  *id.*, Ex. 17 ¶ 7 (same); ECF No. 2-1,

23   Ex. 7 ¶ 13 (one detainee sat upright on the concrete floor for two nights, finding it

24   impossible to sleep more than a couple of hours during the time he was detained); *id.*,

25   Ex. 11 ¶ 12 (several detainees explained that in order to find space to sleep on the floor,

26   some detainees resorted to sleeping next to toilets.).)  In essence, the design of the Hold

27   Rooms mean that the person using the toilet and the person trying to sleep both experience

28

1   difficulties, creating unnecessary tension in the holding cell, especially when it is

2   overcrowded.

3       53.     All of these factors lead me to conclude that detainees suffer unnecessarily

4   and that these conditions are likely to create tension among the detainees as they are

5   forced to compete for access to these most basic functions of everyday life.  (*See*, *e.g.*,

6   ECF No. 2-2, Ex. 20 ¶ 18 ("Sometimes if you went to use the bathroom you would lose

7   your seat [on the bench].").)

8       **C.      Deprivation of Sleep**

9       54.     During my inspections of the four stations, I did not see a single bed, cot or

10  mattress, and no bedding apart from two or three pillows.

11      55.     The only coverings I found were thin sheets made of Mylar, a material

12  similar in appearance to, but more durable than, aluminum.  These sheets are almost paper

13  thin, but are referred to by CBP agents as "Mylar blankets":



21  (Ex. 4.)

22      56.     I understand that Plaintiffs' review of video surveillance from these stations

23  further supports the fact that detainees are not provided beds or mattresses at these

24  stations, regardless the duration of their detention.  (Coles Decl. ¶ 45.)

25      57.     During my inspection of Casa Grande station, there were only three mats in

26  the entire facility:

27

28



(Ex. 3.)

58.    We were informed at each station that mats were intended only for families and children.  According to documents filed by CBP with the court, the policy in the Tucson Sector is that "[m]attress pads are available for juvenile and family units," ECF No. 39-1, Ex. 1 ¶ 15, while in the Rio Grande Valley, "[i]n certain circumstances, aliens who are in Border Patrol's custody may require some form of bedding." (RJN, Ex. A ¶ 21.)

59.    Surveillance video from some of these stations often shows detainees lying on the concrete floors while, at the exact same moment in time in the same station, mats go unused in other unoccupied or less occupied cells:



(Ex. 170; *see also* Ex. 147.)

60.    Surveillance video also shows families and children confined in cells with too few or no mats:

1

2

3

4

5

6

7

 

8   (Ex. 146, 147; *see also* Ex. 155.)

9   61.   This is consistent with the declarations of former detainees held with their

10   children but not provided mats.  (ECF No. 2-1, Ex. 5, ¶ 5; *id.*, Ex. 8 ¶ 9 (mother and 6

11   month old daughter); *id.*, Ex. 13 ¶ 7 (pregnant mother and 5 year old daughter); *id.*, Ex. 16

12   ¶ 7 (pregnant mother and 2 children); ECF No. 2-2, Ex. 29 ¶ 3, 7 (mother and 18 month

13   old child).)

14   62.   According to Plaintiffs' analysis of the e3DM data, out of the 16,992

15   individuals held in U.S. Border Patrol custody between June 10 and September 28, 2015,

16   only 122 were recorded to have received a mat.  (Gaston Decl. ¶ 25.)

17   63.   Additionally, detainees are frequently forced to endure constant illumination

18   in the holding cells through the night.  Video surveillance shows holding cell lights on in

19   the middle of the night.  (Ex. 186, 187; Ex. 142; Exs. 150, 151.)  Even when the holding

20   cell lights are dimmed or turned off, light from the processing areas still floods in through

21   the windows from the processing areas.  (Exs. 171, 182.)

22   64.   Detainees are commonly seen shielding the light by hiding their faces under

23   their Mylar blankets.  (Ex. 152; Ex. 188.)  One juvenile even appears to be shielding

24   himself from the light by hiding underneath one of the mats.  (Exs. 162, 163.)

25   65.   Declarations of former detainees also show that there is constant noise

26   throughout the night.  (ECF No. 2-1, Ex. 9 ¶ 9 (guards would talk to detainees throughout

27

28

1   the night or hit the cell window); *id.*, Ex. 11 ¶ 15 (Mylar sheets were very noisy making it

2   hard to sleep).

3       66.   Video surveillance also shows CBP agents interrupting detainees' sleep in

4   the middle of the night to conduct cell counts or call individuals in or out of the cells.

5   (Coles Decl. ¶ 40; *see also* ECF No. 2-1, Ex.16 ¶ 11 (called out twice for interviews

6   during the night).)

7       67.   The Core Jail Standards require bedding and appropriate illumination:

8       Bedding Issue
    1-CORE-4B-01 (Ref. 4-ALDF-4B-02)

9       Inmates are issued suitable, clean bedding and linens.
    There is provision for linen exchange, including towels, at

10       least weekly.

11   (Ex. 199, 1-CORE-4B-01, at 25.)

12       Environmental Conditions/Lighting
    1-CORE-1A-09 (Ref. 4-ALDF-1A-14, 1A-15)

13       All inmate rooms/cells provide the occupants with access to
    natural light.  Lighting throughout the facility is sufficient for

14       the tasks performed.

15   (*Id.*, 1-CORE-1A-09, at 4.)

16       68.   The Department of Justice NIC Standards also state:

17       Inmates must be provided with clean clothes and bedding.
    Clothing, towels, and bedding must be exchanged, laundered,

18       and inspected on a regular basis. Failing to do so will result in
    an unhygienic facility for both the inmates and the staff."

19   (Ex. 196 at 4.)

20

21       69.   The United Nations Standard Minimum Rules for the Treatment of

22   Prisoners state:

23       Every prisoner shall, in accordance with local or national
    standards, be provided with a separate bed, and with separate

24       and sufficient bedding which shall be clean when issued, kept
    in good order and changed often enough to ensure its

25       cleanliness.

26   (Ex. 198, R. 19 at 3.)

27       70.   Prior to the start of this litigation, even the CBP's own standards required all

28   detainees to be given bedding.  According to CBP's June 2, 2008 Memorandum regarding

1   "Hold Rooms and Short Term Custody" (the "2008 Memorandum"), "[d]etainees

2   requiring bedding will be given clean bedding. Only one detainee will use this bedding

3   between cleanings. This bedding will be changed every three days and cleaned before it is

4   issued to another detainee. Vinyl or rubber-coated mattresses will be disinfected before

5   being reissued." (2008 Memorandum, ¶ 6.11 (Ex. 86 at 330)).

6       71.     Unfortunately, CBP's recently issued standards drop below even this basic

7   level. Section 8.0 of the new TEDS standards defines bedding as "A (or any combination

8   of) blanket, mat, or cot." Section 4.12 of the new TEDS standards states that "bedding"

9   must be provided to juveniles but only a "blanket" needs to be provided to adults and only

10  on request.

11      72.     CBP's recent reductions in bottom line requirements from the 2008 Memo

12  to the new TEDS standards serve as an admission that bedding has not been adequately

13  provided to detainees in these facilities. Standards from top officials at CBP are meant to

14  inform as to what practices are recommended and acceptable. It is clear that, in practice,

15  these minimums have been treated as maximums, if followed at all.

16      73.     The current practice at the CBP facilities is to force detainees to sleep on the

17  concrete floor or on very narrow concrete benches in overcrowded conditions. While

18  inspecting those facilities I made a point of sitting and lying down on those concrete

19  benches. Even though the air temperature of the holding cells seemed more or less

20  "normal" it only took a few minutes on a concrete bench to begin to feel the heat leave my

21  body and for me to begin to feel cold. I cannot imagine that any restful sleep is possible

22  without a bed that is off the floor and adequate bedding to keep myself warm. The

23  declarations of former detainees confirm this. (ECF No. 2-1, Ex. 4 ¶ 6: *id.*, Ex. 8 ¶¶ 8-9;

24  ECF No. 2-2, Ex. 24 ¶ 8; ECF No. 2-3, Ex. 48 ¶ 8; ECF No. 2-1, Ex. 11 ¶ 13; *id.*, Ex. 16

25  ¶¶ 9-10; *id.*, Ex. 15 ¶¶ 9-10, 21-22.)

26      74.     According to one detainee, he and fifteen others had to remain standing

27  throughout the night and he was therefore not able to sleep at all. (ECF No. 2-1, Ex. 6¶ 8

28  (gave up his place on the floor to an injured detainee).) In its report on International

Prison Conditions, the U.S. Department of State identified overcrowding as a "central problem" in prison management and cited specific instances in Ukraine and Haiti where inmates were forced to sleep in shifts as evidence of overcrowding.[4]  The State Department stated that it "encourages the use of the general standard in section 7085(b)(1) of Public Law 111-117 for guiding our assessment of whether prison conditions are overcrowded (i.e., 'the number of prisoners or detainees does not so exceed prison capacity such that per capita floor space is sufficient to allow for humane sleeping conditions and reasonable physical movement')."[5]

75.     Add to this mix the undisputed acknowledgement by CBP officials that the lights in the holding cell are left on 24 hours a day. Furthermore, it is likely that the lack of sleep will exacerbate tensions in an overcrowded environment. It is my opinion that the practices at the CBP facilities are well beyond what would be tolerated in jails or prisons for convicted felons in our country. It is my professional opinion that conditions of confinement at the Tucson Sector Stations unnecessarily deprive detainees of sleep, serve no legitimate penological or custodial purpose, and create an unjustifiable risk of harm to detainees.

### D.     Potable Water

76.     It is a basic requirement that detainees be provided with access to potable water.

77.     The CBP facilities deal with this issue differently.  Surveillance video of holding cells at Tucson Station (which was limited to two dates in August, 2015 and most of September, 2015, *see* Coles Decl. ¶¶ 91-111) shows a 5-gallon water cooler in cells, often placed on toilet stalls or the ground, but with few or no paper cups.  (Exs. 180, 184, 185.)  Cells with 15 or more detainees might have only four or five paper cups shared

---

[4] *Report on Int'l Prison Conditions*, U.S. Dep't of State, May 22, 2013, *available at* http://goo.gl/OaquKm.

[5] *Id.*

among the various detainees.  Individuals can also be seen drinking directly from the water cooler itself.  (Coles Decl. ¶ 39.)

78.     In Casa Grande, there were no water coolers in any of the holding cells during our inspections.

79.     There were no cups in any of the rooms at Casa Grande.  During my inspection of the Casa Grande facility I saw paper cups in the storage room.  (Ex. 1.) Papers cups were never given to the detainees in Hold Room 5 during the 5 days where they were drinking out of the plastic jug depicted below.  (Coles Decl. ¶ 46.)  Depriving detainees of paper cups appears to be common practice.  In general, during my inspections of Tucson, Casa Grande and Douglas stations, I found paper cups being stored at each of the stations, yet found few or none in the holding cells or waste receptacles.  (Ex. 1 (box of Solo brand cups); Exs. 50, 51.)

80.     Numerous detainees complained of not getting adequate access to drinking water.  (ECF No. 2-1, Ex. 5 ¶ 13 (no drinking water); ECF No. 2-3, Ex. 43 ¶ 18 (same); ECF No. 2-2, Ex. 26 ¶ 27 (no drinking water for entire first day).)  Many complain of being forced to recycle used juice boxes to hold drinking water.  (ECF No. 2-1, Ex. 2 ¶ 11; *id.*, Ex. 10 ¶ 16; *id.,* Ex. 12 ¶ 10.)

81.     This testimony is confirmed by surveillance video of the Casa Grande which shows at least a dozen different detainees drinking from the same 1-gallon water jug over the course of 5 days:



(Ex. 130; *see also* Exs. 125, 129, 130, 133, 141.)

82.    The jug was never replaced or cleaned, despite the cell being swept by maintenances crews on several occasions over the course of the 5 days it was used. (Coles Decl. ¶ 46.)

83.    In hold rooms with "bubblers" to dispense drinking water, these were usually located just above or adjacent to the toilets, often as part of the same metal toilet/sink unit.  During each of my inspections of the four stations, I observed numerous bubblers that did not work or had extremely low water pressure.  One example of a malfunctioning bubbler is shown in the picture below:



(Ex. 31.)

84.    In general, I believe that the problem with the bubblers is the same as with the toilets—they are subject to overuse as there are not enough of them for the numbers of detainees placed in the holding cells[6] and they are not regularly inspected and repaired.

85.    CBP's own inspection checklists produced in this litigation support this conclusion.  One of the earliest produced "Processing Inspection Form" for Casa Grande states that "Water fountain 10-7 in cell#6" is not working starting June 7, 2015. (Ex. 103)

---

[6] ACA prison standard 4-4138 requires one washbasin for every 12 prisoners.  (*See* Ex. 195, 4-ALDF-4C-10, at 54.)

1   That entry continues for months.  One of the latest produced Processing Inspection Forms

2   in October 20, 2015 shows the same water fountain has not been repaired. "One Fountain

3   needs repairs Cell #6" (Ex. 107).   Although CBP's records are incomplete, I understand

4   that at least 34 detainees were held in Cell #6 between June 10, 2015 and September 28,

5   2015.  (Gaston Decl. ¶ 72.)

6          86.     Similarly, inspection checklists for the Tucson Station report one or more

7   malfunctioning sinks from July 16 through August 27 (Ex. 114 at USA1758-1776;

8   Ex. 115 at USA1872-1898), and then again on September 10, 21 and 22 (Ex. 114 at

9   USA1758-1776), and again between October 16-19 (Ex. 116 at USA2035-037; Ex. 116 at

10  USA2055-056).  Inspection checklists logs from Nogales Station report malfunctioning

11  sinks on August 23-26 (Ex. 112 at USA1589-1592); August 28-September 9 (Ex. 112 at

12  USA1595-1597; Ex. 112 at USA1608; Ex. 112 at USA1610; Ex. 112 at USA1610-1619);

13  September 11-18 (Ex. 112 at USA1650-1657), September 20-21 (Ex. 112 at USA1659-

14  1660), September 27 (Ex. 113 at USA1694); October 3 (Ex. 113 at USA1750), October

15  14-16 (Ex. 113 at USA1731-1732), and October 18 (Ex. 113 at USA1735).

16         87.     The Core Jail Standards make clear that potable water is required:

17             1-CORE-1A-05 (Mandatory) (Ref. 4-ALDF-1A-07)
               The facility's potable water source and supply, whether owned
18             and operated by a public water department or the facility, is
               certified at least annually by an independent, outside source to
19             be in compliance with jurisdictional laws and regulations.

20  (Ex. 199, 1-CORE-1A-05, at 2.)

21         88.     Even CBP's new TEDS standards make clear that detainees must be

22  provided with potable water.  Section 4.14 of the new TEDS standards also require that

23  clean paper cups be provided to detainees.  In my professional judgment, the failure to

24  provide clean cups and potable water serves no legitimate penological or custodial interest

25  and unjustifiably increases the risk of harm to detainees.  (Ex. 95 at USA000631.)

26         89.     The CBP facilities need to have clear standards for providing access to

27  potable water and make sure that each facility complies with those standards. This is the

28  simple and basic work of a detention facility.  Further, water fixtures must be checked

1  regularly and repaired quickly when they are broken.  If they wish to continue using water

2  jugs as part of their water delivery system, the regular cleaning and refilling of those jugs

3  should be scheduled and logged. In no case should detainees be expected to share the

4  same cups or drink from the same gallon jug as they present an obvious risk of the spread

5  of contagious disease.

6        **E.**    **Food**

7        90.    During my inspections, I found that each of the four stations stored

8  microwaveable burritos, crackers and boxes of fruit juice.  The nutritional information

9  indicated that the burritos generally had between 330 and 360 calories each, crackers 200

10  calories and boxes of fruit juice around 60 calories.  (*See* Ex. 2.)

11        91.    Other than some baby foods and formulas, there was no other food for

12  detainees at these facilities.

13        92.    There were no rotating menus and no evidence of differentiation between

14  the food provided to children (other than infants), adults, and pregnant or nursing mothers.

15        93.    There were no facilities for preparing hot meals other than microwaves or

16  warming trays.  (Ex. 5; Ex. 42.)

17        94.    Plaintiffs' analysis of the e3DM data indicates that, between June 10, 2015

18  and September 28, 2015, the *average* gap time between burritos reportedly offered to

19  detainees at all Tucson sector stations was 7.336 hours.  (Gaston Decl. ¶ 49.)  At Tucson

20  station, the average gap time between meals was 8.239 hours.  (Gaston Decl. ¶ 68.)

21  Consistent with this, many detainees stated that they did not receive any food for 12 or

22  more hours (ECF No. 2-3, Ex. 43 ¶¶ 9, 19, 21, 32; ECF No. 2-1, Ex. 5 ¶¶ 13, 17) and that

23  they were constantly hungry.  (ECF No. 2-3, Ex. 43 ¶¶ 18, 32, 38; ECF No. 2-3, Ex. 45

24  ¶ 28; *id.*, Ex. 46 ¶¶ 12, 15; *id.*, Ex. 47 ¶ 13; ECF No. 2-2, Ex. 26 ¶ 18; ECF No. 2-3,

25  Ex. 48 ¶ 11; ECF No. 2-1, Ex. 5 ¶¶ 13, 17; ECF No. 2-2, Ex. 30 ¶¶ 17, 18; ECF No. 2-3,

26  Ex. 42 ¶¶ 12, 21; ECF No. 2-1, Ex. 11 ¶ 18; ECF No. 2-2, Ex. 21 ¶¶ 15, 25; ECF No. 2-3,

27  Ex.44 ¶ 15, 21, 24; *id.*, Ex. 49 ¶¶ 20, 28; *id.*, Ex. 36 ¶ 23.)

28

95.   Former detainee declarants frequently complained about the quality of food as well.  (ECF No. 2-1, Ex. 9 ¶ 32; *id.*, Ex. 16, ¶ 15; *id.*, Ex. 14 ¶ 8.)

96.   The DOJ NIC Jail Standards state:

> Inmates must be provided with adequate, nutritional meals. Dieticians should ensure that each meal provides inmates with a balanced diet appropriate to their age and medical conditions. Teenagers may need a different caloric intake than older inmates. Diabetics, inmates on dialysis, and those with food allergies all need to have medically approved and appropriate diets. Inmates with legitimate religious dietary restrictions also must be accommodated.

(Ex.  196 at 4.)

97.   The Core Jail Standards make clear that nutritionally balanced diet is required and that meals must be served regularly:

> 1-CORE-4A-01 (Mandatory) (Ref. 4-ALDF-4A-07)
> The facility's dietary allowances are reviewed at least annually by a qualified nutritionist or dietician to ensure that they meet the nationally recommended dietary allowances for basic nutrition for appropriate age groups. Menu evaluations are conducted at least quarterly by food service supervisory staff to verify adherence to the established basic daily servings.

(Ex. 199, 1-CORE-4A-01, at 23.)

> 1-CORE-4A-06 (Ref. 4-ALDF-4A-17, 4A-18)
> Three meals, including at least two hot meals, are prepared, delivered, and served under staff supervision at regular times during each twenty-four hour period, with no more than fourteen hours between the evening meal and breakfast. Variations may be allowed based on weekend and holiday food service demands, provided basic nutritional goals are met.

(*Id.*, 1-CORE-4A-06, at 25.)

98.   Section 4.13 of the new TEDS Standards also requires food to be provided at "regularly scheduled meal times" and accurately "documented in the appropriate electronic system(s) of record" and snacks are to be provided "between regularly scheduled meal times."

99.   Section 5.6 of the new TEDS requires that juveniles and pregnant detainees "will be offered a snack upon arrival and a meal at least every six hours thereafter, at

1    regularly scheduled meal times.  At least two of those meals will be hot.  Juveniles and

2    pregnant or nursing detainees must have regular access to snacks, milk and juice."

3        100.    Former detainees' declarations show that, despite providing irregular and

4    insufficient meals, Border Patrol agents threaten to confiscate food to keep detainees

5    quiet.  (ECF No. 2-1, Ex. 11 ¶ 21; ECF No. 2-2, Ex. 43 ¶ 21; ECF No. 2-1, Ex. 11 ¶ 21

6    ("Border patrol agents said that if we were not quiet they were going to take away our

7    food.  So we stayed very quiet because we were afraid of losing the food.").)

8        101.    I understand that Defendants were ordered to make available to Plaintiffs

9    documents sufficient to show current detainee detention practices and procedures at the

10   four stations I inspected.  I have not seen any documents indicating that any of the four

11   stations' dietary allowances have been reviewed by a qualified dietician or nutritionist,

12   and therefore assume none exists.  I *have* seen Holding Cell Inspection forms from

13   Douglas Station in which CBP employees include in the remarks section that the burritos

14   are "delicious" or "yummy" or "super yummy" or "scrumptious."  (Ex. 108 at USA1185;

15   Ex. 109 at USA1197; Ex. 111 at USA1494; Ex. 111 at USA1467.)  I understand that CBP

16   employees do not eat the food given to detainees so I must assume that these comments

17   are made sarcastically and with the recognition that the burritos are not particularly

18   appetizing and are in fact considered punitive.  (ECF No. 2-1, Ex. 11 ¶ 21.)

19       102.    The failure to provide a nutritionally balanced diet to individuals detained

20   more than 12 hours serves no legitimate penological or custodial interest and creates a risk

21   of harm for some detainees.

22       103.    Detainees should be given food immediately upon arrival and then upon a

23   set schedule.  The current diet also does not address food allergies and should be required

24   to do so.

25       **F.    Temperature and Ventilation**

26       104.    During our inspection, CBP agents informed us that all detainees' outer

27   layers of clothing were confiscated before being placed in hold rooms, and in all but a few

28   instances, detainees were not given replacement clothing.  (ECF No. 2-1, Ex. 3 ¶ 8 (agents

1   confiscated shirts and coat, so detainee had only a short sleeve shirt); ECF No. 2-2,

2   Ex. 20, ¶ 9 (clothes were confiscated, leaving detainee with only a short sleeve shirt.)

3       105.   Surveillance video regularly shows detainees in Hold Rooms with no outer

4   layers of clothing.  (Exs. 126, 129; Ex. 165.)

5       106.   Surveillance video also shows detainees huddled together under Mylar

6   blankets, even in the late Arizona summer months, wrapped head to toe in these flimsy

7   plastic sheets.  (Exs. 187, 188; Ex. 191.)  According to detainees' declarations sometimes

8   they would not even have these sheets.  (ECF NO. 2-3. Ex. 43 ¶ 10 ("[t]hree of the sixteen

9   [detainees] got small aluminum blankets but the rest of us did not. . . [w]e asked for

10  blankets but they ignored us"); ECF No. 2-1, Ex. 9 ¶¶ 24, 25 (guard refused detainee's

11  request for new aluminum sheet when it ripped, so she asked permission to take an

12  aluminum blanket from the trash.)

13      107.   These Mylar sheets are demonstrably inadequate to keep people warm in

14  hold rooms that, even in the warmer months, drop to 58.8° Fahrenheit. (Ex. 111 at

15  USA001461.)  (ECF No. 2-2, Ex. 25, ¶ 9 (detainee stated that she tried to "curl up on the

16  floor and huddle with some of the other women in order to stay warm," but ultimately

17  needed to pace around the holding cell to try to warm herself); ECF No. 2-2, Ex. 20 ¶ 8.

18  (detainee stated that he understood why "dogs sleep in a little ball, to keep warm, but

19  couldn't even keep warm doing that."); *id.*, Ex. 26 ¶ 24 ("[m]any children were crying

20  because it was so cold"); ECF No. 2-3, Ex. 44 ¶¶ 8, 21 (detainee's two year old daughter

21  and other children in the holding cell often cried due to hunger and cold).)

22      108.   Former detainee declarations commonly complain of being subjected to cold

23  temperatures.  (ECF No. 2-1, Ex. 6 ¶ 9 ("The temperature in the cell was very cold, we

24  call it the 'hielera' (freezer) because they turn on the air high and it's so cold.").)  There

25  are even accounts of Border Patrol agents using cold temperatures to punish inmates.

26  (ECF No. 2-2,  Ex. 24 ¶ 6; *id.*, Ex. 23 ¶ 17 ("One Mexican woman asked an agent to turn

27  off the air conditioner.  The agent said, 'Don't ask or we'll turn it up.'"); ECF No. 2-2,

28  Ex. 18 ¶ 8; ECF No. 2-1, Ex. 4 ¶ 6 ("When people asked the guards to make it warmer,

1  they made it colder. Sometimes they laughed at us when we complained about the

2  temperature."); ECF No. 2-2, Ex. 18 ¶ 8; ECF No. 2-1, Ex. 6 ¶ 9 ("the other detainees who

3  spoke English would translate for us and tell us that the guards said that if we talked too

4  much or complained that they would turn on the air even colder"); ECF No. 2-3, Ex. 34

5  ¶ 9 ("Someone asked the officials to make the cell warmer, but they were ignored; in fact,

6  after the request was made we could feel the cell get even colder.").)

7       109.   Given the lack of clothing and mattresses and nothing to do all day,

8  detainees are left to sit or lay down on concrete, which is a very cold experience. During

9  the inspection, I alternately sat on the concrete and wooden benches at Nogales and the

10  difference was striking. Concrete benches are very cold and seep heat from your body.

11       110.   During our inspection of Douglas we were told their air-conditioning system

12  was out of order, yet the temperatures were about the same as at the other facilities we

13  inspected. As a result the CBP had provided sweatshirts/jackets for the detainees to wear.

14  Every detainee was wearing them. In that the temperatures where similar to the other

15  facilities, this is clear evidence of the need for additional insulation.  In September 2015,

16  the Douglas station changed its Holding Cell Inspection form to include a "Cell

17  Temperature Check" section in which CBP employees include temperature readings for

18  each of the cells.  (Ex. 111 at USA001512.)  The temperature of the cells appears to

19  depend on the location of that cell, with some consistently colder than others.

20       111.   The Core Jail Standards Require CBP to provide suitable clothing:

21
22  > 1-CORE-4B-02 (Ref. 4-ALDF-4B-03)
> Inmates are issued clothing that is properly fitted and suitable
> for the climate.  There are provisions for inmates to exchange
> clothing at least twice weekly."

23
24  (Ex. 199, 1-CORE-4B-02, at 25.)

25       112.   The Core Jail Standards also require:

26  > 1-CORE-1A-10 (Ref. 4-ALDF-1A-19, 1A-20)
> A ventilation system supplies at least 15 cubic feet per minute
> of circulated air per occupant, with a minimum of five cubic
> feet per minute of outside air. Toilet rooms and cells with
> toilets have no less than four air changes per hour unless state
> or local codes require a different number of air changes. Air

> quantities are documented by a qualified independent source and are checked not less than once per accreditation cycle. *Temperatures are mechanically raised or lowered to acceptable comfort levels."*]

(*Id.*, 1-CORE-1A-10, at 4.)

113.    Additionally, the DOJ NIC Jail Standards state (emphasis added):

> Inmates must be *provided with* clean clothes and bedding. Clothing, towels, and bedding must be exchanged, laundered, and inspected on a regular basis.  Failing to do so will result in an unhygienic facility for both the inmates and the staff.

(Ex. 196 at 4.)

114.    It is my opinion that the current practice of lack of suitable clothes, lack of bedding and mattresses, and the composition of the benches and floors that detainees must sit and sleep on serves no penological interest and serves only as punishment for the detainees.

### G.    Ability to Maintain Personal Hygiene

115.    I understand that detainees often arrive dirty to the facilities and are in need of the opportunity to clean themselves and change clothing upon arrival.  (ECF No. 2-1, Ex. 33 ¶ 8; ECF No. 2-3, Ex. 39 ¶ 7; ECF No. 2-2, Ex. 26 ¶ 29.  Detainees also need to be able to clean their bodies prior to eating or after using the bathroom. Detainees however are unable to maintain basic personal hygiene in these facilities and typically not permitted to wash or change upon arrival or at any other time during their detention.

116.    Out of the four facilities that we inspected, only Nogales and Tucson had any facilities for detainees to shower themselves.  CBP officials at Nogales told us that these showers were rarely used and then only when a detainee showed evidence of scabies. According to e3DM data produced by Defendants, only 115 detainees were given showers out of 16,992 held in Tucson Sector Border Patrol stations between June 10 and September 28, 2015.  (Gaston Decl. ¶ 27.)  Of those 115 showers, 20 were purportedly provided at Casa Grande station, where we were told by CBP agents that no shower facilities existed.  (Gaston Decl. ¶ 60.)

117.    I observed soap dispenser located on the walls of many hold rooms. However, they were sometimes broken or empty.  During our inspection of Casa Grande station, there were no soap dispensers and no evidence of soap at all for detainees to clean themselves.  In the Douglas station, the Holding Cell Inspection forms record there being no soap during several days in October.  (Ex. 111 at USA1526; Ex. 111 at USA1528; Ex. 111 at USA1537-38; Ex. 111 at USA1546-47; Ex. 111 at USA1549; Ex. 111 at USA1557.)

118.    I also inspected the toilets and sinks.  Most cells had between one and four metal sink/toilet units behind a low brick privacy wall or stall.  (Ex. 55; Exs. 10, 23.)  Occasionally the sink and toilet were separate units (Ex. 44)  A few toilets were not operational.  (Ex. 70.)

119.    In only one case did I find a sink providing hot water.

120.    We did not observe any towels that were made available to detainees.

121.    The Core Jail Standards require:

> 1-CORE-4B-04      (Ref. 4-ALDF-4B-08, 4B-09, 4C-10)
> Inmates, including those in medical housing units or infirmaries, have access to showers toilets, and washbasins with temperature controlled hot and cold running water twenty-four hours per day. Inmates are able to use toilet facilities without staff assistance when they are confined in their cell/sleeping areas. Water for showers is thermostatically controlled to temperatures ranging from 100 degrees to 120 degrees Fahrenheit.

(Ex. 199, 1-CORE-4B-04, at 26.)

122.    The result is that detainees have no opportunity to adequately clean themselves.  Hot water is virtually nonexistent, soap is sometimes available but sometimes it is not, there are no towels and there is only very rare access to a shower.  Many detainees come to the facilities after walking through the desert sometimes for days or weeks.  (ECF No. 2-1, Ex. 11 ¶ 3 (apprehended after walking in desert for 10 days); ECF No. 2-2, Ex. 23 ¶¶ 5, 10 (lost in desert for a week).)  It is likely their personal hygiene has suffered prior to the time of their apprehension.  (ECF No. 2-3, Ex. 39 ¶ 7.)  When they get to a CBP facility they do not have the opportunity to clean themselves.  Especially

given the lack of hot water, they are not able to properly clean themselves before eating or after going to the bathroom.  In a detention facility where detainees are held in overcrowded conditions it is my opinion this creates an unreasonable risk for the spread of disease or infection among the detainees and the staff who work there.  I would think that CBP administrators would want to do more to protect their own staff if for no other reason.

123.    Again, this is simple and basic protocol for the operation of a detention facility. Typically, general population jail inmates can shower daily. Since the detainees are constantly locked in their cells, they do not have an opportunity to shower during out of cell time like a jail population inmate.  It is my opinion that detainees should be provided the opportunity to shower, after being searched, upon arrival at the facility. They should have the opportunity to shower once every 3 days they are confined at the facility.

124.    Once again, this practice of the CBP serves no legitimate penological or custodial purpose, creates an unjustifiable risk of harm to detainees, and amounts to nothing more than punishment.

125.    Additionally, I understand from detainees' declarations that they are not provided with an adequate supply of sanitary napkins (ECF No. 2-2, Ex. 25 ¶ 11) or diapers (*id.*, Ex. 29 ¶ 15 (One and a half year old child without a clean diaper for nineteen hours); *id.*, Ex. 28 ¶ 11 (agents refused mother's request that they get a diaper out of her bag, so child was left in a diaper diaper); *id.*, Ex. 30, ¶ 14.)

**H.    Unsafe Isolation Cells**

126.    At the Douglas facility there are 6 isolation cells that are completely inadequate.  These cells were very alarming to me and very dangerous for any detainee who might be housed there and for the staff who must supervise them. There are no windows to see into the cells in order to view inside nor are there food ports in the doors to safely deliver meals. The in-cell cameras have at least one blind spot that does that allow viewing into all parts of the cell.

127.   Since these cells are without windows in the doors and there is no food port in the cell door, the CBP agents must open the cell door "blind" since they cannot see in before opening the door. This increases the possibility of a serious assault that could occur immediately upon opening the cell door.

128.   In all the documents I have reviewed about the operations of CBP facilities I have seen nothing that describes how these isolation cells are to be operated. As a result there is no evidence that these cells are operated according to industry standards. It is well know that the risk of suicide and self-harm is increased for persons housed in isolation. For that reason alone, consistent with ACA standards and industry practice, half hour checks are required of individuals held in isolation. Moreover, the surveillance cameras in the cells at Douglas are mounted in such a way as to create a hazard for hanging.

129.   It is my opinion that the isolation cells at Douglas should be shut down and not utilized until the problems with the cell doors are  fixed and the agency develops policy for their use that are consistent with industry standards. Continuing their operation creates the risk of serious harm for any detainee who may be housed there.

**I.     Medical Screening Standards in Detention Settings**

130.   Core Jail Standards provide that the admission processes for a newly-admitted inmate include, but are not limited to, health screening, suicide screening, and alcohol and drug screening.  (Ex. 199, 1-CORE-2A-14, at 13.)

131.   Specifically, the Core Jail Standards articulate mandatory guidelines for "Intake physical and mental health screening."  (Ex. 199, 1-CORE-4C-09, at 30.)

132.   The screening should commence upon the inmate's arrival at the facility, unless there is documentation of a medical screening within the previous 90 days or the inmate is an intra-system transfer.  (*Id.*)

133.   The screening should be "conducted by health-trained staff or by qualified health care personnel in accordance with protocols established by the health authority."  (*Id.*)

134.   Screening must include at least:

- current or past medical conditions, including mental health problems and communicable diseases;
- current medications, including psychotropic medications;
- history of hospitalization, including inpatient psychiatric care;
- suicidal risk assessment, including suicidal ideation or history of suicidal behavior;
- use of alcohol and other drugs including potential need for detoxification;
- dental pain, swelling, or functional impairment;
- possibility of pregnancy; and
- cognitive or physical impairment.

135.   Screening should also include observation of the following:

- behavior, including state of consciousness, mental status, appearance, conduct, tremor, or sweating;
- body deformities and other physical abnormalities;
- ease of movement;
- condition of the skin, including trauma markings, bruises, lesions, jaundice, rashes, infestations, recent tattoos, and needle marks or other indications of injection drug use; and
- symptoms of psychosis, depression, anxiety and/or aggression.

136.   At the conclusion of the screening, the medical disposition of the inmate should be determined as:

- refusal of admission until inmate is medically cleared;
- cleared for general population;
- cleared for general population with prompt referral to appropriate medical or mental health care services;
- referral to appropriate medical or mental health care service for emergency treatment; or

- process for observation for high risk events, such as seizures, detoxification head wounds, and so forth.

137.   As explained by the Core Jail Standards, the purpose of this medical screening is two-fold: "to prevent newly arrived inmates who pose a health or safety threat to themselves or others from being admitted to the general population" and "to identify inmates who require immediate medical attention."  (Ex. 199, 1-CORE-4C-09, at 31.)

## J.    Failure to Screen at Tucson Sector CBP Facilities

138.   During our inspection of the Tucson Sector CBP facilities, as described above, we were told by Defendants' personnel that medical screening is not performed upon detainees' arrival at each station.  We were also told that some agents are EMT-trained and can be assigned these duties if they are available.  I am not aware, however, of any records received by Plaintiffs from Defendants that ensure sufficient EMT-trained agents are on the staff rosters in each Tucson Sector CBP facility to consistently perform medical screening of arriving detainees.

139.   The declarations of numerous former detainees show the failure of CBP to provide adequate medical screening, and even medical assistance upon request.  (ECF No. 2-2, Ex. 23 ¶ 7 (no medical evaluation and denied assistance when she complained of heavy vaginal bleeding); ECF No. 2-3, Ex. 38 ¶ 14 (refused medical assistance despite swollen arm); *id.*, Ex. 37 ¶¶ 22, 29, 31 (refused prescribed medication for pain leg fracture); ECF No. 2-1, Ex. 9 ¶ 12-1; ECF No. 2-2, Ex. 19 ¶ 19.)  Moreover, medications that detainees have with them are confiscated.  (ECF No. 201, Ex. 9 ¶ 14.)

140.   The declarations also show that detainees arriving at CBP facilities in the Tucson Sector are a particularly vulnerable population—exhausted, hungry, thirsty, many who are sick or injured and in need of immediate medical care.  (ECF No. 2-2, Ex. 23, ¶ 5; ECF No. 2-2, Ex. 26, ¶¶ 15-16; *id.*, Ex. 21¶ 14; ECF No. 2-3, Ex. 36 ¶ 8; ECF No. 2-1, Ex.15 ¶ 18 (diarrhea and vomiting); *id.*, Ex. 6 ¶ 15 (heart condition); ECF No. 2-1, Ex. 20 ¶ 15 (colitis); ECF No. 2-2, Ex. 23 ¶ 23 (heavy sustained vaginal bleeding); ECF No. 2-3,

Ex. 37 ¶¶ 4, 21, 34 (pain from broken leg).)  This makes medical screening and care all the more crucial in the Tucson Sector setting.

**K.    Practices and Policies are Inadequate For A Facility That Holds Detainees Over 10 Hours**

141.    I understand that Defendants have been ordered to make available to Plaintiffs documents sufficient to show current detainee detention practices and procedures for the four stations I inspected.

142.    I have reviewed all of the policies produced.  I find them to be either inadequate or insufficient and out of line with accepted standards for detention facilities, and woefully inadequate for facilities that detains people over 10 hours.

143.    I understand that after the start of this litigation, in October 2015, the government released new TEDS standards.  The new TEDS standards significantly extended the time period that Border Patrol agents may hold detainees to 72 hours or more.  (Ex. 95 at USA631.)  The hold rooms are completely inadequate facilities for housing detainees that long.

144.    Apart from the deficiencies outlined above, CBP does not have policies on basic items that are standards in all jails and other correctional facilities such as what I have reference above for the use of isolation cells. Just a few examples of other standards taken from the Core Jail Standards that are not addressed by current CBP policies include:

a.    Required weekly, monthly and annual sanitation inspections.  (Ex. 199, 1-CORE-1A-01, at 1.)

b.    All inmate rooms/cells provide the occupants with access to natural light. Lighting throughout the facility is sufficient for the tasks performed.  (*Id.*, 1-CORE-1A-09, at 4.)

c.    When a female inmate is housed in a facility, at least one female staff member is on duty at all times. (*Id.*, 1-CORE-2A-05, at 10.)

d.    If food services are provided by the facility, there are weekly inspections of all food service areas, including dining and food preparation areas and equipment. Water temperature is checked and recorded daily. (*Id.*, 1-CORE-4A-05, at 24.)

e.   Inmates have access to exercise and recreation opportunities. When available, at least one hour daily is outside the cell or outdoors.  (*Id.*, 1-CORE-5C-01, at 27.)

f.   Annual and pre-service training requirements (*Id.*, 1-CORE-7B-03, at 52-53.)

145.   Ultimately the CBP facilities lack the focus on the detail of the operation of detention facilities necessary to make certain they operate in a safe and humane manner.

146.   CBP does not appear to have many of the accountability measures that are typically found in corrections facilities including routine inspection systems in all of its stations (daily, weekly, monthly) and outside audits.  The purpose of these types of procedures is to establish accountability for local managers and to see if their practices are consistent with their policies. Corrections facilities require oversight and that appears to be woefully lacking from the operation of CBP facilities.  Additionally, CBP's policies do not cover all of the apparent practices within CBP facilities, leaving room for abuse.  For example, on July 21, 2015, the Tucson station appears to have ordered 30 spit hoods.  (Ex. 118.)  Spit hoods are typically transparent light hoods that are "designed to prevent the wearer from biting and/or transferring or transmitting fluids (saliva and mucous) to others."[7]  As with any restraint and particularly since the spit hoods cover the eyes, nose, and mouth of the wearer, spit hoods may pose dangers to the wearer if not fastened properly.[8]  However none of the produced policies contained any guidelines regarding the proper use of spit hoods (or any reference to spit hoods or similar devices at all).

147.   CBP's own records demonstrate failings in documenting and addressing issues in its facilities.  CBP appears to complete daily Processing Inspection Forms for each of its stations.  The same form is filled out for different shifts during the day.

148.   These forms suggest that inspections, which have implications for the health and safety of both detainees and CBP personnel, were not performed consistently or with

---

[7] *Policy 306*: *Handcuffing and Restraints*, University of Merced Police Department, *available at* http://police.ucmerced.edu/about/department-policies/policy-306

[8] *Id.*

appropriate care.  For example, forms from Casa Grande station indicate that the video recording system was not working, was working intermittently, or was possibly not checked.  (Ex. 104 at USA706-708, USA718-719, USA722-724, USA729-749) (for the question of whether the video monitors and video loop is operational or in use, the "no" box is checked).)  Similarly, in the Casa Grande station, a lock on a cell was reported broken during some shifts but not during others.  (*Id.* at USA790-791 (No report of broken lock during first shift on July 5 or July 6); Ex. 105 at USA814-816 (Lock on cell 9 reported broken during the second shift on July 5 but not on July 7); *id.* at USA836, USA838 (Lock on cell 9 reported broken during third shift on July 5 and July 7); *id.* at USA866, USA 868 (Lock on cell 9 reported broken during fourth shift on July 5 and July 7); Ex. 107 at USA1043, USA1047 (Lock broken again or still broken in September .)  For the Nogales station, several items are reported as needing repair on August 18, including lighting ("At least one light out in every cell"), benches ("Some benches are missing bolts"), and doors/locks.  (Ex. 112 at USA1570.)  No issues are reported the following day.  (Ex. 112 at USA1571.)  However the same items are indicated as needing repair on August 22.  (*Id.* at USA1574.)  Some forms for the Casa Grande station were not filled out at all.  (Ex. 104, USA728; Ex. 107 at USA1021, USA1029.)  Additionally there very few or no comments in the "Remarks" sections of forms for all stations which suggested to me that the completion of the forms is largely a perfunctory exercise and not an actual inspection.

149.    CBP's inconsistent practices illustrate their own misunderstanding that part of their mission and responsibility is to attend to the basic and human needs of the detainees.

150.    The CBP is engaged in at least two primary functions—the apprehension of detainees and their subsequent detention. It does not appear that they fully embrace, accept or understand the detention function. Agents for the Border Patrol are expected to be proficient at both functions. Structurally it would be best if those functions were separated. Absent that approach, training for agents expected to perform both functions

1    should be separated into separate tracks so that it is clear to agents that the skill sets are

2    different. Managing a detained population is complex work and deserves its own focus

3    and emphasis for the staff expected to perform those functions in order to provide for the

4    safe and humane housing of the detainees.

5        151.   It is clear that the CBP facilities are designed and operated to hold detainees

6    for a short period of time. Whether or not it is 24, 48, 72 hours, or longer, CBP still needs

7    to learn, implement and then monitor all the basic functions of a detention operation. But

8    in order to minimize the amount of time people spend in these facilities, I strongly

9    recommend that CBP do a business process flow analysis of detainees from arrest to

10   transfer out of BP custody to identify roadblocks to moving them quickly. Performance

11   measures should then be established for agency managers to make sure they are constantly

12   focused on the important issue of moving detainees to their next location where full

13   services can be provided.

14       152.   The impact of overcrowded facilities, lack of regular sleep, lack of access to

15   adequate food and water, inadequate sanitation, poor temperature control and ventilation,

16   and other factors described above is likely to create conditions of confinement that place

17   stress on detainees that is completely unnecessary for the safe and secure operation of a

18   detention facility. Such conditions can and do lead to increased risk for detainees and staff

19   alike as they introduce conflict for basic human necessities into an already stressful

20   environment.  Upon arrival at the these facilities detainees are likely to be exhausted,

21   possibly in need of medical care, and some have fled their home country out of fear for

22   their safety or the safety of their loved ones.  (ECF No. 2-3, Ex. 41 ¶ 24 (afraid of

23   returning to home country as relatives had been killed there); *id.*, Ex. 38 ¶ 24 (same); ECF

24   No. 2-1, Ex. 8 ¶ 26 (afraid of returning to home country); *id.*, Ex. 15 ¶ 34 (same); ECF

25   No. 2-2, Ex. 21 ¶ 28 (same).)  Others are seeking be reunited with U.S. citizen children

26   and spouses – often after several years of separation.  (ECF No. 2-1, Ex. 9 ¶ 36; *id.*,

27   Ex. 11 ¶ 23; ECF No. 2-2, Ex. 19 ¶ 27.)  Good security is a combination of humane

28   treatment and adherence to accepted custody practices—not a focus on conditions that

simply punish which appears to be the misguided approach taken in the operation of CBP facilities.

## V.     CONCLUSION

153.    Based on my experience, review of the materials in this case, and the literature, the conditions of confinement in these holding cells for periods longer than ten hours are worse than national jails and prisons and, combined, clearly and unjustifiably create risk of harm to detainees, and, in my professional judgment, serve no penological or custodial interest.

154.    I have worked in correctional organizations for 35 years. During my career and since I commenced my work as a corrections consultant and expert witness nearly four years ago I have been in countless prisons and jails. Those facilities house individuals who have been charged with or convicted of felonies and misdemeanors. I have never been in one that treats those confined in a manner that the CBP treats detainees. The absence of medical screening upon arrival is unthinkable. Sufficient food, water and clothing are fundamental to safe, secure and humane operation but I have never seen the challenges the CBP creates for detainees for access to these basic necessities. I have seen and experienced the effects of overcrowding but no jurisdiction would cram so many people into so little space, without beds and bedding, that routinely occurs in CBP facilities. The conditions of confinement I witnessed through my inspections and through studying the records in this case are unthinkable in any other jurisdiction that I have seen or heard about. The CBP are housing people in conditions that are unnecessarily harsh, dangerous and contrary to accepted industry practices and standards. These conditions seem to me to be designed to punish and that is not the role of the Border Patrol.

155.    CBP must either take the necessary steps to ensure that detainees pass through these short-term facilities in a matter of hours, or take the significant steps required to make the conditions of confinement adequate for overnight stays.

## VI.   CELL CAPACITIES, FLOOR PLANS, AND INSPECTION FORMS

156.   Attached to the Appendix of Exhibits as Exhibit 83 is a true and correct copy of a document produced by Defendants on or about September 4, 2015 and Bates labeled USA000157, which purports to list the maximum cell capacities for each hold room at Tucson station.

157.   Attached to the Appendix of Exhibits as Exhibit 94 is a true and correct copy of a document produced by Defendants on or about September 30, 2015 and Bates labeled USA000617, which purports to list the maximum cell capacities for each hold room at Nogales station.

158.   Attached to the Appendix of Exhibits as Exhibit 99 is a true and correct copy of a document produced by Defendants on October 19, 2015 and Bates labeled USA000673-674, which purports to list the maximum cell capacities for each hold room at Douglas and Casa Grande stations.

159.   Attached to the Appendix of Exhibits as Exhibit 89 is a true and correct copy of a document produced by Defendants on September 4, 2015 and Bates labeled USA000359, which purports to be hand drawn sketches with measurements for cell dimensions at Casa Grande station.

160.   Attached to the Appendix of Exhibits as Exhibit 90 is a true and correct copy of a document produced by Defendants on September 4, 2015 and Bates labeled USA000360-363, which purports to be hand drawn sketches with measurements for cell dimensions at Douglas station.

161.   Attached to the Appendix of Exhibits as Exhibit 91 is a true and correct copy of a document produced by Defendants on September 4, 2015 and Bates labeled USA000364, which purports to be sketches with measurements for cell dimensions at Nogales station.

162.   Attached to the Appendix of Exhibits as Exhibit 92 is a true and correct copy of a document produced by Defendants on September 4, 2015 and Bates labeled

1   USA000365-371, which purports to be hand drawn sketches with measurements for cells

2   at Tucson station.

3        163.    Attached to the Appendix of Exhibits as Exhibit 93 is a true and correct

4   copy of a document produced by Defendants on September 28, 2015 and Bates labeled

5   USA000573-586, which purports to be hand drawn sketches with additional

6   measurements for cells and fixtures at Tucson station.

7        164.    Attached to the Appendix of Exhibits as Exhibit 93 is a true and correct

8   copy of a document produced by Defendants on September 28, 2015and Bates labeled

9   USA000587-591, which purports to be hand drawn sketches with additional

10   measurements for cells and fixtures at Casa Grande station.

11        165.    Attached to the Appendix of Exhibits as Exhibit 93 is a true and correct

12   copy of a document produced by Defendants on September 28, 2015 and Bates labeled

13   USA000592-599, which purports to be hand drawn sketches with additional

14   measurements for cells and fixtures at Douglas station.

15        166.    Attached to the Appendix of Exhibits as Exhibit 93 is a true and correct

16   copy of a document produced by Defendants on September 28, 2015 and Bates labeled

17   USA000600, which purports to be sketches with additional measurements for cells and

18   fixtures at Nogales station.

19        167.    Attached to the Appendix of Exhibits as Exhibit 117 is a true and correct

20   copy of a document produced by Defendants on October 29, 2015 and Bates labeled

21   USA002065, which purports to be the processing area blueprint for Casa Grande station.

22        168.    Attached to the Appendix of Exhibits as Exhibit 117 is a true and correct

23   copy of a document produced by Defendants on October 29, 2015 and Bates labeled

24   USA002066, which purports to be the processing area blueprint for Nogales Grande

25   station.

26        169.    Attached to the Appendix of Exhibits as Exhibit 117 is a true and correct

27   copy of a document produced by Defendants on October 29,, 2015 and Bates labeled

28   USA002067, which purports to be the processing area blueprint for Douglas station.

170.    Attached to the Appendix of Exhibits as Exhibit 117 is a true and correct copy of a document produced by Defendants on October 29, 2015 and Bates labeled USA002068, which purports to be the processing area blueprint for Tucson station.

171.    Attached to the Appendix of Exhibits as Exhibits 105, 106, and 107 are true and correct copies of documents produced by Defendants on November 9, 2015, which purport to be processing inspection forms for Casa Grande station between June and October, 2015.

172.    Attached to the Appendix of Exhibits as Exhibits 109, 110, and 111 are true and correct copies of documents produced by Defendants on November 9, 2015, which purport to be Holding Cell Inspection Forms for Douglas station between June and October, 2015.

173.    Attached to the Appendix of Exhibits as Exhibits 112 and 113 are true and correct copies of documents produced by Defendants on November 9, 2015, which purport to be Holding Cell Checklists for Nogales station between August and October, 2015.

174.    Attached to the Appendix of Exhibits as Exhibits 114, 115, and 116 are true and correct copies of documents produced by Defendants on November 9, 2015, which purport to be Holding Cell Checklists for Tucson station between July and October, 2015.

## VII.   AUTHENTICATION OF INSPECTION PHOTOGRAPHS

175.    Exhibit 50 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Tucson station on September 8, 2015, which accurately depicts a rolling cart at Tucson station containing paper cups and folded Mylar blankets in a cardboard box.

176.    Exhibit 51 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Tucson station on September 8, 2015, which accurately depicts a storage area  at Tucson station  with metal shelving and pallets containing office supplies, drinking cups, diapers, and other items.

177.   Exhibit 52 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Tucson station on September 11, 2015, which accurately depicts Room 19 in Tucson station with a view across the room towards the toilets.

178.   Exhibit 53 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Tucson station on September 11, 2015, which accurately depicts Room 19 in Tucson station with a close-up view of the toilet/sink unit inside a stall.

179.   Exhibit 54 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Tucson station on September 11, 2015, which accurately depicts Room 19 in Tucson station with a view from the toilet stall towards the door and windows.

180.   Exhibit 55 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Tucson station on September 11, 2015, which accurately depicts Room 19 in Tucson station with a close-up view of the toilet/sink unit inside a stall.

181.   Exhibit 56 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Tucson station on September 11, 2015, which accurately depicts Room 19 in Tucson station with a view across the room towards the toilet stalls.

182.   Exhibit 57 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Tucson station on September 11, 2015, which accurately depicts Room 19 in Tucson station with a close-up view of underneath a toilet bowl.

183.   Exhibit 58 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Tucson station on September 11, 2015, which accurately depicts Room 19 in Tucson station with a view across the room towards the toilet stalls.

184.   Exhibit 60 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Tucson station on September 11, 2015, which accurately depicts Room 18 in Tucson station with a view of benches and toilet stalls.

185.   Exhibit 61 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Tucson station on September 11, 2015, which accurately depicts Room 18 in Tucson station with a view of cement benches.

1         186.    Exhibit 62 is a true and correct copy of a photograph taken during Plaintiffs'

2    inspection of Tucson station on September 11, 2015, which accurately depicts Room 18 in

3    Tucson station with a view from the door to the back of the cell.

4         187.    Exhibit 63 is a true and correct copy of a photograph taken during Plaintiffs'

5    inspection of Tucson station on September 11, 2015, which accurately depicts Room 18 in

6    Tucson station with a close-up view of a toilet stall.

7         188.    Exhibit 64 is a true and correct copy of a photograph taken during Plaintiffs'

8    inspection of Tucson station on September 11, 2015, which accurately depicts Room 18 in

9    Tucson station  with a close-up view of a handicapped toilet/sink unit in stall

10        189.    Exhibit 65 is a true and correct copy of a photograph taken during Plaintiffs'

11    inspection of Tucson station on September 11, 2015, which accurately depicts Room 18 in

12    Tucson station with a close-up view of windows and a door frame.

13        190.    Exhibit 66 is a true and correct copy of a photograph taken during Plaintiffs'

14    inspection of Tucson station on September 11, 2015, which accurately depicts Room 18 in

15    Tucson station with a close-up view of underneath the toilet/sink unit in a stall.

16        191.    Exhibit 67 is a true and correct copy of a photograph taken during Plaintiffs'

17    inspection of Tucson station on September 11, 2015, which accurately depicts Room 1 in

18    Tucson station with a close-up view of a soap dispenser and sink/backsplash.

19        192.    Exhibit 68 is a true and correct copy of a photograph taken during Plaintiffs'

20    inspection of Tucson station on September 11, 2015, which accurately depicts Room 4 in

21    Tucson station with a view across the cell towards the back of the room.

22        193.    Exhibit 69 is a true and correct copy of a photograph taken during Plaintiffs'

23    inspection of Tucson station on September 11, 2015, which accurately depicts Room 4 in

24    Tucson station with a close-up view of a privacy wall.

25        194.    Exhibit 70 is a true and correct copy of a photograph taken during Plaintiffs'

26    inspection of Tucson station on September 11, 2015, which accurately depicts Room 4 in

27    Tucson station with a close-up view of a toilet/sink unit in a stall.

28

1    195.    Exhibit 71 is a true and correct copy of a photograph taken during Plaintiffs'

2    inspection of Tucson station on September 11, 2015, which accurately depicts Room 4 in

3    Tucson station with a close-up view of cement benches.

4    196.    Exhibit72 is a true and correct copy of a photograph taken during Plaintiffs'

5    inspection of Tucson station on September 11, 2015, which accurately depicts Room 4 in

6    Tucson station with a close-up view of cement benches.

7    197.    Exhibit 73 is a true and correct copy of a photograph taken during Plaintiffs'

8    inspection of Tucson station on September 11, 2015, which accurately depicts Room 4 in

9    Tucson station with a close-up view of cement benches.

10    198.    Exhibit 74 is a true and correct copy of a photograph taken during Plaintiffs'

11    inspection of Tucson station on September 11, 2015 which accurately depicts Room 4 in

12    Tucson station with a view across cell in front of toilet stalls.

13    199.    Exhibit 75 is a true and correct copy of a photograph taken during Plaintiffs'

14    inspection of Tucson station on September 11, 2015, which accurately depicts Room 6 in

15    Tucson station with a view of cement benches.

16    200.    Exhibit 76 is a true and correct copy of a photograph taken during Plaintiffs'

17    inspection of Tucson station on September 11, 2015, which accurately depicts Room 6 in

18    Tucson station with a view of underneath a toilet/sink unit.

19    201.    Exhibit 77 is a true and correct copy of a photograph taken during Plaintiffs'

20    inspection of Tucson station on September 11, 2015, which accurately depicts Room 6 in

21    Tucson station with a close-up view of underneath a toilet/sink unit.

22    202.    Exhibit 1 is a true and correct copy of a photograph taken during Plaintiffs'

23    inspection of Casa Grande station on September 9, 2015, which accurately depicts a

24    storage area in Casa Grande station with metal shelving containing items including

25    drinking cups, plastic liners, baby diapers, and sanitary napkins.

26    203.    Exhibit 2 is a true and correct copy of a photograph taken during Plaintiffs'

27    inspection of Casa Grande station on September 9, 2015, which accurately depicts the

28    back of a package of microwavable burritos at Casa Grande station.

204.   Exhibit 3 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Casa Grande station on September 9, 2015, which accurately depicts a storage room in Casa Grande station with metal shelving containing three sleeping mats.

205.   Exhibit 4 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Casa Grande station on September 9, 2015, which accurately depicts a box of Mylar blankets in Casa Grande station.

206.   Exhibit 5 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Casa Grande station on September 9, 2015, which accurately depicts a food heating unit and/or microwave in Casa Grande station.

207.   Exhibit 6 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Casa Grande station on September 9, 2015, which accurately depicts a janitor's closet in Casa Grande station.

208.   Exhibit 7 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Casa Grande station on September 9, 2015, which accurately depicts holding cell no. 9 in Casa Grande station from the door.

209.   Exhibit 8 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Casa Grande station on September 9, 2015, which accurately depicts holding cell no. 9 in Casa Grande station with a view of two toilet/sink units.

210.   Exhibit 9 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Douglas station on September 10, 2015, which accurately depicts holding cell S South Black in Douglas station with a close-up view of the floor behind the toilet/sink unit.

211.   Exhibit 10 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Douglas station on September 10, 2015, which accurately depicts holding cell S South Yellow and/or S South Blue in Douglas station with a close-up view of the toilet/sink area.

212.   Exhibit 11 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Douglas station on September 10, 2015, which accurately depicts holding

cell S South Yellow and/or S South Blue in Douglas station with a close-up view of the toilet/sink unit.

213.    Exhibit 12 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Douglas station on September 10, 2015, which accurately depicts holding cell S South Yellow and/or S South Blue in Douglas station with a close-up view of side of the sink and wall.

214.    Exhibit 13 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Douglas station on September 10, 2015, which accurately depicts holding cell N North Blue in Douglas station with a close-up view of the toilet bowl.

215.    Exhibit 14 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Douglas station on September 10, 2015, which accurately depicts holding cell N North Blue in Douglas station with a close-up view of human excrement on the privacy wall of the toilet.

216.    Exhibit 15 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Douglas station on September 10, 2015, which accurately depicts holding cell N North Green in Douglas station with a view from opened door.

217.    Exhibit 17 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Douglas station on September 10, 2015, which accurately depicts holding cell N North Black in Douglas station with a close-up view of the toilet bowl.

218.    Exhibit 18 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Douglas station on September 10, 2015, which accurately depicts holding cell N North Yellow in Douglas station with a view from the door.

219.    Exhibit 19 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Douglas station on September 10, 2015, which accurately depicts holding cell N North Yellow in Douglas station with a view from the side wall towards the privacy wall.

220.    Exhibit 20 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Douglas station on September 10, 2015, which accurately depicts holding cell N North Yellow in Douglas station with a view of the toilet/sink unit.

221.    Exhibit 21 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Douglas station on September 10, 2015, which accurately depicts holding cell N North Yellow in Douglas station with a close-up view of the floor next to the toilet.

222.    Exhibit 22 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Douglas station on September 10, 2015, which accurately depicts holding cell N North Yellow in Douglas station with a close-up view of spotted stainless steel

223.    Exhibit 23 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Douglas station on September 10, 2015, which accurately depicts holding cell N North Yellow in Douglas station with a view of the toilet/sink unit.

224.    Exhibit 24 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Douglas station on September 10, 2015, which accurately depicts holding cell N North Yellow in Douglas station with a close-up view of the floor drain.

225.    Exhibit 25 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Douglas station on September 10, 2015, which accurately depicts isolation cell No. 1 in Douglas station with a close-up view of the floor and sleeping mat.

226.    Exhibit 26 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Nogales station on September 11, 2015, which accurately depicts holding cell no. 3 in Nogales station with a view into the cell from the door.

227.    Exhibit 27 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Nogales station on September 11, 2015, which accurately depicts holding cell no. 3 in Nogales station with a view into the cell from the door.

228.    Exhibit 28 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Nogales station on September 11, 2015, which accurately depicts holding cell no. 3 in Nogales station with a close-up of sleeping mats on benches.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

229.    Exhibit 29 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Nogales station on September 11, 2015, which accurately depicts holding cell no. 3 in Nogales station with a close-up of sleeping mats on benches.

230.    Exhibit 30 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Nogales station on September 11, 2015, which accurately depicts holding cell no. 3 in Nogales station with a close-up view of a stain on the floor.

231.    Exhibit 31 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Nogales station on September 11, 2015, which accurately depicts holding cell no. 5 in Nogales station with a close-up view of an air vent.

232.    Exhibit 32 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Nogales station on September 11, 2015, which accurately depicts holding Cell no. 1in Nogales station with a close-up view of a sink and backsplash.

233.    Exhibit 33 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Nogales station on September 11, 2015, which accurately depicts holding cell no. 1 in Nogales station with a close-up view of a ceiling vent.

234.    Exhibit 34 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Nogales station on September 11, 2015, which accurately depicts holding cell no. 1 in Nogales station with a view of a corner of the floor near a cement bench.

235.    Exhibit 35 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Nogales station on September 11, 2015, which accurately depicts holding cell no. 4 in Nogales station with a close-up view of an orange Igloo water container.

236.    Exhibit 36 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Nogales station on September 11, 2015, which accurately depicts a view of the floor at Nogales station underneath a toilet/sink unit.

237.    Exhibit 37 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Nogales station on September 11, 2015, which accurately depicts holding cell no. 2 in Nogales station with a close-up view of the cinder block walls.

238. Exhibit 38 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Nogales station on September 11, 2015, which accurately depicts a cleaning supply room in Nogales station viewed from the door.

239. Exhibit 42 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Nogales station on September 11, 2015, which accurately depicts Room C in Nogales station with a close-up view of two microwave ovens.

240. Exhibit 43 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Nogales station on September 11, 2015, which accurately depicts Room 8 in Nogales station with a close-up view of underneath the toilet bowl.

241. Exhibit 44 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Nogales station on September 11, 2015, which accurately depicts Room 7 in Nogales station with a close-up view of underneath the sink.

242. Exhibit 45 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Nogales station on September 11, 2015, which accurately depicts Room 7 in Nogales station showing a corner of the floor.

243. Exhibit 46 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Nogales station on September 11, 2015, which accurately depicts Room 7 in Nogales station with a close-up view of a corner wall next to the door.

244. Exhibit 47 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Nogales station on September 11, 2015, which accurately depicts Shower Room 2 in Nogales station viewed from the door.

245. Exhibit 48 is a true and correct copy of a photograph taken during Plaintiffs' inspection of Nogales station on September 11, 2015, which accurately depicts Station ASID at Nogales station with a view of air-conditioning controls and computers.

///

///

///

///

1    246.    Exhibit 49 is a true and correct copy of a photograph taken during Plaintiffs'

2  inspection of Nogales station on September 11, 2015, which accurately depicts Station

3  ASID at Nogales station with a view of air-conditioning controls.

4    Executed this 4th day of December, 2015.

5

6    _____

     ELDON VAIL

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Attachment A

# ELDON VAIL

1516 8th Ave SE
Olympia, WA. 98501
360-349-3033
Nodleliav@comcast.net

## WORK HISTORY

Nearly 35 years working in and administering adult and juvenile institutions, and probation and parole programs, starting at the entry level and rising to Department Secretary. Served as Superintendent of 3 adult institutions, maximum to minimum security, male and female. Served as Secretary for the Washington State Department of Corrections (WADOC) from 2007 until 201l.

- Secretary                          WADOC                                    2007-2011
- Deputy Secretary                   WADOC                                    1999-2006
- Assistant Deputy Secretary         WADOC                                    1997-1999
- Assistant Director for Prisons     WADOC                                    1994-1997
- Superintendent                     McNeil Island Corrections Center         1992-1994
- Superintendent                     WA. Corrections Center for Women         1989-1992
- Correctional Program Manager       WA. Corrections Center                   1988
- Superintendent                     Cedar Creek Corrections Center           1987
- Correctional Program Manager       Cedar Creek Corrections Center           1984-1987
- Juvenile Parole Officer            Division of Juvenile Rehabilitation      1984
- Correctional Unit Supervisor       Cedar Creek Corrections Center           1979-1983
- Juvenile Institution Counselor     Division of Juvenile Rehabilitation      1974-1979

## SKILLS AND ABILITIES

- Ability to analyze complex situations, synthesize the information and find practical solutions that are acceptable to all parties.

- A history of work experience that demonstrates how a balance of strong security and robust inmate programs best improves institution and community safety.

- Leadership of a prison system with very little class action litigation based on practical knowledge that constitutional conditions are best achieved through negotiation with all parties and not through litigation.

- Extensive experience as a witness, both in deposition and at trial.

- Experience working with multiple Governors, legislators of both parties, criminal justice partners and constituent groups in the legislative and policymaking process.

- Skilled labor negotiator for over a decade. Served as chief negotiator with the Teamsters and the Washington Public Employees Association for Collective Bargaining Agreements. Chaired Labor Management meetings with Washington Federation of State Employees.

## HIGHLIGHTS OF CAREER ACCOMPLISHMENTS

- Reduced violence in adult prisons in Washington by over 30% during my tenure as Secretary and Deputy Secretary even though the prison population became much more violent and high risk during this same time period.

- Long term collaboration with the University of Washington focusing on improving treatment for the mentally ill in prison and the management of prisoners in and through solitary confinement.

- Implemented and administered an extensive array of evidence based and promising programs:

  o Education, drug and alcohol, sex offender and cognitive treatment programs.
  o Implemented sentencing alternatives via legislation and policy, reducing the prison populations of non-violent, low risk offenders, including the Drug Offender Sentencing Alternative and, as the Secretary, the Family and Offender Sentencing Alternative. http://www.doc.wa.gov/community/fosa/default.asp
  o Pioneered extensive family based programs resulting in reductions in use of force incidents and infractions, as well as improved reentry outcomes for program participants.
  o Established Intensive Treatment Program for mentally ill inmates with behavioral problems.
  o Established step down programs for long-term segregation inmates resulting in significant reduction in program graduate returns to segregation. http://www.thenewstribune.com/2012/07/10/2210762/isolating-prisoners-less-common.html

- Initiated the Sustainable Prisons Project http://blogs.evergreen.edu/sustainableprisons/

- Improved efficiency in the agency by administrative consolidation, closing 3 high cost institutions and eliminating over 1,200 positions. Housed inmates safely at lowest possible custody levels, also resulting in reduced operating costs.

- Increased partnerships with non-profits, law enforcement and community members in support of agency goals and improved community safety.

- Resolved potential class action lawsuit regarding religious rights of Native Americans. http://seattletimes.nwsource.com/html/opinion/2015464624_guest30galanda.html

- Successful settlement of the Jane Doe class action law suit, a PREA case regarding female offenders in the state's prisons for women.

- Led the nation's corrections directors to support fundamental change in the Interstate Compact as a result of the shooting of 4 police officers in Lakewood, WA.

- Dramatically improved media relations for the department by being aggressively open with journalists, challenging them to learn the difficult work performed by corrections professionals on a daily basis.

## EDUCATION AND OTHER BACKGROUND INFORMATION

- Bachelor of Arts - The Evergreen State College, Washington – 1973

- Post graduate work in Public Administration - The Evergreen State College, Washington - 1980 and 1981

- National Institute of Corrections and Washington State Criminal Justice Training Commission - various corrections and leadership training courses

- Member of the American Correctional Association

- Associate member, Association of State Correctional Administrators (ASCA)

- Guest Speaker, Trainer and Author for the National Institute of Corrections (NIC)

- Commissioner, Washington State Criminal Justice Training Commission 2002-2006, 2008-2011

- Member, Washington State Sentencing Guidelines Commission 2007-2011

- Instructor for Correctional Leadership Development for the National Institute of Corrections

- Author of *Going Beyond Administrative Efficiency—The Budget Crisis in the State of Washington*, published in Topics of Community Corrections by NIC, 2003

- Advisory Panel Member, *Correctional Technology—A User's Guide*

- Consultant for *Correctional Leadership Competencies for the 21st Century*, an NIC publication

- Co-chair with King County Prosecutor Dan Satterberg, *Examining the Tool Box: A Review of Supervision of Dangerous Mentally Ill Offenders* http://your.kingcounty.gov/prosecutor/DMIO%20-WorkgroupFinalReport.pdf

- Consultant for Correctional Health Care Executive Curriculum Development, an NIC training program, 2012

- Guest lecturer on solitary confinement, University of Montana Law School in 2012

- On retainer for Pioneer Human Services from July 2012 - July 2013

- On retainer for BRK Management Services from September 2012 – April 2013

- Guest Editorial, Seattle Times, February 22, 2014 http://www.seattletimes.com/opinion/guest-opinions-should-washington-state-abolish-the-death-penalty/

## CURRENT ACTIVITIES

- Serve on the Board of Advisors for Huy, a non-profit supporting Native American Prisoners

- Registered Agent for the Association of State Correctional Administrators (ASCA) in Washington

- Retained as an expert witness or correctional consultant in the following cases:

  o *Mitchell v. Cate*,
    No. 08-CV-1196 JAM EFB
    United States District Court, Eastern District of California,
    Declarations, March 4, 2013, May 15, 2013 and June 7, 2013
    Deposed, July 9, 2013
    Case settled, October 2014

  o *Parsons, et al v. Ryan*,
    No. CV 12-06010 PHX-NVW
    United States District Court of Arizona
    Declarations and reports, November 8, 2013, January 31, 2014,
    February 24, 2014, September 4, 2014
    Deposed, February 28, 2014 and September 17, 2014
    Case settled, October 2014

- o *Gifford v. State of Oregon*,
  No. 6:11-CV-06417-TC
  United States District Court, For the District of Oregon,
  Eugene Division,
  Expert report, March 29, 2013
  Case settled, May 2013

- o *Ananachescu v. County of Clark*,
  No. 3:13-cv-05222-BHS
  United States District Court, Western District of Tacoma
  Case settled, February 2014

- o *Coleman et al v. Brown, et al,*
  No. 2:90-cv-0520 LKK JMP P
  United State District Court, Eastern District of California,
  Declarations, March 14, 2013, May 29, 2013, August 23, 2013 and
  February 11, 2014
  Deposed, March 19, 2013 and June 27, 2013
  Testified, October 1, 2, 17 and 18, 2013

- o *Peoples v. Fischer*,
  No. 1:11-cv-02694-SAS
  United States District Court, Southern District of New York
  Interim settlement agreement reached February 19, 2014,
  Negotiations ongoing

- o *Dockery v. McCarty*,
  No. 3:13-cv-326 TSL JMR
  United States District Court for the Southern District of
  Mississippi, Jackson Division
  Report, June 16, 2014

- o *C.B., et al v. Walnut Grove Correctional Authority et al*,
  No. 3:10-cv-663 DPS-FKB,
  United States District Court for the Southern District of
  Mississippi, Jackson Division
  Memo to ACLU and Southern Poverty Law Center,
  March 14, 2014, filed with the court
  Reports to the court August 4, 2014 and February 10, 2015
  Testified April 1, 2 and 27, 2015

- o *Graves v. Arpaio,*
  No. CV-77-00479-PHX-NVW,
  United States District Court of Arizona
  Declaration, November 15, 2013
  Testified on March 5, 2014

5

- *Wright v. Annucci, et al,*
  - No. 13-CV-0564 (MAD)(ATB)
  - United States District Court, Northern District of New York
  - Reports, April 19, 2014 and December 12, 2014

- *Corbett v. Branker,*
  - No. 5:13 CT-3201-BO
  - United States District Court, Eastern District of North Carolina, Western District
  - Special Master appointment November 18, 2013
  - Expert Report, January 14, 2014
  - Testified, March 21, 2014

- *Fontano v. Godinez,*
  - No. 3:12-cv-3042
  - United States District Court, Central District of Illinois, Springfield Division
  - Report, August 16, 2014

- *Atencio v. Arpaio,*
  - No. CV12-02376-PHX-PGR
  - United States District Court of Arizona
  - Reports, February 14, 2014 and May 12, 2014
  - Deposed on July 30, 2014

- *State of Oregon v. James DeFrank,*
  - Case # 11094090C
  - Malheur County, Oregon

- *Disability Rights, Montana, Inc. v. Richard Opper,*
  - No. CV-14-25-BU-SHE
  - United State District Court for the District of Montana, Butte Division

- *Larry Heggem v. Snohomish County,*
  - No. CV-01333-RSM
  - United States District Court,
  - Western District of Washington at Seattle
  - Report, May 29, 2014
  - Deposed, June 27, 2014

- *Padilla v. Beard, et al,*
  - Case 2:14-at-00575
  - United States District Court, Eastern District of California, Sacramento Division
  - Declaration November 19, 2015

6

- o *Dunn et al v. Dunn et al,*
  No. 2:14-cv-00601-WKW-TFM
  United States District Court, Middle District of Alabama
  Declarations, September 3, 2014, April 29, 2015 and
  June 3, 2015

- o *Sassman v. Brown,*
  No. 2:14-cv-01679-MCE-KJN,
  United States District Court, Eastern District of California,
  Sacramento Division
  Declaration, August 27, 2014, Report, December 5, 2014
  Deposed, December 15, 2014

- o *Manning v. Hagel,*
  No. 1:14-cv-01609
  United States District Court for the District of Columbia

- o *Doe v. Michigan Department of Corrections*
  No. 5:13-cv-14356-RHC-RSW
  United States District Court, Eastern District of Michigan,
  Southern Division

- o *Robertson v. Struffert, et al*
  Case 4:12-cv-04698-JSW
  United States District Court, Northern District of California
  Declaration March 16, 2015
  Deposed May 4, 2015
  Case settled, October 2015

- o *Commonwealth of Virginia v. Reginald Cornelius Latson*
  Case No: GC14008381—00
  General District Court of the County of Stafford
  Report January 12, 2015
  Pardon granted

- o *Star v. Livingston*
  Case No: 4:14-cv-03037
  United States District Court, Southern District of Texas,
  Houston Division
  Report March 3, 2015

- *Redmond v. Crowther*
  Civil No. 2:13-cv-00393-PMW
  United States District Court, Central Division,
  State of Utah
  Report April 28, 2015
  Deposed July 28, 2015

- *Doe v. Johnson*
  Case 4:15-cv-00250-DCB
  United States District Court for the District of Arizona

- *Flores v. United States of America*
  Civil Action No 14-3166
  United States District Court, Eastern District of New York
  Report August 14, 2015

- *Bailey v. Livingston*
  Civil Action No. 4:14-cv-1698
  United States District Court, Southern District of Texas,
  Houston Division
  Report August 5, 2015
  Deposed December 2, 2015

- *Rasho v. Godinez*
  Civil Action No. 07-CV-1298
  United States District Court, Central Division of Illinois,
  Peoria Division

- *Morgal v. Williams*
  No. CV 12-280-TUC-CKJ
  United States District Court for the District of Arizona

- *Williams v. Snohomish County*
  Case No. 15-2-22078-1 SEA
  Superior Court for the State of Washington, King County

- *Sacramento County*
  Retained to evaluate conditions for mentally ill inmates
  in Sacramento County jail