1  Harold J. McElhinny*
2  Kevin M. Coles*
   Elizabeth G. Balassone*
   MORRISON & FOERSTER LLP
3  425 Market Street
   San Francisco, CA 94105
4  Telephone: (415) 268-7000
   Facsimile: (415) 268-7522
5  Email: HMcElhinny@mofo.com
   Email: KColes@mofo.com
6  Email: EBalassone@mofo.com

7  Attorneys for Plaintiffs

8  * Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

9  Additional counsel listed on next page

10

11            IN THE UNITED STATES DISTRICT COURT

12              FOR THE DISTRICT OF ARIZONA

13

14  Jane Doe #1; Jane Doe #2; Norlan          Case No. 4:15-cv-00250-TUC-DCB
    FLORES, on behalf of themselves and
15  all others similarly situated,            **DECLARATION OF JOE
                                              GOLDENSON, M.D. IN SUPPORT
16                    Plaintiffs,             OF PLAINTIFFS' MOTION FOR
          v.                                  PRELIMINARY INJUNCTION**
17
    Jeh Johnson, Secretary, United States
18  Department of Homeland Security, in his
    official capacity; R. Gil Kerlikowske,
19  Commissioner, United States Customs &
    Border Protection, in his official
20  capacity; Michael J. Fisher, Chief of the
    United States Border Patrol, in his
21  official capacity; Jeffrey Self,
    Commander, Arizona Joint Field
22  Command, in his official capacity;
    Manuel Padilla, Jr., Chief Patrol Agent-
23  Tucson Sector, in his official capacity,

24                    Defendants.

25

26

27

28

1    Colette Reiner Mayer*                    Travis Silva*
     MORRISON & FOERSTER LLP                  LAWYERS' COMMITTEE FOR CIVIL
2    755 Page Mill Road                       RIGHTS OF THE SAN FRANCISCO
     Palo Alto, CA  94304-1018                BAY AREA
3    Telephone: (650) 813-5600                131 Steuart Street, Suite 400
     Facsimile:  (650) 494-0792               San Francisco, CA  94105
4    Email:  CRMayer@mofo.com                 Telephone: (415) 543-9444
                                              Facsimile:  (415) 543-0296
5                                             Email:  tsilva@lccr.com

6    Louise C. Stoupe*
     Pieter S. de Ganon*                      Victoria Lopez (Bar No. 330042)**
7    MORRISON & FOERSTER LLP                  Daniel J. Pochoda (Bar No. 021979)
     Shin-Marunouchi Building, 29th Floor     James Duff Lyall (Bar No. 330045)**
8    5-1, Marunouchi 1-Chome                  ACLU FOUNDATION OF ARIZONA
     Tokyo, Chiyoda-ku  100-6529, Japan       3707 North 7th Street, Suite 235
9    Telephone: +81-3-3214-6522               Phoenix, AZ  85014
     Facsimile:  +81-3-3214-6512              Telephone: (602) 650-1854
10   Email: LStoupe@mofo.com                  Facsimile:  (602) 650-1376
     Email: PdeGanon@mofo.com                 Email:  vlopez@acluaz.org
11                                            Email:  dpochoda@acluaz.org
                                              Email:  jlyall@acluaz.org
12   Linton Joaquin*
     Karen C. Tumlin*
13   Nora A. Preciado*
     NATIONAL IMMIGRATION LAW
14   CENTER
     3435 Wilshire Boulevard, Suite 2850
15   Los Angeles, CA  90010
     Telephone: (213) 639-3900
16   Facsimile:  (213) 639-3911
     Email:  joaquin@nilc.org
17   Email: tumlin@nilc.org
     Email: preciado@nilc.org
18
     Mary Kenney*
19   Emily Creighton*
     Melissa Crow*
20   AMERICAN IMMIGRATION COUNCIL
     1331 G Street NW, Suite 200
21   Washington, D.C. 20005
     Telephone: (202) 507-7512
22   Facsimile:  (202) 742-5619
     Email:  mkenney@immcouncil.org
23   Email:  ecreighton@immcouncil.org
     Email:  mcrow@immcouncil.org
24
     Attorneys for Plaintiffs
25
     *  Admitted pursuant to Ariz. Sup. Ct. R. 38(a)
26   ** Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

27

28

I, JOE GOLDENSON, M.D., submit the following declaration on behalf of Plaintiffs in support of their Motion for Preliminary Injunction:

**I.      BACKGROUND**

1.      I am a medical physician with 28 years of experience as the Director/Medical Director for Jail Health Services for the San Francisco Department of Public Health.  In that role, I provided direct clinical services and managed the correctional health enterprise, including the budget, human resources and medical, mental health, dental and pharmacy services.

2.      I am currently a member of the Board of Directors of the National Commission on Correctional Health Care and past President of the California chapter of the American Correctional Health Services Association.

3.      I have worked extensively as a correctional health medical expert and court monitor.  I am currently one of the medical experts retained by the federal district court *Plata v. Brown*, Case No. 3:01-cv-01351 (N.D. Cal.), to evaluate medical care provided to inmate patients in the California Department of Correctional Rehabilitation.  I have been a medical expert/monitor for Cook County Jail in Chicago, as well as in jails in Washington, Texas, and Florida, and in State Departments of Corrections in Illinois, Ohio, and Wisconsin.

4.      A true and correct copy of my current resume is attached as Attachment A to this report.

5.      I have been retained to consult with Plaintiffs' counsel, review documents and other information, prepare declarations, and be available to testify regarding my opinions on behalf of Plaintiffs in connection with litigation brought against Defendants.

6.      I have been asked to render opinions concerning the medical screening and medical care of detainees in U.S. Customs and Border Protection facilities within the Tucson Sector of the U.S. Border Patrol, and related matters as discussed in this declaration.

DECL. OF JOE GOLDENSON, M.D. IN SUPPORT OF PLAINTIFFS' MOT. FOR PRELIMINARY INJUNCTION
CASE NO. 4:15-cv-00250-DCB
sf-3597245

1

## II.   MATERIALS CONSIDERED

7.     In forming my opinions, I reviewed documents produced by Defendants in this case, including documents related to medical screening and medical care of detainees in U.S. Customs and Border Protection facilities within the Tucson Sector of the U.S. Border Patrol.

8.     I also reviewed the declarations of individuals who were formerly detained in U.S. Customs and Border Protection facilities within the Tucson Sector of the U.S. Border Patrol submitted in support of Plaintiffs' Motion for Class Certification.

9.     I am informed that sanitarian Robert Powitz and corrections expert Eldon Vail personally inspected all four of the Border Patrol Stations made available to Plaintiffs for inspection—Tucson, Casa Grande, Douglas and Nogales—on September 8 through September 11, 2015.  I have read the declarations of Robert Powitz and Eldon Vail submitted in support of Plaintiffs' Motion for Preliminary Injunction.  Specifically, Mr. Vail reports that he was told by Defendants' personnel, during these inspections, that no medical screening is conducted at any of these facilities.  (Decl. of Eldon Vail ("Vail Decl.") In Support of Motion for Preliminary Injunction ¶ 138.)

10.     I also reviewed the declaration of Joseph Gaston, data analyst at Morrison & Foerster LLP, regarding "e3DM" spreadsheet data produced by Defendants, which purportedly reflects Defendants' logging system that tracks certain data points for detainees confined in a U.S. Customs and Border Protection facility within the Tucson Sector of the U.S. Border Patrol.  (Decl. of Joseph Gaston in Support of Motion for Preliminary Injunction.)  Specifically, I reviewed the analysis related to any indications of medical treatment of detainees held in a facility within the Tucson Sector.  (*Id.* ¶¶ 54-55.)

## III.   MEDICAL SCREENING STANDARDS IN DETENTION SETTINGS

11.     The National Commission on Correctional Health Care ("NCCHC") is an organization that sets widely recognized standards for health services in correctional facilities.  Informed by health, legal, and corrections professions, NCCHC establishes Standards for the management of a correctional health services system. Written in

DECL. OF JOE GOLDENSON, M.D. IN SUPPORT OF PLAINTIFFS' MOT. FOR PRELIMINARY INJUNCTION
CASE NO. 4:15-cv-00250-DCB
sf-3597245

2

separate volumes for prisons, jails and juvenile confinement facilities, plus a manual for mental health services and another for opioid treatment programs, the Standards cover the areas of care and treatment, health records, administration, personnel and medical-legal issues.  Since the 1970s, NCCHC offers an accreditation program based on its Standards, to determine whether correctional institutions meet the standards in provision of health services.

12.     Among its other Standards, NCCHC has established a Receiving Screening Standard to take place for all detainees as soon as they are admitted into a facility, by qualified health care professionals or health-trained correctional officers.  (Ex. 202.)[1]

13.     Consistent with this Standard, medical intake in a detention setting consists of two components: (1) immediate medical triage to determine if there are any issues that would preclude acceptance into the facility and (2) a more thorough medical and mental health screening.  In many facilities, this is a two-step process with medical triage performed upon entry into the facility, and the more thorough screening soon after the person has been accepted into the facility.

14.     This screening includes both a face-to-face interview using a structured questionnaire and, whenever possible, a review of the individual's prior medical record. The questionnaire enquires into an individual's current problems and medications; past history, including hospitalizations; mental health history, including current or past suicidal ideation; symptoms of chronic illness; medication and/or food allergies; and dental problems.  For female detainees, it is important to obtain a history of current and past pregnancy, as well as the date of last menstrual period.

15.     Whenever possible, intake screening is performed by qualified health professionals.  In smaller detention settings, where health care staff is not present at all times, specially trained custodial staff conducts the intake screening.

---

[1] All exhibits referenced in this declaration are to the Appendix of Exhibits In Support of Plaintiffs' Motion for Preliminary Injunction.

DECL. OF JOE GOLDENSON, M.D. IN SUPPORT OF PLAINTIFFS' MOT. FOR PRELIMINARY INJUNCTION
CASE NO. 4:15-cv-00250-DCB
sf-3597245

3

16.     Training given to correctional officers who conduct the receiving screening is a crucial aspect of the process.  At a minimum, they should receive periodic training on taking a medical history, making necessary observations, documentation of findings, appropriate actions to take for common medical and mental health issues, and medical confidentiality.  There must also be a procedure for officers to obtain guidance and direction from a health care professional for problems beyond the scope of their training and experience.

17.     Finally, information obtained as part of the screening process should be kept as accessible records so that a detention facility has information regarding the medical status of individuals in its custody, and can provide that information to health care professionals as needed.

## IV.     FAILURE TO SCREEN AT TUCSON SECTOR CBP FACILITIES

18.     U.S. Customs and Border Protection has adopted limited policies related to medical screening.  For example, Section 4.3 of the "U.S. Customs and Border Protection National Standards on Transport, Escort, Detention, and Search" states that "[u]pon a detainee's entry into any CBP hold room, officers/agents must ask detainees about, and visually inspect for any sign of injury, illness, or physical or mental health concerns and question the detainee about any prescription medications."  (Ex. 95 at USA000631.)  It also states that "Observed or reported injuries or illnesses should be communicated to a supervisor, documented in the appropriate electronic system(s) of record, and appropriate medical care should be provided or sought in a timely manner."  (*Id.*)

19.     According to the statements from Defendants' personnel during the inspections performed by Plaintiffs and their experts, as well as the declarations of former detainees submitted in this case, however, medical screening is not performed at these facilities in the Tucson sector.

20.     As explained above, Mr. Vail reports that he was told by Defendants' personnel that no medical screening is conducted at any of these facilities.  (Vail Decl. ¶ 138.)

DECL. OF JOE GOLDENSON, M.D. IN SUPPORT OF PLAINTIFFS' MOT. FOR PRELIMINARY INJUNCTION
CASE NO. 4:15-cv-00250-DCB
sf-3597245

4

21.     The declarations of former detainees are consistent with this representation that there is no medical intake screening performed at these facilities.  For example, Odilla Velasquez Vasquez was detained by Border Patrol and transported to the Douglas Border Patrol Station and held in a cell for 18 hours.  (ECF No. 2-2, Ex. 19 ¶ 7.)  Ms. Vasquez declared that when she arrived with her daughter to the facility "we were never asked about our health nor given a formal medical exam." (*Id.* ¶ 19.)  And when she asked officials at the facility for help and explained that her daughter had an ear infection, they said "there is no medicine here." (*Id.*)

22.     Valdemar Perez Perez and his son were also held at the Douglas Station, for 16 hours, before being transferred to the Tucson Border Patrol Station and detained in that station in a cell for 20 hours.  (ECF No. 2-2, Ex. 21 ¶¶ 7, 18.)  Neither Mr. Perez nor his son was given a formal medical exam or asked about his medical health.  (*Id.* ¶ 24.)

23.     The declarations of numerous other former detainees confirm that these facilities do not have appropriate medical screening as part of the intake process.  (*E.g.*, ECF No. 2-2, Ex. 30 ¶ 20 (no medical screening despite both her and her 2 year old son having bad coughs); *id.*, Ex. 29 ¶¶ 19, 24 (no medical screening despite 1.5 year old daughter having stomach pain); *id.*, Ex. 28 ¶ 30 (no medical screening despite her two children feeling sick); ECF No. 2-3, Ex. 42 ¶ 9 (no medical screening and, after diclosing she was pregnant, agents insulted her, poked her stomach, and contended she was not pregnant); ECF No. 2-1, Ex. 16 ¶ 16 (was not asked about her health despite being five months pregnant); ECF No. 2-2, Ex. 23 ¶ 7 (no medical screening upon entry to facility); ECF No. 2-3, Ex. 36 ¶ 25 (same).)

## V.     FAILURE TO SCREEN PUTS DETAINEES AT MEDICAL RISK

24.     Medical screening during the intake process at a detention facility is one of the most essential components of the health care program in a detention setting.  Correctional officers who conduct such screening are the gatekeepers—this process ensures the safety of both detainees and staff.  All individuals entering a detention facility, whether newly apprehended or transferring from another facility, must be screened so that

Decl. of Joe Goldenson, M.D. in Support of Plaintiffs' Mot. for Preliminary Injunction
Case No. 4:15-cv-00250-DCB
sf-3597245

5

1  correctional staff are aware of the medical and mental health of each individual entering

2  detention and are able to respond appropriately, including enlisting assistance of medical

3  professionals whenever this is necessary.

4      25.     Any screening conducted in the field prior to an individual's arrival at a

5  detention facility is not an adequate replacement for this intake screening process for a

6  variety of reasons.  First, it is unclear whether agents in the field receive sufficient

7  medical training to make determinations regarding the medical and mental health

8  conditions of apprehended individuals.  Second, nothing in Defendants' production

9  suggests that field screening is standardized by any protocol or procedure.

10     26.     Moreover, a significant period of time lapses between the time of

11  apprehension and the time of admission into a detention facility—which provides an

12  opportunity for the conditions of a detainee to change.

13     27.     Lastly, it does not appear that any such screening is documented, or that

14  written documentation is transferred to the detention facility.  Without the appropriate

15  recordkeeping, any such screening is useless to understand the medical conditions of each

16  detainee and the medical risks for the facility once that individual is admitted.

17     28.     Intake screening is so critical because it allows staff to determine whether

18  newly arriving detainees have any urgent or emergent health care needs; are suffering

19  from a potentially communicable disease requiring isolation and enhanced disinfection

20  processes following their transfer or release; are receiving medications that must be

21  continued; or have medical or mental health conditions that require referral for follow-up.

22     29.     Failure to perform medical screening at intake puts detainees at medical risk

23  across all of these areas.  Individuals with urgent or emergent health care needs often

24  require care that cannot be adequately provided in a detention facility or by correctional

25  officers without medical training and certification.  If individuals are not screened at

26  intake, those with urgent or emergent medical problems may not be promptly identified

27  and sent to an outside medical facility or emergency room for care and clearance.

28

30.     Failure to adequately screen detainees also puts these individuals—and staff at the facility—at additional medical risk of infectious disease.  The spread of infectious diseases is a substantial health and public health concern in a detention setting. Documents from the Tucson Coordination Center show that highly contagious skin diseases, like scabies, are an issue for facilities in the Tucson sector.  (Ex. 84 at USA00167 ("We must be prepared for the onslaught of Scabies, Chiggers and other bites and bumps.").)  Given the proximity of physical space in which individuals are detained, unidentified infectious diseases can create an emergency health care issue that a detention facility is not equipped to address.  Moreover, if unrecognized and untreated prior to release, these individuals pose a serious public health threat when they are released.

## VI.     DETAINEES IN TUCSON SECTOR CBP FACILITIES HAVE HIGHER MEDICAL RISK

31.     The risk associated with CBP's failure to perform adequate medical screening is escalated by the condition of detainees arriving in the Tucson Sector facilities.  The journey for individuals attempting to cross the Tucson border is often one of extreme physical hardship—extended physical exertion from walking, lack of sufficient water and food, and no access to medications and other medical supplies.

32.     For example, former detainee Maria Lorena Lopez Lopez describes in her declaration that the group she was with "had been abandoned in the desert for approximately one week without enough food or water, so I was relieved when Border Patrol found us."  (ECF No. 2-2, Ex. 23 ¶ 5; *see also*, *e.g.*, *id.*, Ex. 29 ¶¶ 3, 16, 19 (mother and 1.5 year old daughter had not eaten in four days before they were detained); ECF No. 2-3 ¶¶ 3, 12 (mother and two year old daughter had been walking for 15 hours in the desert, were cold, hungry, tired, and suffering from headache and earache pain before they were detained); *id.*, Ex. 35 ¶ 13 (mother and three year old daughter had not eaten for a day before they were detained); ECF No. 2-1, Ex. 16 ¶  3 (mother with 10 year old daughter and 8 year old son had not eaten for a day before they were detained).)

DECL. OF JOE GOLDENSON, M.D. IN SUPPORT OF PLAINTIFFS' MOT. FOR PRELIMINARY INJUNCTION
CASE NO. 4:15-CV-00250-DCB
sf-3597245

7

33.     The former detainee declarations describe how these conditions can continue throughout an individual's detention in a Tucson Sector facility, including being held in detention for 12 or more hours without provision of adequate food and water.  For example, Anselma Angela Ambrosio Diaz and her 7 year old son were detained at the detention facility in Douglas for one night and then transferred to the Tucson facility. (ECF No. 2-1, Ex. 5 ¶¶ 3, 14, 16. )  They were detained for almost 24 hours but did not receive any food or drinking water, only two small juice boxes each.  (*Id.* ¶¶ 13, 17.)

34.     Jesus Alfredo Mesa Barbosa was held in a cell for 16 hours at the Nogales facility.  (ECF No. 2-3, Ex. 43 ¶¶ 4, 22.)  He was not given any food or drinking water during that time.  (*Id.* ¶¶ 18-19.)  He was then transferred to the Tucson facility where he was detained for three days.  (*Id.* ¶ 22.)  For the next two days, he continued to be held without food and water (*id.* ¶ 28, 32), which he finally received on his final day at the Tucson facility (*id.* ¶ 38, 39).

35.     The former detainee declarations also evidence the unhygienic and unsanitary conditions of the holding cells or detention rooms in Tucson Sector facilities. (*See, e.g.*, ECF No. 2-1, Ex. 5 ¶¶ 10, 12, 15 (no soap or way to wash hands at either Tucson or Douglas facility, while 6 year old boy also in cell at Douglas became sick during the night and was vomiting); *id.*, Ex. 9 ¶ 28 (used toilet paper scattered on ground in cell, no waste container); *id.*, Ex. 8 ¶ 11 (diapers and toilet paper strewn around toilet in cell, no waste container).)

36.     The lack of sufficient hydration and nutrition both prior to and during detention in a Tucson Sector facility, coupled with the hygiene and sanitation issues in each of these facilities, puts detainees at higher medical risk.

37.     Severe dehydration is a medical emergency and requires immediate medical attention.  Prolonged lack of water can result in severe dehydration.  Potential complications of dehydration are heat stroke, seizures, shock, kidney failure, coma, and death.

38.     Inadequate hygiene can cause outbreaks of serious medical illnesses such as food poisoning, amebic dysentery, hepatitis, and skin infections, such as life-threatening staphylococcal infections.

39.     Under these circumstances, medical screening to identify and address urgent or emergent medical issues is even more critical.

## VII.   ACCESS TO MEDICAL CARE AT TUCSON SECTOR CBP FACILITIES

40.     In addition to its provisions regarding medical screening, Section 4.3 of the "U.S. Customs and Border Protection National Standards on Transport, Escort, Detention, and Search" states that "[o]bserved or reported injuries or illnesses should be communicated to a supervisor, documented in the appropriate electronic system(s) of record, and appropriate medical care should be provided or sought in a timely manner." (Ex. 95 at USA000631.)

41.     The documents produced by Defendants also suggest that facilities in the Tucson Sector rely upon emergency rooms and ambulance staff for medical care of detainees, as there are usually not health care professionals on staff at these detention facilities.  (Ex. 84 at USA000164 ("Any subject that requests medical attention, or visible [sic] appears to need medical attention should be evaluated by an EMT.  If there is not an EMT on duty then the subject should be taken to University Medical Center – South Campus for treatment.").)

## VIII.  FAILURE TO PROVIDE ACCESS TO MEDICAL CARE AT TUCSON SECTOR CBP FACILITIES

42.     According to the declaration of data analyst Joseph Gaston, the e3DM data shows that between June 10, 2015 to September 28, 2015, there were approximately 527 incidents of medical treatment reportedly provided to a detainee, out of 17,006 "deportable aliens" detained at U.S. Customs and Border Protection facilities within the Tucson Sector of the U.S. Border Patrol.  (Decl. of Joseph Gaston in Support of Motion for Preliminary Injunction ¶ 54.)

43.     But numerous declarations of former detainees in different facilities indicate a practice that is contrary to the U.S. Customs and Border Protection National Standards regarding the provision of medical care: officers ignore medical issues raised by detainees, as well as their explicit requests for medical attention.

44.     For example, Maria Lorena Lopez Lopez declares that upon her arrival at the Naco Border Patrol station: "I did not receive a medical evaluation, even though I was experiencing heavy, sustained vaginal bleeding." (ECF No. 2-2, Ex. 23 ¶ 7.)  "I asked for medical attention but the agents said was just my period and gave me some tampons.  I was very worried about my health but I did not receive a medical examination until after I was transferred to ICE custody, approximately five days later." (*Id.*)

45.     Luis Carlos Valladares Martinez was detained in Agua Prieta and transported to the Douglas Border Patrol station, where he was kept in a cell for approximately two days and two nights, then transferred to the Tucson station and kept in a cell for another eight hours.  (ECF No. 2-3, Ex. 40 ¶¶ 3-4, 8.)  He explains: "I would have liked medical treatment for a large, deep gash I got on my chest when trying to cross the border.  But when I showed it to an agent he said it was nothing.  I didn't bring it up again because they don't listen, they get mad just by us talking." (*Id.* ¶ 15.)

46.     Several other former detainees described various injuries and medical conditions for which they requested medical attention but were denied.  (*E.g.*, ECF No. 2-3, Ex. 39 ¶ 4 (asked to see a doctor for head pain and sickness, agents said they would call, but no one ever came); ECF No. 2-2, Ex. 19 ¶ 19 (seven year old daughter developed ear infection while in detention, told officials and asked for help but they said "there is no medicine here"); *id.*, Ex. 30 ¶¶ 20, 21 (she and her 2 year old son did not receive medical treatment for severe coughs, and also observed agent tell other detainee reporting illness that he would have to "put up with the sickness because there was no way to get medical attention); ECF No. 2-3, Ex. 35 ¶ 30 (told agent that her head and stomach hurt but agent did not offer medical care, and also observed agent telling woman crying from stomach paid that "it was just because of the hunger or cold and was unimportant and she did not

need medical attention"); ECF No. 2-1, Ex. 7 ¶ 17 (another man in cell was suffering from allergy attack, requested help but agents did nothing); *id.*, Ex. 9 ¶ 13 (told guard she had a headache and fever, guard said "I am not a doctor" and that even if he had pills, he would not give them to her); *see also id.*, Ex. 5 ¶ 10 (in cell with 6 yr old boy who was vomiting, with no way to get agents' attention for help); *id.*, Ex. 11 ¶ 20 (hurt shoulder while walking for 10 days before detention, had no opportunity to access medical care).)

## IX.   PRESCRIPTION CONTINUATION AND ACCESS TO MEDICATION AT TUCSON SECTOR CBP FACILITIES

47.     It is standard in detention facilities similar those within the Tucson Sector of the U.S. Border Patrol to have in place a policy maximizing a detainee's ability to continue prescribed medication.

48.     For detainees who arrive at Tucson Sector facilities with prescribed medication, Section 4.10 of the "U.S. Customs and Border Protection National Standards on Transport, Escort, Detention, and Search" states that a non "U.S.-prescribed" medication must either be "validated by a medical professional" before it can be self-administered by a detainee, or otherwise that detainee "should be taken in a timely manner to a medical practitioner to obtain an equivalent U.S. prescription." (Ex. 95 at USA000634.)

## X.   FAILURE TO PROVIDE PRESCRIPTION CONTINUATION AND ACCESS TO MEDICATION AT TUCSON SECTOR CBP FACILITIES

49.     Like the policies related to medical care, the declarations of former detainees show that, in practice, officers deny detainee requests for medication, even prescription medication, rather than follow the policies and procedures related to medication in the U.S. Customs and Border Protection National Standards.

50.     For example, Fernando Munguilla Erasno was detained at the Douglas facility for 24 hours, then transferred to the Sonoita facility for another 24 hours. (ECF No. 2-1, Ex. 6 ¶¶ 8, 18.)   Mr. Erasno had a prescription for a heart condition, which causes him to have heart pain and numbness in his left arm. (*Id.* ¶ 15.)   While he did not

DECL. OF JOE GOLDENSON, M.D. IN SUPPORT OF PLAINTIFFS' MOT. FOR PRELIMINARY INJUNCTION
CASE NO. 4:15-cv-00250-DCB
sf-3597245

11

have this prescription with him when he was detained, he told agents about his heart condition.  (*Id.*)  The agents told him that they could not prescribe anything for him.  (*Id.*)  He also told the guards about his heart condition at the Sonoita facility, but again the guards said they could not give him anything and that a doctor had to see him first.  (*Id.*)

51.     Maria de Jesus Lopez Magdaleno was detained in a cell at the Nogales facility overnight for 12 hours.  (*Id.*, Ex. 9 ¶¶ 5-6.)  She states: "I was taking medication for an ovarian cyst that I had been diagnosed with.  The guards did not let me take the medication. . . . I was supposed to take the medicine for five days but I had only taken two or three days of the medicine when I was detained and they didn't let me take any more."  (*Id.* ¶ 14; *see also* ECF No. 2-3, Ex. 35 ¶ 14 (carrying medication for severe migraines and stomach pain which was taken   away).)

52.     Beyond medication that a detainee has been prescribed or is carrying when they are detained, the declarations also show that agents refuse requests for medication based on sickness or pain experienced by individuals while in detention.  (*See, e.g.*, ECF No. 2-2, Ex. 25 ¶ 17 (woman detained with her asked for medicine for fever but said they could not give her anything because they were not doctors); ECF No. 2-3, Ex. 36 ¶ 25 (she and her 9 and 15 yr old daughters asked for medication for headache pain, agents told them that they did not give out medication).)

## XI.    FAILURE TO PROVIDE ACCESS TO MEDICAL CARE PUTS DETAINEES AT MEDICAL RISK

53.     Failure to provide access to medical care and medications, including prescribed medication, imposes obvious but serious medical risks on detainees.  Denying or delaying access to medical care for a detainee could exacerbate  his or her medical condition and, depending on the condition, could be life threatening.

54.     Withholding prescribed medication—or access to obtaining that medication through a new prescriber—is particularly serious for those whose medications must be continued in order to avoid urgent health care problems.

**XII.   CONCLUSIONS**

  55. Based on my review of documents, former detainee declarations, and my understanding from representations by Defendants' personnel during the inspection of the four Border Patrol Stations, it is my opinion that the failure to perform adequate medical screening of detainees and provide adequate access to medical care in U.S. Customs and Border Protection facilities within the Tucson Sector of the U.S. Border Patrol results in serious risk of present or future harm to detainees and staff in these facilities.


  Executed this 4th day of December, 2015.


                  _____

                  JOE GOLDENSON, M.D.

DECL. OF JOE GOLDENSON, M.D. IN SUPPORT OF PLAINTIFFS' MOT. FOR PRELIMINARY INJUNCTION
CASE NO. 4:15-CV-00250-DCB
sf-3597245

13

# Attachment A

# CURRICULUM VITAE

**JOE GOLDENSON, MD**
**1406 CYPRESS STREET**
**BERKELEY, CA 94703**
**(510) 524-3102**
**jgoldenson@gmail.com**

## EDUCATION

### Post Graduate Training

| | |
|---|---|
| February 1992 | University of California, San Francisco, CPAT/APEX Mini-Residency in HIV Care |
| 1979-1980 | Robert Wood Johnson Fellowship in Family Practice |
| 1976-1979 | University of California, San Francisco Residency in Family Practice |

### Medical School

| | |
|---|---|
| 1973-1975 | Mt. Sinai School of Medicine, New York M.D. Degree |
| 1971-1973 | University of Michigan, Ann Arbor |

### Undergraduate Education

| | |
|---|---|
| 1967-1971 | University of Michigan, Ann Arbor B.A. in Psychology |

## PROFESSIONAL EXPERIENCE

### Practice Experience

| | |
|---|---|
| 1993-2015 | Director/Medical Director Jail Health Services San Francisco Department of Public Health |
| 1991-1993 | Medical Director Jail Health Services San Francisco Department of Public Health |
| 1990-1991 | Chief of Medical Services, Hall of Justice Jail Health Services San Francisco Department of Public Health |
| 1987-1990 | Staff Physician Jail Health Services San Francisco Department of Public Health |
| 1980-1987 | Sabbatical |
| 1975-1976 | Staff Physician United Farm Workers Health Center, Salinas, CA |

**Consulting**

| | |
|---|---|
| 6/14-9/14 | Medical expert for the Illinois Department of Corrections and the ACLU of Illinois |
| 6/10-12/13 | Federal Court appointed Medical Monitor, U.S. v. Cook County, et al., 10 C 2946, re: medical care in the Cook County Jail |
| 6/08-6/12 | Member, *Plata v. Schwarzenegger* Advisory Board to the Honorable Thelton E. Henderson, U.S. District Court Judge |
| 5/08-9/09 | Medical Expert for ACLU re Maricopa County Jail, Phoenix, AZ |
| 1/08 | Member of the National Commission on Correctional Health Care's Technical Assistance Review Team for the Miami Dade Department of Corrections |
| 9/07-1/10 | Federal Court appointed Medical Expert, *Herrera v. Pierce County, et al.,* re: medical care at the Pierce County Jail, Tacoma, WA |
| 8/06-8/12 | State Court Appointed Medical Expert, *Farrell v. Allen,*  Superior Court of California Consent Decree re medical care in the California Department of Juvenile Justice |
| 6/05 | Member of Technical Assistance Review Team for the Dallas County Jail |
| 11/02-4/03 | Medical Expert for ACLU re Jefferson County Jail, Port Townsend, Washington |
| 4/02-8/06 | Federal Court Medical Expert, *Austin, et. al vs Wilkinson, et al,* Class Action Law Suit re: Prisoner medical care at the Ohio State Penitentiary Supermax Facility |
| 4/02-Present | Federal Court Medical Expert, *Plata v. Schwarzenneger,* Class Action Law Suit re: Prisoner medical care in California State Prison System |
| 1/02-3/02 | Consultant to the Francis J. Curry, National Tuberculosis Center re: *Tuberculosis Control Plan for the Jail Setting: A Template (Jail Template),* |
| 8/01-4/02 | Medical Expert for ACLU re Wisconsin Supermax Correctional Facility, Boscobel, WI |
| 7/01-4/02 | Medical Expert for Ohio Attorney General's Office re Ohio State Prison, Youngstown, OH |
| 1/96-1/14 | Member and Surveyor, California Medical Association Corrections and Detentions Health Care Committee |
| 5/95-6/08 | Medical Expert for the Office of the Special Master, *Madrid vs Alameida,* Federal Class Action Law Suit re: Prisoner medical care at the Pelican Bay State Prison Supermax Facility |
| 3/98-12/98 | Member, Los Angeles County Department of Public Health Jail Health Services Task Force |
| 2/98 | Medical Expert, Department Of Justice Investigation of Clark County Detention Center, Las Vegas, Nevada |
| 6/94 | Surveyor, National Commission on Correctional Health Care, |

INS Detention Center, El Centro, CA

**Work Related Committees**

| | |
|---|---|
| 1/14 to present | Member, Editorial Advisory Board, *Correctional Health Care Report* |
| 10/11 to present | Member, Board of Directors of the National Commission on Correctional Health Care |
| 5/07-10/12 | Liaison to the CDC Advisory Council for the Elimination of Tuberculosis (ACET) from the National Commission on Correctional Health Care |
| 12/04-3/06 | Member of the CDC Advisory Council for the Elimination of Tuberculosis (ACET) Ad Hoc Working Group on the *Prevention and Control of Tuberculosis in Correctional and Detention Facilities: Recommendations from CDC* (MMWR 2006; 55(No. RR-9)) |
| 6/03-8/03 | Member of the Advisory Panel for the Francis J. Curry National Tuberculosis Center and National Commission on Correctional Health Care, 2003: *Corrections Tuberculosis Training and Education Resource Guide* |
| 3/02-1/03 | Member of the Advisory Committee to Develop the *Tuberculosis Control Plan for the Jail Setting: A Template (Jail Template)*, Francis J. Curry, National Tuberculosis Center |
| 6/01-Present | Director's Cabinet |
| | San Francisco Department of Public Health |
| 3/01 | Consultant to Centers for Disease Control on the Prevention and Control of Infections with Hepatitis Viruses in Correctional Settings (MMWR 2003; 52(No. RR-1)) |
| 9/97-6/02 | Member, Executive Committee of Medical Practice Group, San Francisco Department of Public Health |
| 3/97-3/02 | American Correctional Health Services Association Liaison with American Public Health Association |
| 3/96-6/12 | Chairperson, Bay Area Corrections Committee (on tuberculosis) |
| 2/00-12/00 | Medical Providers' Subcommittee of the Office-based Opiate Treatment Program, San Francisco Department of public Health |
| 12/98-12/00 | Associate Chairperson, Corrections Sub-Committee, California Tuberculosis Elimination Advisory Committee |
| 7/94-7/96 | Advisory Committee for the Control And Elimination of Tuberculosis, San Francisco Department of Public Health |
| 6/93-6/95 | Managed Care Clinical Implementation Committee, San Francisco Department of Public Health |
| 2/92-2/96 | Tuberculosis Control Task Force, San Francisco Department of Public Health |
| 3/90-7/97 | San Francisco General Hospital Blood Borne Pathogen Committee |
| 1/93-7/93 | Medical Staff Bylaws Committee, San Francisco Department of Public Health |

**ACADEMIC APPOINTMENT**

1980-2015          Assistant Clinical Professor
                   University of California, San Francisco

**PROFESSIONAL AFFILIATIONS**

Society of Correctional Physicians, Member of President's Council, Past-Treasurer and Secretary
American Correctional Health Services Association, Past-President of California Chapter
American Public Health Association, Jails and Prison's Subcommittee
Academy of Correctional Health Professionals

**PROFESSIONAL PRESENTATIONS**

*Caring for the Inmate Helath Populatioin: A Public Health Imperative,* Correctional Health Care Leadership Institutes, July 2015

*Correctional Medicine and Community Health,* Society of Correctional Physicians Annual Meeting, October, 2014

*Identifying Pulmonary TB in Jails: A Roundtable Discussion*, National Commission on Correctional Health Care Annual Conference, October 31, 2006

*A Community Health Approach to Correctional Health Care,* Society of Correctional Physicians, October 29, 2006

*Prisoners the Unwanted and Underserved Population*, *Why Public Health Should Be in Jail*, San Francisco General Hospital Medical Center, Medical Grand Rounds, 10/12/04

*TB in Jail: A Contact Investigation Course, Legal and Administrative Responsibilities,* Francis J. Curry National Tuberculosis Center, 10/7/04

*Public Health and Correctional Medicine,* American Public Health Association Annual Conference, 11/19/2003

*Hepatitis in Corrections*, CA/NV Chapter, American Correctional Health Services Association  Annual Meeting, 1/17/02

*Correctional Medicine,* San Francisco General Hospital Medical Center, Medical Grand Rounds, 12/16/02

*SuperMax Prisons*, American Public Health Association Annual Conference, 11/8/01

*Chronic Care Programs in Corrections,* CA/NV Chapter, American Correctional Health Services Association  Annual Meeting, 9/19/02

*Tuberculosis in Corrections - Continuity of Care*, California Tuberculosis Controllers Association Spring Conference, 5/12/98

*HIV Care Incarcerated in Incarcerated Populations*, UCSF Clinical Care of the AIDS Patient Conference, 12/5/97

*Tuberculosis in Correctional Facilities*, Pennsylvania AIDS Education and Training Center, 3/25/93

*Tuberculosis Control in Jails*, AIDS and Prison Conference, 10/15/93

*The Interface of Public Health and Correctional Health Care*, American Public Health Association Annual Meeting, 10/26/93

*HIV Education for Correctional Health Care Workers*, American Public Health Association Annual Meeting, 10/26/93

## PUBLICATIONS

*Structure and Administration of a Jail Medical Program – Part II.* Correctional Health Care Report. Volume 16, No. 2, January-February 2015.

*Structure and Administration of a Jail Medical Program – Part I.* Correctional Health Care Report. Volume 16, No. 1, November-December 2014.

*Pain Behind Bars: The Epidemiology of Pain in Older Jail Inmates in a County Jail.* Journal of Palliative Medicine. 09/2014; DOI: 10.1089/jpm.2014.0160

*Older jail inmates and community acute care use.* Am J Public Health. 2014 Sep; 104(9):1728-33.

*Correctional Health Care Must be Recognized as an Integral Part of the Public Health Sector,* Sexually Transmitted Diseases, February Supplement 2009, Vol. 36, No. 2, p.S3–S4

*Use of sentinel surveillance and geographic information systems to monitor trends in HIV prevalence, incidence, and related risk behavior among women undergoing syphilis screening in a jail setting.* Journal of Urban Health 10/2008; 86(1):79-92.

*Discharge Planning and Continuity of Health Care: Findings From the San Francisco County Jail,* American Journal of Public Health, 98:2182–2184, 2008

*Public Health Behind Bars,* Deputy Editor, Springer, 2007

*Diabetes Care in the San Francisco County Jail,* American Journal of Public Health, 96:1571-73, 2006

*Clinical Practice in Correctional Medicine, 2nd Edition*, Associate Editor, Mosby, 2006.

*Tuberculosis in the Correctional Facility,* Mark Lobato, MD and Joe Goldenson, MD, *Clinical Practice in Correctional Medicine, 2nd Edition,* Mosby, 2006.

*Incidence of TB in inmates with latent TB infection: 5-year follow-up.* American Journal of Preventive Medicine. 11/2005; 29(4):295-301.

*Cancer Screening Among Jail Inmates: Frequency, Knowledge, and Willingness* Am J Public Health. 2005 October; 95(10): 1781–1787

*Improving tuberculosis therapy completion after jail: translation of research to practice.* Health Education Research. 05/2005; 20(2):163-74.

*Incidence of TB in Inmates with Latent TB Infection, 5-Year Follow-up,* American Journal of Preventive Medicine, 29(4), 2005

*Prevention and Control of Infections with Hepatitis Viruses in Correctional Settings,* Morbidity and Mortality Reports, (External Consultant to Centers for Disease Control),Vol. 52/No. RR-1 January 24, 2003

*Randomized Controlled Trial of Interventions to Improve Follow-up for Latent Tuberculosis Infection After Release from Jail,* Archives of Internal Medicine, 162:1044-1050, 2002

*Jail Inmates and HIV care: provision of antiretroviral therapy and Pneumocystis carinii pneumonia prophylaxis*, International Journal of STD & AIDS; 12: 380-385, 2001

*Tuberculosis Prevalence in an urban jail: 1994 and 1998*, International Journal of

Tuberculosis Lung Disease, 5(5):400-404, 2001

*Screening for Tuberculosis in Jail and Clinic Follow-up after Release*, American Journal of Public Health, 88(2):223-226, 1998

*A Clinical Trial of a Financial Incentive to Go to the Tuberculosis Clinic for Isoniazid after Release from Jail*, International Journal of Tuberculosis Lung Disease, 2(6):506-512,1998


## AWARDS

Armond Start Award of Excellence, Society of Correctional Physicians, 2014
Award of Honor, San Francisco Board of Supervisors, 2014
Award of Honor, San Francisco Health Commission, 2014
Certificate of Appreciation, San Francisco Public Defender's Office, 2014
Certificate for Excellence in Teaching, California Department of Health Services, 2002
Employee Recognition Award, San Francisco Health Commission, July 2000
Public Managerial Excellence Award, Certificate of Merit, San Francisco, 1997

## LICENSURE AND CERTIFICATION

Medical Board of California, Certificate #A32488
Fellow, Society of Correctional Physicians
Board Certified in Family Practice, 1979-1986 (Currently Board Eligible)