1
2
3
4
5
6       **IN THE UNITED STATES DISTRICT COURT**
7          **FOR THE DISTRICT OF ARIZONA**
8

9   Unknown Parties, et al.,                    No. CV-15-00250-TUC-DCB

10              Plaintiffs,                      **ORDER**

11   v.

12   Jeh Johnson, et al.,

13              Defendants.

14

15          Plaintiffs filed this action on June 8, 2015, asserting six claims for relief related to

16   alleged inhumane and punitive treatment of Tucson Sector[1] civil immigration detainees.

17   Plaintiffs allege five claims of violations of the Due Process Clause of the Fifth

18   Amendment based on deprivation of sleep, of hygienic and sanitary conditions, of

19   adequate medical screening and care, of adequate food and water, and of warmth. (Doc. 1

20   ¶¶ 184-218.) Plaintiffs also alleged the Defendants violated the Administrative

21   Procedures Act (APA) by failing to enforce their own procedures related to the operation

22   of holding cells in Tucson Sector facilities, *id.* ¶¶ 219-24, but this claim was dismissed,

23   (Order (Doc. 118)).   Previously in addition to granting in part and denying in part

24   Defendants' Motion to Dismiss, the Court certified the case as a class action.  (Order

25   (Doc. 117)).   The Court now considers Plaintiffs' Motion for a Preliminary Injunction.

26   _____

27          [1] The Tucson Sector includes Border Patrol facilities at Bisbee (Brian A. Terry
     Station/ Naco Station), Casa Grande, Douglas, Nogales, Sonoita, Tucson, Why (Ajo
28   Station), Willcox, and Three Points.   The Motion for Preliminary Injunction relied on
     early discovery conducted at Tucson, Douglas, Nogales, and Casa Grande.

Following an evidentiary hearing, the Court finds the evidence supports the Plaintiffs' experts' declarations attached to the Motion for a Preliminary Injunction,[2] and grants the motion for the reasons that follow.

### A.   Preliminary Injunction: Standard of Review

Preliminary injunctions are an "extraordinary remedy never awarded as of right." *Winter v. NRDC*, 555 U.S. 7, 24 (2008).  In *Winter,* the Supreme Court explained the four-factor test. "A plaintiff seeking a preliminary injunction must show that: (1) she is likely to succeed on the merits, (2) she is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in her favor, and (4) an injunction is in the public interest." *Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012) (citing *Winter*, 555 U.S. at 20).  "The first factor under *Winter* is the most important—likely success on the merits."  *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (citing *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C.Cir. 2014) ("We begin with the first and most important factor: whether petitioners have established a likelihood of success on the merits.")).  "Because it is a threshold inquiry, when 'a plaintiff has failed to show the likelihood of success on the merits, we 'need not consider the remaining three [Winter elements].'"  *Id.* (quoting *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 944 (9th Cir. 2013) (quoting *DISH Network Corp. v. F.C.C.*, 653 F.3d 771, 776–77 (9th Cir. 2011)).

When a plaintiff is requesting a mandatory injunction, the burden is doubly demanding because then the plaintiff must establish that the law and facts clearly favor

---

[2] Motion for Preliminary Injunction (MPI) (Doc. 206); Opposition (Response) (Doc. 141); Reply (Doc. 145).  The Plaintiffs' experts are: Eldon Vail, a corrections administrator; Robert Powitz, a forensic Sanitarian, with expertise in correctional public health; Joe Goldenson, M.D., Medical Director for Jail Health Services for the San Francisco Department of Public Health; Joseph Gaston, Plaintiffs' attorney responsible for data analysis, and Kevin Coles, Plaintiffs attorney responsible for reviewing video surveillance tapes.  Defendants experts are: George Allen, the Assistant Chief Patrol Agent for the Tucson Sector; Diane Skipworth, Sanitarian; Richard Bryce, retired Undersheriff of Ventura County Sheriff's Department in California; Philip Harber, M.D., Professor of Medicine with expertise in occupational-environmental (preventative) medicine, and Justin Bristow, Border Patrol's Acting Chief, Strategic Planning and Analysis, overseeing various programs including the e3 Processing Module/e3 Detention Module (e3DM data system).

- 2 -

her position, not simply that she is likely to succeed on the merits. *Id.* This was the standard applied when an actress requested an injunction requiring Google to take affirmative action—to remove (and to keep removing) *Innocence of Muslims* from YouTube and other sites under its auspices.  This relief was treated as a mandatory injunction because it "orders a responsible party to 'take action.'" *Id.* (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009). This heightened standard is necessary because a mandatory injunction "goes well beyond simply maintaining the status quo *pendente lite* [and] is particularly disfavored," *id.* (quoting *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994)). Therefore, "mandatory injunctions should not issue in 'doubtful cases.'" *Id.* (quoting *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1160 (9th Cir. 2011)).

Following *Winter*,[3] the Ninth Circuit applies a sliding scale test where serious questions going to the merits and a balance of hardships that tips sharply in favor of the plaintiff can support issuance of a preliminary injunction if plaintiff also shows that there is a likelihood of irreparable injury and the injunction is in the public interest. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

Harm that is merely monetary "will not usually support injunctive relief." *American Trucking Associations v. City of Los Angeles*, 559 F.3d 1046, 1057 (9th Cir. 2009). Harm that is "merely speculative" will not support injunctive relief. *Id.* This is because "[a] preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 55.  In balancing the competing claims of injury and consequences resulting from the granting or withholding of the requested relief, a court

---

[3] Before *Winter*, a plaintiff could demonstrate either: (1) a likelihood of success on the merits and the <u>possibility</u> of irreparable injury; or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor. These two alternatives represented extremes of a single continuum, rather than two separate tests. Thus, the greater the relative hardship to the party seeking the preliminary injunction, the less probability of success the party had to show. In *Winter*, the Supreme Court definitively refuted the "possibility of irreparable injury" standard as too lenient. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1126–27 (9th Cir. 2009)

exercises its sound discretion, and, in equity, a court "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312 (1982). The government cannot be harmed, however, from an injunction that merely ends an unconstitutional practice. *Rodriguez v. Robbins,* 715 F.3d 1127, 1145 (9th Cir. 2013).

The Court "'need not consider public consequences that are highly speculative.'" *Stormans*, 586 F.3d at 1139. (quoting *Golden Gate Restaurant Association v. City & County of San Francisco*, 512 F.3d 1112, 1126 (9th Cir. 2008)). "In other words, the court should weigh the public interest in light of the likely consequences of the injunction. Such consequences must not be too remote, insubstantial, or speculative and must be supported by evidence." *Id.*

In the Ninth Circuit "the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Melendres v. Arpaio,* 695 F.3d 990, 1002 (9th Cir. 2012). This is because "constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm." *Am. Trucking Ass'ns, Inc.,* 559 F.3d at 1059. In the Ninth Circuit, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres,* 695 F.3d at 1002 (quoting *Sammarano v. First Jud. Dist. Ct.,* 303 F.3d 949, 974 (9th Cir. 2002)). If plaintiffs "show that a constitutional rights claim is likely to succeed, the remaining preliminary injunction factors weigh in favor of granting an injunction." *Vivid Entm't, LLC v. Fielding,* 956 F. Supp. 2d 1113, 1136 (C.D. Calif. 2013) (citing *Melendres,* 695 F.3d at 1002; *Klein v City of San Clemente,* 584 F.3d 1196, 1208 (9th Cir. 2009)).

In summary, as a threshold matter under *Winter*, the Plaintiffs must establish a likelihood of success on the merits of their claims before the Court can grant a preliminary injunction. If the Plaintiffs are unable to establish the threshold element of likely success on the merits, the request for a preliminary injunction must be denied and the Court need not review whether the remaining requirements for issuance of a preliminary injunction are satisfied. If the threshold is met, the Plaintiffs must establish

the other three elements: they are likely to suffer irreparable harm without the injunction, the balance of equity tips in favor of the injunction, and the public interest favors the injunction.  Alternatively, under the "sliding scale" approach, a preliminary injunction may be granted if there are "serious questions going to the merits and a hardship balance that tips sharply toward the [Plaintiffs]," so long as "the other two elements of the *Winter* test, [irreparable harm and public interest], are also met."

If a mandatory injunction is sought, the Plaintiffs must make a doubly burdensome threshold showing: that the law and facts clearly favor their position, not simply that there is a likelihood of success on the merits.  This is because mandatory injunctions are not granted unless extreme or very serious damage will result and are not issued in doubtful cases.

### B.  Mandatory Injunction or Injunction to Maintain the Status Quo?

A mandatory injunction orders a party to take action, while a prohibitory injunction prohibits action and preserves the status quo pending a determination of the action on the merits. *Marlyn Nutraceuticals,* 571 F.3d at 878–79.  "The relevant status quo is that 'between the parties pending a resolution of a case on the merits.'" *Arizona Dream Act Coalition (DACA) v. Brewer,* 757 F.3d 1053, 1061 (9th Cir. 2014) (quoting *McCormack v. Hiedeman*, 694 F.3d 1004, 1019 (9th Cir. 2012)). In the context of a preliminary injunction, the "status quo" refers to the legally relevant relationship between the parties before the controversy arose. *McCormack,* 694 F.3d 1020.  It is not enough that the result of an injunction may be an action taken in response to it; as long as the injunction does not mandate a change in the status quo it is prohibitory.  *Id.* (citing *see Marlyn Nutraceuticals*, 571 F.3d at 879).

It is not a defense that "Border Patrol has done everything possible with the resources provided by Congress to ensure that conditions at its stations protect the health and safety of the individuals in its custody."  (Response at 3.)  The Court is not unsympathetic, but a deprivation of constitutional rights cannot be justified by fiscal necessity, *Golden Gate Rest. Ass'n.,* 512 F.3d at 1126, and the government may be

compelled to expand the pool of resources to remedy a constitutional violation, *Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir.2014) (en banc).  The role of the judiciary is a limited one—restricted to assessing the constitutionality of government conduct.  It is for the elected officials, both legislative and executive, and their administrators to determine this Country's immigration policies and how to finance and implement them.

Accordingly, the Court turns to the question of whether or not the government's actions are constitutional.  Defendants submit that they provide medical care, warmth, sanitation, food, and water, and allow detainees to sleep.  Defendants assert they provide for detainees basic human needs pursuant to Border Patrol's 2008 Hold Rooms and Short Term Custody Policy (2008 Policy) and the National Standards on Transport, Escort, Detention, and Search (TEDS standards).

The Court accepts for purposes of this preliminary injunction that these guidelines, the 2008 Policy and TEDS, provide for constitutional conditions of confinement, which Defendants assert is the status quo.  Plaintiffs have presented persuasive evidence that the basic human needs of detainees are not being met pursuant to the current practices being implemented by Defendants pursuant to these guidelines.  The Court preliminarily orders full and immediate compliance with these guidelines, with the clarification that the guideline requiring Defendants to give clean bedding to detainees includes mats for detentions exceeding 12 hours.

### C.   Unconstitutional Conditions of Confinement

"When the State takes a person into custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being: Under this rationale, the State must provide for a detainee's "basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—."*DeShaney v. Winnebago Cty. Dep't of Soc. Servs.,* 489 U.S. 189, 199-200 (1989).

It is undisputed that Border Patrol holds the Plaintiffs as civil detainees, pursuant to civil immigration laws, *Zadvydas v. Davis,* 533 U.S. 678, 690 (2001), therefore, they

are protected under the Fifth Amendment from being held without due process of law under conditions that amount to punishment. *Wong Wing v. United States,* 163 U.S. 228, 237 (1896). Similarly, the Eighth Amendment's prohibition against cruel and unusual punishment requires prison officials to provide humane conditions of confinement, including adequate food, clothing, shelter, sanitation, and medical care, and take reasonable measures to guarantee the safety of the inmates. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). But to be liable under the Eighth Amendment, a prison official must act with deliberate indifference to an inmate's health or safety. *Id.* at 834. Conditions of confinement that violate the Eighth Amendment necessarily violate the Fifth Amendment, but the reverse is not necessarily true. In other words, Plaintiffs are protected by both the Fifth and Eighth Amendments.

Because Plaintiffs are civil detainees and <u>not</u> prisoners, the Court applies the Fifth Amendment, mirrored by the Fourteenth Amendment,[4] Due Process Clause. Both the Fifth and Fourteenth Amendments protect a non-convicted detainee from punishment prior to an adjudication of guilt**.** *Bell v. Wolfish*, 441 U.S. 520, 534–35 (1979). "This standard differs significantly from the standard relevant to convicted prisoners, who may be subject to punishment so long as it does not violate the Eighth Amendment's bar against cruel and unusual punishment." *Pierce v. County of Orange*, 526 F.3d 1190, 1205 (9th Cir. 2008). The "more protective" Fourteenth Amendment standard requires the government to do more than provide minimal necessities, *Jones v. Blanas*, 393 F.3d 918, 931 (9th Cir. 2004),[5] but, a detainee does not have a fundamental liberty interest under the

---

[4] The Due Process Clause of the Fourteenth Amendment bars any State from depriving any person of rights secured under the Bill of Rights (the first eight amendments). Therefore, the Court relies equally on cases applying the Fourteenth and Fifth Amendment Due Process Clauses.

[5] Overruled in part by *Peralta*, 744 F.3d at 1083 (holding monetary damages as a retroactive remedy is unavailable against an official capacity defendant who lacks authority over budgeting decisions; applying subjective intent standard allowing fiscal considerations to factor into deliberate indifference analysis in Eighth Amendment case). The government cannot assert a lack of resources defense against an injunction because it is prospective relief, and the government may be compelled to expand the pool of resources to remedy a constitutional violation. *Id.*.

Fourteenth Amendment to be free from discomfort, *Bell*, 441 U.S. at 537. Under the Fourteenth Amendment, "due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Jackson v. Indiana*, 406 U.S. 715, 738, (1972).

To evaluate the constitutionality of a pretrial detention condition, a district court must determine whether those conditions amount to punishment of the detainee. *Bell*, 441 U.S. at 535; *Pierce*, 526 F.3d at 1205; *Demery v. Arpaio*, 378 F.3d 1020, 1029 (9th Cir. 2004).   For a particular governmental action to constitute punishment, (1) that action must cause the detainee to suffer some harm or disability, and (2) amount to punishment. *Pierce*, 526 F.3d at 1205 (quoting *Bell*, 441 U.S. at 538). To constitute punishment, the governmental action must cause harm or disability that either significantly exceeds or is independent of the inherent discomforts of confinement. *Demery*, 378 F.3d at 1030.   In the absence of evidence of express intent, a court may infer that the purpose of a particular restriction or condition is punishment if the restriction or condition is not reasonably related to a legitimate governmental objective or is excessive in relation to the legitimate governmental objective. *Pierce*, 526 F.3d at 1205 (citing *Bell*, 441 U.S. at 539); *Demery*, 378 F.3d at 1028 (citing *Bell*, 441 at 538).

"Maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." *Bell*, 441 U.S. at 546; *Pierce*, 526 F.3d at 1205.   In the absence of substantial evidence that indicates officials have exaggerated their responses, courts should ordinarily defer to the expert judgment of correction officials to determine whether detention restrictions or conditions are reasonably related to maintaining security and order and operating the institution in a manageable fashion.  *Bell*, 441 U.S. at 540 n. 23.

A reasonable relationship between the governmental objective and the challenged condition does not require an "exact fit," proof that the policy in fact advances the legitimate governmental objective, or even that it is the "least restrictive alternative."

*Valdez v. Rosenbaum*, 302 F.3d 1039, 1045 (9th Cir. 2002).   However, the correction official must have reasonably thought that the policy would advance a legitimate governmental objective.  *Id.* The relevant question is whether the official's judgment was rational, that is whether the Defendants might reasonably have thought that their policies and practices would advance legitimate interests.  *Id.* at 1046 (citing *Mauro v. Arpaio,* 188 F.3d 1054, 1060 (9th Cir. 1999)).

In summary, a condition of confinement for an inmate who has not been convicted violates the Fifth and Fourteenth Amendments if it imposes some harm to the detainee that significantly exceeds or is independent of the inherent discomforts of confinement and is not reasonably related to a legitimate governmental objective or is excessive in relation to the legitimate governmental objective.  *Kingsley v. Hendrickson,* 135 S. Ct. 2466, 2473-74 (2015). Under the Fourteenth Amendment, the Court makes an objective assessment whether there is a reasonable relationship between the government's conduct and a legitimate purpose.  *Id.* at 2469.  This is the measurement for harm relevant for assessing the merits of Plaintiffs' constitutional claims that the conditions of confinement are punitive.

Importantly, the Court notes that Plaintiffs are not pretrial detainees and that the civil nature of their confinement provides an important gloss on the meaning of "punitive" in the context of their confinement. Because they are detained under civil, rather than criminal, process, they are most decidedly entitled to "more considerate treatment" than those who are criminally detained.   *Cf. Estelle v. Gamble*, 429 U.S. 97, 104, (1976); *Youngberg v. Romeo*, 457 U.S. 307, 321–22, (1982). In this way, decisions defining the constitutional rights of prisoners establish a floor for the constitutional rights of the Plaintiffs. *Padilla v. Yoo*, 678 F.3d 748, 759 (9th Cir. 2012) (citations omitted). Therefore, the Court should presume the Plaintiffs are being subjected to punishment if they are confined in conditions identical to, similar to, or more restrictive than those under which the criminally convicted are held.  *See Sharp v. Weston*, 233 F.3d 1166, 1172–73(9th Cir. 2000) (finding that *Youngberg* required that individuals civilly confined

at a commitment center receive "more considerate" treatment than inmates at the correctional center in which the commitment center was located).  Similarly, "[i]f pretrial detainees cannot be punished because they have not yet been convicted, [citing *Bell* ], then [civil] detainees cannot be subjected to conditions of confinement substantially worse than they would face upon commitment." *Lynch v. Baxley*, 744 F.2d 1452, 1461 (9th Cir. 1984).    "Or, to put it more colorfully, purgatory cannot be worse than hell." *Jones,* 393 F.3d at 933.

This is precisely the case here.  Assistant Chief Patrol Agent for the Tucson Sector, George Allen, admitted, when this Court asked him to compare the conditions of confinement at Tucson Sector Border Patrol stations with those afforded criminal detainees at the Santa Cruz County jail, that in jail, detainees have a bed, with blankets, clean clothing, showers, toothbrushes and toothpaste, warm meals, and an opportunity for uninterrupted sleep.  Likewise, the conditions of confinement for civil immigration detainees improve once they are transferred from Border Patrol holding cells to detention centers operated by the United States Marshals.

### D.  Discussion

The Tucson Sector stations are designed for short-term civil detention for processing of immigrant detainees for transfer to Immigration and Customs Enforcement (ICE) for civil immigration removal proceedings or Enforcement and Removal Office (ERO) for juvenile custody determinations, to the United States Marshal for prosecution, or for repatriation.  (Allen Decl. ¶ 7.)  There is no dispute that upon transfer to detention by ICE, ERO or the United States Marshal affords conditions of confinement like those found in the county jails where detainees have beds, blankets, clean clothing, showers, personal hygiene items like toothbrushes, etc., hot meals, and the opportunity to sleep uninterrupted.

Defendants argue the constitutionality of the conditions of confinement in the Border Patrol stations must be assessed with due consideration given to the nature, purpose, and duration, of an individual's time in a Border Patrol station."  (Response at

24.)  "[B]order Patrol stations are twenty-four hour operations, and in fact a significant number of individuals who are detained in Border Patrol stations are apprehended during the evening and night time hours."  *Id.*  Defendants assert that providing sleeping facilities and turning off lights would require structural changes at the facilities, create safety risks, and impede its purpose to provide 24-7 immigration processing.  *Id.* at 24-25, *see also*: (Allen Decl. ¶¶ 46-47; Bryce Decl.  ¶¶ 100-02; Skipworth Decl. ¶¶ 153; Harber Decl. ¶ 65.)  Accordingly, the hold rooms are not designed for sleeping and, therefore, have no beds.  (MPI, Ex. 81:Hold Room Policy (sealed) (Doc. 193)).

Assistant Chief Allen explains that Border Patrol processing begins in the field, but on arrival at the detention facility intake begins in the "sally port" where detainees' outer-clothing is removed for security reasons, (Allen Decl. ¶ 1-4), leaving detainees without sweatshirts, jackets, or second layers of clothing for warmth.  Detainees are placed into group-holding rooms based on age, gender, family units, or criminal suspects.  *Id.* ¶ 4.  Processing consists of obtaining biographical information and biometrics and submitting this information through the e3Nex Generation Identification system to determine prior criminal and immigration arrests.  *Id.* ¶ 5.  Fully processing a detainee includes preparing an arrest report, immigration processing, service of immigration forms, consular notifications, and communication with family members and attorneys as appropriate.  *Id.*  If uninterrupted and if there is no remarkable criminal or immigration history, processing would take between two and two and one-half hours.  *Id.*

But there are interruptions, which can be caused by a large number of prior apprehensions and the criminal background of the detainees awaiting processing, the need to dispense meals, medical or health care, to arrange consular communications, phone calls to family members or attorneys, to conduct investigations, and computer system outages.  *Id.*  Evidence at the hearing revealed that detention in Border Patrol holding rooms is also extended because of delays by the receiving agencies ICE, ERO, and the United States Marshal in accepting the Border Patrol transfers.  *See also* (Allen Decl. ¶ 9.)

Discovery in this case reflects that between June 10, 2015 and September 28, 2015, only about 3,000 of approximately 17,000 detainees were processed out of Border Patrol station detention within 12 hours.  (Gaston Decl. ¶ 20.)  Of these 17,000 detainees, 8,644 people were held at Border Patrol stations up to 23 hours, 6,807 were held up to 47 hours, 1,207 were held up to 71 hours, and 476 were held for 72 hours or more. (Response at 6.)   Defendants' expert, Diane Skipworth, indicated that based on her review "BP tries diligently to process detainees promptly, and generally does so within 24 hours."  (Skipworth Decl. ¶ 154.) Defendants' other expert, Richard Bryce, believes that nearly all detainees were processed within 48 hours.  (Bryce Decl. ¶ 38.)

The conditions of confinement challenged by the Plaintiffs include: 1) deprivation of sleep; 2) failure to provide a safe and sanitary environment, including potable water; 3) inadequate and insufficient food, and 6) inadequate medical screening and care.

<center>1.  Success on the Merits</center>

<center>Sleeping:</center>

"Detention facilities (and prisons) must provide detainees held overnight with beds *and* mattresses.  The absence of *either* violates detainees' due process rights."  (MPI at 10 (citing *Thompson v. City of Los Angeles,* 885 F.2d 1439, 1448 (9th Cir. 1989); *accord Anela v. City of Wildwood,* 790 F.2d 1063, 1069 (3rd Cir. 1986)).  "Indeed, the use of floor mattresses—i.e., mattresses without bed frames—is unconstitutional 'without regard to the number of days a prisoner is so confined.'"  *Id.* (quoting *Lareau v. Manson,* 651 F.2d 96, 105 (2nd Cir. 1981)).

According to Plaintiffs' analysis of the Defendants' e3DM data system,[6] "out of 16,992 detainees between June 10 and September 28, 2015, only 122 were recorded to have received a mat."  (Vail Decl. ¶ 62 (citing Gaston Decl. ¶ 25.)  The remainder of detainees' bedding needs was met with a Mylar sheet/blanket.  The 2008 Policy provides

---

[6] This is an electronic data system designed by Defendants to track each action taken by Border Patrol for each detainee, including the time of arrest; check-in and out at the station; when meals are served, mats are provided, personal hygiene items are delivered, health care is administered, and when a transfer is made to a hospital facility, etc.

that "detainees requiring bedding will be given clean bedding."  (Ex. 87 at 000330.) Under TEDS, only juveniles receive mats.  (Ex. 95: TEDS at 000634).  Adults get clean blankets, which are Mylar sheets, upon request when available.  *Id.*  Video releases by Defendants reflect overcrowded hold rooms with wall to wall detainees lying cocooned in Mylar blankets and adjacent empty cells with some of the empty cells having mattresses piled high.  (Coles Decl. ¶ 37.)  Plaintiffs found no mats in videos from the Casa Grande, Willcox, Sonoita, and the Brian A. Terry stations.  (Coles Decl. ¶ 37.)

Plaintiffs add that the harshness caused by the lack of mats and the inadequacy of the Mylar blankets is compounded by the Defendants' practices of keeping holding-cell lights turned on 24-7, feeding one of the three regular hot meals to detainees at 4:00 a.m., moving detainees in and out of holding cells throughout the night for processing, overcrowding cells which causes people to lie cramped together and next to toilet facilities or to sit or stand up, and because the hard concrete floors and benches retain the cold caused by low thermostat temperatures and make it too hard and cold to sleep.[7]

Plaintiffs attest that there are prison standards for short-term detentions, defined as being less than 10 hours, which require at least 25 square feet of unencumbered space per occupant.  (Vail Decl. ¶ 42).  Prison standards for detaining two to 64 occupants requires 25 square feet of unencumbered space per occupant, *id.* ¶ 44, and 35 square feet when confinement exceeds ten hours per day, *id.* (relying on American Correctional Association (ACA) CORE Jail Standards, United States Department of Justice National

---

[7] *Toussaint v. McCarthy,* 597 F. Supp. 1388, 1409-10 (N.D. Calif. 1984) (noise occurring every night, often all night interrupting or preventing sleep gives rise to due process claim), *reversed on other grounds*; *Keenan v. Hall,* 83 F.3d 1083, 1090 (9th Cir. 1996) (no penological justification for psychological harm caused by living in constant illumination), *amended on other grounds*; *King v. Frank,* 328 F. Supp.2d 940, 946-47 (W.D. Wis. 2004) (constant illumination leading to sleep deprivation may violate Eighth Amendment); *Bowers v. City of Philadelphia,* 2007 WL 219651 (E.D. Pa. Jan. 25 2007) (unconstitutional where overcrowding caused detainees to sleep overlapping one another and on every inch of concrete floors with heads next to toilets and on metal benches); *United States v. Wilson,* 344 F. App'x 134, 137, 143 (6th Cir. 2009) (cells with only concrete bench and floors stated Eighth Amendment claim for subjection to cold); *Knop v. Johnson,* 667 F. Supp. 467, 475-77 (W.D. Mich. 1987) (clothing must be minimally adequate for conditions of confinement); *Henderson v. DeRobertis,* 940 F.2d 1055, 1059 (7th Cir. 1991) (same).

Institute of Corrections (NIC), and United Nations Body of Principles for the Protection of all Persons Under any form of Detention or Prison).

In comparison, the capacity numbers for the border patrol holding cells is calculated as 35 square feet for the first detainee, plus an additional seven square feet for each additional detainee. *Id.* ¶ 41, ¶ 29 (citing 2009 Border Patrol Handbook). At the evidentiary hearing, the evidence reflected that holding-cell occupancy limits are established for detainees sitting up, and the problem of overcrowding is compounded by the need to lie down and would be further compounded if detainees were given mats to lie down in the holding cells. Detainees need to lie down to sleep because they are detained at the Border Patrol stations in excess of 12 hours. The Court finds the holding-cell capacity numbers cannot accommodate the number of detainees being detained longer than twelve hours because detention of this duration requires them to lie down to sleep rather than sit up.

Defendants' expert, Richard Bryce, objects to Plaintiffs' comparison between Border Patrol short-term immigration processing facilities and detention facilities like prisons and jails.   (Bryce Decl. ¶ 32.) He opines the Border Patrol facilities are on par with short-term [prison] holding cells, *id.* ¶ 35, of the type which is used during the booking process in jail facilities. He explains that "[n]o other law enforcement agency in the United States faces the unique issue of populations subject to fluctuation based on the entry patterns of aliens." *Id.* The processing time depends on immigration patterns and the characteristics of those apprehended, but generally he believes that nearly all detainees are processed within 48 hours. *Id.* ¶ 38.

The Court rejects Bryce's suggestion to allow conditions of confinement appropriate for holding cells used at a jail facility for its booking process, which does take hours instead of days. The processing being conducted at the Border Patrol stations, whether or not it is being done for booking purposes, takes days (48 hours).

It is undisputed that the holding-cells are illuminated 24-7 for security reasons and there is constant coming and going during the night, which Defendants assert is

necessary, given the very essence of the facility is to provide 24-7 immigration processing.  The Court accepts Defendants' assertion that the holding cells need to be illuminated for security where security cameras are not technologically capable of recording in dimmed light.  In terms of interruptions of sleep, the Court finds no security reason nor any reason related to the processing activities being conducted at these facilities to wake up detainees by scheduling one of the three burrito meals at 4:00 a.m.

As to warmth, without mats, the Mylar sheets are the only barriers between the detainee and the cold, including the cold concrete floors and benches in the holding cells upon which they are forced to lie.  Defendants admit that the Mylar sheets do not provide insulation but merely prevent evaporation so that when wrapped around the body the Mylar blankets reflect approximately 80% of body heat back to the body and provide a barrier between the body and air currents or drafts.  (Skipworth Decl. ¶ 150.) The efficacy of the Mylar blanket depends on comfortable room temperatures being maintained at Border Patrol stations.  *Id.*

Defendants report holding cell temperatures are set between 71 and 74 degrees, (Response at 10 (citing Allen Decl ¶¶ 13-14; Skipworth Decl. ¶¶ 35, 133-134, 137-141, 147-48 (citing Ex. 2) Bryce Decl. ¶¶ 82, 83 (citing Ex. 3); Harber Decl. ¶ 66 (citing Ex. 4), and at the hearing the evidence reflected a variability of 2 degrees up or down.  Defendants assert the acceptable institutional standard is 68 to 80 degrees.  (Skipworth Decl. ¶ 133 (citing ANSI and ASHRAE standards).   In addition to room temperature, body heat is affected by the sedentary nature of the detention and whether or not detainees have the ability to move around can be a factor in warmth.   The Court recognizes that Plaintiffs have a constitutional right to clothing that is at least minimally adequate for the conditions of confinement, *Knop v. Johnson*, 66 F. Supp. 467, 475-77 (Mich. 1987), but when mats are provided for detentions exceeding 12 hours the analysis regarding adequate clothing and comfortable room temperature may change.  As of now, the Court will require Defendants to continue monitoring cell temperatures.

The Court finds that the law and the facts clearly favor Plaintiffs' position that

Defendants are violating Plaintiffs' constitutional right to sleep. Preliminary, the Court orders that clean bedding, which Defendants assert they are providing to all detainees, must include a mat and a Mylar blanket for all detainees being held longer than 12 hours.

<div align="center">Sanitation:</div>

"A sanitary environment is a basic human need that a penal institution must provide for all inmates," *Toussaint,* 597 F.Supp. at 1411, which includes a "right to personal hygiene supplies such as toothbrushes and soap," *Keenan v. Hall,* 83 F.3d 1083, 1091 (9th Cir. 1996), and "sanitary napkins for female prisoners," *Atkins v. County of Orange,* 372 F. Supp.2d 377, 406 (S.D.N.Y 2005). *See also Dawson v Kendrick,* 527 F. Supp. 1252, 1288-89 (S.D.W.Va. 1981) (failing to provide clean bedding, towels, clothing and sanitary mattresses, as well as toilet articles including soap, razors, combs, toothpaste, toilet paper, access to a mirror and sanitary napkins for women constitutes denial of sanitary living conditions).   Sanitation includes "the control of vermin and insects, food preparation, medical facilities, lavatories and showers, clean places for eating, sleeping, and working." *Rhodes v. Chapman*, 452 U.S. 337, 364 (1981).

Plaintiffs offer the opinion of Robert Powitz, a practicing forensic sanitarian, who has expertise in correctional public health.  He opines that Defendants do not comply with their own Border Patrol standards, which do not comply with national standards for correctional facilities with respect to hygiene.  *Id.* ¶ 18-22 (relying on Performance-Based Standards for Adult Local Detention Facilities (ALDF), American Public Health Association Standards for health Services in Correctional Institutions, and U.S. Depart. of Justice ICE Detention Standards).

He personally observed holding rooms with floors, walls, benches, drains, toilets, sinks, stalls, and other fixtures—all of which were badly soiled.  *Id.* ¶ 23.  ICE detention standards require garbage and refuse be collected and removed from common areas daily. *Id.* ¶ 25.  The hold rooms lacked trash receptacles, *id.* ¶ 27, and toilet stalls lacked waste receptacles for sanitary napkins, diapers, and other bathroom waste.  *Id.* ¶ 28.  Cleaning supplies did not appear to be segregated so as to prevent interchangeable use in toilet

areas and food storage or sleeping areas.  *Id.* ¶ 88.  Cleaning crews did not appear to clean and sanitize common-touch points in detainee areas. *Id.* ¶ 89.  He concluded that cleaning was not sufficient to sanitize the holding cells.  *Id.* ¶¶ 88,89.  He explains that exposure to garbage increases the risk of disease and presence of vermin, and is psychologically stressful.  Blood-born transmission can occur from exposure to diapers and sanitary napkins.  *Id.* ¶ 31.

According to Powitz, the CORE prison standard 4-4137 requires one toilet for every twelve male prisoners and one toilet for every eight female detainees.  *See also* TEDS § I.A.7.  He reports that "in most cases, the number of toilets in a hold room was inadequate for the contemplated occupancy numbers posted or produced by Defendants." *Id.* ¶ 51.  One large hold room at Nogales station, with capacity up to 88, had one working toilet and one non-flushing toilet.  *Id.* ¶ 52, *see also* ¶¶ 83-86 (relying on Border Patrol logs[8] reflecting long-term out of order sinks and toilets supporting his conclusion that there is no regular maintenance program and policy), *see also* (Vail Decl. 51; Powitz Decl. ¶ 52) (some rooms where over 40 detainees were forced to share one toilet).

Powitz explains that the toilet is a sink/toilet combination fixture, with the sink fixture on top of the toilet and the water spigot is designed for use as a water fountain. *Id.* ¶ 38.  This explains the lack of hot water and why the fixtures were not capable of providing an uninterrupted water flow of at least ten seconds, which is the minimal flow required for adequate hand washing.  *Id.* ¶ 64. This also creates a potential for contamination from fecal matter and saliva.  *Id.* ¶ 39. Plaintiffs complain that the toilet/sink combination system for dispensing drinking water creates a potable water problem. At the Tucson and Nogales stations, 5-gallon Igloo water coolers are placed in many hold cells, without cups and there are no sinks, kitchens, or any other means at these facilities to properly clean the Igloo containers.  *Id.* ¶ 73.  One video recorded

---

[8] The Court is not clear on whether these logs are part of the e3DM data system or were designed for purposes of conducting discovery in this case.  Regardless, the Court will rely on them for the purposes of monitoring compliance with TEDS standards for the working sinks and toilets per detainee.

detainees all drinking from the same one-gallon water jug because cups were not provided.  *Id.* ¶ 75.

A person who has been trudging across the Arizona desert will likely arrive at a detention station dirty and in need of a shower, but Plaintiffs report that only two stations, Nogales and Tucson, have shower facilities, and these were sparsely used, generally for detainees who have scabies.  (Vail Decl. ¶ 116.)  The Defendants e3DM data system showed that only 115 detainees were given showers out of the 16,992 held between June 10 and September 28, 2015.  Of those 115 showers, 20 reportedly occurred at Casa Grande station where Border Patrol agents said no shower facilities existed.  *Id.*

Plaintiffs tender first-hand accounts from detainees that there were no sanitary napkins, or available diapers.  (Vail Decl. ¶ 125.)  The Defendants e3DM data confirms that personal hygiene items, including those necessary for feminine hygiene and dental care, were routinely denied.  (Powitz Decl. ¶ 60.)

Defendants offer explanations to present a different picture.  They report the holding cells are cleaned twice a day, except for the Casa Grande station which is cleaned only once a day, (Allen Decl. ¶¶ 29-30), and admit there were problems with the Casa Grande custodial services, but assert that things are being rectified, (Allen Decl. ¶¶ 29-30).

Defendants also report that in 2015, they began placing trash receptacles in the holding cells, *id.* ¶ 31, whereas previously "there were no trashcans in the hold rooms for safety reasons," (Response to Motion for Expedited Discovery, Padilla Decl. ¶ 14 (Doc. 39-1)). Defendants admit that dirty toilet paper is on the floor next to the toilets rather than flushed because detainees are from countries where plumbing cannot tolerate flushing toilet paper and instead it is common practice to dispose of it in trash receptacles.  *Id.* ¶ 32.  This is no excuse.  Instead, it suggests that toilet receptacles are especially important.

Cleanliness is monitored by walk-throughs of the holding cells during each shift turnover, and the review is logged in e3DM.  *Id.* ¶36.  Defendants' sanitarian, Skipworth,

inspected the Tucson station, reviewed Defendants' contracts with cleaning companies, and it was her opinion that the facility is kept clean and sanitary.  (Skipworth Decl. ¶¶ 36-67 (citing TEDS)).   According to her, the ACA Plumbing Fixture Standard (one toilet per 12 male detainees; one toilet per 8 female detainees) is met.  *Id.* ¶ 69.  Personal hygiene items are regularly dispensed, *id.* ¶¶ 78-91, and children had toys and games and were watching television in the Tucson station, *id.* ¶ 87

Defendants assert soap has been available to detainees upon request and in 2014, it was decided to fit the hold rooms with soap dispensers.  Due to "security, functionality and durability" concerns, these dispensers had to be specially fabricated.  The process of installing them in hold rooms was completed in 2015.  *Id.* ¶ 34.  The cleaning services are now responsible for filling the dispensers.

Defendants assert that if the water fountain in the cell is inoperable, the five gallon water coolers provide a sufficient source of drinking water, and disposable cups are provided.  (Allen Decl. ¶ 44 (citing TEDS)).  They do not explain how the Igloo water coolers are kept clean and sanitary.   Skipworth's inspection found compliance with TEDS: "functioning drinking fountains or clean drinking water along with clean drinking cups must always be available to detainees."  (Skipworth Decl. ¶¶ 126-131.) Defendants explain the one-gallon jug seen in the video is the container of water, which was distributed in the field at the time of apprehension—some stations allow detainees to retain these jugs of water, and detainees choose to share them even though other sources of water are available.  (Allen Decl. ¶ 44.)  The video did not, however, reflect another water source.

The evidence reflects that Defendants are making ongoing efforts to rectify personal hygiene and sanitation problems, which in large part appear to be noncompliance issues.  Preliminarily, the Court will order compliance monitoring to ensure detainees have access to working toilets and sinks, soap, toilet paper, garbage receptacles, tooth brushes and toothpaste, feminine hygiene items, baby food, diapers, and clean drinking water.

1       The Court turns to the admitted lack of shower facilities and lack of access to hot

2   running water.  Jail standards require access to showers and washbasins with temperature

3   controlled hot and cold running water 24 hours per day, (Vail Decl. ¶ 121), with daily

4   shows being available to general population jail-inmates, *id.* ¶ 123.

5       Defendants assert that the lack of shower accommodations is not a problem

6   because detainees are transferred when approaching 72 hours, and TEDS only requires

7   that reasonable efforts be made to provide showers to those approaching 72 hour

8   detentions.  *Id.* ¶ 33.  Like Defendants' failure to provide for the necessity of sleeping

9   when detention exceeds 12 hours, Defendants fail to recognize the basic human need to

10  wash during these detentions.  "The more basic the particular need, the shorter the time it

11  can be withheld."  *Hoptowit v. Ray*, 682 F.2d 1237, 1259 (9th Cir. 1982).  So for

12  example, it is doubtful that any circumstance would permit a denial of access to

13  emergency medical care, but less critical needs may be denied for reasonable periods of

14  time when warranted by exceptional circumstances such as an emergency or disciplinary

15  need. *Id.* (citing *Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979)).  The Court's task

16  is to "determine whether a challenged punishment comports with human dignity,"

17  *Furman v. Georgia*, 408 U.S. 238, 282 (1972) (BRENNAN, J., concurring), and requires

18  careful scrutiny of challenged conditions and application of realistic yet humane

19  standards, *Rhodes*, 452 U.S. at 361.

20      It has been held to be self-evident that adequate and functional plumbing

21  providing neither too hot nor too cold water is necessary so as to not discourage prisoners

22  from taking showers, which would result in an increased risk of skin problems and

23  transmission of disease from person to person and a foul and malodorous environment,

24  *Benjamin v. Fraser*, 161 F. Supp.2d 151, 171 (S.D. N.Y. 2001).  Nevertheless, courts are

25  extremely reluctant to find constitutional violations based on temporary deprivations of

26  personal hygiene and grooming items.  *Id.* at 175 (citations omitted).  Additionally, courts

27  have found that when other materials are made available for a prisoner to clean himself, a

28  constitutional violation has been averted.  *Shakka v. Smith,* 71 F.3d 162, 168 (4th Cir.

1   1995).

2        This Court does not mean to suggest that a lack of daily showers for a few days

3   would necessarily rise to the level of a constitutional violation in a prison setting, *see e.g.*

4   *Griffin v. Southern Health Partners, Inc.,* 2013 WL 530841, *9 (W.D. Kentucky,

5   February 11, 2013) (finding six day, eight day, and 72 hour deprivation of showers and

6   being subjected to unsanitary conditions insufficient to violate the constitution), but

7   Border Patrol detainees are not pretrial detainees or prisoners.  They are civil detainees

8   who are being denied the ability to wash or clean themselves for several days.

9   Transferring them when detention approaches 72 hours does not solve this problem.

10  Given the admitted lack of showers, the Court preliminarily finds that Defendants need

11  only provide some means or materials for washing and/or maintaining personal hygiene

12  when detainees are held longer than 12 hours.

13       Given the evidence of noncompliance related to conditions of sanitation,

14  compliance monitoring is warranted.  Plaintiffs are likely to prevail on this claim unless

15  there is full compliance by Defendants with the guidelines for sanitation and there are

16  materials available for detainees held longer than 12 hours to clean themselves.

17                                    Food

18       It is undisputed that "[p]rison officials are 'obligt[ed] to provide inmates with

19  nutritionally adequate meals on a regular basis.'"  (MPI at 16 (quoting *Foster v. Runnels,*

20  554 F.3d 807, 816 (9th Cir. 2009)).  Prison food does not need to be tasty or aesthetically

21  pleasing, it must simply be adequate to maintain health.  (Response at 22 (citing *Keenan*

22  *v. Hall,* 83 F.3d 1083, 1091 (9th Cir. 1996)).

23       Detainees receive a diet of burritos (bean, beef, or beef and bean (330 to 360

24  calories), cheese or peanut-butter filled crackers (200 calories), and boxes of fruit juice

25  (60 calories).  (Vail Decl. ¶ 90); (Allen Decl. ¶ 37).  Snacks include cookies, cereal bars,

26  graham crackers, and goldfish crackers.  (Allen Decl. 38.)  There is baby food and

27  formula. (Vail Decl. ¶ 91.)  There is no evidence in the Defendants' data base of any

28  fluctuation in this regimen except for pregnant and nursing women. *Id.* ¶ 92.

1    There are no food preparation areas in the detention stations.  The burritos are

2  heated up in microwaves or warming trays.  *Id.* ¶ 93.  The Defendants' e3DM data

3  system reflects that the average time between meals/burritos is 7.336 hours, and at the

4  Tucson station the average time between meals/burritos is 8.239 hours.  *Id.* ¶ 94.

5    According to Defendants, this diet adequately satisfies the basic nutritional needs

6  of detainees.  (Skipworth Decl. ¶ 122.)  Skipworth believes that food preparation is

7  performed under safe and sanitary conditions, with food being commercially prepared

8  and packaged, and agents heating it to adequate temperatures.  (Skipworth Decl. ¶¶ 109-

9  112.)

10    The CORE jail standards require: three meals, including at least two hot meals to

11  be served at regular times during each 24 hour period, with no more than 14 hours

12  between the evening meal and breakfast.  *Id.* ¶¶ 96-97.  TEDS mirrors this, with regularly

13  scheduled meal times and snacks to be provided between regularly scheduled meal times.

14  Two meals must be hot. Juveniles and pregnant detainees are to be offered a snack upon

15  arrival and meals at least every six hours thereafter.  Juveniles, pregnant and nursing

16  detainees must have access to snacks, milk and juice.  *Id.* ¶¶ 98-100.

17    According to Defendants, meals are served 3 times per day at 4:00 a.m., 12:00

18  p.m., and 8:00 p.m.; snacks are served three times per day at 8:00 a.m., 4:00 p.m., and

19  12:00 a.m.   (Allen Decl. ¶ 38.)   This creates approximately an eight-hour interval

20  between the evening burrito meal and the burrito breakfast, and eight-hour intervals

21  between the three regularly served burrito meals.  To ensure that no more than four hours

22  elapses between eating times, an internal auditing function exists within the e3DM

23  system that warns agents when a detainee is approaching the timelines.  *Id.* ¶ 38.  When

24  an individual is scheduled for transfer, "it is incumbent on each individual station to

25  identify whether the transfer will cause a detainee to exceed the four hour limit to provide

26  a snack and juice or burrito, accordingly.  *Id.* ¶ 39.

27    With the exception of changing the 4:00 a.m. meal schedule to accommodate

28  sleeping, the question is one of compliance with TEDS.  Preliminarily, compliance

1    monitoring is warranted.

2                                    <u>Medical Care:</u>

3         "Denying, delaying, or mismanaging intake screening violates the Constitution.

4    (MPI at 18 (citing *Gibson v. Cty. of Washoe, Nev.,* 290 F.3d 1175, 1188-90 (9th Cir.

5    2002); *Lareau v. Manson,* 651 F.2d 96, 109 (2nd Cir. 1981)).  Defendants agree that the

6    Constitution does require them to "'provide a system of ready access to adequate medical

7    care.'" (Response at 13 (quoting *Madrid v. Gomez,* 889 F. Supp. 1146, 1554 (N.D. Calif.

8    1995) (citing *Hoptowit,* 682 F.2d at 1253; *Casey v. Lewis,* 834 F. Supp. 1477, 1545 (Ariz.

9    1993)).  The parties are, however, at odds regarding the boundaries of this constitutional

10   right.

11        Plaintiffs challenge the adequacy of Defendants' intake screening.  (MPI at 18

12   (relying on *Graves v. Arpaio,* 48 F. Supp. 3d 1318, 1340-1344 (Ariz. 2014) and *Madrid,*

13   889 F. Supp. at 1257)).  They bring the following challenges: 1) screening is performed

14   by border patrol agents, not doctors, nurses, or other qualified or specially trained

15   personnel; 2) Defendants do not maintain a medical treatment program capable of

16   responding to emergencies that arise after detainees are placed in holding cells because

17   they do not have medical staff on site, and 3) the practice of confiscating  incoming

18   detainees' medication creates impermissible and heightened risk that detainees will

19   experience a medical emergency.  (MPI at 18-20.)

20        Defendants assert that TEDS provides a system of ready access to adequate

21   medical care.  Before detainees are placed into a Border Patrol hold room, a Border

22   Patrol agent "must ask detainees about and visually inspect for any sign of injury, illness,

23   or physical or mental health concerns and question . . . about any prescription

24   medications."  (Harber Decl. ¶ 26-32 (citing TEDS § 4.3, 4.10)) *but see also* (Harber

25   Decl. ¶ 30, Attachment B: Medical Screening Form used by agents) (missing questions

26   required about physical and mental health concerns, and prescription medications)).

27   Observed or reported injuries or illnesses should be communicated to a supervisor,

28   documented in the appropriate electronic system, and appropriate medical care should be

provided or sought in a timely manner.  *Id.*  Treatment plans and medication accompany detainees when they are transferred or discharged.  TEDS § 4.10.

Defendants assert that they either have EMTs who can treat emergencies at the detention centers, (Harber Decl. ¶ 33), or they routinely transfer detainees to hospitals for emergency care, *id.* ¶¶ 29, 34.)

Under TEDS prescription medication may be used by incoming detainees, if it is in a properly identified container with the specific dosage indicated, but non-U.S. prescribed medication must be validated by a medical professional, or the detainee should be taken in a timely manner to a medical practitioner to obtain an equivalent United States prescription.  TEDS § 4.10.  It is standard practice to send detainees to the hospital for appropriate care and prescriptions for medication by U.S. doctors. (Allen Decl. ¶ 22; Harber Decl. ¶ 34.)

Plaintiffs' expert, Joe Goldenson, M.D., has extensive experience in jail and state correctional facilities.  (Goldenson Decl. ¶¶ 1-3.)  He based his opinion on declarations of individual Plaintiffs, review of the e3DM data system, and depositions by Vail and Powitz.  *Id. ¶¶* 8-9. He found there was no evidence of any formalized screening process being carried out by agents at the detention centers.  *Id. ¶¶* 19-23.  The e3DM data system reflects approximately 527 incidents of medical treatment being provided to detainees out of the approximately 17,000 detained individuals for the period of time from June 10 to September 28, 2015.  *Id. ¶* 42.

He explains there are two components of screening: 1) immediate medical triage to determine if there are any issues that would preclude acceptance into the facility and 2) a more thorough medical and mental health screening.  *Id.* ¶ 13.  He explains that in some facilities, the first triage-step is performed upon entry into the facility, with the more thorough screening done soon after the person is accepted into the facility.  *Id. ¶* 14.  The screening includes both a face-to-face interview using a structured questionnaire and, whenever possible, a review of the individual's prior medical record.  The questionnaire covers the detainee's current problems and medications; past history, including

hospitalizations; mental health history, including current or past suicidal ideation; symptoms of chronic illness; medication and/or food allergies, and dental problems. Female detainees are asked about current and past history related to pregnancy and date of last menstrual period. *Id.*

Whenever possible, intake screening is performed by qualified health professionals, but in smaller detention settings, where health staff is not present at times, specially trained custodial staff conduct the screening. *Id.* ¶ 15. This staff should be trained, including on-going training, on conducting medical screening, and there should be procedures for officers to obtain guidance and direction from a health care professional for problems beyond the scope of their training and experience. *Id.* ¶ 16. It is important to record the information obtained during screening and have the records accessible during detention so it can be provided to health care professionals as needed. *Id.* ¶ 17.

Dr. Goldenson believes that field screening is not an adequate replacement for intake screening because field screening is not done pursuant to a type of standardized protocol or procedure that would suffice as "intake screening." *Id.* ¶ 25, *see also* (Harber Decl. ¶ 30, Attachment B: Medical Screening Form used by agents) (missing questions required under TEDS about physical and mental health concerns, and prescription medications).

Proper intake screening is critical to identifying newly arriving detainees with urgent or emergent health care needs, who are suffering from potentially communicable diseases which require isolation and enhanced disinfection processes, or to identify continuity of care issues like medication or prescription needs, or to identify medical or mental health conditions that require referrals. (Goldenson Decl. ¶28.) Dr. Goldenson suggests detainees are high risk for medical problems because they have just crossed the desert under extreme physical hardship, lacking in water and food, without access to medication and medical supplies. *Id.* ¶¶ 31-39.)

The number of medical/hospital referrals, 527 out of approximately 17,000

detainees from June 10 to September 28, 2015, support Dr. Goldenson's opinion, especially when considered in the context of the TEDS requirement that all foreign prescriptions be rewritten by U. S. doctors.  The cursory medical screening performed at the detention stations is problematic as the duration of detention lengthens because intake screening becomes more important if it must be relied on for detention extending over several days rather than for a few hours.  Defendants are already using an intake screening questionnaire, but it does not meet the TEDS standards because it fails to ask about physical and mental health concerns and prescription medications.  It also fails to ask about pregnancy and whether a detainee is nursing.  TEDS § 4.2.  And, Defendants do not know whether the screening form is being used at all the stations.

Preliminarily, the Court requires compliance with TEDS, including measures to ensure the Medical Screening Form currently being used by Defendants at some stations is used at all stations, and that the form asks questions to ensure compliance with TEDS standards for screening and delivering medical care.  Without this compliance, the Court finds that Plaintiffs are likely to prevail on this constitutional claim.

<center>2.  Irreparable Harm</center>

Plaintiffs have presented evidence of harm related to the conditions of confinement, such as the physiological effects of sleep deprivation or constant discomfort that comes from an inadequate food supply, or health risks related to exposure due to contaminated water or unsanitary cells, or medical risks associated with being unable to continue taking prescription medications or being exposed to communicable diseases. These are the types of harm relevant to the 14th Amendment assessment of whether the challenged conditions of confinement exceed or are independent of the inherent discomforts of confinement and are not reasonably related to a legitimate government objective, or are excessive in relation to legitimate government objectives.

For the purpose of assessing whether Plaintiffs are likely to suffer irreparable harm in the absence of an injunction, this Court looks at the deprivation of constitutional rights.  If, like here, a court finds that plaintiffs are likely to succeed on the merits of their

1  constitutional claims, then "the deprivation of constitutional rights unquestionably

2  constitutes irreparable injury." *Melendres,* 695 F.3d at 1002.  This is because

3  "constitutional violations cannot be adequately remedied through damages and therefore

4  generally constitute irreparable harm."  *Am. Trucking Ass'ns, Inc.,* 559 F.3d at 1059.

5  <center>3.  Balance of equities and Public Interest</center>

6  Likewise, because the Court finds the Plaintiffs have established a likelihood of

7  success on the merits of their constitutional claims and that they are likely to suffer

8  irreparable harm without an injunction, all that remains is for Plaintiffs to persuade the

9  Court that the balance of equity and the public interest tips in favor of the injunction.

10  "Once a plaintiff shows that a constitutional claim is likely to succeed, the remaining

11  preliminary injunction factors weigh in favor of granting an injunction." *Vivid Entm't*

12  *LLC,* 65 F. Supp.2d at 1136 (citing *Melendres,* 695 F.3d at 1002; *Klein,* 584 F.3d at 1208.

13  "'[I]t is always in the public interest to prevent the violation of a party's constitutional

14  rights.'"  *Melendres,* 695 F.3d at 1002 (quoting *Sammarano,* 303 F.3d at 974.   The

15  government suffers no harm from an injunction that merely ends unconstitutional

16  practices and/or ensures that constitutional standards are implemented.  *Rodriguez,* 715

17  F.3d at 1145 (citing *cf. Zepeda v. I.N.S.,* 753 F.2d 719, 727 (9th Cir. 1983) (INS cannot

18  assert harm in any legal sense by being enjoined from constitutional violations).

19  <center>D.  Conclusion</center>

20  Defendants cannot sidestep reality by relying on the structural limitations of the

21  Border Patrol detention facilities, i.e., that they are not designed for sleeping.  If anything,

22  this cuts against the 72-hour definition of short-term.  If detainees are held long enough to

23  require them to sleep in these facilities, take regular meals, need showers, etc., then the

24  Defendants must provide conditions of confinement to meet these human needs.  Where

25  there is no evidence of an express intent to punish, the Court may infer that the purpose

26  of the condition is punishment if it is not reasonably related to a legitimate governmental

27  objective or is excessive in relation to the legitimate governmental objective.  The Court

28  finds that there is no objectively reasonable relationship between 24-7 immigration

processing or security and the conditions of confinement which Plaintiffs have preliminary shown exist in the Tucson Sector Border Patrol stations related to sleeping, sanitation, food, and medical care. Therefore, there is a likelihood of success on the merits of Plaintiffs' constitutional claims.  The deprivation of a constitutional right unquestionably constitutes irreparable injury.  It is always in the public interest to prevent the violation of a party's constitutional rights, and the government suffers no harm from an injunction that merely ends unconstitutional practices and/or ensures that constitutional standards are implemented.

**Accordingly,**

**IT IS ORDERED** that the Motion for a Preliminary Injunction (Doc. 206) is GRANTED as follows:

1.     Clean bedding, which Defendants assert they are providing to all detainees, must include a mat and a Mylar blanket for all detainees being held longer than 12 hours.

2.     Personal hygiene needs of detainees held longer than 12 hours include the need to wash or clean themselves.

3.     Defendants shall implement the universal use of their Medical Screening Form at all stations and ensure that the form questions reflect the TEDS requirements for delivery of medical care to detainees.

4.     Defendants shall monitor for compliance the following: availability of working sinks and toilets and/or other materials sufficient to meet the personal hygiene needs of detainees on a per cell per station basis; cell temperatures; cell sanitation and cleanliness; delivery to detainees of bedding, including mats, personal hygiene items such as toilet paper, toothbrushes and toothpaste, feminine hygiene items, baby food, diapers, and meals.

/ / /

/ / /

/ / /

**IT IS FURTHER ORDERED** that Defendants monitoring responsibilities shall be met by using the e3DM data system and Border Patrol logs, shall be released to Plaintiffs on a quarterly basis.

Dated this 18th day of November, 2016.

_____
Honorable David C. Bury
United States District Judge