1  JOSEPH H. HUNT
   Assistant Attorney General
2  Civil Division
   WILLIAM C. PEACHEY
3  Director
   WILLIAM C. SILVIS
4  Assistant Director
   SARAH B. FABIAN
5  CHRISTINA PARASCANDOLA
   MICHAEL A. CELONE
6  Senior Litigation Counsels
   KATELYN MASETTA-ALVAREZ
7  Trial Attorney
   Office of Immigration Litigation
8  U.S. Department of Justice, Civil Division
   P.O. Box 868, Ben Franklin Station
9  Washington, DC 20044
   Telephone: (202) 305-2040
10
   Attorneys for Defendants
11

12                    IN THE UNITED STATES DISTRICT COURT
13
                        FOR THE DISTRICT OF ARIZONA
14

15  Jane Doe #1; Jane Doe #2; Norlan Flores,      Case No. 4:15-cv-00250-TUC-
    on behalf of themselves and all others        DCB
16  similarly situated,
                                                  **DEFENDANTS' PROPOSED**
17        Plaintiffs,                              **FINDINGS OF FACT AND**
                                                  **CONCLUSIONS OF LAW**
18        v.
                                                  **CLASS ACTION**
19  Chad Wolf, Acting Secretary of Homeland
    Security;[1] Mark A. Morgan, Acting           Action Filed: June 8, 2015
20  Commissioner, U.S. Customs and Border
    Protection; Carla L. Provost, Chief of
21  United States Border Patrol, in her official
    capacity; Roy D. Villareal, Chief Patrol
22  Agent-Tucson Sector, in his official
    capacity,
23
          Defendants.
24

25  _____

26  [1] On November 13, 2019, the President designated Chad F. Wolf Acting Secretary of Homeland
    Security, automatically substituting for Kevin K. McAleenan, the previous Acting Secretary. *See*
27  Fed. R. Civ. P. 25(d).  On July 5, 2019, Mark A. Morgan became Acting Commissioner of U.S.
    Customs and Border Protection, automatically substituting for John Sanders, the previous Acting
28  Commissioner. *Id.*

                                        1

Pursuant to this Court's pre-trial Order (ECF No. 405), Defendants provide the following Proposed Findings of Fact and Conclusions of Law. Defendants reserve the right to supplement or amend these Proposed Findings prior to, or immediately following, trial.

## I.   FINDINGS OF FACT

**A.   The conditions of confinement that exist in Tucson Sector Border Patrol stations are not excessive when viewed through the lens of severity and duration, and are not excessive in relation to the purpose of confinement.**

1. The U.S. Border Patrol is charged with securing 6,000 miles of Mexican and Canadian international land borders and 2,000 miles of coastal waters. The land border between the United States and Mexico spans several thousand miles and requires the Border Patrol to operate in a rugged, unpredictable, and often isolated environment, unlike that in which any other law enforcement agency operates. Border Patrol agents in Tucson Sector patrol 262 miles of the United States-Mexico border in southern Arizona.

2. The Border Patrol's primary mission is detecting and preventing the entry of terrorists, weapons of mass destruction, and unauthorized aliens, as well as interdicting drug smugglers and other criminals entering the United States between the ports of entry.

3. When a Border Patrol agent in the Tucson Sector apprehends an individual, the agent brings him or her to one of eight Tucson Sector stations—Ajo, Brian A. Terry, Casa Grande, Douglas, Nogales, Sonoita, Tucson Coordination Center ("TCC") or Willcox.[2]

4. Once an individual arrives at a station, Border Patrol agents ascertain the individual's identity, and immigration and criminal history. The individual is processed to determine his or her next steps. The individual may be repatriated, transferred into the custody of another agency, referred for prosecution in accordance with the law, or, in rare circumstances, released on his or her own recognizance.

5. It is rarely possible to complete an individual's processing in a single, uninterrupted sitting due to the volume of individuals to be processed and the need to ensure that each person receives all appropriate attention and care. All individuals undergo intake, biometric information capture, and processing. Depending on a particular individual's needs, responses, and time in custody, an individual may also be provided with a shower and other hygiene items, medical care, phone calls, meetings with consular officials, more extensive interviews, and/or pre-trial services.

---

[2] Agents working out of Tucson Station, or the newly-designated Three Points Station, bring individuals to the TCC.

6. Individuals awaiting the completion of processing and transfer out of Border Patrol custody wait in hold rooms within the Border Patrol station. Border Patrol stations, like Border Patrol itself, operate twenty-four hours a day, seven days a week. A significant number of Tucson Sector Border Patrol apprehensions occur at night.

7. Once detained, individuals are often transferred from one hold room to another as they progress through the stages of processing, or as operational demands require or suggest. Operational demands include, but are not limited to, the Prison Rape Elimination Act ("PREA"), Pub. L. No. 108-79, 117 Stat. 972 (Sept. 4, 2003) (codified at 42 U.S.C. §§ 15601, *et seq.*); U.S. Customs and Border Protection ("CBP")'s National Standards on Transport, Escort, Detention, and Search ("TEDS"), available at: https://www.cbp.gov/sites/default/files/assets/documents/2017-Sep/CBP%20TEDS%20Policy%20Oct2015.pdf (viewed Dec. 30, 2019); detainee and occupational safety requirements; and facility cleanliness needs.

8. In FY 2017, Tucson Sector Border Patrol apprehended 38,657 individuals. In FY 2018, Tucson Sector Border Patrol apprehended 52,172 individuals. In FY 2019, Tucson Sector Border Patrol apprehended 63,490 individuals, an increase in 22 percent from the previous fiscal year. Of the 63,490 individuals apprehended in FY 2019 by Tucson Sector, 5,105 were unaccompanied alien children, 16,199 were members of family units, and 42,186 were single adults.

9. Tucson Sector Border Patrol aims to maintain a safe environment both for individuals in custody and for its agents, other employees, and on-site contractors.

10. Border Patrol stations are intended and designed for short-term holding during processing, and are not long-term detention facilities. In FY 2019, the average time an individual spent in custody in Tucson Sector was 53.92 hours. More specifically, the times in custody for the 63,490 individuals apprehended by Tucson Sector in FY 2019 were as follows: 3,008 individuals were held for fewer than 12 hours; 15,238 individuals were held for 12 to 24 hours; 23,416 individuals were held for 24 to 48 hours; 9,798 individuals were held for 48 to 72 hours; and 12,030 individuals were held for longer than 72 hours.

11. The length of time individuals spend in the custody of Tucson Sector varies widely and depends on a number of factors, including, but not limited to: age; gender; family status; criminal history; country of origin; immigration history; the number of individuals apprehended together; overall Border Patrol apprehension numbers; and the ability of the U.S. Department of

Health and Human Services, U.S. Marshals Service, and U.S. Immigration and Customs Enforcement to take custody.

12.    The custody of individuals apprehended by Tucson Sector Border Patrol may be governed by applicable immigration detention statutes. *See* 8 U.S.C. §§ 1225, 1226, 1231, 1252. An individual may also be detained by Tucson Sector Border Patrol pending referral for criminal prosecution. In most instances, Tucson Sector must keep individuals in its custody for the time that it takes to complete their individual processing and to arrange transportation to each individual's next destination. Even in the limited situations where Tucson Sector Border Patrol may have the authority to grant a discretionary release for an individual, that discretion is often limited to consideration of specific factors. *See* Memorandum from Kevin K. McAleenan, Commissioner, U.S. Customs and Border Protection, <u>Southwest Border Security and Humanitarian Crisis: U.S. Customs and Border Protection Immediate Action Plan</u> (April 9, 2019).

13.    The number of individuals in any given station or hold room within Tucson Sector will depend on a number of factors that are constantly changing. These factors include, but are not limited to: the number of individuals apprehended in the Tucson Sector in a given day or night; the breakdown of those apprehended by age, gender, family group, and criminal status; an individual's destination; any safety or health concerns that may arise related to individuals at the station; and the pace of processing, which may itself depend on each individual's criminal and immigration history. Additionally, temporary issues with station facilities impacting detention conditions—such as temperature, availability of potable water, functioning toilets, and sanitation needs—may impact the number of individuals in a given hold room or station.

14.    Many of these factors are further dependent on a variety of other factors such as the time of year, weather, conditions in other countries, and the custody space available with other agencies whose participation is needed to transfer individuals out of Border Patrol custody. There is no basis on which Border Patrol can accurately predict on any given day whether tens or thousands of individuals will show up at a specific location or at a specific time along the border, even if the Border Patrol is monitoring the movement of large groups towards the U.S. border.

15.    The number of individuals in a given hold room is never intended to create discomfort or challenges for those in custody, but rather is determined by operational concerns. Food, water, sanitation, hygiene items, bedding, medical care, etc., are not withheld as a punitive measure, and station temperatures are not set for punitive purposes.

16.   Tucson Sector has internal review processes in place to ensure that it is complying with  policies and procedures (e.g., PREA, TEDS, 2008 Hold Rooms and Short Term Custody memorandum), as well as any court orders. In addition, every quarter, the Tucson Sector Policy and Compliance Division conducts "no-notice" compliance evaluations of each Tucson Sector station where individuals are held in custody, and provides the results of that evaluation to the Tucson Sector Chief Patrol Agent. The Chief Patrol Agent then sends a memorandum to the respective location's leadership that documents the compliance evaluation results as well as any remedial steps that need to be taken. Among other things, these evaluations assess both physical layout and data input, and the evaluators have the authority to suggest recommended actions. Where these review processes result in a finding that Tucson Sector is out of compliance, Tucson Sector takes steps to return to compliance.

**B.   Plaintiffs' due process claims regarding sleep**

1.   Individuals in Tucson Sector custody are permitted to sleep, and frequently do sleep, while in Tucson Sector stations.

2.   Tucson Sector hold rooms have built-in concrete benches, or wood or metal benches that are fastened to the ground, on which individuals can sit and lie down. Concrete, wood, and metal surfaces are used in Border Patrol stations because they can be cleaned easily and quickly, and inhibit the growth of microorganisms that cause disease, thereby protecting the health of individuals in custody. Tucson Sector's practice is to provide a sleeping mat and a Mylar blanket to each individual upon arrival at a Tucson Sector station. Individuals can place these mats on the floor or on any of the benches in a hold room, providing a more comfortable surface on which an individual can rest or sleep. Tucson Sector will provide an individual in its custody a new Mylar blanket upon request.

3.   Tucson Sector station hold rooms do not contain movable beds or other furniture because it would pose a safety hazard. This is because furniture or pieces of furniture can be used as weapons, and also because placing furniture in hold rooms would greatly reduce the amount of available space in the hold room—thus making it difficult for individuals in custody, agents, employees, and contractors, to move quickly and easily within the hold room as needed.

4.   Tucson Sector has established hold room capacities that are based on the number of sleeping mats that can be fully unfolded on the floor of the hold rooms with minimal or no overlapping, and with a sufficient area of the floor clear for walking into and out of the hold room and to/from the hold room toilet(s) and sink(s). Tucson Sector makes every effort to not exceed

these hold room capacities, and if it must do so—out of operational necessity—it makes every effort to limit the time period in which such capacities are exceeded.

5.     Except for a single washer and dryer in the TCC, Tucson Sector stations do not have laundry facilities on site, making the use of cloth blankets that must be cleaned after each use impractical. Moreover, the location of the stations and the large volume of individuals in custody would make the use of cloth blankets prohibitively expensive to clean. Finally, providing cloth blankets or other cloth bedding poses a health risk, because cloth can transmit diseases if shared by individuals who are being held in close proximity during their custody.

6.     Tucson Sector keeps station hold rooms illuminated at all hours to maintain the continuity of operations, and to ensure the safety and security of individuals in custody as well as the safety and security of agents, other employees, and on-site contractors.

7.     Turning lights off in hold rooms would make it difficult for agents to monitor activity in those rooms, which would in turn create a risk to the safety of individuals held there as well as to the safety of employees and on-site contractors who enter the hold rooms.

8.     Turning lights off in hold rooms would also make it difficult to move safely in and out of those hold rooms. Because Border Patrol stations operate 24 hours a day, 7 days a week, and individuals frequently arrive at the stations at all hours of the day or night, it is not possible for Tucson Sector stations to safely turn off the lights at night or during a specified time period throughout the day.

**C.     Plaintiffs' due process claims regarding hygiene and sanitation**

1.     The numbers of toilets in Tucson Sector station hold rooms are consistent with the American Correctional Association's Plumbing Fixtures standards, which—although not mandated for Border Patrol—require a minimum of one toilet for every 12 male detainees and one toilet for every eight female detainees.

2.     The privacy walls around the toilets in the Tucson Sector hold rooms are consistent with those used in correctional facilities where individuals are held and are positioned at a height that affords a reasonable level of privacy while still providing enough visibility to minimize safety and security risks. Tucson Sector also blocks the view of the toilet on its surveillance cameras to ensure privacy.

3.     Tucson Sector Border Patrol has cleaning contracts with professional cleaning companies for each of its stations. These contracts provide for at least daily cleaning of the hold rooms (although in practice, cleaning is ordinarily performed twice daily). Hold rooms also are

inspected by Border Patrol personnel multiple times each day (generally by a supervisor at the beginning of each shift) for a variety of things, including cleanliness, ventilation, temperature, and presence/absence of pests. The results of these checks are required to be placed into e3DM (e.g., "amenity reports"), and responses indicating that something is out of compliance are tracked to assure a remedy was sought.

4.     Tucson Sector's general practice is to provide trash cans inside station hold rooms, although individuals in custody do not always use them. When trash cans cannot be provided inside the hold rooms, they are made available outside the rooms, and cleaning personnel collect the trash during each hold room's cleaning. Trash sometimes accumulates in between regular cleanings because individuals do not use the trash cans that are provided. Additionally, dirt may be tracked in when individuals enter the hold rooms. Border Patrol agents inspect hold rooms for insects, rodents, and vermin, and must report positive findings through the e3DM system. Tucson Sector addresses such issues promptly. Tucson Sector locations have not had problems with insects, rodents, or vermin that would result from trash accumulation or poor cleaning.

5.     All individuals who remain in Tucson Sector custody for longer than twelve hours are provided the opportunity to clean themselves. Most stations provide a "paper shower" product for this purpose. Tucson Sector also provides showers to individuals in its custody where possible; whether and when a shower is provided will depend on various factors such as individual necessity, availability, and the processing requirements for the individual. Originally, only two Tucson Sector stations had showers: TCC and Nogales. More recently, other Tucson Sector stations have built shower facilities or signed contracts to build shower facilities, including: Ajo, Willcox, Douglas, and Brian A. Terry stations. Ajo, Willcox, and Douglas stations will each have a single shower, while Brian A. Terry station will have two showers.

6.     A universal policy of providing showers to all individuals upon their arrival to a Tucson Sector station—or when they have only been in Border Patrol custody for a short time period—would significantly slow the processing of every individual, and would in many cases extend the time the individual spends in custody at a station. At a minimum, Tucson Sector makes reasonable efforts to provide showers for juveniles approaching 48 hours in custody and for adults who are approaching 72 hours in custody, including transporting such individuals to facilities with showers in order to accomplish this goal.

7.     Tucson Sector generally provides toothbrushes to individuals in custody upon their arrival to a station, and again on a daily basis or upon request.

8.     Tucson Sector provides toilet paper in hold rooms and makes sanitary napkins, diapers, diaper cream, and baby wipes available. In the section of the TCC where children and families are generally held, many of these items are readily accessible on a cart immediately outside—and in view of—this population's unlocked hold rooms so that individuals may take the items as needed. Tucson Sector makes sanitary napkins available on shelves near the toilets in all hold rooms where females are routinely held. The presence/absence of sanitary napkins in hold rooms where females are held is checked at the beginning of every shift, and additional products are provided if needed. In addition, sanitary napkins are available upon request.

9.     All of the Tucson Sector hold rooms have been fitted with soap dispensers, which provide individuals with the ability to wash their hands in the hold rooms. Tucson Sector uses the "air-drying method" for handwashing, which the Centers for Disease Control and Prevention recognizes as an effective hand drying method.  Tucson Sector has determined that providing paper towels is operationally problematic as individuals in custody would frequently throw the paper towels on the floor or put them into the toilet, creating clogs.

**D.     Plaintiffs' due process claims regarding food and water**

1.     Clean, potable, drinking water is always available to individuals in Tucson Sector hold rooms. Each hold room in Tucson Sector has a bubbler, water fountain, or faucet with clean paper cups. In addition, Tucson Sector may provide five-gallon Igloo coolers of clean water (as well as clean paper cups) for drinking.

2.     The water available from the hold room drinking fountains and bubblers is potable and comes from the same water supply that is used by station employees.

3.     Tucson Sector regularly tests the water flow and arc of the drinking water portion of the bubbler to ensure that water is suitable for drinking directly, or filling a cup, from the fountain.

4.     Tucson Sector provides a meal or snack to each individual upon their arrival to a station.

5.     Tucson Sector offers meals to all individuals in custody at regularly scheduled meal times. At least two of the meals per day are hot. Tucson Sector also provides snacks in between meal times. For hot meals, Tucson Sector has generally offered vegetarian or meat burritos. For snacks, Tucson Sector has generally offered cheese- and peanut butter-filled crackers, as well as juice.

6.     Tucson Sector is in the process of implementing a new food contract that provides additional variety in the meals and snacks available to individuals in custody, such as raisins, apple

sauce, and fruit cups. Additionally, juveniles at the TCC have open access to all of the above items, as well as granola/cereal bars, animal crackers, and dairy-free (i.e., soy/almond) milk.

7.     Other food items also may be provided. If individuals have specific dietary needs for religious or health-related reasons, Tucson Sector may use its discretionary funds to purchase meals to meet those needs.

8.     When an adult in custody requests additional food in between meal times, a Border Patrol agent may grant the request.

9.     Tucson Sector provides children and pregnant, or nursing, individuals with meals every six hours and snacks are available at all times. In the section of the TCC where children and families are generally held while in Tucson Sector custody, snacks are readily accessible on a cart immediately outside—and in view of—this population's unlocked hold rooms so that individuals may take the items as needed. Tucson Sector also uses signage, in English and Spanish, and pictures to demonstrate that snacks and hygiene items are available upon request.

10.    Tucson Sector stations keep in stock and provide age-appropriate food, such as formula, baby food, and toddler food.  Food expiration dates are noted and food is discarded if it is not used by the expiration date. Food, and its expiration date, is specifically tracked in multiple different review processes, including by the Tucson Sector's "no-notice" quarterly compliance evaluations and the Management Inspection Division's unannounced evaluations.

11.    Tucson Sector's practice of providing packaged foods that are served in their original, unopened packages is a safe food-handling practice that serves to protect the health of individuals in custody.

12.    The food Tucson Sector provides individuals is nutritionally adequate considering the relatively short period of time spent in custody.

**E.     Plaintiffs' due process claims regarding medical care**

1.     Border Patrol employs a multi-layered approach to identify and treat medical concerns for individuals in its custody.

2.     Prior to entering a Tucson Sector station, individuals have contact with agents in the field who begin assessing them visually and through oral communications. Agents actively screen individuals by asking them about their health and medical needs and passively screen them by observing for any medical concerns. If an agent has a medical concern about an individual, he or she will generally arrange for the individual to be taken to the hospital for medical care prior to being transported to a Border Patrol station for processing.

3.    When an individual arrives at a Tucson Sector station other than the TCC, he or she is screened by a Border Patrol agent who will complete a universal medical screening form within e3DM from which the agent asks each individual a series of questions and records the individual's answers. If this screening identifies any medical concerns, the individual will be sent to a local hospital for care. In some cases, a Border Patrol agent who is also a certified Emergency Medical Technician ("EMT") or paramedic may provide applicable medical care to individuals. When apprehension levels warrant, most individuals spend a very short time at Tucson Sector stations before being transported to the TCC for processing and/or transfer.

4.    Upon arrival to the TCC, all individuals are provided intake medical examinations and/or applicable medical care from medical personnel.

5.    Tucson Sector agents and medical professionals are proficient, if not fluent, in the Spanish language and thus are able to converse with and obtain necessary information from more than ninety percent of individuals in custody for purposes of providing medical screening. For individuals who do not speak English or Spanish, Tucson Sector relies on a contract service that provides foreign language speakers who interpret conversations between agents/medical professionals and individuals in custody via the telephone.

6.    Tucson Sector agents or medical professionals are able to identify emergent problems during initial screening by looking for symptoms, such as bleeding, incoherent speech, and other physical issues and to arrange for appropriate emergent care. Other conditions may be identified based on the responses an individual provides to the screening questions.

7.    In all cases where an agent or medical professional identifies a medical condition in need of medical attention, the agent will refer the individual for medical care, or on-site care will be provided as appropriate. In most cases, medical care is provided by transporting the individual to a local hospital. In some cases, a Border Patrol paramedic or EMT may provide medical care consistent with his or her level of training and certification. At the TCC, on-site medical personnel may provide non-emergent medical care.

8.    Tucson Sector agents regularly receive health-related training and guidance.

9.    Tucson Sector agents pose questions to individuals in custody that are designed to identify suicide risk, and agents will refer individuals for medical care or take other appropriate action if such risks are identified.

10.    Tucson Sector agents receive policy updates and training concerning infectious diseases. These materials are updated periodically to reflect changes in epidemic and endemic situations.

11.    Tucson Sector agents constantly interact with and observe individuals throughout their time in custody. Such interaction and observation provides many opportunities to identify signs and symptoms of health conditions, and may lead to agent-initiated communications regarding potential health concerns, including some mental health concerns.

12.    Individuals may request medical care while in custody at any time, even after they have completed their screening and processing. Tucson Sector agents will convey an individual's request to seek medical attention to a supervisor, and Tucson Sector will transport individuals to local medical care facilities or provide on-site care as appropriate in response to such requests.

13.    Tucson Sector has an arrangement with St. Mary's Hospital emergency department, in Tucson, Arizona, where a physician advisor is on call twenty-four hours a day to provide Tucson Sector with medical advice.

14.    If an individual arrives with medication prescribed by a U.S. physician, Tucson Sector will store the medication, and make it available to the individual to take consistent with the prescription, throughout their time in Tucson Sector custody.

15.    If an individual arrives in Tucson Sector custody with a medication that is not prescribed by a U.S. physician, or states that he or she needs a particular medication while they remain in Tucson Sector custody, then Tucson Sector will refer the individual to a medical professional to obtain a U.S. prescription for the medication.

16.    Tucson Sector's policy of confiscating non-U.S. medications that individuals have in their possession at the time of apprehension is necessary to protect against the introduction of contraband at the Border Patrol stations.

F.    **Plaintiffs' due process claims regarding warmth**

1.    Tucson Sector maintains hold rooms at temperatures between 66 and 80 degrees. This temperature range is reasonable and is set to not create a risk to the health and safety of individuals in Tucson Sector hold rooms.

2.    In most stations, hold room temperatures are controlled remotely and agents do not have the ability to locally change the temperature. Where Tucson Sector Facilities Management does have access to control the hold room temperature, Tucson Sector practice is to set the temperature so that it will stay within the 66 to 80 degree range.

3.    If a malfunction causes a hold room temperature to move outside that range, Tucson Sector practice is to arrange for repair and to accommodate the individuals who are in the affected hold room by providing them with extra clothing or moving them to another area of the station.

4.    For safety reasons, Tucson Sector confiscates adults' outer layer(s) of clothing and permits them to keep one layer of their own clothing. Tucson Sector maintains all clothing it confiscates while its owner is in custody and returns the clothing to the individual when he or she leaves Border Patrol custody. Children are generally permitted to keep an additional layer of clothing while in Tucson Sector custody.

5.    Tucson Sector checks hold room temperatures once per shift and records the temperatures for each station hold room in e3DM. Hold room temperatures recorded as out of compliance with the 66 to 80 degree range generally result in the creation of a work order to address the issue, and the affected hold room may be deemed temporarily out of use until the temperature issue is remedied.

6.    Significant deviations from the 66 to 80 degree hold room temperature range are infrequent in Tucson Sector and attributable to malfunctions if they do occur.

## II.    CONCLUSIONS OF LAW

### A.    The conditions of confinement in Tucson Sector Border Patrol stations do not deprive Plaintiffs of their Fifth Amendment right to due process.

1.    To establish an objective deprivation of their Fifth Amendment rights, Plaintiffs must prove that the alleged conditions exist by a preponderance of the evidence. Plaintiffs have not met this burden with regard to any of their claims.

2.    Even if Plaintiffs have met their burden to establish existence of the conditions they allege, those conditions do not amount to a violation of the constitutional due process rights of class members.

3.    To succeed on their claims that the constitutional due process rights of class members are being violated by Tucson Sector Border Patrol, Plaintiffs must establish that the alleged conditions are "punitive," by establishing that they are not "incident of some . . . legitimate governmental purpose[,]" or otherwise "reasonably related to a legitimate goal . . . ." *Bell v. Wolfish*, 441 U.S. 520, 539 (1979). Likewise, Plaintiffs may succeed by showing that the severity and duration of a condition poses an objectively "unreasonable risk of serious damage to [their] health." *Darnell v. Pineiro*, 849 F.3d 17, 30 (2d Cir. 2017).

4.     There is a contrast between those conditions imposed to promote a legitimate governmental objective and those that are "arbitrary and purposeless," from which "a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees." *Bell*, 441 U.S. at 539. "[I]f a particular condition or restriction of pretrial detention is reasonably related to a government interest, it does not, without more, amount to 'punishment.'" *Id.* at 539–40.

5.     In making these kinds of determinations, courts must be deferential. In this regard, government officials "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 547; *see also Bull v. City and Cty. of San Francisco*, 595 F.3d 964, 972 (9th Cir. 2010) (en banc); *Olivier v. Baca*, 913 F.3d 852, 858 (9th Cir. 2019).

6.     "[T]he effective management of [a] detention facility once the individual is confined is a valid objective that may justify imposition of conditions and restrictions of [civil] detention and dispel any inference that such restrictions are intended as punishment." *Bell*, 441 U.S. at 540. "The difficulties of operating a detention center [also] must not be underestimated by the courts." *Florence v. Board of Chosen Freeholders of County of Burlington*, 566 U.S. 318, 326 (2012).

7.     There is no "static test" to determine whether a deprivation is sufficiently serious to deny someone due process. *Darnell*, 849 F.3d at 30 (citing *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981)). Rather, "the conditions themselves must be evaluated in light of contemporary standards of decency." *Id*. For this reason, courts should refrain from ordering "[b]right-line limits" because such limits "are generally incompatible with Fourteenth Amendment teaching that there is no 'static' definition of a deprivation, and the Supreme Court's instruction that any condition of confinement can mutually enforce another, so long as those conditions lead to the same deprivation." *Id.* at 31 (internal citations omitted); *see also Walker v. Schult*, 717 F.3d 119, 127–28 (2nd Cir. 2013).

8.     The Court evaluates confinement conditions on a case-by-case basis through the lens of severity and duration. *Darnell*, 849 F.3d at 37; *see also Turano v. Cty. of Alameda*, No. 17-cv-06953, 2018 WL 5629341, at *5 (N.D. Cal. Oct. 30, 2018) (articulating standard in *Darnell*, 849 F.3d at 37). Conditions, when aggregated, may rise to the level of a constitutional violation, "'but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise.'" *Darnell*, 849 F.3d at 30 (quoting *Walker*, 717 F.3d at 125). Accordingly, "conditions of confinement cases involve fact-

intensive inquiries." *Id.* at 31; *see also* Order Denying Plaintiffs' Motion for Partial Summary Judgment, ECF No. 383 at 9 ("This fact-intensive inquiry cannot be made on the summary judgment record.").

9.   Consistent with the above case law, each of Plaintiffs' challenged conditions of confinement must be considered in light of their severity and duration, and none of these conditions are subject to a bright-line durational or severity threshold. *See Darnell*, 849 F.3d at 32. Moreover, the conditions must be analyzed in combination, not in isolation, at least where one alleged deprivation has a bearing on another. *Id.*

10.   Plaintiffs have not established that the detention conditions that they allege exist throughout the Tucson Sector are impermissibly punitive, nor have they established that such conditions are not "reasonably related to a legitimate governmental objective." *Bell,* 441 U.S. at 539.

11.   The fact that individuals are generally in custody in Tucson Sector for only a "short-term" period is relevant to this Court's consideration, and supports this Court's finding that conditions in Tucson Sector are not punitive or unnecessarily severe. *See* H.R. Con. Res. 644, 114th Cong., Title VIII, § 411(m)(3) (2015) (enacted) (Congress defined "short-term detention" as "detention in a U.S. Customs and Border Protection processing center for seventy-two hours or less, before repatriation to a country of nationality or last habitual residence.").

12.   As a general matter, Plaintiffs' claims fail because Plaintiffs' assertions as to what they believe the Court should conclude are Plaintiffs' preferred alternatives to meet governmental objectives. Plaintiffs' preferred alternatives, however, ignore the reality of the unique operational challenges involved in the management of a Border Patrol station—including, most importantly, the Border Patrol's mission of apprehending individuals and processing them efficiently for release or transfer to the custody of another government agency.

13.   Plaintiffs' attempts to analogize short-term custody in Tucson Sector Border Patrol stations to detention in a jail or prison miss the mark because Plaintiffs fail to take into account Border Patrol's unique governmental purposes. Defendants' need to administer Border Patrol stations efficiently is inextricably tied to its broad authority over the border itself, which has no parallel in the criminal justice system. The characteristics and size of the population at a given Border Patrol station can vary dramatically—from hour to hour, day to day, month to month, and year to year—based on conditions at the border, individuals apprehended and the global migration patterns affected by geo-political events. By contrast, jails and prisons have some ability to control

and manage the scope of their detention populations, and have the benefit of foresight as to the size and characteristics of those who will be in their custody.

14.   Since problems that arise in the day-to-day operation of detention facilities are not susceptible to universal, bright-line solutions, administrators must be accorded wide-ranging deference in their adoption and execution of policies and practices they believe necessary to accomplish their institutional goals. *See Bell*, 411 U.S. at 547–48 (citations omitted); *see also id*. at 543 ("We disagree  . . . that there is some sort of 'one man, one cell' principle lurking in the Due Process Clause of the Fifth Amendment."); *Darnell*, 849 F.3d at 31–32 (rejecting the imposition of bright-line limits). Thus, to faithfully follow *Bell*, it is necessary to focus on the governmental justification for a particular condition of detention, as opposed to bright-line rules or rigid analyses. *Bell*, 411 U.S. at 539.

15.   In light of all of the above, this Court thus concludes that it must conduct its analysis of Plaintiffs' constitutional claims against the backdrop of these justifications—namely, the unique nature of Tucson Sector Border Patrol's law enforcement purpose and the operational challenges of detention that come with it. Moreover, this Court determines that it will give deference to Tucson Sector's administration of its Border Patrol stations and will not attempt to apply blanket rules from inapplicable case law that contain solutions designed to address dissimilar facilities and dissimilar forms of custody.

### i.   *Sleep*

16.   Plaintiffs have not shown that the conditions in Tucson Sector deprive individuals in Border Patrol custody the opportunity to sleep in a manner that violates any constitutional due process requirements.

17.   Moreover, Plaintiffs have not shown that any conditions in Tucson Sector stations related to the ability of an individual to sleep while in Tucson Sector custody are arbitrary, nor have Plaintiffs shown that such conditions are not reasonable in light of unique and important governmental interests.

18.   Tucson Sector's practices with regard to sleep, as discussed above, meet the standard for constitutional due process, particularly in light of the short-term duration of custody for the vast majority of individuals in Tucson Sector and the operational needs of Tucson Sector Border Patrol. Tucson Sector's practices in this regard are reasonably based on Border Patrol's interest in the safe, efficient, and effective administration of their short-term holding facilities.

19.   Plaintiffs' have not established that beds are necessary for constitutional compliance in the context of Border Patrol custody in the Tucson Sector. As the Ninth Circuit recognized in this case, "the [Tucson Sector] stations are not set up to accommodate beds. Defendants have neither the space for beds and mattresses, nor, presumably, beds and mattresses that might be immediately moved to the stations." *Doe v. Kelly*, 878 F.3d 710, 721–22 (9th Cir. 2017). While the Ninth Circuit did note that evidence of a continuing need for beds might be relevant to consideration of Plaintiffs' request for a permanent injunction, *id.*, Plaintiffs have not shown that such need exists. The constantly fluctuating numbers of individuals in Tucson Sector custody, and the fluctuations of time in custody—which are generally very short, but occasionally may be longer during times of influx—mean that there is not a continuing and ongoing need to provide additional sleeping accommodations, particularly in light of the serious operational considerations that would be negatively impacted by such a requirement.

20.   This Court concludes that Plaintiffs have not met their burden to establish any constitutional violation with regard to this claim.

21.   Even if this Court were to conclude that the existing conditions amount to a constitutional violation with regard to this claim, in order to adhere to *Bell*'s guidance, any permanent injunctive relief the Court were to order must be weighed against Tucson Sector's functions, operational needs, and whether such a remedy would be excessive in light of legitimate governmental interests. The *Bell* analysis also requires that this Court take into account the fact that the vast majority of the Plaintiffs here are detained at relatively rugged Border Patrol stations, because of their own choice to illegally cross the U.S. border in remote areas of the Southwest desert, often in the dark of night. The "purpose of the [Tucson Sector] stations is to process the detainees as efficiently as possible so that they may be transferred to other facilities or released." *Doe*, 878 F.3d at 721.

22.   Moreover, a bright-line injunction mandating the distribution of sleeping mats or the provision of beds or other fixed sleeping accommodations after a time-in-custody threshold, regardless of the circumstances, would effectively impose a population cap on the number of individuals who could be detained at Border Patrol stations in the Tucson Sector. Such a cap could thus require Defendants to release individuals into the United States in derogation of fundamental principles of national sovereignty. *See*, e.g., *Landon* v. *Plasencia,* 459 U.S. 21, 32 (1982) ("This Court has long held that an alien seeking initial admission to

the United States requests a privilege and has no constitutional rights regarding his application.").

23.   Therefore, to the extent this Court were to order a permanent remedy, the Court declines to order any bright-line requirement in this regard, but instead orders that Defendants continue to provide mats consistent with the manner in which it has implemented this Court's preliminary injunction. This Court further provides that Defendants' long-term implementation of the requirement to provide mats to individuals in custody for longer than twelve hours may take into account fluctuations in numbers of individuals who will be in Border Patrol custody at any given time, and may allow for flexibility in the event that such fluctuations pose legitimate concerns about the capacity of Tucson Sector stations and the effect of more limited capacity on the ability of Border Patrol to conduct its operations.

24.   This Court thus concludes that Defendants' objection to a rigid mandate to provide a mat is not a result of an intent to deprive an individual of a means to sleep regardless of how long it holds that individual in their custody. Rather, the timing and provision of a mat should be at least responsive to the unique practical difficulties of operating a Border Patrol station, let alone operating such a station during border "surge" situations when capacity is paramount.

### ii. *Hygiene and Sanitation*

25.   Plaintiffs have not shown that the conditions in Tucson Sector deprive individuals in Border Patrol custody of any constitutional due process rights with regard to hygiene and sanitation.

26.   Moreover, Plaintiffs have not shown that any conditions in Tucson Sector stations related to hygiene and sanitation are arbitrary, nor have Plaintiffs shown that such conditions are not reasonable in light of unique and important governmental interests.

27.   Tucson Sector's practices with regard to hygiene and sanitation, as discussed above, meet the standard for constitutional due process, particularly in light of the short-term duration of custody for the vast majority of individuals in Tucson Sector and the operational needs of Tucson Sector Border Patrol. Tucson Sector's practices in this regard are reasonably based on Border Patrol's interest in the safe, efficient, and effective administration of their short-term holding facilities.

28.   Practical considerations support the denial of Plaintiffs' assertion that detainees have a right of access to showers. *See, e.g.*, *Doe*, 878 F.3d at 722. Unlike body wipes, which can be efficiently distributed, "providing showers for thousands of detainees raises substantial security

and logistical concerns." *Id*. Further, diverting Defendants' limited human and physical resources to provide detainees with showers would almost certainly slow down the processing of detainees, thereby encumbering Defendants' primary mission and prolonging the time that individuals spend in Border Patrol custody.

29.   Allowing Defendants to provide Plaintiffs with body wipes to maintain a minimal level of personal hygiene is sufficient for the vast majority of individuals who pass through Tucson Sector stations, particularly where those individuals are in custody for only a short-term duration. Moreover, Tucson Sector has shown that it does provide showers, when operationally feasible, for individuals who are in custody for forty-eight (children) or seventy-two (adults) hours, and it is taking steps to expand its ability to provide showers in more locations, thus providing assurance that for the smaller number of individuals whose custody is of a longer duration, showers are likely to be available. The practice of providing shower wipes to all individuals, and providing showers only where an individual's stay is of a longer duration, is consistent with—and does not violate—constitutional due process. *Id*. (Although Plaintiffs have a right to hygiene, "the Constitution does not requires access to a shower within 12 hours or even 24 hours.").

30.   Plaintiffs' claim with regard to hygiene and sanitation is denied.

### iii.   *Medical Care*

31.   Plaintiffs have not shown that the conditions in Tucson Sector deprive individuals in Border Patrol custody of any constitutional due process rights with regard to medical care.

32.   Applicable case law "allows considerable flexibility as to when and how constitutionally 'adequate medical care' is provided." *Doe*, 878 F.3d at 722. Indeed, while Plaintiffs are entitled to adequate medical care, Ninth Circuit precedent "does not require that all stages of medical care be provided by trained medical staff." *Id*. at 724. Rather, "before directing an agency to retain medical personnel, a court must first evaluate whether the government's proposed plan adequately meets the detainees' medical needs." *Id*. Plaintiffs have not shown that the conditions in Tucson Sector stations deprive individuals in Border Patrol custody of medical care in a manner that violates any constitutional due process requirements. Plaintiffs have not shown any ways in which class members' medical needs are not being met. Plaintiffs also have provided no evidence that individuals in the custody of Tucson Sector Border Patrol are routinely harmed by any failure to provide adequate medical care.

33.   Plaintiffs also have not shown that any conditions in Tucson Sector Border Patrol related to the provision of medical care to individuals in custody are arbitrary, nor have Plaintiffs

shown that such conditions are not reasonable in light of unique and important governmental interests. Specifically, Tucson Sector provides medical care through a combination of screening by agents both in the field and at the stations, screening and treatment by on-site medical professionals, and treatment at off-site medical facilities by outside medical professionals. This combination and continuum of care protects the medical and health needs of Plaintiffs, while at the same time taking into account the short-term nature of Border Patrol custody and the limited space at Tucson Sector stations that must also be kept available for Border Patrol's processing and operational needs.

34.   This Court concludes that the existing system of medical care is adequate to meet Plaintiffs' medical needs, and therefore Plaintiffs' claim with regard to medical care is denied.

### iv.   *Warmth*

35.   Plaintiffs have not shown that their due process right to adequate shelter has been violated by reason of a purported deprivation of adequate warmth.

36.   The Supreme Court has held that "a low cell temperature at night combined with a failure to issue blankets" could establish a constitutional claim for deprivation of warmth. *Wilson v. Seiter,* 501 U.S. 294, 304 (1991). Here, however, the evidence shows that Tucson Sector does issue blankets to individuals in its custody. Moreover, this Court concludes that Tucson Sector's practice of maintaining hold room temperatures between 66 and 80 degrees— regardless of the issuance of blankets—does not rise to a constitutional deprivation. *See Daniels v. Hickey*, No. 11-cv-4151, 2012 WL 4759235, at *9 (N.D. Ill. Oct. 5, 2012) (holding that cell temperatures between 60 and 70 degrees did not constitute a deprivation of warmth).

37.   Defendants' policy of maintaining Tucson Sector hold rooms at temperatures between 66 and 80 degrees is reasonable in light of the operational need to ensure the comfort, health, and safety of both detainees and Border Patrol agents in the stations, as well as the practical need to maintain a range that works for a number of facilities in different locations and with vastly fluctuating numbers of individuals in custody. The temperature range utilized by Tucson Sector does not create a risk to the health and safety of the individuals being held in its custody. Moreover, Plaintiffs have provided no evidence of any individual who suffered harm as a result of the temperature in any Tucson Sector station, let alone any widespread harm.

38.   Plaintiffs likewise have not shown that the temperature range maintained in Tucson Sector stations is arbitrary or designed to punish individuals in custody.

39.   Tucson Sector's practices with regard to the temperature at its facilities, as discussed above, meet the standard for constitutional due process, particularly in light of the short-term duration of custody for the vast majority of individuals in Tucson Sector and the operational needs of Tucson Sector Border Patrol. When considering the circumstances, nature, and duration of Plaintiffs' alleged deprivation of adequate warmth, this Court determines that no constitutional violation has occurred.

   *v.   **Nutrition***

40.   Plaintiffs have not shown that the conditions in Tucson Sector deprive individuals in Border Patrol custody of any constitutional due process rights with regard to the provision of food and water or adequate nutrition.

41.   The Ninth Circuit has held that the Constitution only requires that food be "adequate to maintain health; it need not be tasty or aesthetically pleasing." *LeMaire v. Maass*, 12 F.3d 1444, 1456 (9th Cir. 1993) (citation omitted) (holding that a diet solely consisting of "Nutraloaf," a tasteless bread that provided the daily caloric needs of detainees, was constitutional because a temporary Nutraloaf diet does not deny "the minimal civilized measure of life's necessities."); *see also Hutto v. Finney,* 437 U.S. 678, 686–87 (1978) (stating that serving inmates a tasteless food concoction called "grue", which provided only 1000 calories a day, was not unconstitutional if served temporarily, but could become unconstitutional if served for "weeks or months."). Similarly, regarding an individual's right to potable water, merely because water "comes from the sink next to the toilet" does not establish that the water is unsanitary. *Mendiola–Martinez v. Arpaio*, 836 F.3d 1239, 1243, 1259 (9th Cir. 2016).

42.   Here, Plaintiffs have not shown that any conditions in Tucson Sector Border Patrol related to the provision of food and water or adequate nutrition are arbitrary, nor have Plaintiffs shown that such conditions are not reasonable in light of the unique and important governmental interests.

43.   Tucson Sector's practices with regard to the provision of food and water, as described above, meet the standard for constitutional due process, particularly in light of the short-term duration of custody for the vast majority of individuals in Tucson Sector and the operational needs of Tucson Sector Border Patrol. Potable water is available to all individuals, and the food provided is adequate in light of the short duration of Border Patrol custody. Tucson Sector's practices in this regard are reasonably based on Border Patrol's interest in the safe, efficient, and effective administration of their short-term holding facilities.

44.   Accordingly, Plaintiffs' nutrition claim is denied.

Respectfully submitted,

January 6, 2020                              By: */s/ Michael A. Celone*

JOSEPH H. HUNT
Assistant Attorney General
Civil Division

WILLIAM C. PEACHEY
Director

WILLIAM C. SILVIS
Assistant Director

SARAH B. FABIAN
CHRISTINA PARASCANDOLA
MICHAEL A. CELONE
Senior Litigation Counsels

KATELYN MASETTA-ALVAREZ
Trial Attorney
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 305-2040

Attorneys for Defendants