1            IN THE UNITED STATES DISTRICT COURT

2               DISTRICT OF ARIZONA

3  Jane Doe #1; Jane Doe #2; Norlan Flores,
on behalf of themselves and all others

4  similarly situated,

                      CV-15-250-TUC-DCB

5        Plaintiffs,

                    January 14, 2020

6  v.                      9:17 a.m.
                      Tucson, Arizona

7  Chad Wolf, Acting Secretary of Homeland
Security; Mark A. Morgan, Acting

8  Commissioner, U.S. Customs and Border
Protection; Carla L. Provost, Chief of

9  United States Border Patrol, in her official
capacity; Roy D. Villareal, Chief Patrol

10  Agent-Tucson Sector, in his official
capacity,

11

          Defendants.

12

13  _____

14       REPORTER'S OFFICIAL TRANSCRIPT OF PROCEEDINGS

15                 BENCH TRIAL

16                   DAY TWO

17            (PART ONE OF TWO)

18       BEFORE THE HONORABLE DAVID C. BURY
           UNITED STATES DISTRICT JUDGE

19

20

21

22  Court Reporter:       Erica R. McQuillen, RDR, CRR
                 Official Court Reporter

23                 405 W. Congress Street
                 Tucson, Arizona 85701

24                 (520)205-4267

25     Proceedings Reported by Stenographic Court Reporter
     Transcript Prepared by Computer-Aided Transcription

```
 1                    A P P E A R A N C E S

 2   For the Plaintiffs:

 3        Jack Williford Londen
          Elizabeth Gilmore Balassone
 4        Morrison & Foerster, LLP
          425 Market Street
 5        32nd Floor
          San Francisco, California 95105
 6
          Colette Reiner Mayer
 7        Morrison & Foerster, LLP
          755 Page Mill Road
 8        Palo Alto, California 94304

 9

10   For the Defendants:

11        Sarah B. Fabian
          Katelyn Masetta-Alvarez
12        Michael Anthony Celone
          United States Department of Justice
13        P.O. Box 868 Ben Franklin Station
          Washington, D.C., 20044
14
          William Charles Silvis
15        United States Department of Justice
          Civil Division of Immigration Litigation
16        450 Fifth Street NW
          Washington, D.C., 20001
17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

1                          EXAMINATION INDEX

2   ELDON VAIL
          DIRECT BY MR. LONDEN  . . . . . . . . . . . . . . . 6
3         CROSS BY MR. SILVIS . . . . . . . . . . . . . . . 31
          REDIRECT BY MR. LONDEN . . . . . . . . . . . . . 102
4

5
                           EXHIBIT INDEX
6

7   Exhibit Number              Offered                  Admitted

8   1.1                            7                        8

9   917                           10                       10

10  1229                           9                        9

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2              THE COURT:  Can we go ahead and start?

 3              Mr. Vail, do you want to take the stand, please,

 4    sir.

 5              THE CLERK:  In Civil Matter 15-250, Doe, et al., vs.

 6    Wolf, et al., on for bench trial day two.

 7              Counsel, please state your appearances.

 8              MR. LONDEN:  Jack Londen of Morrison & Forester,

 9    Your Honor, for plaintiffs.

10              MS. MAYER:  Colette Reiner Mayer for Morrison &

11    Forester on behalf of the plaintiffs.

12              MS. FABIAN:  Good morning, Your Honor.  Sarah

13    Fabian, Department of Justice, for defendants.  We have Will

14    Silvis here as well, Michael Celone, Kate Masetta-Alvarez and

15    Christina Parascandola will be here shortly, and our

16    paralegal, Brittney Kershaw.

17              THE COURT:  Okay.

18              MS. FABIAN:  Your Honor, one matter that we,

19    Mr. Londen and I, discussed this morning, defendants had

20    raised the issue of Your Honor potentially visiting a Border

21    Patrol station during, well, at any time, but you had I

22    believe said that, if you were interested, it might be during

23    the course of the trial.

24              Defendants -- or plaintiffs have told me that they

25    don't oppose defendants offering Your Honor the option to come
```

 1    visit, we could do it.  So we haven't discussed details.  We

 2    would defer to whatever Your Honor wanted to do, but I wanted

 3    to raise that now so that you could do it at your leisure and

 4    let us know whatever time.

 5              THE COURT:  If at all.

 6              MS. FABIAN:  Okay.  The one proposal we had, and I

 7    just throw this out there, one of our witnesses is slated to

 8    testify to give a little bit of that background about what is

 9    the station like, what is -- you know, what will you find when

10    you go there.  We could use photographs for that.  But another

11    option would be, to cut down on part of her testimony, to do a

12    walk-through with her showing those things with counsel

13    present, and that would sort of be a part of her -- that would

14    cut out the need for her to testify on that, but Your Honor

15    would be able to see for yourself.

16              THE COURT:  Okay.

17              MR. LONDEN:  Your Honor, we think it might be

18    informative and don't oppose a visit.  I've said our one

19    concern is having a record of oral exchanges so that we

20    know -- so that we can respond to any information that needs

21    rebuttal.  We might do that by having an agreed statement,

22    which I'm sure we could work out, if attorneys accompanied you

23    on the visit, if you do decide to do it.

24              THE COURT:  All right.  I'll think about it.

25              We left off with your thinking about Mr. Vail and

 1  whether you had any further questions, I guess.

 2          MR. LONDEN:  If I gave Your Honor that impression, I

 3  didn't have any doubt that I have further questions, but not

 4  lengthy --

 5          THE COURT:  Oh, all right.  Go ahead.

 6          MR. LONDEN:  -- as these things go.

 7          THE COURT:  Okay.

 8          MR. LONDEN:  Mr. Lucero, could you put up the

 9  exhibit that's been marked Plaintiffs' 1228.

10          To identify this, Your Honor, this is Plaintiffs'

11  Demonstrative Exhibit 1.1.  It's been referred to frequently

12  in the record, and I would like to ask Mr. Vail some questions

13  about it and offer it for admission.

14          THE COURT:  Go ahead.

15              ELDON VAIL, WITNESS, PREVIOUSLY SWORN

16                      DIRECT EXAMINATION

17  BY MR. LONDEN:

18  Q.   What is this, Mr. Vail?

19  A.   This is the mat count for four Tucson Border Patrol

20  facilities as determined by the diagrams that we created that

21  shows six inches around each mat.

22  Q.   And looking at the one on the left entitled "TCC," it

23  cites to Joint Trial Exhibit 630, which is in evidence, do you

24  know whether those counts correctly reflect the counts of mats

25  in the diagrams in 630?

1    A.   Yes, these totals match the results of the individual

2    diagrams.

3    Q.   How do you know?

4    A.   I've looked at them, compared them.

5    Q.   And is that true also of Casa Grande, Joint Trial Exhibit

6    627; Douglas, Joint Trial Exhibit 628; and Nogales, Joint

7    Trial Exhibit 629?

8    A.   Yes.

9         MR. LONDEN:  Your Honor, we offer this into

10   evidence.

11        THE COURT:  Say again, this is a count based upon

12   his calculations of the sufficient room between the mats so

13   folks can move around?  Is that --

14        MR. LONDEN:  To be real clear, I'll ask Mr. -- I'll

15   ask to put up, for example, 630, page 20.  Exhibit 630, page

16   20, Mr. Lucero.

17   BY MR. LONDEN:

18   Q.   So this is a -- well, you tell us what this is, Mr. Vail.

19   A.   Well, this is applying the guidelines of putting the mat

20   down and making room around each mat approximately six inches,

21   to be able to walk, so you can get to the bathroom, so you can

22   get to the front door of the cell.

23   Q.   So in each of these instances, you've compared the counts

24   on this Plaintiffs' Exhibit 1228, one-page exhibit, to

25   counting the mats in each of the cells listed, and the totals

1  match up; right?

2  A.   That's correct.

3            THE COURT:  All right.  There's been an offer of

4  1.1.

5            MR. SILVIS:  No objection.

6            THE COURT:  All right.  It's admitted.

7            MR. LONDEN:  And Your Honor, for our record, I've

8  referred to it as Plaintiffs' Demonstrative Exhibit 1.1 in

9  previous testimony primarily in order to keep the numbers

10  confidential.  That is the same exhibit, I'm saying for the

11  record, as what's now Exhibit -- Plaintiffs' Exhibit 1228 in

12  evidence, based on Your Honor's just having admitted this.

13            THE COURT:  Okay.

14  BY MR. LONDEN:

15  Q.   Look at Plaintiffs' Exhibit 1229.  What is this?

16  A.   If you apply the American Correctional Association

17  standards to the available square feet in each of the hold

18  cells at Tucson, this is the number of beds, number of mats

19  that would be appropriate.

20  Q.   And the black and white part of this exhibit is copied

21  from the second page of the admitted exhibit regarding TCC;

22  correct?

23  A.   Yes.

24  Q.   That was 630, or I will say that was 630, page 2.

25            Where does -- and the colored part, "Area Divided By 35,"

1    what is that?

2    A.   That's the result of applying the square feet, the

3    American Correctional Association square feet standards, and

4    dividing by 35, which is the standard, into the available

5    square feet in each one of the hold rooms.

6    Q.   And how do you know that?

7    A.   I watched the exercise take place, and some of them are

8    fairly simple I can do off the top of my head, but they're

9    correct.

10           MR. LONDEN:  Your Honor, again, this is a

11   demonstrative exhibit that we referred to many times so that

12   we could give the numbers by putting them on paper and not

13   saying them out loud.  I'd like, for the sake of our clear

14   record, to admit this as 1229, move its admission.

15           MR. SILVIS:  No objection.

16           THE COURT:  All right.  1229 is admitted.

17           MR. LONDEN:  Could you please put up, Mr. Lucero,

18   507.143.

19           Your Honor, again, if you forgive the housekeeping,

20   we put in screenshots with all the videos, because videos are

21   hard, less inconvenient, to the review in the record.  This is

22   another screenshot.  It is of cell 19, set of screenshots,

23   cell 19, September 17, 2019, and it reflects a time period

24   that encompasses that of videos 507.146, 507.147, and like the

25   other exhibits, videos, and screenshots, this a public

DIRECT OF ELDON VAIL
JANUARY 14, 2020 (DAY 2, PART 1)

 1  exhibit having been redacted.  We'd offer it in evidence.

 2          I'm sorry.

 3  BY MR. LONDEN:

 4  Q.   Mr. Vail, have I correctly described this exhibit?

 5  A.   Well, this picture's 9/16, not 9/17, but other than that,

 6  yes.

 7  Q.   It starts at 9/16 at what time?

 8  A.   At 6 p.m.

 9  Q.   And if you go to the last page, page 35.

10          MS. MAYER:  Jack, it's not up on the screen.  It's

11  not public.

12  A.   It's 9/17 at 5:34 a.m.

13          MR. LONDEN:  Your Honor, we'd offer this in

14  evidence.

15          MR. SILVIS:  No objection.

16          THE COURT:  All right.  917 is admitted.

17          MR. LONDEN:  I can move on, Your Honor.  I wanted to

18  get these things in the record.

19          THE COURT:  All right.

20  BY MR. LONDEN:

21  Q.   Mr. Vail, one of the conditions of confinement at issue

22  in this case is deprivation of sleep.  First do you have

23  knowledge about general practices of jails with regard to

24  facilitating sleep by detainees?

25  A.   Yes, I do.

1  Q.   How do you know about that?

2  A.   Well, I think I referenced yesterday I've done some

3  research exploring what exists in administrative code in other

4  states and found it pretty typical that beds, linen, bedding,

5  is authorized.

6      I've also inspected jails in different parts of the

7  country.  I inspected a jail in New Jersey related to some

8  litigation there and looked at many cells.  They had beds.

9  They had bedding.  They had pillows, mattresses.

10     Did the same thing in the state of Florida, the Broward

11  County Jail, which is actually four jails, inspected all of

12  them, looking at the housing units and the conditions under

13  which prisoners were living, and they too had beds and

14  bedding.

15     Have inspected three jails in St. Louis and St. Louis

16  County.  All were individual city jails, and in those

17  facilities particularly I looked at the holding area, when

18  someone would come into the jail.  Two of those cases are

19  still ongoing.  In one of those cases I inspected the jail,

20  had been retained by plaintiff's counsel, and when I was done,

21  I indicated to them I didn't think I could help them, that to

22  me it looked like it was up to standard.

23     I was hired by Sacramento County Sheriff, who was facing

24  litigation about conditions in his jail, two large jails,

25  inspected those two facilities, and again, prisoners had beds

1    and mattresses and bedding.

2        In my home state, in Mason County, Washington, relatively

3    small jail, I inspected it, looked at the holding area where

4    people come in when they're initially sent to the jail, and

5    then looked at their areas where that person would go after

6    they completed the initial assessment process, and they too

7    had beds and mattresses and bedding.

8        Also in Washington I've inspected the ICE facility there.

9    There is a bill in our legislature to move some nonviolent

10   offenders before their sentences were over to ICE so that they

11   could be deported.  There was some controversy about that.

12   Our Governor contacted Janet Napolitano, who was a friend of

13   hers, and Ms. Napolitano sent out Dora Schriro, who I actually

14   knew.  She was the previous Secretary of Corrections or

15   Director of Corrections in the states of Missouri and Arizona

16   at the time, and together we escorted some legislators through

17   the ICE facility and looked at the conditions there, and they

18   too had beds and mattresses and linen.

19       So I've had that experience in jails, particularly, or in

20   one case ICE.

21   Q.   Are there generally accepted standards for practices in

22   jails to facilitate sleep?

23   A.   There are, yes.

24       MR. LONDEN:  Please put up Joint Trial Exhibit 48 in

25   evidence at page 6, please.

DIRECT OF ELDON VAIL
JANUARY 14, 2020 (DAY 2, PART 1)

1   BY MR. LONDEN:

2   Q.   What is this?

3   A.   This is an ACA standard, American Correctional

4   Association standard, and I have to scroll down to find

5   anything about beds, I believe.  I'm not seeing it here.

6        There we go.  Whoops.  You were there at the last page.

7            MR. LONDEN:  The page you were just at, Mr. Lucero.

8            THE WITNESS:  No, keep going.  There we go.  Stop.

9   A.   This is a standard.  It says, "Each inmate confined in a

10  cell/room is provided with the following:  a sleeping surface

11  and mattress that allows the inmate to be at least 12 inches

12  off of the floor."

13       There's another section of the standards that talk about

14  bedding, I believe.

15  Q.   Could we look, please, at Exhibit 48 in evidence at page

16  13, I think.  "Bedding issue."

17       Is that a relevant standard?

18  A.   Yes.  "Inmates are issued suitable clean bedding and

19  linens, including two sheets, pillowcase, pillow, one

20  mattress, not to excluded a mattress," et cetera.

21  Q.   To your knowledge, are these standards generally followed

22  by jails?

23  A.   In my experience, these standards are generally followed.

24  There is some times in intake process where someone will be in

25  a holding area, it might have a bench, it might have a bunk.

1    But that's a relatively short-term time frame, and once that

2    initial assessment is completed, then they are typically and

3    generally moved to a bed in a cell or a dormitory.

4    Q.   Let's look at the 2008 Hold Room Policy marked as Joint

5    Trial Exhibit 9 in evidence, and let's look at page 9.

6         Section 6.11 is entitled, Bedding."  Could you highlight

7    -- blow that up for us.

8    A.   This says, "Detainees requiring bedding will be given

9    clean bedding.  Only one detainee will use this bedding

10   between cleanings.  This bedding will be changed every three

11   days and cleaned before it is issued to another detainee.

12   Vinyl or rubber-coated mattresses will be disinfected before

13   being reissued."

14   Q.   All right.  Does this standard define which detainees

15   require bedding?

16   A.   It does not.

17   Q.   How does Tucson Sector's practices with respect to

18   facilitating sleep compare to the general practices of jails?

19   A.   They're very different.  The practice of sleep in the

20   holding facilities in Tucson, they never move out of the hold

21   room.  Whether they're there for 12 hours or 72 hours or

22   longer, they're expected to sleep in that area.

23   Q.   And what do they sleep on?

24   A.   They sleep on mats on the floor.

25   Q.   What are the prevailing practices of jails, to your

DIRECT OF ELDON VAIL
JANUARY 14, 2020 (DAY 2, PART 1)

1   knowledge, with respect to level of light at the nighttime?

2   A.   I've not seen a facility that didn't dim the lights

3   during typical sleeping hours.  It's unusual to keep them on

4   all night long.

5   Q.   How about practices with regard to the frequency of

6   interruptions?

7   A.   Well, the advantage of a bed is that you assign a person

8   to a bed so you know where they are.  So if you've got to wake

9   someone up in the middle of the night, you can go to that bed

10  and wake that person up and do whatever you have to do.

11  That's different than what happens in the Border Patrol

12  facilities.  They know the person's in a holding cell, but

13  there may be many other people in there.

14       So they've got to I assume holler out a name to get that

15  person up.  That's going to disrupt all of those other people

16  who are sleeping.

17  Q.   And together, how do these differences in practice from

18  what prevails in jail generally affect the ability of

19  detainees to get a night's sleep when they're held overnight?

20  A.   Well, in addition to the external interruptions, as we

21  saw from the videos, there's interruptions of sleep because

22  there's not enough room, for example, to get into the cell or

23  to get to the bathroom, so people are disturbed during their

24  sleep while other folks need to perform basic bodily

25  functions.  In addition, those blankets make noise, and that's

DIRECT OF ELDON VAIL
JANUARY 14, 2020 (DAY 2, PART 1)

1   likely to wake some folks up.

2       I'm sorry.  Could you ask me the question again?

3   Q.  I'll ask you a fresh question.

4   A.  Okay.

5   Q.  Is there a relation between the duration of detention for

6   a given detainee and the deprivation caused by using

7   mattresses on the floor instead of beds?

8   A.  The situation that exists in the Border Patrol facilities

9   for sleep is much more severe than anything I've seen in any

10  jail or in any prison.  I did -- I have indicated and do

11  acknowledge that sometimes people are in holding areas for a

12  while before they're assigned a bed, but I've never seen a

13  situation where they're kept in the hold rooms beyond a

14  reasonable capacity level for several days.

15      So one day I understand.  It's a difficult process that

16  the agents go through to figure out who they've got, but

17  beyond that, the length of time, the duration, extends far

18  beyond anything I've even remotely seen in any jail that I've

19  been in or any prison I've been in.

20  Q.  Have you yourself had any experience with the use of mats

21  on the floor for sleeping in a jail or detention facility,

22  aside from Tucson Sector?

23  A.  Yeah, I've faced the problem of mats on the floor in my

24  own career, and I referenced yesterday, when I worked at the

25  state reception center and was responsible for receiving all

1    the people who are committed from the counties and the state

2    and getting them processed and on to the next location.

3        When I got that assignment, it came with direction from

4    the Secretary, the Secretary of the department at the time,

5    that he was concerned for safety and security because we were

6    overcrowded there, and we had men sleeping on the floor.

7    Q.    What did you do about it?

8    A.    Well, his assignment to me was to get him off the floor.

9    So he was relatively new in the -- in his role, and he was

10   trying to get a handle on the system, and it was a fairly

11   decentralized system, so we did a couple things.

12       My task at the facility was to examine what it takes to

13   process someone once we receive them from the court and figure

14   out where the roadblocks are and speed up that process so we

15   were ready to move people quicker.

16       The other thing that we needed to do, in exercising his

17   authority, essentially, is that took away some leeway of local

18   institutions, individual superintendents, who historically had

19   been deciding how many people they would take, even though

20   they had available beds.  And sometimes they would argue about

21   who they would take because they know some prisoners they

22   didn't want.

23       That went away.  We became much more of a system so that,

24   once the person was ready to be transferred to the next

25   institution, they went there.  There was -- we eliminated the

DIRECT OF ELDON VAIL
JANUARY 14, 2020 (DAY 2, PART 1)

1   delays and the logjams, and we got people off the floor as a

2   result of doing that.

3   Q.   You stated that jails generally provide bedding, meaning

4   a blanket, sheets, and a pillow?

5   A.   Yes.

6   Q.   Are you aware of any use of Mylar blankets instead of

7   bedding for overnight sleep anywhere other than Tucson Sector?

8   A.   I've never seen Mylar blanket used in a correctional

9   institution.  I've seen Mylar blankets made available to

10  prisoners who are fighting fires out in the woods, which is a

11  typical practice in our state.

12  Q.   What difference does it make in facilitating sleep to

13  provide blankets, sheets, and a pillow compared to a Mylar

14  sheet?

15  A.   It is -- it's hard to -- let me start over again.

16       When most of us lay down at night, we lay down on a

17  blanket or on a mattress with a blanket and a sheet.  That's

18  typically how we sleep.  To expect people to do that for more

19  than that, maybe one night, I think is particularly

20  disrespectful to the folks in custody.

21  Q.   Does the level of crowding in Tucson Sector, especially

22  TCC, during recent months affect the ability of detainees to

23  get a night's sleep?

24  A.   I think that's a significant aggravating factor here, and

25  as we saw from all the data that we looked at, there's more

DIRECT OF ELDON VAIL
JANUARY 14, 2020 (DAY 2, PART 1)

1  and more people who are subjected to those conditions for

2  longer periods of time.  It would be one thing if there were

3  fewer people in those holding cells consistent with ACA

4  standards.  You're at least not having to touch the person,

5  the stranger, probably, that you're laying down next to and

6  try to get a night's sleep.  You have a little bit more

7  physical room.

8      But that's not the case over and over again, especially

9  at TCC.  That was the problem that we saw back in 2015, and

10  it's four years later, and that problem continues and, in

11  fact, is getting worse.

12  Q.  Let me turn to the issue of sanitation.  Are there

13  standards that tell us about the availability of showers for

14  detainees in jail?

15  A.  I went through the same exercise that I did for beds and

16  bedding, looking at administrative rules around the country,

17  and showers are referenced frequently in state standards.  It

18  says -- there's a range of things that it says, but primarily

19  what is said is that it's either upon arrival or within 24

20  hours, or sometimes it's a little more vague, just says

21  showers are available.

22      But when it's referenced, it's clear that, from the

23  state -- review of state standards, that showers are

24  recognized as something that's important when you're receiving

25  somebody into confinement.

DIRECT OF ELDON VAIL
JANUARY 14, 2020 (DAY 2, PART 1)

1  Q.   And do you have experience -- based on your experience

2  inspecting jails, what's the general practice as to frequency?

3  A.   There's some variation, but that variation depends on the

4  nature of the housing unit.  Prisoners in general population,

5  in other words, they have a cell, they're living in a dorm,

6  but there's a lot of out-of-cell time, showers are available

7  when necessary.  When a person feels like they need to take a

8  shower, then they can take a shower.  In some states there's

9  requirements that showers are mandatory, you have to take a

10 shower twice a week.  I saw that in a couple of jurisdictions.

11      But in other kinds of housing units, for example, housing

12 units where prisoners are locked down most of the day,

13 typically segregation units, the standard is three showers a

14 week, and that's something that I look at when I have cases

15 related to solitary confinement.

16 Q.   Let's look at the ACA standards, Joint Trial Exhibit 48,

17 and let's look at page 16.  And about the middle of the page,

18 do you see the --

19          MR. LONDEN:  Mr. Lucero, could you blow up the

20 section that starts with, "Inmates have access to operable

21 showers."

22 A.   Yeah, this is one of them that says -- it simply says

23 inmates have access to showers, hot and cold running water,

24 and then it goes ahead to describe the ratio of showers

25 necessary per prisoner.

DIRECT OF ELDON VAIL
JANUARY 14, 2020 (DAY 2, PART 1)

1  Q.   And is this a standard that is generally followed in your

2  experience with jails?

3  A.   It is entirely consistent from what I've seen in jails,

4  yes.

5  Q.   Are detainees in Tucson Sector able to take actual

6  showers?

7  A.   Not very often.  To my knowledge, historically, there's

8  only been showers in two locations.  I've seen some

9  information that more showers might be added.  That would be a

10  good thing.  The guidelines that I've read in material in

11  preparation for this case talk about making an effort to give

12  children a shower when they approach 48 hours in confinement

13  and making an effort to give adults a shower when they

14  approach 72 hours of confinement.

15  Q.   In your experience, can the capacity to provide

16  additional showers be increased without interfering with

17  processing and detention functions of a jail or in another

18  detention facility?

19  A.   Well, it's really a separate activity.  I don't think

20  that they're necessarily connected.  You can process someone

21  and then give them an opportunity to take a shower.

22  Q.   And how does a facility add to its number of showers,

23  shower cells?

24  A.   You build more showers.

25  Q.   Are temporary showers available?

1  A.   They are.  I put in my report, what we use when we take

2  prisoners out to fight fires, there's portable showers

3  available.

4         MR. LONDEN:  Could we put up 1218 in evidence,

5  please, Mr. Lucero.

6  BY MR. LONDEN:

7  Q.   Now, what does this show us?

8  A.   The title is, "Detainees held for longer than 12 hours

9  grouped by whether e3DM shows that they received a shower or a

10 wipe."  This is calendar year 2015 through November of 2019.

11 The blue line, blue color, shows those who received a shower

12 or a wipe, and orange is those who did not.

13 Q.   And in the blue line, as you understand the e3DM data, is

14 there anywhere telling how many actual showers are given?

15 A.   No, there's not.

16 Q.   Is a -- is the use of a paper shower or a wipe, how does

17 that compare to an actual shower with respect to sanitation?

18 A.   Well, I'm happy that they're there.  It's something that

19 didn't exist at the time of the preliminary hearing,

20 injunction hearing.  But it's not a shower.

21       And as I've said repeatedly, including in my report and I

22 think yesterday, when I've tried to do that, after I've worked

23 up a sweat working in my yard, it does an okay job on the

24 upper half of my body, but then it was useless.  It didn't

25 last longer than that.  And nor could I clean -- nor could I

1  clean my hair.

2      I don't know, I've never seen paper, these paper shower

3  things used in a jurisdiction in lieu of a shower, so it's an

4  outlier in terms of the practice.

5  Q.   How does the deprivation, if you will, or difference

6  between a shower and a wipe relate to the duration of

7  detention?

8  A.   Well, the longer you're there, the more you're going to

9  want to shower, the more you're probably going to need a

10  shower.  And again, if you return to the hold rooms when

11  they're -- at times when they're crowded, it just simply makes

12  it more difficult, more unpleasant, for the folks who are in

13  there.  It's one thing to be in that environment for a few

14  hours.  It's quite another thing to be there for 72 hours or

15  more.

16  Q.   Are there sanitation issues currently in Tucson Sector

17  that are other than providing showers?

18  A.   Yeah, I believe there are.  I mean, and that goes back to

19  mats on the floor, and what we saw in the photographs and

20  videos is that people have to walk on those mats to move

21  around the room.  That further contaminates them.

22      There's also a challenge sometimes in getting trash into

23  the trash can, and sometimes that is food that's not eaten.

24  We saw that in my own inspections.  There would be half-eaten

25  food in the trash can, but if you can't get to the trash can

1   because the holding room is too crowded, it's going to stay on

2   the floor, and that presents a contamination problem for

3   everybody in there.

4   Q.   Sleeping in toilets because of crowding?

5   A.   Yeah, that one's particularly difficult for me.  I've

6   once again never seen any situation where folks who were

7   detained by whatever authority are -- have to wind up sleeping

8   in a toilet.

9   Q.   Let me turn to the condition of warmth.  How does Tucson

10  Sector compare with other -- with jails, generally, with

11  respect to the practices for keeping detainees warm?

12  A.   It's a little bit different process, but there are some

13  similarities.  When you come into a jail, whatever street

14  clothes you have are given up, and you're put into government

15  clothing, for lack of a better phrase, but you're also given

16  bedding.

17       And it depends on the facility, but I don't know of a

18  facility that only gives clothes or only gives bedding.

19  You've got some ability to have a second wrap of cloth around

20  you.  I mean, I've seen circumstances, for example, in jail

21  where you just get a jumpsuit, but then you're going to get a

22  blanket.  And I do a lot of cell-to-cell conversations with

23  prisoners, and when it's cold, they're wrapped in a blanket.

24       That cloth blanket does a much better job at keeping you

25  warm than the Mylar blanket will.  It's a second layer of

1  clothing.

2  Q.   How many layers of clothing are permitted in Tucson

3  Sector?

4  A.   They take everybody down to one layer of clothing,

5  personal clothing.

6  Q.   Is there evidence that detainees are cold?

7  A.   If you look at the photographs, and I've spent a lot of

8  time looking at the photographs, no matter what time of day it

9  is, frequently they are wrapped in the Mylar blankets.

10  Q.   You mentioned interviewing detainees.  Does the subject

11  come up?

12  A.   When I interviewed detainees at the shelter in September,

13  it came up from all of the folks I talked to about how cold

14  they were, consistent with the declarations that were

15  submitted originally in this case, and that was also a common

16  theme of the detainees, that it's just simply cold.

17  Q.   If there are reasons to take away one of the layers of

18  clothing, what can be done to provide warmth?

19  A.   I think that there's a couple of options.  During one of

20  our inspections, there was a problem with the heat or the air

21  conditioning system, and somehow Border Patrol produced

22  sweatshirts, and everyone in that station had a sweatshirt on.

23  That's one thing that could happen.

24       If they limited the use of Mylar blankets to a short time

25  in the holding room and then were able to assign someone a bed

1  and then give them a cloth blanket, that will give them a

2  better tool in which to try to keep warm.

3  Q.   Let me ask you about food and water.  What food items do

4  you understand Tucson Sector stations provide to detainees?

5  A.   Mainly they give burritos and crackers and juice boxes.

6  They have some additional items available for kids.

7  Q.   How does Tucson Sector compare with the practices of

8  jails, generally, with respect to food provided?

9  A.   There's pretty extensive standards about providing food

10  to incarcerated populations that don't line up with the

11  practice in the Tucson Stations.

12      MR. LONDEN:  Could we put up Joint Trial Exhibit 48,

13  the ACA standards at page 10.  And could you highlight,

14  Mr. Lucero, the "Dietary Allowances" section at the bottom.

15  A.   Yeah -- excuse me -- this is typically the standard

16  that -- I don't know of any place where this is not the

17  standard, that a dietitian takes a look at the menu and says,

18  this is okay.  That's the practice in every place I know or

19  every place that I've been.  It's an easy standard to follow,

20  and I don't know why that hasn't happened for folks in the

21  Border Patrol.

22      MR. LONDEN:  Let's look at Plaintiffs' Exhibit 910

23  in evidence at page 106.  These are the ICE requirements for

24  facilities that it will allow to hold its detainees, and at

25  the bottom, Mr. Lucero, please highlight, "Nutritional

 1    Analysis."

 2    BY MR. LONDEN:

 3    Q.   What does this tell us?

 4    A.   This is consistent with the standard that we've just

 5    said, that there's an annual nutritional analysis of every

 6    master cycle menu plan.  The menus must be certified by a

 7    dietitian.

 8    Q.   What is the effect of the diet in Tucson Sector stations

 9    on inmates, detainees rather?

10    A.   Again, I think it relates to the issue of how long it

11    goes on.  Universally -- well, not universally.  That's too

12    strong.  It's not a tasty meal for lots of folks, but so what

13    if it's a day.  But if you're in there for three days or

14    longer, I don't think that's the right thing to do.  You need

15    to have food that is nutritious, food that responds to

16    individual dietary needs, foods that respond to religious

17    needs, and that's not possible, I don't think, in what happens

18    at the Border Patrol facilities.

19    Q.   What are your observations about the state of providing

20    drinkable water now in Tucson Sector stations?

21    A.   When we started or when I started paying attention to

22    this set of issues, I think water was much more of a

23    challenge, and I saw a difference in a couple of ways from my

24    first inspection to the second.  A lot of the water spigots

25    and fountains and faucets were more problematic on the first

1    inspection than on -- than on the second.  Cups were rare back

2    in 2015.  Now I see that cups are available.  I see much more

3    frequently that those orange -- big orange water containers

4    are in the cells, and those are good things.

5        But again, the complicator is the crowding, and as we've

6    seen from those videos, and I've seen some where a person does

7    the same thing, like, to get into the bathroom, they have to

8    crawl over everybody to get a glass of water, is disruptive,

9    and so it makes it less likely that someone's going to get

10   that drink of water when the time comes, when the need arises.

11   Q.   One of the conditions that is at issue in this case is

12   medical screening and medical care.  Do you have knowledge

13   about the point in time at which medical screenings of

14   detainees generally takes place in jails?

15   A.   They generally take place as part of the initial

16   assessment process.  There are some exceptions to that,

17   depending on the size of the jail, and some small jails don't

18   have resources to have 24-hour/seven-day-a-week medical

19   coverage.  So if they, like, come in in the middle of the

20   night, they're probably not going to get a medical assessment

21   in some small jails, but that next working day they will.

22       So it's important to people who work in detention

23   facilities that they figure out who they've got and what

24   diseases they might be bringing into the jail as soon as

25   possible.  And that's consistent with the standards.

1   Q.   And do you have knowledge about the training or
2   qualifications, generally, of personnel who perform medical
3   screenings in jails?
4   A.   It's the agents, and there are some agents who have
5   certification in emergency medical techniques, but whether or
6   not those folks are qualified to do a medical assessment is
7   beyond my area of expertise, but I have asked during those
8   inspections, are those the people that do these medical
9   assessments, and it's not.  It's whatever agent is there.  So
10  it might be somebody --
11  Q.   I'm sorry.  Are you speaking of general practices now or
12  Tucson Sector?
13  A.   I'm speaking of Tucson Sector.
14  Q.   All right.  Let me ask you, do you have knowledge about
15  the training and qualifications in jails, generally, other
16  than Tucson Sector, to conduct medical screenings?
17  A.   Yeah, medical evaluations are performed by medical
18  professionals, people who have the appropriate training and
19  necessary degrees to do the assessments.  They're medical
20  staff.
21  Q.   And that doesn't always happen, depending on
22  circumstances, immediately upon intake, but generally?
23  A.   Generally, it does, but if it doesn't happen immediately,
24  it's a quick item of follow up once the medical staff are back
25  on duty.

1   Q.   Could you please sum up your opinions about the

2   comparison of practices of jails with the conditions in Tucson

3   Sector stations with respect to sleep, warmth, food,

4   sanitation.

5   A.   It's a difficult environment that detainees are brought

6   into, and the conditions that they are experiencing upon

7   arrival are different than what happens in jails, in my

8   experience.  There are -- there is a little bit of overlap,

9   which I've tried to be clear about in my testimony, where some

10  of the experience of maybe not having a bed right away because

11  you're in a holding room, maybe not getting a medical

12  assessment until the next morning, but I have not seen

13  anything like what detainees are expected to experience

14  living, sleeping, eating in those hold rooms for days on end.

15      It is completely extraordinary.  Nobody operates a

16  detention facility like that.  It might be one thing for it to

17  be a little more difficult for that first day, but after that,

18  I think that the standards need to apply.  Basic human

19  treatment for these folks need to be in place so that they've

20  got a bed, so that they've got some variety in their food, so

21  they can keep themselves warm, and that doesn't happen.

22      And the difficulty here is that it didn't get better.  I

23  mean, it got better for a little while there in 2017, but

24  since then, the duration of the confinement and the difficult

25  conditions are continuing to get worse.

1          MR. LONDEN:  Pass the witness, Your Honor.

2          THE COURT:  Yes.  Cross-examine.

3                    CROSS-EXAMINATION

4  BY MR. SILVIS:

5  Q.   Good morning, Mr. Vail.

6  A.   Good morning.

7  Q.   Just getting my papers situated here.

8       Mr. Vail, is it fair to say that your working experience

9  in corrections is mostly as an administrator exclusively at

10  the state level?

11  A.   The first half of my career I wasn't living in this a

12  lot, but I certainly have a lot of time spent as administrator

13  yes.

14  Q.   And as an administrator at the federal level or state?

15  A.   At the state level.

16  Q.   Exclusively at the state level.  And of that experience,

17  it's mostly for longer-term detention, with prisons; correct?

18  A.   That's correct.

19  Q.   And jails?

20  A.   I'm sorry?

21  Q.   Is more of your time with prisons, or is it with jails?

22  A.   Oh, it's with prisons.

23  Q.   How would you define the difference in time in custody

24  between prisons and jails?

25  A.   Well, the duration of confinement in jails is sometimes

 1   very short, sometimes up to a year, sometimes longer.  In the

 2   prison system that I worked in, we didn't house anybody who

 3   hadn't done -- who wasn't committed for a year and a day.

 4   Q.   And that's the jail?

 5   A.   Pardon?

 6   Q.   Is that the jail setting or it's the prison setting?

 7   A.   No, the prison setting, the folks that we received would

 8   be a year and a day.  Now, they may have jail time credit

 9   that -- so sometimes we would just have people for literally a

10   couple of weeks because they satisfied their sentence from the

11   time they spent in the jail.

12   Q.   Understood.  So your primary experience as an

13   administrator is with individuals who have been detained or

14   will be detained for over a year?

15   A.   Yes, mainly.

16   Q.   And am I correct to say that your experience as an

17   administrator is largely on the northern border of the United

18   States?

19   A.   I'm sorry?  Can you say it one more time?  I'm having a

20   little bit of a hard time hearing you.

21   Q.   Yeah, I understand.

22        Is it fair to say that your experience is mostly in the

23   northern part of the United States versus the southern?

24   A.   The state of Washington, yes, which is next to Canada.

25   Q.   Right, but not the southern border, say Arizona, Texas,

CROSS OF ELDON VAIL
JANUARY 14, 2020 (DAY 2, PART 1)

1  New Mexico?

2  A.   No.

3  Q.   Okay.  And you're not claiming any expertise with Border

4  Patrol operations, are you?

5  A.   I've never worked for the Border Patrol, no.

6  Q.   Okay.  And you haven't done any analysis prior to this

7  case about Border Patrol operations?

8  A.   No.

9  Q.   So you're not offering yourself as a witness in this case

10  anything related to federal law enforcement?

11  A.   I'm not offering anything related to federal law

12  enforcement.

13  Q.   And more specifically, you're not offering any expert

14  opinions on the operations of Border Patrol enforcement?

15  A.   Well, as they relate to conditions of confinement, I

16  believe I am.

17  Q.   Uh-huh.  But in terms of operations, understanding what

18  they're faced with, what their duties and responsibilities

19  are, you don't have any specific expertise in that area, do

20  you?

21  A.   The same answer.  To the degree that it relates to

22  condition of confinement, I do believe I have some expertise

23  there.

24  Q.   So just to parse that out a little bit, you're testifying

25  that you have some experience or you're proffering opinions

1   based on the detention portion or the custody portion of

2   Border Patrol operations, but you're not offering any opinion

3   on the operations aspect of Border Patrol operations?

4   A.   I think that's fair to say.

5   Q.   Okay.  Would you agree that a legitimate government

6   interest in border security involves apprehending,

7   identifying, and custody as necessary of people attempting to

8   unlawfully enter the United States?

9   A.   I would.

10  Q.   And you don't think people should be released immediately

11  after they're processed, do you?

12  A.   No.  That's -- I'm not offering that opinion, no.

13  Q.   You don't think that would be a good idea?

14  A.   What I think is irrelevant to my concerns about

15  conditions of confinement.  I mean --

16  Q.   I understand, but I'm still asking the question.  I mean,

17  would you think that that would be a good idea, to release

18  people instantly after processing?

19  A.   If I was in that position, I probably wouldn't do that.

20  I haven't thought a lot about that, actually.

21  Q.   Just so I understand your answer, so is your opinion

22  that, if someone's crossing the border unlawfully, that they

23  should be -- and they were being processed, that they should

24  be released immediately after processing?

25  A.   I've not said that.  I don't believe that that's probably

1    what I would do.  Honestly, I haven't contemplated what we

2    should do relative to who's let go and who's not.  That's

3    beyond what I'm here to offer.

4    Q.   But in terms of custody, you agree that there is a

5    legitimate government interest in keeping custody of a person

6    until they're processed and theoretically at least to the next

7    level so that they might be charged with either an

8    administrative or criminal offense for crossing illegally?

9    A.   When somebody is in custody, then, you know, there's

10   processes that need to take place.  What I'm concerned about

11   are the conditions that they're kept in while they're in that

12   custody.

13   Q.   I understand.  My question's a little bit different, and

14   you understand -- you understand -- you would agree that

15   there's a government interest in maintaining custody over a

16   person until they can be processed, both for processing, so

17   you can identify, and also, if they are going to be in

18   proceedings, to hold that person for proceedings.

19        Would you agree with that?

20   A.   Yes.

21   Q.   Are you familiar with how many miles of the border the

22   Tucson Sector is charged with patrolling?

23   A.   I've heard that number before, but I haven't retained it.

24   Q.   Would it surprise you to learn that it's 262 miles?

25   A.   That would not surprise me.

CROSS OF ELDON VAIL
JANUARY 14, 2020 (DAY 2, PART 1)

1   Q.   And you'd agree that these stations are located in remote

2   locations?

3   A.   Many of them are, yes.

4   Q.   Which ones aren't?

5   A.   Well, the Tucson one obviously isn't.

6   Q.   And how many stations are in the Tucson Sector?

7   A.   Eight.

8   Q.   Okay.  And of those eight, how many would you say are not

9   remote?

10  A.   It's been a while since I've been to them, but they're

11  all pretty remote except for Tucson.

12  Q.   Okay.  And -- okay.  I'm going to go through your site

13  visits a little bit, because I know you testified that you

14  visited some before.  Earlier I believe you testified that you

15  had four site visits in 2015?

16  A.   Yes.

17  Q.   And which stations were those?

18  A.   I'm not going to remember without looking at my report.

19  Q.   Okay.  But let's just say those four stations that you

20  visited in 2015, have you visited them since 2015?

21  A.   Depends on when I saw Tucson, because I was at Tucson

22  again.  That's the place where I've been twice.

23  Q.   Okay.  So Tucson aside, any other station other than

24  Tucson that you would have visited in 2015, you haven't been

25  back?

CROSS OF ELDON VAIL
JANUARY 14, 2020 (DAY 2, PART 1)

1    A.    That's correct.

2    Q.    And I believe you testified that you visited four more

3    stations in 2016?

4    A.    That's correct.

5    Q.    And same answer, I assume, other than Tucson Sector, you

6    haven't been to any other station since 2016?

7    A.    That is also correct.

8    Q.    So you've been to each of these stations other than

9    Tucson only once?

10   A.    Yes.

11   Q.    And it's been approximately three to four years since

12   you've been physically in any of these stations other than

13   Tucson?

14   A.    That's true.

15   Q.    Okay.  Approximately, in your estimation, I'm not looking

16   for a map answer or pure mileage, but how far apart are these

17   Border Patrol Stations from one another?

18   A.    Some of them are a great distance, but I can't give you

19   an estimate as to the actual distance, but it took some

20   driving to get there, I remember that.

21   Q.    And, "It took some driving," meaning hours?

22   A.    Couple hours sometimes, sometimes more.

23   Q.    Sometimes more than a couple hours between stations?

24   A.    We were able to do sometimes two in a day, but it -- it

25   was usually quite a distance to get there, and then there was

1   one that was not terribly far, and you know, this is just

2   memory from three or four years ago, and so we could get a

3   couple done each day.

4   Q.   And how would you describe the terrain where most of

5   these stations are located?

6   A.   Pretty wild, pretty rugged.

7   Q.   Are there a lot of amenities available?

8   A.   Well, we would find places to get gas and places to eat,

9   but some of them were pretty remote.  I'll acknowledge that.

10  Q.   So pretty limited in terms of other things that might be

11  around for supplies and that type of situation?

12  A.   Well, folks live out there, so you know, there's ability

13  to get supplies, but yeah, generally, they're rural

14  situations.

15  Q.   You'd agree that the amenities out in many of these

16  stations are very limited?

17  A.   The amenities?  I'm sorry.

18  Q.   The amenities stationed where many of these stations are

19  located are very limited?

20  A.   We're talking for just about people in general that

21  services are limited in the areas where the Border Patrol

22  Stations are?  I'm not sure I understand your question.

23  Q.   I understand.  I think it's kind of confusing.  It was a

24  general question, but you'd agree that, in these remote

25  locations, you're going to have much fewer amenities and

CROSS OF ELDON VAIL
JANUARY 14, 2020 (DAY 2, PART 1)

1    access to services than you would closer to a city?

2    A.    Yes.

3    Q.    Thank you.  And that most of these -- other than Tucson

4    Sector or Tucson station, most of these stations are located

5    out in these remote areas?

6    A.    That's true.

7    Q.    Now, is that unique, in your experience, compared to

8    other jails?

9    A.    There are some jails are pretty remote, but they're

10   generally attached to at least a small town --

11   Q.    Okay.

12   A.    -- which is the case maybe with a couple of the Border

13   Patrol Stations, but -- you know, I'll leave it at that.

14   Q.    So just in terms of the numerous, I guess, jails that

15   you've had experience with or you've testified that you had

16   experience with, these stations are pretty unique in their --

17   in the remoteness and lack of facilities that are close by?

18   A.    That's generally true, yes.

19   Q.    In your experience, have other jurisdictions built long-

20   term jails in remote locations to deal with initial

21   processing?

22   A.    Wherever there's jail, whether it's in a big city, a

23   small town, they're built to accommodate processing.

24   Q.    So my question for the remote locations, if there's a

25   small -- if there's a station out or a local jail that's sort

1   of in a remote location, would it be generally, if they just

2   had a holding facility, would they generally build a larger

3   facility, or would they transport the prisoner, you know, to a

4   different location for anything more than initial processing?

5   A.   Well, I'm not sure that we're talking about what jails

6   are.  I mean, you have a city jail in a rural community.  I'm

7   thinking of one in Forks, Washington, which is an hour and a

8   half from any other town on the Olympic Peninsula, and they

9   built a jail to accommodate both that assessment process and

10  holding that prisoner.  They have to transport them an hour

11  and a half to go to the courthouse, but they're going to hold

12  the prisoner in that remote location.

13       There's lots of urban areas in the state I come from, but

14  there's lots of rural areas as well, so they're going to build

15  a facility that does both of those functions, that initial

16  assessment and then confining that person until whatever the

17  issue is is resolved.

18  Q.   What was the town you said?  Was it Forks, Washington?

19  A.   I said Forks, Washington.

20  Q.   Forks, Washington?

21  A.   Yeah.

22  Q.   And do you have any sense of what their apprehension

23  rates are there?

24  A.   No.

25  Q.   I mean, you'd agree that's probably nowhere near what a

CROSS OF ELDON VAIL
JANUARY 14, 2020 (DAY 2, PART 1)

1  Border Patrol Station is dealing with in the Tucson Sector?

2  A.    In terms of volume, I'm sure that that's true.

3  Q.    Okay.  And in terms of any other examples you can think

4  of with a small local jail or holding facility, are they

5  dealing anywhere near the capacity that the Border Patrol in

6  Tucson Sector is?

7  A.    No.  The demands of the facilities in terms of number of

8  people are going to be greater here.

9  Q.    Do you have any sense of how many people the Tucson

10  Sector apprehended in fiscal year 2019?

11  A.    2019?

12  Q.    Yeah, fiscal year 2019.

13  A.    I think it was 68,000, if I remember correctly.

14  Q.    That's close.

15  A.    Okay.

16  Q.    Would it surprise you to learn that it was 63,500,

17  approximately?

18  A.    Yeah, it was 60-something-thousand.  I don't know where

19  the eight came from.  Maybe that was the calendar year.

20  Q.    How do those numbers compare to those in custody of the

21  entire Washington State Department of Corrections?

22  A.    There's a stock population and has been for several years

23  of about 18,000, but the churn rate is -- and it's been a few

24  years since I looked at this, because I'm not responsible

25  anymore, but the churn rate, in other words, how quickly you

1  turn that over, is basically double.

2      So that would be 36,000, 35,000, 36,000 different people

3  that we would touch each year, which would be half of the

4  60,000 number we just talked about.

5  Q.   So just to make sure I understand, you said 18,000, and

6  you used the term "stock;" right?

7  A.   On any given day, an average daily population would be

8  about 18,000, but if you look at how many people move through

9  the system in a year, it's literally double that.  That was --

10  why that was important is irrelevant, but that became

11  important in our conversation about how we operated our

12  system.

13  Q.   In Washington state, in your experience there, how did

14  you deal with influx?  How were you able to plan for influx?

15  A.   You mean intake?

16  Q.   Well, I guess I mean in terms of, how did you do planning

17  for it?  In any given year, how did you know how many new

18  people would be coming in, I think, into the system?

19  A.   We did projections.  That was far beyond my level of

20  expertise, but folks who know how to look at crime rates and

21  conviction rates and what's going on in the different counties

22  around the state could do projections that were sometimes

23  accurate, sometimes not.  But it became one of the things we

24  relied on in planning.

25  Q.   Okay.  So just to make sure I understand how this

1  planning worked, they did projections based on the number of

2  people being arrested or -- how would you in any one year

3  determine whether -- how many spaces you would need in the

4  correctional -- in the Washington Department of Corrections?

5  A.   Well, that's always a critical dynamic, because you want

6  to fight crowding.  You don't want to wind up crowded.  And it

7  is and was beyond my expertise to actually do that work, but I

8  was the beneficiary of that work, and we would get projections

9  from the statewide forecast council.  They would forecast what

10 they thought the prison population would be.  As I said

11 earlier, sometimes they're right, sometimes they were wrong.

12      They did the same thing, for example, for education, how

13 many schools do we need, and a number of different areas, so

14 that those folks who write budgets could plan, and those folks

15 who operate organizations could, for lack of a better word,

16 lobby for an appropriate amount of resources.

17 Q.   Now, projections, you testified, are outside your

18 expertise; is that correct?

19 A.   Doing them, yes.

20 Q.   Doing them, correct.

21      Now, yesterday, when you were testifying, I believe you

22 made some projections or testified about the projections for

23 immigration enforcement.  Do you recall giving any testimony

24 or offering opinions about the Government's ability to make

25 similar projections?

1   A.   If I recall what I said, and I'm sure you can correct me

2   if I'm wrong, but if you look up four out of the last five

3   years, the number is pretty solid.  It's pretty stable,

4   although it seems to be in the last year to be inching upward.

5        Now, that's not doing projections.  That's just sort of

6   common sense looking at the math.  The process of doing actual

7   forecasts for budgets is much more sophisticated, and that's

8   what I mean.  I'm not -- I don't have that level of

9   competency.

10       But I can look at five years in a row and see that four

11  of them are about the same, although towards the end here, the

12  numbers are going up again.  As a practitioner, that's the

13  kind of thing I'd certainly pay attention to.

14  Q.   Right.  But you would understand, too, that it's more

15  complicated for federal immigration enforcement than just

16  looking at the numbers in any given year and expecting that

17  they're going to be the same the following year, even if there

18  may be some identifiable trend?

19  A.   I suspect that there would be a more sophisticated way to

20  do an analysis than I just did, yes.

21  Q.   And that's beyond your expertise?

22  A.   That's not what I'm qualified to do, no.

23  Q.   Right.  So you're not offering an expert opinion on how

24  the projections -- how past immigration data should inform

25  what the Border Patrol or DHS should be doing in this case?

1  A.   I have to talk about that one a little bit.  I mean, one

2  of the things I try to do, right or wrong, is to try to put

3  myself in the position that, if I were responsibile for

4  running this, what would I be doing, what would I be looking

5  at.

6      And as the Border Patrol Commissioner said, there's a

7  problem here, that we're holding people longer because we

8  can't move them, and when you look at those numbers, that is

9  consistent with that.  I don't think that that allows -- would

10  allow me to stay silent on the issue.  I think that would mean

11  I need to do some planning.  I need to do some figuring out

12  how I can make it so that I don't hold these people so long,

13  or if I can't hold -- if I do have to hold them this long,

14  then I need to comply with the relevant standards for

15  conditions of confinement.

16  Q.   Understood, but how many years of data is it before you

17  can stay it's a trend in your -- I mean, you're saying five

18  years.  Is that enough data to really know precisely where the

19  public should be spending their money on immigration

20  enforcement?

21  A.   I'm not sure I know how to answer that question.  I mean,

22  it is the information that we have that's available.  It's

23  kind of common sensical.  Is it sufficient for projections?

24  You're probably asking me a question that is beyond my

25  expertise.  Forecast council people in my experience have

CROSS OF ELDON VAIL
JANUARY 14, 2020 (DAY 2, PART 1)

 1   years of data that they sort and then make projections based

 2   on that.

 3        I'm talking as if, again, if I was responsible for this,

 4   what my concerns would be.  Would I like to enlist some folks

 5   who could do some more sophisticated analysis?  Sure.  But

 6   absent that, the trends seem clear to me.

 7   Q.   Just as a layperson though?  That's not within your

 8   professional expertise that you're offering to this Court on

 9   the conditions; right?  This is just based on your sort of lay

10   opinion of looking at the Secretary's memo at that time?

11   A.   I would give myself more credit than a layperson.  I'm

12   looking at it as a practitioner who's been responsible for

13   ensuring that facilities don't become overcrowded, and

14   sometimes those projections are right, and sometimes they

15   aren't, and sometimes you have to act in ways that aren't

16   consistent with those projections because reality is here, and

17   you don't want to crowd.  You don't want people sleeping on

18   the floor.

19   Q.   And -- but you haven't made any projections as part of

20   your expert report in this case or your testimony about what

21   those trends -- whether they'll continue or not; right?  You

22   haven't done any analysis on that?

23   A.   What I've done here, sitting here for the last day or

24   two, is that the numbers are going up.  The duration of

25   confinement's getting longer.

1   Q.   I'm just asking, though, as part of it, have you done any

2   analysis on this, or are you just testifying based on evidence

3   that's been put in front of you?

4   A.   Just the evidence that's been put in front of me, yes.

5   Q.   Okay.  And would it surprise you to know that, even if

6   the numbers over the past five years have been consistent, the

7   demographics of those are not the same or not consistent?

8   A.   I think I know what you mean, but can you say more about

9   demographics?

10  Q.   Sure.  If the makeup of those populations or number of

11  apprehensions, if the makeup is not consistent in terms of

12  whether it's family units -- and do you understand what I mean

13  by "family units?"

14  A.   Yes.

15  Q.   And then if I use the term "UAC," you'd understand I mean

16  unaccompanied alien child?

17  A.   My understanding is there's more of that now, yes.

18  Q.   Right.  So if the makeup of these, the percentages, has

19  changed over these past five years, would that surprise you?

20  A.   No, not at all.

21  Q.   Okay.  And would that inform your analysis in any way on

22  what the Border Patrol should be doing in terms of custody and

23  processing?

24  A.   Whoever they're putting in custody and wherever they come

25  from doesn't matter to me.  What matters to me is that they

CROSS OF ELDON VAIL
JANUARY 14, 2020 (DAY 2, PART 1)

48

1   have humane conditions of confinement, and that's what I'm

2   opining on.

3   Q.   Do you know what the TVPRA is?

4   A.   I'm sorry?

5   Q.   Do you know what the TVPRA is?

6   A.   If I do, I don't know the acronym.

7   Q.   Okay.  It's -- and I think I'll get this right, but it's

8   the Trafficking Victims Protection Reauthorization Act.

9   A.   No, I don't.

10       You got that right.

11  Q.   I wanted to make sure I had that correct as well.

12  A.   Okay.

13  Q.   So can I use "TVPRA" going forward?

14  A.   Sure, yeah.

15  Q.   Do you know what it is?

16  A.   No.

17  Q.   Do you know what it requires?

18  A.   No.

19  Q.   Do you have any idea what that would do in terms of

20  different populations coming through, different demographics

21  coming through on a given year?

22  A.   I'm guessing that it's going to extend processing time.

23  Q.   And why are you guessing that?

24  A.   I shouldn't have said that.  No, I don't know.

25  Q.   Okay.

1    A.    I won't guess.

2    Q.    Okay.  Would it surprise you to learn that the TVPRA has

3    requirements for determining whether children who are coming

4    through and being apprehended, that there's certain

5    requirements that need to be done within a certain amount of

6    time to ensure their protection?

7    A.    That would not surprise me.

8    Q.    Would that have any impact on your opinion on what should

9    be done by the Border Patrol if you knew that before that?

10   A.    No, not at all.  In fact, that's the argument here, that

11   if you hold people past a certain point, you've got to comply

12   with standards.  I know there's a lot of work to do.  I know

13   it gets more complicated.  I know it changes.  But you know

14   you've got the body, and you shouldn't have them sleeping on

15   the floor and et cetera.  I mean, I won't...

16   Q.    But how can you make a recommendation based on what

17   should be done -- I'm not so much talking about your opinion

18   at this point.  I understand your opinion is that, after a set

19   period of time, there needs to be different standards than

20   what the Border Patrol is doing.  I think that's what your

21   opinion generally is; is that correct?

22   A.    Fair enough.

23   Q.    But any recommendations you're going to make to this

24   Court or solutions that you have, how can you really -- how

25   can we really rely on those if you don't understand the

1  populations that are coming into these Border Patrol

2  facilities?

3  A.    Processing is a separate function from detention.  I'm

4  focused on the detention function.

5  Q.    Absolutely.  But what if there are certain rules on who

6  can be detained with whom, and what if there are different

7  responsibilities for determining if someone who says they're a

8  parent is or isn't a parent?  Wouldn't that have any effect on

9  where you can keep people during processing and after

10  processing?

11  A.    It may have an effect on where you keep people after

12  processing, but it doesn't mean you shouldn't have a bed, et

13  cetera.

14  Q.    Understood, but there may be other limitations on what

15  you can do or what solutions can be provided, and you don't

16  really have a firm understanding of those legal requirements.

17       Is that fair to say?

18  A.    I don't think any of that trumps the need to comply with

19  contemporary and general standards for how you confine

20  someone.

21  Q.    I understand that's your opinion.  What I'm sort of

22  trying to understand, unless you have a different -- you don't

23  really -- any solution you have wouldn't have taken into

24  account these other things that the Border Patrol has to take

25  into account, like the TVPRA and dealing with different

1  populations?

2  A.   Can you say that one more time?  I want to make sure I

3  understand.

4  Q.   Sure.  I understand you're -- again, I think we talked

5  about before your general opinion about, after a certain

6  amount of time, certain standards should apply, but any

7  recommendation you're going to make or any proposed solution

8  that you're going to offer today, it hasn't taken into account

9  the TVPRA and any other standards that the Border Patrol might

10  be legally required to consider in making determinations on

11  where people should be placed.

12  A.   I think my position, sir, is I don't think it needs to.

13  Q.   I'm sorry?

14  A.   I don't think it needs to take that into account.  People

15  are people.  Humans are humans.  They are entitled to basic

16  dignified care when they're in someone's custody.  All the

17  processing issues, they are complicated, I get that, but that

18  doesn't change the standards that the Border Patrol should be

19  required to align themselves with.

20      I didn't say that very well, but I think you understood.

21  Q.   Okay.  Are you familiar with the Flores settlement

22  agreement?

23  A.   A little bit.

24  Q.   And what's your understanding of that?

25  A.   Just that at a high level it had some requirements for

1  what you do with kids.

2  Q.   And do you have any understanding how that impacts the

3  Border Patrol custody issues that the Tucson Sector deals

4  with?

5  A.   Not with any precision, no.  I've read it, but it's been

6  a while.

7  Q.   All right.  Is it typical for a jail or prison to have to

8  accept processing 24/7, 24 hours a day, seven days a week?

9  A.   It's typical for a jail, and it depends on which prison.

10 At a reception center, yes, not frequently, but if somebody

11 violates parole and there is no room in the jail, then you've

12 got to take them in the middle of the night, but it's very

13 typical in a jail.

14 Q.   You say it's very typical in a jail?

15 A.   Sure.

16 Q.   I mean, of those ones you've gone, it's typical for jails

17 to accept people 24 hours a day, seven days a week?

18 A.   Absolutely.  When someone's arrested on the street, they

19 go to jail, 24/7.

20 Q.   Is it typical, I guess, in a processing facility or in a

21 jail to have to determine the nationality of someone who's

22 coming into the United States, or I'm sorry, of someone who's

23 being processed?

24 A.   Yes.  Sometimes it is, and even when they get to prison

25 we still don't know sometimes.  We're still working on that.

1   Q.   And why is it necessary in a jail?

2   A.   Well, you want accurate demographic information about who

3   you have.

4   Q.   I mean, it would -- in a typical situation when someone's

5   coming into a jail, what information -- why would you want to

6   know the nationality?  Is the immigration part important?

7   A.   Like I said, you want to know who you have, and you want

8   to know what their criminal history is, and you want to know

9   if there's any warrants or detainers for their arrest.  I

10  mean, the problem with illegal immigration is not just in

11  Arizona.  It's a major problem in my state as well.  There's a

12  lot of farm work, lot of the forestry work.  So there's lots

13  of people who are picked up who don't have papers, and so

14  that's a common practice in jails in Washington, try to figure

15  out who is who and who else might have an interest in this

16  case, not just prior felonies, but whether or not they're here

17  legally or not.

18  Q.   Okay.  How often, I mean, in your experience, is someone

19  that's being booked into a jail, how often is that their first

20  encounter with, if they're coming in from a foreign country,

21  how long -- how often, in your experience, is that their first

22  encounter with law enforcement in the United States?

23  A.   Can you say it one more time?  I think I got it, but I'm

24  not sure.

25  Q.   In your experience, how frequently is it a person's first

1  encounter with law enforcement in the United States to be

2  booked into a jail?

3  A.    So the first time they run into police authority is the

4  first time they're booked into jail?  You know, I don't have a

5  good way to estimate that.  I'm sure sometimes it is,

6  sometimes it isn't, which is what I was talking about before.

7  I mean, if you bring somebody in off the street, you want to

8  know who you've got, have they been in jail before, is there

9  an arrest warrant out for them, where are they from.

10       But sometimes I'm sure that does occur that you don't

11  know or it's their first encounter.

12  Q.    I guess, typically, what do you need to find out in a

13  jail?  What would your typical booking questions be?  What

14  would you have to find out before processing to the next

15  stage?

16  A.    You want to know as much as you can in terms of

17  identifying who they are.  You're going to take fingerprints.

18  You're going to take photographs.  You're going ask some basic

19  questions about where they're from, where they're living.

20  You're going to -- you're going to assess for suicide risk.

21  You're going to do some kind of quick mental health check.

22  You're going to do a medical check to see if they have some

23  kind of contagious diseases.  It's a big liability if you

24  bring somebody into the general population who's got

25  tuberculosis.  A number of demographic and biological

CROSS OF ELDON VAIL
JANUARY 14, 2020 (DAY 2, PART 1)

1   information, to the degree you can get it, as soon as you can,

2   all that's necessary when you take someone into your custody.

3   Q.   Do you have to contact a foreign consulate ever in your

4   experience in a jail?

5   A.   I deal with foreign consulates in prisons all the time,

6   because we have people who are, you know, from other countries

7   who are likely to be deported at the end of their sentence.

8   And so whether or not that occurs in a jail with much

9   frequency, I think it might depend on the size of the jail,

10  but I don't really know.

11  Q.   In your experience, though, how often is that an intake

12  question?

13  A.   What's an intake question?

14  Q.   How often is contacting a consulate part of intake, in

15  your experience in a jail?

16  A.   I don't know that.

17  Q.   How about dealing with, I guess, a family unit?  How

18  often would a jail be put in the situation of having to

19  determine what to do with a family unit?

20       And you understand what I mean by "family unit?"

21  A.   Yeah, I doubt that that occurs very often.

22  Q.   Do you know if it ever occurs?

23  A.   Lots of things are possible in this world.  I can't think

24  of an example.  I mean, if you're going to -- you don't arrest

25  a family for being a family, unless it's an issue of

1    immigration.

2    Q.    All right.

3    A.    You don't take into custody, I should put it that way,

4    other than arrest.

5    Q.    Would it surprise you to learn that people may lie or be

6    untruthful about the integrity of this family unit, whether

7    someone is the father or the mother of the child?

8    A.    That would not surprise me.

9    Q.    And if you had to contact, say, a consulate or determine

10   with any amount of precision or hopeful precision about the

11   integrity of a family unit, would it be reasonable that that

12   might take more than 10 or 12 hours?

13   A.    It might take more than 10 or 12 hours, yeah.

14   Q.    Okay.  Would it surprise you to learn that, in fiscal

15   year of 2019, that there were over 5,000 unaccompanied alien

16   children apprehended in the Tucson Sector?

17   A.    I'll take your word for that, but it would not surprise

18   me, no.

19   Q.    I'm sorry?

20   A.    I can take your word for that, but I would not be

21   surprised by that number.

22   Q.    You wouldn't be surprised by it.  Okay.

23         And would it surprise you to learn that, in that same

24   year, fiscal year 2019, over 16,000 family units were taken

25   into custody in the Tucson Sector?

1    A.    I would not be surprised.

2    Q.    Not surprised.

3          So following on your testimony earlier before, you could

4    understand why, in those situations, why it may take more than

5    10 to 12 hours to figure out the integrity of the family unit?

6    A.    It might.

7    Q.    Have you ever worked with the Department of Health and

8    Human Services, the United States Department of Health and

9    Human Services?

10   A.    Only from some distance, not very directly.

11   Q.    What do you know -- what do you mean by "some distance?"

12   A.    Well, there's some funding issues that we addressed in

13   the state prison system, but it's not going to be anywhere

14   near where you're going, I'm sure.

15   Q.    Okay.  Well, I guess that's -- maybe you're forecasting

16   where I'm going.  Have you ever dealt in any way with custody

17   issues relating to children and Department of Health and Human

18   Services?

19   A.    I have not.

20   Q.    Okay.  Do you have any sense of what their capacity is

21   for -- their current capacity is for dealing with housing of

22   UACs?

23   A.    I do not.

24   Q.    Have you done any consulting or prior work regarding ICE

25   detention?

1  A.   Consulting or prior work?  No.

2  Q.   And you understand by "ICE," I'm sorry, I didn't give you

3  the acronym, but United States Immigration and Customs

4  Enforcement?

5  A.   I do understand.

6  Q.   So was there a qualifier?  You said prior to work with

7  consulting.  Have you done any work with U.S. -- with ICE?

8  A.   No, I just said that to make sure I understood your

9  question.

10  Q.   Okay.

11  A.   My experience with ICE has been fairly minimal.  I

12  inspected one facility with some legislators.

13  Q.   When did you inspect that facility?

14  A.   In Tacoma, Washington.

15  Q.   And when was that?

16  A.   Approximately 2010.

17  Q.   And you don't have any degree in public health, do you?

18  A.   In public health?

19  Q.   Right.

20  A.   I do not.

21  Q.   And do you have any medical degrees?

22  A.   No.

23  Q.   So you're not claiming any special expertise in medical

24  or public health areas?

25  A.   No.  I rely on doctor -- a doctor for that, who's in this

1    case -- my only experience with this issue is being

2    responsible for operation of a prison or operation of a state

3    system, and so once I say medical professionals need to do the

4    assessment, that's the end my expertise.

5    Q.   And you're not a lawyer?

6    A.   I'm not a lawyer.

7    Q.   I believe you testified before, but I apologize that I'm

8    hitting this again, but you're not offering any special

9    expertise in immigration enforcement?

10   A.   No.

11            THE COURT:  Would it be a good time to take a

12   recess?

13            MR. SILVIS:  Sure, Your Honor.

14            THE COURT:  Ten minutes, so a little before 10:45

15   we'll take up again.  We'll be at recess.

16            (Recess.)

17            THE COURT:  Back on the record, continuing with

18   cross-examination.

19            Go ahead.

20   BY MR. SILVIS:

21   Q.   I'm going to ask you a few questions about the opinions

22   you're offing in this case, but before I get to that, is it

23   fair to say that your primary concern with the Border Patrol

24   custody is when it exceeds 10 to 12 hours?

25   A.   That's fair to say.

CROSS OF ELDON VAIL
JANUARY 14, 2020 (DAY 2, PART 1)

1    Q.    Why would you focus on 10 to 12 hours?

2    A.    Because that's what the standards say.

3    Q.    And what standards are those?

4    A.    ACA standards, primarily.

5    Q.    You agree that those aren't law?

6    A.    They're not law.

7    Q.    It's primarily a credentialing thing?

8    A.    No.  I think it's more than that.  There's an option that

9    jurisdictions can choose to be accredited, and many do and

10   many don't, but they set the floor for how we operate

11   correctional facilities in a civilized manner in this country.

12   Q.    Correct, but if you fail to meet that, what's the

13   consequence?

14   A.    Well, it depends.  I mean, there's no legal consequence,

15   unless you're -- and at that point you're not really looking

16   at standards, but you're going to see conditions that fall far

17   below the standards, and you're going to have litigation

18   trouble.  I mean, that's a constant issue for those of us who

19   operate at correctional facilities.

20   Q.    Correct.  But you agree it's not a legal standard?

21   A.    It's not a legal standard.

22   Q.    Are you aware of any public health study that supports

23   this 10-hour threshold for detention?

24   A.    A public health study that supports a 10-hour --

25   Q.    That after 10 hours, say, in detention or custody, that

1  certain additional requirements should apply?

2  A.   Public health, no.

3  Q.   Just a question on how you're calculating this.  You're

4  worried about the total time in station.  Is this starting

5  after processing, or is this just a total time calculation?

6  A.   I understand that Border Patrol agents have a difficult

7  job trying to find out who they've got and what they're going

8  to do with them, and that's an important function for them.

9  And I have learned over the course of my education on this

10 case to understand that that might take them a day to at least

11 get initial assessment.  At that point, you know what you know

12 and you know what you don't know.

13      But at that point, when that's done, it's my opinion that

14 the standards need to apply, and you need to house these

15 people humanely, consistent with the standards.

16 Q.   Okay.  I understand what you're saying, but to that

17 point, if it takes, say, five hours to process somebody, or it

18 takes a little bit longer than that, when would the standard,

19 in your opinion, would the ACA kick in?  Is it 10 hours after

20 processing is complete?

21 A.   You're asking me to define where the line should be

22 drawn, and I have struggled with that, quite honestly, because

23 of the complexity of the function associated with processing.

24 But I'm pretty clear that the second night needs to be there.

25      I might draw it in a different place, and I'll give you

 1   some examples.  You pick somebody up at eight o'clock, you

 2   know everything you need to know about them in some cases by

 3   noon, you can move them into the detention portion of your

 4   facility, not the hold portion of your facility.  On the other

 5   hand, you might pick somebody up at eight, nine o'clock at

 6   night, you don't get to them.  Okay.  Now they have to sleep

 7   in the hold room with the mat.  That's fuzzy.

 8        And so what makes sense to me is that second night, that

 9   they should have the accommodations that are consistent with

10   the general practices in jails in this country.

11   Q.   Okay.  But if I understood your answer correctly, you

12   seem to be saying that the clock would start running generally

13   after processing is complete.

14   A.   No, that isn't what I said.  I mean, if you're done with

15   processing by noon, what's the point of holding that person

16   for a night in a holding room with a mat on the floor when

17   they should be in a bed up off the ground?

18   Q.   If you're making a recommendation, I guess, on, like, a

19   workable standard, and Border Patrol would have to in some way

20   determine how long someone has been in, what's your opinion,

21   what's your recommendation in this case of when that would

22   kick in, because we all need to be working with workable

23   standards?

24   A.   Yeah, and then that's my struggle, and that's why --

25   that's why I say it's the second night.  If I've got -- if

CROSS OF ELDON VAIL
JANUARY 14, 2020 (DAY 2, PART 1)

1   I've got to draw a line, it's the second night.

2   Q.   Okay.  And approximately how many hours, I guess -- well,

3   when you're saying that second night, how many hours are you

4   saying, I guess?

5   A.   The second sleeping night, and it's going to depend when

6   you get that person in.  You get that person in at 10 o'clock

7   at night and they sleep in the hold room, that's a night.

8   Next night you should be able to get them in a bed.  You get

9   them at 6:00 a.m. in the morning, same issue, if I have to

10  draw a bright line.  I think practically that might not be

11  necessary.  You might be able to process that person you get

12  at 6:00 or 8:00 a.m. and have them in a real bed that night,

13  but if we've got to draw a line, I personally -- I would draw

14  it at the second night.

15  Q.   And that would be your expert opinion for this case, the

16  second night?

17  A.   With all the caveats I just said, but yes.

18  Q.   Is there an ACA standard for holding cells, in other

19  words, something short of a jail?

20  A.   I'm not aware of it if there is.  I don't believe there

21  is.

22  Q.   So to your knowledge there's only an ACA standard for

23  jails and prisons?

24  A.   Well, the ACA -- I'm sorry.  The ACA standards apply to

25  detention facilities.  I think that's the title.  But

1    practically the ones that we're talking about here are about

2    jails.

3    Q.   Okay.  Is there any standard that would apply to sort of

4    a shorter-term holding thing, sort of a, you know, something

5    that the court may have here for holding people that are being

6    detained, or maybe a jail, a smaller sheriff's office that may

7    not be really considered a jail?  Is there any ACA standard

8    for that?

9    A.   Not that I am aware of.

10   Q.   Okay.  So in this case you're attempting to apply the

11   standard that you're aware of, which is the ACA for jails?

12   A.   Well, there's also the ICE standard for hold rooms.

13   Q.   Correct, but before this case, you didn't have any

14   familiarity with the ICE standard; is that right?

15   A.   I've learned a lot in this case about a lot of things I

16   didn't know about before I started --

17   Q.   But in response --

18   A.   -- including that one, yes.

19   Q.   Thank you.

20        Okay.  You've offered an opinion in this case.  Could you

21   briefly tell us what your opinion is.

22   A.   That the detention practices -- it's my opinion that the

23   Border Patrol is in the detention business at some point after

24   they take control of the body and that they don't comply with

25   generally accepted practices for detention in areas of sleep,

1  of warmth, personal hygiene, food, and medical.

2  Q.   Okay.  Now, you offered a written expert report in 2017;

3  is that correct?

4  A.   I can't remember the date, but that sounds about right.

5  Q.   Have you offered any subsequent reports in this case

6  after that?

7  A.   I have not.

8  Q.   Okay.  Is there any change from your expert report, from

9  the written report that you offered to the one you're offering

10  for these two days in trial?

11  A.   I think in a couple ways.  I mean, I've got more data now

12  in terms of what's going on with the population, and the other

13  one is the conversation that we just had, where do you draw

14  the line, and the ACA standard talks about getting a bed at 10

15  hours, and that's what I talked about in my report.

16  Plaintiffs' counsel I think took that to 12.  I think I was

17  asked somewhere either in deposition or maybe in preliminary

18  if I could live with that, and I said yes.

19       The change is that, understanding the complexity and

20  looking at all the issues, that second night becomes my

21  recommendation.

22  Q.   Okay.  So you have looked at additional evidence since

23  you submitted your earlier expert report?

24  A.   Yeah, I read a lot of documents and looked at new data.

25  Q.   Okay.  And that evidence has been important to forming

CROSS OF ELDON VAIL
JANUARY 14, 2020 (DAY 2, PART 1)

1   the opinion that you're offering the Court today?

2   A.   Yes.

3   Q.   And yesterday?

4   A.   Yes.

5   Q.   Have you disclosed any of that evidence to the Government

6   in terms of supplemental report?

7   A.   I have not written a supplemental report.

8   Q.   So you haven't created a supplemental report?

9   A.   No.

10  Q.   Okay.  And you haven't been asked to do so?

11  A.   I was not asked to do so.

12  Q.   Okay.  You were testifying yesterday using a lot of

13  charts that Mr. Mis had prepared.  Do you remember that?

14  A.   I do.

15  Q.   When was the first time you saw those charts?

16  A.   A few weeks ago.  I can't give you an exact date, but

17  I've seen those charts for, you know, the last few weeks.

18  Q.   Last few weeks.  What other evidence have you relied on,

19  I guess, that since your expert report has been entered that

20  wasn't supplemented to the Government?

21  A.   Well, I did the Border Patrol inspection at Tucson Sector

22  in September.  I visited counsel's office I think in April of

23  2019 and then again last week, actually.  I'm losing track of

24  time here.

25       So my visits to the Morrison & Forester office in San

1    Francisco, I looked at lots of video, I looked at lots of

2    photographs, and there has been some written material from,

3    I'm going back to April now, through the rest of this year, I

4    would occasionally receive different documents from the

5    plaintiffs' counsel, and then I would read them, study them,

6    and then like I said, the video and photograph review.

7    Q.    But none of the -- so you testified about the site visit.

8    You said Tucson Sector in 2019?

9    A.    Just the Tucson Station.

10   Q.    Tucson Station.

11   A.    Yeah.

12   Q.    And to your knowledge, you didn't provide any of those

13   notes in any sort of supplemental report?

14   A.    I did not do a supplemental report.

15   Q.    And any of the information -- you said you met with the

16   attorneys of Morrison & Forester you said April 2019 and

17   sometime last week?

18   A.    April I think it is, but roughly, I suppose it could have

19   been late March or early May, but I think it was April.

20   Mr. Londen was new to the case, and he didn't know me and I

21   didn't know him, and so I went to San Francisco, and we talked

22   about things.  And then in September, again with Mr. Londen,

23   we went to the Tucson Station so that he could see it and then

24   I could see it again, and then we visited the shelter where

25   people had been released from TCC either that day or the day

1    prior.

2          And then last week, I guess it was, I was in San

3    Francisco in their office looking at more video, looking at

4    more photographs, et cetera.

5    Q.   Okay.  During your inspection or visit to Tucson, the

6    station in 2019, was it overcrowded?

7    A.   No, it was pretty empty.

8    Q.   How did that inform your opinion that you're offering

9    today?

10   A.   Well, I believe they told us they moved out as many

11   people as we could so we could get into the cells.

12   Q.   Now, I'm sorry, who was that?

13   A.   I don't remember who, but we were told that they had done

14   what they could to move people so that we would be able to get

15   inside the cells and see them and, like I did previously,

16   checking on whether or not there's hot water, whether or not

17   the spigots worked, whether or not there was a trash can.

18   There were some people there, but not very many.

19         And I -- I'm sorry.

20   Q.   I'm sorry.  Were you finished?  I didn't mean to --

21   A.   Well, I was finished.  There were some people there but

22   not very many.

23   Q.   Do you have any reason to believe that, based on your

24   visit, that it was overcrowded in other cells while you were

25   there?

1    A.    No, it was not.  I mean, they told us they purposefully

2    moved people so we could get into the cells.

3    Q.    I mean other cells though.  The cells that you weren't

4    going into, did you have any reason to believe that the

5    station was overcrowded in the areas where you didn't visit?

6    A.    In other Border Patrol stations?

7    Q.    No, within the Tucson Sector.

8    A.    Well, you can see everything.  I mean, there was about 20

9    people there, and they would move them from one cell to the

10   other so that we could go into the cell.  I mean, they were

11   very agreeable and helpful so that we could do what we needed

12   to do while they were there.

13   Q.    So you only saw about 20 people there at that time?

14   A.    It's a rough estimate, but there wasn't very many.

15   Q.    And when you went to Morrison & Forester's office to

16   prepare for your testimony, a lot of that was looking at

17   video?

18   A.    Some of it was.

19   Q.    Okay.  I mean, approximately -- I think you testified

20   yesterday you looked at approximately 50 hours of video?

21   A.    You know, it's been over all these years, it's tough.  I

22   actually think I said 30, but it could be 50.  I mean --

23   Q.    You can change your answer today.  I'm just curious

24   what's the number.

25   A.    I'm estimating.

CROSS OF ELDON VAIL
JANUARY 14, 2020 (DAY 2, PART 1)

1   Q.   Okay.

2   A.   And I can stand by what I said yesterday.  I mean 30, 30

3   is fine.  Some of that is in their office, and they sent me

4   some videos, and I looked at them at home.

5   Q.   What -- okay.  But the 30 hours, that's a total between

6   the two?

7   A.   Yeah, that's the total of the length of the case.

8   Q.   And how did you decide what 30 hours to look at?  How was

9   that culled?

10  A.   Many of them were selected by Morrison & Forester, but

11  back in April I had a chance to go into the room and surf a

12  little bit and look at what was there.  It's a lot of volume

13  and a little bit tricky to look at stuff, maybe fast forward,

14  you know.  So I had some independent opportunity to look, but

15  many of them were obviously selected by Morrison & Forester.

16  Q.   Well, that's what I'm getting at a little bit, because I

17  imagine that there was much more than 30 hours the Government

18  has produced, you know, even in the last year from Tucson

19  Sector Station, so I guess what I'm getting to is, what was

20  the selection process for what the Court was shown yesterday

21  and what you're testifying about?

22  A.   I'd be speculating about how they selected.

23  Q.   You'd be speculating because the attorneys provided it to

24  you?

25  A.   Yes.

1  Q.  How would you then determine -- I think you testified

2  yesterday that, you know, the conditions that you observed are

3  representative of what's happening in the Tucson Sector.  Am I

4  correct, that is your testimony?

5  A.  Yes.

6  Q.  Now, was any of that based on video?

7  A.  It's a combination of the two.  I mean, you can't just

8  look at video.  You have to look at the statistics, which is

9  why the graphs and charts are so important.  And what we see

10  is the number of people in those cells.  What we see is that

11  the duration's getting longer.  The videos are just simply

12  examples of what that looks like.

13  Q.  What chart shows overcrowding?  Can you identify any one

14  chart that we went through that would show that a cell's

15  overcrowded?

16  A.  Several of the charts show that.

17  Q.  Could you provide us --

18  A.  I don't have the numbers memorized.  I mean, we can go

19  back through them, but that's what some of those charts did.

20  It showed us the median amount of people in that cell in

21  comparison to the Border Patrol's line where they said this is

22  how many mats fit in there.  And so there's illustrations of

23  that over and over and over again.

24      So, I mean, the videos show you what that looks like.

25  The numbers show you that it's happening frequently and it's

CROSS OF ELDON VAIL
JANUARY 14, 2020 (DAY 2, PART 1)

1   happening more often.  You can't look at one in isolation.

2   You have to look at both.

3   Q.   Sure.

4        MR. SILVIS:  Ms. Kershaw, could you pull up Joint

5   Exhibit I think it's 1208?

6   BY MR. SILVIS:

7   Q.   Now, would this be a chart where you could see the amount

8   of time that it would show overcrowding?

9   A.   It doesn't show overcrowding in cells.  It shows you how

10  many people are spending how much time in detention.  It

11  doesn't show you cells.

12  Q.   I'm just at a bit of a loss because I was, you know,

13  listening to the testimony yesterday, and I was looking for

14  any one exhibit that would show me overcrowding in a cell.

15  A.   Those would be the charts that talked about the median

16  numbers in the cells versus the mat capacity as determined by

17  the Border Patrol.

18  Q.   So does that mean you're determining overcrowding solely

19  by mat capacity?

20  A.   It's a combination.  If you look at the numbers, the

21  numbers tell you that the Border Patrol's putting more people

22  into those cells on a frequent basis than they believe they

23  should based on their own mat capacity.  And if you look at

24  the video, you can see what that looks like, what that means.

25  Q.   Right.  So let's just still look at the data part of it.

CROSS OF ELDON VAIL
JANUARY 14, 2020 (DAY 2, PART 1)

1  So you're saying that capacity you're determining based on mat

2  capacity by the Border Patrol; right?  That's like the numbers

3  part of this, right, not the video?  That's based on sleeping

4  mat capacity?

5  A.    Yes.

6  Q.    Okay.  Now, would that be -- so you're determining,

7  basically, overcrowding.  The assumption, I guess, baked into

8  that is that, if a cell is held for that period of time, that

9  people should be able to sleep, theoretically, 24 hours a day,

10  seven days a week.

11  A.    I'm not following you.

12  Q.    Well, cell capacity, if you're trying to determine

13  overcrowding, and you're saying it's cell capacity, correct,

14  if the cell capacity is being calculated based on sleeping

15  mats, aren't you basically saying that people have to have

16  enough room to be able to sleep during that entire period?

17  A.    No, I'm not saying that.  I'm saying people need to have

18  enough -- and it's mat capacity.  I think I said cell capacity

19  too.  It's mat capacity that we're talking about.

20       I'm saying that, during normal sleeping hours, on a

21  second night, people should be able to sleep in a condition

22  that's not overcrowded and not on the floor.

23  Q.    Okay.  I guess I'm just trying to understand what metric

24  we're using to determine.  We saw a lot of charts, we saw a

25  lot of calculations based on how many mats you could fit in a

1  room, but to me, that seems to suggest the idea that the

2  metric we're using here is the assumption that, at all times

3  of the day, if there's more people in that cell at any time

4  than the mat capacity would allow, that's a condition of

5  overcrowding.

6  A.   I'm talking about the sleeping hours.  I mean, if I

7  remember the last time I was at Tucson, they had a seating

8  capacity and a mat capacity, and if folks are in there, you

9  know, during normal waking hours seated, that's one thing, but

10 when it comes time for it a typical sleeping period, that's

11 another thing.

12      And the mat capacity, you know, and I think we said this

13 too, as determined by Border Patrol, I think it's too big.  I

14 mean, if you look at the square feet from ACA, or if you look

15 at just giving six inches around the mat, the work that we did

16 and presented in other charts reduced that number

17 significantly.  There's no question in my mind that the

18 sleeping situation is frequently crowded.

19 Q.   And just so -- to be sure I understand the limitations of

20 your opinion, you're not offering any opinion on crowding

21 conditions based on these metrics during nonsleeping hours?

22 A.   That's a different question.  There is language either in

23 the TEDS or the 2008, one of the two, that talks about what

24 the fire marshal says.  I mean, those numbers should be

25 adhered to.  I don't know if the fire marshal has ever gone in

1  and established a number.  I mean, you could put too many

2  people in there, theoretically, just sitting, but that's not

3  what I've been talking about.

4  Q.  Right.  That's what I'm getting at.  I'm saying, for the

5  purposes of your opinion in this case, you're not offering any

6  opinion really on the nonsleeping hours and overcrowding.

7  A.  I think that's fair.

8  Q.  I want to get back to sort of the video and how you

9  determined the video.  You said that most -- that was part of

10  determining that the situation was overcrowded during sleeping

11  hours; is that correct?

12  A.  It illustrates it.  It shows you what these numbers

13  looked like.

14  Q.  Okay.  So -- and correct me if I'm wrong, but you

15  testified that that was mostly determined -- the videos that

16  you reviewed were mostly determined by the attorneys?

17  A.  Two-part process.  I mean, they showed -- sent me lots of

18  videos.  I mean, what did we show, seven or eight here?  I

19  looked at dozens and dozens and dozens.  I did have some input

20  into which ones I thought they should turn into exhibits, a

21  lot of debate about how many to show, cut it down, cut it

22  down, cut it down, and it got to be the point where what you

23  saw yesterday is what was shown.

24      And then, back in April, like I said, I had a chance to

25  surf the system a little bit, so that's what I know about the

1   videos.

2   Q.   What do you mean by, "surf the system a little bit?"  I

3   mean, were you looking at the raw data then?  This was not at

4   all culled by the attorneys?  You were just looking at --

5   A.   At video.

6   Q.   -- hours -- right, but the hours and hours, you were

7   given free rein --

8   A.   Yes.

9   Q.   -- to look at the hours?

10  A.   Yes.

11  Q.   Of that amount, how many hours would you estimate that

12  you looked at that was totally open?

13  A.   I don't know for sure.  Less than five.  That's a guess.

14  Q.   Okay.  And every video we saw it was overcrowded; right?

15  A.   Right.

16  Q.   So you think there's no video that would show that it's

17  not -- those conditions aren't being -- that it's not crowded?

18  A.   No, that's not what I'm saying at all.  Absolutely --

19  Q.   It's just a question.  I'm just saying, I know what we

20  saw yesterday.  What I'm asking you, and it wasn't largely --

21  it doesn't sound like it was largely culled by you, and we all

22  saw that it was crowded in those, but I mean, how many hours

23  did you see in all that they weren't crowded?

24  A.   I didn't track how many hours, but I mean, I will

25  acknowledge that there's many times, especially the non TCC --

CROSS OF ELDON VAIL
JANUARY 14, 2020 (DAY 2, PART 1)

1  not at Tucson, where it tends to be more crowded, but there's

2  many times when it's not crowded.

3  Q.   I wanted to ask you, you also went to -- you testified

4  that you went to a shelter and interviewed some individuals.

5  A.   Yes.

6  Q.   Okay.  And when was that, approximately?

7  A.   September 2019.

8  Q.   Okay.  And what shelter was that?

9  A.   Casa, and the next word starts with an "A."  I don't

10  remember.

11  Q.   That's in Tucson?

12  A.   It's in Tucson.

13  Q.   And about approximately how many people did you

14  interview?

15  A.   14.

16  Q.   14.

17       And could you just -- I don't need the names at the

18  moment, but approximately what was the breakdown?  Were these

19  all kids?  Were these adults?

20  A.   They were all families.  This is a shelter that had taken

21  in families, and so there, you know, there would be a single

22  parent, or there would be both parents, one kid, two kids,

23  three kids.

24  Q.   Okay.  And when had they been detained or when had they

25  been in Border Patrol custody?

CROSS OF ELDON VAIL
JANUARY 14, 2020 (DAY 2, PART 1)

1   A.   They had just been released either that day or the day

2   before.

3   Q.   So sometime in December 2019 they'd been released?

4   A.   Yeah, from the Tucson Station.

5   Q.   I believe you testified this morning that more and more

6   people have been subjected to these conditions, these

7   complaint of conditions, for longer periods of time.  What

8   evidence did you rely on to reach that conclusion?

9   A.   The chart we just looked at, sir.

10  Q.   Just the chart, just 1208?

11  A.   Well, that's one example --

12  Q.   Okay.

13  A.   -- but it's displayed in many different ways.  There's

14  really -- I don't think that there's an argument that people

15  -- the duration of confinement is getting longer.

16  Q.   But you're -- that's based on these charts?

17  A.   What?

18  Q.   It's based on these charts?  That's the evidence you're

19  relying on, the charts?

20  A.   It's based on the evidence from e3DM that created these

21  charts, yes.

22  Q.   I understand.  I'm trying to understand the universe of

23  your opinions here.  So it's based on those -- largely on the

24  charts.  When you say "duration," it's based on these charts?

25  A.   Yes.

CROSS OF ELDON VAIL
JANUARY 14, 2020 (DAY 2, PART 1)

1  Q.   Okay.  You testified this morning that you believe

2  individuals in Border Patrol are kept in hold rooms beyond a

3  reasonable capacity level for several days.

4      Do you remember that?

5  A.   I do.

6  Q.   What is the reasonable capacity level you refer to here?

7  A.   Well, if it were up to me, and you're asking my opinion,

8  I think the ACA standard should apply.  But the problem is

9  those rooms weren't designed for sleeping.  It really is never

10 going to work given how many people might show up in the

11 middle of the night.  There is not enough room in them for the

12 volume.  You need to have some other facility to house people

13 for sleeping.

14      MR. SILVIS:  I'd like to -- Ms. Kershaw, could you

15 pull up Joint Trial Exhibit 630.  Could you page down a

16 couple.  Yeah, that's good.  Hold there.

17 BY MR. SILVIS:

18 Q.   I believe you testified, did you participate in making

19 calculations of sleeping mats based on what's represented in

20 Joint Trial Exhibit 630 and other similar trial exhibits?

21 A.   Yes.

22 Q.   Okay.  And in what manner did you do that?

23 A.   Well, I asked that -- I expressed my frustration that it

24 was difficult in some of these cells to determine how many

25 square feet there were, because my interest was in saying what

1  if we applied the ACA standards.  So that's how this thing

2  started.

3      But then in discussion it made sense to, okay, let's just

4  lay mats down, put six inches around them, see what that looks

5  like.  What was interesting is that it came out pretty close,

6  like in Tucson, within four mats.  Six inches of personal

7  space around the mat made sense to us in terms of being able

8  to not have to touch the stranger that you're sleeping next

9  to, being able to get to the toilet, being able to get to the

10  door of the holding room without stepping on someone else.

11      So that's where that activity came from.  I didn't draw

12  it.  I didn't color it.  I don't have that stuff.  But the

13  conversations were with me and plaintiffs' counsel.

14  Q.   I guess I was just trying to determine, for the creation,

15  I believe most of these exhibits came in under Mr. Mis's

16  testimony earlier yesterday, and in terms of we saw diagrams

17  where mats -- where mats were drawn out, what was your role?

18  I mean, did you -- were you actually doing those computerized

19  drawings?

20  A.   No.  I think I just described my role, that it came from

21  conversations, what would it look like, what's the actual

22  square feet, how do you apply the ACA standards, what does

23  that mean for mats, and then from there the conversation

24  morphed into, well, what if we just put six inches around each

25  mat and make sure you could go to the bathroom and exit the

1    cell.

2         So I didn't do any of the drawing.  I mean, that's -- it

3    wouldn't look this good if I did.

4    Q.   Okay.  So they created -- Mis created these exhibits, and

5    they just asked your opinion about how to incorporate these

6    based on the ACA standards?

7    A.   No, and I don't know who created these drawings.  Someone

8    at Morrison & Forester did.  I'm not representing that it was

9    Mr. Mis or anybody else.

10        But the concept of how do we figure out, if you apply the

11   standards, how many mats you can put into that cell or each

12   cell, that was my idea.  And in conversation, okay, what if we

13   switched it up a little bit and put in the six inches around,

14   what would that number look like, we were just trying to

15   explore what are realistic options here for the Border Patrol.

16   That's what we were looking at, and also protect the dignity

17   of the detainees.

18   Q.   I'm just trying to determine the reliability of these

19   charts, because I guess you're saying that you didn't have any

20   role, really, in creating them.  So we're trying to determine

21   who actually drew these charts and who determined what the

22   square footage would be, because really the result is that, in

23   your opinion, that the squire footage, that the mat capacity

24   is actually way lower or significantly lower than the Border

25   Patrol determined capacity.

CROSS OF ELDON VAIL
JANUARY 14, 2020 (DAY 2, PART 1)

1   A.   That is my opinion, yes.

2   Q.   And that's, in part, based on from these charts, right,

3   that these charts were drawn not by you, and you were part of

4   that, but you're really relying on someone else's work, aren't

5   you?

6   A.   I'm relying on someone else to do the math here, yes.

7   Q.   And if those are inaccurate, that would affect your

8   opinion?

9   A.   If they were inaccurate, then that would make a

10  difference.

11  Q.   Okay.  You've offered an opinion that it falls below

12  standards in some way for sleeping mats to be on the floor; is

13  that correct?

14  A.   Yes.

15  Q.   And where would I find that standard?

16  A.   In ACA.  We went through that.

17  Q.   Okay.  And is that -- is there any study related to -- I

18  mean, it's an ACA standard, but is there any sort of public

19  health or any hygiene study that would sort of support that,

20  for a limited period of time, having a sleeping mat on the

21  floor is unhygienic?

22  A.   I don't know any studies.  I know where ACA standards

23  came from, but I don't know of any public health study, if

24  that's your question.

25  Q.   Do all jails have beds?

1    A.    Never seen one that didn't.

2    Q.    But you -- so you don't -- all jails that you've seen

3    have beds?

4    A.    Well, it's also on, you know, eight years I was on the

5    Washington State Criminal Justice Training Commission, which

6    had oversight over training programs for jails and prisons,

7    and hung out what lot of sheriffs, talked about a lot of

8    issues, visited their jails.  I developed curriculum for

9    correctional officers in their jails.  They all have beds.

10   Q.    Yeah, I guess my question might be different, and I'm

11   sorry, but have you ever been aware of or seen a jail that

12   didn't have a bed?

13   A.    I'm not aware of or nor have I seen a jail that doesn't

14   have beds.

15   Q.    In the expert report you proffered earlier, you had some

16   concern about the proper cleaning of sleeping mats.

17         Is that correct?

18   A.    I did.

19   Q.    Do you still have that concern?

20   A.    I've not updated myself on that issue.  Again, looking at

21   video, what I saw was that it wasn't a good technique to

22   clean, and I'd have to look at my report to remember exactly

23   what I said, but it wasn't a sanitary process.  But there's no

24   new information that I'm offering on that.

25   Q.    Okay.  So you don't have any -- that's not really part of

1    your opinion for the Court today, or today and yesterday?

2    A.   I haven't testified to it yesterday or today.  It's in my

3    report, and I'll stand by what I said in my report, but that's

4    time limited.

5    Q.   Right.  So I'd say at least two years you haven't looked

6    at that issue?

7    A.   That would be true.

8    Q.   Okay.  How about opinions -- do you have concerns about

9    access to personal hygiene items?  Not talking about showers,

10   just personal hygiene items.

11   A.   I think that that has improved.

12   Q.   Okay.  Improved from?

13   A.   From what it was.

14   Q.   So -- but do you have any current concerns of those, as

15   we sit here today and as you're offering your opinion today,

16   about the access to personal hygiene items?

17   A.   Well, it is complicated when the cells are crowded in

18   terms of being able to get to a sink to wash your hands, for

19   example, if you might want to do that before you eat.  I have

20   concerns about people sleeping on the floor, in toilets.  I

21   think that's a hygienic concern.

22        So I still have some concerns about hygiene, but the

23   supply issue looks to me to be better.

24   Q.   Are you aware of which stations in Tucson Sector have

25   showers?

1   A.   There's two.  It's Tucson and Nogales if I remember

2   correctly.  If there's been more added, and I saw some

3   reference to that, I'm not clear on if there's been any added.

4   Q.   Okay.  It would surprise you to learn that there are

5   showers now in the Brian A. Terry Station, the Douglas

6   Station, and the Ajo Station?

7   A.   That would be a good thing.

8   Q.   Okay.  And that there's one in the process of being built

9   in Willcox?

10  A.   That's excellent.

11  Q.   How would that inform your opinion of conditions going

12  forward?

13  A.   Well, I would say it's good that you got showers.  How

14  are you going to use them, and when are you going to offer

15  them?  And I don't have that information.

16       MR. SILVIS:  Okay.  Ms. Kershaw, could you pull

17  up -- I believe it's Plaintiffs' Exhibit 48.  Can you page

18  down?  Again.  Sorry.  I don't have the exact page.  Again.

19       I'm just looking for the section with your testimony

20  today about requirements for bedding being off the floor, the

21  standard.  Next page.

22  BY MR. SILVIS:

23  Q.   Okay.  I believe it's here at the top of page 6.

24       I believe you testified a little bit about the first

25  paragraph, that, "Each inmate confined to a cell/room is

1   provided with the following," and you testified about a

2   sleeping surface and mattress that allows the inmate to be at

3   least 12 inches off the floor.

4       Do you remember testifying about that today?

5   A.   I do.

6   Q.   There are two other requirements under that.  Do you see

7   those?

8   A.   I do.

9   Q.   Do you believe that the Border Patrol should also provide

10  those two other things listed?

11  A.   I haven't said that.

12  Q.   Do you believe that they should?

13  A.   No, I don't think those are necessary.

14  Q.   You also testified a little bit this morning about the

15  use of Mylar blankets.  Do you remember that?

16  A.   Yes.

17  Q.   And do most jails in your experience or that you've

18  consulted with have laundry facilities?

19  A.   Yes.

20  Q.   Did you observe any laundry facilities in the Border

21  Patrol Stations?

22  A.   No.

23  Q.   Okay.  Without a laundry facility available, would it be

24  reasonable to use the Mylar blanket?

25  A.   No.  You'd have to have a laundry.

1  Q.   Correct.  So if you don't have a laundry, I guess I'm

2  saying, it would be reasonable to use a Mylar blanket for

3  warmth?

4  A.   No.  It would be reasonable to figure out how you're

5  going to wash clothes.  I mean, you can do a contract.  You

6  can add washing machines.  Small jails have washing machines.

7  Big jails have washing machines.

8  Q.   Okay.  So you don't think using a Mylar blanket's

9  reasonable?

10 A.   I don't think it provides insulation necessary,

11 especially if you take that outer lay of clothing.

12 Q.   And what exactly is that based on?  What's your

13 experience with Mylar blanket not providing sufficient heat?

14 A.   Well, for the preliminary injunction, we all did some

15 research to figure out what they're going to do, and they're

16 not going to keep your body heat in like a piece of cloth is,

17 to short-circuit the answer there.

18 Q.   Now, to some extent, is that -- is that effect maybe

19 lessened by sleeping on a mat versus on the floor?

20 A.   I think that sleeping on a mat, the fact that mats are

21 there, it's better than before.  That's a good thing.  It's

22 going to help a little bit.

23 Q.   So in your opinion the Border Patrol shouldn't use Mylar

24 blankets, they should find some way to provide clothing or

25 laundry services at every station?

1   A.   On that second night, yes.

2           MR. SILVIS:  Ms. Kershaw, could you pull up

3   Plaintiffs' Exhibit 1218.

4   BY MR. SILVIS:

5   Q.   Mr. Vail, do you remember testifying about this exhibit

6   today?

7   A.   I do.

8   Q.   Okay.  From this exhibit, how can we tell whether someone

9   has received a shower at a Border Patrol facility?

10  A.   We can't.

11  Q.   Okay.  So can you offer any opinion on whether they're

12  receiving showers or not?

13  A.   Pardon?

14  Q.   Are you able to offer any opinion on the frequency that

15  people are offered showers if you can't tell from this exhibit

16  that they're actually being offered them?

17  A.   Here's what I know.  In quizzing folks about what's in

18  e3DM, in my effort to try to understand it, in some of these

19  cases, it will show the "Shower" field, the box, in other

20  words, is checked, but the comment says, "Paper shower."

21          Now, to sort the thousands or tens of thousands of

22  records to figure out what that looked like, that work wasn't

23  done.  So I guess my point is, I can't tell how many people

24  are getting showers, how many are not, but I do know that some

25  people, even though the "Shower" box is checked, the comments

 1  section says,"Paper shower."

 2       The data's bad.

 3  Q.   Okay.  I think I understand, but I guess how are you able

 4  to offer any opinion, then, on the frequency of people getting

 5  showers, and what data are you using on how frequently people

 6  are getting them?

 7  A.   What I'm using is the guidelines that I understand to be,

 8  and maybe you'll correct me here, is that you try to get a kid

 9  a shower at 48 hours and try to get an adult a shower at 72

10  hours.  I think that shower should happen much sooner.

11  Q.   But you don't know when it's happening, do you?  I mean,

12  based on this chart, it doesn't tell you what's happening.

13  A.   There's not good data.

14  Q.   All right.  Because I believe you testified earlier that

15  showers aren't being offered very often, so what was the basis

16  for that?

17  A.   A small sample of interviews in September, many of those

18  folks had not had an opportunity to shower, and there were

19  mothers and fathers and children.

20  Q.   Which interviews?  Were these the people at the --

21  A.   At the shelter.

22  Q.   At the shelter?

23  A.   Yeah.

24  Q.   Okay.  But not based on any empirical data from this

25  case?

CROSS OF ELDON VAIL
JANUARY 14, 2020 (DAY 2, PART 1)

1   A.    No, no.

2   Q.    You testified a little bit earlier about the lights being

3   left on in hold room facilities?

4   A.    Yes.

5   Q.    Okay.  You'd agree that, in some ways, the lighting is

6   important for safety?

7   A.    Having the ability to see is important to safety, yes.

8   Q.    Okay.  And in terms of processing, if a Border Patrol

9   station's a 24-hour-a-day/seven-day-a-week processing

10  facility, wouldn't lighting be important for determining which

11  individuals need to be asked to come out of the cell to

12  complete processing?

13  A.    I'm pretty convinced you could do that and still dim the

14  lights, but I understand that that's not the practice.

15  Q.    Okay.  So there's a reasonable reason that you might have

16  cells not -- that you might still have the lights on in terms

17  of the operations of a Border Patrol Station?

18  A.    Going back to what I've said several times, and I think

19  about if I was operating this, what would I do, I mean, first

20  of all, there's the second night issue.  The second night you

21  can significantly dim the lights like every jail in the

22  country does.  On that first night, I still think you could

23  dim them a bit.

24  Q.    Okay.

25  A.    But I understand and accept that first night may be

CROSS OF ELDON VAIL
JANUARY 14, 2020 (DAY 2, PART 1)

1    rugged, may be difficult, and I think there's another way

2    around it, but I understand that the Border Patrol's position

3    is they're going to keep the lights on.

4        The problem is, you keep them on night after night after

5    night, the duration of that experience, the fact that you

6    never get to lay down in the dark, or even half dark, kind of

7    like a jail, is a problem.

8    Q.   But you don't really have any concern with -- no large

9    concern with the lights on for that first night?

10   A.   No, that's not what I said.  I do have concerns about it.

11   I think there's a way around it.  But drawing that line, that

12   bright line that this case has kind of forced me to draw on

13   the second night, that's when it really -- that's where I have

14   a strong feeling that the lights should be significantly

15   dimmed.

16   Q.   Just curious about that first -- what way around it would

17   you have?  If you're trying to process people as quickly as

18   possible, I'm just curious, you know, what you think could be

19   done so that people could be moved quickly, understanding that

20   some people might have gotten there in the middle of the

21   night?

22       So what -- I mean, what are you really suggesting?

23   A.   There's lights and cameras that can record sufficiently

24   that are available in correctional facilities today that

25   allows you to lower the foot-candle level of the lights in the

CROSS OF ELDON VAIL
JANUARY 14, 2020 (DAY 2, PART 1)

1  hold cells and still do everything that you need to do.

2  Q.   But that's for a camera.  If an agent needs to come in

3  and see, I mean, they don't have night vision, I imagine.

4  A.   If the agent's coming in, he's saying a name, come see

5  me.  Light has nothing to do with that.

6  Q.   For safety reasons?  I mean, in the initial processing,

7  you may not know who everyone is.  Would there be a safety

8  reason, at least on that first night, for wanting to know and

9  keep an eye on, you know, through the camera and also maybe

10  just for agent -- to be sure that, you know, the people who

11  came in are, you know, safe?

12  A.   I'm not lobbying for total darkness in Border Patrol, nor

13  would that be acceptable in any detention facility, but foot-

14  candle can be lowered to a level where you can still see and

15  allow people some more rest.  But like I've said, my primary

16  concern is for that second night.

17  Q.   Is your opinion -- are you offering an opinion today that

18  people are being denied access to water?

19  A.   I'm not saying that people are being denied access to

20  water.  I'm saying the crowding conditions sometimes makes it

21  difficult.

22  Q.   And I'm not trying to go back too much, but you testified

23  a little bit about evidence of it being cold, and this morning

24  you were talking -- you were talking about the blankets at

25  that point.  I'm just trying to make sure I understand the

1   universe.

2       What other evidence are you offering about warmth in

3   Border Patrol custody?

4   A.   Well, the temperatures look good.  I mean, there's no

5   question about that.  But from the beginning of this case all

6   the way to September of '19, when you hear the word from the

7   people who are in there, they say it's cold, and I think that

8   that's due to a couple things.  It's due to the surface, the

9   concrete surface, which is helped some, for example, by the

10  mats, but it's also due to the lack of ability to have any

11  kind of large muscle exercise, especially when it's extremely

12  crowded.

13      You couldn't do pushups.  You couldn't run in place.  You

14  couldn't do situps.  There's hardly room for any kind of

15  activity, so your body is going to get cooler.  You don't have

16  the ability to put another layer of clothes on.  All the kinds

17  of things that we in the normal world do, in the free world

18  do, to regulate our own body temperature is limited for the

19  detainees.

20      I think that's a problem always, but once again, I think

21  that's a big problem when it goes on for more than that first

22  night.

23  Q.   Okay.  And I guess that's what I'm trying to determine.

24  What evidence is there of that?  I mean, you said you talked

25  to the detainees.  Again, are you talking about the people who

CROSS OF ELDON VAIL
JANUARY 14, 2020 (DAY 2, PART 1)

1  were at the shelter?  What current evidence do you have of

2  warmth?

3  A.    Yeah, it's one of the things I was curious about, and so

4  that's why I asked that question, because it was so

5  overwhelming in the declarations that began at the beginning

6  of this case, and you know, it's all over the media and all

7  that as well, and you know, so I'd ask questions about

8  showers, I'd ask questions about warmth, I'd ask questions

9  about the basic conditions of confinement, and the detainees

10  were quick to say, it's really cold.

11  Q.    I understand that, but a lot of those declarations are

12  three or four years ago; is that correct?

13  A.    Uh-huh.

14  Q.    So what I'm asking is the current evidence.

15  A.    Current --

16  Q.    Is it just the interviews with the people at the shelter?

17  A.    Yes.

18  Q.    I think we sort of tread over this a little bit earlier,

19  but you testified earlier that there's no real ACA standard

20  for hold rooms; right?

21  A.    Not that I'm aware of is what I said.

22  Q.    So is there any -- short of jails, is there any sort of

23  ACA standard or standard that should be applied for food?

24  A.    I'm sorry, once more?

25  Q.    I guess short of -- I'm trying to determine what standard

CROSS OF ELDON VAIL
JANUARY 14, 2020 (DAY 2, PART 1)

1   we're using.  I understand you think that ACA jail standard

2   should apply or the ICE standard should apply, but is there

3   any standard short of a jail setting or longer custodial time

4   that would inform us on what food -- what food needs to be

5   provided for someone sort of in shorter-term detention?

6   A.   Oh, as opposed to just jail period?

7   Q.   Right, instead of just defaulting to ACA or ICE

8   standards, you know, for longer-term detention, what guides us

9   on the hold rooms?

10  A.   I'm not aware of any.

11  Q.   You testified a little bit or were asked some questions

12  about the ICE standards this morning.  Do you remember that?

13  A.   A little bit, yes.

14  Q.   And are you aware that ICE generally has people in

15  custody for longer periods of time than the Border Patrol?

16  A.   Oh, of course.

17  Q.   Could you explain a little bit -- I'm going to ask you

18  some questions about your recommendations or opinions on the

19  medical treatment that -- or care that's provided to people in

20  the Tucson Sector.

21       Could you just briefly describe your understanding from

22  time of initial apprehension until someone leaves the Border

23  Patrol Station what's offered in terms of medical care and

24  intake?

25  A.   Well, my understanding is that there's supposed to be a

CROSS OF ELDON VAIL
JANUARY 14, 2020 (DAY 2, PART 1)

1  medical assessment done by a nonmedical person.  Detainees are

2  also told, if you have an issue, let us know, and sometimes

3  they do that, and sometimes people go to a local doctor or

4  local hospital.

5  Q.   Is that it?

6  A.   There's EMT on staff.  They don't seem to impact the

7  schedule.  In other words, there's no post requirement that

8  there be an EMT on each shift or two EMTs on each shift.

9  That's another resource.

10  Q.   Are you aware of any contracted medical care that's

11  available within the Tucson Sector?

12  A.   When I visited in September, I was told that there is

13  some contract care but primarily for children.

14  Q.   Okay.  Would it change your opinion at all if you were

15  aware about medical conditions or care if you knew that that

16  -- if the assessments were not just limited to children?

17  A.   It might.  I'd have to know more detail.

18  Q.   Okay.

19  A.   I mean, I think everybody needs a medical assessment by a

20  medical professional, so you get to that point, it would

21  eliminate my opinion.

22  Q.   What do you mean by "eliminate?"

23  A.   The generally accepted practice around the country, as

24  I've said several times, is for a medical professional to do

25  an assessment of a person coming into the custody of a

CROSS OF ELDON VAIL
JANUARY 14, 2020 (DAY 2, PART 1)

1    government organization, and if that threshold is met, my

2    ability to opine on medical is done.

3    Q.    You testified a little bit about medical screening, the

4    term "screening."  What's your understanding of that term?

5    A.    All I know is what was in the -- I believe it was in the

6    judge's preliminary injunction where he said, standardize the

7    screening you're using at Tucson, and make sure it's in place

8    everywhere.  That's my understanding of it.

9    Q.    Okay.  You don't have any special understanding of the

10   term "screening" versus, say, "medical assessment?"

11   A.    No.  Again, I try to be concise there.  If a medical

12   professional's doing the assessment, that is my obligation to

13   say is necessary in operating a facility where you take

14   control of another human's body.

15   Q.    Are you aware that the Tucson Coordination Center

16   specialized medical personnel screen each and every person who

17   comes into custody at intake?

18   A.    I have not clearly been told that, no.

19   Q.    I'm sorry?

20   A.    I have not clearly been told that, no.

21   Q.    And as you testified earlier, that would likely alleviate

22   your concern, if true?

23   A.    If a medical professional is doing an assessment at that

24   facility, I would say that my opinion doesn't apply at that

25   facility.

1    Q.   Are you aware that the Tucson Sector has an agreement

2    with a local medical services provider to pay for services

3    rendered when people in custody are transferred to the

4    hospital for care?

5    A.   That wouldn't surprise me.  If they're using community

6    hospitals, then they usually want to have some kind of written

7    agreement to make sure they get paid.

8    Q.   Are you aware that Tucson transfers people to these local

9    hospitals for care and treatment when necessary?

10   A.   I am.

11          MR. SILVIS:  Okay.  Your Honor, if I could have just

12   a brief moment to confer?

13          THE COURT:  Sure.

14          MR. SILVIS:  I just have a couple, few more items,

15   couple items.  Let me just get back to where I was.

16   BY MR. SILVIS:

17   Q.   Mr. Vail, if I remember your testimony earlier about your

18   visit to the Tucson Sector recently, I believe you testified

19   that an agent told you that the individuals who were in

20   custody at that time had been moved so you could conduct, I

21   guess, your examination of the facility?

22   A.   I didn't say "agent."  I don't remember who said it.

23   Q.   Was it someone in the uniform?

24   A.   I don't remember.

25   Q.   When was this visit?

1  A.   In September of 2019.

2  Q.   Okay.  So you -- who did you go there with?

3  A.   Mr. Londen.

4  Q.   Okay.  And anyone else?

5  A.   I don't think so.

6  Q.   And did you have a contact with the Government that

7  showed you around the facility?

8  A.   Well, they met us and they let us through locked doors,

9  things like that.

10  Q.   "They," but they weren't Border Patrol agents?

11  A.   I don't remember, you know, whether they were agents or

12  supervisors or some other category.  I don't remember which

13  attorneys were there.  But, you know, we don't get to walk

14  into the housing unit.  People have to let us in, and there's

15  some informal conversation as you do that.  They know kind of

16  what we want to look at, and we can ask questions about where

17  you keep this, where you keep that, and so there was someone

18  that was sort of supervising the tour.  I honestly don't

19  remember who it was.

20  Q.   Okay.  So that individual was the one who told you that

21  they'd moved people?

22  A.   Yeah, for our convenience.

23  Q.   Was that a male or female?

24  A.   I can't even see it.  That information just was in my

25  head from that inspection.  I don't know who --

1   Q.   You have no recollection of this individual whatsoever,

2   other than the fact that they told you that people had been

3   moved for the purpose of your visit?

4   A.   That's correct.  That was not unusual.  I mean, when we

5   inspected the other stations, they were often emptied, and

6   folks did tell us, Mr. Allen told us, that they'd move people

7   out so we could get into these cells.

8   Q.   And earlier you testified a little bit, I mean, is it

9   fair to say that there were -- there are highs and lows,

10  right, in terms of how busy a station is?  I mean, you just

11  testified, I guess, that Tucson Sector wasn't very busy when

12  you went, the Tucson Station wasn't busy wasn't crowded, when

13  you were there in 2019; is that correct?

14  A.   It wasn't busy during the couple hours we were there.

15  Q.   Right.  And would you agree generally that, I mean, there

16  are highs and lows; right?  It's not always -- you're not

17  testifying that it's always overcrowded in the Tucson Sector?

18  A.   I am not testifying that it's always overcrowded.  I am

19  testifying that it is much more frequently overcrowded at

20  Tucson than at the other stations.

21  Q.   Other stations within the Sector, or do you mean --

22  A.   Other stations within the Tucson Sector.

23  Q.   Okay.  But getting back to sort of the video, and you

24  were saying that the video, you believe, you know, this is

25  representative of what's happening, if there are highs and

 1  lows, and all the video we saw was crowded conditions, in any

 2  way how can we -- how can we be satisfied that that's

 3  repetitive, I guess, of the conditions?

 4  A.   By looking at the median number of detainees in cells

 5  week by week from the e3DM data, and it's far beyond in many

 6  cases -- the median, not the top, not the maximum, the

 7  median -- is far beyond your definition of mat capacity, which

 8  is much higher than my definition of appropriate mat capacity.

 9  That's how you tell.

10  Q.   Okay.  So you're looking more -- when you're saying it's

11  representative, you're not really saying that the videos are

12  representative; right?  Because those were hand-picked.

13  You're saying that the data represents that there's -- that's

14  based on mat capacity, is that it's -- that it's

15  representative?

16  A.   I mean, the trial could last a year.  We could show every

17  video from every time it's crowded, but that's ridiculous.

18  The numbers are what they are.  What we showed was a sample of

19  what that looks like with human beings in it.

20  Q.   Fair enough, but I mean, this isn't a random sample.

21  You'd admit that.

22  A.   It's a typical example.  We didn't pick the days that --

23  none of these were the worst crowded days, and there's videos

24  from those days too.  Purposely selected some that weren't the

25  most crowded days in order to be fair to the process.

1        But if you look at those charts, it'll show you how many

2   times the number of people in that cell in the middle of the

3   night are beyond the mat capacity that the Border Patrol

4   defines.  It's obvious.

5        If you don't look at the video and it's just numbers,

6   it's a little more impersonal, hard to understand.  If you

7   look at the videos, and you see what that experience is like

8   for the detainees, I think that's important for people to see.

9   Q.   Understood.  And if you saw videos where it wasn't as

10  crowded, would that inform your opinion at all?

11  A.   Of course it's part of the opinion.  I'm not arguing that

12  every -- every cell is crowded all the time.  I'm saying

13  they're crowded much more frequently and at much higher levels

14  than they were four years ago, especially at the Tucson

15  Center.

16           MR. SILVIS:  That's all I have, Your Honor.

17           THE COURT:  Any redirect, Mr. Londen?

18           MR. LONDEN:  Very briefly.

19           Mr. Lucero, can you show us Exhibit 1216.42 in

20  evidence.

21                     REDIRECT EXAMINATION

22  BY MR. LONDEN:

23  Q.   Do you recognize this, Mr. Vail?

24  A.   I don't see it yet.

25        Yes.

JANUARY 14, 2020 (DAY 2, PART 1)

 1   Q.   You were asked about the capacity data suggesting that at

 2   all times the numbers are above the sleeping mat capacity.

 3   What's the time period covered by this 1216 series?

 4   A.   January 2018 until through November of 2019.

 5   Q.   And the median numbers of the 15-minute intervals during

 6   that time period, that is 10 p.m. to 6 a.m., are compared to

 7   the sleeping mat capacity in these 1216 charts?

 8   A.   That's correct.

 9             MR. LONDEN:  That's all my questions, Your Honor.

10             THE COURT:  Okay.

11             MR. LONDEN:  Mr. Vail will remain available for

12   redirect, but we have nothing further for him at this time.

13             THE COURT:  Well, let me --

14             MR. LONDEN:  I'm sorry, for rebuttal testimony, if

15   necessary.

16             THE COURT:  Let me ask the witness a couple of

17   questions.

18             Mr. Vail, it seems like, when a person's freedom is

19   restrained, there's kind of a scale.  There's an arrest,

20   there's a hold, there's detention, there's jail and/or

21   imprisonment, which could be referred to as imprisonment,

22   depending upon the sentence imposed.

23             Right so far?

24             THE WITNESS:  Yes.

25             THE COURT:  In your mind, how do you distinguish

 1  between hold and detained?  Is it events or time?  Both?  I

 2  know you hate bright lines, but hey, I'm asked to draw bright

 3  lines all the time.  I guess I'm asked to do so in this case.

 4          So I'm asking you, well, first, for your opinion,

 5  the difference between a hold and a detention, if there is a

 6  difference, what is it?

 7          THE WITNESS:  I don't -- I'm sorry, Your Honor.  I

 8  don't make a distinction.  Once you take possession of the

 9  body, that person is in custody.  And I understand that the

10  initial assessment is different than the time when you're now

11  confining that person beyond an hour or two.  I mean,

12  sometimes you bring a person into a jail and they're

13  immediately released.  Sometimes they're released the next

14  day.  But oftentimes they're not, and they go from that

15  holding function, that assessment function, to have a place to

16  sleep.

17          THE COURT:  Well, let's put it in the context of

18  this facility, say Tucson facility.  Is there a difference in

19  your mind between a hold and a detention?  For example, out in

20  the lobby, there's a processing center with a fingerprint

21  machine.  There's an intake officer, et cetera.  Then, if they

22  spend the night, that might be a detention.

23          Is there a distinction in your mind at all?

24          THE WITNESS:  No.  I mean, I think you described it

25  accurately, that if they spend the night, they're in

JANUARY 14, 2020 (DAY 2, PART 1)

```
 1    detention.  The challenge here, and I'm going beyond your
 2    question, is it is a complex job that these folks have, and
 3    they do get a lot of people in at odd hours and they don't
 4    know what to do with them.
 5           But I'm saying, once that initial sort is done, you
 6    need to draw that bright line and let them go sleep in
 7    conditions that are more typical.
 8           THE COURT:  All right.  Well, let's try another
 9    line.  You say -- used the phrase "second night."  Is another
10    way of putting that 48 hours?
11           THE WITNESS:  No.  I think 48 hours would put you
12    into a third night.  That would be my concern.
13           THE COURT:  How many nights do you sleep during a
14    48-hour period?
15           THE WITNESS:  Well, I guess I'd have to see the
16    language that you're thinking about.
17           THE COURT:  Well, don't you sleep two nights in a
18    period of 48 hours?
19           THE WITNESS:  Yes.  Second night.
20           THE COURT:  All right.  So in your opinion, there
21    should be raised beds at 48 hours, a shower at 72 hours, and
22    three nutritional meals per day?
23           THE WITNESS:  The last one I'd say -- I'm just
24    looking for a dietitian to say this is all right.
25           THE COURT:  Okay.  But otherwise I'm making a very
```

 1   succinct summary of what I think --

 2           THE WITNESS:  You are.  My -- I would offer a slight

 3   difference, that once you're into that area where there's a

 4   bed, you should be able to take a shower too.  It's likely to

 5   be in the same location.

 6           THE COURT:  48 hours or the second night for an

 7   individual prisoner, a raised bed and a shower made available?

 8           THE WITNESS:  Yes,

 9           THE COURT:  All right, sir.  Thank you, Mr. Vail.

10           THE WITNESS:  Thank you.

11           THE COURT:  All right.  How are we doing on our

12   time?  Are we dragging a little bit?  We've had two --

13           MR. LONDEN:  I believe we're ahead, Judge.  We have

14   one more expert witness, and then we have, for the notice of

15   security, a detainee witness or two.  That's our -- that's our

16   line-up.  And then we're going to try to close up with some

17   arguments about additional evidence before we close.

18           I don't think all that will happen today.  I do

19   think we'll get to the first detainee today.

20           THE COURT:  Okay.  Cool.

21           MR. LONDEN:  And we'll go as fast as we can.

22           THE COURT:  Couple of questions, since we've got a

23   couple of minutes.

24           It seems like the Court is a gatekeeper to what the

25   public hears or sees in the trial of a case, and you've

JANUARY 14, 2020 (DAY 2, PART 1)

```
 1   mentioned several times what is secret, and I guess I don't
 2   recall the standard that was applied to secrecy or why
 3   anything in this case is secret.  I mean, for example, bed
 4   capacity, we were very sensitive that that's not public
 5   information.  Why?  I mean --
 6           MS. FABIAN:  Your Honor, overall capacity numbers
 7   for Tucson Sector are considered sensitive.  Now, there's
 8   some --
 9           THE COURT:  Why?  Why?
10           MS. FABIAN:  Because of the concern that individuals
11   who knew the capacities could use that information to
12   overwhelm the sector, for example.  I mean, there's -- I mean,
13   we can submit testimony about it as well, but essentially the
14   idea is that, you know, and it's I think proven by -- I think
15   Border Patrol would say they have evidence of this, but any
16   sort of knowledge of a sensitivity of a sector could be used
17   by those who bring people into the United States to take
18   advantage of the sector.
19           So for example, and particularly in light of this
20   litigation, if there's a limitation on our ability to hold
21   folks, and folks are aware of those limited numbers, then
22   that's the sector to bring individuals to and to overwhelm us
23   with those numbers.  So the less those numbers are out there,
24   for example, if Your Honor ordered bed capacity and, you know,
25   and then folks knew the limits on the numbers of what we could
```

JANUARY 14, 2020 (DAY 2, PART 1)

```
 1   hold, that would be impetus for those bringing people into the
 2   United States to overwhelm us on those numbers.
 3            THE COURT:  All right.  All right.
 4            MR. LONDEN:  Your Honor, on our part, we don't see
 5   that it helps us accomplish the goals that we're seeking in
 6   this case narrowly to buck the other side when they say this
 7   is a security issue.  If I were making the call based on the
 8   law, I think a greater finding than that might be required,
 9   but we're prepared to continue going and deferring to them.
10            THE COURT:  Oh, yeah, well, it doesn't affect what
11   I'm going to hear or see or decide in the case.  That's -- and
12   it doesn't affect you in your presentation, but that's really
13   not the point.  The point is the public's right to know, and
14   that's what I'm trying to respect.
15            MS. FABIAN:  Your Honor, and I have -- that's
16   actually the note I made at the top of my notebook today is,
17   at some point, so I'll just mention it now, is that we have
18   referred to several things as confidential, which, you know,
19   it may be largely meaningless in terms of they're currently
20   just being put into the record, and Mr. Londen and I talked
21   briefly at the outset, and I think what we would both agree
22   is -- and we can -- this is sort of for your staff, as to
23   their preference, but we can move -- we can look at those and
24   move to seal or offer to submit redacted -- redacted exhibits
25   on those points and let Your Honor make the decision of how
```

1    those should go.

2         THE COURT:  Well, yeah, put it this way.  Just make

3    sure that there is a Border Patrol official who would, if

4    called upon, would say this is sensitive and should not be

5    public information.

6         MS. FABIAN:  Absolutely, Your Honor.

7         THE COURT:  Don't make that decision on your own.

8         MS. FABIAN:  I will not.  I will absolutely call on

9    the Border Patrol to assess that.

10        THE COURT:  Okay.  Then, with regard to a visit to a

11   facility, I think that would be a thing the Court should do,

12   and I'm thinking of some parameters.  I don't want to kill any

13   court time to do that, because I've already cut your court

14   time down, unless you think we're going to finish.

15        MR. LONDEN:  I can't say the length of the other

16   side's case, Your Honor, but we've finished a day short of

17   what we thought might be taken, so there's a day right there.

18        THE COURT:  Well, let's -- you know, we can respect

19   Martin Luther King Day Monday morning.  How about if we go out

20   to the facility Monday, like, at four o'clock, we go to the

21   Tucson facility.  There's one lawyer on each side.  I would be

22   there.  I'd bring my law clerk with me.

23        I would request that there be one official at the

24   center to be present, not to -- not that I would a plan to ask

25   him any questions other than innocuous things like, you know,

JANUARY 14, 2020 (DAY 2, PART 1)

```
 1    where is the toilet or where is the thermostat, you know,

 2    things like that.  I wouldn't ask him about, you know, how

 3    many prisoners have you got in here, how many did you have

 4    last night, did you feed them.  I'm not interested in hearing

 5    from the person, but just a person who is knowledgeable of the

 6    physical plant that can lead me around.

 7              MR. LONDEN:  We have no objection to that, Your

 8    Honor, and the time works.

 9              MS. FABIAN:  Your Honor, and the person I would

10    propose is Carrie Davison, who will be testifying, and I'll

11    give it some thought as to whether -- her testimony may in

12    fact come up before the end of the week, but I could -- I

13    could keep it shorter on the things that you'll see, and we'll

14    figure out the best way to make that work.

15              But yes, she'd be the person, and she was going to

16    testify about the things you would see so she could show them

17    to you instead.

18              THE COURT:  Well, yeah, maybe it should be somebody

19    else.

20              MR. LONDEN:  Well, she can give her testimony first

21    and not tell you things that are substantive while you're

22    there.

23              MS. FABIAN:  I'm trying to think of ways to use this

24    to shorten our time.  I'm happy to have her give her full

25    testimony depending on the timing --
```

 1            THE COURT:  Well, we're not going to have a reporter

 2    there.  I'd like to stay away from any witness in the case.

 3            MS. FABIAN:  Okay.  Understood, Your Honor.

 4            THE COURT:  So if you could set somebody up.

 5            Now, could you have a lawyer there at four o'clock?

 6            MS. FABIAN:  I can be there, Your Honor.

 7            MR. LONDEN:  Yes.

 8            THE COURT:  Mr. Londen?

 9            MR. LONDEN:  It will be me, Judge.

10            THE COURT:  Four o'clock at the Tucson facility.

11    Dress casual.  It's a day off anyway.

12            MS. FABIAN:  Your Honor, if it helps, I'll send your

13    clerk the information you'd need to -- it's just a phone call

14    to get into the gate there and park and where to go.  I'll

15    send her that information.

16            THE COURT:  All right.  We'll confirm that later in

17    the week, but I should do that, go out and -- I saw the

18    Nogales facility years ago when I did a border tour, and they

19    took us to the facility, but it's so long ago I don't even

20    remember.  And I think -- well, needless to say, I think I

21    ought to see the Tucson facility.

22            MS. FABIAN:  That sounds great, Your Honor.

23            THE COURT:  Okay.

24            MR. LONDEN:  Yes, Your Honor.

25            THE COURT:  So let's take up again at 1:15.  We'll

JANUARY 14, 2020 (DAY 2, PART 1)

1  be at recess, 1:15.

2           (End of Day 2, Part 1.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

JANUARY 14, 2020 (DAY 2, PART 1)                     113

1                         C E R T I F I C A T E

2

3           I, Erica R. McQuillen, Federal Official Realtime

4    Reporter, in and for the United States District Court for the

5    District of Arizona, do hereby certify that, pursuant to

6    Section 753, Title 28, United States Code, the foregoing is a

7    true and correct transcript of the stenographically reported

8    proceedings held in the above-entitled matter and that the

9    transcript page format is in conformance with the regulations

10   of the Judicial Conference of the United States.

11           Dated this 14th day of January, 2020.

12

13                         s/Erica R. McQuillen
                      Erica R. McQuillen, RDR, CRR
14                    Federal Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

                  UNITED STATES DISTRICT COURT