1              IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF ARIZONA

3   Jane Doe #1; Jane Doe #2; Norlan Flores  )
    on behalf of themselves and all others   )
4   similarly situated,                       )
                                              )
5            Plaintiffs,                       )
                                              )        CV-15-0250-DCB
6        vs.                                   )
                                              )        Tucson, Arizona
7   Chad Wolf, Acting Secretary of            )        January 14, 2020
    Homeland Security; Mark A. Morgan,        )        1:16 p.m.
8   Acting Commissioner, U.S. Customs and     )
    Border Protection; Carla L. Provost,      )
9   Chief of United States Border Patrol,     )
    in her official capacity; Roy D.          )
10  Villareal, Chief Patrol Agent-Tucson      )
    Sector, in his official capacity,         )
11                                             )
             Defendants.                       )
12  _____)

13

14             REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                    BENCH TRIAL DAY TWO
                       SESSION 2 of 2
16
                BEFORE:  THE HONORABLE DAVID C. BURY
17              UNITED STATES SENIOR DISTRICT JUDGE

18

19

20

21  Cheryl L. Cummings, RDR-CRR-RMR-CRC-CRI
    Official Court Reporter
22  Evo A. DeConcini U.S. Courthouse
    405 West Congress, Suite 1500
23  Tucson, Arizona 85701
    (520)205-4290
24
    Proceedings Reported by Stenographic Court Reporter
25  Transcript Prepared by Computer-Aided Transcription

```
 1   APPEARANCES

 2   For the Plaintiffs:
          Morrison & Foerster, LLP
 3        By:  JACK W. LONDEN,  ESQ.
          By:  ELIZABETH GILMORE BALASSONE, ESQ.
 4        425 Market Street, 32nd Floor
          San Francisco, California 95105
 5
          Morrison & Foerster, LLP
 6        By:  COLETTE REINER MAYER, ESQ.
          755 Page Mill Road
 7        Palo Alto, California 94304

 8        National Immigration Law Center
          By:  ALVARO M. HUERTA, ESQ.
 9        3450 Wilshire Blvd., Ste. 108-62
          Los Angeles, CA 90010
10
          Lawyers' Committee Civil Rights SF Bay Area
11        By:  BREE BERNWANGER, ESQ.
          131 Steuart St., Ste. 400
12        San Francisco, CA 94105

13

14   For the Defendants:
          United States Department of Justice
15        By:  MICHAEL A. CELONE, ESQ.
          BY:  KATELYN MASETTA-ALVAREZ, ESQ.
16        P.O. Box 868 Ben Franklin Station
          Washington, D.C., 20044
17

18

19

20

21

22

23

24

25
```

```
 1                        EXAMINATION INDEX

 2   WITNESSES CALLED ON BEHALF OF THE PLAINTIFF

 3   JOSEPH GOLDENSON

 4        DIRECT BY MS. BALASSONE                      4
          CROSS BY MR. CELONE                         62
 5

 6   WITNESS A

 7        DIRECT BY MR. HUERTA                        74
          CROSS BY MS. MASETTA-ALVAREZ                86
 8

 9   WITNESS B

10        DIRECT BY MS. BERNWANGER                   100

11                        EXHIBIT INDEX

12

13                                                   ADM
     364                                              16
14
     911                                              22
15
     915                                              27
16
     881                                              45
17
     884                                              54
18
     81                                               56
19
     447.02                                          108
20
     507.93                                          111
21
     507.94                                          112
22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2        (Proceedings commenced at 1:16 p.m., as follows:)
 3             MS. BALASSONE:  Good afternoon, your Honor.
 4   Elizabeth Balassone of Morrison & Foerster for the next
 5   witness, Dr. Joseph Goldenson.
 6             THE CLERK:  Would you please stand and raise your
 7   right hand.
 8           JOSEPH GOLDENSON, PLAINTIFF WITNESS, SWORN
 9             THE CLERK:  Thank you.  If you'd please state your
10   full name and spell your last name.
11             THE WITNESS:  Joseph Goldenson.  G-o-l-d-e-n-s-o-n.
12                       DIRECT EXAMINATION
13   BY MS. BALASSONE:
14   Q.   Good afternoon, Dr. Goldenson.
15   A.   Good afternoon.
16   Q.   Can you walk us through your educational background?
17   A.   Yes.  I attended the University of Michigan as an
18   undergraduate.  I graduated from Mount Sinai School of
19   Medicine for my MD degree and then I did a residency in family
20   medicine at the University of California, San Francisco.
21   Q.   What was your specialty?
22   A.   Family medicine.
23   Q.   Can you walk us through your employment history?
24   A.   Pretty much, the -- really the only job I had after
25   completing my residency was working for the Department of
```

1    Public Health in San Francisco at the county jail providing

2    health services to prisoners who were in the jail.

3    Q.   Working at the San Francisco Jail Health Services, what

4    was your first position there?

5    A.   My initial position was as a staff physician.  And I

6    would just see patients who were referred to me by the nurses

7    who they felt needed to see a doctor or who had other issues

8    that brought them in.

9    Q.   Did you perform medical screening of individuals as part

10   of that role?

11   A.   Not the specific screening.  In San Francisco, registered

12   nurses performed the screening.

13   Q.   What was your next position at the San Francisco

14   Department of Public Health?

15   A.   I was the medical director for Jail Health Services.

16   Q.   What did that job entail?

17   A.   I was responsible for hiring and supervision of the

18   clinical -- of the doctors and nurse practitioners, and I was

19   also involved in the development of the clinical program.

20   Q.   Did Jail Health Services have a medical screening form

21   when you started as the medical director?

22   A.   Yes.

23   Q.   Were you involved in any updates to the medical screening

24   form?

25   A.   Yes.  Over the years, there were a number of occasions

 1   when either we decided it was time to relook at the form and

 2   update it or when something would happen out in the community.

 3   For example, when there was the flu outbreaks, then we would

 4   revise our screening form to reflect questions that were

 5   needed to identify those individuals.

 6   Q.   What did you look at when you updated the medical

 7   screening form?

 8   A.   I'm sorry, I didn't hear you.

 9   Q.   What did you look at when you updated the medical

10   screening form?

11   A.   I would use -- I was in contact through my associations

12   with different organizations with people in jails all over the

13   country, so I would often look at the forms that they were

14   using.  I also used the National Commission on Correctional

15   Health Care is an organization that develops standards for

16   health care in correctional facilities, including receiving

17   screening.  And I would look at their updates and see how they

18   had changed their screening policy and try to see if it -- if

19   it meant that we should be changing ours.

20   Q.   Did you have any roles at Jail Health Services beyond

21   just the medical director?

22   A.   Yeah.  After -- after I had been medical director for a

23   few years, I guess I was promoted to being both medical

24   director and the program director for Jail Health Services.

25   So not only was I responsible for clinical operations, but

1  also for administrative operations including things like human

2  resources and budget.

3  Q.   How many years were you the program and medical director

4  of the Jail Health Services in San Francisco?

5  A.   Somewhere around 25 years.

6  Q.   In that role, what facilities were you responsible for

7  overseeing?

8  A.   All of the jails in San Francisco which varied in number.

9  Over the 28 years, there were different jails that would open

10 and close, but anywhere from three to six different

11 facilities.

12 Q.   In your experience, how long were people detained at

13 those jails?

14 A.   Whenever I'm asked this question, it's a little difficult

15 to answer because it's really a bimodal kind of distribution,

16 that somewhere over 40, over 40 to 50 percent the people that

17 get arrested and in the jail are gone within the first couple

18 of days.  And then for the people who end up staying, the

19 average is about four months.

20 Q.   Did those jails house civilly committed people?

21 A.   There were some civil commitments.  Mostly it was

22 criminal cases, but occasionally we'd have a civil commitment.

23 Q.   Have you been a member of any professional organizations

24 related to detention facilities?

25 A.   I'm sorry, can you repeat that?

1   Q.   Sure.  Have you been a member of any professional

2   organizations related to detention facilities?

3   A.   Yes.  I'm -- I'm a fellow in the Society of Correctional

4   Physicians, which is a national organization of physicians and

5   mid-level practitioners who work in jails and prisons.  And

6   I've also been involved with National Commission on

7   Correctional Health Care.  I was on the board of that

8   organization for seven years.  I was also involved with --

9   California has its own medical accreditation program through

10  the medical board and I was involved with that organization.

11  I was -- I was president of it for a year and also involved in

12  other activities.

13  Q.   Have you ever been appointed by a court as a medical

14  expert or monitor for detention facilities?

15  A.   Yes, I have.

16  Q.   Can you walk us through those appointments?

17  A.   I think my first appointment was in 1995.  I was

18  appointed to be the medical expert for the federal court in a

19  case called Madrid, which involved Pelican Bay State Prison in

20  California, which is the maximum prison in California.  In

21  2002, there was another lawsuit in California involving the

22  health care in all of the prisons.  And that -- when that case

23  settled, Pelican Bay was rolled into that case and I became

24  one of the medical experts for that case.  And I'm still

25  performing that function as of today.  I've also been court

1    appointed in Tacoma County Jail in Washington, Cook County

2    Jail in Chicago, the Ohio State Penitentiary, which is Ohio's

3    maximum security prison and also the California youth

4    facilities.

5    Q.   Have you ever provided technical assistance to detention

6    facilities?

7    A.   Yes.  Over the years I've been part of a team, different

8    teams that have gone to correctional facilities at their

9    request to perform an evaluation and come up with

10   recommendations as to how they can improve their services.

11   I've done that in Miami, Miami, Florida, in Los Angeles on two

12   different occasions.  I was part of a technical assistance for

13   Los Angeles County.  There were some others but I can't

14   remember right now.

15   Q.   Have you performed other expert work related to detention

16   facilities in Arizona?

17   A.   Yes, I was an expert witness for the ACLU in a case

18   involving Maricopa County jail.

19   Q.   Has the work you described involved visiting detention

20   facilities?

21   A.   I'm sorry, can you repeat that?

22   Q.   Has the work you described involved visiting detention

23   facilities?

24   A.   Yes.

25   Q.   What kinds of facilities?

1  A.   I've mostly been to jails and prisons.  A long time ago

2  in the early '90s, I was part of a team that went to an ICE

3  facility actually in southern California.  But other than

4  that, it's been mostly either jail, prisons or youth

5  facilities.

6  Q.   Has the work you described involved analyzing medical

7  screening programs?

8  A.   Yes, it has.

9  Q.   Has the work you described involved analyzing medical

10 care programs?

11 A.   Yes, it has.

12        MS. BALASSONE:  Your Honor, we request that

13 Dr. Goldenson be permitted to testify as an expert and present

14 expert opinion testimony in this matter.

15        THE COURT:  Any objection?

16        MR. CELONE:  Is Dr. Goldenson being proffered as an

17 expert in long-term or short-term detention facilities or

18 both?

19        MS. BALASSONE:  Both.

20        MR. CELONE:  We object on the basis of his expertise

21 in short-term detention facilities, your Honor.

22        THE COURT:  Overruled.  I'll accept his credentials

23 to testify.

24 BY MS. BALASSONE:

25 Q.   Dr. Goldenson, what was your assignment in this case?

1  A.   I was asked to look at and evaluate the medical care

2  including the medical screening process at the Border Patrol

3  stations in the Tucson Sector of Arizona.

4  Q.   What work have you done to inform yourself about the

5  facts of this case?

6  A.   I reviewed a number of documents that were Border Patrol

7  either policies or memorandum clarifying their procedures.  I

8  reviewed declarations from some of the plaintiffs.  I also

9  reviewed two depositions from plaintiffs.  And reviewed a

10 deposition from Dr. Tarantino and also from George Allen.

11 Q.   Did you visit any facilities as a part of your assignment

12 in this case?

13 A.   Yes.  Three years ago when I was here, I visited three

14 facilities.

15 Q.   Did you reach opinions that were expressed in an expert

16 report?

17 A.   Yes, it did.

18 Q.   Please give us a high level summary of your opinions in

19 this case.

20 A.   I found that the medical screening process that's being

21 utilized is inadequate.  The -- the -- not everyone who enters

22 the facilities is being screened.  That the form that is being

23 used to administer the health screening questionnaire is not

24 adequate.  And that the individuals, the officers who are

25 administering the questionnaire are not trained or qualified

1   to do a kind of medical screening.

2        I also found that there were problems related to

3   individuals' access to care once they had been accepted into

4   the facility and were in a holding cell if a problem developed

5   and also that there were issues concerning medication when

6   people came in who were receiving prescription medications,

7   there were problems with how that system was working.

8   Q.   Did you give a deposition in this case?

9   A.   I'm sorry, what?

10  Q.   Were you deposed in this case?

11  A.   Yes.

12  Q.   Since the time you finished your report and gave a

13  deposition, have you considered more recent information?

14  A.   Yes, since the deposition, some of the documents I was

15  talking about in terms of policies and the memoranda I've

16  reviewed since that -- since the deposition.  Dr. Tarantino's

17  deposition was since the -- my deposition.  And then just

18  recently I think a couple of weeks ago I reviewed a new policy

19  that was issued by Border Patrol on doing their health

20  screenings in the stations.

21  Q.   Have your opinions changed based on that more recent

22  information?

23  A.   Yes, they have.

24  Q.   In what ways?

25  A.   I think things are actually worse now than when I was

 1    here three years ago because during the hearing, I had the

 2    impression and then it was confirmed in Dr. Tarantino's

 3    deposition that everyone who was entering the facility was

 4    being given a health interview.  And the newest policy limits

 5    that to juveniles and to individuals who are either

 6    self-identified as having medical problems or where an officer

 7    may have some concern based on something they see.

 8              MS. BALASSONE:  Your Honor, may I show Dr. Goldenson

 9    joint Exhibit 364 for identification?

10              THE COURT:  Yes.

11              MS. BALASSONE:  Mr. Lucero, please show the first

12    page of joint Exhibit 364.  I'll also note that the first few

13    exhibits that I'm going to be using are not confidential and

14    ask that they be shown on public gallery.  Thank you.

15    BY MS. BALASSONE:

16    Q.   Dr. Goldenson, do you recognize joint Exhibit 364?

17    A.   Yes, I do.

18    Q.   It is titled Standards for Health Services in Jails by

19    The National Commission on Correctional Health Care.

20    Dr. Goldenson, I believe you mentioned that you had a role

21    with NCCHC?

22    A.   Yes.

23    Q.   What was that role?

24    A.   I was on the board for seven years.  And as a member of

25    the board, I was on the policy and standards committee.  The

1   way the standards are developed by NCCHC is every number

2   of years a work group is put together.  Some of the members of

3   the work -- excuse me, of the work group are board members and

4   others are just people who have worked with the commission for

5   a long time.  And they -- excuse me, they go through the

6   standards and make any revisions or changes that they think

7   are indicated since the last time the standards were

8   published.

9        Once the work group has a finished product, then that

10  goes to the policy and standards committee which is the

11  committee I was on.  We would review their recommendations.

12  If we had concerns, there would be a back and forth between us

13  and the work group.

14       And then finally there would be a finished product that

15  would go to the full board.  And when the full board would

16  then vote on it.  So I was basically involved two different

17  times in the approval process for the standards.

18  Q.   And looking at the bottom of this first page, it says

19  2018.  Did you work on this version of the NCCHC standards as

20  part of your role on that committee?

21  A.   Yes, I did.

22  Q.   Are these NCCHC standards used by jails or other

23  detention facilities?

24  A.   Yes, they are.

25  Q.   How are they used?

1  A.   They're used in two different ways.  The standards

2  themselves, they're -- NCCHC offers a voluntary accreditation

3  program to jails and prisons that want their health services

4  to be accredited.  Their accreditation is based on these

5  standards.  So in order to achieve accreditation, a facility

6  needs to meet the standards that have been developed by the

7  commission.

8        In reality, a small percentage, I don't know the exact

9  number of facilities are accredited across the country.  The

10 standards are used more commonly by other jails and prisons

11 who might not -- might not necessarily be looking for

12 accreditation, but really looking for how to set up their

13 program, how to improve their program, how to develop the

14 policies that they need to know that they're providing

15 adequate care.

16       So it's really used as a reference by jails and prisons

17 across the country to sort of familiarize themselves with what

18 the accepted standard of care is for different aspects of

19 health care provision.

20            MS. BALASSONE:  Your Honor, we request admission of

21 joint Exhibit 364 into evidence.

22            MR. CELONE:  Objection based on relevance.

23            THE COURT:  Doctor, is this a generally recognized

24 throughout the country as establishing standard of care in

25 prison and detention medical care?

1          THE WITNESS:  Well, for jails and prisons, it is,

2     yes.  It's recognized as the -- as one of the standards.

3          THE COURT:  Okay.  Overruled.  It can be received.

4     It's admitted.

5          (Exhibit 364 entered into evidence.)

6          MS. BALASSONE:  Thank you.  Mr. Lucero, please show

7     page 13 of joint Exhibit 364.

8     BY MS. BALASSONE:

9     Q.   Dr. Goldenson, what is JE-O2?

10    A.   It's the National Commission Standard for Receiving

11    Screening.  As you can see next to the title, it says

12    essential.  The standards are broken down into two groups.

13    One group are the essential standards which a facility must

14    meet all of the essential standards in order to be accredited.

15    The other group of standards are important standards and a

16    facility can miss a certain number of those and still be

17    accredited as long as they meet all the essential standards.

18    Q.   And then below the word "standard," it says, Screening is

19    performed on all inmates upon arrival at the intake facility

20    to ensure that emergent and urgent health needs are met.

21         In your experience, does this NCCHC standard describe the

22    actual practice of receiving screening that jails commonly

23    follow?

24    A.   Yes, it is.

25    Q.   Under the standards section, it says compliance

1  indicators.  Do you know what compliance indicators means

2  here?

3  A.   Yeah, so the compliance indicators are sort of a road map

4  for the facilities to know what kind of things the commission

5  considers significant to go into each different standard.  So,

6  for example, in this receiving screening standard, the

7  compliance indicators talk about what should happen at the

8  receiving screening and then they talk about the form that

9  should be used when doing the initial screening.  And then it

10  also lists a number of specific health conditions and concerns

11  that need to be addressed in the form to ensure that people

12  aren't entering the facility with health issues that need to

13  be addressed on an urgent basis.

14  Q.   And when you describe the items that should be in the

15  receiving screening form, are you referring to paragraphs 3

16  and 4 of the receiving and screening standard compliance

17  indicators?

18  A.   Yes, I am.

19  Q.   In your experience, do those categories describe

20  categories of actual screening questions that jails commonly

21  follow?

22  A.   Yes.  Like I said, in San Francisco, for example, I know

23  the facilities I've been at, these questions are used to

24  develop -- or these recommendations are used to develop the

25  questions that end up on the receiving screening form that's

 1    used at the individual facility.

 2              MS. BALASSONE:  Mr. Lucero, please show page 14 of

 3    joint Exhibit 364.  And I'll ask you to show the full page,

 4    please.

 5    BY MS. BALASSONE:

 6    Q.   Dr. Goldenson, on the last paragraph of this page, it

 7    says in all will -- it starts by saying, In all facilities

 8    where health staff are available, it is expected that they

 9    conduct the initial screening.

10         Do you know what "health staff" means here?

11    A.   Health staff refers to licensed and credentialed health

12    professionals.  Generally, the health screening is performed

13    by nurses.  In some places, part of the screening is performed

14    by physicians or mid-level providers.

15    Q.   The next sentence of that same paragraph says, However,

16    this standard allows receiving screening to be conducted by

17    health trained correctional staff members when health staff

18    are not on duty.

19         Do you know what "health trained correctional officer"

20    means here?

21    A.   Yes.  It's an officer who has been assigned to perform

22    receiving screening.  And generally they will receive training

23    by health care staff in the facility as to how to perform the

24    screening, which includes how to ask the questions, how to

25    make the necessary observations, if there are any specific

1    follow-up questions that need to be asked based on the answers

2    to the first questions.  And then how to address positive

3    responses to the questionnaire.

4    Q.   In your experience, does this section of page 14 describe

5    the actual practice of who does screening commonly in jails?

6    A.   Yes, it does.

7    Q.   In your experience, does this kind of medical screening

8    described by this standard require a medical screener to make

9    a diagnosis?

10   A.   No.  It doesn't -- you don't need to make a diagnosis.

11   Really the purpose of the screening is to be able to identify

12   that there's a medical condition or concern or illness that

13   needs to be addressed with further evaluation and/or

14   treatment.  So you don't have to specifically know what that

15   condition is.

16        So, for example, if someone is complaining of chest pain

17   and it's significant, that's enough to know that they're

18   having chest pain.  You don't have to know whether it's from a

19   heart attack or peptic ulcer or whatever.  So you don't need a

20   specific diagnosis, you just need to know that the person

21   needs further evaluation.

22        MS. BALASSONE:  Your Honor, may I show Dr. Goldenson

23   joint Exhibit 911 for identification?

24        THE COURT:  Yes.

25        MS. BALASSONE:  Mr. Lucero, please show the

 1  first page of joint Exhibit 911.

 2  BY MS. BALASSONE:

 3  Q.   Dr. Goldenson, do you recognize joint Exhibit 911?

 4  A.   Yes, I do.

 5  Q.   It is titled Performance-based National Detention

 6  Standards, 2011 by U.S. Immigration and Customs Enforcement.

 7  Dr. Goldenson, have you reviewed this document?

 8  A.   Yes, I have.

 9  Q.   How did you review it?

10  A.   I've seen a paper copy and I also reviewed it on the ICE

11  website.

12          MS. BALASSONE:  Your Honor, we request admission of

13  joint Exhibit 911 into evidence.

14          MR. CELONE:  Objection based on relevance.  This is

15  Border Patrol.  We're not talking about ICE detention

16  facilities, your Honor.

17          MS. BALASSONE:  And, your Honor, I would just note

18  that joint Exhibit 910 was also a standard that was admitted

19  yesterday.  So that we offer this document for the same

20  reason, that it's evidence of standards that are used in other

21  detention facilities.

22          THE COURT:  Why don't I have a copy of it?  I mean,

23  I know I have a copy buried in these books somewhere, but you

24  were going to get me a copy of --

25          MR. LONDEN:  Your Honor, you do have a copy of the

 1  2019 version which was issued December.  This is a version

 2  that precedes it.  If it's not in your notebook, I apologize.

 3  I will provide it.  It's Exhibit 910.  But the preceding

 4  standard is 911.

 5          MR. CELONE:  That's not a basis for relevancy, your

 6  Honor.  It's a 2011 document.  Over eight years old.

 7          THE COURT:  Is there a newer edition?

 8          MS. BALASSONE:  Your Honor, there is a update to the

 9  ICE standards in 2019, but the 2011 version I will represent

10  has -- has a more robust section on medical screening and it

11  also has as an appendix an intake -- an exemplar of an intake

12  screening form.

13          THE COURT:  Well, was it continually used from 2011

14  to 2019 revision?

15          MS. BALASSONE:  Yes, your Honor.  My understanding

16  is that the version that we have in the joint exhibit binders

17  was continuously used until 2019.  There were no other updates

18  that changed it.

19          THE COURT:  How would this witness know that it

20  would constitute a standard in the correctional institutions?

21          MS. BALASSONE:  Your Honor, I believe that the --

22  this is -- because this is an ICE standard, it would represent

23  the standards used in ICE facilities.  And Dr. Goldenson did

24  visit an ICE facility.

25          THE COURT:  Will any other witness be making

 1    reference to this document, this --

 2              MS. BALASSONE:  Not to my knowledge.

 3              MR. CELONE:  And Dr. Goldenson testified that he had

 4    visited an ICE facility in the '90s I believe.  So the

 5    relevancy here is beyond the scope.

 6              THE COURT:  All right.  I'm going to allow it.  911

 7    is admitted.

 8         (Exhibit 911 entered into evidence.)

 9              THE COURT:  Go ahead.

10              MS. BALASSONE:  Thank you.

11              Mr. Lucero, please show 270 of joint Exhibit 911.

12    BY MS. BALASSONE:

13    Q.   Dr. Goldenson, under Section J titled Medical and Mental

14    Health Screening of New Arrivals, it says, As soon as possible

15    but no later than 12 hours after arrival, all detainees shall

16    receive by a health care provider or a specially trained

17    detention officer an initial medical, dental and mental health

18    screening and be asked for information regarding any known

19    acute or emergent medical condition.

20         How does Section J compare to NCCHC's standard for

21    receiving screenings?

22    A.   They -- they're basically the same except that the NCCHC

23    says that upon entry into the facility, the screening will be

24    performed and this says as soon as possible but no later than

25    12 hours after arrival.  My understanding is that individuals

 1  who are admitted to ICE facilities, many if not most are

 2  coming from other facilities where presumably they've already

 3  undergone a health screening.

 4      So I think in this situation, the 12 hours is based on

 5  that.  I still think 12 hours is too long a period of time,

 6  but I think it's in there because people are coming from other

 7  facilities.

 8          MS. BALASSONE:  Mr. Lucero, please show page 271 of

 9  joint Exhibit 911.

10  BY MS. BALASSONE:

11  Q.   Dr. Goldenson, page 271 has a list of 19 items on the

12  left side.  How does this compare to the list of categories in

13  NCCHC standard for receiving screening?

14  A.   It's very similar.  It covers the same types and medical

15  conditions and medical issues that you'd be concerned about

16  when performing screening on someone coming into your

17  facility.

18      The one -- the one that I'm aware of that's different is

19  the last one that talks -- asks the person if there's any

20  history of physical or sexual victimization.  I think that's

21  not -- it's -- it's asked in some jails, not all.  I don't

22  think it's as big an issue as it is just from what I've read

23  in the newspapers and what you hear is that sexual

24  victimization is not uncommon for women who are coming across

25  the border.  So I think this is an important question, even

 1  though it's not in the NCCHC standard, that needs to be asked

 2  for people being picked up by the Border Patrol so that --

 3  because if someone is the victim of a sexual assault, they

 4  need medical attention as soon as possible.

 5  Q.   Dr. Goldenson, on the same page on the right side of

 6  the page, about two-thirds of the way down, there's a

 7  paragraph that starts:  The health intake screening shall be

 8  conducted using the IHSC intake screening form, parenthesis,

 9  IHSC 795 A, close parenthesis, or equivalent and shall be

10  completed prior to the detainee's placement in the housing

11  unit.  The intake screening form attached as appendix 4.3.A

12  mirrors Form IHSC 795 A and may be used by facilities to

13  ensure compliance with screening requirements in these

14  standards.

15       Dr. Goldenson, have you reviewed appendix 4.3.A?

16  A.   Yes, I have.

17          MS. BALASSONE:  Mr. Lucero, I'll ask you to please

18  scroll through pages 287 to 293 of joint Exhibit 911.

19  BY MS. BALASSONE:

20  Q.   Dr. Goldenson, is this the appendix 4.3.A you reviewed?

21  A.   Yes.

22  Q.   How do the questions in this appendix form compare to the

23  list on page 271 of this exhibit?

24  A.   The questions reflect the list that's earlier in the

25  document.

1           MS. BALASSONE:  Mr. Lucero, please show the

2   first page of joint Exhibit 910 in evidence.

3   BY MS. BALASSONE:

4   Q.   Dr. Goldenson, do you recognize joint Exhibit 910?

5   A.   Yes, I do.

6   Q.   Did you review this document?

7   A.   Yes, I did.

8           MS. BALASSONE:  Mr. Lucero, please show page 119 of

9   joint Exhibit 910.

10  BY MS. BALASSONE:

11  Q.   Under the Roman numeral 1 policy heading, it says:  All

12  detainees shall have access to appropriate medical, dental and

13  mental health care including emergency services.  Each medical

14  facility will strive for accreditation with National

15  Commission on Correctional Health Care.

16      Dr. Goldenson, do you know whether ICE facilities have

17  received NCCHC accreditation?

18  A.   My understanding is that at least some of the facilities

19  have been accredited by the NCCHC.

20          MS. BALASSONE:  Mr. Lucero, please show page 120 of

21  joint Exhibit 910.

22  BY MS. BALASSONE:

23  Q.   Dr. Goldenson, looking at the first paragraph of Section

24  D entitled Medical Screening, New Arrivals, the first sentence

25  says:  As soon as possible but no later than 12 hours after

 1   arrival, all detainees shall receive by a health care

 2   practitioner or a specially trained detention officer an

 3   initial medical, dental and mental health screening and be

 4   asked for information regarding any known acute, emergent or

 5   pertinent past or chronic medical conditions including history

 6   of mental illness, particularly prior suicide attempts or

 7   current suicidal slash homicidal ideation or intent and any

 8   disabilities or impairments affecting major life activities.

 9        Dr. Goldenson, how does this compare to the NCCHC

10   receiving screening standard?

11   A.   Well, again, it's pretty much the same except for the

12   12-hour -- that they give a 12-hour window that, you know,

13   they specify the screening should be done as soon as possible,

14   but they allow for a 12-hour window, which I've already

15   discussed why I think that exists and that I think it's too

16   long.

17   Q.   And how does this compare to the ICE 2019 version that we

18   saw -- excuse me?

19   A.   It's pretty much identical.

20   Q.   I'll just correct my question.  This is the current

21   version of the ICE standard.  So in either way, your opinion

22   is that they're similar?

23   A.   They're pretty identical.

24   Q.   Thank you.

25            MS. BALASSONE:  Your Honor, may I show Dr. Goldenson

 1 | joint Exhibit 915 for identification?

 2 |           THE COURT:  Yes.

 3 |           MS. BALASSONE:  Mr. Lucero, please show the

 4 | first page of joint Exhibit 915.

 5 | BY MS. BALASSONE:

 6 | Q.   Dr. Goldenson, do you recognize joint Exhibit 915?

 7 | A.   Yes, I do.

 8 | Q.   On the upper left corner, it is numbered CBP directive

 9 | No. 2210 dash 004.  Entitled:  Enhanced Medical Support

10 | Efforts.  How did you review this -- excuse me, have you

11 | reviewed this document?

12 | A.   Yes, I have reviewed it.

13 | Q.   How did you review it?

14 | A.   I reviewed a paper copy and I reviewed it on the Border

15 | Patrol website.

16 | Q.   Is this the medical policy from the past few -- few weeks

17 | that you referenced earlier?

18 | A.   Yes.  It's the one I mostly recently saw.

19 |           MS. BALASSONE:  Your Honor, we request admission of

20 | joint Exhibit 915 into evidence.

21 |           MR. CELONE:  No objection.

22 |           THE COURT:  Yes, it's admitted.

23 |      (Exhibit 915 entered into evidence.)

24 | BY MS. BALASSONE:

25 | Q.   Dr. Goldenson, looking at the scope section of this

1    policy, does it state what Border Patrol stations this

2    directive applies to?

3    A.   Yes, the Border Patrol stations along the southwest

4    border.

5    Q.   Looking at the purpose section of the policy, does it

6    state what the directive replaces, if anything?

7    A.   Yeah.  It says that the purpose is to deploy enhanced

8    medical support efforts to mitigate risk to and to sustain

9    enhanced medical efforts for people in custody across the

10   southwest border.  So it's their new policy on deploying

11   enhanced medical support.

12   Q.   I'm looking at the last line, it says:  This directive

13   replaces the CBP interim enhanced medical efforts directive

14   signed on January 28th, 2019?

15   A.   Correct.

16   Q.   Looking back to the scope section of the policy, does it

17   state how this directive interacts with TEDS?

18   A.   Yeah, it says -- it says that it supplements TEDS.

19          MS. BALASSONE:  Mr. Lucero, please show page 4 of

20   joint Exhibit 915.

21   BY MS. BALASSONE:

22   Q.   Looking at Section 7.1, it states:  CBP will utilize a

23   phased approach to the identification of potential medical

24   issues in persons in custody.  Does this policy identify how

25   many phases are in this approach?

1  A.    They have three phases.

2  Q.    What does this policy say about the first phase?

3  A.    So under the first phase, the agent will observe the

4  individual and will also advise the individual to alert Border

5  Patrol personnel or medical personnel of any medical issues of

6  concern.  And then it specifies that people who do have

7  identified medical issues will receive a health interview or

8  medical assessment or be referred to a local health system for

9  evaluation.

10  Q.    Is this first phase different than what you understood

11  Border Patrol said it was doing on screening before?

12  A.    Yes, it is different.

13  Q.    In what way?

14  A.    As I said before, my understanding was that everyone

15  entering the facility was going to be given the health

16  interview.  And according to this, it's just people who either

17  a Border Patrol agent might see something that makes them want

18  the person to have the interview or by self-identification of

19  the patient themselves saying that they have a problem.

20        So the majority of people in my opinion would end up not

21  being screened by this, whereas the prior policy everyone was

22  getting a health interview.

23  Q.    Why is that worse?

24  A.    Excuse me?

25  Q.    Why is that worse?

1  A.   It's worse because the whole purpose of the health

2  interview and the screening process is to ensure that people

3  who are coming into your facility, whether it's a jail, a

4  prison or the detention center, that you're aware of the

5  medical issues that they have.  Because your primary

6  responsibility is -- well, one of your primary

7  responsibilities is to ensure the health and safety of the

8  people who are in custody.  And if you don't know what kind of

9  health issues they may have or what medications they need to

10 take, then you're putting them at risk for harm by not having

11 their health issues addressed.

12      Also, screening is very critical piece of the whole

13 infectious disease program of a jail or a prison or a

14 detention center in that you want to ensure that people aren't

15 entering the facility with contagious diseases like

16 tuberculosis, scabies, chicken pox, measles that can affect

17 other individuals, both other detainees and people who work in

18 the facility.  So you want to make sure that you're

19 identifying people with these kind of illnesses as soon as

20 possible so you can isolate them and keep them away from other

21 people so other people don't get infected.  And by not

22 screening everyone, you're risking that you're going to miss

23 people.

24 Q.   In your opinion, is observation by Border Patrol agents

25 an adequate substitute for screening with a complete

1   questionnaire?

2   A.   No.  The Border Patrol agents as far as I know don't

3   really receive any kind of training in what, you know, what

4   observation means.  It's hit or miss and up to the individual.

5   People don't take their clothes off so you're not really

6   seeing their skin.  You can't see if they have rashes and

7   things like that.  So there are a lot of things that would go

8   unnoticed if all you're basing it is on observation.

9        With observation, you sort of pick up some of the -- some

10   of the more blatant kind of problems, but for the more subtle

11   things, it can be just as dangerous.  You would have no clue.

12   Q.   In your opinion, is advisement to a detainee to

13   self-report medical issues an adequate substitute for

14   screening?

15   A.   I missed the last part of that.

16   Q.   Sure.  In your opinion, is advisement to a detainee to

17   self-report medical issues an adequate substitute for

18   screening?

19   A.   No, it's not.

20   Q.   Why?

21   A.   Well, for a number of reasons.  But the main thing is

22   that when you're asking people to basically self-report,

23   sometimes people might not be aware that they have a

24   significant medical problem.  And if someone who has been

25   coughing for three or four months and has occasional fevers,

1    you know, they may have become used to that condition.  So if

2    someone says do you have any medical issues, they're going to

3    say no.  Whereas, in fact, that person could have

4    tuberculosis.  So unless you're asking a specific question,

5    you're not going to know that.

6         The other concern I have with the self-reporting is that,

7    you know, a lot of people are not that medically

8    sophisticated.  They haven't had good access to medical care

9    prior to being picked up and this is true in jails, prisons,

10   and detention centers.  And so they don't -- medical care is

11   not something that's real high, necessarily, on their priority

12   list as it would be for some of us.

13        And when you're first incarcerated, there's so much going

14   on and people are upset.  In this situation they've just

15   crossed the border.  They may be hungry.  They may be thirsty.

16   Medical issues might not be the first thing that they're going

17   to start complaining about.

18        The other thing is that in a lot of situations, once

19   someone's arrested, you know, they're not that interested in

20   prolonging their contact with the people who have arrested

21   them.  So they're going to want to ignore things and just not

22   respond to things.

23        So that's why it's so important that you actually have a

24   face-to-face interview with the person sitting in front of you

25   using a structured questionnaire where you know you're asking

1   specific questions about specific medical conditions that you

2   would need to know about to protect the health and safety of

3   both that individual and the other people in your facility.

4   Q.    In your opinion, is it appropriate for Border Patrol

5   agents to decide whether someone gets a health interview

6   versus a medical assessment versus a referral to the local

7   health system?

8   A.    Again, without training, I don't see how they could make

9   that decision.

10  Q.    In your opinion, is a referral to the local health system

11  an adequate substitute for medical screening?

12  A.    Well, I think if your system is set up such that everyone

13  that entered your facility was sent to the local hospital to

14  be cleared before they are admitted to the facility, that that

15  would be acceptable.  It's very resource intensive and, you

16  know, I'm not aware of any jails that would do that except

17  maybe some tiny jail that gets very few people coming in.

18  They may do that.

19       But in general, it's too expensive to send everyone that

20  comes in to the hospital to have a screening.

21            MS. BALASSONE:  Mr. Lucero, please show page 2 of

22  joint Exhibit 915.

23  BY MS. BALASSONE:

24  Q.    Dr. Goldenson, looking at Section 5.3, how does this

25  policy define the term "health interview"?

1    A.    It defines the health interview as a standardized medical

2    questionnaire that's completed either by Border Patrol

3    employees, other government employees or contracted medical

4    personnel.

5    Q.    Have you seen CBP form 2500?

6    A.    Yes, I have.

7    Q.    Looking down to Section 5.4, how does this policy define

8    the term "medical assessment"?

9    A.    Medical assessment is basically a medical evaluation

10   conducted by a health care provider which I think means in

11   this context a doctor or a mid-level provider.

12   Q.    Have you seen a medical assessment form produced by

13   defendants in this case?

14   A.    Yes, I have.

15   Q.    Looking up to Section 5.2, how does this policy define

16   the term "health care provider"?

17   A.    Health care provider is a medically credentialed person

18   who delivers authorized health care in a systematic way to

19   individuals or groups in need of health care services.

20   Q.    Do you have any understanding of whether contracted

21   medical personnel are stationed in the Tucson Sector?

22   A.    It's my understanding that there are contracted medical

23   personnel at the Tucson station and possibly at one other in

24   the Tucson area.

25   Q.    What's the basis of your understanding?

1  A.    Dr. Tarantino's deposition.

2  Q.    And is it your understanding that that -- the stationing

3  of contracted medical personnel is fluid such that it may

4  shift?

5  A.    Yes.

6         MS. BALASSONE:  Mr. Lucero, please show page 4 of

7  joint Exhibit 915.

8  BY MS. BALASSONE:

9  Q.    Looking at Section 7.2, does this policy explain what the

10  second -- excuse me, looking at Section 7.3, does this policy

11  explain what the second phase is?

12  A.    Yeah, the second phase is that all juveniles or

13  individuals who are under 18 years of age will receive a

14  health interview.

15  Q.    Is this second phase different from your understanding of

16  the screening Border Patrol said it did before?

17  A.    Yes.  As I said before, my understanding was that

18  everyone coming in to the facility was being administered the

19  health interview.

20  Q.    And the basis of your understanding was Dr. Tarantino's

21  deposition?

22  A.    The deposition and also what I understood from being at

23  the hearing.

24  Q.    So in your opinion, is it appropriate for a Border Patrol

25  to perform medical screening only on children detained at the

 1  Tucson Sector stations?

 2  A.    I'm sorry, could you repeat that?

 3  Q.    In your opinion, is it appropriate for Border Patrol to

 4  perform a health interview only on children detained in the

 5  Tucson Sector stations?

 6  A.    No, it's not.  As I said before, screening or using the

 7  health interview needs to be conducted on everyone entering

 8  the facility so that you're aware what the health issues are

 9  that are entering your facility.

10  Q.    Looking at Section 7.4, does this policy explain what --

11          MS. BALASSONE:  Oh, and Mr. Lucero, I'll ask you to

12  put pages 4 and 5 up from joint Exhibit 915.

13  BY MS. BALASSONE:

14  Q.    Looking at Section 7.4, does this policy explain what the

15  third phase is?

16  A.    Yes, it does.  It says that a medical assessment --

17  excuse me, will be performed on all children under the age of

18  12 and also on any other person who answers "yes" to one of

19  the mandatory referral questions on the health interview.

20  Q.    Is this third phase different than your understanding of

21  what Border Patrol said it was doing before upon medical

22  assessments?

23  A.    Yes, it is.  My understanding was they were doing the

24  medical assessment or they were planning to do the medical

25  assessment on all juveniles, not just those under 12.

```
 1   Q.   What's the source of your understanding?

 2   A.   The prior policy.

 3   Q.   And also the deposition of Dr. Tarantino?

 4   A.   Right.  But it was in the policy also.

 5   Q.   Do you know who Dr. Tarantino is?

 6   A.   Yeah.  I don't know him personally.  He -- I forget his

 7   exact title, is something like senior medical advisor for the

 8   Border Patrol.

 9   Q.   And do you have an understanding of whether this policy

10   identifies the senior medical personnel, Dr. Tarantino, as

11   another position?

12   A.   I'm sorry, say that again?

13            MS. BALASSONE:  Mr. Lucero, if you could try to find

14   the footnote in joint Exhibit 915, please.

15            It may be on pages --

16            THE WITNESS:  Were you asking if he's responsible?

17   BY MS. BALASSONE:

18   Q.   Page 3.  Looking at this footnote, is it your

19   understanding that Dr. Tarantino is the senior medical advisor

20   for CBP?

21   A.   Yes.

22   Q.   And then based on this footnote, is it your understanding

23   that the chief -- that the role of the chief medical officer

24   under this directive shall be fulfilled by Dr. Tarantino?

25   A.   Yeah.  Until they appoint a CMO, yeah.
```

1   Q.   Thank you.

2        So in your opinion, is it appropriate for Border Patrol

3   to perform medical assessments only on children under 12 who

4   are detained in the Tucson Sector stations?

5   A.   No.  I think it's appropriate that they perform them on

6   all children.

7   Q.   Does this policy explain who conducts the medical

8   assessments?

9   A.   Yes, it does.

10  Q.   What's your understanding of who conducts the medical

11  assessments under this policy?

12  A.   That primarily, the medical assessments are conducted by

13  medical professionals which, again, would be a doctor or

14  mid-level provider.  However, it does provide for under what

15  they call exigent circumstances, which isn't defined in the

16  policy, that under -- under exigent circumstances, a -- an EMT

17  could perform the assessment.

18  Q.   In your experience, is it a practice in jails or other

19  detention facilities for EMTs to perform medical assessments?

20  A.   No, it's not.

21  Q.   Why not?

22  A.   Because they are not trained or medically qualified to do

23  a medical assessment.

24  Q.   So in your opinion, is it appropriate for Border Patrol

25  agents who are also EMTs to perform medical assessments?

1  A.    No, it's not and this actually came up in -- in my own

2  experience.  When I started working in San Francisco at the

3  county jail, the health department was utilizing a

4  classification of employees who were called jail medical

5  technicians.  And they were people who had been EMTs on the

6  ambulances and then moved over and started working in the

7  jail.  And some of their functions included doing medical

8  screening and doing assessments.

9        And there was a lawsuit going on.  And part of a result

10  of the lawsuit is that we were sort of forced to get rid of

11  that classification because the individuals were not qualified

12  medically to be doing screening and other types of

13  assessments.

14          MS. BALASSONE:  Mr. Lucero, could you please

15  put page 4 of joint Exhibit 915 on the screen?

16  BY MS. BALASSONE:

17  Q.    So Dr. Goldenson, under Section 7.4, it says:  Subject to

18  availability of resources and operational requirements.

19  A.    Correct.

20  Q.    What's your understanding of this caveat to the policy's

21  statement regarding medical assessments?

22  A.    Well, it's a little vague as to what it means about

23  availability of resources and operational requirements.  As

24  far as I remember, it was not in earlier policy statements.

25  And whenever I see a statement like this in a policy, it's

1   very concerning to me because what it means is that basically

2   it gives staff the ability to ignore following the policy and

3   be able to say, well, you know, we didn't have the resources,

4   so-and-so was sick today, blah, blah, blah.  So that it's a

5   way of basically getting around what your policy is

6   saying needs to be done.  It's saying, well, this needs to be

7   done unless you can't do it.  Then it's okay not to do it.

8        So like I said, it's almost like a red flag for me that,

9   you know, statements like this shouldn't be in policy

10  statements.

11  Q.   In your experience, is it a practice in jails or other

12  facilities to perform medical screening on only some

13  detainees?

14  A.   I'm sorry, I missed the last part?

15  Q.   In your experience, is it a practice in jails or other

16  detention facilities to perform medical screening on only some

17  detainees?

18  A.   No.  It's -- you need to perform screening on every

19  individual to ensure that you're not missing something.

20  Q.   In your experience, is it a practice in jails or other

21  detention facilities to perform medical screening only if a

22  detainee self-reports that she or he has a medical issue of

23  concern?

24  A.   No, no, the way screening is routinely done is by using a

25  structured questionnaire similar to the one that we looked at

 1    before on the screen where the questions are specific to

 2    certain medical illnesses and conditions and not just sort of

 3    a blanket question of whether you have any health problems.

 4    Q.    In your experience, is it a practice in jails or other

 5    detention facilities to perform medical screening only if an

 6    officer observes or identifies a medical issue of concern?

 7    A.    No.

 8    Q.    Why not?

 9    A.    For the same reason that I mentioned before.  That, one,

10    there are only certain things you're going to pick up by

11    observation.  A lot more -- it's a lot more common for medical

12    problems and conditions to be identified by taking a history

13    rather than just by looking at the person.  So you really need

14    to go through that structured questionnaire to ensure that

15    you're finding all the issues that you need to find.

16    Q.    In your experience, is it a practice in jails or other

17    detention facilities for an officer to have discretion about

18    what kind of medical screening an individual will receive?

19    A.    No, it's not.

20    Q.    Why not?

21    A.    Because they don't -- they don't have the requisite

22    training, education, background or skills to make those kind

23    of decisions.

24    Q.    In your experience, is it a practice in jails or other

25    detention facilities to rely on information gathered by an

1  officer in the field in lieu of a medical screening upon

2  arrival at a facility?

3  A.   No.  The information that's obtained in the field, you

4  know, often can be very useful, but situations can change,

5  conditions can change.  People don't necessarily tell the

6  arresting officer what's going on with them.  So it can be

7  useful information, but it's certainly not sufficient to rely

8  upon in terms -- in lieu of a formal medical screening.

9  Q.   What role does the medical screening system play in a

10  detention setting?

11  A.   Well, it's the mechanism by which -- so let me back up.

12  As I said earlier, the -- one of the things that you're

13  responsible for when someone enters your facility is ensuring

14  the individual's health and safety.  That requires that you're

15  aware of whatever medical issues they may have, even if

16  they're not necessarily aware of them when they walk in the

17  door.  So you're asking a series of questions to identify any

18  health issues that need to be addressed on an urgent or an

19  emergent basis.

20       So you're not really looking for long-term care at this

21  point.  That usually will happen down the line in a jail or a

22  prison.  But you're really concerned about the first couple,

23  three days when someone is in your custody where they could

24  develop significant medical problems, either because they have

25  a condition that's not being treated or they're not getting

1   medication for something that they need.  And you're placing

2   them at risk of harm if you don't address those medical

3   issues.

4        The other important factor, as I said, was the need to

5   keep infectious diseases as much as possible out of the

6   facility.  And again, the way to accomplish that is to do a

7   structured questionnaire where you're asking for signs and

8   symptoms of the common illnesses that you're going to see

9   wherever your facility is.  But in corrections, generally

10  tuberculosis, skin diseases, things like that are fairly

11  either common or they're harmful enough that you need to focus

12  on them and make sure you're identifying people so they don't

13  infect either staff or other detainees.

14  Q.   Beyond the infectious diseases that you just mentioned,

15  are there other categories or types of medical issues that are

16  common in a detention setting?

17  A.   Yes.  A large proportion of people have chronic illnesses

18  like diabetes, hypertension, asthma for which they're taking

19  medications.  There's history of trauma, both recent and old

20  trauma.

21       I think in the -- specifically in the Border Patrol, one

22  of the major health issues is dehydration.  In the Border

23  Patrol stations that I did go into, there were signs -- a

24  number of signs on the walls talking about dehydration and how

25  people need to drink fluids to keep hydrated.  I reviewed some

1    of the treatment authorization forms.  A number of the people

2    sent to the hospital from Tucson Sector jails were being sent

3    for the treatment of dehydration.

4        So, again, here's a medical condition where it's

5    extremely important, given the situation, that you have

6    specific questions that would detect people who are in early

7    stages of dehydration who need treatment so they don't get

8    worse.

9    Q.   How do you know the kinds of medical issues that

10   individuals were -- who were detained at Tucson Sector Border

11   Patrol stations were being sent for treatment?

12   A.   It was on the treatment and authorization forms that I

13   reviewed.

14          MS. BALASSONE:  The next exhibit I will refer to has

15   been designated as confidential so I'll ask that it be removed

16   from the gallery screen.  Thank you.

17          Your Honor, may I show Dr. Goldenson joint Exhibit

18   881 for identification?

19          THE COURT:  Sure.

20          MS. BALASSONE:  Mr. Lucero, please show the

21   single page of joint Exhibit 881.

22   BY MS. BALASSONE:

23   Q.   Dr. Goldenson, do you recognize joint Exhibit 881?

24   A.   Yes, I do.

25   Q.   It is titled Alien Initial Health Interview Questionnaire

```
 1 || from Department of Homeland Security, U.S. Customs and Border
 2 || Protection.
 3 ||        MS. BALASSONE:  Your Honor, we request admission of
 4 || joint Exhibit 881 into evidence?
 5 ||        MR. CELONE:  No objection.
 6 ||        THE COURT:  It's admitted.
 7 ||    (Exhibit 881 entered into evidence.)
 8 || BY MS. BALASSONE:
 9 || Q.   Dr. Goldenson, is this the document that you referenced
10 || previously and that was referenced in the new medical policy
11 || CBP 2500?
12 || A.   Yes, it is.
13 || Q.   How do you know that?
14 || A.   It's at the bottom of the form.  It says form 2500.
15 || Q.   Okay.  And I'll just note you're referring to the bottom
16 || left section.
17 ||        MS. BALASSONE:  Thank you, Mr. Lucero.
18 || BY MS. BALASSONE:
19 || Q.   Dr. Goldenson, how does this set of questions here
20 || compare with the category of questions in the NCCHC receiving
21 || screening standard?
22 || A.   Well, the questions aren't as thorough as the ones that
23 || we discussed earlier.
24 ||        MS. BALASSONE:  Mr. Lucero, please show page 13 of
25 || joint Exhibit 364 with this exhibit.
```

 1  BY MS. BALASSONE:

 2  Q.   Dr. Goldenson, in your opinion, are there NCCHC

 3  categories of questions that are missing from the health

 4  interview questionnaire?

 5  A.   Yes, there are.

 6  Q.   What are they?

 7  A.   Well, I think in this setting, the questions that are

 8  important that are not on form 2500 would be concerning dental

 9  care or dental problems, I'm sorry.  That if someone has a

10  dental abscess, that can rapidly become a medical emergency.

11  So people need to be questioned about whether they do have any

12  dental issues when they come in.

13       Dietary needs, if someone is going to be in the facility

14  for two, three days or longer, it's important that the people

15  running the facility are aware if the individual has any

16  specific dietary needs based on their medical conditions so

17  that they can try to meet those needs.

18       There is a question on here:  Are you thinking about

19  hurting yourself or others.

20  Q.   Well, you're referring to --

21  A.   No. 10, I'm sorry.

22  Q.   No. 10 on joint Exhibit 881?

23  A.   So that's an important question.  In my opinion, it needs

24  to be a little more robust in the sense of asking if anyone

25  has tried to commit suicide.  If they're thinking about

 1   committing suicide.  If they've ever harmed themself or if

 2   they're thinking of harming themselves.  When people first get

 3   arrested, it's a very high risk time for self-harm and

 4   suicide.  So it's important to know if someone is either

 5   thinking about that or has a history so appropriate actions

 6   can be taken to lessen the chances that the person will be

 7   doing that.

 8        Similarly, question 11 and 12, do you have a fever, do

 9   you feel feverish and do you have a cough or difficulty

10   breathing are questions that get at symptoms of tuberculosis,

11   but there are a number of other questions that need to be

12   asked such as has a person had weight loss, night sweats,

13   fatigue because tuberculosis can present in a number of

14   different ways and some of the symptoms can be very subtle if

15   the person has had it for a while.

16        And again, it's such a huge issue if someone -- luckily

17   it doesn't happen very often, but if someone does get into a

18   facility with tuberculosis and they're not identified and

19   isolated, they can spread the disease very rapidly to other

20   detainees and to staff.

21   Q.   Do these -- sorry, go ahead.

22   A.   No, go on.

23   Q.   Do these questions that you've identified as missing from

24   joint Exhibit 881 matter for screening of individuals who are

25   held in short-term detention?

1   A.   I'm sorry, I didn't understand.

2   Q.   Do the questions that you've identified as missing from

3   joint Exhibit 881 matter for screening of individuals who are

4   held for short-term detention?

5   A.   Yeah.  Because I think a lot -- the issues I'm talking

6   about are things that would need to be addressed within the

7   first couple of days of someone being in the facility.  So you

8   would want to screen for these problems.

9        The other one I didn't mention was -- they ask if --

10  No. 4, question 4 asks if you're a drug user.  There's no

11  question related to alcohol use and alcohol withdrawal.  For

12  people who are coming into a facility where they've been not

13  incarcerated and all of a sudden they're incarcerated and

14  they're no longer able to drink, they're at extremely high

15  risk for withdrawal and death unless the fact that they are at

16  risk is identified and the treatment is implemented.

17  Q.   Dr. Goldenson, looking at the first question of joint

18  Exhibit 881, are the questions you described as missing

19  covered by this first question:  Do you have a history of or

20  current medical or mental health issues?

21  A.   I mean, broadly they are covered.  But again, it's -- to

22  me, it's the same as asking someone to let us know if you have

23  a health problem, that people aren't always that forthcoming

24  with some of their medical issues, that they just -- so they

25  just might not be thinking in terms of some of the things that

1   we would consider are important.

2        So given it's -- you know, that you are responsible for

3   maintaining the health and safety, again, you really need to

4   know what the health issues are.

5        And an open-ended question like this really won't get at

6   it.  I mean, if you go to a hospital or something, they don't

7   just ask you one question like this and say, okay, you're

8   done.  You know, they ask you specific questions about

9   symptoms and other history.  And that's what the screening

10  form really needs to look like.

11            MS. BALASSONE:  Mr. Lucero, please show page 271 of

12  joint Exhibit 911 and the first page of 881.

13            I'm looking --  page 271, please of 911.  And then

14  can I -- great.  Thank you.  881 with page 271 of joint

15  Exhibit 911, please.

16  BY MS. BALASSONE:

17  Q.   Dr. Goldenson, you identified the category 19 on the ICE

18  screening list of categories as questions related to sexual

19  abuse and assault; correct?

20  A.   Correct.

21  Q.   Are those questions adequately covered by the Alien

22  Initial Health Interview Questionnaire?

23  A.   No, I don't think they are.

24  Q.   Do those questions matter for screening of individuals

25  who are held in short-term detention?

 1   A.   The question on sexual assault?

 2   Q.   Yes.

 3   A.   Well, as I was saying, it matters in the Border Patrol

 4   stations because at least it appears from things I've read,

 5   that there is a fairly high incidence of sexual assault of

 6   women coming across the border.  And if someone has been

 7   sexually assaulted within the past day or two, it's important

 8   they get medical care as soon as possible so you'd want to

 9   identify that when the person comes into the facility so they

10   could be sent to the hospital for further care and treatment.

11   Q.   Is the category on sexual abuse and assault in the ICE

12   standard covered by the first question on joint Exhibit 881:

13   Do you have a history of or current medical or mental health

14   issues?

15   A.   I would say no, that if someone who is sexually assaulted

16   was asked that question, it doesn't necessarily compute that

17   they would say -- say that that is related to a current

18   medical or mental health issue.

19   Q.   And what about the question 7:  Are you currently ill or

20   injured or do you have significant pain.  In your opinion,

21   does that cover the category of sexual abuse in ICE standard?

22   A.   Again, I would say no.  I don't consider being ill or

23   injured the same as being sexually assaulted.

24   Q.   Looking at -- on just 881 now.

25        The box that says, Additional agent slash officer

 1    observations which reads:  Are there any other observations or

 2    concerns.  Examples are disorientation, bruising slash

 3    bleeding, yellow eyes slash skin, environment-relate illness,

 4    parentheses, heat stroke, hypothermia, severe dehydration,

 5    closed parens.

 6         In your opinion, is this section adequate screening for

 7    the types of issues it describes as examples?

 8    A.   No, because the -- for example -- well, first of all, you

 9    wouldn't necessarily observe that someone is dehydrated.

10    Also, you'd want to know if someone is dehydrated before it

11    came severe so when they're first entering the facility, you'd

12    want to make sure that you're checking for that.  And really

13    the way to do it is by getting a history of symptoms related

14    to dehydration or heat-related injuries such as headache,

15    dizziness, blurred vision.  Just looking at the person doesn't

16    give you all the information you need.

17         MS. BALASSONE:  Mr. Lucero, please show

18    just page 287 of joint Exhibit 911.

19         And then if you could scroll to page 288, please.

20    BY MS. BALASSONE:

21    Q.   Dr. Goldenson, midway down the -- a third of the way down

22    the page, it says:  Do you now or have you ever had

23    tuberculosis, TB.  And then it says:  In the past two months

24    have you experienced any of the following signs or symptoms

25    continuously for more than two weeks and has several follow-up

1  questions.  Is this the series of questions covering TB that

2  you described as missing from the health interview

3  questionnaire?

4  A.   Yes.

5       MS. BALASSONE:  Mr. Lucero, please show page 290 of

6  joint Exhibit 911.

7  BY MS. BALASSONE:

8  Q.   At the top, under the heading Sexual Abuse and Assault

9  Screening, there are three questions.  Does this series of

10 questions cover the sexual abuse and assault questions you

11 described as missing from the health interview questionnaire?

12 A.   I'm sorry, repeat that.

13 Q.   Does this series of three questions cover the sexual

14 abuse and assault questions you described as missing from the

15 health interview questionnaire?

16 A.   Yes.

17       MS. BALASSONE:  Mr. Lucero, please show the

18 first page of joint Exhibit 881.

19 BY MS. BALASSONE:

20 Q.   Dr. Goldenson, looking at the 13 questions on this

21 questionnaire, they are separated by headers; correct?

22 A.   Yes.

23 Q.   Do you have any understanding of what these separate

24 sections mean?

25 A.   I have an idea.  I wouldn't say I know for sure.  It

1   seems like the alien health background is really sort of more

2   global kind of questions about medical problems, medications,

3   allergies, and drug use.  And then the next section is for

4   women only.  And then the next series of questions are

5   specifically looking for symptoms of certain medical

6   conditions like we've discussed.

7        What I don't understand is on the last section, alien

8   health interview, it says:  If answered or observed yes to any

9   of the health interview questions below, refer for a medical

10  assessment.  I don't understand why, if someone responds yes

11  to one of the first six questions, that wouldn't also prompt a

12  medical assessment because the person's basically saying they

13  have medical issues.  So I don't know why that wouldn't be

14  mandatory in the same way that the last set of questions is.

15  Q.   So in your opinion, questions No. 1 through 6 shouldn't

16  be treated any differently from questions 7 through 13 in

17  terms of referral to a medical assessment?

18  A.   Yeah, I don't see why they're being treated any

19  differently.

20        MS. BALASSONE:  Your Honor, may I show Dr. Goldenson

21  joint Exhibit 884 for identification?

22        THE COURT:  Yes.

23        MS. BALASSONE:  Mr. Lucero, please show the first

24  page of joint Exhibit 884.

25  ///

1  BY MS. BALASSONE:

2  Q.   Dr. Goldenson, do you recognize joint Exhibit 884?

3  A.   Yes, I do.

4  Q.   It is titled Juvenile Intake Medical Assessment from

5  Loyal Source Government Services.  Dr. Goldenson, do you know

6  what Loyal Source Government Services is?

7  A.   No, I don't.

8  Q.   Dr. Goldenson, do you know who provides the medical

9  contractors for stations in the Tucson Sector?

10  A.   I don't know specifically who provides them.

11        MS. BALASSONE:  Your Honor, we request admission of

12  joint Exhibit 881 into evidence.

13        MR. CELONE:  You mean 884?

14        MS. BALASSONE:  Yes, thank you.

15        MR. CELONE:  No objection.

16        THE COURT:  It's admitted.

17      (Exhibit 884 entered into evidence.)

18  BY MS. BALASSONE:

19  Q.   Is this the document referenced -- you referenced

20  previously as the medical assessment form?

21  A.   Yes.

22  Q.   And separate from the alien health questionnaire, are the

23  questions on this juvenile intake medical assessment adequate

24  for medical screening in your opinion?

25  A.   Well, they're not adequate for medical screening, but as

1    far as I know, this form isn't used for medical screening.

2    It's used by a medical provider to do the assessment and I

3    think it's okay for the purpose of the medical provider to be

4    using this form.

5    Q.   But it would not be appropriate for a -- for anyone to

6    use this medical -- this juvenile intake medical assessment as

7    the sole form for medical screening; correct?

8    A.   Correct.

9              MS. BALASSONE:  Your Honor, may I show

10   Dr. Goldenson --

11             THE WITNESS:  When I say -- could you repeat?  I

12   think I answered too quickly.

13   BY MS. BALASSONE:

14   Q.   Sure.  So is it your opinion that the juvenile intake

15   medical assessment form should not be used as the sole medical

16   screening form for an individual detained in the Tucson Sector

17   stations for the purposes of medical screening, not for

18   medical assessment?

19   A.   I understand.  But if a physician was filling out this --

20   if a physician was assigned to do medical screening and used

21   this form, I don't have a problem with that because it's a

22   physician using the form.  A physician knows how to ask the

23   questions, knows what -- so it doesn't need to be as

24   completely thorough as something where a nurse or a nonmedical

25   person was using it.

1   Q.   So an EMT using this medical assessment form would not be

2   sufficient?

3   A.   Correct.

4              MS. BALASSONE:  Your Honor, may I show Dr. Goldenson

5   joint Exhibit 81 for identification?

6              THE COURT:  Yes.

7              MS. BALASSONE:  Mr. Lucero, please show the

8   first page of joint Exhibit 81.

9   BY MS. BALASSONE:

10  Q.   Dr. Goldenson, do you recognize joint Exhibit 81?

11  A.   Yes, I do.

12  Q.   It is titled Defense's Response to Plaintiffs' First set

13  of Interrogatories.  Have you reviewed this document?

14  A.   Yes, I have.

15             MS. BALASSONE:  Your Honor, we request admission of

16  joint Exhibit 81 into evidence.

17             MR. CELONE:  No objection.

18             THE COURT:  Admitted.

19        (Exhibit 81 entered into evidence.)

20             MS. BALASSONE:  Mr. Lucero, please show pages 10 and

21  11 of joint Exhibit 81.

22  BY MS. BALASSONE:

23  Q.   Dr. Goldenson, I'm looking at Interrogatory 13.  Starting

24  at line 27, there's a sentence that states:  All Border Patrol

25  agents receive basic first aid training which covers basic

 1  treatment for cuts and abrasions, bandaging and applying

 2  pressure to a wound.

 3      Dr. Goldenson, is that consistent with your understanding

 4  of basic first aid training?

 5  A.   Yes, it is.

 6  Q.   Looking at page 11 of joint Exhibit 81, starting with

 7  line 6.  There's a sentence that states:  Tucson Sector also

 8  has an emergency medical technician program which includes

 9  approximately 265 agents trained as EMTs.

10      Do you have any understanding of how many agents in the

11  Tucson Sector have basic first aid training compared to EMT

12  training?

13  A.   No.  But my understanding is that there are a lot more

14  agents with first aid training than there are EMTs.

15  Q.   In your experience, is it a practice in jails to have

16  personnel with only basic first aid training conduct medical

17  screening?

18  A.   No, it's not.

19  Q.   Why not?

20  A.   Because again, they don't have the training or the

21  education or skills to perform an adequate screening without

22  further training and supervision.

23  Q.   In your experience, is it a practice in jails to have

24  personnel with only EMT training conduct medical screening?

25  A.   No, it's not.

1   Q.   Why not?

2   A.   Again, they don't -- it exceeds the scope of practice

3   that an EMT is allowed to perform.  And based on their

4   training and their skills and education, you know, they're not

5   qualified to do medical assessments or medical screenings.

6   Q.   Dr. Goldenson, what is your --

7          MS. BALASSONE:  Mr. Lucero, if you could please take

8   the pages down.  Thank you.

9   BY MS. BALASSONE:

10  Q.   Dr. Goldenson, what is your understanding of Border

11  Patrol's policy regarding detainees who arrive with

12  prescription medications?

13  A.   My understanding is that if someone comes into a facility

14  with a prescription from a U.S. pharmacy, that that medication

15  is accepted into the facility and the person is allowed to

16  maintain that medication in their possession and then take the

17  medication as it's prescribed.

18       If someone comes in with a prescription from a

19  nonU.S. pharmacy or if they come in and say that they have a

20  health problem that requires medication that they take, then

21  the person is referred to a medical professional who will

22  determine, you know, if the person needs the medication, what

23  medication, and then prescribe it.

24       Then when the person comes back from getting the

25  prescription, the officer will have the prescription.  And the

1   officers keep the prescriptions and then bring -- bring the

2   bottle to the patient however many times a day they're

3   supposed to take the medication and then have them take the

4   medication and then they take it back and store it somewhere.

5   Q.   In your opinion, is Border Patrol following its policy

6   regarding replacement of prescription medications?

7   A.   From some of the declarations I read, they were not

8   following it in the past.  According to the deposition of

9   Jorge Allen, he testified that there was some discretion among

10  the custody staff as to whether or not they would refer

11  someone to a medical provider for medication.  So I think as

12  long as there's discretion again by a nonmedical person and a

13  nonmedically trained person, that that's a problem with the

14  system and should not allowed to continue -- should not be

15  allowed to continue.

16  Q.   In your experience, are there risks to detainees with not

17  having access to continuation of prescription medication in

18  jails or other detention facilities?

19  A.   You know, it's high risk.  People -- people could be on

20  antibiotics for an infection that if they don't continue

21  getting the antibiotic, infection could become worse and

22  life-threatening.  If people have medications for chronic

23  illnesses like diabetes, asthma, seizure disorder, even if

24  they're only in your custody for two or three days, they

25  could -- or HIV is another good example, if they miss these

1    medications, it could lead to serious harm, even if they just

2    miss it for two or three days.

3    Q.   So that's true even for individuals who are held in

4    short-term detention?

5    A.   It's true for -- I didn't hear the last.

6    Q.   Oh.  So it's true even for individuals who are held in

7    short-term detention?

8    A.   Correct.

9    Q.   In your experience, what percentage of the population in

10   jails come in with prescription medications?

11   A.   I'd say in general, over 40 to 50 percent come in with

12   prescription.

13   Q.   What's the source of your understanding?

14   A.   Just from my experience working in jails for 30 years.

15   Q.   Do you have an understanding of how Border Patrol

16   monitors medical screening at Tucson Sector stations?

17   A.   I'm not aware of any monitoring efforts that are going on

18   currently.

19   Q.   What's the source of your understanding?

20   A.   I think it was Dr. Tarantino's deposition.  Also in the

21   new policy, they say they're going to set up something, but

22   they haven't set it up yet.

23   Q.   In your experience, what kind of monitoring of the

24   medical screening process do jails commonly perform?

25   A.   You would want to -- basically, it would be part of your

 1   quality management program, which is a way of looking at the

 2   different activities you do to ensure that you're doing them

 3   and that they're working the way you want them to work.  So

 4   you want to use that program to identify any potential

 5   problems and then come up with solutions to those problems.

 6        So for one, just off the top of my head, if you're

 7   looking at the screening program, you'd want to look and

 8   ensure if it was adequate functioning that everyone who enters

 9   the building is being screened, that the forms are being

10   filled out appropriately, that if there are positive

11   responses, that they're being addressed appropriately.  So

12   those are the kind of things just in terms of your initial

13   screening that you might look at with your quality improvement

14   program.

15   Q.   As part of your position as medical director of

16   San Francisco Jail Health Services, did you do an audit of the

17   actual medical screening forms that were filled out from time

18   to time?

19   A.   Yes, I would look at them.  So when I first started

20   working, they were paper forms.  And then after about seven or

21   eight years, we converted to an electronic medical record.

22   And I would review the -- so the screening was actually done

23   on the computer.  So I would review what was on the computer.

24        Initially I would actually look at some of the forms.

25   Q.   Have you also performed an audit of actually filled out

1  medical screening forms in your work as an expert?

2  A.   I'm sorry, could you repeat that?

3  Q.   In your work as an expert, have you performed the same

4  kinds of audit where you look at the actual medical screening

5  forms to determine if individuals are being screened

6  correctly?

7  A.   Yes, I do.

8          MS. BALASSONE:  Thank you, no further -- nothing

9  further at this time.

10          THE COURT:  Cross-examine.

11                          CROSS-EXAMINATION

12  BY MR. CELONE:

13  Q.   Good afternoon, Dr. Goldenson.

14  A.   Good afternoon.

15  Q.   Nice to see you again.  My name is Michael Celone.

16      Do you have any evidence of any actual harm that's been

17  caused to detainees from a purported inadequate medical

18  screening?

19  A.   No, I don't.  I -- I didn't have the opportunity to

20  review any actual records, was not able to observe any

21  screening that was actually going on, was not able to talk to

22  any of the people at the stations that we visited, so I have

23  no direct knowledge.  But I do have to add that in my work as

24  an expert, what I've always been told by -- is that really the

25  risk of harm is what's important; not necessarily that someone

1   suffers harm, but that if there's a risk of harm.

2        So, for example, if you didn't have any medical screening

3   program in a jail and for some reason you were lucky and over

4   the last two years nothing bad happened, that still would not

5   be an adequate system even though there's no direct harm

6   because there's such a risk of harm by not doing the

7   screening.

8   Q.   How many years have you served as an expert witness?

9   A.   I'm sorry, I didn't hear.

10  Q.   How many years have you served as an expert witness in

11  medical care related to correctional facilities?

12  A.   A little over 25 years, I think.

13  Q.   And in what types of cases have you served as a -- as an

14  expert witness?

15  A.   I'm sorry, say that again.

16  Q.   Which types of cases?  Can you characterize?

17  A.   Well, I've done -- the majority of my work has been

18  working as a court-appointed medical expert in situations

19  where either there's a consent decree or settlement.  And then

20  either by myself or with other people are asked to go in and

21  work with the facility to come up with ways to improve what

22  they do.  And then monitor to make sure that they're actually

23  making things better.

24       I've also done a number of individual cases where a

25  private attorney will contact me because their client was

1    incarcerated and something adverse happened and they're suing

2    the facility.

3    Q.   So I want to focus on those individual cases, the

4    litigation context.  Are those generally civil rights cases?

5    A.   Are they generally what?

6    Q.   Civil rights cases?

7    A.   Yeah, I think they're all federal civil rights cases.

8    Q.   And in those cases, have you ever found a medical

9    screening program that has been considered adequate in your

10   opinion?

11   A.   Well, not -- in those individual cases, I'm not

12   necessarily looking at the -- it depends what the

13   circumstances of the injury to the person was.  In many cases

14   it didn't involve the intake screening.  It's something that

15   happened, you know, further down the road when the person was

16   in custody.

17       So I've seen both adequate and inadequate intake

18   screening.

19   Q.   Is it fair to say that you take on individual cases in

20   litigation in order to try and improve the quality of medical

21   care to prisoners?

22   A.   I'm sorry, could you repeat that again?

23   Q.   Is it fair to say that you take on individual cases in

24   litigation in order to try to improve the quality of health

25   care for prisoners?

 1  A.    Yes.

 2  Q.    Is it fair to say that you take on civil rights cases in

 3  which you try to -- where you see a problem in health care?

 4  A.    Yes.  If I don't see a problem, I don't take the case.

 5  Q.    And you stated earlier that you have never had an

 6  opportunity to actually observe the medical screening of

 7  detainees in Tucson Sector; is that correct?

 8  A.    Correct.

 9  Q.    And have you evaluated any detainees in this case for

10  medical purposes?

11  A.    Have I evaluated what?

12  Q.    Any -- any detainees in this case for medical care?

13  A.    No.

14  Q.    You testified just a short while ago regarding the

15  questionnaire that's used in Tucson Sector.

16          MR. CELONE:  Ms. Kershaw, can you pull up joint

17  Exhibit 164, please.

18          I'm sorry, take that down, please.

19  BY MR. CELONE:

20  Q.    Are you familiar with a revised medical screening form

21  that was implemented in Tucson Sector based on this Court's

22  preliminary injunction order?

23  A.    You mean prior to the one that we've been talking about?

24  Q.    Correct.

25  A.    I remember there were a number of different forms.

1   Q.   And there was one that was revived that was implemented

2   to comply with the TEDS standards that this Court ordered.  Do

3   you recall seeing that?

4   A.   If it's the one that just flashed on the screen, I did

5   see that.

6   Q.   It was -- yeah, one that was supplemented beyond that.

7   But would your opinion change today if you learned that the

8   health questionnaire is still part of the routine processing

9   and questioning of Tucson Sector detainees when they arrive to

10  all stations?

11  A.   I'd have to -- I'd have to look at the form again.  I

12  don't remember it well enough to be able to answer that

13  question.

14       But basically, I mean, from what I said earlier, the

15  areas that I specified are what I think needs to be added to

16  the form.  So if those specific questions are in the form

17  you're talking about, then it would probably be acceptable.

18  If they're not, then I think we need to add some things to it.

19            MR. CELONE:  Ms. Kershaw, can you pull up joint

20  Exhibit 915, please; specifically, page 4.

21  BY MR. CELONE:

22  Q.   In subsection 7, does this in any way say that the health

23  questionnaire will not be utilized in Tucson Sector regardless

24  of any of the phases?

25  A.   It doesn't say it won't be used.

1   Q.   So you have no evidence to -- that -- you're not basing

2   your opinion on any evidence that Tucson Sector is no longer

3   using the health questionnaire?

4   A.   Well, my understanding is they are using it for

5   children -- for juveniles.

6   Q.   Would your opinion change if I was to tell you that they

7   were using it for all individuals on intake and that's a

8   routine part of the questioning?

9   A.   I'm sorry, they're using it what?

10  Q.   Would your opinion change if I were to tell you that they

11  routinely ask those questions as part of the intake processing

12  for all the individuals arriving in the Tucson Sector?

13  A.   So everyone walking in the door of the facility gets

14  asked those questions is what you're saying?

15  Q.   As part of the e3DM system.

16  A.   If everyone is being asked the questions on the health

17  interview, then my opinion that it's not being used on

18  everyone would change.  I still consider the form inadequate,

19  so ...

20  Q.   Would your opinion also change if you were to -- if I

21  were to tell you that in addition to the health questionnaire,

22  the continuum of care provided is the questionnaire that's

23  asked to all individuals as well as the health -- health

24  interview and the medical assessment provided by the medical

25  contractors at the Tucson Coordination Center?

1  A.   I didn't really understand what you said.

2  Q.   Would your opinion today change if I were to tell you

3  that in addition to the health questionnaire that's asked of

4  all detainees upon intake, the continuity of the -- the

5  continuum of care consists of the medical assessment and the

6  health interview by -- particularly the medical assessment by

7  the medical contractors?

8  A.   For everyone?  I don't -- okay, so you're saying the

9  health interview is being done on everyone?

10  Q.   Uh-huh.

11  A.   Are you saying the medical assessments are being done on

12  everyone also?

13  Q.   I'm saying the medical assessment is available to

14  everyone in the Tucson Coordination Center.

15  A.   Okay.  So if everyone who walks in the door gets the

16  health interview and all kids under 18 got a medical

17  assessment and adults who answer yes to the screening

18  questionnaire as long as it's updated, then I would think

19  that's okay for that piece of it.  There's still the whole

20  issue of the training and who's administering the

21  questionnaire.  That's problematic for me also.

22        MR. CELONE:  Ms. Kershaw, could you flip to page 5,

23  particularly Section 7.5.

24  BY MR. CELONE:

25  Q.   Dr. Goldenson, how does this paragraph differ from the

1  NCCHC screening standards?

2  A.   Well, the difference is in the last sentence where it

3  says in exigent circumstances, an EMS or EMT may conduct the

4  medical assessment under the medical direction of the CBP CMO.

5  So when we were looking at the NCCHC screening, that was

6  talking about the initial health screening.  It wasn't talking

7  about a medical assessment.

8       Medical assessment is sort of the next level of medical

9  care.  And EMS personnel can't be doing that.  They're not

10  trained.  They're not qualified.  They're not credentialed to

11  be doing assessments like that.

12  Q.   And is Border Patrol mandated to comply with the NCCHC

13  standards?

14  A.   No.  But as I said earlier, the reason I look at the

15  NCCHC standard is because I think it does set the community

16  standard for a lot of the health care operations that are

17  going on in jails or in detention centers.  And they're used

18  by a lot of people even if they're not mandated to use them.

19  Q.   And if a detainee is not presenting with a medical issue,

20  wouldn't the implementation of such NCCHC standards slow down

21  the processing?

22  A.   I'm sorry, if an -- if someone what?

23  Q.   If a detainee is not presenting with a medical issue?

24  A.   If they're not presenting with a medical issue.

25  Q.   Wouldn't the implementation of NCCHC standards cause them

1    to be in detention longer and slow down the processing

2    effectively?

3    A.   Slow it down from what?  Because what you're saying --

4    Q.   It would take longer.

5    A.   No, no, no.  But what I mean is you're -- there's

6    different situations.  There's a situation that I think is

7    going on now where not everyone is getting a health interview.

8    There's a situation where you're saying that maybe everyone is

9    getting a health interview.  If everyone is getting a health

10   interview, then adding a few more questions I don't think will

11   significantly add time to your initial processing.

12   Q.   Is it fair to say that there are problems with

13   individuals administering medicine on their own without

14   oversight from a medical professional?

15   A.   I'm not sure what you mean because people do that all the

16   time.  I mean, they go to the doctor and they come home with

17   medicine and they take their own medicine.  So for the most

18   part, people sort of are explained how to take their

19   medication and then take it.

20   Q.   But as far as in a -- strike the question.

21        Would your opinion change if I were to tell you that

22   Border Patrol policy now is to contact medical professionals

23   to have prescription medicines refilled if it's from a foreign

24   prescriber?

25   A.   I mean, that was the policy before, so the question isn't

1    whether that's the policy.  It's whether it's actually being

2    followed all the time.

3         So if there was data showing that when people come in and

4    say they have -- again, it's part of what I was calling

5    quality improvement.  You go back to the original form.  You

6    see if a person said -- and you -- you don't look at everyone,

7    obviously.  You look at subsets.  And, you know, you look at a

8    certain number of people who said they are taking medication

9    and you see what happened.  You know, if your study shows that

10   people are getting their medication, then your system is

11   working.  If they're not getting it, then you have a problem.

12   Q.   But do you have any evidence or have you seen any

13   evidence of individuals not receiving their medication?

14   A.   Like I said, just from the initial declarations that I

15   saw prior to the first hearing.

16   Q.   And when were those declarations written?

17   A.   Sometime prior to the hearing.  I don't remember

18   exactly -- I don't remember the exact dates.

19   Q.   Does 2015 sound -- does that ring a bell?  Does 2015,

20   does that sound familiar for when those declarations were

21   written?

22   A.   It's possible because that's when I started working on

23   this case, so ...

24   Q.   And finally, do you have any evidence of any long-term

25   harm caused by the purported insufficient medical screening?

1   A.   No.  As I said before, I don't have any evidence one way

2   or the other because I wasn't able to review the kinds of

3   things that I normally would review as an expert.

4           MR. CELONE:  Thank you, Dr. Goldenson.  No further

5   questions.

6           THE COURT:  Well, Counsel, clarify while you're

7   while you're there.  I think I read Exhibit 915 dated

8   December 30, 2019, the same way the witness does.  I'll need

9   you to have a witness testify in this case that every person

10  is being screened when they come in.

11          And No. 2, maybe explain why they wouldn't amend

12  that document.  Because the way that document reads is that

13  the arresting officer will make certain observations and tell

14  the individual, the arrestee, to report any medical issues.

15  That's phase 1.

16          Phase 2 is the screening process for juveniles.  It

17  doesn't say anything about screening process for everybody

18  else.  So that could be read by people at these detention

19  centers that they don't have to do a screening process for

20  adults; right?

21          MR. CELONE:  Sure.

22          THE COURT:  Now, if they're not screening everybody,

23  your client is in violation of the preliminary injunction.  So

24  I need to hear about that, okay?

25          MR. CELONE:  And we have at least two witnesses who

```
 1    are prepared to testify about that, both this week and next

 2    week, as well as Dr. Tarantino.  So I fully plan to address

 3    that.

 4                THE COURT:  All right.  Thank you.  Thank you.  Any

 5    redirect?

 6                MS. BALASSONE:  No, your Honor.

 7                THE COURT:  All right.  We'll take a recess for

 8    15 minutes.  You've got the unidentified witnesses to testify

 9    now.  Is that the idea?

10                MS. REINER MAYER:  Yes, your Honor.

11                THE COURT:  If you want to get those individuals

12    ready and make sure that you get together with Sara here to

13    make sure they're identified --

14                And thank you, Doctor.  I didn't -- you can be

15    excused.  Thanks for your appearance.

16                -- make sure they're identified in some form or

17    fashion.  For example, they were Jane Does, John Does and now

18    they're going to be witnesses A, B, C and D, et cetera.  We

19    need to match A with John Doe 1, so forth, just so we can keep

20    our record straight.

21                MS. REINER MAYER:  We will.

22                THE COURT:  And we still won't identify them or use

23    their names.  You may address such witness as Mr. -- Witness A

24    if you want to.  All right.

25                MS. REINER MAYER:  Thank you, your Honor.
```

 1           THE COURT:  So we'll take 15 minutes.  Be at recess.

 2   Thank you.

 3        (Recess from 3:08 p.m. to 3:24 p.m.)

 4           THE COURT:  Next witness.

 5           MR. HUERTA:  Your Honor, I'm Alvaro Huerta for the

 6   National Immigration Law Center for the plaintiffs.

 7           The plaintiffs will call Witness No. A who is listed

 8   as Witness No. 5 on the sealed witness list.

 9           THE COURT:  All right.  I guess the record should

10   show that you are furnishing the interpreters and that those

11   interpreters are certified.  Affirmatively head shakes.  All

12   right.

13           Ma'am, if you want to come up here to this witness

14   box.

15           THE CLERK:  If you remain standing.

16              WITNESS A, PLAINTIFF WITNESS, SWORN

17           THE CLERK:  Thank you.

18           THE COURT:  Have a seat.

19           MR. HUERTA:  Thank you, your Honor.  Your Honor,

20   with your permission I'll be referring to the witness as

21   Witness A.

22           THE COURT:  Yes.

23                        DIRECT EXAMINATION

24   BY MR. HUERTA:

25   Q.   Good afternoon.  I'm going to avoid using your name to

1  protect your identity today, and we'll call you Witness A or

2  Ms. A.  Is that okay?

3  A.   Yes.

4  Q.   Ms. A, could you please describe what happened when you

5  were arrested by Border Patrol?

6  A.   We were with some people in the desert.  We were all

7  lying down, getting a little rest.  The Border Patrol came up

8  with dogs and motorcycles and some on foot.  They tied us up.

9  They brought us out to the sun.  I was with my sister.  And

10 they put us in the patrol car.  We spent two hours out in the

11 sun without any protection, and then they put us in the patrol

12 car.

13 Q.   Could you describe your physical condition when you were

14 arrested by Border Patrol?

15 A.   Yes.  I was dehydrated.  I was bruised.  I had thorns in

16 me.  I had problems urinating, problems with my kidneys.

17           THE COURT:  Counsel, when was this?

18 BY MR. HUERTA:

19 Q.   Do you remember what date this was?

20 A.   I don't remember for sure, but I think it was June 7,

21 2015.

22 Q.   Could you describe a little bit more about your physical

23 condition, anything else that you remember?

24 A.   The sites where I had thorns I was getting an infection.

25 My body was aching.  I had a pain in my back because I wasn't

1   urinating well.

2   Q.   Did the Border Patrol ask you any questions about your

3   health?

4   A.   No.

5   Q.   Were you given food or water after you were arrested?

6   A.   Nothing.

7   Q.   Did you ask for it?

8   A.   Yes.

9   Q.   And what were you told?

10  A.   While we were in the patrol car, they did ask us if we

11  wanted water or food or we were hungry.  We all replied yes.

12  And then they laughed and they said, well, we're going to

13  drive you to a good restaurant and you will have really fresh

14  water there.

15  Q.   After you were arrested, where did Border Patrol take

16  you?

17  A.   I remember they took us to a large place, like a

18  detention center.  It had many metal doors and --

19            MS. FABIAN:  Objection; relevance.

20            THE COURT:  We don't even know where this is,

21  Counsel.

22            MR. HUERTA:  So I can --

23            THE COURT:  So the subject matter of this case are

24  the detention centers in Southern Arizona.  At least we need

25  further foundation -- we know when she goes there, which is

 1  problematic in itself, but where does she go?

 2          MR. HUERTA:  Sure, your Honor.  Let me ask a few

 3  questions to clarify with her.

 4  BY MR. HUERTA:

 5  Q.  Do you remember where you were taken?  Do you know the

 6  name of the facility or where in Arizona?

 7  A.  I don't.

 8  Q.  Do you remember where you crossed the border?

 9  A.  Into Arizona, we were arrested at a place called Sasabe.

10  Q.  Were you ever told what the name of the center was?

11          THE INTERPRETER:  What the name of the what,

12  Counsel?

13          MR. HUERTA:  The name of the center.

14          THE WITNESS:  No.

15  BY MR. HUERTA:

16  Q.  Can you describe the detention center for us?

17          MS. MASETTA-ALVAREZ:  Objection; relevance.

18          THE COURT:  Overruled.  She can answer.

19          THE WITNESS:  It was a large place.  It seemed to be

20  a large facility.  I only remember the hallway because I

21  couldn't see any other places.  What I do remember full well

22  was the cell that I was put into.

23  BY MR. HUERTA:

24  Q.  What do you remember about that cell that you were put

25  into?

 1  A.   What I remember the most is how cold it was.

 2            MS. MASETTA-ALVAREZ:  Objection; relevance.  May I

 3  be heard, your Honor?

 4            THE COURT:  I can make some assumption, but I don't

 5  know that I should.  We don't even know if she's in one of the

 6  subject detention centers.  Do we?

 7            MR. HUERTA:  Well, your Honor --

 8            THE COURT:  Is that the nature of your objection?

 9            MS. MASETTA-ALVAREZ:  In part, your Honor.  They

10  have not laid the sufficient foundation that she was in a

11  Tucson Sector facility.  But also because these events as she

12  has already testified occurred in 2015, they are not relevant

13  to this case which is based on the current conditions.  If I

14  may make an offer of proof, she'll testify that her only time

15  in a Border Patrol facility was in June of 2015, which was

16  approximately four and a half years ago.

17            THE COURT:  Is that -- isn't that a problem?  We

18  don't know where she is, and she's there at a time that is

19  probably not even relevant to the issues today.

20            MR. HUERTA:  Well, I think, your Honor, we can

21  establish that she was near -- she was detained in the Arizona

22  sector and therefore would have likely been taken to one of

23  the sector detention centers.  I can ask her a few more

24  questions to establish that.

25            And in terms of relevance for her testimony, as

 1   your Honor stated at the beginning of the case, this is about

 2   the impacts, not only of her detention when she was detained,

 3   but I will be asking her questions about how that's impacted

 4   her since and I think that could be relevant to the Court.

 5            MS. MASETTA-ALVAREZ:  May I respond, your Honor?

 6            THE COURT:  Sure.

 7            MS. MASETTA-ALVAREZ:  Again, this case is about

 8   conditions as they are currently as this Court has stated and

 9   this -- because this happened four and a half years ago, you

10   know, it's just not relevant to what's going on in 2019.

11            THE COURT:  Well, we can't be too narrow because if

12   it's about conditions today, we'd have to have a prisoner that

13   was there today.  But at the very least, we need a relevant

14   period of time which I would deem probably back to 2017

15   anyway.  I guess I could stretch it that far.  But 2015, I

16   don't think so.

17            MS. MASETTA-ALVAREZ:  And your Honor, if I may?

18            THE COURT:  I don't know how her testimony would be

19   relevant to the ongoing conditions that are the subject of

20   this lawsuit.

21            MR. HUERTA:  Well, I think, your Honor, one of the

22   things --

23            THE COURT:  A lot of changes since 2015.

24            MR. HUERTA:  Yes, your Honor.  Agreed.  But I think

25   what we also hope to show is that many things haven't changed,

 1   and to establish that there were conditions then that

 2   continue, and that because those conditions haven't changed

 3   will effect people years later.

 4          MS. MASETTA-ALVAREZ:  If I may be heard, your Honor?

 5   There have been significant changes that have occurred.  For

 6   one, this Court did order a preliminary injunction requiring

 7   mats after ten hours, requiring that everyone receive a mylar

 8   blanket, requiring that everyone have a means to clean

 9   themselves.  And those requirements were not in place in 2015

10   when the witness was in custody.

11          THE COURT:  Counsel, I'm going to sustain the

12   objection to relevancy with this witness.

13          MR. HUERTA:  If I may, your Honor.

14          Just so the Court is aware, the witness is also

15   Jane Doe 1, the plaintiff in this case, and filed it back in

16   2015.  I'm not sure if that helps your Honor understand that

17   as she will, as we talked to her, try to establish that part

18   of this case is that despite the defendant's changes to the

19   conditions, there are things that you will see that have been

20   put into evidence that continue.  And I think that the effects

21   of those on people years later I think is what your Honor was

22   trying to get at the beginning of the case.

23          THE COURT:  Well, and we don't even know which

24   facility we're talking about or whether we're even, in fact,

25   talking about a facility that's the subject of this case.

 1            MR. LONDEN:  Your Honor, she is recorded in e3DM.

 2   We could tie it up.  I don't want to say that, but the time

 3   frame is what it is.

 4            THE COURT:  You can put her in a particular facility

 5   by some other document or record?

 6            MR. LONDEN:  Yes, sir.  Her name is in e3DM.

 7            THE COURT:  Is she going to be talking about the

 8   five -- any one of the five present claims in the lawsuit?

 9   For example, it's not relevant how she's treated out in the

10   arresting field or what Border Patrol agents said to her when

11   she was arrested.  There are five claims for constitutional

12   violations in this case.  And if other evidence can identify

13   her as being in a particular facility which is the subject of

14   the lawsuit and it pertains to some condition that is ongoing,

15   if you can tie that up, I can grant you the relevance.

16            MR. HUERTA:  Yes, your Honor.  We will be asking

17   about the conditions that pertain to the claims right now.

18            THE COURT:  Well, I'll consider the weight of it,

19   but -- I'm going to allow it for now, if you can tie it up

20   with some record.

21            MR. LONDEN:  Your Honor, we will be able, after the

22   witness is down as has completed their testimony, to show in

23   e3DM listing of her confidential identifying information.

24            THE COURT:  All right.  Go ahead, Counsel.

25            MR. HUERTA:  Thank you, your Honor.

```
 1   BY MR. HUERTA:
 2   Q.   So Ms. A, could you continue telling us about the
 3   conditions in the -- the detention center cell that you were
 4   held in?
 5   A.   Yes.  There was a cement bench, one toilet.  Above the
 6   toilet, there was, like, a drinking fountain.  The floor and
 7   there was nothing else in there.
 8   Q.   Do you remember how many people were held in that cell
 9   with you?
10   A.   Approximately, about 20 people.  Women.
11   Q.   Were you able to sleep in that cell?
12   A.   No.
13   Q.   Why not?
14   A.   For starters the air conditioning was too cold.  The
15   floor was too hard.  The blanket we were given made a lot of
16   noise.  It was made of aluminum or something.  It didn't
17   provide any heat.  My health was poor and I had a fever.
18   Q.   Could you -- you mentioned the cold.  Could you describe
19   the temperatures in the cells and how that felt to you?
20   A.   We didn't have a way to measure the temperature but I was
21   shivering.  My body felt that it was very, very cold there.
22              MS. MASETTA-ALVAREZ:  Objection; relevance.
23              THE COURT:  Overruled.
24   BY MR. HUERTA:
25   Q.   And did you do anything to try to keep warm?
```

1    A.    I held my sister in my arms.  All us women were huddled

2    to keep our temperature.

3    Q.    And did you ever ask for an extra aluminum blanket?

4    A.    Yes.

5    Q.    And what was -- what did they say?

6    A.    They said that was not a hotel for me to be asking for

7    warm blankets and they only had one per person.

8    Q.    Did you ask -- ever ask for the temperature to be raised?

9    A.    We all did.

10   Q.    And what did they say?

11   A.    They said no, it couldn't be done.

12   Q.    Okay.  You mentioned it was also noisy in the cell.

13   Could you describe the noises in the cell?

14   A.    It was outside.  We could hear like there was banging on

15   the door with metal.  The people who worked there were

16   laughing and they were loud.

17   Q.    And do you remember how many days you were detained?

18   A.    Four and a half days.

19   Q.    And were you ever able to rest or sleep during that time?

20   A.    No.

21   Q.    How did that lack of sleep affect you?

22   A.    I felt nervous.  I feel like someone was chasing me.  I

23   felt fear.

24   Q.    Were you ever provided any personal hygiene items while

25   in Border Patrol custody?

```
 1   A.    No.

 2   Q.    Was there soap at the facility?

 3   A.    No.

 4   Q.    And how would you describe the cleanliness of the cell?

 5   A.    It was quite dirty.  The people, and I am including

 6   myself, were quite smelly.  It smelt of feet and armpits.

 7   There was garbage on the floor.

 8   Q.    And how did the dirtiness of the cell affect you?

 9   A.    In several ways.  My wounds were infected and, because of

10   the conditions, they got worse.

11   Q.    Did you ever get any medical treatment for those

12   conditions?

13   A.    No.

14   Q.    Did you ask to see a doctor?

15            MS. MASETTA-ALVAREZ:  Objection; hearsay.

16            THE COURT:  Overruled.

17            THE WITNESS:  I did.

18   BY MR. HUERTA:

19   Q.    You can answer.

20   A.    No.

21   Q.    Were you given food while in Border Patrol custody?

22   A.    Yes.

23   Q.    And what did they give you to eat?

24   A.    One burrito, one cookie and small juice.  But the burrito

25   was almost one year past expiration.  It was green and it was
```

1    smelly.

2    Q.   Did you eat the burrito?

3    A.   No.  Only the cookie and the juice.

4    Q.   And were you given water to drink?

5    A.   The water was pretty much above the toilet.  We drank it

6    when we felt almost that we had to drink because our throat

7    was so dry.  We could not trust the water because the bathroom

8    was there.  The potty.  And we feared that from the feces, it

9    would seep up into the water.

10   Q.   How did the conditions of your detention make you feel

11   back then?

12   A.   I felt I was less than other people.  I was being treated

13   practically like an animal.  I had fear.  It felt really bad.

14   Q.   What were you afraid of?

15   A.   I feared that I would freeze to death.  I would die of

16   hunger.  I would die of thirst.  And especially I have a big

17   sister and my little sister was there.  She was in the same

18   condition as I was.  And I felt I couldn't protect her.

19   Q.   So you said it's been about four and a half years since

20   you were detained.  How does the way you were treated in

21   detention make you feel today?

22   A.   I watched the news and it makes me feel the same as I

23   did.  It's just that my conditions are now different and my

24   lifestyle is different, but when I see it on the news, it

25   brings back the memories of the conditions I went through.  It

```
 1    makes me cry.  I put myself in the shoes of those people.
 2              MR. HUERTA:  Your Honor, I have no more questions
 3    for Witness A.  Thank you, Ms. A.
 4              THE COURT:  Any cross?
 5              MS. MASETTA-ALVAREZ:  Yes, your Honor.
 6                        CROSS-EXAMINATION
 7    BY MS. MASETTA-ALVAREZ:
 8    Q.   Good morning.  My name is Kaitlyn Masetta-Alvarez and I
 9    represent the government.  Is it okay if I call you Ms. A
10    today?
11    A.   Yes.
12    Q.   Ms. A, you said it's been four and a half years since
13    you've been in Border Patrol custody.  Is that right?
14    A.   Yes.
15    Q.   Have you gone to a Border Patrol facility since 2015?
16    A.   No.
17    Q.   Ms. A, you also testified during your direct examination
18    that you were in Border Patrol custody for about four days.
19    Are you sure about that?
20    A.   Yes.
21    Q.   Ms. A, do you know whether Border Patrol keeps records of
22    how long people are in detention?
23    A.   Well, they should do so.
24    Q.   Would it surprise you that Border Patrol records show
25    that you were in Border Patrol custody for only two days?
```

1    A.   Well, they'll do what's more convenient for them.

2    Q.   Now, when you were in custody, were you inside a

3    building?

4    A.   Well, it wasn't a building.  It was like a large

5    facility.  It did not have floors.

6    Q.   Did it -- did the cell that you were in, did it have

7    windows?

8    A.   No.

9    Q.   Were you able to tell whether it was day or night

10   outside?

11   A.   No.  The lights were always on.

12   Q.   How did you keep track of how many days you were in

13   Border Patrol custody?

14   A.   Well, because I was detained on the 7th, and then they

15   transferred us to a different facility more or less on the

16   11th.  I don't recall exactly because it's been a long time.

17   Q.   Would it surprise you, Ms. A, that you were transferred

18   on June 8th to a different facility?

19   A.   That's not true.

20   Q.   Ms. A, how do you know that you were transferred on the

21   11th of June?

22   A.   Well, I don't recall the exact date, but I do know there

23   were -- it was four days.  Because when we were taken to the

24   other detention center, there was a clock outside.  It said it

25   was 2 a.m.  And then we went to another detention center for

 1  one day.

 2  Q.   Okay.  So how long were you in the first detention

 3  center?

 4  A.   Four days.

 5  Q.   And then how long were you in the second detention

 6  center?

 7  A.   One day.

 8  Q.   But again, in the first detention center, you didn't have

 9  any way of looking outside to keep track of the days.  Is that

10  right?

11  A.   That's right.

12  Q.   And did you have a cell phone on you to help you keep

13  track of the days?

14  A.   They didn't give me back my cell phone until after we

15  left the detention center.

16  Q.   So you didn't have a cell phone to help you keep track of

17  the days.  Is that right?

18  A.   No.

19  Q.   Ms. A, I want to talk to you about the meals that you

20  received while you were in Border Patrol custody.

21  A.   Okay.

22  Q.   You mentioned earlier that you received a burrito that

23  you believed was expired?

24  A.   Yes.

25  Q.   How did you know that the burrito was expired?

1  A.   I'm able to a bit read expiration dates.

2  Q.   So you could tell by the expiration date?

3  A.   Of course.

4  Q.   And what was the expiration date?

5  A.   It's been four and a half years.  You shouldn't expect

6  for me to have that information now.  I do not recall.

7  Q.   Ms. A, what country are you from?

8  A.   El Salvador.

9  Q.   Is it true that in El Salvador, sometimes the months come

10  after the days when you are looking at dates?

11  A.   Yes.

12  Q.   So, for example, if it were June 7th of 2015, in

13  El Salvador that might be marked 07-06-2015.  Is that right?

14  A.   Correct.

15  Q.   Do you remember when you were looking at the date if you

16  were looking at it the way you would read it in El Salvador?

17  A.   No.

18  Q.   How were you reading the date?

19  A.   Well, first I was reading the month, then the day, and

20  then the year.

21  Q.   Ms. A, are you familiar with Julian dates?  Julian dates?

22  A.   I don't understand that.

23  Q.   Have you ever heard of the Julian date?

24  A.   I don't know what that is.

25  Q.   Would it be a surprise that -- would it surprise you that

1    a Julian date is a way of measuring expiration dates that are

2    a little bit different than the way that we normally read

3    dates?

4    A.   Well, I don't know.

5    Q.   Ms. A, I want to talk to you about the sleeping

6    conditions.

7    A.   Okay.

8    Q.   You testified that you received a mylar blanket upon

9    arrival; is that right?

10   A.   Yes.  It was a package like this (indicating).

11   Q.   It was -- it was a silver blanket?

12   A.   Yes.

13   Q.   Do you remember getting a second blanket on June 9th,

14   2015?

15   A.   No.  Only one.

16   Q.   When you were transferred to the second station, did you

17   receive a blanket at that time?

18   A.   When I went to the second detention center, there was a

19   mat there.  There was a blanket.  There was food, but only

20   after four days.

21   Q.   Okay.  Would it surprise you that on June 9th, which we

22   have -- which was when you were at the second detention center

23   is when you received a second blanket?

24   A.   I spent four days in the first detention center and I was

25   detained on June 7th.

1  Q.   So you're saying that it would surprise you if Border

2  Patrol that maintains records of detention shows that you

3  received a blanket on June 9th at the second station that you

4  were transferred to?  Or excuse me, at the station that you

5  were transferred to?

6  A.   If you're telling me I only spent one day in the first

7  detention center and on June 9th I went to the second

8  detention center, I'm telling you that I spent four days in

9  the first detention center.

10  Q.   I understand that you're testifying that you spent

11  four days in the first detention center.  So I'm just asking

12  you, would you be surprised if there was a record from the

13  second detention center you were at that on June 9th you

14  received a blanket?

15  A.   Yes.  I -- what I'm telling you is that after four days I

16  went to the second detention center and I did receive a

17  blanket.  There was a bed that was actually a bunk bed.  My

18  sister slept in the bottom bunk and I slept on the top bunk.

19  And I did have a blanket, and I slept all night because I was

20  very, very tired.

21  Q.   Do you know whether that second facility was an ICE

22  facility?

23  A.   I do not know.

24  Q.   Do you know what the difference is between Customs and

25  Border Protection and Immigration and Customs Enforcement?

1   A.   Well, how could I know the difference between those

2   organizations?  I had just come into the country.  I was very

3   hungry.  I was very tired.  At that moment one doesn't stop to

4   look at that.

5   Q.   I completely understand, Ms. A.

6        It's important, though, in this case to distinguish

7   between Customs and Border Protection and Immigration and

8   Customs Enforcement because this case is against specifically

9   Customs and Border Protection.

10  A.   I understand.

11  Q.   So it's your testimony today that the second facility you

12  were transferred to with the bunk beds and the blanket, you're

13  not sure if that was Customs and Border Protection or

14  Immigration and Customs Enforcement?

15  A.   Well, all I know I remember is that when we were going to

16  be transferred to Eloy where I would be there for

17  three months, they didn't have any space for two more people.

18  So that's why I spent a day and a night at that second place.

19  Q.   And do you know what that place where you spent one day

20  and one night was called?

21  A.   No.

22  Q.   Ms. A, do you remember being transferred to a different

23  building after two days of being in Customs and Border Patrol

24  custody?

25            THE INTERPRETER:  After how many days, Counsel?

 1             MS. MASETTA-ALVAREZ:  I'm sorry, after two days of

 2    being in Customs and Border Protection.

 3             THE INTERPRETER:  I'm sorry, repeat the question.

 4             MS. MASETTA-ALVAREZ:  It's okay.  I'll repeat.

 5    BY MS. MASETTA-ALVAREZ:

 6    Q.   Do you remember being transferred to a different facility

 7    after -- after two days of being in Customs and Border

 8    Protection custody?

 9    A.   It was four days.

10    Q.   I understand that you're testifying that you were in

11    custody for a total of four days, but were you transferred

12    anywhere within that four days?

13    A.   Well, they -- we -- they took us out of the -- that place

14    and then there wasn't any space where we were going.  So then

15    they brought us back and then they took us out again.

16         And I don't know if at that point they had a count of

17    people that were coming in and out.

18    Q.   And when you say they took us out again, what do you mean

19    by that?

20    A.   Well, first they took us and I mean us because my sister

21    was with me and unfortunately she couldn't be here today.  But

22    they took us out on the bus.  But then there wasn't any space

23    so the bus returned.  And when I returned -- when we returned,

24    those mylar blankets were there and they weren't clean and I

25    just used it because I wanted to warm up.

1   Q.   But as you stated earlier, Ms. A, you can't remember

2   exactly what date you were transferred.  Is that right?

3   A.   Of course.

4   Q.   Ms. A, I want to talk to you about -- about the medical

5   treatment that you -- about the medical treatment that you

6   received while you were in Customs and Border Protection

7   custody.

8   A.   Okay.

9   Q.   You testified earlier that -- that you were in a lot of

10  pain.  Is that right?

11  A.   Yes.

12  Q.   You testified earlier that you had an infection; is that

13  correct?

14  A.   Yes.

15  Q.   Did you tell anyone that you had an infection?

16  A.   Well, we would knock on the door, bang on the door, and

17  we told them that we wanted -- we needed pills for our fever

18  and pain.  And they would say, well, we don't have any.

19  Q.   But, Ms. A, did you tell anyone that you had an

20  infection?

21  A.   Yes, that my skin was red.

22  Q.   When did you tell someone that your skin was red?

23  A.   Well, the next day that we came in -- well, in fact, when

24  we first came in, I told the officer that my body hurt, that I

25  have thorns.  And he did not respond.  And I knew that the

 1   officer did speak Spanish.

 2   Q.   Do you remember signing a medical screening form?

 3   A.   They did not give me any form.

 4   Q.   Do you remember if a Border Patrol agent asked you if you

 5   were sick?

 6   A.   They didn't ask anything.

 7   Q.   No one asked you if you have a fever?

 8   A.   No.

 9   Q.   No one asked you if you had a headache?

10   A.   I didn't have a headache.

11           MS. MASETTA-ALVAREZ:  Your Honor, I would like to

12   put a medical screening form on the ELMO, but this does

13   contain PII so I'm just trying to figure out how to best go

14   about this.

15           THE COURT:  Well, we can do that and just not

16   publish it to the -- anywhere except counsel and the bench.

17   Do you want to turn that ELMO on?

18   BY MS. MASETTA-ALVAREZ:

19   Q.   Now, Ms. A, without saying your name, can you tell me

20   just with a yes or no whether this is your name at the top of

21   the form?

22   A.   I can't see anything.

23           THE COURT:  Oh.  We need the witness monitor.

24           THE WITNESS:  Yes.

25   ///

1   BY MS. MASETTA-ALVAREZ:

2   Q.   And without saying your date of birth, is this the month

3   in which you were born?

4   A.   Yes.

5   Q.   And is this the day on which you were born?

6   A.   Yes.

7   Q.   And is this the year in which you were born?

8   A.   Yes.

9   Q.   Okay.  Now, Ms. A, you read Spanish; correct?

10  A.   Yes.

11  Q.   Okay.  Can you read just that first line there?  No. 1 in

12  Spanish?

13  A.   Yes.

14  Q.   Okay.  Go ahead and read it, please.

15  A.   Are you sick.

16  Q.   Okay.  And, Ms. A, can you tell us what the checkmark is

17  on that screen on that?  Is that under si or no?

18  A.   It says no.

19  Q.   And, Ms. A, can you read No. 2?

20  A.   Do you have a fever.

21  Q.   Okay.  And, Ms. A, what is checked?  Si or no?

22  A.   No.

23  Q.   Okay.  And, Ms. A, is my understanding correct that you

24  took some classes in nursing?

25  A.   Yes.

1    Q.    Okay.  So you know what a fever is; right?

2    A.    Perfectly.

3    Q.    Okay.  Okay.  And, Ms. A, without saying what your

4    initials are, are those your initials on the bottom of the

5    form?

6    A.    Yes.

7    Q.    Ms. A, did you sign this form?

8    A.    Well, the truth is that I filled out so many forms that I

9    thought it was all in English, and I placed my initials on a

10    lot of them.  But the truth is that I never saw a doctor or a

11    nurse.

12    Q.    Okay.  But this form is in Spanish.  Is that right,

13    Ms. A?

14    A.    Not all of it.

15    Q.    The first seven questions are in Spanish.  Isn't that

16    right?

17    A.    Well, you have to understand that I had not been sleeping

18    or eating and I had just been in the desert and it took me a

19    month to reach the U.S.  And under my medical condition and it

20    was very -- it was almost impossible to read all of it.  But,

21    yes, I did sign many forms and yes, those are my initials.

22    That is my signature.  I cannot deny that.

23              MS. MASETTA-ALVAREZ:  Thank you, Ms. A.

24              You can turn off the ELMO.  Thank you.

25              Your Honor, one moment to confer with co-counsel.

```
 1              THE COURT:  Sure.

 2         (Pause.)

 3              MS. MASETTA-ALVAREZ:  No further questions,

 4    your Honor.

 5              THE COURT:  Any redirect?

 6              MR. HUERTA:  Yes, your Honor.  He's going to go

 7    ahead and try that e3DM matter.

 8              MR. LONDEN:  This is not redirect, your Honor.  I

 9    make an offer of proof.  And I have a document, at least not

10    for Federal Rule of Evidence 104, foundational purposes, if

11    it -- because I don't have a sponsoring witness for the

12    document at the moment.  I could, but I'd like to tie it up.

13    This a page from e3DM.

14              THE COURT:  I still don't know what you want to do.

15              MR. LONDEN:  I want to make a foundational showing.

16    It is from joint Exhibit 433 in e3DM file.  I can could it now

17    or I can do it later.  I'll do it now just to get it over

18    with.

19              THE COURT:  What's the subject matter?

20              MR. LONDEN:  The location.

21              THE COURT:  Oh.  Okay.

22              MR. LONDEN:  The location.  It doesn't change the

23    time.  Just, I want to tie that up.  433, e3DM, I can show the

24    result.

25              THE COURT:  Why don't you just stipulate to it?
```

 1            MS. MASETTA-ALVAREZ:  Yeah, let's make sure the

 2   record I have is the same as what they have.

 3            MR. LONDEN:  Maybe this is not an issue.

 4            THE COURT:  I wouldn't think so.

 5            MS. MASETTA-ALVAREZ:  Sorry.  Yes, those are the

 6   same.  Yes, yes, you can.

 7            MR. LONDEN:  We've stipulated that the e3DM records

 8   show an arrest on June 7, 2015, at 10:30 in the morning.

 9   Booked into Casa Grande June 7, 2015, at 2:36 in the

10   afternoon.  Transferred to TCC, transferred to Eloy and back,

11   and released from TCC on June 9, 2015, at 10:25 p.m.

12            THE COURT:  All right.

13            MS. MASETTA-ALVAREZ:  And for completeness,

14   your Honor, we would also like to admit the e3DM subject

15   activity log.

16            MR. LONDEN:  No objection.

17            THE COURT:  All right.  What's it show now that

18   we've got the context?

19            MS. MASETTA-ALVAREZ:  I'm sorry, your Honor?

20            THE COURT:  What's it show?

21            MS. MASETTA-ALVAREZ:  Well, it shows every time that

22   Ms. A was served a meal.  It shows that she was given a mylar

23   blanket twice.  It also shows that she was in custody as

24   Mr. Londen just said from June 7th until June 9th.  And so

25   completeness, yes, I'd like to admit this.

1           THE COURT:  Thank you, next witness.

2           Oh.  Ms. A, you can step down.  Thank you.

3           Is the next one B?

4           THE CLERK:  If you please remain standing and raise

5    your right hand to be sworn.

6               WITNESS B, PLAINTIFF WITNESS, SWORN

7           THE CLERK:  Thank you.

8           MS. BERNWANGER:  Good afternoon, your Honor.  Do I

9    need to enter my appearance on the record?

10          THE COURT:  Well, how many lawyers are there in this

11   case anyway?  They just keep popping up.  Good to see you.

12          MS. BERNWANGER:  You, too.  One more now.

13          THE COURT:  What's your name?

14          MS. BERNWANGER:  Bree Bernwanger for the plaintiffs.

15          Plaintiffs are calling Witness B who is listed as

16   No. 2 on the sealed witness list.

17                      DIRECT EXAMINATION

18   BY MS. BERNWANGER:

19   Q.   Good afternoon, ma'am.

20   A.   Good afternoon.

21   Q.   Do you remember around when you came to the United

22   States?

23   A.   Yes, I do.

24   Q.   When was it?

25   A.   In early April.

```
 1   Q.   Of which year?

 2   A.   2019.

 3   Q.   Do you remember where you crossed into the United States?

 4   A.   No.

 5   Q.   Do you remember around what state of the United States

 6   you crossed into?

 7   A.   No.

 8   Q.   Ma'am, what's your date of birth?

 9   A.   November 2, 1999.

10        MS. BERNWANGER:  Ms. Barkley, I'll now be showing a

11   confidential exhibit only on the confidential screen, please.

12   It will be joint trial Exhibit 447.02.

13   BY MS. BERNWANGER:

14   Q.   Do you recognize on this document your name?

15   A.   Yes.

16   Q.   Do you recognize your date of birth on this document?

17   A.   Yes.

18   Q.   Thank you.

19        When you entered the United States in early April of

20   2019, can you describe what happened next?

21   A.   We crossed through the desert and we ran into some

22   officers who took us to the first detention center where we

23   were detained.

24   Q.   And who were you traveling with at this point?

25   A.    I was with my boyfriend and my brother.
```

1  Q.   At the time you encountered the immigration officers, how

2  were you feeling physically?

3  A.   I was tired and sleepy.  I was nauseous and I was

4  vomiting because I was pregnant and mine was a high-risk

5  pregnancy.

6  Q.   About how many months into your pregnancy were you at

7  this time?

8  A.   Seven weeks.

9  Q.   Do you remember around what time of day it was when you

10  encountered the officers in the desert?

11  A.   Between 7:00 and 8:00 in the morning.

12  Q.   And did the officers do anything before they took you to

13  the first detention center where you were?

14  A.   They asked us for our names and where we were from.

15  Q.   Did they ask you anything about your health?

16       MS. MASETTA-ALVAREZ:  Objection; relevance as to --

17       THE COURT:  Overruled.

18       THE WITNESS:  No.

19  BY MS. BERNWANGER:

20  Q.   Did you tell them anything about your health?

21  A.   Yes.  I told them I was nauseous because I was pregnant.

22  Q.   And what did they do when you told them you were nauseous

23  because you were pregnant?

24  A.   They just said that was fine and I was going to be seen

25  at another detention center.

1  Q.   About how much time passed between when you encountered

2  the officers in the desert and when you arrived at the first

3  detention center where you went?

4  A.   Between two and three hours.

5  Q.   What happened when you got to the first detention center?

6  A.   We were outside for a little while.  I started vomiting

7  and I asked an officer if I could see a doctor because I was

8  pregnant and I had a high-risk pregnancy.

9  Q.   And what did the officer do after you told him about your

10  pregnancy?

11  A.   He said they could take me to see a doctor later.

12  Q.   What happened next?

13  A.   We went inside and I was taken to a cell.  And a while

14  later, I came out to remind the officer they told me they were

15  going to take me to a doctor.

16  Q.   When you say a while later, about how much time passed

17  before you went out to remind the officer?

18  A.   One to two hours.

19  Q.   And what did the officer do after you reminded him that

20  you were pregnant?

21  A.   He said that they could take me to a doctor, but it was

22  very far.  And if they were to take me to the doctor, maybe

23  during that time they would come and pick us up to take us to

24  a second detention center and then they won't be taking me.

25  Q.   How did it -- how did you feel after the officer told you

 1   that you would have to wait to go see a doctor?

 2   A.   I felt sad and I was concerned because I wanted to be

 3   seen by a doctor to make sure about my baby's health.

 4   Q.   You mentioned that you entered a cell at this detention

 5   center.  Can you please describe the cell?

 6   A.   It was a room and it had a bathroom.  And you just had to

 7   lay the mat on the floor.

 8   Q.   When you say the mat, can you describe what you're

 9   referring to?

10   A.   It was what they gave us to lie on.

11   Q.   Can you please describe the mat that they gave you to lie

12   on?

13   A.   It was -- I don't know how to put it.

14   Q.   Was the mat clean?

15   A.   It was dusty.

16   Q.   How did you feel physically when you entered the cell?

17   A.   I felt sick because of the nausea and the vomiting that I

18   was having.

19   Q.   Did you vomit while you were in the cell?

20   A.   Yes.

21   Q.   How would you feel after throwing up?

22   A.   I was sick.

23   Q.   Did you have access to water?

24   A.   The officers said we could drink water from the tap in

25   the bathroom.

1    Q.    Did you drink it?

2    A.    No.

3    Q.    Why not?

4    A.    Because in my country, we don't drink tap water and I

5    didn't know if it was safe or not.  I wasn't sure.

6    Q.    At any point while you were detained in the center, did

7    any officials ask you any questions about your health?

8    A.    No.

9    Q.    You mentioned that one of the officials told you you

10   would be transferred.  Ultimately were you transferred to

11   another center?

12   A.    Yes.

13   Q.    If you can approximate, please, about how much time

14   passed between when the official told you you would be able to

15   see a doctor upon transfer and when you were actually

16   transferred?

17   A.    I don't remember how many hours, but by the time I left,

18   it was nighttime.

19   Q.    And when you left, where did you go?

20   A.    To another detention center.

21   Q.    What happened when you arrived at the other detention

22   center?

23   A.    We arrived and we again were outside and I kept on

24   vomiting.

25   Q.    Can you please describe where you were vomiting, what you

 1  were vomiting into?

 2  A.   One of the garbage cans outside.

 3  Q.   And ultimately, did you go inside the detention center?

 4  A.   Yes.

 5  Q.   What happened when you went inside?

 6  A.   My partner spoke to an officer and told him that I was

 7  pregnant, and I was feeling ill because I was pregnant.

 8  Q.   And what did the officer do in response?

 9  A.   He said that was normal.  He said that his wife was also

10  pregnant and the same thing happened.  And I got mad then and

11  I told him that maybe the symptoms were normal, but that I had

12  gone one day without eating.

13          MS. MASETTA-ALVAREZ:  Objection; hearsay.

14          THE COURT:  Overruled.

15  BY MS. BERNWANGER:

16  Q.   After this exchange with the officer, what happened?

17  A.   The officer just smiled and didn't say anything else.

18  Q.   What happened next after entering the center?

19  A.   Again, we were taken into another cell.

20  Q.   At this point, were you given anything that you could use

21  to clean yourself?

22  A.   No.

23  Q.   Were you given any wet or dry towels?

24  A.   No.

25  Q.   Were you given a toothbrush?

1   A.   No.

2   Q.   Were you given anything?

3   A.   Only the mat.

4   Q.   You weren't given a blanket?

5   A.   No.

6   Q.   Did you ever get access to a blanket?

7   A.   One of the ladies there gave me one that she had.

8   Q.   You mentioned that you went into a cell.  Could you

9   please describe the cell?

10  A.   It was a room and it had two bathrooms and it was

11  completely full of women.  And there was no room left for

12  anyone else.

13          MS. BERNWANGER:  Ms. Barkley, I'll now be showing a

14  confidential exhibit, please.  I'm going to show you a video

15  still, confidential joint Exhibit 507.92, page 4.

16          And if I might, I just realized I neglected to move

17  joint Exhibit 40 -- 447.02 into evidence.  I'd like to so move

18  now.

19          MS. MASETTA-ALVAREZ:  Was that the e3DM data?

20          MS. BERNWANGER:  It was.

21          MS. MASETTA-ALVAREZ:  No objection.

22          THE COURT:  Well, Ms. Barkley.  That's Ms. Jones by

23  the way.

24          MS. BERNWANGER:  With apologies.  Thank you.

25          THE COURT:  Barkley is over there.

 1                You can mark that in.

 2          (Exhibit 447.02 entered into evidence.)

 3     BY MS. BERNWANGER:

 4     Q.   This is a video still from the Border Patrol of -- well,

 5     excuse me, do you recognize this room?

 6     A.   Yes.

 7     Q.   Do you recognize -- are you in this photo?

 8     A.   Yes.  I am in the process of lying down right at the

 9     bathroom door.

10               MS. BERNWANGER:  Would it be helpful if she pointed

11     herself out?

12               THE COURT:  Yes, she can make a mark on that screen,

13     I think.

14     BY MS. BERNWANGER:

15     Q.   Can you please mark the screen where you are in this

16     photo?

17     A.   (Witness complied.)

18     Q.   Can you please describe what this room is?

19               THE COURT:  Is there something secret about this

20     photograph?

21               MS. BERNWANGER:  This photograph does not have

22     redacted faces, your Honor, but I will be following up with

23     additional exhibits that are not confidential.

24               THE COURT:  Sure look redacted to me.

25               MR. LONDEN:  Yeah, I think Mr. Lucero may have

```
 1  pulled up the redacted one rather than the unredacted.  I

 2  think he can pull up the unredacted one immediately.

 3          THE COURT:  Can you recognize anybody's face in

 4  there?  The one I'm looking at is -- doesn't show a face.  I

 5  mean, I don't want to be hypersensitive about this, but you're

 6  calling things secret that really aren't.  I mean, what's

 7  secret about this photograph?  Are we looking at the same one?

 8  I can see no face, no name.  In fact, I can't see any people.

 9  What I can see are blankets.  Are we looking at the -- what's

10  secret about this?

11          MR. LONDEN:  In general, your Honor, everything has

12  been -- has had a blur put in front of it whether you can

13  really see it or not.  We would not object to this unredacted

14  version being received in evidence, in the public record.

15          MS. MASETTA-ALVAREZ:  No objection.

16          THE COURT:  All right.  We can publish it.

17          MS. BERNWANGER:  Ms. Barkley, I will now be showing

18  a series of exhibits that are not confidential.  Excuse me,

19  Ms. Jones.  I'm so sorry.  Ms. Jones.  Please accept my

20  apologies.

21          Thank you for correcting me.

22          I would ask that the Court ensure that the following

23  exhibits are visible on all of our screens.

24          I'm now going to show you a video, joint

25  Exhibit 507.93.
```

1   BY MS. BERNWANGER:

2   Q.   Do you recognize this room?

3   A.   Yes.

4   Q.   What is it?

5   A.   That's the cell where I went.

6   Q.   Can you please describe what's happening in this video?

7   A.   That's when I'm coming in to the second cell and I

8   couldn't find any place to be.

9   Q.   Can you describe what you're doing in the video now?

10  A.   I'm laying my mat on the floor right at the bathroom

11  door.

12  Q.   Can you please describe how you felt in this moment?

13  A.   It felt bad.  At the situation that there wasn't room for

14  anyone else and I had to stay there at the bathroom door.  And

15  I was also feeling sick because of my pregnancy.

16  Q.   At this point, had anyone asked you any questions about

17  your health?

18  A.   No.

19  Q.   At this point, had you seen a doctor?

20  A.   No.

21  Q.   Is there anything else that you observed as you entered

22  this cell and laid down or sat down?

23  A.   The room was dirty and it smelled really bad.

24  Q.   Could you please describe the smell?

25  A.   It smelled like a bathroom with pee and poop.

1    Q.   You mentioned the cell was dirty.  Can you please

2    describe in what way it was dirty?

3    A.   There was toilet paper all over the place.

4    Q.   Was anything else making the cell dirty?

5    A.   Yes.  There was garbage.  There was the wrappings from

6    the food they handed out.

7              MS. BERNWANGER:  Your Honor, we'd like to move joint

8    Exhibit -- this video joint Exhibit 507.93 into evidence,

9    please.

10             MS. MASETTA-ALVAREZ:  No objection.

11             THE COURT:  It's admitted.

12        (Exhibit 507.93 entered into evidence.)

13             MS. BERNWANGER:  Ms. Jones, we'd please like to pull

14   up joint Exhibit 507.94.  It is not confidential and can be

15   shown on all screens.

16   BY MS. BERNWANGER:

17   Q.   I'm going to show you another video now.  This video is

18   marked as taking place on April 7th, 2019, at 12:52 a.m.  Do

19   you recognize this room?

20   A.   Yes.

21   Q.   Can you please describe what's happening in this video?

22             MS. MASETTA-ALVAREZ:  Objection; calls for

23   speculation.  Your Honor, may I be heard?

24             THE COURT:  Yes.

25             MS. MASETTA-ALVAREZ:  Your Honor, in this video, it

 1  shows that there's not sufficient foundation that the witness

 2  knows what was going on in this room at that time because it

 3  appears that the witness was maybe lying down perhaps asleep

 4  at this time.

 5          THE COURT:  Well, respectfully we can see what's

 6  going on in the room.  It's a video.

 7          MS. MASETTA-ALVAREZ:  Yes, your Honor.  I object to

 8  any questions about what other people are doing or attempting

 9  to do as it would call for speculation beyond what is in plain

10  sight of the video.

11          THE COURT:  Overruled.  It's admitted.

12      (Exhibit 507.94 entered into evidence.)

13          MS. BERNWANGER:  Thank you.

14  BY MS. BERNWANGER:

15  Q.  Could you please describe what's happening in this video?

16  A.  More women are coming in the room, and there is no room

17  left, and they have to go and stay in the bathroom.

18  Q.  And how were they getting to the bathroom?

19  A.  They were walking over all of us.

20  Q.  Where are you in this photo?

21  A.  I am lying down at the bathroom door.

22  Q.  Can you please describe how you felt as these women

23  walked over you into the bathroom?

24  A.  I felt bad because they were coming -- going over me and

25  I had to move -- wake up and move because they were coming

1   through.

2   Q.   Is this the only time someone had to walk over you to get

3   to the bathroom?

4   A.   No.

5   Q.   Did this ever happen while you were trying to sleep?

6   A.   Yes.

7   Q.   Can you please describe how it affected you when it

8   happened while you were trying to sleep?

9   A.   It affected me because I was feeling ill because of the

10  pregnancy symptoms.  And every time someone wanted to go

11  through, I had to wake up.

12  Q.   Before you arrived in the United States, when was the

13  last time you had had a full night of sleep?

14  A.   Two days before.

15  Q.   You mentioned that previously officials had told you that

16  you would get to see a doctor after you were transferred.  Did

17  you get to see the doctor -- a doctor in this station?

18  A.   There was one doctor and I went to see him, but he said

19  to me he couldn't see me because he had to see the children

20  first.

21  Q.   And what did you do when he told you he couldn't see you?

22  A.   I went back to the cell.

23  Q.   At any point, did you tell the doctor how you were

24  feeling?

25  A.   No, he didn't talk to me anymore.

```
 1   Q.   How did you feel after you got back to the cell?

 2   A.   I was feeling the same.  I was sick with nausea and I was

 3   concerned because I didn't know how my baby was doing.

 4            MS. BERNWANGER:  Ms. Jones, we'd like to pull up,

 5   please, joint Exhibit 507.92 at page 10.  We'll be showing the

 6   version that is not confidential and can be placed on the

 7   redacted version for all screens.

 8   BY MS. BERNWANGER:

 9   Q.   Thank you.  We're looking at another video still of the

10   cell that you were in.  This one marked 1:19 a.m. on

11   April 7th, 2019.

12        Do you see yourself in this still?

13   A.   Yes.

14   Q.   Can you please mark where you are in this photo?

15   A.   (Witness complied.)

16   Q.   Can you please describe what's happening in this photo?

17   A.   I'm going to the bathroom to vomit.

18   Q.   As far as you remember, was this the only time you

19   vomited that night?

20   A.   No.

21   Q.   At any point later that night did you tell officials how

22   you were feeling?

23   A.   No.

24   Q.   At any point did you get to see a doctor?

25   A.   Yes.  Not until the next day.
```

1  Q.   Can you describe how you got to see a doctor?

2  A.   An officer came calling my name and told me that they

3  were going to take me to the hospital to see a doctor.

4  Q.   And do you remember around when that was?

5  A.   I don't.

6  Q.   Okay.  The night when you vomited more than once, were

7  you able to sleep?

8  A.   No.

9  Q.   Why couldn't you sleep?

10  A.   Because I was feeling sick with nausea and it was very

11  loud there.  And also because of the light.

12  Q.   What were the -- what was loud?

13  A.   The officers talked outside loudly and more people were

14  coming in also.

15  Q.   What about the light interfered or kept you from

16  sleeping?

17  A.   They didn't turn them off.

18  Q.   Apart from feeling bad, the noise and the light, did

19  anything keep you from sleeping?

20  A.   It was very cold.

21  Q.   Can you please describe how the cold felt?

22  A.   It was very cold.  I was shivering.

23  Q.   You mentioned that eventually the next day you were

24  called to see a doctor.  Where did you go?

25  A.   To a hospital.

1    Q.   Who attended to you at the hospital?

2    A.   A lady doctor.

3    Q.   Were you able to speak with the doctor?

4    A.   Yes.  Through an interpreter.

5    Q.   And what happened at the hospital?

6    A.   I told the doctor that I had nausea and I was vomiting

7    and I was pregnant and I had a high-risk pregnancy.

8    Q.   And what did the doctor do?

9    A.   She said she was going to run some tests and do an

10   ultrasound.

11   Q.   Did they do the test and ultrasound?

12   A.   Yes.

13   Q.   Were you given anything at the hospital?

14   A.   They gave me an IV and some medication for nausea and

15   vomiting.

16   Q.   Were you given any food?

17   A.   Yes.

18   Q.   What food were you given?

19   A.   Rice, chicken, juice and gelatin.

20   Q.   Were you able to eat the food without vomiting?

21   A.   Yes.

22   Q.   Did you receive any other medicine at the hospital?

23   A.   No.

24   Q.   Did you receive any instructions from the doctor at the

25   hospital?

1    A.   She told the officer that if I vomited again and I wasn't

2    able to eat, to start me out with a banana and then rice and

3    then food.

4    Q.   And how did the officer respond?

5    A.   They said it was all right.

6    Q.   What happened after you returned from the hospital or,

7    excuse me, where did you go after you left the hospital?

8    A.   I went back to the same cell where I was at the detention

9    center.

10   Q.   How did you feel when you got back to the cell?

11   A.   At that time I was feeling fine.

12   Q.   About how long did you spend at the hospital, if you

13   know?

14   A.   I don't remember how many hours.

15   Q.   Were you given any food after you returned to your cell

16   from the hospital?

17   A.   Only burritos and juice.

18   Q.   What did you do when you received the burrito and juice?

19   A.   I told the officer that I couldn't eat that because I was

20   having nausea.  And the officer told me to eat it because I

21   had to eat.

22   Q.   How did you feel in that moment?

23   A.   I felt bad because I knew that I would be vomiting again

24   if I didn't eat anything.

25   Q.   Can you please describe what the cell was like after you

 1   returned from the hospital?

 2   A.   It was the same.  It was full of women.

 3   Q.   I'm going to show you another photo of the cell.  This

 4   one dated April 7th, 2019, at 8:05 p.m.

 5              MS. BERNWANGER:  Ms. Jones, this is joint Exhibit

 6   507.92, page 16.  We'd like to use the nonconfidential version

 7   so the redacted version for all screens, please.

 8   BY MS. BERNWANGER:

 9   Q.   Do you recognize this room?

10   A.   Yes.

11   Q.   Do you know where you are in this room?

12   A.   I'm right at the bathroom door.

13   Q.   Can you please describe what is happening in this photo?

14   A.   More women are coming in to the cell.  And there are

15   other women who are washing their underwear in the bathroom.

16   Q.   Did you observe this while it was happening?

17   A.   Yes.

18   Q.   Can you describe what effect it had on the cell that the

19   women was washing her underwear in the sink in the bathroom?

20   A.   Well, she was washing her underwear.  It would splash and

21   the bathroom floor would get wet.

22   Q.   Did it have any other effects on the cell?

23   A.   The clothes were being dried right in the bathroom.

24   Q.   Can you please describe how you were feeling in terms of

25   your own personal hygiene at this time?

1   A.   My clothing was dirty and it smelled.

2   Q.   Were you ever able to bathe yourself?

3   A.   Yes.

4   Q.   Approximately, when were you able to bathe yourself?

5   A.   It was the day before I left the detention center.

6   Q.   Around what time was it?

7   A.   It was in the early morning hours.

8   Q.   Can you please describe how you were able to bathe

9   yourself?

10   A.   An officer came and called me and asked me if I wanted to

11   bathe.

12   Q.   And did you receive anything to use to bathe yourself?

13   A.   Shampoo and a paper towel.

14   Q.   And how were you able to bathe yourself?

15   A.   There was another room where there was a bathroom.

16   Q.   And were you able to dry yourself with the towel you

17   received?

18   A.   I was able to dry my body, but not my hair.

19   Q.   What did you do after you bathed yourself?

20   A.   I went back to the cell.

21   Q.   What clothes did you put on after you bathed yourself?

22   A.   The same clothes I was wearing.

23   Q.   How did you feel afterwards?

24   A.   I was feeling cold because I wasn't able to dry my hair

25   and I also washed my underwear while I was bathing and I put

1    it on wet.

2           MS. BERNWANGER:  I'd like to please pull up another

3    video still from the cell, joint Exhibit 507.92, page 20.  The

4    nonconfidential version, please for all screens.

5    BY MS. BERNWANGER:

6    Q.   This still is dated April 8th, 2019, at 2:04 a.m.  Do you

7    recognize this room?

8    A.   Yes.

9    Q.   What is it?

10   A.   It's the cell where I was.

11   Q.   Could you please tell me what you see in this photo what

12   this photo shows?

13   A.   The room is still full of women.  And there are more

14   women sleeping in the bathroom.

15   Q.   I'd like to -- excuse me.

16          MS. BERNWANGER:  Your Honor, I haven't been rigorous

17   about this.  We'd like to move this photo into evidence.

18          THE COURT:  507.92.

19          MS. BERNWANGER:  Oh, it's -- it's a different page

20   of the same exhibit I suppose, so I think we're good.  It's

21   been admitted.  Am I correct on that?

22          THE COURT:  Well --

23          MR. LONDEN:  By my notes, .92 is in evidence.

24          MS. BERNWANGER:  I'd like to show you another video

25   still from the same exhibit, please.  Joint exhibit

1    507.92 page 32.  The nonconfidential version so the redacted

2    version for all screens, please.  It's dated April 9th, 2019,

3    at 10:44 a.m.

4    BY MS. BERNWANGER:

5    Q.   Can you please -- do you recognize this room?

6    A.   Yes.

7    Q.   Can you please tell me what this photo shows?

8    A.   I am coming out of the room.

9    Q.   Where are you going?

10   A.   They said they were going to take us out of there.

11   Q.   Can you describe the condition of the room at this time?

12   A.   It was the same with more women and the same -- in the

13   same condition.

14   Q.   At any point between the last photo that we looked at and

15   this one, so April 8th and April 9th when you left, did the

16   conditions in the room change in any way?

17   A.   No.

18   Q.   How are you feeling physically at this point when you

19   left?

20   A.   I was the same with nausea and vomiting.

21   Q.   Immediately after, in the time immediately after you were

22   released, how did the experience of having been detained

23   affect you?

24   A.   It affected me that in a way that when I was released, I

25   didn't want to go anywhere.  Because whenever I saw people

1   from here if I had a question to ask or something, I felt I

2   was going to be treated the same way I was treated at the

3   detention center.

4   Q.   Were there any other affects immediately after in the

5   time immediately after being released?

6   A.   When I first was released, I was having nightmares that I

7   was back in the detention center.

8   Q.   Now, sitting here today, how does the experience of

9   having been detained affect you?

10  A.   It affects me in that thinking back at those times makes

11  me sad and depressed.

12         MS. BERNWANGER:  Thank you, your Honor.  Nothing

13  further.

14         THE COURT:  All right.  We'll take up

15  cross-examination of this witness tomorrow morning at 9:15.

16  Isn't that what our schedule says -- or 9?  9:00.  You got

17  that?  9 a.m.  Right here.

18         MS. BERNWANGER:  We'll be here.

19         THE COURT:  9:00 tomorrow morning.  All right.

20  We'll be at recess.

21         MS. BERNWANGER:  Thank you.

22      (Proceedings adjourned at 5:23 p.m.)

23

24

25

1                         C E R T I F I C A T E

2

3              I, Cheryl L. Cummings, certify that the

4    foregoing is a correct transcript from the record of

5    proceedings in the above-entitled matter.

6

7                        Dated this 14th day of January, 2020.

8                        /s/Cheryl L. Cummings

9                        Cheryl L. Cummings, RDR-CRR-RMR-CRC-CRI
                         Federal Official Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25