```
 1                IN THE UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF ARIZONA

 3  Jane Doe #1; Jane Doe #2; Norlan Flores  )
    on behalf of themselves and all others  )
 4  similarly situated,                      )
                                             )
 5            Plaintiffs,                     )
                                             )    CV-15-0250-DCB
 6        vs.                                 )
                                             )    Tucson, Arizona
 7  Chad Wolf, Acting Secretary of           )    January 16, 2020
    Homeland Security; Mark A. Morgan,       )    1:16 p.m.
 8  Acting Commissioner, U.S. Customs and    )
    Border Protection; Carla L. Provost,     )
 9  Chief of United States Border Patrol,    )
    in her official capacity; Roy D.         )
10  Villareal, Chief Patrol Agent-Tucson     )
    Sector, in his official capacity,        )
11                                           )
              Defendants.                     )
12  _____  )

13

14             REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                   BENCH TRIAL DAY FOUR
                       SESSION 2 of 2
16
              BEFORE:  THE HONORABLE DAVID C. BURY
17             UNITED STATES SENIOR DISTRICT JUDGE

18

19

20

21  Cheryl L. Cummings, RDR-CRR-RMR-CRC-CRI
    Official Court Reporter
22  Evo A. DeConcini U.S. Courthouse
    405 West Congress, Suite 1500
23  Tucson, Arizona 85701
    (520)205-4290
24
    Proceedings Reported by Stenographic Court Reporter
25  Transcript Prepared by Computer-Aided Transcription
```

APPEARANCES

**For the Plaintiffs:**
      Morrison & Foerster, LLP
      By:  JACK W. LONDEN,  ESQ.
      425 Market Street, 32nd Floor
      San Francisco, California 95105


      Morrison & Foerster LLP - Tokyo Japan
      By:  PIETER S. DeGANON,ESQ.
      Shin-Marunouchi Bldg.
      5-1 Marunouchi 1-Chome, 29th Fl.
      Tokyo, Japan


**For the Defendants:**
      United States Department of Justice
      By:  SARAH B. FABIAN, ESQ.,
      BY:  KATELYN MASETTA-ALVAREZ, ESQ.
      P.O. Box 868 Ben Franklin Station
      Washington, D.C., 20044

```
1                        EXAMINATION INDEX

2    WITNESSES CALLED ON BEHALF OF THE DEFENSE

3    LINUS ROLAND ALEXANDER

4         DIRECT BY MS. MASETTA-ALVAREZ                    4

5    BRADLEY DAVIS

6         DIRECT BY MS. MASETTA-ALVAREZ                   61
          CROSS BY MR. LONDEN                             92
7

8

9                        EXHIBIT INDEX

10
                                                        ADM
11   870                                                 14

12   840                                                 46

13   841-847, 738                                        47

14   729                                                 75

15   863                                                 93

16

17

18

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2          (Proceedings commenced at 1:16 p.m., as follows:)

3              THE COURT:  All right.  Back on the record.  We're

4      ready for our next witness, I believe, aren't we?

5              MS. MASETTA-ALVAREZ:  Your Honor, defendants call

6      Linus Roland Alexander.

7            LINUS ROLAND ALEXANDER, DEFENSE WITNESS, SWORN

8              THE CLERK:  If you please state your full name and

9      spell your last name for the record.  You can be seated.

10             THE WITNESS:  Yes, ma'am.  Turning my phone off.

11             My name is Linus Roland Alexander.

12             THE CLERK:  Have you seat, sir.  Thank you.

13             THE WITNESS:  My name is Linus Roland Alexander.

14     Last name is Alexander, spelled A-l-e-x-a-n-d-e-r.

15             THE COURT:  All right.  Sir, go ahead, Counsel.

16             MS. MASETTA-ALVAREZ:  Okay.

17                          DIRECT EXAMINATION

18     BY MS. MASETTA-ALVAREZ:

19     Q.   Good afternoon.  Please introduce yourself to the Court.

20     A.   My name is Roland, Linus Roland Alexander.  I'm the

21     compliance inspector over at CBP, Tucson Sector.

22     Q.   And by CBP, do you mean Customs and Border Protection?

23     A.   Customs and Border Protection, ma'am.

24     Q.   Are you here to testify about your experience as a

25     compliance officer at the Tucson Sector of Customs and Border

1   Protection?

2   A.   Yes, ma'am, I am.

3   Q.   I'd like to first talk to you about your background.

4   Where do you live?

5   A.   I live here in Tucson, Arizona.

6   Q.   Have you always lived in Tucson?

7   A.   No, ma'am, I have not.

8   Q.   When did you move here?

9   A.   August 2001.

10  Q.   What brought you to Tucson?

11  A.   I was active duty military and we had received a PCS, a

12  permanent change of station, me and my wife.

13  Q.   Did you grow up in Tucson?

14  A.   No, ma'am.  I grew up in Jersey City, New Jersey, and I

15  lived in Statesboro, Georgia, for two years.

16  Q.   Did you go to high school in New Jersey?

17  A.   I went to high school in Jersey City and in Statesboro.

18  Q.   Did you graduate high school?

19  A.   Yes, ma'am.

20  Q.   What year did you graduate high school?

21  A.   1987.

22  Q.   Did you attend college?

23  A.   I attended some classes that I took while I was in the

24  Air Force on station versus going to a campus.

25  Q.   Okay.  Now I want to talk to you a little bit about your

1   employment history, so before you became a compliance officer

2   at the Tucson Sector.  All right?

3   A.   Yes, ma'am.

4   Q.   All right.  Okay.  Do you have any previous experience in

5   doing compliance evaluations or inspections?

6   A.   Yes, ma'am, I do.  From my military career.

7   Q.   And by "military career," do you mean the Air Force?

8   A.   Yes, ma'am.  I was -- I'm retired from the Air Force.  I

9   did 23 years.  And the last 10 years of me being in the

10  Air Force, I was involved in the compliance side of the house.

11  And I was the compliance superintendent the last 7 or 8 years

12  of my Air Force career.

13  Q.   Now, did you receive any training to be in the compliance

14  division of the Air Force?

15  A.   Yes, ma'am.  I received technical training when it came

16  down to compliance aspects of inspecting the fuel and things

17  that we handled, because my primary mission was the fuel

18  specialist.  I received training when it comes down to the

19  environmental aspects of things as far as the regulations,

20  covering EPA and safety.  And bioenvironmental as well.

21  Q.   What year did you leave the Air Force?

22  A.   I left the Air Force -- I retired in December of 2010.

23  Q.   What did you do after you retired from the Air Force in

24  2010?

25  A.   I was hired by the United States Secret Service office

 1  here in Tucson, Arizona.

 2  Q.   What did you do for the Secret Service?

 3  A.   I was the administrative officer for the Tucson resident

 4  office.

 5  Q.   Did that involve compliance evaluations?

 6  A.   No, ma'am.  It was more logistics and administrative

 7  work.

 8  Q.   How long were you at the Secret Service?

 9  A.   I was at the Secret Service roughly four years.  Three,

10  three, three, yeah, three and a half, going on four.

11  Q.   And do you have any previous experience in custody

12  conditions?

13  A.   No, ma'am.  Not formally.  I have knowledge of through

14  the Air Force.  When I first came in the service, we had --

15  there were certain types of corrective postures that the

16  commanders are given.  I'm an NCO, but officers are

17  given certain -- NCO is a noncommissioned officer.  I'm -- we

18  have certain types of aspects of discipline that have to be --

19  that have to be enforced because of the nature of our job.

20       So something that would get someone a verbal counseling

21  in a civilian sector may warrant correctional custody in a

22  military from the military side of the house.  And with that

23  being said, our -- our security forces organization has

24  holding and detainment unit for bad soldiers, for lack of a

25  better term.  You get in trouble, you're doing something you

1  shouldn't have, you've been late for work or what have you,

2  you could be -- the commander could see fit to give you three

3  weekends of correctional custody.

4      And me as an NCO or noncommissioned officer, all of my

5  subordinates, I had to be aware of that tool.  And if a need

6  ever arise for an assessment to be made, that I would be able

7  to advise the commander whether or not that type of corrective

8  action would be warranted.

9  Q.   Were you involved in making any custody conditions

10  determinations?

11  A.   Absolutely not.  No, ma'am.

12  Q.   Okay.  When did you begin your position as a compliance

13  officer at the Tucson Sector?

14  A.   In June of 2018.

15  Q.   Can you please describe your job duties?

16  A.   I have two -- I have two primary job duties, and both of

17  them are centered around inspections and evaluations of our

18  own internal practices.  One is I'm a compliance -- I'm the

19  facilities inspector for compliance to make sure that we're

20  abiding by the actual Customs and Border Patrol's or CBP's

21  Customs policy when it comes down to short-term hold

22  detention -- detention and custody, the TEDS which is the

23  United States custody escort and detention -- I just know them

24  by acronym so you've got to excuse me -- and then also the --

25  the Jane Doe injunction and then also the Flores Reno

 1  settlement agreement where we look to make sure that we're

 2  abiding by those guidelines.

 3  Q.   Now, you said you evaluate for compliance with these

 4  various policies and court orders.  Do you do inspections to

 5  evaluate these policies?

 6  A.   Yes, ma'am.  I was charged to perform no notice

 7  compliance evaluations in all of the Tucson Sector stations

 8  that have a holding facility.

 9  Q.   Do you write any reports based on your compliance

10  evaluations?

11  A.   Yes, ma'am.  I do.  I write what we call an after action

12  report or a memoranda outlining the actual inspection that I

13  did, the areas that I looked at and what the overall outcome

14  came out of that -- those evaluations.

15  Q.   Okay.  I want you to walk the Court through one of your

16  compliance evaluations.  First let's start with scheduling.

17       Who sets up the schedule?

18  A.   I set up the schedule, ma'am.

19  Q.   And how do you determine when to schedule one of these no

20  notice compliance evaluations?

21  A.   I look -- I look at the actual stations, what time --

22  what quarter we're in.  Like, each quarter we have a minimum

23  that we're going to inspect every station a minimum of once a

24  quarter.  We can inspect more, but we're going to shoot -- the

25  target is to get it done once a quarter.

1          So what I'll do is I'll take a look at my schedule as far

2   as what I have going on and what I -- where I need to be at

3   and what I -- when I want to inspect.  And then I'll

4   coordinate over at the TCC or the Coordination, the Tucson

5   Coordination Center to make sure that I have a lead evaluator

6   to accompany me when I go out.

7          Once I've done that, the next thing I'll do is I'll look

8   at the previous -- my previous inspections and I'll look at --

9   the calendar in the quarterly basis to make sure that I

10  haven't established a pattern of showing up around the same

11  time at these different stations.  And then I'll mix them

12  around to make sure that there isn't -- it isn't predictable

13  when I'm going to come.  And then I'll billet them and then

14  I'll make sure that I have -- I have my support -- my

15  supporting partner.

16  Q.   Okay.  I want to break that down a little bit.  You said

17  that you try to evaluate each station once per quarter.  What

18  length of time is a quarter?

19  A.   Okay.  We have two ways of looking at it from the

20  quarterly.  The calendar year quarterly starting in January,

21  we divide it into, January, February, March; or we operate off

22  fiscal year for this particular deal, so it would be October,

23  November, December will be first quarter.  January, February,

24  March, second quarter and so on.

25  Q.   So once every three months, approximately?

1    A.   Yes, ma'am.

2    Q.   And you also mentioned that when you're looking at

3    scheduling, you're also coordinating with a lead evaluator?

4    A.   Yes, ma'am.

5    Q.   Who is a lead evaluator?

6    A.   A lead evaluator is normally a Customs and Border

7    Protection agent or a badge carrier, and we usually pull that

8    individual from the Tucson Coordination Center.  This

9    individual will go in and look inside of the -- it's called

10   the e3DM or it's the electronic detention module.  And his or

11   her job is to go inside of that actual program because during

12   the processing of detainees when they embark into custody,

13   everything about them has to be loaded in.  A lot of that

14   information is law enforcement sensitive, so I'm not -- really

15   not privy to be looking in that.  So we'll have an agent that

16   is authorized to do that, to look into it.

17   Q.   Now, does this lead evaluator or Border Patrol agent that

18   accompanies you on the compliance evaluations -- I'm sorry,

19   that is involved in the compliance evaluations, does this lead

20   evaluator go on the actual compliance evaluation with you?

21   A.   Yes.  We coordinate together to make sure that we -- our

22   slates are clear and that when I set the appointment, that we

23   see -- we follow it all the way through to completion.

24   Q.   Now, let's walk through one of your inspections.

25        What do you bring with you when you are going to inspect

 1   a station for compliance?

 2   A.   When I'm going to inspect a station for compliance, I'll

 3   bring my clipboard.  Inside of my clipboard I'll have, of

 4   course, a notebook.  I'll have my checklist.  I'll have my --

 5   any best practices that are paper documents that we want to

 6   share or cross-tell with the stations to make sure we can

 7   establish and maintain some uniformity.

 8        And I'll bring the last performance evaluation report

 9   that I wrote on that station because in that -- in that

10   performance evaluation point, if there's any deficiencies or

11   maybe, let's say, a best practice, I may want to revisit that

12   to see -- well, mostly is when if I have a finding or an

13   infraction, I'm going to revisit that finding or infraction

14   when I go back down there.  So I'll bring that report so that

15   everything is transparent with the patrol agent in charge

16   who's running the station and everyone involved once I come

17   down and we announce ourselves.

18   Q.   Okay.  You said that you bring -- one of -- you said one

19   of the items you bring with you is a checklist?

20   A.   Yes.

21   Q.   If I showed the checklist, do you think you would

22   recognize it?

23   A.   Yes, ma'am.

24          MS. MASETTA-ALVAREZ:  Ms. Kershaw, can you put on

25   the screen and this can go on the public screen as well

 1   joint -- excuse me -- joint Exhibit 870.  I'm sorry, one

 2   moment to confer, your Honor?

 3              THE COURT:  Sure.

 4              MS. MASETTA-ALVAREZ:  Thank you.

 5   BY MS. MASETTA-ALVAREZ:

 6   Q.   Mr. Alexander, do you recognize what's in front of you?

 7   A.   Yes, ma'am, I do.

 8   Q.   What is it?

 9   A.   It's -- it's our compliance inspection checklist for TCA

10   or Tucson Sector.

11   Q.   Okay.  Do you use this checklist during your evaluations?

12   A.   Yes, ma'am, I do.

13   Q.   Is that a regular practice of your evaluations?

14   A.   Yes, ma'am, standard.

15   Q.   Are compliance evaluations a regular practice of the

16   Tucson Sector?

17   A.   Yes, ma'am, standard.

18   Q.   Are you the person who fills out this checklist?

19   A.   Yes, ma'am.

20   Q.   And do you fill it out at or near the time that you're

21   completing the compliance evaluations?

22   A.   Yes, ma'am.

23   Q.   And would you consider yourself a person who has

24   knowledge of the compliance evaluations of the Tucson Sector?

25   A.   Yes, ma'am.

1    Q.    Okay.

2              MS. MASETTA-ALVAREZ:  Your Honor, defendants offer

3    joint Exhibit 870 into evidence as a business record under

4    8036.

5              MR. De GANON:  No objection, your Honor.

6              THE COURT:  It's admitted.

7         (Exhibit 870 entered into evidence.)

8    BY MS. MASETTA-ALVAREZ:

9    Q.    Now, Mr. Alexander, I want to direct your attention to

10   the top of the first page of the holding facility compliance

11   evaluation.  There's a paragraph on the top of that page.  Is

12   that right?

13   A.    Yes, ma'am.

14   Q.    Okay.  What is that -- what's the purpose of that first

15   paragraph?

16   A.    To establish why we're doing what we're doing when it

17   comes down to the compliance evaluation, that we're going to

18   meet all of those directives and policies that's listed above.

19   Or I'm going to ensure that we're doing it properly.

20   Q.    Okay.  I also notice on this compliance evaluation

21   checklist that there are Border Patrol policies and

22   regulations and other documents cited to in each of the

23   checklist items.  Do you know why those are there?

24   A.    Yes, ma'am.  They're there, one, because they're --

25   they're a Customs and Border Protection policy.  They're there

 1   because they're either some type of court order or injunction

 2   that says that we will do that or they're there because --

 3   which right now we don't have anything added.  If there's

 4   anything additional that the sector chief will want me to look

 5   at, then it would also be added to it.  But as of right now,

 6   it is for the actual holding facilities itself.

 7   Q.   Do the holding facilities or the stations that you

 8   monitor compliance of receive a copy of one of these

 9   compliance evaluations?

10   A.   Yes, ma'am.  They will receive a copy of my checklist and

11   they'll also receive a copy of the after action report once

12   it's done.

13   Q.   Do they receive a -- or do all of the stations have a

14   copy of the compliant -- of the compliance evaluation for

15   their own knowledge and compliance, internal compliance?

16   A.    Yes, ma'am.  We -- as a practice, we hand out the

17   checklist that we use to do the evaluations to all of the

18   stations and all of the SMEs or subject matter experts so

19   they'll have a clear understanding of where we pulled the data

20   that -- excuse me, that directed us to go out and conduct said

21   inspection.  And that is not something that we came up

22   ourselves; it's something that we're mandated to take care of

23   by instruction.

24   Q.   Mr. Alexander, we're going to go through this checklist.

25   We're going to go through each checklist item number that

1    pertains to the actual holding facilities and custody

2    conditions.  Okay?

3    A.   Yes, ma'am.

4    Q.   Let's start with checklist No. 1.

5         Now, checklist No. 1 asks:  Are policies posted slash

6    visible or contained in an accessible binder for all agents to

7    use.

8         Now, how do you -- what are you looking for when you are

9    evaluating for checklist Item No. 1?

10   A.   I'm looking to see that it is -- it is physically there

11   and that it is tabbed out properly so that those references

12   can be easily looked up and referred to if needed on the

13   floor.

14   Q.   You said you're looking to make sure that it is posted

15   up.  What do you mean by "it"?

16   A.   The policy.  The binder.  Nine times out of ten, the

17   binder is kept inside of the control room of that holding

18   facility.  And in that control room there's going to be

19   various documents and various go-bys and directives.  But we

20   want those directives to be set aside and set out so that

21   they'll be easily -- you can easily find them and everyone is

22   knowledgeable of it and what's in it.

23   Q.   Okay.  And when you say that you have a binder of

24   these -- I think you said maybe policies or directives?

25   A.   Yes, ma'am.

1  Q.   Are those the four that are listed in checklist Item

2  No. 1?

3  A.   Yes, ma'am.

4  Q.   Can you give any examples of noncompliance with checklist

5  Item No. 1?

6  A.   Noncompliance would be I ask for the binder to see

7  whether or not they have it on -- on station readily available

8  and it's not there.  They can actually have the binder there

9  and it's -- one -- one of these policies or directives is not

10  in it.  They can have it -- they can have this binder and have

11  all of those policies and directives in there, but if there

12  has been a change unless a new revision has come out, it will

13  have the latest up-to-date revision, that can be an infraction

14  as well.

15  Q.   Now, overall, based on your experience as a compliance

16  officer for the Tucson Sector since June 2018, would you say

17  that most stations have been compliant with checklist Item

18  No. 1 during your compliance evaluations?

19  A.   Yes, ma'am.  I would.

20  Q.   Let's move on to check Item No. 2.  Checklist items No. 2

21  asks:  Does your location have comprehensive detainee

22  supervision guidelines that meet the detention standard.

23       Now, this looks like it's broken up -- let me rephrase.

24       Is this broken up into two sections, No. 2?

25  A.   Yes, ma'am.  It's broken into two:  A and B.

1    Q.   Let's start with A first.  A says video surveillance.

2    What are you looking for to determine whether a particular

3    station has comprehensive detainee supervision guidelines

4    meeting the video surveillance portion of the compliance

5    evaluation?

6    A.   That would mean that that station or that holding

7    facility would have video surveillance, real-time video

8    surveillance of that -- those particular holding rooms, and

9    that the actual video itself is clear on the monitors that can

10   be -- that can be seen in the control room, and that each one

11   of those rooms that will provide an image that is -- that can

12   be seen, is pixelated in the areas where you would have to

13   pixelate, like the latrine area because of privacy issues.

14   Q.   Can you give an example of noncompliance or where you

15   find noncompliance?

16   A.   If they have the video system installed and not on,

17   they're not monitoring it.  If the system is on and there's

18   some problem as far as when you're looking at the monitors,

19   it's not clear, it's not concise.  If there's any type of

20   issue where the pixelation isn't providing the proper amount

21   of privacy for any one of the detainees using the actual

22   facilities, for instance, the latrine area.

23   Q.   But these -- excuse me.  Based on your experience as a

24   compliance officer since June 2018, would you say that most

25   facilities that you've inspected have been compliant with

1   checklist Item No. 2a, video surveillance?

2   A.    Yes, ma'am.   I would.

3   Q.    Let's move on to subsection B, welfare checks.   How --

4   what are you looking for to determine whether or not a

5   facility is compliant with the welfare checks portion of the

6   compliance evaluation?

7   A.    The welfare checks is a broad -- is a broad phrase in

8   itself.   So it will encompass a lot of different aspects from

9   meal service to providing amenities and personal hygiene items

10  and things of that nature.   But it also carries a deal is when

11  it comes down to the physical aspects of making sure a person

12  is in good -- their well being is being sought -- being

13  monitored and sought after.

14       In other words, if I was to go down into a station and

15  give -- for lack of better term, if I go to the station and

16  while I'm in that station I'm going to start my inspection, my

17  evaluation, and I can look into a holding room and in this

18  holding room I see that we have, let's say, a teenage female

19  in a room with it's obviously an adult male, I'm going want to

20  know what's going on.   Because that's cohabitation.   That's

21  not -- that is not the way you want to have her placed for her

22  own safety and well being.

23       So there are certain guidelines that say we will keep

24  juveniles and adults separated.

25  Q.    So would you say that part of this -- part of your

1    evaluation for welfare checks is a visual inspection?

2    A.   Yes, yes, yes, ma'am.  A visual inspection, you're

3    looking for the obvious -- obvious indicators of things that

4    are not necessarily the way they should be.  If an individual

5    looks like they suffered from trauma, if an individual looks

6    like they're isolated or they're under some type of duress,

7    all of these things are -- fall under the same umbrella to

8    make sure they're taken care of and the safety is being

9    protected.

10   Q.   Mr. Alexander, have you ever found noncompliance based on

11   your visual inspection for welfare checks?

12   A.   No, ma'am, I have not.

13   Q.   Is e3DM also part of this welfare check portion?

14   A.   Yes, ma'am.  Primarily when -- for instance, while I'm

15   filling out this checklist real-time, that area, I'm looking

16   around because it gives me my mental cue to eyeball and make

17   mental assessments of what I'm looking at.  But at the same

18   time simultaneously, my -- the lead evaluator is actually at

19   one of the control rooms or usually at the processing desk

20   when I'm down on the floor itself and he's logged into e3DM.

21   And in e3DM he is validating, that those items that are

22   required for welfare checks have been checked off and have

23   been annotated, for lack -- because I don't know if it's a

24   check or if it's a memo they write because I don't -- I can't

25   see into it.  But he's making sure that those -- that process

1  has taken place and has been documented on based on the

2  samples that that he's pulled to evaluate.

3  Q.    Remind me, Mr. Alexander, why are you not the person

4  looking in the e3DM logs?

5  A.    I'm not a badge carrier and a law enforcement officer,

6  and that system carries law enforcement officer sensitive

7  information that I don't have the -- there's no need for me to

8  see it.

9  Q.    Based on your experience since June 2018, would you say

10 that most stations are generally compliant with checklist Item

11 No. 2B, welfare checks?

12 A.    Yes, ma'am.  I would.

13 Q.    Let's move on to checklist Item No. 3.  E3DM logs.

14        Now, Mr. Alexander, are you the person that is looking

15 for compliance with these e3DM logs in checklist Item No. 3?

16 A.    Yes and no.  I'm looking at the physical aspects of the

17 meals, the drinking water, the -- like the visuals I will

18 pull, visual assessments I'm making as far as the overall

19 health and welfare of the detainees that I can physically see

20 and the bedding.  And then under "other," usually we're

21 looking at consulate and -- consulate notifications and PREA.

22 Those are the two main ones that I wind up using the "other"

23 for.

24        On the flip side simultaneously, the lead evaluator is in

25 the e3DM module which is the electronic detention module, and

1    they're looking to see whether or not those amenities and

2    those -- those items have been checked off in a timely manner

3    for when they're prescribed to be provided to the detainees.

4    Q.   And have you ever had any reason to think that the lead

5    evaluator or Border Patrol agent that accompanies you and

6    looks at these e3DM logs is lying about the data that he or

7    she is seeing?

8    A.   No, ma'am, I have no reason to believe that.

9    Q.   Let's go through each of these and talk about -- and

10   discuss what you're looking for in regards to compliance.

11        So if you look at 3a, meals.

12   A.   Yes, ma'am.

13   Q.   What are you looking for to determine compliance with

14   meals?

15   A.   Physically, I look at where the meals are being kept.  I

16   look at the pantry area.  Some -- we have -- they have dry

17   storage areas.  They have freezers and things of that nature.

18   I look to see whether or not the items are readily available.

19   And if they are readily available, that the items have been

20   inspected to make sure that they're -- if they're supposed to

21   be frozen, they're frozen.  If -- the actual expiration dates

22   of the food provided to the detainees, the shelf life is good.

23   That nothing is outside of the shelf life that they're going

24   to serve to them as -- like as far as a support function as

25   far as providing meals and snacks.

1          When it comes down to the water, the juice, milk, baby

2     formula --

3     Q.    I'm sorry, Mr. Alexander, are we on 3b?

4     A.    Excuse me.  I'm sorry.  I'm sorry, I got on a tangent,

5     I'm sorry.

6     Q.    It's okay.  I just want to make sure for the record.

7     Sure.  So go on.  So 3b.  Drinking water, juice, milk and baby

8     formula?

9     A.    Drinking water, if there's a -- any place where a

10    detainee -- water will be provided so it's not a question of

11    if.  Water will be provided for them.  Wherever that -- they

12    can source that drinking water, that area or that actual --

13    that source will be marked as potable.  Potable water.  That

14    means they can drink it.

15         When it comes down to the juice, the juice falls under

16    the same -- the same threshold that I'm using when I'm looking

17    at the actual meals, that is, the expiration date on it.  Has

18    it exceeded the expiration date.  Is it free of pests and

19    bugs.  And is the actual general area where they keep the food

20    and everything being kept in a clean and professional manner.

21    Q.    I know you talked about welfare checks earlier, but is

22    there anything else you're looking for as far as welfare

23    checks go in item 3c?

24    A.    Again, yes and no.  It all depends.  I cannot tell you

25    what it's saying in e3DM for the welfare checks.  I can just

1    look at the overall impression and the overall condition that

2    I'm seeing the facility is in.

3         The housekeeping is part of welfare, too.  If -- if the

4    rooms are not clean and sanitized, if the mats are dirty, if

5    the cups they're going to drink water out of have sand on them

6    or stuff like that, that's a no go.  That's a no fly.  It's a

7    write-up for lack of better term, excuse me.  So yes,

8    that's -- it's so broad we can just go and go and go on that.

9    Q.   Okay.  Let's look at checklist item 3D, medical care to

10   include medical screening forms.  Do you evaluate the medical

11   screening forms or the medical care?

12   A.   No, ma'am.  I do not.  That would be the lead evaluator

13   that's checking it through e3DM.

14   Q.   Why don't you look at these?

15   A.   That's PREA -- or not PREA, but PII, personal

16   identifiable information that I don't necessarily need to have

17   or see.  Excuse me.

18   Q.   Okay.  Let's look into Item 3e, bedding slash blanket.

19   A.   Yes, ma'am.

20   Q.   What are you looking for when you were determining

21   compliance  with bedding slash blanket?

22   A.   I'm looking, one, to make sure that a bedding or a

23   blanket is being provided, No. 1.  No. 2, if the bedding and

24   blanket are being provided, that the bedding and blankets that

25   are provided are serviceable.  Serviceable meaning you're not

 1   providing a bedding that's got holes in it, that might have

 2   pests in it, that is torn and ripped, soiled, what have you,

 3   and the same for the blanket which is a mylar blanket if I'm

 4   not mistaken.

 5   Q.    Are these visual inspections that you're doing?

 6   A.    Yes.  Yes, ma'am.

 7   Q.    And what about 3f, other.  What are you looking for in

 8   3f, other?

 9   A.    3f, other.  I have, like -- it's -- other is written

10   there so that if I have to fill in something that might come

11   out that's kind of unique, that I write it in.  But primarily,

12   I'm looking to find out whether or not if we had juveniles

13   that are on -- that were part of the swatch that the lead

14   evaluator -- when I say swatch, that means the lead evaluator

15   is going to go in and from the last time that we did an

16   inspection, he's going to take from that date all the way up

17   to the day we walk through the door and announced ourselves at

18   that station to do the next inspection, he's going to take a

19   swatch or a random sample of several different events.

20        And when he does that, what he grabs, if that -- if --

21   well, let's say if an event they have some juveniles in

22   that -- listed in the event.  Then they're looking to see if

23   consulate notifications were actually done.  They're looking

24   to see whether or not phone calls had been provided.  They're

25   going to look at if, for instance, God forbid we ever have an

1   issue, if there's an issue of PREA, that if a PREA situation

2   came up, that that detainee had the telephone number and the

3   information they needed to make -- so they could make a call

4   to get the type of assistance they needed.

5        So I would identify that on the paper as an indicator of

6   what specifically it was that may be mentioned in the -- in

7   the -- in the after action report because it's something that

8   evaluated or that the lead evaluator evaluated.

9   Q.   Now, based on your experience since June 2018, are the

10  Border Patrol stations that you have evaluated generally

11  compliant with the checklist items in No. 3?

12  A.   Yes, ma'am.  They are.

13  Q.   Let's move on to checklist Item No. 4.  It reads:  Are

14  detainees being promptly processed and transferred out as soon

15  as administratively feasible.

16       Mr. Alexander, what are you looking for to determine

17  checklist Item No. 4?

18  A.   When it comes down to that, it goes again -- it prongs

19  into two prongs.  The physical portion that I'm looking at a

20  lot of times is going to be the actual -- the conducting of

21  those detainees.  Because a lot of times because we come

22  unannounced, we may catch them in the middle of processing

23  people out or processing people in, and I can actually

24  evaluate that process to see if it's flowing seamlessly or if

25  there's a whole lot of hang-ups or things that are causing the

1    process to slow down because of not being managed properly.

2         My counterpart, the lead evaluator, he'll be looking

3    inside e3DM looking at the timetable that was window stamped

4    to the event log for that group of people to see when they

5    came in, to see whether or not did they take all of the

6    requirements that we -- that we have to take care of once we

7    take -- take them into our care and custody.  So -- the

8    detainees when I say "they."

9         When he looks at that to make sure that we provided what

10   we're suppose to provide, when we're supposed to provide it

11   and how it's supposed to be provided on intervals the way it's

12   supposed to be done.  And I'm looking at the physical side of

13   it which would be the end result.  I see the individual going

14   and receiving a meal.  I see the individual being taken to --

15   let's say they're going to take them to court.  So now they're

16   going over to the contractor, which is a courier that moves

17   them.  That's where the I-216 comes into play.  It's like a

18   manifest, a chain of custody of who all was being carried and

19   where they are being carried to.

20   Q.   So I know there's a lot that goes into -- it sounds like

21   there's a lot that goes into checklist Item No. 4.  Would it

22   be safe to say that you're looking for processing delays on

23   the part of CBP when you're evaluating for checklist Item

24   No. 4?

25   A.   We would be looking for processing delays.  I'm looking

1    at the delay as far as how -- how -- how smoothly they are

2    able to move the individuals through, the actual processing

3    process.  And my lead evaluator is looking at the timetable or

4    the time stamps on when they got these individuals to certain

5    stages to be ready to be processed out.  Because in a

6    detention standard, short-term custody hold room I believe is

7    Chapter 610 or something of that nature.  At a certain hour

8    amount, a report would be sent up to the patrol agent in

9    charge if we cannot get a particular individual out by a

10   particular time window.  So that corrective actions or some

11   type of decisions could be made to expedite that process.

12   Q.   And based on your experience since June 2018, would you

13   say that the Border Patrol facilities that you've evaluated

14   have been generally or most of the time compliant with

15   checklist Item No. 4?

16   A.   To meet the administrative portion, yes, ma'am.

17         MS. MASETTA-ALVAREZ:  Ms. Kershaw, if you could

18   please go to page 2.

19   BY MS. MASETTA-ALVAREZ:

20   Q.   Okay.  Let's look at checklist Item No.  5.  Checklist

21   Item No. 5 asks:  Does your location have hold rooms which

22   meet the requirements as set forth in the national standards

23   on transport, escort, detention and search, otherwise known as

24   TEDS.

25         Now, it looks like it has several subsections.  Let's go

 1  through each one individually.

 2        Mr. Alexander, what are you looking for to determine

 3  compliance evaluation with checklist Item 5a, toilet and sink?

 4  A.    I physically go into the hold room itself and I

 5  physically actuate the toilets and the sink to make sure that

 6  they're functioning properly.

 7  Q.    Do you flush the toilets?

 8  A.    Yes, ma'am.  I -- do you want that -- do you want me to

 9  explain how I go about the process of doing it or --

10  Q.    It's up to you.

11  A.    Well, what -- what I do is when I into the -- into that

12  area, first of all I make sure no one is actually using the

13  latrine or I'm not invading their privacy while they're using

14  it.  But once I go into there, what I'm going to do is I'm

15  going to take some toilet paper from the toilet roll, I'm

16  going to actuate the soap dispenser, I'm going to actuate the

17  sink to make sure the water is running.  If it's the water

18  fountain, that the water is coming out of the water fountain

19  high enough that you can drink from it.  I'm going to look to

20  make sure that the sink and water fountain is in a clean -- is

21  clean and is not filthy and dirty or can possibly cause

22  somebody to get sick.  Then I'm going to actuate the toilet.

23  When I dispose of the toilet paper, I'm putting it in the

24  toilet and I'm flushing it because I flush 100 percent of all

25  of the toilets and actuate 100 percent of all of the sinks and

1    faucets that's inside that room each time I go in there.

2    Q.   Do you go into each room when you inspect a facility?

3    A.   I go into -- what I -- not all of the time.  I'll

4    go in -- what I usually do is I'll take from the last

5    inspection which rooms I went into the last time and I try not

6    to do those again.  I try to do another sample.

7         So what I'll do is ask the SME or the subject matter

8    expert that's escorting me if he can go ahead and take me -- I

9    want to inspect a room that he has set up for an adult male,

10   adult female, a juvenile male, a juvenile female or a

11   families.  Because sometimes they have families.  I want to go

12   there.  And then based on what he has available that's open or

13   if they're even using them -- because I'll go in if they have

14   people in there as well.  But I'll take that actual number and

15   then I'll write it down.  And then I'll count how many rooms

16   there are and we'll do 50, 60, 70, 80 percent.  And then I'll

17   go into those rooms and do my checks.

18   Q.   All right.  Let's talk about checklist Item 5b,

19   professional cleaning and sanitizing at least once per day and

20   in parentheses, it says log.

21        How do you evaluate compliance for this subsection?

22   A.   I go down and when I'm down -- it is the usually the

23   actual contractors which I believe is JPI Industries, the

24   contractor that takes care of the cleaning of the facilities.

25   I usually bear witness to them actually going through the

1    process because I'm there in the morning or kind of toward

2    lunch and they're in there cleaning up.  Which a lot of times

3    they're coming in to prepare for people coming in or to clean

4    up after people are disembarked.

5        So I'll usually see them there.  And then I'll also go

6    and either get in contact with whatever custodian that's in

7    charge and have them take me to wherever they keep their

8    logbook.  And I'll pull the logbook and look again, sample

9    dates from when the last time I was there to that date, I'm

10   looking at that swatch window to see did they clean, what they

11   checked off, and what intervals are they doing it.  For

12   instance, if they've got  we clean the sinks monthly, that's

13   not going to be a satisfactory interval.  It's going to be

14   daily, probably more than once a day.  That type of thing.

15   Q.   Okay.  So let's look at checklist Item 5d or, I'm sorry,

16   5c.  Drinking fountains or drinking -- or clean drinking water

17   along with clean drinking cups.

18       How are you evaluating this subsection?

19   A.   Through physical inspection.  I'll go and I'll look.

20   There are some sinks that are -- have low pressure so the

21   water doesn't shoot all the way high out the fountain so

22   they'll provide water coolers.  If they provide a water cooler

23   in the room, then that water cooler needs to be marked with

24   potable water.  Put ice in the water cooler and make sure the

25   water is cool.  Provide clean cups.  Most of the time the cups

1    come in a tier or a tower that's in plastic.  Some of them

2    come actually individually wrapped.  I guess that just depends

3    on what vendor they got the cups from.  And they have to be

4    there for them to be able to use to get water.

5    Q.   And how do you determine whether water is clean?

6    A.   By visually looking inside of the actual -- the actual

7    cooler or actuating the water and taking a visual inspection.

8    Q.   Let's look at checklist Item No. D.  Is there signage

9    indicating water is potable.  I think that's how you say it.

10   Potable.

11        How are you evaluating for this subsection?

12   A.   I'm look for that sign it's physically -- they can either

13   post it by stencil.  They can put it on a placard.  They can

14   put it on a piece of -- an 8-by-10 and then post it to

15   whatever water source it or right near or right above the

16   water source, but it has to be there.

17   Q.   5e, adequate temperature control and ventilation.

18        What are you -- how do you evaluate whether something is

19   at adequate temperature?

20   A.   I -- I -- I've had my section purchase -- well, they

21   actually -- they did buy me thermometers, and they went and

22   got a camera for me to do this job that we're doing.  So what

23   I do is I have a thermometer, one that when I go into the

24   room, I go to where the inlets and the outlets, vents that

25   push the air, and I take a sample.  And then I'll turn the

1   system on.  I'll look to see what it is coming in the inlet,

2   then I'll go to a median spot in the room and I'll set my wand

3   down so it's taking an ambient temperature while I go through

4   my process of checking, doing all my other checks that are

5   listed in section 5.

6        Once I'm done with that doing those checks, I'll grab my

7   thermometer and I'll take the reading from that thermometer,

8   and I'll write it to the corresponding number for the room

9   that I was in.

10  Q.   What would be an adequate temperature for a given hold

11  room?

12  A.   Based on the checklist that was from the Flores Reno

13  settlement that we absorbed into this checklist, from 66

14  degrees to 80 degrees is the actual temperature range that the

15  rooms are supposed to be in.  But there's a caveat to that as

16  far as the posture that we're taking with it.  If 66 degrees

17  is the coldest it can be in that room, if it's 67, we might

18  want to look at warming it up a little bit because the body

19  doesn't distinguish.  Just like 80 is the high, if it's 79,

20  it's still a little warm, we might want to look at bringing it

21  down.  And I'll actually identify that.

22  Q.   When you say you'll actually identify that, do you mean

23  it will end up in your after action report?

24  A.   It won't end up in a report because it hasn't exceeded

25  the limit, but I need to let the SME know, or the subject

1   matter expert know or I'll ask the question to the duty

2   supervisor what's he think about that room -- the temperature

3   in that room.  I think it might be a little bit cold or it

4   might be a little warm.  I had one occasion where I asked the

5   actual SME to ask the actual detainee who was in there because

6   I don't speak Spanish, was he cold or hot.  And he was like

7   I'm good to go.  But I was doing an assessment, so.

8   Q.   Let's look at Item 5f, clean mats.  It says in

9   parentheses, all juveniles and adults at 12 hours.

10      How do we -- how do you evaluate for clean mats?

11  A.   The -- the mats, the actual support -- the actual support

12  agency we got for the mats are the contractors.  So what has

13  to happen is we have to have a collection point and an issue

14  point.  The collection point is for any mat that's been used

15  because now it's going to have to go through the sanitation

16  process, be dried and be put back on the serviceable line so

17  it can be reissued.

18      And then there's the actual issue point, which is where

19  all the clean -- all the mats that went through the process of

20  them, they are now on the ready line for use.  So I go to look

21  at those mats and look at are they clean.  If you put them on

22  a clean mat pile, they need to be clean.

23  Q.   Let's look at checklist Item 5g, maintenance logs.

24      How do you evaluate compliance for that?

25  A.   Maintenance -- to try the maintenance logs, what will

 1    happen, like, for instance, when I'm actuating the toilets in

 2    the actual rooms or any of the hard parts to the facility, if

 3    the water isn't working or if the toilet doesn't flush

 4    properly or if it continues to run, then I'm -- at that time

 5    is when I'm going to get with the subject matter expert and

 6    I'll probably ask had anybody done any checks through here to

 7    find out if they did any visual inspections themselves, do

 8    they have that as part of their deal.

 9         And then I'm going ask if I can see the actual manager or

10    the appointee who is responsible for submitting work orders to

11    fix problems with the facilities.  And it's at that time

12    because I know in this particular room this wasn't working,

13    I'm going to ask to look at the log, try not to give an

14    indicator of what it is until after I get a chance to look

15    through the log and he's shown me everything that he has an

16    active work order in.  And then I'll present to him whether or

17    not what I saw in there is in that work order.

18         If it's in there, I'm going to identify that I did find a

19    toilet that wasn't working and when I followed up with Triaga

20    (ph.), a work order had been submitted.  And if there wasn't

21    one, I'm going to point that out and put it in the report as

22    well.

23    Q.   Now, I'm sorry for not asking this earlier, but you said

24    several times that you'll ask the subject matter expert, you

25    know, for assistance or, you know, to look at something or

1   evaluate something.  Who is the subject matter expert?

2   A.   Nine times out of ten or ten times out of ten, to be

3   honest with you, the subject matter expert is a Border Patrol

4   agent that is assigned to the holding facilities.  And he is

5   part of the processing team which they use to process all of

6   the detainees.

7   Q.   Does the Border Patrol agent who is the subject matter

8   expert, does he know that you're coming to do a compliance

9   evaluation ahead of time?

10  A.   He knows that we're coming once a quarter, but he has no

11  idea when we're going to show up.

12  Q.   Do you give the person, the subject matter expert any

13  notice before you come?

14  A.   Negative, ma'am, no.

15  Q.   All right.  And last, I want to talk to you about

16  checklist Item No. 5h.  Reasonable accommodations for sleeping

17  mat adherence.

18       Now, before we go into how you evaluate compliance, can

19  you explain to the Court what you mean by reasonable

20  accommodations for mats, for sleeping mats adherence?

21  A.   Yes.  My superiors, I want to say it was late spring,

22  early last year, my superiors wanted to go out and look at the

23  actual how many mats, sleeping -- I would say they wanted to

24  make an assessment on how many mats can go into a room on the

25  floor that would still -- that would -- that that room could

 1    reasonably accommodate without it becoming a hazard as far as

 2    hygiene or some type of safety hazard where someone could get

 3    stepped on inadvertently or they can be sleeping right by a

 4    doorway.  If someone opens a door, the door could hit a person

 5    and things of that nature.

 6         So what happened is they came out, they set the mats

 7    down.  During our compliance evaluation, they brought a bunch

 8    of mats.  They got with the holding facility processing agents

 9    to lend a hand as far as helping shuffling mats in and out.

10    They set them down, configured them out different ways to look

11    to see how many could actually fit.  Because the thing that

12    you have -- well, I'm not going to say that you have to

13    understand, but what it is is that each room when it was

14    designed, it was designed to hold X amount of people.  And the

15    engineers or the architects said this room can fit this amount

16    of people.  Well, that amount of people doesn't equate to the

17    same amount if you lay them down.  So they had to figure out

18    how many could you actually lay down in here and it be

19    considered adequate, you're not overcrowding them or causing a

20    hazard.

21    Q.   Is there a specific or set number of mats for each room?

22    A.   Yes.  They came up with a number and they made a chart

23    for each one of the stations, for each holding room in each

24    one of the stations.  They made a chart.  And they put that

25    number on that chart, and that chart is one of the items I

       1  have in my clipboard when I go out to do my assessments.

       2  Q.   How do you determine whether a station is meeting the

       3  reasonable accommodations standards for sleeping mats?

       4  A.   Physically checking and looking and doing a count.

       5  Q.   And overall, based on your experience since June 2018,

       6  would you say that most stations have been compliant with the

       7  subsections in checklist Item No. 5 during your compliance

       8  evaluations?

       9  A.   Yes, ma'am.  I would.

      10  Q.   Let's look into checklist Item No. 6.  And we're going to

      11  stop at 8 because after 8, it goes into things that are not

      12  necessarily specific to the hold rooms.

      13       So let's look at checklist Item No. 6.  Does your

      14  location have a process in place to ensure that juveniles are

      15  offered food and liquids at appropriate times.

      16       Now, this is also broken up into four sections, but let's

      17  go through it generally.  What are you looking for generally

      18  to determine compliance -- to determine compliance for

      19  checklist Item No. 6?

      20  A.   I look at the actual setup for the process itself.  Based

      21  on being fed upon arrival, that means you're going to provide

      22  some type of snack or a meal when they come in.  So in order

      23  to do that, the embarkation area will be coming in through the

      24  sally port.  Their personal property being collected and

      25  tagged and stored for later reclaiming it.  Then they're going

1   to go in and they're going to be checked for security and make

2   sure they're not introducing contraband into the actual

3   facility.

4        Once they come through the next area, the next area is

5   going to be where they'll start receiving the amenities that

6   we're going to give them as they go up towards the desk to be

7   processed into e3DM.  It's at that time where one of the best

8   practices that I was able to identify at one station where the

9   actual agents -- because in e3DM, each one of the items has a

10  check.  Right.  The agents for the -- for meals and snacks,

11  for instance.  The agents will have to check off each thing

12  that they get.  Well, what they decided to do which was really

13  smart, was they took some one gallon Ziploc freezer bags and

14  they took a cup, toothpaste, toothbrush, the paper shower,

15  mylar blanket, crackers, juice, and they put them all into

16  this one bag and they called it an intake kit.

17       So once -- when the detainee comes in, they hand them an

18  intake kit and they grab their mat, they know they've provided

19  food and what have you.  At the same time, right at the actual

20  processing stations, there's a cart that -- I don't think I've

21  ever went and I didn't see a cart sitting out on the floor to

22  be honest with you.  The cart sits right out there and

23  that's -- has juice and crackers on it so that the children,

24  because they do have, like, rooms where they have juveniles

25  in.  And they'll have the doors open sometimes so they can

1   come out and take what they want.  And there's a big sign that

2   they have on the cart as well as at various places in the

3   actual holding facilities that says these amenities will be

4   provided upon request or you can have them.  Take right here.

5   It's like free issue.  And so they will get their -- the items

6   that way.

7        So that's the way that I'm seeing that they're getting

8   what they are getting physically.  And then, of course, we're

9   validating that through the documentation of it in the e3DM

10  from the lead evaluator.

11  Q.   You talked about snacks and toothbrushes and paper

12  showers.  One of the checklist items on here, though, is 6D.

13  Baby formula and toddler food properly stored and labeled.

14  A.   Right.

15  Q.   How are you evaluating for that?

16  A.   Yeah, the baby food and toddler food isn't put inside the

17  intake kit for obvious reasons.  100 percent, everybody

18  doesn't have a toddler or a baby when they come in.  They're

19  usually kept inside the actual pantry area or whatever it's

20  designed to set up as a kitchen or the dry storage area, which

21  they can go in to access where they keep these things on the

22  shelf.

23       When you go in there to look at, for instance, the baby

24  food, the toddler food, it's broken down in stages.  And that

25  was another best practice that we took that we identified at

1  one station that we shared with the other stations so they can

2  adopt those practices while we get everything standardized to

3  make sure everything is running, the continuity is good.

4       Excuse me.  So what happens is, for instance, the baby

5  food, you're going to have different stages of baby food.  We

6  have the Gerber baby food that will be in a jar that's pretty

7  much all blended up.  Then you've got food that a toddler can

8  eat, which might be like a little dinner tray.  Then you have

9  baby formulas like the Similac.  And then you also have milks,

10  like a shelf milk like the baby -- toddlers can drink.  So

11  it's like in different stages they're different ones.  But I'm

12  looking to make sure that, you know, they're in compliance as

13  far as shelf life and that they can be served to them because

14  they're good to go.

15  Q.   Based on your experience since June 2018, would you say

16  that the stations that you've evaluated have for the most part

17  been compliant with checklist Item No. 6?

18  A.   Yes, ma'am.

19  Q.   Let's look at checklist Item No.  7.  Does the location

20  have a process in place to ensure that juveniles are offered

21  showers, soap, clean towels, and basic hygiene products upon

22  arrival?

23  A.   Yes.

24  Q.   What are you looking for generally to determine whether

25  or not a station is compliant with checklist Item No. 7?

1    A.    I look to make sure that those amenities are provided.

2    If you don't, if they don't have a dedicated shower or a

3    built-in shower room, then paper towel showers need to be

4    provided.  There is also a timetable that's in the e3DM module

5    where if an individual has been in custody after -- to a

6    certain amount of time, you are to take them to a facility

7    that does have a hard shower that they can use.  When I say a

8    hard shower, I mean a fixed facility shower, a real standard

9    shower, not just an interim contingency type of thing.

10   Q.    So is part of the -- is part of evaluating checklist Item

11   No. 7 a visual inspection that you're doing?

12   A.    Yes, ma'am.  As well as the lead evaluator doing an e3DM

13   inspection because of an individual has been in custody at a

14   certain hour amount, they need to have been taken or

15   transferred to a facility where they can use the shower and

16   then be brought back.

17   Q.    How are you determining 7C, all diaper -- are all sizes

18   of diapers available?

19   A.    I'm not a -- I don't have any children, but what I do is

20   I look at the actual box itself and usually the box will tell

21   you, diaper for a baby from newborn or they'll go from one to

22   three months or three to five or they'll have different sizes

23   for the diapers.  So I'll look at that.

24         And then as well, I'll look to make sure that that is

25   free of pests because we don't want a pack rack to go make a

1  nest in the diaper box.  So we make sure that everything is

2  being kept clean and it's not exposed to any kind of outside

3  influences, so to speak.

4  Q.   Last but not least, let's look at checklist Item No. 8.

5  Does the location afford privacy for showering, performing

6  bodily functions and changing clothing outside the view of the

7  staff of the opposite gender.

8       How do you evaluate compliance for checklist Item No. 8?

9  A.   I do that through physical visual inspection as well.

10 One, when I'm in the control room and I'm looking at the video

11 surveillances, that -- once I identify they are working, that

12 every area that has a latrine area which you would consider to

13 be a privacy area for a person to have the -- have the bodily

14 functions, that it's pixelated so no one can be -- can view

15 them from the opposite -- from the -- the opposite gender

16 isn't just sitting back, can see them.

17      Second, if the facility has a shower, of course you need

18 to have some curtain or some type of blockade or some type of

19 blind so you cannot -- people just walking by cannot watch a

20 person shower.  They are afforded a level of privacy in that

21 regard.

22      If they're at -- if they're going to use a paper towel

23 shower, that they -- that the station itself provides or sets

24 up a room where they can provide a privacy curtain or some

25 level of privacy where this individual is away from wandering

1  eyes, for lack of a better term, so they can go ahead and

2  properly care for themselves.

3  Q.   Based on your experience since June 2018, would you say

4  that most of the evaluations you've completed have shown that

5  stations have been compliant with checklist No. 8?

6  A.   Yes, ma'am.

7  Q.   And how about checklist No. 7?  I apologize, I didn't ask

8  this earlier, but would you say in your experience since June

9  2018, that most stations have been compliant with checklist

10  Item No. 7?

11  A.   Oh, yes, ma'am.  Yes, ma'am.

12        MS. MASETTA-ALVAREZ:   Okay.  Ms. Kershaw, you can

13  take this exhibit off the screen.  Thank you.

14  BY MS. MASETTA-ALVAREZ:

15  Q.   Mr. Alexander, earlier you talked about how you do some

16  after action reports.  What is an after action report?

17  A.   An after action report is a memoranda, you know, what

18  most people know as a memo.  It's a memoranda that I write

19  down what it was that we did and when we did it.  It's like a

20  record, a physical record of this inspection taking place, the

21  things that were observed, to what extent were they observed.

22  Were they -- was it satisfactory, unsatisfactory, what have

23  you.

24        And I document this in the memoranda and then I route it

25  around to the chief because I'm writing the memoranda on

 1  behalf of the sector chief going back to the actual patrol

 2  agent in charge of the station whose facility was evaluated by

 3  myself and the lead evaluator.

 4  Q.   Okay.  If I showed you one of the after actions report,

 5  would you recognize it?

 6  A.   Yes, ma'am.

 7        MS. MASETTA-ALVAREZ:  Ms. Kershaw, if you could

 8  please pull up joint Exhibit No. 840.  And Ms. Kershaw, will

 9  you please go to page 2 of Exhibit 840.  Thank you.

10  BY MS. MASETTA-ALVAREZ:

11  Q.   Mr. Alexander, what is this?

12  A.   This is an after action report for an inspection that I

13  did at the Tucson Coordination Center.

14  Q.   And is this typical of the after action reports that

15  you -- that you write after your compliance evaluations?

16  A.   Yes, ma'am.  This is the standardized format.

17  Q.   Are these after action reports a regular practice of the

18  compliance evaluations?

19  A.   Yes, ma'am, it's a standard practice.

20  Q.   And again, are the compliance evaluations a regular

21  practice of the Tucson Sector?

22  A.   Yes, ma'am.

23  Q.   Are you a person with knowledge -- would you consider

24  yourself a person with knowledge to make these kinds of after

25  action reports?

1    A.    Yes, ma'am.

2    Q.    And do you make these after action reports at or near the

3    time of the -- of the compliance evaluation?

4    A.    Yes, ma'am.

5           MS. MASETTA-ALVAREZ:  Your Honor, defendants move

6    Exhibit 840 into evidence as a business record.

7           MR. LONDEN:  No objection, your Honor.

8           THE COURT:  It's admitted.

9        (Exhibit 840 entered into evidence.)

10          MS. MASETTA-ALVAREZ:  And, your Honor, there are

11   many of these that defendants would like to admit into

12   evidence.  I think it would be quite a waste of the Court's

13   time to admit them one by one since they do, as Mr. Alexander

14   testified, one each quarter for each station.  We would like

15   to show these from beginning 2017 per your ruling I believe

16   two days ago that things after 2017 would be -- you would

17   consider relevant for the purposes of present day conditions.

18   And for that, I ask that defendants would also request to move

19   Exhibits 840 through 847 -- I'm sorry, we have 840 in already.

20   We would like to move 841 through 847 and joint Exhibit 738

21   into evidence as well.

22          THE COURT:  Mr. Londen, apparently those are all

23   similar compliance reports, different quarters or different

24   facilities, I guess.

25          MR. LONDEN:  We won't have an objection to their

 1  coming in.  They are regularly kept records.

 2          THE COURT:  All right.  They're admitted.

 3      (Exhibits 841 through 847 and 738 entered into evidence.)

 4          MS. MASETTA-ALVAREZ:  Thank you.

 5  BY MS. MASETTA-ALVAREZ:

 6  Q.  All right.  Mr. Alexander, I'd like to talk about what's

 7  in front of us, joint Exhibit 840.

 8      Now, who -- who was this memo from?  I'm sorry, who is

 9  this memo from?

10  A.  The memo is from the chief agent of Border Patrol sector.

11  Chief Villareal.  I'm sorry.  I apologize.  I messed his name

12  up.

13  Q.  It's okay.  And who is this memorandum for?

14  A.  It's to go to Mrs. Davison, who is the acting chief

15  patrol agent over the facilities.

16  Q.  Now, would the person for whom the memorandum -- I'm

17  sorry, would the person whom the memorandum is for change

18  depending on what station is being evaluated?

19  A.  Yes.  In this particular case, Mrs. Davison was wearing

20  two hats.  But she would be over the -- over the TCC as well

21  as performing that duty as an acting assistant patrol chief

22  according to this -- for this memo purposes.

23  Q.  And if you do a compliance evaluation, say, for Nogales,

24  would the memorandum be for the chief patrol or the assistant

25  chief patrol agent of that particular station or the patrol

1    agent in charge of that particular station?

2    A.   Yeah, I just -- just to get it straight.  It would be for

3    the -- what we call the PAC, which would be the patrol agent

4    in charge of that station.  Yes, that would be it.

5    Q.   All right.  And what's included in this memorandum?  What

6    are you discussing in this memorandum?

7    A.   In the memorandum I'm discussing the actual inspection of

8    the holding facility, why we were inspecting the holding

9    facility, which basically for the care and welfare of our

10   detainees.  And then I will go into the actual areas that were

11   evaluated and the outcome of those evaluations.  I will go

12   into if, for instance, there were -- if there was a write-up

13   from the previous inspection, I would have that item reposted

14   in this memorandum because I'm going to revisit it to see if

15   they took corrective actions to fix that issue.

16       And then I'll also put in if there -- sometimes when I go

17   down to stations, they may not have any detainees.  So there

18   would not be a reason to put in the actual reasonable

19   accommodations write-up because there was nothing to evaluate.

20   But if there was something to evaluate, that's when I would

21   put that in and so forth and so on.  Of course, e3DM.  And

22   then the other items that are on the checklist.

23   Q.   Are there any attachments to this memorandum?

24   A.   Yes, ma'am.

25   Q.   What are those attachments?

1    A.   Usually I will attach pictures of the actual facilities

2    or the areas that I evaluated in the actual state that I found

3    them in, be it whether it's satisfactory or unsat, I'm going

4    to take that picture.

5         I'll attach -- if there was a best practice that came out

6    that I thought should be warranted that should be shared with

7    the sector and that my bosses should know about, I put that

8    down as an attachment.  And basically that's it.

9              MS. MASETTA-ALVAREZ:  Ms. Kershaw, will you go down

10   two pages?  Thank you.

11   BY MS. MASETTA-ALVAREZ:

12   Q.   Mr. Alexander, what are these?

13   A.   Those are pictures of the actual facility and the areas

14   that I actually saw or I more than likely wrote about in the

15   memorandum report so I get a visual with the literary portion.

16   Q.   And why are you taking pictures to be included with your

17   memorandum?

18   A.   I'm doing it as record and also as a form of transparency

19   and also to show that based on my -- what I thought was

20   acceptable or being serviceable, you can see it, it's clear,

21   it's clear, it's not ripped, it's not damaged.  Or it is

22   ripped, it is damaged and this is how I saw it and this is --

23   and I'm showing it to you or to the -- to the sector -- to the

24   sector.  Excuse me.

25             MS. MASETTA-ALVAREZ:  Ms. Kershaw, will you go down

1    one more page?  And go down one more page.  One more.

2    BY MS. MASETTA-ALVAREZ:

3    Q.   Mr. Alexander, what, is this an attachment as well to the

4    memorandum?

5    A.   Yes, it is.

6    Q.   What is this?

7    A.   Well, actually, it's an attachment to the folder itself.

8    What it is, this is the e3DM audit memo from the lead

9    evaluator.  Once he went back and all of the information that

10   he harvested from e3DM or the detention module, he'll go back

11   and he'll write a synopsis of everything that he had looked at

12   and what the finding was on that item.  Then he'll e-mail that

13   to me.

14        I will take this document in real-time, I'm going to put

15   it in a folder so it accompanies my checklist as well.  And

16   I'm going to take what verbiage that he used in the actual --

17   in his memo to me to describe what he found.  And then I'm

18   going to get on the phone with him and verify that once I

19   transfer the information over, do I need to transfer it over

20   verbatim or should I write it in the flow of the package that

21   I got.  Like, if it was -- for instance, there was no finding

22   and he had no discrepancies noted, they're doing a good job,

23   so forth, so on.  Then if I already have a packet already

24   during this inspection time period there were actually no

25   findings for this -- for this time period over these events

1    that was evaluated, those are the numbers that I'm harvesting

2    from his report to me.  So I don't necessarily have to cut and

3    paste it.

4         I'll verify that I'm -- am I interpreting this right, am

5    I writing this right.  And then I'll let him take a look at it

6    or she take a look at it and then they'll let me know, yeah,

7    you hit the nail on the head.  And then I'll go ahead and add

8    it so it supports what I put in the memo.  And it's in the

9    folder as supporting documentation.

10             MS. MASETTA-ALVAREZ:  And, Ms. Kershaw, would you go

11   down one more page.  Okay.

12   BY MS. MASETTA-ALVAREZ:

13   Q.   What is this, Mr. Alexander?

14   A.   That's the actual audit snapshot that I believe it was

15   Agent Kaison gave me for that inspection on that particular

16   day for the Tucson Coordination Center.

17   Q.   Now, in the second paragraph on this page, it says:  To

18   conduct the audit a random sample group of 30 detainee records

19   from 30 different e3 events starting from the date of the

20   previous audit, September 3rd, 2019, to the date of the

21   current audit, October 17, 2019, were queried.  Is it typical

22   to the best of your knowledge that a -- that the lead

23   evaluator or Border Patrol agent would do a random sample of,

24   say, 30 e3 events?

25   A.    Yes, it is typical.  There were -- I've seen more and

1    I've seen less.  We've increased the number from what it was

2    in the past.  We went I think from 14 to 15 randoms across the

3    board.  Because one event, for instance, for those that may

4    not know, one event item may have 50 people in that event.

5    And each one of those individuals are going to have the exact

6    same requirement individually that the group has collectively.

7         So if there was 50 people in one event, there are 50

8    meals, at least one has to be -- I mean, not at least one, has

9    to be inspected.  There is 50 people in one event.  So if you

10   times that about how long those people have been there, he's

11   checking each one of those for the time period that they were

12   there to make sure they were all satisfactory.

13        So we went from 15 events to 30.  So to get a wider

14   swatch and to try to get closer to identifying any problems

15   that we may not see based on the swatches that we took in the

16   past.

17   Q.   So Mr. Alexander, just to clarify, you're saying that

18   each event in e3 might have several individuals in it?

19   A.   Might have several individuals in it, a large group.

20   Sometimes they could be small, sometimes they could be a large

21   group or contain more than one group of families.  It just --

22   it really depends on how they were received, I guess.  I don't

23   know.  But I think that's what I'm making an assumption on

24   that part.

25   Q.   Now, Mr. Alexander, again, we're looking in the second

 1    paragraph, the last sentence, I apologize.

 2    A.   Yes, ma'am.

 3    Q.   It says that no discrepancies were identified in any of

 4    the 30 sampled events.  Do you know what that means?

 5    A.   That means he did not find any infractions that would --

 6    that would go against whatever the posted policies are.  When

 7    I say the posted policies, again, I'm referring back to those

 8    four items that we have.  We make sure they're keeping in the

 9    book.  Any type of injunction orders that we had.  When I say

10    injunction order, let me take that back.  When I say

11    injunction, there were some things that I saw in the Jane Doe

12    audit that were items that I highlighted that we need to look

13    at in particular.  And I believe they had something to do with

14    the mats and it was like two or three items.  And I can't

15    recall right off the top of my head.  But I highlighted them

16    to make sure that we had a standard for making sure that they

17    were satisfactory and that we were -- I'm not -- the word

18    aggressively is not what I'm -- we were actively in pursuit to

19    make sure that we were -- we were in compliance with those

20    suggestions or mandates from the Court.

21    Q.   Okay.  I want to talk about this word deficiency.  What

22    does the word deficiency mean in one of your compliance

23    evaluations?

24    A.   Yeah, deficiency, discrepancy, findings, a lot of that

25    I'll -- I take as my -- if there's -- if there's a problem

 1    with definition, it will be it's because I'm using language

 2    that I was accustomed to using as a compliance inspector in

 3    other places.  A discrepancy means it's not the way it's

 4    supposed to be.  It's a finding or a write-up.  Right?

 5        A deficiency would be it's not up to par.  Same thing.

 6    And I would use those -- those terms.  And I know what I mean

 7    and I hope I didn't use a term that wasn't accurate enough,

 8    but I was trying to drive -- hit that nail from different

 9    angles to let you know we're standing on point when we're

10    posting what we're supposed to be doing.

11        Is that what you mean, is it like a clarification deal?

12    Q.   Yes.  We'll get into in just one second.

13            MS. MASETTA-ALVAREZ:  Ms. Kershaw, if you could just

14    take -- yes, thank you.  And if you could go again to page 2

15    of the document.  Thank you.

16    BY MS. MASETTA-ALVAREZ:

17    Q.   Now, we were just talking about discrepancies and

18    deficiencies.  If you found that a particular station was not

19    compliant with one of the sections of the compliance checklist

20    that we were looking at earlier, would it make it into this

21    record?

22    A.   Yes, ma'am.

23    Q.   Is there --

24    A.   If it's a checklist item, it can make it into this

25    report, yes, ma'am.

1  Q.   Is there ever a time that you would find something that

2  was not compliant with the checklist that might not make it

3  into this report?

4  A.   Yes, ma'am.  I've had that happen.  Item like the clean

5  mat area.  The mats had been washed.  They were put out to the

6  drying stage.  After they dry, they go in to the clean mat

7  area so they could be issued back out.  Well, in this

8  particular station, they chose to hang a paper sign like an

9  8-by-11 above the mat station that says clean mats.  And the

10 paper fell down.  It was there, but it was behind the mats on

11 the wall on the floor.

12      So when I walk in, I notice it's the clean mat room

13 because it says clean mat room on the door, but the sign above

14 where the mats are is not there.  So I'm like you don't have

15 the clean mat sign posted up there and they ran and made one

16 and stuck it up there.  And then they found the one that was

17 originally had fell on the floor.  So I didn't write that up.

18 Q.   And why didn't you write something like that up?

19 A.   It didn't directly have any affect on our detainees.  If

20 the -- if there's something that directly affects detainees,

21 it's going in.  Sorry.  I mean, it is what it is but it's got

22 to go in.

23 Q.   So let me give you an example.

24 A.   Yes, ma'am.

25 Q.   If you went into a particular station and you were

1    looking at the reasonable accommodation for mat capacity.

2    A.   Yes, ma'am.

3    Q.   And you saw that the mat capacity on the wall was nine?

4    A.   Yes, ma'am.

5    Q.   And you go into that room and you see that there are 13

6    mats on the floor?

7    A.   Yes, ma'am.

8    Q.   Would that finding make it into the report, even if at

9    that moment in time the agents were able to, say, move four

10   people to another room?

11   A.   Yes, ma'am.  Not only is it going to go into the report,

12   but the posture that I have from my leadership is that if it's

13   above, it's elevated directly to the duty sup, the watch

14   commander or whoever is delegated or directly to the DPAC or

15   the PAC himself, DPAC being deputy patrol agent in charge or

16   the PAC, the patrol agent in charge.

17       Because from my understanding, as leadership, they have

18   come up with certain types of contingencies of postures

19   they're going to take if they hit thresholds or exceed them or

20   what have you.  And whatever internal corrective actions

21   they're going to take, I'm not privy to, but I'm going to

22   elevate it.  And again, primarily because it has a direct

23   impact.

24       I'm there, no notice.  So because of no notice, that

25   means that this situation was existing and now you're fixing

 1   it because I'm saying something about it or should you have

 2   clicked and you taken appropriate actions to get that taken

 3   care of at the lowest level.

 4   Q.   And just to clarify, would a discrepancy like that, like

 5   finding something above the reasonable mat accommodation,

 6   would that make it into this report?

 7   A.   Yes, ma'am.

 8   Q.   Signed by the chief patrol agent?

 9   A.   Yes, ma'am, it would.

10   Q.   Let me give you one more example just to clarify where

11   that line exists.

12        Let's say you go into the pantry area and you're looking

13   at baby formula, and you see that one of the baby formulas is,

14   you know, three days expired.  And if the agent were to say,

15   oh, I can take that down, throw it away and it's all good,

16   would that be something that would make it into the report,

17   the fact that that was expired?

18   A.   Absolutely, ma'am.  Yes.

19   Q.   Why is that?

20   A.   Because it directly impacts.  And not only that, it's

21   something that we're going to -- we could have easily been

22   provided to a detainee and it is -- and it's past the shelf

23   life.  We can't have those type of things.  It's just -- don't

24   mean to get all personal about it, but it's -- it's -- it's a

25   human rights thing.  You've got to take care of those who

1    can't take care of themselves.  It's just what it is.

2    Q.   So that would make it into this report, signed by the

3    chief patrol agent?

4    A.   Yes, ma'am.

5    Q.   I want to talk to you about what happens after you send

6    this report out to the patrol agent in charge.  Has there ever

7    been a time that you're aware of where a patrol agent in

8    charge has responded to a finding or a deficiency that was

9    identified in one of these after action reports?

10   A.   Yes, ma'am.  It's twofold when we get responses from

11   patrol agent in charge or whoever that delegate might be.  One

12   is at the outbrief.  Once we're finished with our inspection

13   from when we show up, we also do a debrief with the patrol

14   agent in charge so they -- and all those that were involved so

15   they know what's coming out, what the overall health was and

16   what they can expect coming down from the memoranda.  And if

17   there's any actions that they want to take on their own,

18   they've got time to start before they talk to their superiors

19   or what have you.

20       And then the second one is once the memorandum -- the

21   memo goes out, after it's been routed through the chief and

22   all of the section heads to look at it at headquarters, then

23   it's sent out to sector so they all have a record of it.  It's

24   at that time that the second -- that's the second opportunity

25   where the patrol agent in charge who may have pointed out --

1   for instance, there was one in October, you know, we had where

2   they would respond back to us.  And state this is what for

3   that finding on this particular day, we went out and did

4   further investigation, i.e., something wasn't logged in e3DM.

5   And they went back because they can do another -- there's

6   another way to find out whether the action took place and they

7   go back and they do their research.

8   Q.   So is this something that actually happened recently?

9   A.   Yes, ma'am.

10  Q.   What station was it at?

11  A.   It was at Willcox station.

12  Q.   What was the finding that was in the report that they

13  reacted to?

14  A.   It was a finding that during the -- it was the lead

15  evaluator found -- it was a meal that was missed or not

16  documented.  But because it was not documented in e3DM or

17  properly logged or whatever it is that they do in it to

18  reflect it, we have to take the posture that if you didn't

19  document it, it didn't happen.  So when we back briefed that

20  to the Willcox PAC, the Willcox PAC had said unequivocally --

21  Q.   I'm sorry.  By PAC, do you mean patrol agent in charge?

22  A.   Patrol agent in charge is the PAC.  Excuse me, I'm sorry.

23  I did that again.  I apologize.

24       They said unequivocally this is not going to be taking

25  place.  So the PAC -- because we gave the outbrief and then,

1    of course, the report came out, during that time frame, the

2    PAC directed her -- it was Ms. -- yeah, directed their

3    leadership to go in and it didn't matter how long it took to

4    get into the videos and look at those videos for that event

5    number and identify each time that individual had been given a

6    meal and verify it and then get back with them.  Because

7    they're going to respond to this finding with either they did

8    or they did not.  But they're going to make sure that due

9    diligence is taken to make sure it doesn't happen again.

10        And I -- that's the impression that I got from it.  And I

11   wound up writing the amended memo because the PAC sent a memo

12   to my office stating they found it and they have the

13   supporting information for visual checks and what have you.  I

14   wind up going out -- I was out of medical for a little bit.

15   When I came back, I got -- I saw the memo and I wrote it when

16   I -- I saw where they -- where the PAC had written it and it

17   was validated by my boss.  So I wrote an amended memo to state

18   that that finding was -- it was a finding because of operator

19   error or oversight as far as logging, but that meal was

20   provided and then I pushed it out to the sector.

21            MS. MASETTA-ALVAREZ:  Okay.  One second to confer

22   with co-counsel.

23            THE COURT:  Yes.

24            MS. MASETTA-ALVAREZ:  No further questions for

25   direct examination.

1            MR. De GANON:  No questions, your Honor.

2            THE COURT:  Oh.  All right.

3            THE WITNESS:  Sorry, my head is shining.

4            THE COURT:  I understand the problem.

5  Mr. Alexander, thanks for coming in and talking to us.

6            THE WITNESS:  Sir?

7            THE COURT:  Thank you for coming in and talking to

8  us.  You may be excused.

9            THE WITNESS:  Thank you, sir.

10            MS. MASETTA-ALVAREZ:  Your Honor, should we take a

11  short recess or do you want to move on to the next witness?

12            THE COURT:  Let's move on.

13            MS. MASETTA-ALVAREZ:  Okay.

14            THE COURT:  For a while.

15            MS. MASETTA-ALVAREZ:  All right.  Defendants call in

16  Bradley Davis.

17            BRADLEY DAVIS, DEFENSE WITNESS, SWORN

18            THE CLERK:  Thank you.  Please be seated.  And if

19  you then state your full name and spell your last name.

20            THE WITNESS:  Bradley S. Davis.  D-a-v-i-s.

21            THE COURT:  Go ahead, Counsel.

22                      DIRECT EXAMINATION

23  BY MS. MASETTA-ALVAREZ:

24  Q.   Good afternoon, Mr. Davis.

25  A.   Good afternoon.

 1  Q.   Please introduce yourself to the Court.

 2  A.   I am Bradley S. Davis.  I'm the director of policy and

 3  compliance at the Tucson Sector headquarters here in Tucson.

 4  Q.   Are you here to testify about your experience as the

 5  director of policy and compliance?

 6  A.   Yes.

 7  Q.   Mr. Davis, I want to talk to you about your background

 8  and educational history.  In what city do you live?

 9  A.   I live in Oro Valley, which is a bedroom community north

10  of Tucson.

11  Q.   Okay.  Mr. Davis, if you don't mind talking into the

12  microphone so that we can hear you.

13  A.   I like to see.

14  Q.   Perfect.  Okay.  I'm sorry, where did you say that you

15  live?

16  A.   I live in Oro Valley which is just north of Tucson.

17  Q.   It's hard for me to hear you.  Do you mind pulling the

18  mike a little bit closer to you?  That should be better.

19       All right.  Have you always lived in the Tucson area?

20  A.   No.  I've lived here only since June of 2018.

21  Q.   What brought you to the Tucson area?

22  A.   To accept the position that I currently hold.

23  Q.   Okay.  And you said you're not from around the area.

24  Where did you go to high school?

25  A.   I was born and raised in southern California and went to

 1   high school in Garden Grove, California and then attended

 2   UCLA.

 3   Q.   Okay.  And did you graduate from UCLA?

 4   A.   Yes, with a bachelor of arts in history.

 5   Q.   Did you ever obtain a master's degree?

 6   A.   Eventually from UCLA I was commissioned a second

 7   lieutenant in the Air Force and went on active duty.  And

 8   during my time on active duty, I obtained a master of science

 9   degree in organizational behavior and human resource

10   management.

11   Q.   Okay.  Have you had any specific training in compliance?

12   A.   Yes.  In a number of locations.  The first formal

13   training that I received in compliance had to do with my

14   position, my last job in the military where I was an inspector

15   under the arms control or in arms control under the

16   conventional forces in Europe treaty and I was stationed in

17   Europe for that.  I was a team chief and received about

18   three months of formalized training, which included two weeks

19   of training at the NATO school in Oberammergau, Germany on

20   inspection capabilities, processes, rights, what have you.

21   And after that I had to certify with my division chief.

22        At that point when I went out on inspections, I could

23   speak formally for the United States government in regards to

24   the treaty.

25   Q.   Have you received any certificates or awards?

 1  A.    Other than course completion certificates, I received a

 2  number of military awards.  However, during my time after my

 3  military career, I became a civilian working for DOD for five

 4  years.

 5  Q.    I'm sorry, DOD, when you say that?

 6  A.    I'm sorry, the defense department.

 7  Q.    Okay.

 8  A.    And then after about five years continuing with the

 9  organization that I was originally with in the military, I was

10  secunded by the U.S. government to the UN organization in the

11  Hague, the Netherlands called the Organization for the

12  Prohibition of Chemical Weapons or OPCW.  This is the

13  organization that inspects under the treaty for chemical

14  weapons and chemical precursors.  During the time that I was

15  assigned to that organization, that organization was awarded

16  the Nobel Peace Prize.

17  Q.    Were you also extended a Nobel Peace Prize because of

18  your work?

19  A.    I have a certificate saying that I was a member of the

20  organization that received the award.

21  Q.    I'd like to talk to you about your employment history.

22        Now, before you started as the director of policy and

23  compliance in the Tucson Sector, what did you do?

24  A.    Prior to this position, I worked as the -- a strategic

25  planner on the staff of the Army logistics headquarters

 1  located in Michigan, just north of Detroit.

 2  Q.   And how many years were you there?

 3  A.   Four years.

 4  Q.   Four years.  Do you have any other experience in

 5  compliance or inspections?

 6  A.   One of my first experiences when I was assigned to the

 7  State department and the arms control disarmament agency

 8  portion of the State department where I worked on the

 9  strategic planning and implementation of the START treaty, the

10  strategic arms reduction treaty between us, the U.S., and the

11  Soviet Union.  Part of that included being assigned to the

12  negotiating team that was sent to Geneva.  I went five times

13  for the negotiations and working out issues about compliance

14  to the treaty from all partner states.

15  Q.   Okay.  Do you have any other experience in compliance or

16  inspections besides your experience with the Department of

17  State?

18  A.   Other than what I talked about, being in the -- oversees

19  in Europe, no.

20  Q.   And when you say being oversees in Europe, do you mean

21  the organization for the prohibition of chemical weapons?

22  A.   That was part of it.  The other one was being assigned in

23  the military as the team chief to an inspection team.  And

24  then staying there as a civilian when I retired and that

25  lasted eight years, two years at OPCW.  And then I had a

1   stint, a four-year stint working at Africa command in

2   Stuttgart, Germany and then four years in Michigan and then

3   coming here.

4   Q.    And just to clarify, when you were with the Department of

5   Defense, I believe it was the Defense Threat Reduction Agency;

6   is that correct?

7   A.    Uh-huh, uh-huh.

8   Q.    What was your position title there?

9   A.    Initially when I first was assigned to the Defense Threat

10  Reduction Agency, that was the agency I was assigned to to go

11  oversees to be an inspection team chief.  That organization

12  has a division directly assigned in Europe to conduct those

13  types of inspections.  Part of the inspection protocol is you

14  do the inspections into the countries of Russia, Belarus and

15  Ukraine.  And when those countries come to U.S. facilities in

16  the European theater, I would become an escort team chief

17  helping to protect U.S. interests in compliance with the

18  treaty.

19  Q.    What years were you working in that capacity?

20  A.    From January 2000 until May of 2008 when I moved to the

21  OPCW and the Hague.

22  Q.    Okay.  And again, the OPCW is the Organization for the

23  Prohibition of Chemical Weapons?

24  A.    Yes.

25  Q.    Okay.  And what was your title, your job title there?

1  A.    When I was at OPCW?

2  Q.    Correct, yes.

3  A.    I was the chief of the strategic plans and operations

4  division.

5  Q.    And what did you do as far as inspections went in your

6  position as chief?

7  A.    In that position I was in a support function, I was not

8  one of the certified inspectors of the organization; however,

9  I helped to schedule all of the inspection teams from the

10 organization to do the requirements of the treaty around the

11 world, which turned out to be about 4- to 500 inspections a

12 year that were sent out by that organization.

13      Also, I was responsible for the support of the operations

14 for each inspection.  And eventually I became the division

15 chief while I was stationed there.  I did go off on three of

16 the inspections down to Libya, to oversee the preparations for

17 the Libyan destruction of their weapons or their chemical

18 weapons that they had stored out in the middle of the desert.

19 Q.    Okay.  And do you have any experience in policy

20 development?  Any previous experience in policy development?

21 A.    The policy development I -- while I was at the State

22 department working on START treaty, the Strategic Arm

23 Reduction Treaty, in a little bit in a previous assignment at

24 the Pentagon when I started initially working with the START

25 treaty, I was helping to provide the financial resources for

1    the Air Force across the continental United States for them to

2    be in compliance with the START treaty.

3    Q.    Okay.  Now, I want to talk to you about your current

4    position.

5         You stated earlier that you are the director of the

6    Tucson Sector compliance and policy department.  Can you

7    please tell us what the purpose of the policy and compliance

8    department is of Tucson Sector?

9    A.    We have a number of responsibilities to the sector and to

10   the service in its whole.  We're responsible for health and

11   safety issues for all of the agents and professional staff

12   that are in the field.  Making sure that safety notices,

13   safety items to help people stay safe in the field, hydration

14   packets, the typical Band-aids and what have you are out with

15   the individuals in the field to make sure that they're safe.

16        We also involved with -- and I'm personally responsible

17   for the physical security of all facilities for Tucson Sector

18   here in Southern Arizona.  And finally, we are responsible for

19   the national level and sector level guidance and policy.

20   We're the clearinghouse for all of that.  We have an archive

21   of all of the national guidance and local guidance.

22        We interpret, we pass along to the rest of the sector.

23   We give new guidance that comes down from the headquarters to

24   the -- whoever is the subject matter expert within the sector.

25   So that they can take care of implementing that.

```
 1  Q.   Does your department also oversee compliance evaluation?

 2  A.   Yes, as part of our final responsibility, compliance

 3  evaluations is one of the -- one of our major

 4  responsibilities.

 5  Q.   Okay.  And how long has your department, the department

 6  of compliance and policy been in existence?

 7  A.   I cannot say for sure since I've only been in the

 8  position for 18, 19 months.  But I know it was in existence at

 9  least three or four years before my arrival.

10  Q.   And how many employees do you have?

11  A.   Twelve.

12  Q.   Now, is the department of policy and compliance also in

13  the same division as the operations support of the Tucson

14  Sector?

15  A.   No, it's not.  I'm assigned under the mission readiness

16  operations division, one of the four divisions within the

17  Tucson Sector.  There's operations, operations support

18  programs, the mission readiness operation -- for the life of

19  me I can't remember what the fourth one is.  Sorry.

20  Q.   It's okay.  And which of these sections is in charge of,

21  say, the daily operations of a given sector or of a given

22  station?

23  A.   The operations division is in direct responsibility for

24  maintaining the operational capability of the stations in the

25  field to include the formal infrastructure, the agents,
```

1  whatever they need to do their job.  The other divisions are

2  mainly in a support function.

3  Q.   So would you see that one of -- so would you say that

4  your division is a support function?

5  A.   Yes.

6  Q.   What are your weekly -- what do your weekly job duties

7  look like?

8  A.   It involves all of the main functions of the

9  organization.  I oversee who -- my department is broken into

10  two branches, one for policy, one is for compliance.  The

11  policy side is the side that takes care of security and being

12  the clearinghouse for national and sector level guidance and

13  policy.  And the compliance branch is obviously the one that

14  takes care of doing compliance evaluations and also health and

15  safety.  I divide my time between the two branches working

16  with branch chiefs to take care of daily taskings that come

17  from within the sector and also from higher headquarters.

18  Q.   Okay.  Let's break down those a little bit.

19       So can you tell me what do you, say, on a weekly basis in

20  regards to the compliance portion of your job?

21  A.   Depending upon the schedule for a particular week,

22  compliance activities on my part could be reviewing the

23  schedule that Mr. Alexander develops for doing compliance

24  evaluations at the stations.  Reviewing draft reports from

25  previous evaluations prior to being signed off by the patrol

1    agent of the sector.  Monitoring the coordination of a

2    formalized report for his signature.  Taking a look at any

3    national guidance that may impact the conduct of compliance

4    evaluations.

5        Mr. Alexander and I, with our military background have

6    developed and revitalized the checklist for the compliance

7    evaluation to make sure that it speaks directly from national

8    guidance and has references for each of the items on the

9    checklist and what is required at the stations.

10   Q.   And how about your -- the policy part of your job?  What

11   are your, say, weekly job duties in regards to the policy

12   portion?

13   A.   One of the biggest things is the physical security of our

14   facilities.  There are -- there are a number of national level

15   guidances to say what security is required at our facilities.

16   And a number of our facilities unfortunately due to resource

17   limitations do not meet those limit- -- or those directives.

18       And so it's my responsibility to provide intense

19   research, background and options to the chief patrol officer

20   so that he can make formal resource allocation at his desire

21   and his decision to increase security of our facilities.

22   Q.   Have you ever assisted in or developed practices or

23   policies within holding facilities in the Tucson Sector?

24   A.   I don't develop policies for that.

25   Q.   Okay.

1    A.    I just do evaluations of that.  I may help in the process

2    of developing that only to the point of as part of the policy

3    requirement in my responsibility in my department of making

4    sure that it's put into the correct format, it's coordinated

5    correctly and given to the right people for the

6    implementation.  Also if it comes from a national requirement,

7    that I can provide the interpretation of it for the field and

8    the stations.

9    Q.    Okay.  Mr. Davis, were you involved in developing a

10   reasonable accommodation for sleeping mat capacity in the

11   stations, in the Tucson Sector stations?

12   A.    Yes.

13   Q.    Okay.  And what is the reasonable accommodation for

14   sleeping mat capacity?

15   A.    The reasonable accommodation is a way or a process of

16   determining what is the most effective, efficient and humane

17   way to lay down mats within a holding cell so that we can

18   maximize the number of mats, but at the same time, provide a

19   reasonable accommodation for anyone on a mat to get off the

20   mat and go walk to the personal facilities, the toilets,

21   without stepping over anyone, stepping on anything.  They have

22   a clear path from their mat to the toilet.

23   Q.    Okay.  Now, is the sleeping mat capacity, is this a

24   requirement for a station or is it a suggestion or how would

25   you describe it?

 1   A.   It's an internal sector directive that they follow that

 2   number because it was determined by the sector what that

 3   criteria and how it was determined for each holding room.

 4   Q.   Would you consider that mandatory guidance?

 5   A.   Yes.

 6            MS. MASETTA-ALVAREZ:  Okay.  Ms. Kershaw, would you

 7   please pull up joint Exhibit 729.

 8            THE COURT:  Before you get into that, why don't we

 9   take our afternoon recess for 10 minutes?  We'll take it up

10   again at 3:15.  We'll be at recess.

11            MS. MASETTA-ALVAREZ:  Thank you.

12        (Recess from 3:03 p.m. to 3:16 p.m.)

13            HE COURT:  All right.  We're on the record.  Go

14   ahead, Counsel.

15            MS. MASETTA-ALVAREZ:  Thank you, your Honor.

16   Ms. Kershaw, could you please pull up on the nonpublic screen

17   Exhibit 729.  And for the record, this is on a nonpublic

18   screen because it does have certain numbers that cannot be

19   publicized.

20   BY MS. MASETTA-ALVAREZ:

21   Q.   Mr. Davis, do you recognize the document that's on the

22   screen before you?

23   A.   I do.

24   Q.   What is it?

25   A.   It's a memorandum that my department developed and

1  formatted and had the chief patrol officer sign as the

2  official designation of mats per holding or per station and

3  sent out within the sector.

4  Q.   Is the -- is creating memoranda a regular part of your

5  job as compliance and policy director?

6  A.   Yes.  Not only on compliance issues such as this one, but

7  on a number of issues, health and safety issues, policy

8  issues, security issues especially.  All of these are

9  developed in this type of template to get the chief patrol

10 officer to sign as national -- or as sector guidance or

11 information.

12 Q.   And is -- would you consider yourself a person with

13 knowledge about the mat capacity numbers in this regard?

14 A.   Yes.  I was the team lead at every station that

15 determined the numbers that are on this memo.

16 Q.   And what's the date on this memorandum?

17 A.   29 May 2019.

18 Q.   Was this memorandum drafted or sent out at or near the

19 time that you determined the mat capacities for each station?

20 A.   This memo was dated approximately two weeks after the

21 final station's mat capacity was determined.

22        MS. MASETTA-ALVAREZ:  Your Honor, defendants move

23 joint Exhibit 729 into evidence as a business record under

24 Federal Rules of Evidence 803(6).

25        MR. LONDEN:  No objection.

```
 1              THE COURT:  Admitted.

 2         (Exhibit 729 entered into evidence.)

 3   BY MS. MASETTA-ALVAREZ:

 4   Q.   Now, Mr. Davis, do you see in the middle of the page,

 5   there are each station and then a number next to each station?

 6   A.   Yes.

 7   Q.   What is that?

 8   A.   Those are the specific numbers of mats in cumulative for

 9   all of the holding facilities at that station, and the

10   combined number of mats that are available for that particular

11   station.  We did not break it down in this memo by holding

12   room.  I did that by a separate e-mail.

13   Q.   And without stating the number of the mat capacity for

14   each station, do these mat capacities generally look accurate

15   to you?

16   A.   Yes.

17   Q.   Okay.  Mr. Davis, to whom did this memo go out?

18   A.   It states at the top that it goes to command staff which

19   is internal to the sector headquarters; the patrol agents in

20   charge which are the senior agents in charge at each of the

21   stations; and the Tucson Sector, any other activity within the

22   sector that would be involved with compliance and mat

23   capacity.

24   Q.   Who is this memo addressed from?

25   A.   It is addressed from Roy D. Villareal, who is our chief
```

 1  patrol agent in Tucson Sector.

 2          MS. MASETTA-ALVAREZ:  Ms. Kershaw, can you please

 3  pull up what has been previously admitted into evidence joint

 4  Exhibit 730.

 5  BY MS. MASETTA-ALVAREZ:

 6  Q.   Mr. Davis, do you recognize this?

 7  A.   Yes.  This is an e-mail from myself to the PAC or patrol

 8  agent in charge of Ajo station.

 9  Q.   What is this e-mail about?

10  A.   This is an e-mail that specifies by holding room at Ajo

11  what the maximum number of mats can be allowed in the room.

12  Q.   Does this e-mail contain any attachments?

13  A.   Can I see the second page?

14  Q.   Certainly.

15          MS. MASETTA-ALVAREZ:  Ms. Kershaw, please go to the

16  second page.  Please go to the third page.

17          THE WITNESS:  It has the photographs that we took

18  during the determination in each of the rooms.  And I took

19  these photographs.

20  BY MS. MASETTA-ALVAREZ:

21  Q.   And how are these photographs organized in the e-mail?

22  A.   Hopefully I did it this way, that I took a picture of the

23  designation of the room, such as 1213, followed by a picture

24  or picture of the room with nothing on the floor, everything

25  removed from the facility or from that room.  And then finally

1  after we had determined where the mats would be located and

2  the total number that could be used in that room, I would take

3  pictures to try to encompass all of the mats and to see how

4  the layout was determined.

5  Q.   Now, let's look at some of these photos.

6       So the first photo, the top photo that's on the screen,

7  it has a cell number, and underneath it says unprocessed

8  female holding, and underneath there's a photo.

9            MS. MASETTA-ALVAREZ:  And, Ms. Kershaw, if you could

10 pull up that photo on the screen so it's full size.  Thank

11 you.

12 BY MS. MASETTA-ALVAREZ:

13 Q.   Mr. Davis, can you walk us through the process of how

14 you and your team came to determine this layout for mats?

15 A.   The room was completely cleared so that the floor inside

16 the holding room was free of any object.  And then taking the

17 mats that we use throughout the sector, we started laying the

18 mats down so that we can find the best effective, efficient

19 and humane way to lay them down and to maximize the number.

20      The -- going in criteria was they could not touch each

21 other, although in this particular one it looks like as though

22 the one on the far right upper side touches a little bit.

23 Given the capability of the room, a slight touch was not

24 considered a disqualification.  And we tried to maximize the

25 laydown.  I liken it much to a puzzle of trying to move

1    objects within a given space to find the best way of laying it

2    down.  Once myself and my other team members looked at the

3    final laydown, that's what we decided as the best way to do

4    it.

5    Q.   How did you determine whether there was sufficient

6    walking space within a given room?

7    A.   All members of the team would go from each of the mats

8    and find the path from that mat to the toilet area.

9    Q.   Now, Mr. Davis, looking at this picture, some of the mats

10   as you stated are close or touching each other.  How would an

11   individual get up off the mat and go find the facility or an

12   exit?

13   A.   We determined that exiting the mat didn't have to come

14   from the long side.  It could occur at the short side so that

15   an individual on a particular mat, say, the one that's

16   sticking out just a little bit in the center of the picture,

17   the individual could leave the mat by coming off the end of

18   the mat, standing up in the open area right there and then

19   walking along the pathway to the toilet.

20   Q.   And, Mr. Davis, I see kind of in the top right-hand

21   corner of the photo, it looks like there's one mat going,

22   excuse me, vertically and then several mats going

23   horizontally.  And there's a corner that looks like it's

24   almost touching one of the mats.  How would a person go over

25   that corner of the mat?

1  A.    By stepping over.  We determined that a slight step over

2  of a corner was insufficient to say that mat should not be

3  used.  Everyone has a tendency to step over a small item on

4  the floor.  It was not a big object that they had to take care

5  of.

6  Q.    Did you determine that it was permissible for people to

7  step over mats, say, over the middle part of the mat?

8  A.    That was not allowed.

9  Q.    Mr. Davis, did you use any criteria for placing mats

10 around the toilet facilities?

11 A.    We made sure that no mats went into the area of the

12 toilet facility for privacy reasons.  However, to maximize the

13 number of mats in the room, some mats were placed somewhat

14 close to the toilet facility.

15 Q.    Why did you determine that that was reasonable?

16 A.    Because it helped maximize the number of mats in the

17 room, but the individual was not necessarily placed in an area

18 that close to the toilet.

19 Q.    You said you didn't place any mats near the toilet

20 facilities.  What do you mean by "near the toilet facilities"?

21 A.    Not within the confines of the wall that you see there at

22 the left center of the picture.

23 Q.    And the wall that you're describing, is that the wall

24 around the toilet?

25 A.    Yes.

1  Q.   Mr. Davis, did you use the same methodology that you used

2  in this particular holding room for all of the holding rooms

3  that you inspected?

4  A.   Yes.

5  Q.   Does this mat capacity determination take into account --

6  I'm sorry, please strike that question.

7       Mr. Davis, are you aware of the room capacity numbers

8  determined by the fire marshals?

9  A.   I'm aware of what it stands for, yes.

10  Q.   Do you know whether any of the hold rooms, if any of the

11  mat capacities that your team determined were reasonable

12  exceeded the number determined by the fire marshals?

13  A.   In no case did it ever exceed the fire marshals'

14  determination.  The fire marshals' determination of the number

15  of people to go in a holding room like this is simply the

16  maximum number of people that can go into the room for safety

17  reasons.  It did not take into consideration the mats.  The

18  mat capacity in every holding room is less than the fire

19  marshal's number.

20  Q.   Mr. Davis, did you use any jail or detention standards

21  when coming up with this mat capacity?

22  A.   No.  Since this is a holding facility, we did not use

23  jail or detention facility standards.

24  Q.   Why do you distinguish between a holding facility and a

25  jail or a prison standard?

 1  A.   Because individuals that are placed into the room that

 2  you see here or any of the other ones are there for a

 3  temporary processing term and then are moved on to other areas

 4  along the CBP processing standard.

 5          MS. MASETTA-ALVAREZ:  Ms. Kershaw, you can -- will

 6  you please take down the exhibit.  Thank you.

 7          Ms. Kershaw, if you could pull up joint

 8  Exhibit No. 735 which has been previously admitted into

 9  evidence.

10  BY MS. MASETTA-ALVAREZ:

11  Q.   Mr. Davis, do you recognize this document?

12  A.   Yes.

13  Q.   What is it?

14  A.   This is my e-mail to the PAC at Sonoita station.  It is

15  the determination of the mat capacity in each of the holding

16  room at Sonoita station.

17          MS. MASETTA-ALVAREZ:  Ms. Kershaw, can you please go

18  to page 4 of the exhibit.

19  BY MS. MASETTA-ALVAREZ:

20  Q.   Mr. Davis, what is this?

21  A.   As I mentioned before, the process as we went through it,

22  I would take pictures at certain points in the determination

23  of the mat capacity.  This is a picture of one of the holding

24  rooms, I'm assuming it's at Sonoita, prior -- after we had

25  cleared the floor and before we started laying mats down in

 1   that particular room.

 2            MS. MASETTA-ALVAREZ:  Ms. Kershaw, please go to the

 3   next photo.

 4   BY MS. MASETTA-ALVAREZ:

 5   Q.   Mr. Davis, what is this a photo of?

 6   A.   It's a photo of the same room with mats laid down, but

 7   it's from a different perspective, from 180 degrees different.

 8   Q.   Can you please explain the methodology that you used in

 9   laying down these mats in this room?

10   A.   Same thing as I've mentioned before.  We tried to find

11   the maximum amount of mats that we could put into the room

12   effectively, efficiently and humanely, leaving a path or

13   pathways for each individual on a mat to get from their mat to

14   the toilet facilities without crossing over any other mat.

15   Q.   Now, Mr. Davis, I see a space between the mats that are

16   positioned horizontally and then the mats that are positioned

17   vertically.  Was -- did any of your team walk within that

18   floor space when you were putting down these mats?

19   A.   As I mentioned before, yes.  Every team member walked

20   from the edge or the expected exit point of each mat to the

21   toilet facility in each of the laydowns.

22   Q.   Were they able to get off of the mat and walk over to the

23   fatalities or to an exit without stepping over any other mats?

24   A.   Every time.  Other than the small corner of a mat on a

25   very rare time.

1          MS. MASETTA-ALVAREZ:  Ms. Kershaw, you can please

2   remove that exhibit.

3   BY MS. MASETTA-ALVAREZ:

4   Q.   Mr. Davis, how does your -- how does the Tucson Sector

5   monitor mat capacity compliance?

6   A.   From the point of responsibility from my particular

7   department, it's through the compliance evaluations that we

8   conduct at each station.

9   Q.   Now, if exigent circumstances exist such as an influx of

10  people coming into a station, is it possible that the stations

11  might go over mat capacity?

12  A.   It's possible.  The number of people coming in the

13  holding facilities is very cyclical.  It could be a very slow

14  day and very few individuals are brought into a particular

15  holding facility, or a mass apprehension at the border of

16  hundreds of people could occur and all brought to a particular

17  station.

18       Now, mats are not normally set out until they have --

19  meet a specific hour in holding criteria.  But if they're

20  already maxed out or close to maxed out on the number of

21  people totally in the room, and I mentioned that the mat

22  capacity is less than that level, there are circumstances that

23  may be met that the facility may have to have more mats than

24  are allowed.

25  Q.   And is there anything that the facility should do when

 1   that happens?

 2   A.   I've directed the facilities to -- the senior staff of

 3   each facility that if that occurs, they are to immediately

 4   document the circumstances.  And as I call it, the 5 Ws of

 5   why, where, when.  From the time that it's required, why.

 6   What are they doing to remediate it.  How long is that

 7   particular situation going to occur and did occur.  And as

 8   soon as they can get down to the mat capacity to the room,

 9   that they finalize the documentation of that situation so that

10   there is a complete record of why we went beyond the current

11   mat capacity for that particular room.

12   Q.   And to the best of your knowledge, Mr. Davis as the

13   director of policy and compliance, are stations consistently

14   going over mat capacity?

15   A.   No.

16   Q.   I want to talk to you about the compliance evaluation

17   process.

18        Mr. Alexander was in here testifying a little bit earlier

19   about the evaluation process, and I want to talk to you about

20   it as well.  Are you involved at all on the scheduling of

21   evaluations?

22   A.   I approve the schedules.

23   Q.   What time of the day are the -- are the compliance

24   evaluations scheduled?

25   A.   They're normally conducted during daylight hours, what we

 1    call our core work hours simply because some of the stations

 2    are an extreme distance from the sector headquarters where

 3    we're stationed.  And it takes between two, three hours,

 4    sometimes, to get to some of the stations, conduct the

 5    evaluation which normally takes about one to two hours, and

 6    then to drive back safely.

 7    Q.   Do you ever do evening evaluations?

 8    A.   Yes.  Recently senior leadership has requested that I

 9    look into doing after-hours evaluations at the sites which

10    includes either early morning or in the evening.  We've

11    conducted a few of those for test purposes.  Mainly, I want to

12    make sure my folks are safe if they're driving at dark hours.

13    It has been well received and we are including after-hour

14    inspections into our normal rotation of schedules so that we

15    can do one to two stations per quarter on a rotational basis.

16    Q.   Will every station under this plan have at least one

17    night compliance evaluation within a given year?

18    A.   Yes.

19            MS. MASETTA-ALVAREZ:  Ms. Kershaw, can you please

20    you pull up joint Exhibit 840.

21    BY MS. MASETTA-ALVAREZ:

22    Q.   Mr. Davis, what is this?

23    A.   This is the cover memo from our administrative unit for

24    the distribution of the formal after action report for the

25    Tucson Coordination Center.

 1  Q.   And who does this memo go out to?

 2  A.   As it's addressed here, it's -- it's going to some of the

 3  senior staff of the operations directorate, our local Office

 4  of Chief Counsel, and Mr. DeFreitas and the PACs, and within

 5  the very last "to" address is within my -- everybody in my

 6  department, PCD.

 7            MS. MASETTA-ALVAREZ:  Ms. Kershaw, please go

 8  to page 2.

 9  BY MS. MASETTA-ALVAREZ:

10  Q.   And do you recognize this, Mr. Davis?

11  A.   Yes.  This is the formal evaluation report for Tucson

12  center, Coordination Center which the previous cover memo

13  would be on top.  This is what is being sent out.

14  Q.   Mr. Davis, what is the purpose of this after action or

15  compliance evaluation report?

16  A.   It's the formalization of the findings of each evaluation

17  by the teams coming from my department going to do -- to

18  conduct the evaluation.  They use the checklist to find

19  discrepancies, best practices or just items to bring up with

20  the station management.

21       They -- when an evaluation is complete, we immediately do

22  what we call a hot wash or just a quick review with the senior

23  staff of the station so that they understand what we found,

24  whether it's a discrepancy, whether it's a best practice,

25  anything that we find that they should be aware of.

1          The inspection checklist is used as the basis for

2    developing and drafting this report so that -- this is the

3    official report since this is a sector guidance and directive.

4    It is the chief patrol agent of the sector who sends it to the

5    PAC of the station inspected.  We develop it and write it for

6    him, send it through coordination.  He signs it there, as you

7    can see, and it then goes to the memorandum for lines.

8    Q.   And why does the Tucson Sector have these after action

9    reports sent or signed off by the chief patrol agent?

10   A.   Chief patrol agent is ultimately the person in charge and

11   responsible for everything going on in this sector.  So it's

12   his responsibility.  This is a requirement that the sector has

13   established.  And because of the injunctive requirements that

14   we have to ensure compliance, and this is the process that

15   this sector has developed to get to that point.

16   Q.   Mr. Davis, since you started in June 2018, have you

17   noticed any improvements in the compliance evaluation process?

18   A.   There have been a number of improvements both on the part

19   of a decrease in the number of discrepancies written up, an

20   increase in the number of best practices written up, and an

21   acceptance, if you will, on the part of the station personnel

22   on the benefits of having the compliance evaluations

23   conducted.

24          A number of times in conversation I've talked with the

25   senior staff, and they said this is really helping us ensure

1    that we understand what needs to be done.  What you write in

2    these after action reports help us focus on what needs to be

3    done.

4        I would like to point out that the concept of the

5    evaluation process is not to finger point.  It's to be a

6    cooperative team effort to find the best way to take care of

7    people in the holding facilities.  To do it effectively.  As I

8    mentioned about the mats, to do it effectively, efficiently

9    and humanely.  That's what we have to do and that's the basis

10   of our compliance evaluations.

11   Q.   Mr. Davis, you mentioned that you've seen a decrease in

12   the number of discrepancies.  Can you remind us what a

13   discrepancy is?

14   A.   The checklist that we use is a multipage document that

15   lists various requirements from national or sector level

16   guidance that the stations must follow for the care and

17   feeding and -- of individuals in the holding facilities.  Each

18   of those steps has one or more references that provides the

19   reference for what we're asking them and what we're evaluating

20   them against.  And then from there, we develop the after

21   action report.

22   Q.   And what's a discrepancy?

23   A.   A discrepancy is when an evaluator finds something that

24   does not correspond with the requirement in the checklist.

25   Q.   So you've seen a decrease in noncompliance with the

1  checklist points?

2  A.   Yes.

3  Q.   You said you've also seen an increase in best practices.

4  What's a best practice?

5  A.   Finding activity or saying an activity at a particular

6  station where they go above and beyond the requirements in the

7  checklist.  For example, at one of the stations agents bring

8  in toys for children.  We have no direction to give -- to have

9  toys available for underage or minor people being held at the

10  facility.  They bring in toys.  They bring in clothes to

11  replace some of the clothes that are -- to just replace the

12  clothes of some of the children.

13       There's a number of ways.  How they do activity in the

14  field.  I know one of the ones that Mr. Alexander is very

15  happy to have noticed is a number of the facilities are now

16  using a specialized matrix to ensure that all of the food and

17  any of the items that they -- that we have to provide during

18  the care of or the holding facility time doesn't go beyond its

19  suspense dates.  Some of the suspense dates were very hard to

20  determine, but they have developed a matrix that now helps

21  them determine for everything that has a suspense date, they

22  make sure it doesn't go beyond the suspense date.

23  Q.   When you said "suspense date," what do you mean by that?

24  A.   You look on any kind of manufactured item, food, clothes,

25  medicines, there's a suspense date or an effective date that

1   you do not want to go beyond.

2   Q.   Is that similar to an expiration date?

3   A.   Yes.

4   Q.   Okay.  Do other -- do other facilities sometimes develop,

5   adopt these best practices?

6   A.   The -- it is the choice of the other stations whether

7   they wish to do that.  Each of the stations are uniquely

8   situated.  Their buildings, their rooms are all different.

9   The locations where they're at, it's all unique for their

10  station.  It is a best practices for them to know about and

11  that's why we put them in the after action report, but it is

12  not directed.  It is only voluntary if they wish to do it or

13  to do it and change it to meet their needs.

14  Q.   When you say you include them in the after action report,

15  do you mean that you include all the patrol agents in charge

16  in any given compliance evaluation?

17  A.   These memorandums, the holding facility after action

18  reports, when it goes to the PAC of the station evaluated,

19  it's also sent to every other PAC in the sector, each patrol

20  agent in charge.

21  Q.   Mr. Davis, we've talked a little bit about improvements

22  that you've seen in the compliance evaluations.  I also want

23  to talk to you about improvements that you've seen within your

24  division.  Have you seen any improvements in the way that you

25  conduct compliance evaluations since you've been -- since you

 1   came on in June 2018?

 2   A.    The people have -- my leadership process is to give as

 3   much responsibility to the individuals doing the job.  I give

 4   them what they need to do.  They determine how to do it.

 5        Mr. Alexander, with his military background, has been

 6   exemplary in making the compliance evaluation checklist a

 7   living document, so to speak.  It's gone through many, many

 8   variations.  As we learn of new guidance or guidance somewhat

 9   changes, we have to make sure that the checklist evolves with

10   that.

11        One of the items that both Mr. Alexander and I found when

12   we both came in to policy and compliance department, which was

13   basically the same time, is the checklist was never sent to

14   the field.  We would go out as PCD, policy and compliance

15   department, to do an evaluation and the field -- each of the

16   stations didn't have the checklist.  We would show up and

17   start going, Well, do you have this?  Do you do this?  Maybe.

18   I don't know.  They had no idea what was going on.  And that

19   wasn't right.

20        This goes back to the idea that this is a team effort to

21   do the best, not a finger-pointing exercise.  So now one of

22   the things that we changed is any time the checklist changes,

23   it goes out to every station immediately.

24              MS. MASETTA-ALVAREZ:  A moment to confer.

25              THE COURT:  Sure.

 1              MS. MASETTA-ALVAREZ:  Thank you, Mr. Davis.

 2   Defendants are finished with direct examination.

 3              THE COURT:  All right.  Any cross?

 4              MR. LONDEN:  Yes.

 5                        CROSS-EXAMINATION

 6   BY MR. LONDEN:

 7   Q.   Good afternoon, Director Davis.  We met before.  I'm Jack

 8   Londen.

 9   A.   Nice to see you again, sir.

10   Q.   You, too.

11        One of your functions is to make sure that the policy

12   that applies to Tucson Sector including policy with respect to

13   hold rooms is promulgated and identified and known to the

14   sector; correct?

15   A.   That is correct.

16              MR. LONDEN:  Could we put up joint Exhibit 9?

17   BY MR. LONDEN:

18   Q.   This is already in evidence, Director Davis.  And it is

19   the -- it's entitled Hold Rooms and Short Term Custody, dated

20   June 2, 2008.  Do you recognize this?

21   A.   I recognize it, yes.  Yes, I do.

22   Q.   And is this policy that governs holding rooms still?

23   A.   May I take a -- a minute to read?

24   Q.   We can -- I will have to help you scroll through it if

25   you need to look beyond the first page.

1   A.   I just need to read the first page.

2       After reading the document, it could possibly still be

3   current, but I don't know.

4           MR. LONDEN:  Could we put up joint Exhibit 863,

5   please.

6   BY MR. LONDEN:

7   Q.   863 is not yet in evidence.  It is dated October 3, 2019.

8   Its subject is Hold Rooms and Short Term Custody Policy.  It's

9   from Chief Patrol Agent Roy D. Villareal to command staff and

10  others.

11      Do you recognize this?

12  A.   Yes, I do.

13          MR. LONDEN:  We offer this in evidence, your Honor.

14          THE COURT:  It's admitted.

15      (Exhibit 863 entered into evidence.)

16          THE COURT:  I took your silence as no objection.

17          MS. MASETTA-ALVAREZ:  No objection.

18  BY MR. LONDEN:

19  Q.   The first sentence says, The attached memorandum, Hold

20  Rooms and Short Term Custody dated June 2, 2008, remains the

21  national level guiding policy on short-term custody.  End my

22  quote there.

23      Please take whatever time you need to review this

24  document.  And my question will be, does this indicate that

25  the hold rooms and short-term custody is at least in part

 1  still applicable?

 2  A.   Yes, it does.

 3  Q.   All right.  It says, "All patrol agents in charge will

 4  ensure that this policy is available to all agents assigned to

 5  their respective stations," in the second paragraph.  Do you

 6  see that?

 7  A.   Yes.

 8  Q.   And the third paragraph says, It is important to point

 9  out that since this national policy was published, another

10  national level policy has also been published, U.S. Customs

11  and Border Protection, CBP, *National Standards on Transport,*

12  *Escort, Detention and Search* (TEDS), dated October 15 --

13  October 2015.  I'm ending my quote there.

14       Are you familiar with the TEDS program?

15  A.   I am.

16            MR. LONDEN:   Could we put up joint Exhibit 74,

17  please.

18  BY MR. LONDEN:

19  Q.   Is this the first page of the TEDS standard?

20  A.   I believe so.

21  Q.   Back to joint Exhibit 863, please.

22       Continuing in the third paragraph.  TEDS is the

23  comprehensive CBP policy related to safety, security, and care

24  of detainees which reinforces the current standards under the

25  Hold Rooms and Short Term Custody Policy.  Then it says, There

1    may be instances where the two policies differ; in these

2    circumstances, the more restrictive policy takes precedence.

3         Do you see that?

4    A.   Yes.

5    Q.   And the term "more restrictive policy," that means the

6    policy that imposes more restrictions on the Border Patrol?

7    A.   That was the interpretation, yes.

8              MR. LONDEN:  Look, please, at joint

9    Exhibit 9, page 4.  The hold room policy section 6.2.

10   BY MR. LONDEN:

11   Q.   At the bottom, it says, Duration of Detention, 6.2.1.

12        Whenever possible, a detainee should not be held for more

13   than 12 hours.  Every effort will be made to promptly process,

14   transfer, transport, remove or release those in custody as

15   appropriate and as operationally feasible.  I'm ending my

16   quote there.

17        Do you understand that to be the duration of detention

18   provision under this policy?

19   A.   It is the level of detention time frame as outlined in

20   this policy, yes.

21             MR. LONDEN:  Could we look at joint Exhibit 74, the

22   TEDS standard at page 14, section 4.1.

23   BY MR. LONDEN:

24   Q.   That also has a duration of detention section that says,

25   Detainees should generally not be held for longer than

1  72 hours in CBP hold rooms or holding facilities.  Every

2  effort must be made to hold detainees for the least amount of

3  time required for the processing, transfer, release or

4  repatriation as appropriate and operationally feasible.

5  Ending my quote.

6       That is the duration of detention policy statement in

7  TEDS; correct?

8  A.   I believe so.

9  Q.   Going back to joint Exhibit 863, in that third paragraph,

10  that last sentence that we considered refers to instances

11  where the two policies differ, saying in those circumstances,

12  the more restrictive policy takes precedence, ending my quote

13  there.

14       The 72-hour limit of TEDS Section 4.1 does not override

15  the 12-hour whenever possible standard of Section 6.2 of the

16  2008 hold room policy; correct?

17  A.   I don't know.  This is not my policy.  This is not one

18  that was written by my office.  It was written by the office

19  that Agent Carrie Davison is in.

20  Q.   This being the memo?

21  A.   The memo, yes, the memo --

22  Q.   863.

23  A.   -- that brings the two policies together with the third

24  paragraph there or the -- yes, the last line of the third

25  paragraph.

1   Q.   Do you have any reason to doubt that this memo which

2   we've labeled 863 is authoritative?

3   A.   I don't doubt it as being authoritative.  However, it

4   doesn't apply to PCD and our compliance evaluations.

5   Q.   All right.  Does it apply to the stations?

6   A.   It applies to the stations because it's a holding

7   directive.  But that's not the responsibility of the

8   compliance evaluation that I conduct.  That's a responsibility

9   and a subjective decision requirement in the operational

10  division and at the particular station.

11  Q.   And for purposes of your compliance review, your

12  checklist, which has been marked as joint Exhibit 870 and it's

13  in evidence --

14              MR. LONDEN:  Can we put that up?

15  BY MR. LONDEN:

16  Q.   -- that checklist does not include any item about length

17  of detention; correct?

18  A.   I believe so.  I'd have to read over it in detail, but I

19  don't believe it has anything to do with detention time

20  frames.

21  Q.   So that's not something that is overseen in the

22  compliance review process?

23  A.   That is correct.

24  Q.   And it's the case that you've never had the occasion to

25  determine the length of detention of any detainees; correct?

1   A.    That is not a responsibility of the compliance inspection

2   nor is it listed on the inspection checklist.

3   Q.    Is it correct as a general matter that subjects that are

4   not listed on your checklist are outside the scope of the

5   compliance evaluation?

6   A.    Yes.

7   Q.    And is it correct that the compliance review process does

8   not consider the contents of any medical assessment or the

9   documentation of any medical assessment?

10  A.    That is correct.

11  Q.    Is it correct that the compliance evaluation review does

12  not consider the medical competence of the personnel who

13  conduct medical interviews or assessments?

14  A.    We do not make that determination.

15  Q.    You have thoroughly explained the way that the mat

16  capacity maximums were determined.  Is there a time frame,

17  that is, a definition of what times of day that maximum

18  capacity standard for mats applies?

19  A.    Not based on time of day.

20  Q.    When is the policy applicable?

21  A.    When the requirement for -- when the time requirement for

22  an individual that is being held in that room is met and

23  requires a mat to be provided for that individual, if the

24  number of individuals in that room who are required to have

25  mats reach the maximum capacity, that's when they stop issuing

1    mats and remove anyone above that number to other holding

2    rooms.

3    Q.    That's what's supposed to happen?

4    A.    Yes.

5    Q.    Now, I heard you just say that the -- that you had

6    instructed the staff of facilities to document noncompliance

7    with the mat capacities.  How long ago did you give that

8    instruction?

9    A.    It was after the May 29th memo that went out to all

10   stations.  Normally, I was giving it during the development of

11   the mat numbers at each station.  They asked the question.

12   They were worried what happens if we have to go beyond.  And

13   that's when I made the determination to tell them there are

14   operational situations that you cannot control at each station

15   where you will find it necessary to go beyond the mat

16   capacity.  Document it from start to finish so that there is a

17   reasonable historical document that you can -- you or anyone

18   after you write it up can refer to as to why it occurred.

19   Q.    Was that advice in a written memo?

20   A.    No.

21   Q.    Oral?

22   A.    Oral.

23   Q.    Have you received some -- such reports?  Have you

24   received reports in compliance with that instruction?

25   A.    No.  It was not that they had to submit them to me.  That

1    they had to keep them on their record at the station.

2    Q.   Have you seen them?

3    A.   No.

4    Q.   To your knowledge, has anyone asked whether such reports

5    can be found?  I would like to know what the name is.

6    A.   I've never been asked to provide them or to ask for them.

7    Q.   We have not seen any such reports and if we wanted to ask

8    for them, who should we ask?

9    A.   I would go to Mr. DeFreitas.

10             MR. LONDEN:  Okay.  Your Honor, I'm done.  I pass

11   the witness.

12             THE COURT:  Any redirect?

13             MS. MASETTA-ALVAREZ:  One moment, your Honor.

14             Nothing further, your Honor.

15             THE COURT:  All right.  Mr. Davis, you can step down

16   and be excused.  Thank you, sir.

17             THE WITNESS:  Thank you.

18             THE COURT:  Next?

19             MS. FABIAN:  Your Honor, our next witness has just

20   arrived on a plane.  We've gotten him here early, but he's

21   just arrived on a plane in Tucson.  I've spoken to Mr. Londen,

22   and we're hoping if there's about an hour left, he's got about

23   an hour of deposition designations.  So we thought we could

24   use this time for that if that's acceptable to everyone, and

25   our witness will be here first thing tomorrow morning.

1           THE COURT:  Okay.  Let's do that.

2           MR. LONDEN:  Ms. Fabian asked for time schedule

3    accommodation.  We're happy to use the time.  I won't promise

4    it lasts the entire hour, but we have entire deposition

5    designation on video.

6           THE COURT:  All right.  Good.  Let's do it.

7           MR. LONDEN:  All right.  First off is of Raleigh

8    Leonard.

9       (Exhibit played.)

10          MR. LONDEN:  Your Honor, that concludes the excerpts

11   from Raleigh Leonard.

12          The next one is George Allen.

13          MS. FABIAN:  Your Honor, you asked Mr. Leonard's

14   title, and I don't think I saw --

15          MR. LONDEN:  Assistant chief deputy.

16          THE COURT:  Yeah, at the time, but that was back

17   in -- he was assistant --

18          MS. FABIAN:  He was actually the division chief, and

19   I believe acting as the deputy chief at the time.

20          THE COURT:  But that's back in '17; correct?

21          MS. FABIAN:  Correct.  And retired about a year ago.

22          MR. LONDEN:  He's retired.

23          The next is a deposition of 30(b)(6) deposition of

24   George Allen and the defendant will appear here.

25       (Exhibit played.)

```
 1              MR. LONDEN:  The next excerpt is from the deposition
 2   of George Allen, the same witness on April 7, 2017.
 3         (Exhibit played.)
 4              MR. LONDEN:  We have one more excerpt.  It's of
 5   someone on the defendant's may call list.  This is -- it's
 6   Anthony Weitz, October 24th, 2019, deposition.
 7              THE COURT:  How long will that take?
 8              MR. LONDEN:  Ten minutes.
 9              THE COURT:  Okay.  Let's do it.
10         (Exhibit played.)
11              MR. LONDEN:  That completes our deposition
12   designations, your Honor.
13              THE COURT:  All right.  Let's quit for the day.  I'm
14   toast.
15              So we'll start at 9:00.  You be here at 9:00.
16   Hopefully, we can start a couple of minutes after.  I've got
17   something to do.  Okay.  So 9:00 tomorrow morning.
18              MS. FABIAN:  Sounds good, your Honor, thank you.
19              MS. MASETTA-ALVAREZ:  Thank you.
20         (Proceedings adjourned at 4:49 p.m.)
21
22
23
24
25
```

SESSION 2

1                    C E R T I F I C A T E

2

3          I, Cheryl L. Cummings, certify that the

4  foregoing is a correct transcript from the record of

5  proceedings in the above-entitled matter.

6

7                    Dated this 16th day of January, 2020.

8                    /s/Cheryl L. Cummings

9                    Cheryl L. Cummings, RDR-CRR-RMR-CRC-CRI
                     Federal Official Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25