```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                      DISTRICT OF ARIZONA

 3   Jane Doe #1; Jane Doe #2; Norlan Flores,
     on behalf of themselves and all others
 4   similarly situated,
                                             CV-15-250-TUC-DCB
 5           Plaintiffs,
                                             January 17, 2020
 6   v.                                           9:09 a.m.
                                             Tucson, Arizona
 7   Chad Wolf, Acting Secretary of Homeland
     Security; Mark A. Morgan, Acting
 8   Commissioner, U.S. Customs and Border
     Protection; Carla L. Provost, Chief of
 9   United States Border Patrol, in her official
     capacity; Roy D. Villareal, Chief Patrol
10   Agent-Tucson Sector, in his official
     capacity,
11
             Defendants.
12
     _____
13

14          REPORTER'S OFFICIAL TRANSCRIPT OF PROCEEDINGS

15                        BENCH TRIAL

16                          DAY FIVE

17                    (PART ONE OF TWO)

18           BEFORE THE HONORABLE DAVID C. BURY
                 UNITED STATES DISTRICT JUDGE
19

20

21

22   Court Reporter:          Erica R. McQuillen, RDR, CRR
                               Official Court Reporter
23                             405 W. Congress Street
                               Tucson, Arizona 85701
24                             (520)205-4267

25        Proceedings Reported by Stenographic Court Reporter
          Transcript Prepared by Computer-Aided Transcription
```

```
1                      A P P E A R A N C E S

2     For the Plaintiffs:

3          Jack Williford Londen
           Elizabeth Gilmore Balassone
4          Morrison & Foerster, LLP
           425 Market Street
5          32nd Floor
           San Francisco, California 95105
6

7          Colette Reiner Mayer
           Morrison & Foerster, LLP
8          755 Page Mill Road
           Palo Alto, California 94304
9

10

11    For the Defendants:

12         Sarah B. Fabian
           Katelyn Masetta-Alvarez
13         Michael Anthony Celone
           Christina Parascandola
14         United States Department of Justice
           P.O. Box 868 Ben Franklin Station
15         Washington, D.C., 20044

16         William Charles Silvis
           United States Department of Justice
17         Civil Division of Immigration Litigation
           450 Fifth Street NW
18         Washington, D.C., 20001

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

1                        EXAMINATION INDEX

2   DAVID A. TARANTINO
          DIRECT BY MR. CELONE  . . . . . . . . . . . . . . .  4
3         CROSS BY MS. BALASSONE . . . . . . . . . . . . .  44

4   DIANE SKIPWORTH
          DIRECT BY MS. PARASCANDOLA . . . . . . . . . . .  87

5

6

7
                          EXHIBIT INDEX
8
    Exhibit Number            Offered                  Admitted
9
    206                          24                        24
10
    758                          53                        53
11
    868                          10                        10
12
    882                          31                        31
13
    883                          33                        33
14

15

16

17

18

19

20

21

22

23

24

25

                    UNITED STATES DISTRICT COURT

1                    P R O C E E D I N G S

2             THE COURT:  All right.  Back on the record, and

3    we're ready for our next witness, I assume, to be presented by

4    the Government.

5             MR. CELONE:  Defendants call Dr. David A. Tarantino,

6    Your Honor.

7             THE CLERK:  If you'd step into the witness box,

8    please.

9             DAVID A. TARANTINO, WITNESS, SWORN

10            THE CLERK:  Thank you.  Please be seated.

11            If you'd state your full name and spell your last

12   name for the record.

13            THE WITNESS:  David Tarantino, T-a-r-a-n-t-i-n-o.

14            THE COURT:  Good morning, sir.

15            THE WITNESS:  Sir.

16            THE COURT:  Go ahead, counsel.

17                    DIRECT EXAMINATION

18   BY MR. CELONE:

19   Q.   Good morning, Dr. Tarantino.  What is your title?

20   A.   I am the CBP Customs and Border Protection Senior Medical

21   Advisor.

22   Q.   And how long have you been in that role?

23   A.   About two years or a little over two years.

24   Q.   And what does that role entail?

25   A.   I provide medical direction and oversight for CBP medical

1   efforts.

2   Q.   And that's across all of Customs and Border Protection?

3   A.   Yes, and geographically as well as across all lines of

4   operation and across all sort of mission space.

5   Q.   And prior to that, what was your medical background?

6   A.   Well, how far back do you want me to go?

7   Q.   Let's start with your education and kind of advance from

8   there.

9   A.   I was premed at Stanford University, and then that led me

10  to Georgetown University Medical School, and I got my M.D.

11  from there.  And that was on a Navy scholarship, so I joined

12  the Navy after that, and I did additional internship training

13  with the Navy.  I became a Navy flight surgeon, so I did a lot

14  of operational medicine, aerospace medicine, preventive

15  medicine, occupational health, and a lot of operational

16  medicine with the military.

17       Then I also did a residency in family medicine, so I

18  became board certified in family medicine, which is a

19  specialty, a clinical specialty, covering pediatrics, OB/GYN,

20  and adult care, and -- which has actually come in very handy

21  for dealing with the issues of today, because that's our

22  population in custody, and that's the one specialty that is

23  sort of clinically trained and certified to cover that whole

24  spectrum.

25       I also then did a lot more assignments with the military,

1    a lot of overseas operational medical experience on six

2    continents, including a lot of humanitarian assistance and

3    disaster response work.  I then did a fair amount of time in

4    the Pentagon working on health systems and health programs and

5    health policy, helped setting up Department of Defense and

6    U.S. Navy and Marine Corps health systems and health programs.

7         I spent a year in Iraq where I helped set up the Iraqi

8    health system after -- after the 2003 military intervention,

9    and then I spent a fair amount of time in Afghanistan also,

10   helping them set up their health system.

11        And I became the Medical Director of the Marine Corps, or

12   I was Director of Medical Programs for the Marine Corps, so

13   for the entire Marine Corps I was responsible for direction

14   and oversight of their medical programs in garrison at home

15   but also overseas in Afghanistan and Iraq.

16        And then I spent -- my last assignment was at the

17   Uniformed Services University, so I was a professor there

18   where I taught medical systems, medical programs, unit

19   humanitarian medicine, operational medicine, a whole array of

20   subject matter.

21        I retired and I ran a nonprofit, the Yellow Ribbon Fund,

22   for a year, and then I spent a year with International Medical

23   Corps, which is a global humanitarian organization similar to

24   Doctors Without Borders.  I did a lot of global relief work,

25   humanitarian work, refugee medicine, and then I ended up at

 1   DHS/CBP.

 2   Q.   Great.  And in your role in the military, working in

 3   battalion aid stations and things, what type of involvement

 4   did you have with medical intake or medical assessments?

 5   A.   I've had significant involvement with that in a number of

 6   venues over my career, be it military, be it disaster

 7   response, be it humanitarian settings, so I have a lot of

 8   experience in that area.

 9   Q.   And specifically with medical screening or assessments,

10   what type of level of involvement have you had?

11   A.   Well, I've designed the systems, the programs, I've

12   provided the medical direction, the oversight, I've provided

13   the quality assurance and the review of a number of such

14   efforts, in a number of settings.

15   Q.   And do you believe that's prepared you well for your

16   current role in assessing the medical care needed in Border

17   Patrol stations?

18   A.   Yes.  I feel like my experience and expertise was sort

19   of, by happenstance, the totality of it was exactly what I

20   needed for this role that I have in Border Patrol and Customs

21   and Border Protection because it combines operational

22   medicine, humanitarian medicine, family medicine, medical

23   systems, medical programs, medical planning, medical quality

24   management, all of which I have extensive experience and

25   expertise in.

1   Q.   And in the two years that you've been in your current

2   role as Senior Medical Advisor, how has the medical care

3   improved, would you say, in Border Patrol Stations?

4   A.   There has been a continuous significant ongoing expansion

5   and enhancement of the CBP medical support capabilities in

6   scope and scale, and you know, there is -- I could -- I could

7   go on for a long time about that.  You know, there is a lot of

8   different branches of that, and that's -- that's beyond even

9   the detainee health care arena, which I know we're interested

10  in today, because Customs and Border Protection has a number

11  of lines of effort, many of which interact with this.  For

12  example our EMT program, we've been growing and enhancing

13  that, which then helps us on the detainee health mission.

14       But specific to the detainee health mission, there has

15  been a significant expansion and enhancement in scope and

16  scale of that.  The largest, most visible sign of that is the

17  medical support contract that we have in place, which we

18  started on my watch, and with my -- with my involvement, we

19  started -- well, let me back up.

20       That contract started back around 2014-2015, and for --

21  and that was -- that was built out of a prior crisis that was

22  focused in RGV back at that time.  Out of that came this

23  construct to use this contract medical team approach, but that

24  had been limited to RGV, to a few locations in RGV, for a

25  number of years because the crisis had kind of abated, and we

1    were back to sort of a steady-state operations.

2         But a year and a half ago, even more than a year and a

3    half ago, we started to see -- I started to recognize the

4    benefit of that construct broader than RGV, but also we

5    started to see some early indications of some uptick in

6    traffic and hearing talk of seeing some signs of caravan

7    movement, other things, so we started to expand that contract

8    well before the caravans.  Well before the most recent crisis

9    we started to expand that contract to some other priority

10   locations.

11        As the crisis began to really pick up pace and as we were

12   able to identify additional resources, we started to

13   dramatically accelerate the expansion of that contract such

14   that, you know, a year ago that contract was in maybe six,

15   seven facilities and maybe had a few dozen medical

16   professionals.  Now we're in over 45 facilities, and we have

17   over 700 medical personnel on contract.

18        In any given day there's over 300 who are actively

19   providing medical support along the southwest border, and that

20   goes from southeast Texas all the way to southwest California,

21   and to include -- to include Tucson Sector as well.

22        So that's one kind of vivid example, but there's been

23   other significant enhancements in terms of our -- of our

24   initial assessment processes, our public health infectious

25   disease, our flu control measures.  I could go on and on, but

1   that's sort of a vivid example of the expansion enhancement

2   that we've been making.

3           MR. CELONE:  Ms. Kershaw, could you pull up Joint

4   Exhibit 868, please.

5   BY MR. CELONE:

6   Q.   And Dr. Tarantino, is this the -- have you seen this

7   document before?

8   A.   Yes.

9   Q.   And is this the statement of work that provides the

10  guidance for the medical contractors?

11  A.   Yes.  Now, I can't -- I can't say definitively that this

12  is the most current one, but this is what I have seen, and I'm

13  very familiar with it.  We do make modifications to it with

14  task orders and other things, so I can't speak to its 100

15  percent currency, but this is -- this is what I've seen and

16  what I'm familiar with.

17          MR. CELONE:  Your Honor, move to have Joint Exhibit

18  868 admitted to the record.

19          MS. BALASSONE:  No objection.

20          THE COURT:  It's admitted.

21          MR. CELONE:  Thank you, Ms. Kershaw.

22  BY MR. CELONE:

23  Q.   And Dr. Tarantino, what is the name of the medical

24  contractor who's providing this care?

25  A.   It's Loyal Source Government Services.

DIRECT OF TARANTINO
JANUARY 17, 2020 (DAY 5, PART 1)

1  Q.   And so you said they were originally in a -- or now

2  they're in -- they were in six to seven facilities, now up to

3  45 facilities.  What is the -- what type of criteria or

4  factors go into deciding where the medical contractors will be

5  located and providing care?

6  A.   Right.  We use an operational risk management methodology

7  whereby we're constantly evaluating volume, demographics,

8  crowding, length of time in custody, access to care,

9  remoteness, a number of other variables that allows us to

10  identify the priorities, the facilities that are most --

11  represent a priority for the enhanced medical support, the

12  placement of medical support teams.

13       We're still in a growth and an expansionary phase, so we

14  have not reached a steady state level-off area, so we're still

15  identifying additional priority locations, and we use that

16  methodology.  That could even lead us to shift resources from

17  time to time, and it's still informing our continued expansion

18  as well.

19       So it's a -- it's a -- it's a very thoughtful and

20  collaborative operational risk management process that

21  involves the stations, the sectors, the headquarters, my

22  input, and we're able to identify priority locations through

23  such a methodology.

24  Q.   Okay.  And what are the operational benefits of having

25  medical contractors in place?

1   A.   Well, certainly there's a number of reasons why we have

2   medical support in place.  One of them, a primary driver, is

3   that it enhances and supports our operations.  It allows us to

4   conduct operations more effectively and efficiently in these

5   priority locations.

6        One example, if we are able to identify and handle

7   medical issues on-site.  These would be basic medical issues,

8   basic care for some simple, uncomplicated problems and/or even

9   to just identify a potential medical issue and determine the

10  level of severity of it, the triage.

11       And if we're able to provide treatment or medication,

12  adjudication, provide medication on site, that saves trips to

13  the hospital, and trips to the hospital are very operationally

14  impactful for us because we typically send two agents as

15  hospital watch escort, and they're there for the duration of

16  the hospital visit.  That takes our agents out of processing,

17  and that takes our agents out of the field, takes them off the

18  line.  So of course we're willing to do it and will do it, but

19  if we can handle more of that internally, without sacrificing

20  quality, then that's a win-win for the patient as well as for

21  the operators and as well for our mission.

22       So that's one example of the operational benefit, but

23  also, you know, our operations are designed around a law

24  enforcement mission but also providing for those in our

25  custody, and to include medical care.  So if we're able to

1    provide better, quicker access to medical care to persons in

2    our custody, then that's enhancing our operational mission.

3        And thirdly I would say that it also benefits us in terms

4    of taking care of our own people, because if we're able to

5    address medical issues on-site, prevent the spread of

6    infectious disease, also take some of that burden off of the

7    agents or officers, then that's a win as well for us.

8    Q.   And what types of medical issues do the medical

9    contractors address on-site?

10   A.   Well, they're a big part of the initial assessment

11   process, which I can -- I imagine I'll get asked about, and I

12   could go into more detail on that, but they're a big part of

13   the initial assessment process, triage, if you will.  They can

14   also adjudicate medication issues, identify if medication

15   needs to be replaced or reordered or adjusted.

16       They can and handle basic nonemergency,

17   non-life-threatening, noncomplex type issues, common colds,

18   you know, cuts, scrapes, coughs, nausea, vomiting, scabies,

19   lice, anything that is -- and our system -- I should say our

20   system is still designed to really revolve around the local

21   health system.

22       We have a low threshold for referral to the emergency

23   room or a hospital to get definitive diagnosis and treatment,

24   just like the population of Arizona or wherever we are.  We

25   still try to apply and maintain local standards of care, and

DIRECT OF TARANTINO
JANUARY 17, 2020 (DAY 5, PART 1)

1   we will refer to or defer to the local health system, but in

2   appropriate circumstances, consistent with the training and

3   certification of our providers, we're able to handle some

4   medical issues on-site.

5        And that helps us, it helps the patient, and it helps

6   our -- it helps our operators, it helps the patient, and also

7   helps our people to do that.

8   Q.   And what is the medical team construct with the medical

9   contractors?  What type of personnel do they have on-site?

10  A.   A typical team would be an advanced practice provider,

11  which is a physician assistant or a nurse practitioner, and

12  then they would have two technicians, might be an EMT, might

13  be a medical assistant, but a medical -- a medical technician,

14  a medical assistant.

15       Sometimes, depending on the volume, and also we're still

16  in the growth phase, to some extent, in terms of hiring and

17  such, sometimes certain shifts there might be one technician,

18  one assistant.  And then they work in shifts, so they provide

19  24/7 coverage.

20       And they also have -- we have added additional layers

21  above that, where we have physician supervisors who are

22  doctors, M.D.s, who provide medical direction, oversight,

23  consultation, medical quality management, coordination and

24  outreach with the mid-level, with the advanced practice

25  providers.

DIRECT OF TARANTINO
JANUARY 17, 2020 (DAY 5, PART 1)

1      We've also brought on pediatric advisors who can provide

2  pediatric-specific consultation and training and protocol,

3  advising, and referral coordination, and quality -- quality

4  management as well on a pediatric-specific basis.

5  Q.   What's the scope of supervision that the physician

6  supervisors will provide?

7  A.   Well, they're part of our medical quality management

8  process.  We have a medical quality management process that is

9  -- that parallels the standard processes that you would see in

10 analogous medical settings.  And so we have the initial

11 licensing/credentialing/certification process.  Then we have

12 the ongoing -- the focused and ongoing professional practice

13 evaluation whereby our providers have their charts reviewed on

14 a regular basis by the physician supervisors to look at their

15 clinical decision-making and clinical practice, their acumen,

16 and we will use that process to look for areas of improvement

17 or areas of remediation.

18     We also have sentinel event reviews where, if there is an

19 adverse event or unusual events, the physician supervisors and

20 our medical quality management team can take more of a deep

21 dive into that, look at issues related to that.

22     So we do have a robust medical quality management

23 program.  Our physician supervisors are a key part of that to

24 -- to provide that level of review and oversight for the

25 advanced practice providers.  I'm involved in those processes

DIRECT OF TARANTINO
JANUARY 17, 2020 (DAY 5, PART 1)

1  as well.

2      We have also brought on patient safety risk managers,

3  patient safety quality managers, at -- across our, you know,

4  sort of sector level across the southwest border, and we have

5  a national patient safety quality manager who coordinates our

6  medical quality management efforts at large.

7      So we've been building in additional layers, you know,

8  sort of pyramidal additional layers of professional medical

9  support and oversight and quality management as this process

10  has grown.  You know, it started a handful of people in a few

11  locations a little over a year ago, and now it's blossomed

12  significantly, so we've been adding in the additional

13  appropriate layers and levels of medical direction, oversight,

14  coordination, and quality management.

15  Q.   And specific to the Tucson Sector, where is the Loyal

16  Source -- or is Loyal Source Government Services providing

17  medical contract care to Tucson Sector?

18  A.   Yes, they are at the TCC.  In fact, I had a chance to

19  revisit yesterday and have another look at that.  I've been

20  out to Tucson Sector many times, and I've been here earlier as

21  Loyal Source was standing up, and now they've also recently

22  established at Nogales, at the Nogales Station.

23  Q.   And how -- what was the decision-making process for

24  implementing LSGS -- I'm going to call Loyal Source Government

25  Services by the acronym LSGS.  What was the process for

DIRECT OF TARANTINO
JANUARY 17, 2020 (DAY 5, PART 1)

1   deciding where to install LSGS into Tucson Sector?

2   A.   We used that same operational risk management

3   methodology, and so we worked with the sector to identify

4   within Tucson Sector what would be their first priority,

5   again, based on volume, demographics, flow, access to medical

6   care, concentration of medical issues.  And between the sector

7   and headquarters and myself, there was a pretty easy

8   consensus, I think, that TCC was the place to start, was the

9   top priority.

10      Now, my job -- you know, Tucson Sector's job is to

11  identify their priorities within Tucson Sector.  One of my

12  jobs and Headquarters' job is to cross-match that across the

13  southwest border, and so that's why some might ask, well,

14  why -- why was a team set up somewhere else outside of Tucson

15  Sector before TCC?  Same -- the same equations, the same

16  methodology is used there.  It's used across sectors, but it's

17  also used within sectors.

18      So that's why TCC was identified as the first location

19  within Tucson Sector, and that same methodology led to the

20  conclusion that Nogales would be the second, the next priority

21  location within Tucson Sector.

22  Q.   And let's start with TCC.  So what is it that's unique

23  about TCC, or is there something unique about TCC, that led to

24  that conclusion of installing LSGS there first?

25  A.   Well, I think people who are familiar with this case or

1   this sector probably understand that TCC played sort of a

2   hub-and-spoke role within the sector and that it is the

3   central processing center, essentially, for all of Tucson

4   Sector.  So most if not vast majority if not all of the people

5   who are brought into CBP custody will eventually make their

6   way through Tucson Sector.  It's sort of a collection and then

7   onward movement point.

8       And so that in and of itself was a key factor in being

9   able to do the greatest good for the greatest number and be at

10  the -- be at the point that is the most sort of critical --

11  critical central point for Tucson Sector operations in terms

12  of processing and short-term holding.

13  Q.   And as far as Nogales -- well, let me back up for a

14  second.

15      When did LSGS first move into -- where they stood up in

16  the Tucson Coordination Center?

17  A.   I can't remember that date.  I remember being involved in

18  those discussions.  I remember being there shortly thereafter.

19  I can't remember that date.  You know, obviously, I know -- I

20  have documents, and I have my own chart, and we have tracking

21  of every single site with every single date of when it was

22  stood up, so I just -- I didn't bring that level of detail

23  with me, so I can't recall specifically.  I don't want to

24  venture a date and have it be wrong.

25      But I was definitely involved in the process of it, and I

```
 1   was there shortly before, I was there when Loyal Source wasn't
 2   there, in fact, and I was there shortly after.
 3   Q.    Would you say it was sometime last summer?
 4   A.    Yes.
 5   Q.    Okay.  And you said that Nogales was the next phase of
 6   the LSGS expansion.  When was LSGS stood up in Nogales
 7   Station?
 8   A.    Yeah, and again, to have the exact date, I'm not sure.
 9   That was sometime in mid-December, and --
10   Q.    Of 2019?
11   A.    Yes.
12   Q.    And similar to TCC, what were the unique criteria or were
13   there unique criteria in Nogales that led to the decision to
14   expand LSGS to Nogales Station?
15   A.    Again, that would have been using our operational risk
16   management methodology, looking at volume, flow, demographics,
17   remoteness, access to care, time in custody, level of -- level
18   of census, if you will, and throughput, and based on what I've
19   -- I visited Nogales, and speaking to the Tucson Sector
20   leadership and headquarters leadership, I think there was a
21   consensus -- a very general consensus that Nogales would and
22   should be the next priority for Tucson Sector based on
23   obviously its location and proximity to some transit points
24   and historical -- historical flow patterns and a number of
25   other -- number of other factors.
```

DIRECT OF TARANTINO
JANUARY 17, 2020 (DAY 5, PART 1)

1   Q.   And prior to LSGS's expansion to Tucson Sector, were

2   there physicians or any other medical providers in place over

3   the past year?

4   A.   I'm sorry.  Could you repeat that.

5   Q.   So prior to LSGS's expansion into Tucson Sector, were

6   there other medical providers on-site in Tucson Sector or at

7   TCC providing medical care?

8   A.   We did have a period of time where we had Coast Guard and

9   Public Health Service teams providing sort of short-term surge

10  support for us as we were ramping up the Loyal Source

11  contract.  That isn't as easy as you might think because it

12  involves a lot of background investigation.  We need to make

13  sure that anyone who's going to be coming into our facilities

14  interfacing with people in our custody have gone through the

15  requisite background checks, and of course we have to verify

16  their credentials, their licensing, their certification, so

17  that takes a little bit of time to ramp up such an undertaking

18  across such a broad -- a broad scope and scale.

19       So during that period, we didn't want to leave some of

20  the priority locations without the additional medical support,

21  so we worked with Coast Guard and Public Health Service to

22  bring some teams in on a temporary basis.

23  Q.   And now that LSGS is in place, there's no longer that

24  need for Coast Guard or Public Health Service?  Is that --

25  A.   Correct.

DIRECT OF TARANTINO
JANUARY 17, 2020 (DAY 5, PART 1)

1   Q.   And your level of involvement with LSGS, is it -- do you

2   oversee the contract, so to speak?

3   A.   I am not the contracting officer for the Corps, but I am

4   involved in the day-to-day coordination and oversight and

5   guidance for the contract, particularly on the medical side of

6   things.  There's certainly some -- a lot of non-medical

7   aspects to contract management, obviously, that I don't have

8   the lead for, but I'm involved in those discussions, and it's

9   a very collaborative process at the headquarters level.  But

10  I'm very immersed in it and very, very involved in it.

11  Q.   And do you work with the -- with LSGS to identify

12  different areas for improvement, in collaboration with the

13  sectors?

14  A.   Yes.  I have an open line of communication to the Loyal

15  Source leadership.  They're very responsive to evolving

16  circumstances.  As you can imagine, there's no way you could

17  write a contract five years ago or even a statement of work or

18  a modification a year ago and have it be a hundred percent

19  applicable to what we're seeing on a regular basis.

20       So there is adaptability, there is the ability to adjust,

21  and that can be -- within a certain band that can be done

22  based on just discussions.  If we get outside of that, then we

23  can do a task order modification to add some more processes

24  and/or expansions of the contracted services.

25       So it is a flexible vehicle, and the contractor has been

 1  very flexible and responsive.

 2  Q.   Great.  Now I want to kind of talk about the general

 3  process of medical compare or the continuum of care that's

 4  provided in Tucson Sector.

 5       Based on your understanding, when somebody is apprehended

 6  in the field, what is their -- what type of initial medical

 7  assessment or screening, so to speak, will they receive --

 8  A.   All right.

 9  Q.   -- before they arrive at the station?

10  A.   So sometimes I describe our medical assessment process as

11  a three-phase process which is part of a larger multiphase

12  process, but the medical assessment process has three phases

13  for descriptive purposes.

14       Phase 1 is agent observation and patient -- sorry --

15  patient or person self-reporting, and that can -- that can

16  happen out in the middle of nowhere, out in a remote desert

17  outpost, where an agent is going to use their training and

18  their experience to look and -- look, listen, feel, hear,

19  observe anyone they're bringing into custody for any signs or

20  symptoms or even history of any significant illness that might

21  be urgent, emergent, life-threatening.

22       And of course they're going to listen to self-reporting.

23  They're going to ask, are you sick, ill, something wrong?  And

24  so even that far out, there can be that level of interaction,

25  and if there is something identified that appears to be

DIRECT OF TARANTINO
JANUARY 17, 2020 (DAY 5, PART 1)

1  urgent, emergent, life-threatening they can engage one of our

2  EMTs, if they happen to be on-site or nearby, or they can

3  transport to the local hospital, or they can activate EMS,

4  which is a fairly regular occurrence, even calling in a Life

5  Flight, which happens on a fairly regular basis, or calling in

6  one of our own aircraft to do an extraction or a rescue or a

7  transport.

8       So that can happen anywhere, at any time, and that's --

9  sorry again -- that's phase 1, which is agent observation, and

10 then patient self-reporting.  And that's to your -- that's to

11 your question about the initial interaction, I think.

12 Q.   When you said our own aircraft or EMS, is that -- were

13 you referring to the BORSTAR unit?

14 A.   Yes, could be BORSTAR and it could be AMO, our Air and

15 Marine Operations.  They have -- they have a branch here, and

16 they have helicopters at their disposal.  That's another

17 branch of CBP who works with BORSTAR, works with Border

18 Patrol.

19 Q.   And then so when -- assuming somebody does not have an

20 emergent issue that requires them to go to the hospital, so on

21 the assumption an individual's brought to the station, what is

22 your -- your understanding of what type of medical observation

23 or screening occurs upon arrival to the station?

24      We'll start --

25 A.   That would be what I could characterize as phase 2.

1   Obviously phase 1 still applies, but phase 2 would be a health

2   intake interview, which I know -- I think that's been -- I

3   think maybe, sir, you may have been involved in putting that

4   in place for Tucson many years ago, which was --

5           MR. CELONE:  And let's -- Ms. Kershaw, would you

6   mind bringing up Exhibit 206, please.

7   BY MR. CELONE:

8   Q.   And Dr. Tarantino, is this what you were referring to,

9   the initial medical screening form that was --

10  A.   Yes.

11  Q.   -- in place?

12  A.   This is -- to my understanding and in my experience, this

13  is a form that had been used in Tucson for a number of years,

14  in Tucson Sector for a number of years.

15          MR. CELONE:  And I'm going to, Your Honor, move for

16  Joint Exhibit 206 to be admitted into the record.

17          MS. BALASSONE:  No objection.

18          THE COURT:  It's admitted.

19          MR. CELONE:  And Ms. Kershaw, could you bring up

20  Joint Exhibit 881, please.

21  BY MR. CELONE:

22  Q.   And Dr. Tarantino, are you familiar with this form?

23  A.   Yes.  This is the CBP Form 2500.  This is the now

24  standardized CBP-wide health interview questionnaire, and

25  sometimes we call it the health intake interview.  And this

1  was meant to standardize -- there was not only the previous
2  Tucson form.  Other sectors had other forms.  Other parts of
3  CBP had other forms.
4      This was an effort to standardized that but also to
5  incorporate some lessons learned in best practices over the
6  years.  This form was specifically designed to in no way step
7  back from the Tucson form, but there is some incremental
8  improvements in some of the wording, some additional --
9  additional parameters that are featured in here, also sort of
10 the organizational structure of it.
11     But in no way is it -- does it decrement in any way what
12 had been being done in Tucson Sector, but this was a
13 significant effort by us to standardize this across CBP and
14 make it consistent with Tucson practices but also our
15 electronic systems and also to make sure that this had been
16 reviewed broadly by a number of experts and internal and
17 external stakeholders, so this was developed through a very
18 collaborative process that actually took months.
19     And so this is -- that's what this is, and that's how we
20 got to this today.  So this would be phase 2.  You know, to
21 continue my loose phase description, this would be phase 2,
22 which would be the health intake interview.
23 Q.  And to your understanding, this health interview
24 questionnaire is being asked of all detainees in the Tucson
25 Sector upon arrival to a station?

1  A.   Yes, that's what -- that's what I've heard as the

2  guidance put out by Tucson Sector, that's what I've seen in

3  practice, and that is my understanding of what is happening in

4  Tucson Sector.

5  Q.   And you said that you've arrived at that based on

6  observation in the stations?

7  A.   Yes.

8           MR. CELONE:  Your Honor, move to have Joint Exhibit

9  881 into the record.

10          MS. BALASSONE:  I think it's already admitted.

11          MR. CELONE:  Excuse me.  Thank you.

12          THE COURT:  All right.

13  BY MR. CELONE:

14  Q.   And so Dr. Tarantino, what occurs if somebody answers yes

15  to any of these 13 questions?

16  A.   Well, the -- if someone answers yes to one of the

17  questions that, you know, identifies, like, on this form, that

18  identifies a medical issue, or it doesn't even have to be a

19  yes to one of these questions, it could be additional

20  observations, or down below we actually added in additional

21  discretion, again, for the agent or officer to just say, hey,

22  something doesn't look right, something doesn't sound right,

23  this person's saying everything is fine, but it doesn't look

24  that way to me, that would trigger a medical assessment, in

25  which you see at the bottom of the page, "Was the alien

1    referred for medical assessment?  Yes or no."

2    Q.    And what happens if -- when somebody is referred to --

3    referred for a medical assessment?

4    A.    That would -- that would be what I would describe as

5    phase 3 of our assessment process.  They would get a medical

6    assessment by medical personnel, and that could be by referral

7    to the local hospital, to the emergency room or the hospital,

8    if our Loyal Source is not on-site or available, or it could

9    be by Loyal Source -- the assessment could be done by our

10   Loyal Source personnel on-site.

11   Q.    Great.

12         MR. CELONE:  And Ms. Kershaw, could you bring up

13   Joint Exhibit 884, please.

14   BY MR. CELONE:

15   Q.    Dr. Tarantino, have you -- are you familiar with this

16   exhibit?

17   A.    Yes.

18   Q.    Is this the medical assessment form that would be used in

19   that phase 3 that you were describing?

20   A.    Yes.  Now, I can't speak to -- a hundred percent to a

21   version control issue.  I think that there -- there may be

22   another version of this that's not specific to juvenile.  But

23   this form I helped develop.  I'm very familiar with it.  This

24   is -- this would be the medical assessment form that would be

25   used as that phase 3 process to conduct a medical assessment.

1  Q.   And this medical assessment would be conducted by a

2  medical practitioner; is that correct?

3  A.   Yes.

4  Q.   And to your understanding at the TCC, who is receiving or

5  which individuals are receiving medical assessments?

6  A.   My understanding of the practice at the TCC and what I

7  observed in fact yesterday is that all juveniles will receive

8  a medical assessment, and any person who has been observed or

9  reported or had a positive -- reported to have a medical

10 issue, a medication issue, or a positive finding on the health

11 interview would get a medical assessment.

12      And so to clarify that, that means that juveniles would

13 be getting a medical assessment even if phase 1 and phase 2

14 were completely normal or completely negative.  We would have

15 a medical assessment conducted on the juveniles as an extra

16 precaution, if you will.

17 Q.   And that medical assessment is upon arrival to the TCC?

18 A.   Maybe not upon immediate arrival.  The health interview

19 is conducted immediately in the sally port before they even

20 come into the facility, and that's to identify public health

21 infectious disease issues and address them up-front.  The

22 medical assessment will follow shortly thereafter.

23      They may go through some -- depending on the acuity of

24 the issue, if it looks urgent or questionable, if it's more

25 routine, they may go through some additional processing,

 1  and/or the provider may have a backlog, but they'll get the

 2  medical assessments expeditiously.

 3  Q.   We talked about how the health interview questionnaire is

 4  asked upon all arrivals to the station.  What happens

 5  hypothetically if somebody is asked the health interview

 6  questions upon arrival to the Ajo Station and then they're

 7  brought to the TCC subsequently?  Does that health interview

 8  questionnaire -- is that asked a second time?

 9  A.   I think that probably we'd say it wouldn't necessarily be

10  required to by our policy, but in our practice it is, and we

11  saw -- I saw it yesterday.  And in fact, it's even being done

12  essentially twice in the sally port.  It's being done by

13  medical as well as by the agents, and they collaborate and

14  work collaboratively on this.  So the agents will be asking

15  these questions, but also our medical personnel will be asking

16  it at the TCC.

17       So there is a high likelihood that persons in custody

18  will be getting health interviews multiple times, and from our

19  perspective, you know, that's fine.  And so they generally

20  are, will get it at a -- at the outlying station, but they

21  will also get it at the TCC.

22            MR. CELONE:  Ms. Kershaw, could you pull up Joint

23  Exhibit 882, please.

24  BY MR. CELONE:

25  Q.   Dr. Tarantino, are you -- have you seen this document

1   before?

2   A.   Yes.

3   Q.   What is it or how would you describe it?

4   A.   As entitled, "Patient Encounter Note," this would

5   document a medical encounter, which this is part of our -- of

6   the continuum of care that we have.  This would follow phase

7   3, essentially.  This would be, if you would, a phase 4

8   whereby this would be a medical encounter if someone was

9   actually identified as having an illness, an injury, an issue

10  that needs to be addressed by a provider, and that would be

11  documented here.

12       And that could be upon initial entry, or it could be 24

13  hours later something manifests.  A person is in -- is in

14  holding and they develop some nausea or vomiting and they need

15  to be looked at, that would be documented on this encounter

16  note.

17            MR. CELONE:  Just, excuse me, one housekeeping item,

18  Your Honor.  We wanted to move Joint Exhibit 884 into the

19  record, but I believe it already -- it may have already been

20  entered.

21            Is that -- has it already been?

22            MS. BALASSONE:  You mean 884?

23            MR. CELONE:  Yes, the juvenile --

24            MS. BALASSONE:  I believe it's already been

25  admitted.

DIRECT OF TARANTINO
JANUARY 17, 2020 (DAY 5, PART 1)

1              MR. CELONE:  I thought so as well.

2              Move to have Joint Exhibit 882 admitted to the

3      record.

4              MS. BALASSONE:  No objection.

5              THE COURT:  Admitted.

6      BY MR. CELONE:

7      Q.   And so Dr. Tarantino, the phase 4, so to speak, or the

8      patient encounter note, how would LSGS kind of arrive to the

9      encounter stage?  What would trigger the evolution from phase

10     4 to phase -- or phase 3 to phase 4?

11     A.   That would be -- well, an easy way is, if you want to go

12     back to that, if you go back to the assessment form, I can

13     show you.

14             MR. CELONE:  Ms. Kershaw do you mind pulling up or

15     having simultaneously on the screen Joint Exhibit 884 and 882.

16     A.   So if you look at 884, down at the bottom, "Assessment

17     Disposition," you can see there's three general assessments.

18     One is, there's no -- there's no -- despite what was said

19     before, you know, despite someone having a question about a

20     medical issue, we have now had a medical provider look, and

21     they've decided that there is nothing of any significance

22     going on at this point in time, so they can continue

23     processing.

24             Or they might say, hey, this is a really emergent,

25     complex issue.  We can't handle it here.  They have to go to

 1   the emergency room.  Or they could say, this person does have

 2   a medical issue.  We can handle it here.  We're going to

 3   initiate a medical encounter.  And that will be done on-site

 4   if available.  Otherwise, even for a routine -- quote/unquote

 5   routine medical encounter, that would go to the emergency room

 6   if it couldn't be done on-site.  And so if it does lead to a

 7   medical encounter, that would generate this patient encounter

 8   note.

 9          MR. CELONE:  And Ms. Kershaw, could you pull up

10   Joint Exhibit 882, page 2, please.  The second page.  Yes,

11   thank you.

12   BY MR. CELONE:

13   Q.   So for the right-hand screen, how does -- I mean, these

14   types of questions are a follow-on or all part of the

15   encounter; is that correct?

16   A.   Yes.  This is the back side of the form.  This is -- this

17   is all part of the patient encounter.

18          MR. CELONE:  Ms. Kershaw, could you bring up Joint

19   Exhibit 883, please.

20   BY MR. CELONE:

21   Q.   And Dr. Tarantino, are you familiar with this document?

22   A.   Yes.

23   Q.   How would you describe this document's purpose or role in

24   the different phases of the continuum of care?

25   A.   Yeah, this would be a medical continuation note.  If

1   during an encounter it was identified that a person had a

2   medical issue that was going to require some continuation or

3   additional monitoring such as you see here, temperature

4   checks, blood pressure checks, glucose checks, medication

5   administration, that would be determined during the assessment

6   and encounter period, and then it would be implemented and

7   documented on this form.

8   Q.   In all of these LSGS forms that we've been looking at,

9   these are -- these encounters and assessments are all

10  performed by the medical providers; is that correct?

11  A.   Yes.  Now, a temperature check, if someone needs a repeat

12  temperature check, that might be performed by one of the

13  technicians, but it would be under the direct supervision of

14  the provider, who's on-site 24/7.

15  Q.   Okay.  Great.

16        MR. CELONE:  Your Honor, move to have Joint Exhibit

17  883 admitted into the record.

18        MS. BALASSONE:  No objection.

19        THE COURT:  It's admitted.

20        MR. CELONE:  Ms. Kershaw, could you bring up Joint

21  Exhibit 881 again, please.

22  BY MR. CELONE:

23  Q.   So Dr. Tarantino, I wanted to step back to the health

24  interview questionnaire that's performed, as you testified,

25  upon all individuals upon their arrival to Tucson Sector

1    Station.

2        Which -- who -- do Border Patrol agents, are they the

3    ones performing this health interview questionnaire?

4    A.    It can be performed by Border Patrol agents or by medical

5    personnel.

6    Q.    And then is this -- where is this questionnaire

7    documented?

8    A.    This is documented in the e3 system.

9    Q.    And are there any instructions for Border Patrol agents

10   to ask these questions, or are there instructions

11   complemented -- or contemplated, excuse me?

12   A.    Well, in the Tucson Sector, this is very similar to what

13   they've been doing for years, so there hasn't seemed to be any

14   significant learning curve there.  We have developed

15   additional -- or have been developing, I should say --

16   additional instructions for this form.  It goes into a little

17   bit more detail, which might become a training module, but

18   we're still getting feedback from the users on this in terms

19   of what their questions are about it, what might be confusing,

20   what might -- what they might need further training or

21   explanation about.

22        So we're still interacting with the field and with our

23   agents and collecting feedback on this, which could end up in

24   forming some additional instructions or some additional

25   training modules or something like that.

1   Q.   Great.

2          MR. CELONE:  Ms. Kershaw, could you bring up Joint

3   Exhibit 915, please, which I believe has already been admitted

4   to the record.

5   BY MR. CELONE:

6   Q.   Dr. Tarantino, are you familiar with this document?

7   A.   Yes.

8   Q.   How would you describe this document or its purpose?

9   A.   This document was an effort to sort of capture/codify

10  where we are at this point in a continuously evolving and

11  expanding process.  This was an effort to document and clarify

12  some guidance about where we are and where we're going.  It's

13  kind of a snapshot in time of a much broader system and a much

14  broader level of effort in scope and scale, but it does

15  capture some key and important points and milestones.

16         But -- some people have read into it as the be-all/end

17  all and only -- only-and-this-is-it sort of document.  That is

18  not the case.  In many ways we have already exceeded this

19  document, including in Tucson Sector, and we continue to

20  evolve and enhance our practices.

21         And this document will be further informed as in the

22  document by the more detailed implementation plans that will

23  be developed that will go into some additional detail.

24         MR. CELONE:  Ms. Kershaw, can you pull up page,

25  excuse me, page 4 of Joint Exhibit 915.

1    BY MR. CELONE:

2    Q.   So Dr. Tarantino, under subsection 7 entitled,

3    "Procedures," subsections 7.2, 7.3, 7.4 outline a number of

4    different phases, including phase 1 -- first phase, second

5    phase, third phase.

6         Could you briefly describe how these phases interact or

7    intersect with the various phases that you had identified

8    earlier in the Tucson Sector?

9    A.   Right, and this was what I was describing before, that

10   CBP-wide and in Tucson Sector we use this three-phase approach

11   for the initial assessment.  We have -- as I said, we have

12   additional phases beyond that, but for the initial assessment

13   period, if you will, we have the three phases, which is, first

14   of all, it's agent/officer observation, and then it's also

15   persons' or subjects' individual self-referral or

16   self-reporting of issues.

17        So that's phase 1.  That can happen out in the middle of

18   the desert, on first contact, or anywhere throughout the

19   process.  Second phase would be at a station where the health

20   interview, the new standard CBP 2500, would be conducted.

21   You'll note this -- this document says that will be done on

22   all individuals under the age of 18 but also notes it at a

23   minimum, and that gives sectors, including Tucson Sector,

24   leeway to obviously conduct this on all persons, which is the

25   guidance within Tucson Sector.

1          In some ways this -- and people will ask, well, why

2      doesn't it say all individuals?  In some ways that's the

3      difficulty in writing a document that is CBP-wide, because we

4      have -- if we make it a set policy in here, it has to apply

5      everywhere all the time, and that can be very difficult in

6      some very remote locations or locations that don't even exist

7      yet because they've never been a transit route.

8          And so it was -- it was difficult to draft a document

9      that went as far as we want but also didn't commit us to

10     something that we might not be able to meet on day one of when

11     it was -- when it was put out.  That's why the language has

12     "at a minimum" in many areas, because as I said before, in

13     many cases, we expect to and already are exceeding these kind

14     of de minimis, or I won't say de minimis, but minimum --

15     minimum standards, if you will.

16     Q.   And so in Tucson, everyone -- to your understanding,

17     everyone is receiving that health interview questionnaire?

18     A.   Yes.

19     Q.   Not just individual -- not just juveniles?

20     A.   And I would just reclassify that, in my opinion, that is

21     not at odds with what this says here.

22     Q.   Because of the "at a minimum" language?

23     A.   Yes.

24     Q.   And provides that threshold that sectors can rise or go

25     above?

1   A.   Yes.  And then the third phase, as I mentioned before,

2   will be the medical assessment phase, and you've seen that

3   described in more detail.  You saw the form.  Again, at a

4   minimum, all tender age children, and then I can't see the

5   rest, but I know it says anyone who had a positive finding on

6   the observation or the health interview or anyone with a

7   medical issue identified in one way or other.

8        So as I said, here in Tucson Sector, we're already

9   exceeding that standard, that "at a minimum" level, because

10  our practice here in Tucson Sector is to do the medical

11  assessment on all juveniles, regardless of whether they had a

12  positive health interview or not.  And so that's another

13  example where we've been able to put the resources in place

14  and also have -- have -- the circumstances are amenable to

15  expanding that to all juveniles.

16  Q.   And in addition to Tucson Sector exceeding the phase 2

17  requirement here regarding the health interview, are there

18  other additional phases that are being used in Tucson Sector

19  that exceed these three phases?

20  A.   Well, you said in addition to doing all persons versus

21  just juveniles on the health interview.  That's one area.  The

22  other area I mentioned is that, in Tucson Sector, on the

23  medical assessment, they're doing all juveniles, not just all

24  tender age children.

25       And then this document does not speak specifically to the

1    level of care and support that Loyal Source has set up at

2    Tucson, at the TCC and now Nogales, so that -- that is

3    anticipated in this document, but it's not required, and that

4    will come in the implementation plans and other areas, but TCC

5    and Nogales are certainly exceeding the expectations of this

6    document by having all the medical providers on sight 24/7 and

7    all the levels of capability that they're able to provide in

8    that regard.

9    Q.   And so you had identified up to phase 5 of different --

10   on the continuum of medical care.  Are there any phases beyond

11   phase 5, which I believe you had characterized as the

12   continuation --

13   A.   Yeah, so just to put it back into perspective, phase 1

14   would be agent observation and self-reporting.  Phase 2 would

15   be the health interview.  Phase 3 would be the medical

16   assessment.  Phase 4 would be a medical encounter, which would

17   be an actual clinical encounter for a specific issue.  Phase

18   5, if you will, could be -- you know, again, this is

19   imprecise, but it could be phase 4-A, or phase 5 could be the

20   continuation, patient continuation, if there's issues that

21   need to be followed up.

22       Phase 6, if you will, would be referral to the emergency

23   room or to the hospital for some additional issue.  Phase 7

24   would be follow-up upon return from the emergency

25   room/hospital to reassess and identify what additional issues

DIRECT OF TARANTINO
JANUARY 17, 2020 (DAY 5, PART 1)

1    need to be addressed back in our care.

2        Next phase would be what we call enhanced medical

3    monitoring where, if we have received people back who have

4    significant illness such as they are diagnosed with the flu or

5    something else, they will get enhanced medical monitoring or

6    they'll get periodic checks and be monitored by the medical

7    staff.

8        Next phase after that would be exit -- exit interview as

9    appropriate, depending on their destination, be it travel,

10   transfer, release, Marshal Service, ICE, HHS, et cetera.

11       So there is a very robust continuum of care that is

12   provided, and that is not described in detail in this document

13   by design.  This document, again, was a waypoint, a snapshot.

14       Some of that additional detail will be in the

15   implementation plans that are directed by this document, and

16   some of those efforts continue to evolve, and so it's hard to

17   capture them in writing in a formal policy document while

18   they're still evolving and being enhanced.

19   Q.   And just to clarify, so this Joint Exhibit 915 that we're

20   looking at now, it's a Customs and Border Protection-wide

21   document, it's not unique to U.S. Border Patrol.

22       Is that correct?

23   A.   Correct.  It's not unique to Tucson sector, yes.

24   Q.   I just want to now talk about prescription medications

25   and how that relates to detainees.  What is your understanding

1  of the prescription medication policy in Border Patrol

2  detention in Tucson Sector?

3  A.   So if a person arrives with an issue, a question, a

4  concern, or an existing supply of medication, in any way a

5  question, a concern, an issue about medication or a

6  preexisting supply of medication, that person will be assessed

7  through the assessment process, through the interview, through

8  the medical assessment, as appropriate.

9      If there's any question about their need for medication

10  or the need to have a valid, current, accurate prescription,

11  that will be addressed by our medical personnel on-site or

12  referred to the hospital.

13      But we do not confiscate medication and not replace it or

14  not have that evaluated.  If we do -- if the medical personnel

15  decides what prescription is required, then that medication

16  will be filled.  That prescription will be filled by us, and

17  it will be dispensed in a controlled manner to the person in

18  custody.  And then, upon their departure, they will be given a

19  supply of that medication to take with them.

20  Q.   And do individuals always receive replacement

21  medications?

22  A.   Unless a medical provider determines that that --

23  whatever that -- whatever that medication was was invalid, was

24  -- came from an inappropriate source, was not related to an

25  actual medical condition, is not indicated at this time, you

1   know, our medical providers are not going to, you know,

2   provide something that is inappropriate or harmful or

3   dangerous to someone, and if there is any question about it,

4   then that will be referred to the emergency room or to the

5   hospital for a higher level evaluation or assessment.

6   Q.   And what is the risk of harm to individuals maintaining

7   their foreign-based prescriptions without supervision or

8   confirmation from a domestic physician?

9   A.   Well, we've seen all sorts of -- you know, sometimes

10  we've seen what has been described as a prescription, and it's

11  actually contraband.  And it's -- you know, it could be

12  fentanyl.  It could be, you know, who knows what.  It could

13  have been -- it could have been handed out or prescribed by

14  some disreputable pharmacist or organization.

15       We know very well that the pharmacy practices and the

16  prescription practices in Central America and Mexico are

17  nowhere near the level of reliability and of accuracy, if you

18  will, as we have here in the United States.  So in good

19  medical practice, we can't -- we can't allow someone who's in

20  our care and custody to be taking something that is suspect or

21  might be harmful or might be dangerous.

22       That being said, we're not just going to leave it at

23  that.  We're always going to reassess and evaluate and

24  identify the medical issues that might be in play, and we'll

25  have professional, licensed, credentialed, certified medical

1 personnel make a decision about the prescription, and if it's

2 beyond their scope of practice, maybe it's some complex

3 seizure disorder or something like that, they will refer them

4 to the hospital, to the emergency room, to a hospital, to have

5 that further assessed or evaluated.

6 Q.    And who checks the -- sorry.  Once the prescription is

7 filled, how is that administered in Border Patrol's stations?

8 A.    That's -- that is dispensed in a controlled manner

9 whereby Border Patrol, in cooperation with the medical

10 personnel will hold onto the medication but will ensure that

11 it's dispensed on schedule, in a timely manner.

12      From a law enforcement practices perspective, you can't

13 just have a bunch of people, you know, in holding with various

14 supplies and medications and you can't be certain if they're

15 being taken, if they're being shared.  There's potential for

16 overdose, for any number of things.  So it's standard law

17 enforcement practice to dispense that in a controlled manner.

18 Q.    And finally, what are the, in your opinion, the

19 operational goals or needs of providing medical care in Border

20 Patrol stations and detention?

21 A.    Well, number one, we want to support the CBP mission, the

22 law enforcement mission, as well as the mission of caring for

23 persons in our custody, and that leads into number two, which

24 is we want to ensure the well-being and safety of persons in

25 our custody, to include ensuring that medical issues are

1    addressed as appropriate.

2        And number three, we want to address public health

3    infectious disease issues.  We want to identify them early and

4    respond appropriately to them.  And number four, we want to

5    take care of our people.  We want to enhance -- we want to

6    make sure our people are comfortable with what's going on in

7    their facilities and also that they're confident that medical

8    issues are being addressed that could affect persons in

9    custody, because of course it's a concern -- a very

10   significant concern to our agents is the well-being of people

11   in our custody, and so having medical personnel there helps

12   with that, but also it reassures them that we're addressing

13   issues that might impact them and/or their families when they

14   go back home at the end of the day.

15       So it has a -- there's a number of rationales for it.

16           MR. CELONE:  Thank you very much, Dr. Tarantino.  No

17   further questions.

18           THE COURT:  All right.  Cross-examine.

19                       CROSS-EXAMINATION

20   BY MS. BALASSONE:

21   Q.   Good morning, Dr. Tarantino.

22   A.   Good morning.

23   Q.   You've had a lot of experience with medical programs in

24   various settings, but is it fair to say that you've never

25   worked in a detention facility like a jail?

1  A.   That is correct.

2  Q.   And are you familiar with jail or detention standards,

3  like, for example, the Standards for Health Services in Jails

4  written by the National Commission on Correctional Health

5  Care?

6  A.   Yes.  And I would say that I had no prior experience, but

7  since I've been here, I have extensive experience.  I've been

8  to jails and prisons, and I've worked with ICE very carefully

9  in their health system.  I work daily with ICE Health Service

10 Corps and with their health system because we interact and

11 we're part of a continuum, so I'm very familiar with their

12 practices and their approaches and their standards, and I've

13 been to many of their facilities for the past two years.

14      So I have two years of very extensive, solid experience

15 in that, but I didn't have experience prior to my job.

16 Q.   Do the generally followed standards for medical screening

17 and detention apply to CBP's medical screening?

18 A.   I'm sorry.  Could you repeat that?  And I can already

19 tell you it's going to need to be clarified, but maybe start

20 by repeating it.

21 Q.   Sure.  Do the generally followed standards for medical

22 screening and detention apply to CBP's medical screening?

23 A.   Medical screening in detention?

24 Q.   Correct.

25 A.   Well, this is a difficult -- and we've discussed this

1  before.  It depends on what you mean by screening.  Screening

2  means different things to different people, and it means

3  different things in different settings.  Screening, typically

4  you're screening against a specific set of standards or a

5  specific end state, such as screening for detention or

6  screening for public health entry into the United States or

7  screening for employment or screening for a school physical.

8  So it has no meaning just by itself.  It's setting-specific

9  from a medical perspective.

10      And so we have developed -- we don't -- we don't even

11  formally call what we do screening because we're not screening

12  against a specific standard.  We've developed a full, robust

13  assessment process, which is a three-phase process.  It

14  doesn't just rely on a single quote/unquote screening form.

15  It's a multifaceted process.

16      It's different -- if you're asking, is it the same as

17  ICE's, is it the same as Bureau of Prisons', no, it's

18  different, because we have a different setting.  They're

19  screening for detention into their facility for a long-term

20  detention purposes.  That's not what our mission is.  That's

21  not what our mission space is.

22      So our process is different.  It's informed by and it's

23  part of a continuum with, but it is different.

24  Q.  And given your experience with ICE, would you say that

25  the ICE screening is more robust than the CBP screening

CROSS OF TARANTINO
JANUARY 17, 2020 (DAY 5, PART 1)

 1   because, in your view, ICE is doing screening for detention?

 2   A.    In some ways ours, you know, if you were to line the

 3   processes up 100 percent side by side, in some ways ours is

 4   more robust because it's more front-forward and it's more

 5   immediate.  Some of theirs is a little bit more delayed in

 6   some areas.  They look at -- they have to assess for very

 7   specific things that would be applicable to detention that we

 8   don't.

 9        So it's different.  I can't say one's better.  You can't

10   say one is better or -- they're different because they're in

11   different settings.

12   Q.    And the distinction you're making there is that CBP is

13   not a detention setting, in your view?

14   A.    Among other things.  You know, our function is short-term

15   holding, processing, onward movement to a place where we know

16   these capabilities are going to exist.  ICE is an end state

17   place.  CBP is a throughput place.  You know, we can get into

18   all sorts of hypotheticals, but the world that we operate in

19   is that we know we're sending people onto ICE or HHS that have

20   robust -- that do long-term detention and have robust medical

21   capabilities and can offer additional services that it's not

22   appropriate for CBP to have at its place in the continuum.

23   Q.    And Dr. Tarantino, you testified that you're the Senior

24   Medical Advisor for CBP; correct?

25   A.    Yes.

1   Q.   Are you also the Acting Chief Medical Officer at the

2   moment for CBP?

3   A.   Well, I don't think that that could be said.  Maybe de

4   facto, but I've not been formally designated that.  We don't

5   have a Chief Medical Officer right now.  That position is, in

6   my understanding, it's being developed, is being -- I don't

7   know the right word.  It's being established.  But I'm

8   essentially functioning in that role, but I don't have that

9   formal title is the best I could say to that.

10       Now, I'm not trying to be evasive, but it's a little bit

11  of bureaucracy involved in some of the terminology, perhaps,

12  but...

13  Q.   And so in your role as the Senior Medical Advisor, you

14  testified that you provide medical direction and oversight for

15  CBP medical efforts across all of CBP; right?

16  A.   Yes.

17  Q.   In that capacity, do you interact directly with EMTs who

18  are stationed in the Tucson Sector?

19  A.   Yes.

20  Q.   And is that because they are operating under your medical

21  direction when they do things like conduct medical

22  assessments?

23  A.   Excuse me.  Yes.  And we also have -- we also have local

24  EMT supervisors, and we also have a local physician advisor

25  here in the Tucson Sector.  But the ultimate sort of medical

1  authority that they're operating under would be mine.

2  Q.   Do you have direct contact with agents who are not EMTs

3  who are stationed in the Tucson Sector stations?

4  A.   Yes.  That would be more limited.  Again, you can imagine

5  sort of a pyramidal structure.  The farther out you get and

6  the farther away from the medical arena, I would have less --

7  obviously we have, like, 65,000 people or something, so -- but

8  I do interact.  I've been out to Tucson Sector many times, and

9  when I come, I go out with agents, as well as EMTs, and I talk

10 to them at the stations and in their facilities.  I did that

11 yesterday, in fact.  So certainly to an extent, yes.

12 Q.   So there are multiple layers of people and communication

13 pathways between you and sort of the agents who are doing --

14 agents who are not EMTs who are doing the day-to-day screening

15 of individuals in the Tucson Sector; correct?

16 A.   Right.  I'm not -- I'm not going to try to say that I'm

17 interacting directly with every agent on a day-to-day basis.

18 Absolutely not.  We have -- we have layers of communication.

19 I am able to bypass them and go direct, and I do at times, and

20 if there is an issue or a question or a concern or an event,

21 then all those layers can be bypassed by people who have my

22 cell phone number, and they know that they can contact me

23 directly.

24       But you know, I'm not trying to fight your point.  Yes,

25 it's true that I definitely don't interact with, you know,

1  with all agents directly on a day-to-day basis.  There is

2  chains of command for that and lines of communication for

3  that.

4        MS. BALASSONE:  Mr. Lucero, please show the first

5  page of Joint Exhibit 868 as admitted.

6  BY MS. BALASSONE:

7  Q.   Dr. Tarantino, you testified that this is the statement

8  of work --

9  A.   I'm not seeing anything.  Now I am.

10  Q.   Okay.  Great.

11        Dr. Tarantino, you testified that this is a statement of

12  work that governs the medical contractor's role in the Border

13  Patrol stations; is that right?

14  A.   Yes.

15  Q.   Okay.  And this document explains why Border Patrol needs

16  medical contractors to provide assistance in things like

17  conducting screening; correct?

18  A.   Well, this would apply to certain priority locations, and

19  it would apply to certain points in the process.  So like I

20  said, we have -- they're supporting some of the phases, but

21  other phases are done and doable and appropriately done by

22  agents.  And then there is a point at which there's an overlap

23  and almost a -- I don't want to say a duplication, but there

24  is a point where that comes together.  And in fact, you know,

25  we saw that yesterday in the sally port where the agents and

1   the medical is cooperating on doing the health interviews.

2        So I wouldn't say that this establishes a requirement

3   that medical personnel conduct every phase or every aspect of

4   our operations.  We have long history and experience and

5   practice in conducting some of the phases, and the system and

6   the phasing that we have set up has been validated by a number

7   of internal and external stakeholders, to include

8   pediatricians, to include, you know, leading world experts on

9   this, from the CDC, HHS, external parties, the Coast Guard,

10  Public Health Service teams who are in our stations for

11  months.  All have validated these approaches and found them to

12  be appropriate and reasonable.

13       So I would not agree that this document somehow

14  establishes a need for contracted medical personnel to be

15  leading or doing every single aspect of our operations.

16  Q.   Is it fair to say that this document expresses a desire

17  to have medical contractors participate in the health

18  interviews, the second phase, for example, of medical

19  screening in places like TCC?

20  A.   No, I don't read it that way.  I think a lot of the

21  terminology in here, this is dated.  This comes from -- was

22  established five years ago, and some of the terminology has

23  been adjusted, and some of our practices have evolved since

24  then.

25       I think the core of this document is that we want medical

 1   personnel -- and the way it's evolved is that we want medical

 2   personnel to be supporting our agents and to be providing the

 3   medical assessments and the medical care, the medical

 4   treatment, things that only -- only medical personnel can do.

 5   So that's the way I interpret it, and that's the way it is

 6   currently envisioned in terms of the guidance to the

 7   contractor and such.

 8   Q.   Looking at the third paragraph of the first page of this

 9   document, the first two sentences say, "As this population

10   transits to the U.S., they may endure physically demanding and

11   poor living conditions that adversely affect their health and

12   well-being and pose increased public health concern upon

13   apprehension and processing.  The majority of USBP agents are

14   not medically trained to effectively screen for and/or treat

15   medical/public health concerns."

16        That's what it says right there; correct?

17   A.   Right.

18        MS. BALASSONE:  Mr. Lucero, please show the first

19   page of Joint Exhibit 758.

20   BY MS. BALASSONE:

21   Q.   Dr. Tarantino, do you recognize Joint Exhibit 758?

22   A.   Yes.

23   Q.   What is it?

24   A.   This is guidance to the field to essentially implement

25   what was called the interim medical directive that had been

 1   signed earlier in that year.

 2   Q.   Were you involved in drafting this document?

 3   A.   Excuse me?  Could you repeat that?

 4   Q.   Were you involved in drafting this document?

 5   A.   Not this memo.  I was involved in drafting the document

 6   it refers to.  I was aware of this memo, but this is from the

 7   Chief of the Border Patrol.  But I also was involved in the

 8   guidance -- well, is there more to this document?

 9            MS. BALASSONE:  Mr. Lucero, could you please scroll

10   through pages 2 through 8 of Joint Exhibit 758.

11   A.   So yes, I was involved in this part of it.  I was

12   involved in that cover memo that was from leadership, but yes,

13   I was involved in this, absolutely.

14   Q.   And when you say "this," you mean starting on page 3 --

15   A.   Yes.

16   Q.   -- what's titled "The Medical" --

17   A.   It's the direction, yes.

18            MS. BALASSONE:  Your Honor, we request admission of

19   Joint Exhibit 758 into evidence.

20            MR. CELONE:  No objection.

21            THE COURT:  It's admitted.

22            MS. BALASSONE:  Going back to the first page,

23   Mr. Lucero, please.

24   BY MS. BALASSONE:

25   Q.   Dr. Tarantino, I'm looking at the second sentence of this

1   first page, which says, "These assessments by medical

2   personnel may include in urgent circumstances United States

3   Border Patrol (USBP) Emergency Medical Services (EMS)."

4   A.   Yes.

5   Q.   What is a medical assessment?

6   A.   Well, as I've described before, that is a -- I try to

7   define things without using the term that is in the

8   definition, but essentially it's an assessment by medical

9   personnel for medical issues of urgent or emergent concern

10  that will need an encounter or a referral.

11  Q.   When circumstances are not urgent, then are EMTs not

12  supposed to do medical assessments?  Is that a fair statement?

13  A.   Well, the medical assessment is a little bit more of a

14  formal process that was called out in the interim directive,

15  so again, it gets into a lot of terminology and semantics.

16  Certainly our EMTs are called all the time to evaluate and

17  triage and even start immediate care and intervention.

18       This medical assessment, as we're talking about it here,

19  is almost an additional collateral duty that we created some

20  specifics about for our EMTs so they would understand exactly

21  what was expected of them.

22       But in the course of their day-to-day work, they're

23  responding to an emergency scene, they're going to assess that

24  patient, they're going to initiate care, they're going to

25  initiate referral.  This medical assessment process that we

1    established as part of our assessment process was a little bit

2    more specific, and so we had to give them some additional

3    guidance, because they had questions about it, and we wanted

4    to make sure they were clear on what the expectations were.

5         So we developed that detailed guidance.  We also

6    developed training, training materials, training videos, other

7    things.  We've incorporated this into their EMT training,

8    their annual and refresher training.

9         And just to further clarify this, this is the -- when I'm

10   talking about the three phases of the assessment, we have the

11   observation and self-reporting, we have the interview, we have

12   the medical assessment, this is referring to phase 3 of that,

13   which generally speaking is going to be done by Loyal Source

14   or referred to the hospital.

15        But during the peak of the crisis, we had, you know,

16   significant issues with remote entry, groups of a thousand,

17   hours from medical care, and so we were engaging and diverting

18   and empowering our EMTs to step into that role as an

19   additional layer as part of this sort of crisis response

20   effort, and that's what this is about.

21   Q.   And so medical assessments can -- now can be done by

22   EMTs, government -- the LSGS contractors, or the local health

23   provider; correct?

24   A.   They can only be done by EMTs in quote/unquote exigent

25   circumstances, which would be sort of an unusual really large

 1   influx or a remote setting or some reason why it can't be done

 2   by Loyal Source or the local health system.  And even were it

 3   to be done by an EMT, that -- eventually that person is still

 4   going to filter into the regular system anyway, and in Tucson

 5   Sector they're eventually -- they're either going to be at a

 6   hospital or they're going to be at the TCC one way or the

 7   other anyway, so this is just an additional layer, and it's an

 8   additional way that we can empower our EMTs who may or may not

 9   be available.

10   Q.   And it's reserved for urgent circumstances because it

11   would be preferable to have a medical contractor or the local

12   health system do the medical assessment versus the EMTs having

13   to do it?

14   A.   Well, I would say it's preferable that it's done through

15   our process, through our system.  This is almost -- this is --

16   is alongside the system in the process whereby it goes from

17   our feeder stations to the TCC to the local health system, if

18   needed, onto ICE or HHS.  That's the continuum, that's the

19   process.

20        This is an additional sort of exigent capability that we

21   have to lay alongside of that.  And so, you know, ideally, we

22   won't be doing that.  Ideally we'll be using the flow in the

23   process in the system that we have.

24   Q.   I'm sorry.  When you say -- excuse me.  When you say

25   ideally, ideally we won't be doing EMTs performing medical

 1   assessments?  That's what you mean?

 2   A.    Ideally the --

 3   Q.    And doing the normal route of contractors or local health

 4   system?

 5   A.    Yes.  Ideally we'll use the normal continuum, which is

 6   what we were able to use during steady-state or limited-surge

 7   type of operations where we have the outlier stations, and

 8   then we funnel people to TCC, and we have Loyal Source, we

 9   have the health system, we move people onto ICE and HHS.

10        And that's -- that's the way the system is designed, but

11   we build in -- we tried to build a system that doesn't have a

12   single point of failure and that also has layers of defense,

13   and this is an additional layer of defense because we have

14   this unique capability, which is our EMTs, and so we have them

15   available as appropriate in sort of limited circumstances.

16             THE COURT:  Counsel -- counsel, let me interrupt

17   you.  We need to take a recess.  I mean, we're not working

18   very hard, but Erica is.  She needs a --

19             MS. BALASSONE:  Absolutely.

20             THE COURT:  She needs a break.  So let's take a

21   recess for 10 minutes.

22             THE WITNESS:  Yes, Your Honor.

23             (Recess taken.)

24             THE COURT:  All right, counsel.  Go ahead.

25             MS. BALASSONE:  Thank you.

                        UNITED STATES DISTRICT COURT

1    BY MS. BALASSONE:

2    Q.   Dr. Tarantino, you testified that there are medical

3    contractors at TCC; right?

4    A.   Yes.

5    Q.   And you testified that they started in the summer.  Is

6    that the summer of 2019?

7    A.   Yes.

8    Q.   You also testified that there are medical contractors in

9    Nogales; right?

10   A.   Yes.

11   Q.   And you testified that those contractors started in

12   Nogales in December of 2019; right?

13   A.   Yes.

14   Q.   You testified that medical -- the medical contractor

15   structure is still in an expansionary phase.  Are there plans

16   to have medical contractors at any other station in the Tucson

17   Sector besides TCC and Nogales?

18   A.   Well, that's something that's constantly being assessed

19   based on the operational risk management methodology, so I am

20   not specifically aware of a set decision to establish a

21   specific additional location on a specific date, but I know it

22   continues to be assessed based on evolving conditions,

23   availability of resources, as we continue to -- are able to

24   put resources to the contract, and the contractor's able to

25   hire additional persons, and then we identify the next

 1   operational priority locations based on the parameters that

 2   I've discussed before.

 3   Q.   Is there any long-term vision, excuse me, to have medical

 4   contractors stationed everywhere in the Tucson Sector?

 5            MR. CELONE:  Objection, Your Honor.  I'm just

 6   concerned that some of this line of questioning might get into

 7   deliberative process, so I would just like to keep that in

 8   mind as the examiner is asking questions.

 9            THE COURT:  Okay.  I don't really know what that

10   means.

11            MR. CELONE:  I mean, as the -- I'm concerned that

12   the witness may be encouraged to disclose processes that are

13   under consideration by Customs and Border Protection, and

14   those are privileged under the deliberative process privilege.

15            THE COURT:  Okay.  We don't want to --

16            MR. CELONE:  I haven't heard any concerns just yet,

17   but as this line of questioning goes on, I just want --

18            THE COURT:  Well, let's wait until we hear your

19   concerns.

20            Go ahead.  Answer.  He can answer the question.

21   A.   Did you finish it?  Could you repeat it?

22   Q.   I sure can.  Is there any long-term vision to have all

23   stations in the Tucson Sector have medical contractors?

24   A.   Well, I think there is a long-term vision to right-size

25   our medical footprint based on the operational risk and

1    operational risk management assessments that are made.

2        I could certainly envision a circumstance where an

3    additional station might require medical support, but I can

4    envision scenarios where a station might not, and we don't

5    just put medical teams out in stations if there's not going to

6    be the appropriate volume or workload or -- we have to be

7    diligent about resources and about taxpayer dollars and about,

8    you know, having professionals engaged professionally instead

9    of just sitting and waiting.

10       So there is a long-term vision to right-size the medical

11   footprint, and that's going to continue to be informed by

12   operations and by volume demographics, remoteness, access to

13   care, time in custody, crowding, or not crowding, but volume

14   and census and those sorts of factors.

15   Q.   You testified that there are shifts in contractor

16   resources from time to time; is that correct?

17   A.   Yes.

18   Q.   So is it possible that the contractors currently at TCC

19   could be removed if, under the factors you identified, it's

20   determined that they shouldn't be there?

21   A.   Well, it's hard to speculate about hypotheticals.  I

22   think, you know, in the realm of anything being possible, you

23   know, you could talk about a lot of hypotheticals.  My

24   understanding is that the -- my understanding and my intent

25   and my guidance and my advice is that the medical support

1   requirement at Tucson Sector, TCC, has been validated and is

2   valid, and the intent is to continue this contract.  This

3   contract is not a short-term stopgap measure.  It's meant to

4   be a long-term solution.

5        Now, could you imagine a hypothetical in some location,

6   maybe not even in Tucson Sector, where we currently have

7   medical support, but then, for whatever reason, we go six

8   months where not a single person is brought into holding or

9   custody?  Would we then, in that hypothetical situation, look

10  at moving that medical team somewhere else?  I would have to

11  say almost certainly.

12       But again, you're getting into a lot of hypothetical

13  situations.  I don't see us as being anywhere near that at the

14  TCC, but, you know, the construct is meant to be scalable and

15  flexible and adaptable to operational circumstances, and I

16  think that's how it will unfold.

17       But I do not envision, have not heard any talk, I don't

18  personally see any time on the horizon a driver to change the

19  medical support at TCC, if that's what you're asking.

20  Q.   And the same --

21  A.   Well, I mean, that may not be what you're asking, but

22  I'll make that point.

23  Q.   And the same is true for Nogales, that there is

24  flexibility built into the approach such that at some point

25  they could not be there, the medical contractors?

CROSS OF TARANTINO
JANUARY 17, 2020 (DAY 5, PART 1)

1   A.   Well, I would just go back to my same answer, that

2   there's a lot of hypotheticals involved, but for Nogales, I

3   haven't seen any indication or have not been party to any

4   discussions and my recommendations have not changed that the

5   medical support -- the requirement for the medical support at

6   Nogales Station is valid and should continue, and the intent

7   is to continue it, you know, essentially indefinitely.

8        Like I said, this is a long-term solution.  It's not a

9   short-term stopgap solution.  This is a -- the entire effort

10  across the whole southwest border is an ongoing long-term

11  effort in the eyes of the CBP leadership.

12  Q.   And as things stand now, the medical contractor

13  arrangement could end in the future if Border Patrol decides

14  not to spend the money; right?

15  A.   Well, I think it's the reverse.  I think what could end

16  it is if it's not funded, it's not appropriated funding by

17  Congress, because obviously it costs money, and the

18  contractors aren't going to work for free.  So CBP and Border

19  Patrol are committed to it.  You can see it in that document,

20  that directive.  That's CBP policy, and it specifically talks

21  about the contract.

22       But if you read that document -- I'm not saying you

23  haven't read it, but if you -- if you look at it, it speaks to

24  the requirement for funding, which is out of CBP's control.

25  So it has to have the funding from Congress appropriated to

 1  fund this effort because it's, you know, it's a financially

 2  intensive effort.

 3      But that is not -- that is not a CBP or Border Patrol

 4  issue, in my perspective.  That's a congressional funding

 5  issue.  CBP and Border Patrol have signed on for this in

 6  writing, in that directive that was an exhibit already.

 7          MS. BALASSONE:  Mr. Lucero, please show page 1 of

 8  Joint Exhibit 915 as admitted.

 9  BY MS. BALASSONE:

10  Q.  Dr. Tarantino, you testified that this directive captures

11  or codifies where CBP is right now for the Tucson Sector; is

12  that right?

13  A.  This is a broad high-level document.  It doesn't get into

14  a level of detail such that -- it doesn't speak specifically

15  to a medical team at TCC, but it speaks to the operational

16  risk management methodology which was used to identify the

17  requirement at TCC.

18      So if that answers your question, that's my answer to

19  that.

20  Q.  So in the future, there could be additional directives or

21  policies that scale down the kinds of efforts that are

22  described in this document?

23  A.  Well, and can policy be changed?  I think policy can be

24  changed.  All I can speak to is that this is the current

25  policy of Department of Homeland Security, U.S. Customs and

1   Border Protection, and Border Patrol.  This is the policy that

2   captures the direction that we're going in, which includes the

3   contracted medical support at high-priority locations as

4   identified through the operational risk management

5   methodology, which in this case includes TCC and Nogales.

6       So this is in writing, and one of the reasons it was put

7   in writing was for questions like this.  It was put in writing

8   as official policy of the U.S. Government.  So that's where we

9   are now.

10  Q.   And you testified that Tucson Sector is doing more than

11  what this policy describes in that it's doing health

12  interviews for all detainees, and it's doing medical

13  assessments for all kids, even those between the ages of 12

14  and 18; correct?

15  A.   13 and 17, but yes.

16  Q.   Thank you.

17      So is it possible that those additional efforts that

18  Tucson Sector is doing at the moment they could decide not to

19  do at some later point?

20  A.   Well, my understanding of the Tucson Sector situation is

21  that -- well, let me just say that this is our practice across

22  the border, is to do health interviews on all persons where we

23  have the medical support at a minimum, because where we have

24  medical support, we health interview everybody who comes in,

25  this is other sectors, and all juveniles.  So that's our --

1    that's our practice everywhere.

2         We weren't able to commit to that formally in writing

3    because there are some locations that don't have medical

4    support yet or are so remote that that's just not going to be

5    feasible.  But within Tucson Sector, my understanding of the

6    situation here is that there is a separate requirement, I

7    think it was maybe imposed by this Court, to do health

8    interviews on all persons, and that's why -- that's one of the

9    reasons or I think why it couldn't be relaxed, because of

10   that.

11        But our guidance, again, is at-a-minimum guidance, where

12   you have the resources, such as the medical support at TCC,

13   then the health interviews should be on all persons, and the

14   medical assessment should be on all juveniles.  It's when you

15   get to places where you don't have resources or you get into

16   some really exigent circumstances where we fall back to that

17   minimum standard.

18   Q.   Would you agree that this document talks about where

19   medical contractors are and talks about operational -- things

20   that are caveated as where operationally feasible?

21   A.   Yes, and I'm aware of the -- of the concern about that

22   and the subject to interpretation nature of that.  Certainly

23   there was a lot of discussion of that as this document was

24   built.  That was meant to capture situations such as a mass

25   migration that just completely overwhelms available resources

 1  and/or congressional -- if Congress for some reason

 2  deappropriates funding for this, which these are things that

 3  are out of CBP control.

 4      It's essentially, I'm not a lawyer, essentially a force

 5  majeure type of situation or some situation whereby CBP just

 6  can't do -- can't do these things because they're just

 7  overwhelmed.  And that becomes a U.S. Government solution

 8  versus a CBP solution.  This is a CBP document, so that can't

 9  be written into here.

10      If we get into those situations where the funding doesn't

11  exist and then CBP will need Congress or someone else to give

12  them funding, that can't really be written in here because

13  this is a CBP document, or we need those Public Health Service

14  or Coast Guard teams again.  That can't be written in here

15  because this is a CBP document.  We can't commit them to

16  things in here.

17      But we are having those discussions, and we do have plans

18  with them to have those surge capabilities, but this is kind

19  of a focused, high-level snapshot-in-time CBP document.  It

20  shouldn't be interpreted as some sort of absolute restriction,

21  you know, an absolute box around our efforts.  It's sort of --

22  it's sort of a snapshot in time of where we are and where

23  we're going.

24  Q.  But if this document already contemplates caveats for

25  operational feasibility and where medical contractors are

CROSS OF TARANTINO
JANUARY 17, 2020 (DAY 5, PART 1)

1   located, why doesn't it say what the Tucson Sector and other

2   sectors are actually doing with regards to health interviews

3   and medical assessments, with those caveats?

4   A.   You mean why doesn't it -- why doesn't it capture what's

5   happening at every -- at every station along the southwest

6   border?

7   Q.   Well, my understanding is you testified that Tucson

8   Sector is already doing other things that are not in this

9   policy; correct?

10  A.   Right.

11  Q.   And that the goal is for all sectors to be doing that on

12  the southwest border, which is what this policy applies to,

13  with the exception of where it's not operationally feasible

14  and where there aren't medical contractors.

15       So why doesn't this document reflect what is actually

16  being done with those caveats?

17  A.   Well, I'm not sure -- a hundred percent sure I'm

18  following your question, but it is not -- because this is a

19  constantly evolving and enhancing process, and there's other

20  sectors that are in a different stage of the evolution, and

21  it's -- if this -- if we had captured that in November, it

22  would have changed -- for Tucson Sector, it would have changed

23  in December, because Nogales was stood up.  And then it will

24  change in January.  It will change in February.

25       We have to have at some point a static snapshot of a

1  dynamic process, so it's very hard to capture, you know, the

2  level of detail you're talking about in a static document when

3  it's describing a very dynamic process.  And so that's the

4  best I can say to that.

5      And that's why I caveat it that, the direction is that

6  this is a snapshot in time.  It's maybe -- it's the marching

7  orders to march onward from and continue to improve and

8  enhance our efforts.  It is not meant to say this is set in

9  stone forever, and we'll never do any more than this, and if

10  anyone ever tries to do any more than this, then that's wrong.

11  That's not what it represents.

12  Q.  So looking at this document, how does a Border Patrol

13  agent in TCC or Nogales know that they are supposed to do

14  health interviews, or anywhere in the Tucson Sector, know

15  they're supposed to do health interviews for everyone?

16  A.  Well, that hasn't changed.  This document did not change

17  that.  So they would have already known that, and they would

18  continue to know that, and they would continue to get that

19  guidance from their sector leadership, and this document does

20  not -- does not change that in any way.

21      Although I guess maybe, I think it's in this document,

22  the one thing that's changed is the form has been enhanced to

23  some degree, and that -- but that is in the e3 system, so they

24  just continue to fill out the form.  They'll notice -- and

25  we're told that there's some subtle changes to it, but they'll

1    continue doing what they've been doing and completing the

2    health interview form in e3, slightly modified and updated.

3         So this directive does not change that, and the practices

4    in that regard have not really changed.

5    Q.   So if it's not explicitly in this document, what

6    assurances are there that the Tucson Sector is going to keep

7    doing what it's doing in terms of efforts that are not

8    outlined in this policy document?

9    A.   I guess you're saying if somehow the other requirement to

10   do it were removed or something?  Because we know that there's

11   a requirement to do it in Tucson Sector.

12   Q.   My question --

13   A.   And so that's not going to change.  We're not going to

14   violate a requirement.

15   Q.   And by "requirement" you mean requirement by this Court

16   to do a health interview?

17   A.   Right.

18   Q.   And so if this Court were to no longer require Border

19   Patrol to do a health interview, are there any assurances that

20   the stations in the Tucson Sector would continue to do it for

21   all people?

22   A.   That would continue to be the intent and the practice.

23   Now, would there be -- is there a possibility that, in some

24   exigent circumstance such as, you know, a mass migration or a

25   group of a thousand, that that might be delayed or might be

1   prioritized to juveniles, which is the -- and one of the main

2   aspects of this is that it's really meant to really focus

3   limited resources on to the vulnerable populations of

4   juveniles.

5        So could there be a circumstance whereby, in some exigent

6   circumstance, mass migration or a remote location or a group

7   of a thousand, that juveniles were prioritized?  That could be

8   the -- that could be the case.  But the intent -- the guidance

9   and the intent and the practice is to do it on all -- I'm

10  sorry -- to do the health interview on all persons in custody.

11  Q.   So turning to health interviews that are performed at

12  TCC, you testified that those health interviews are performed

13  by either agents or medical contractors; right?

14  A.   Well, the intent is that they can be, per this document,

15  they can be done by agents or medical personnel.  At the TCC,

16  the practice is it's actually done by both, and it's done

17  collaboratively.  They're right there in the same location.

18  They're side by side.  They're near each other.

19       So agents will be asking these questions and documenting

20  them.  The medical personnel will also be asking them and

21  examining the patient and relaying any of those findings to

22  the agent, who can make sure it gets documented, and the

23  medical person can take any action that's appropriate

24  immediately or refer -- take them, escort them for medical

25  assessment, or declare an emergency or a public health issue

1    and proceed with masking and isolation, referral straight from

2    there, 911 or transport to the hospital.

3        So it's -- there is some redundancy, and there is -- and

4    it's done collaboratively.

5    Q.   And by collaborative -- collaboratively, you mean -- are

6    they done at the same -- is the contractor and the agent doing

7    the health interview at the same exact time together, or are

8    they doing them separately at different times?

9    A.   Well, I don't think either of those is right.  They're

10   doing it in a collaborative manner where they're -- each is

11   doing health interviews, but they may be -- they may be

12   overlapping.  There will be -- some will be separate, there

13   may be some overlapping, and then there may be -- so it's

14   done, you know, it's -- I went and saw it, and it's a very

15   well-choreographed dance, if you will, that they have down

16   pretty well, and so the health interview is being conducted

17   through an agent's prism but also through the medical prism,

18   and it's getting documented, and the appropriate actions are

19   being taken, and it's going quite well for a relatively

20   newly -- you know, newly advanced, newly adjusted process.

21       And we continue to learn lessons from it, and I got some

22   feedback from one of the agents yesterday.  I talked to the

23   medical person who's doing it.  We'll continue to, you know,

24   adjust the implementation or the execution of it.  We're not

25   adjusting the intent, but we can continue to refine and

1    enhance our processes from a systems perspective.

2        But it's going very well, and it's a very robust process.

3    Q.    And you testified that the agents fill out the alien

4    health interview questionnaire form; correct?

5    A.    Yes.

6    Q.    And you also testified that the medical contractors ask

7    questions, but they don't fill out the actual form; is that

8    correct?

9    A.    They will inform the agent who will fill it out.  So it

10   will be doubly verified, essentially.  And so we're not going

11   to have two separate, perhaps, potentially conflicting health

12   interview forms completed.  They will work with the agent to

13   put their inputs in along with the agents.  And so it will be

14   in our electronic systems, is the key point, to have it in e3.

15   Q.    And that's something the agent does that they take the

16   information from the medical contractor, and the agent is the

17   one who fills out the alien health interview questionnaire and

18   then puts it in e3DM?

19   A.    Well, it's part of -- it's not like and then they put it

20   in.  It's in.  It's part of it.  It's integral to it.  But

21   they enter it in there, yes.

22   Q.    So since the contractors aren't filling out their own

23   alien health interview questionnaire forms, are you just

24   relying on the reports that they are doing it, or how do you

25   know that it's actually being done?

1   A.   Well, I went there and watched and saw it being done, and

2   I know that as part of our -- we have task order monitors in

3   place who monitor the contractor to make sure they're

4   completing the required tasks.  We have contracting officer

5   representatives who monitor the contract.  We also have

6   medical quality management processes in place.  We've also

7   incorporated this monitoring into the work of our juvenile

8   coordinator who goes out and looks at monitoring and

9   compliance of our medical support efforts, to include the

10  health interview and the medical assessment.

11        So there is layers and layers and layers of review of

12  that, but also, you know, right back to the point of origin,

13  if you will, it gets entered.  It does get entered directly

14  into e3, without delay, without chance for forgetting or

15  missed documentation.  It gets entered directly in, and it has

16  two sets of eyes and two sets of perspectives that are

17  essentially duplicating that process and entering it straight

18  in, straight into the system.

19  Q.   But that entering of the system is being done by the

20  agent; correct?

21  A.   Yes.

22             MS. BALASSONE:  Thank you.  No further questions.

23             THE COURT:  Any redirect?

24             MR. CELONE:  No redirect, Your Honor.

25             THE COURT:  Doctor, I appreciate you being on board

COURT EXAMINATION OF TARANTINO
JANUARY 17, 2020 (DAY 5, PART 1)

 1   to attend to the medical issues for these people that are

 2   detained.  I have a couple of clarifying questions, if I may.

 3           Would you bring up Exhibit 881.

 4           MS. BALASSONE:  Would you like that on the screen,

 5   Your Honor?

 6           THE COURT:  Yes.  Let me see if I can find this

 7   testimony.

 8           Yeah, that's the standard form that's now being

 9   used?

10           THE WITNESS:  Yes, sir.  Yes, sir.

11           THE COURT:  All right.  We had a witness testify in

12   the case that, in his opinion, that wasn't adequate, and he

13   was critical of that form because there was nothing in it

14   about dental or dietary needs, suicide ideation, fever, cough,

15   night sweats, alcohol abuse, sexual abuse.

16           Do you have any comment about that observation?

17           THE WITNESS:  Well, sir, first of all, I think the

18   majority of those things are in there, and if we wanted to go

19   through them, I'm not contradicting you, sir, if we want to go

20   through, it does talk about fever.

21           It does talk about suicidal ideation, which we kind

22   of -- the layman's short-term for that is, "Are you thinking

23   about hurting yourself?"  Generally in practice you don't just

24   say, "Are you suicidal?"

25           So we said, "Are you thinking about hurting

UNITED STATES DISTRICT COURT

1  yourself," and that was in consultation with a number of

2  experts, "and/or others," is homicidal.  So you don't say,

3  "Are you suicidal?"  "Are you homicidal?"  We say, "Are you

4  thinking about hurting yourself or others?"

5         And so a lot of those are in there, but I think that

6  person's perspective may be a detention level, sort of intake

7  screening for detention level, and when you get into some of

8  the things -- yes, we don't ask about dental specifically, but

9  that would come out of pain, ill, injured, pain, are you

10  having any other issues, certainly if someone is having some

11  dental pain, that falls under observation.

12         So at some point this form, there was a real tension

13  between packing everything into this form to the point where

14  it's not going to be feasible to be done operationally and we

15  won't be able to do it on as many people and getting the real

16  critical highlights in there that need to be in a form that's

17  operationally feasible.

18         And we didn't cook this up on our own.  It was done

19  -- it took literally months and months and months.  It was

20  done through a very collaborative process with inputs from

21  internal -- internal CBP operations, medical privacy, CRCL,

22  which is Civil Rights/Civil Liberties Division, DHS

23  Headquarters, physicians at that level, physicians in Public

24  Health Service, in CDC.

25         We also talked to external groups about things.  We

1  looked at other examples that I knew from my career that we

2  use in refugee centers, that we've used in disaster settings,

3  from FEMA.  So we looked at a number of examples, and we

4  consulted widely, and this is what came out of a very lengthy

5  and involved deliberative process.

6          THE COURT:  All right.  Well, I'm not being critical

7  of it because I don't know enough.

8          THE WITNESS:  Sure.

9          THE COURT:  This was a witness in the case.

10          THE WITNESS:  Understood.

11          THE COURT:  And he used an example I think about

12  drug/alcohol abuse, because there might be some

13  pain/discomfort associated with that --

14          THE WITNESS:  Yes, sir.

15          THE COURT:  -- if there's a severe alcoholic or

16  something like that being in custody.  There might be some

17  issues, obviously, related to sexual abuse that's relatively

18  -- I don't know if it's common, but happens a lot that there's

19  abuse along the way, along the travel way, for these people,

20  and he was critical of that form because of some of those

21  omissions.

22          THE WITNESS:  Yes, sir.  The abuse question, that

23  comes up in other lines of questioning as part of the law

24  enforcement process, which I think is involved in that -- that

25  would -- we have to look out for trafficking of persons and

1   identify other legal, you know, illegal things that may have

2   happened or been happening, so -- but we did not -- there was

3   not a broad consensus to include that in here specifically.

4   We do ask about drug use, "Are you a drug user?"  That

5   question is in here.

6           So, you know, it was -- you know, will well-meaning

7   experts look at this form and come up with another question

8   that they would like to see on it?  Absolutely, and that was

9   part of this really ongoing deliberative process, and we ended

10  up with this.  The key point was in no way to regress from the

11  prior form, so there's nothing that was in the prior form that

12  isn't addressed in here.

13          THE COURT:  Got it.  All right.

14          Well, I may have been the problem with Exhibit 915,

15  that's that phases used at intake.  Let me come at it a

16  different way.

17          We're looking -- first place, we're looking at it

18  with legal minds --

19          THE WITNESS:  Yes, sir.

20          THE COURT:  -- some great and some small, but we

21  look at it as lawyers, and when I see a document that says

22  that something be done at a minimum, I read that to mean that

23  an officer could conclude that we have to treat these

24  juveniles differently, we have to do that, but we don't have

25  to do adults because it says at a minimum.  That was the

1    reason for all these questions.

2           Now, maybe it is a question of, when you describe

3    it, 915, as a high-level document, is that to say that it

4    really doesn't go out into the field?  It's for management and

5    supervisors as a policy statement?

6           THE WITNESS:  It is.  It is a high-level policy

7    document, sir, but it has been pushed out to the sectors and

8    to the field to guide their operations, but --

9           THE COURT:  Oh, okay.

10          THE WITNESS:  -- there are going to be detailed

11   implementation plans which will be much more oriented towards

12   the operators at the sector and station level, and we're

13   working with them on that now to build those -- those

14   implementation plans that will have additional detail.

15          THE COURT:  All right.  Well, here was my intent

16   with the preliminary order issued in this case, that all

17   detainees upon intake get a medical screening.

18          And you've been asked some questions.  If an order

19   is preliminary, that means it expires.  Does the Border Patrol

20   have to be ordered to do a medical screening for all

21   detainees?  Put another way, is there a written directive of

22   any type out in the field, in the Tucson Sector, that's what

23   I'm -- that's what I've got jurisdiction of in this case, not

24   Rio Grande, Tucson Sector -- is there a written guideline or

25   directive to all Border Patrol personnel that a medical

1  screening must be done for every person that comes into

2  custody?

3          THE WITNESS:  Sir, if you're -- if you are sort of

4  equating screening to our health interview --

5          THE COURT:  I am.

6          THE WITNESS:  Okay.  That helps.  Then I can't

7  personally vouch for a current written document in the Tucson

8  Sector.  I know that that is the guidance.  I know that that's

9  the policy in the Tucson Sector.  I know that's the practice.

10 I can't say that I know of a current, specific Tucson Sector

11 policy document in that regard, but I do know that that is the

12 policy.

13         So it's a fair question, obviously.  By definition

14 you asked if it's fair.  But I can't answer specifically about

15 that document.

16         THE COURT:  How can I rely on the fact that it will

17 be done in the future?

18         THE WITNESS:  Well --

19         THE COURT:  I mean, you know, that's the nature of

20 injunctive relief.  Let me give you a gross example.  Let's

21 say Border Patrol was ordered to put beds in.  Well, those

22 beds can be taken out; right?

23         THE WITNESS:  Yes, sir.

24         THE COURT:  The same with respect to this screening

25 process?

1              THE WITNESS:  Right.

2              THE COURT:  If the Border Patrol is not ordered on a

3     permanent basis to do medical screenings, they can just quit

4     doing them?

5              THE WITNESS:  Yes, sir, and what I would say is,

6     Border Patrol is permanently ordered now to do health

7     interviews/screenings on all juveniles.

8              THE COURT:  Right.

9              THE WITNESS:  In Tucson Sector, they are ordered to

10    do it on all -- all adults or all -- everyone, to include

11    adults.  So -- but that is specific to Tucson, and it's

12    specific to your injunction, if that's the right term.

13             Going forward, if that is relaxed, could Tucson

14    Sector, you know -- but I will say that the intent and the

15    guidance is to do it on everyone, to do it on all individuals,

16    to the extent possible, but you absolutely have to -- you have

17    to do it on all juveniles, because that's our top priority.

18             And I can tell you how that came out in that

19    directive, why it says health interview on all, minimum, all

20    juveniles, is because the juveniles are thought to be an

21    especially vulnerable population who oftentimes are unable to

22    speak up for themselves.  Sometimes they don't have the

23    awareness to know if they have a symptom or something or their

24    history.  And they deteriorate more quickly than adults, and

25    sometimes their symptoms are masked.

COURT EXAMINATION OF TARANTINO
JANUARY 17, 2020 (DAY 5, PART 1)

1      That's why the decision was made to have that

2  demarcation where we've got to get the interviews on all

3  juveniles.  Adults, more likely to be able to be observed,

4  self-report, understand what's happening, and not be --

5  they're more likely to come forward.

6      So that demarcation was essentially accepted and

7  approved by the experts and all the parties in CBP and DHS,

8  and it was socialized across the U.S. Government, to a large

9  extent, and that rationale was accepted, where it says, if

10  capable, if able, if the resources are there and we're not

11  under a giant influx, we're going to do health interviews on

12  everyone, but we're really putting a marker down as, we'll be

13  out of compliance if it's only juveniles.

14      Of course you're free to do what you -- what you

15  want to do.

16      THE COURT:  Yeah.

17      THE WITNESS:  Obviously.

18      THE COURT:  That's the problem.  And of course I can

19  be wrong.

20      Do you think, in your opinion, in your medical

21  opinion, do you think it's necessary to have at least some

22  type of medical screening process in place for all persons

23  taken into custody?

24      THE WITNESS:  I think the way we have that directive

25  written now is a very good balance of the operational sort of

COURT EXAMINATION OF TARANTINO
JANUARY 17, 2020 (DAY 5, PART 1)

 1   realities that we work in, plus the medical prerogatives that

 2   I need to enforce, and so I know that I'm building a system

 3   and we're building a system whereby, where we have the medical

 4   support, which is increasingly -- increasingly at any -- at

 5   any high-volume facility, everyone is going to get the health

 6   interview.

 7          Now, there may be some outliers and some

 8   circumstances where juveniles get prioritized.  I am

 9   comfortable with that medically.  It's -- I always -- I don't

10   want to -- I always would feel bad about signing us up for

11   something that we know we might fail at.  If we commit all

12   day, every day, all the time, we're going to do health

13   interviews on everybody, no matter the circumstances, that's a

14   very high bar.

15          We have said, all day, every day, whatever the

16   circumstance is, we're going to make sure we get it done on

17   juveniles, and we're going to strive on a daily basis to do it

18   on everyone.  I'm comfortable with that.  I think it is

19   reasonable, because we have other fail-safes in the system.

20   We have agent observation.  We have self-reporting.  We have a

21   low threshold for referral to the health system, if any issue

22   appears to be going on.

23          We look at patterns in terms of adverse events,

24   deaths in custody, you know, and we see, was that because

25   there was not a health interview or something like that?  We

COURT EXAMINATION OF TARANTINO
JANUARY 17, 2020 (DAY 5, PART 1)

 1   haven't really been able to show that or show data on that.

 2   You know, we haven't seen -- you know, although I think the

 3   order to have the universal health interview in Tucson was

 4   clearly well-intentioned, and -- but we haven't seen, you

 5   know, a marked difference in terms of outcomes between Tucson

 6   Sector, where they do it on everyone, and other sectors where

 7   they may do it on juveniles, probably for the reasons that I

 8   said, that adults, it's easier to tell if they're sick,

 9   they're more likely to come forward, and in most cases we are

10   doing it.

11         So certainly reasonable people could disagree on

12   this issue, but I think, when you're balancing the operational

13   and the medical, I think the way we have it laid out and the

14   direction we're heading, and to continue to give us the

15   discretion to continue to enhance that as resources come on, I

16   think is a very reasonable medical -- can be very reasonably

17   justified medically, and a lot of other experts who looked at

18   it thought so also.

19         And I'll take it even one step further, because the

20   medical assessment, we say tender age children, and why is

21   that?  Because that's a subset of an at-risk population, the

22   preteen.  Everyone will have gotten a health interview, but

23   the preteens are even more able to come forward and represent

24   themselves, and the preteens, they're less likely to

25   deteriorate as quickly.

COURT EXAMINATION OF TARANTINO
JANUARY 17, 2020 (DAY 5, PART 1)

1    So we had pediatricians look at that, and they said,

2    on the medical assessment piece, that is reasonable, because

3    it's pretty intensive.  Doing a medical assessment is pretty

4    labor intensive.  It takes time.  It can back up our

5    processing.  And ultimately, the more medical we lay on and

6    the more processes, the longer we prolong the custody, which

7    isn't good for anybody, because ultimately CBP wants to be as

8    efficient as possible to move forward people through.

9    THE COURT:  Well, does the use of Form 881 on all

10    detainees coming through the process seriously impair the

11    function of Border Patrol in its mission?

12    THE WITNESS:  In a day-to-day-type setting, no, but

13    if you get into -- as you get into a heavy surge or a crisis

14    or you get a group of a thousand, which we've had, I'm sure

15    you're aware of that, to then have to stop and formally do

16    this on every single person, that is a significant operational

17    challenge, and it's a significant undertaking.  And it does --

18    it does slow things down.

19    That's not to say it's not well-intentioned, but

20    there's always a balance, and we're trying to thread that

21    needle and walk a fine line and make sure medical is given the

22    same consideration as operational, because CBP does not want

23    any bad outcomes in our custody.  It's not like we're trying

24    to cut corners, because nobody bears the brunt of a bad

25    outcome more than our agents who witness it and have to live

COURT EXAMINATION OF TARANTINO
JANUARY 17, 2020 (DAY 5, PART 1)

1    with it, and of course we bear all the repercussions of it.

2                So we do not want any bad outcomes, and we're trying

3    to navigate that.  It's a very difficult environment.  I

4    understand how it looks from the outside, but from the inside,

5    we're really leaning forward to ensure that the right care at

6    the right time to the right person is happening.

7                THE COURT:  Do the El Paso and Rio Grande Sectors do

8    medical -- some kind of a medical screening on all detainees?

9                THE WITNESS:  The practice that I've been describing

10   is pretty universal.  They are not required to do the health

11   interview screening on all individuals.  The practice is to do

12   it where we have the medical support.

13               And the point is, where we have the medical support,

14   it's easier to do on everybody, because we have that

15   additional support, and it takes some of the burden off the

16   agents.  Where we have these more remote small stations, only

17   a small handful of agents, that's where it gets hard to demand

18   that they do it on everybody, and especially because a lot of

19   times people will only be there for not too long, and then

20   they're going to end up at another one of our feeder stations,

21   and it gets done there, where we have medical.

22               So in other sectors, per our policy, they are not

23   required to do a health interview on all persons, but the

24   practice is to do it --

25               THE COURT:  Gotcha.

1          THE WITNESS:  -- where I have medical.  And in those

2    sectors, RGV and El Paso, they've obviously been busier

3    sectors, we have a bigger medical footprint, and so they're

4    more able to do it.

5          THE COURT:  All right.  Nice discussion.

6          Did that lead to any questions from counsel?  Any

7    further questions?

8          MR. LONDEN:  There's nothing we need to ask, Your

9    Honor.

10          MR. CELONE:  Nothing further.  Your Honor.

11          THE COURT:  All right, Doctor.  Thank you very much

12    for coming here to talk to us.

13          THE WITNESS:  Yes, sir.

14          THE COURT:  You may be excused.

15          THE WITNESS:  Thank you.

16          MR. CELONE:  Your Honor, just for clarification, is

17    the witness dismissed or excused?  Because he has a flight

18    back to D.C.

19          THE COURT:  Yes.  He can leave; right?

20          MR. LONDEN:  (Nodding.)

21          THE COURT:  Okay.  Take off.

22          THE WITNESS:  Thank you.

23          THE COURT:  Big day in D.C., I'm sure.

24          THE CLERK:  Please raise your right hand.

25               DIANE SKIPWORTH, WITNESS, SWORN

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION OF SKIPWORTH
JANUARY 17, 2020 (DAY 5, PART 1)

1          THE CLERK:  Thank you.  Please be seated.

2          If you'd state your full name and spell your last

3     name for the record.

4          THE WITNESS:  Diane Skipworth, S-k-i-p-w-o-r-t-h.

5          THE COURT:  How do you do.

6          Go ahead, counsel.

7                    DIRECT EXAMINATION

8     BY MS. PARASCANDOLA:

9     Q.   Ms. Skipworth, would you please tell us what

10    certifications you possess.

11    A.   I am a registered dietitian, a licensed dietitian, a

12    registered sanitarian, a certified correctional health care

13    professional, and I'm certified in laundry and linen

14    management.

15    Q.   What's the difference between a registered and a licensed

16    dietitian?

17    A.   A registered dietitian is a national credential, and it's

18    registration through a national organization, whereas my

19    licensure is through the State of Texas.

20    Q.   And what does -- what's required to become a registered

21    dietitian?  Do you have to have an undergrad degree?

22    A.   Yes.  I have a bachelor of science in dietetics or

23    nutrition and passed an examination and then maintenance

24    through continuing education.

25    Q.   And what is required to become a registered sanitarian?

DIRECT EXAMINATION OF SKIPWORTH                    88
JANUARY 17, 2020 (DAY 5, PART 1)

1  A.   Also educational requirements and passing of an

2  examination and continuing education.

3  Q.   And when did you become a registered dietitian?

4  A.   In 1993.

5  Q.   Okay.  And when did you obtain your state licensure?

6  A.   In 1993.

7  Q.   And when did you become a registered sanitarian?

8  A.   In the late '90s.

9  Q.   And when did you become a certified correctional health

10  professional?

11  A.   In 2015.

12  Q.   And when did you become a certified laundry and linen

13  manager?

14  A.   I can't remember the exact date at the moment, but it was

15  in the early 2000s.

16           THE COURT:  I've never heard of that.  That's

17  awesome.  There's a laundry and what did you call it?  Laundry

18  and --

19           THE WITNESS:  A certified laundry and linen manager.

20  It's -- I had to learn a whole lot about things that most

21  people probably don't care about.

22           THE COURT:  Yeah.  Uh-huh.

23  BY MS. PARASCANDOLA:

24  Q.   And do you possess any degrees?

25  A.   Yes.  In addition to a bachelor of science in nutrition

DIRECT EXAMINATION OF SKIPWORTH
JANUARY 17, 2020 (DAY 5, PART 1)

1  or dietetics, I also have a master's degree in criminal

2  justice.

3  Q.   And when did you obtain your bachelor of science in

4  nutrition?

5  A.   In 1993.

6  Q.   Are you currently employed?

7  A.   Yes.  I'm employed by the Dallas County Sheriff's

8  Department in Dallas, Texas.

9  Q.   And how long have you been employed there?

10  A.   A little over 25 years.

11  Q.   And what is your title?

12  A.   I am the Director of Detention Support Services.

13  Q.   And what exactly do you do there?

14  A.   I oversee the food service and laundry sections of the

15  department.

16  Q.   And do you have any other recent professional experience

17  outside of your work for the Dallas County Sheriff?

18  A.   Yes, I do.

19  Q.   And what would that be?

20  A.   I do contract work for the Department of Homeland

21  Security for their Office for Civil Rights and Civil

22  Liberties, and I'm also a monitor for the Court.  I monitor

23  food service for Orleans Parish.

24  Q.   And with the second item that you just discussed, is that

25  -- are you a court-appointed monitor?

DIRECT EXAMINATION OF SKIPWORTH
JANUARY 17, 2020 (DAY 5, PART 1)

1   A.   Yes.

2   Q.   Okay.  And is that in connection with a court case?

3   A.   Yes, it is.

4   Q.   And what is that?

5   A.   It's the Lashawn -- the Lashawn vs. Marlin Gusman case.

6   Q.   And is that in Federal Court?

7   A.   Yes, it is.

8   Q.   Okay.  In the District of Louisiana?

9   A.   Yes.

10  Q.   Okay.  And have you also done any outside work for the

11  Department of Justice?

12  A.   Yes, I have.

13  Q.   Okay.  And what was that?

14  A.   I have done work for their special litigation section.

15  I've gone to a jail and a women's prison and done some

16  consulting work for them as a subject matter expert.

17  Q.   And these -- your subject matter in these projects was

18  environmental health in the correctional environment?

19  A.   Yes, and one was specifically nutrition.

20  Q.   Okay.  And have you ever testified in court as an expert

21  witness?

22  A.   Yes, I have.

23  Q.   And what matter was that?

24  A.   That was a case in Mississippi.  I was plaintiff's expert

25  for the ACLU.

DIRECT EXAMINATION OF SKIPWORTH
JANUARY 17, 2020 (DAY 5, PART 1)

1   Q.   Was that Dockery v. Epps?

2   A.   Yes.  I believe that the name changed towards the end,

3   but that was the initial name, was Dockery v. Epps, yes.  Epps

4   changed at the end.

5   Q.   And in what area of expertise were you qualified in, in

6   Dockery v. Epps?

7   A.   Environmental health and safety.

8   Q.   And who retained you in that litigation?

9   A.   The National Prison Project for the ACLU.

10  Q.   And what was that case about?

11  A.   Conditions in a prison in Mississippi.

12       MS. PARASCANDOLA:  Your Honor, at this time we

13  tender Diane Skipworth as an expert in environmental health,

14  nutrition, and sanitation.

15       MS. MAYER:  Without objection, Your Honor.

16       THE COURT:  Okay.  Accepted.

17  BY MS. PARASCANDOLA:

18  Q.   Ms. Skipworth, did you prepare a report in this case?

19  A.   Yes, I did.

20  Q.   And on what date did you finish and sign the report?

21       And you can -- if you can't remember exactly, a rough

22  estimate is fine.

23  A.   It was late October/early November of 2017.

24  Q.   And do you still stand by the opinions in your report?

25  A.   Yes, I do.

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION OF SKIPWORTH
JANUARY 17, 2020 (DAY 5, PART 1)

92

1  Q.   What information did you consider in writing your report?

2  A.   I considered quite a few things.  I did a site visit of

3  different Border Patrol Stations in the Tucson Sector.  I

4  looked at a number of documents.  I looked at some video, a

5  variety of different things went into my report.

6  Q.   Well, let's talk about the visits to the Border Patrol

7  stations.  So would it be fair to say that the first visits

8  were in 2015?

9  A.   Yes.

10 Q.   Okay.  And around the week after Thanksgiving?

11 A.   Yes.  It was the Monday, Tuesday, Wednesday after

12 Thanksgiving in 2015.

13 Q.   Okay.  And how many stations did you visit approximately?

14 A.   I believe it was five, I believe.  Four or five.  I think

15 it was five.

16 Q.   Okay.  And the next time you visited Tucson Sector

17 stations was that in September 2017?

18 A.   Yes, it was.

19 Q.   Okay.  And how many stations did you visit?

20 A.   I visited five stations.

21 Q.   Do you remember what they were?

22 A.   Yes.  The Brian A. Terry Station, the Ajo Station, the

23 Sonoita Station, the Willcox Station, and TCC.

24 Q.   And did you visit any Tucson Sector station subsequently?

25 A.   Yes.  In the latter of 2019, August 21st, 22nd, and 23rd

DIRECT EXAMINATION OF SKIPWORTH
JANUARY 17, 2020 (DAY 5, PART 1)

1   of 2019, I went to five different stations in the Tucson

2   Sector.

3   Q.   Do you remember what they were?

4   A.   Yes.  I went to Nogales, TCC, Douglas, Brian A. Terry,

5   and Ajo.

6   Q.   Did you use any special equipment on these inspections?

7   A.   Yes.  I used standard tools that I use on all of my

8   inspections: a thermometer to measure air temperature, a tape

9   measure, standard things I take with me.  I took a camera as

10  well to take some photographs.  That helps me remember what I

11  saw after the fact.

12  Q.   And during the site inspections, were you denied access

13  to anything that you needed to inspect?

14  A.   No, I was not.

15  Q.   Would it be fair to say that all of the stations have

16  more or less the same facilities, that is, they have, as the

17  Court was discussing yesterday, the sally port, the interior

18  entrance area where people go through a metal detector, the

19  processing area, the hold rooms, one or two hold rooms

20  reserved for showers or self-cleaning, a supervisory

21  observation area or what the agents call the bubble that

22  allows direct visual observation of the processing area and

23  hold rooms and has computer monitors streaming video, an EMT

24  room where basic first aid supplies are stored, a storage for

25  janitorial supplies, a designated area for storage of sleeping

DIRECT EXAMINATION OF SKIPWORTH
JANUARY 17, 2020 (DAY 5, PART 1)

 1  mats, a room for food preparation, a room for food storage?

 2      With some variation do all the stations have this same

 3  basic layout?

 4  A.   Yes.  I mean, all -- the stations vary somewhat.  Some

 5  are smaller.  I mean, obviously TCC is larger.  But all the

 6  stations have a very similar layout.  There's a sally port

 7  where the individuals come in.  They're preprocessed.  You

 8  know, the food preparation area, some had a room, some had a

 9  much smaller space.

10      But overall I think that they all had a bubble or also

11  kind of known as a control center, but yes, they all have a

12  similar layout.  That's a fair characterization, yes.

13  Q.   So can you tell us what areas of the stations you visited

14  during your inspections.

15  A.   Yes.  I mean, I visited the sally port of all the

16  sections.  I kind of did a -- asked to be walked through the

17  way an individual coming into the station would, so I started

18  in the sally port, came in through where they would come in

19  through, like through the medical detector or through the area

20  where they would be processed by the agent, you know,

21  initially, and where they would go into a room.

22      So I observed all those areas.  I did specifically ask to

23  see where the food was prepared.  I asked to see where

24  cleaning supplies or janitorial supplies were kept, and I

25  inspected those areas as well.  So I asked to see medical, you

DIRECT EXAMINATION OF SKIPWORTH
JANUARY 17, 2020 (DAY 5, PART 1)

1   know, first-aid-type rooms.  I observed those.

2        So I asked to see the general layout.  Facilities that

3   had showers, I looked at the showers, or facilities that had a

4   designated room for an individual to use a shower wipe, I

5   asked to see those areas as well.

6   Q.   So would it be fair to say you basically inspected the

7   entire station?

8   A.   I inspected the entire station where an individual coming

9   in -- most of the stations had other areas that agents and

10  different people use.  I didn't obviously look at those areas,

11  but I looked at all the areas that were applicable to the

12  individuals.

13  Q.   So were you present in court yesterday when Roland

14  Alexander testified about compliance evaluations?

15  A.   Yes, I was.

16  Q.   And what is your opinion of this compliance evaluation

17  process?

18  A.   I think the compliance evaluation process is -- I was

19  actually impressed with it, and I was impressed with his

20  testimony.  Self-inspections are always, you know, a very good

21  tool.  They're a best practice.  And I felt like he was very,

22  you know, very adamant about his work and very, you know, on

23  top of what he does, and I think that that's very important,

24  that you have someone in a role that strongly believes in what

25  they do.

1       And I thought that his testimony about the follow-through

2   with the -- I believe he called them after-action reports, I

3   thought that was very important, and the fact that he

4   testified about documenting both, you know, when he found

5   things that were compliant but when he also found things that

6   were noncompliant, because the entire purpose of inspection,

7   you know, self-inspections, is to find your internal problems.

8       If you're not inspecting to find what you're doing wrong,

9   then, you know, if you just have someone that's saying, yep,

10  we're doing this right, we're doing this right, we're doing

11  this right, there's really -- I mean, no one's going to be

12  doing anything right a hundred percent of the time.  At least

13  that's my opinion after having been in 25 years of the

14  business I've been in.  You know, it's -- I often say it's a

15  very imperfect world.  And, you know, I think that the

16  self-inspections are an excellent tool.

17  Q.   Are the compliance evaluations announced in advance?

18  A.   He said they were not, and I have no reason to doubt

19  that.

20  Q.   He referred to them as no-notice evaluations, I believe.

21  Is that --

22  A.   Yeah, I gathered that they were unannounced or no-notice,

23  yes.

24  Q.   And is it more effective if the inspector does it

25  unannounced?

DIRECT EXAMINATION OF SKIPWORTH
JANUARY 17, 2020 (DAY 5, PART 1)                                    97

1   A.    Oh, absolutely.

2   Q.    And why is that?

3   A.    Oh, well, I mean, you obviously, I think, as Your Honor

4   said the other day, you don't want to give people time to, you

5   know, polish the floors ahead of your visit.  So you know,

6   it's always better if someone doesn't know that you're coming.

7   Q.    And is it your understanding that the self-inspections

8   are done by a Border Patrol agent who works in the station or

9   by somebody outside?

10  A.    There's room for both.  You know, I think that the

11  advantage to having -- you know, I mean, I guess you're asking

12  about, when you say "outside," you mean someone still within

13  Border Patrol but that doesn't work at that particular

14  station?

15  Q.    Yes.

16  A.    Okay.  Yes, I mean, the advantage to that is they

17  understand the operation and the processes, but they don't

18  necessarily have a vested interest in saying, yes, my facility

19  is doing everything a hundred percent perfect.

20          MS. PARASCANDOLA:  Ms. Kershaw, would you please

21  show us Joint Exhibit 846.

22          Could you please scroll to the next page.

23  BY MS. PARASCANDOLA:

24  Q.    Ms. Skipworth, do you recognize this document?

25          MS. PARASCANDOLA:  And Ms. Kershaw, if you could

1   scroll down a few pages so she could have a look at it.

2   A.   Well, it looks like a memo regarding one of the

3   compliance evaluations.

4           MS. PARASCANDOLA:  Ms. Kershaw, could you please

5   scroll to page 5.

6           I'd like to ask plaintiffs' counsel to stop having a

7   conversation behind me.  It's quite distracting.

8           Thank you.

9           MR. LONDEN:  We apologize for any distraction.  We

10  will not --

11          THE COURT:  Well, you can do that.  Just move away

12  from the microphone, maybe.

13          MR. LONDEN:  We won't have conversations.

14          THE COURT:  All right.

15          MS. PARASCANDOLA:  Ms. Kershaw, could you scroll up

16  one page to page 4.  Okay.  Oh, I'm sorry.  They're out of

17  order.  If you could scroll down a couple pages to the

18  beginning of the checklist.

19  BY MS. PARASCANDOLA:

20  Q.   Ms. Skipworth, do you recognize this checklist?

21  A.   Yes.  I recognize this as one of the compliance

22  evaluation forms.

23  Q.   Uh-huh.  And in your opinion, is this adequate for

24  evaluating compliance?

25  A.   Well, I mean, I think that it's a good form for an

DIRECT EXAMINATION OF SKIPWORTH
JANUARY 17, 2020 (DAY 5, PART 1)

 1   inspection form, if that's what you're asking.  I mean, it's

 2   hard to -- I guess that's a little tricky question when you

 3   say "evaluating compliance."

 4   Q.   Of course.  So let's go through the form.

 5        So the first question is, you know, "Are the policies

 6   posted and visible and accessible for all agents to use?"  You

 7   know, why is that important?

 8   A.   Well, you want the agents to have availability to the

 9   policy so that they're aware of and have access to make sure

10   that they're following the policies and aware and know what,

11   and so if there's any question about what they need to do,

12   that they have access to the answer.

13   Q.   Uh-huh.  So let's go down to the area -- areas of this

14   form that are within your expertise.

15        So item number three on the form asks or has checkboxes

16   for such amenities as meals, drinking water, juice, baby

17   formula, welfare checks, medical care, including the medical

18   screening form, bedding and blankets, and other amenities.

19        Do you see that?

20   A.   Yes, I do.

21   Q.   Uh-huh.  And why is it important to have I guess a paper

22   form checklist that someone actually has to go in and fill

23   out?

24   A.   Well, it just provides a layer that someone has

25   physically, and I believe this is saying that the e3DM logs

DIRECT EXAMINATION OF SKIPWORTH
JANUARY 17, 2020 (DAY 5, PART 1)

1   were checked for those particular items.

2           MS. PARASCANDOLA:  Ms. Kershaw, would you scroll to

3   the next page.

4   BY MS. PARASCANDOLA:

5   Q.   And so question number five asks whether the fixtures I

6   guess in the hold room comply with the standards and are

7   functional, and why is it important to do this sort of

8   inspection and to document it?

9   A.   Well, you want someone to go in, of course, and make sure

10  that the, you know, that the fixtures are functional, you

11  know, that the professional cleaning and sanitizing is

12  performed and logged, you know, all the things listed, you

13  know, that the signage is indicating that the water is potable

14  or potable.

15      So it's very important to have someone ensure that these

16  things are in place.

17  Q.   And so the items that are asked -- that the form asks the

18  evaluator to check include toilet and sink, whether there is

19  professional cleaning and sanitizing at least once per day,

20  whether there are drinking fountains or clean drinking water,

21  along with clean drinking cups.

22      Actually, I wanted to ask you, based on your site visits,

23  did you observe that there were drinking fountains and clean

24  drinking water provided separately in five-gallon containers?

25  A.   Yes, I did observe that.

DIRECT EXAMINATION OF SKIPWORTH
JANUARY 17, 2020 (DAY 5, PART 1)

1   Q.   Okay.  And is it important to have signage indicating

2   that that water is potable?

3   A.   Yes.  It is important.

4   Q.   Uh-huh.  And why is that?

5   A.   Well, I think there's been confusion amongst individuals

6   about whether or not that water was clean, and I think that

7   just hopefully provides them some assurance that that is safe

8   to drink, you know, to -- you know, everyone wants clean

9   water, and anything that you can do to help someone understand

10  that that water is safe to drink is just an added layer of, if

11  nothing else, just understanding.

12       I did hear, you know, someone did -- the witness the

13  other day said that in her country it's not safe to drink that

14  water, and just letting her know, you know, beyond someone

15  verbally saying, you know, that this water is safe to drink.

16  Q.   And it says here that one of the items on the checklist

17  is to make sure there is adequate temperature control and

18  ventilation.  Why is that important?

19  A.   Well, of course temperature control and ventilation are

20  important in any environment, and checking the temperature to

21  make sure that it's within a comfortable range, comfortable

22  range is something that is really hard to establish, I think

23  that's already been established in some previous testimony,

24  but checking the temperature to make sure that it is in within

25  what could be determined in my area maybe called an acceptable

DIRECT EXAMINATION OF SKIPWORTH
JANUARY 17, 2020 (DAY 5, PART 1)

1   range.  There are some ranges of those and -- but making sure

2   that it's not, you know, really cold or really warm, making

3   sure -- number one, just making sure that the ventilation

4   system is working.

5   Q.   And item six on the form asks, "Does your location have a

6   process in place to ensure that juveniles are offered food and

7   liquids at appropriate times?"  And it refers to the TEDS

8   standards.

9        And you know what the TEDS standards are; right?

10  A.   Yes, I'm familiar with them.

11  Q.   Okay.  And so the evaluator checks four things, whether

12  the process ensures that juveniles are fed upon arrival,

13  whether they're provided water, milk and juice, and,

14  importantly, unlimited access, snacks, unlimited access to

15  that, and baby formula and toddler foods, and that they're

16  properly stored and labeled.

17       Why is it important to document that?

18  A.   Well, the question is asking, "Does your location have a

19  process in place to ensure" -- well, I mean, it's vital that

20  they ensure that the individuals meet the TEDS standards, that

21  they're provided food and snacks and of course, you know,

22  water and beverages, and the baby formula and toddler foods

23  are properly stored and labeled.

24       Baby formula and toddler foods, those are critical in

25  terms of -- I mean, the USDA requires that you not ever serve

DIRECT EXAMINATION OF SKIPWORTH
JANUARY 17, 2020 (DAY 5, PART 1)

1  anyone expired infant formula, and I did note that, when I was

2  in all the stations, they've taken the practice of taking like

3  a marker and putting -- they've done a best practice, it's not

4  a requirement, but they actually label every item.  They look

5  at what the use-by or sell-by, or infant formula the

6  expiration date, they take a marker, and they actually write

7  it on, in big letters, they handwrite it on the front of the

8  package, to help them with rotating the food items.

9       The agents at the facilities explained to me that,

10  because of the flow of people, sometimes it's greater,

11  sometimes it's lesser, and sometimes there's children, and

12  sometimes there's not, that these items may actually expire

13  because of they're not being used.

14       And so to assist with rotating that stock and making sure

15  that they discard it when it does go out of date, that they've

16  taken the step of putting that on the front of it so that they

17  have this bigger visual reminder of, you know, okay, this

18  expires, you know, 1 of '20 or January of '20, so when this

19  January rolled around, they would know to discard that, and it

20  would also help them as a reminder to, I need to, you know,

21  order more or buy, you know, purchase more.

22  Q.   So is this an additional check to ensure that people in

23  custody are receiving fresh food or food that is not expired?

24  A.   Yes, I believe it is, yes.

25  Q.   Okay.  And in your observations, did all of the stations

DIRECT EXAMINATION OF SKIPWORTH
JANUARY 17, 2020 (DAY 5, PART 1)

1   have this practice in place?

2   A.   Yes, I observed it in all of them.

3   Q.   And what would be other reasons to label the food

4   prominently with the sell-by or expiration date?

5   A.   Well, just to make sure that the -- so that if the -- one

6   of the things I think is really important is to promote

7   comfort and to make sure that the individuals provided the

8   food also feel secure with the food.  I mean, you know, you

9   want to promote a sense of -- you don't want them to be

10  concerned about whether or not this is something safe for them

11  to eat.

12       There's been discussion about or testimony about an

13  expired burrito and some discussion about the coding of the

14  dating, and so by adding that on there, individuals may or may

15  not be concerned, but at least, you know, you want people to

16  feel safe with the food that they're provided, and when you

17  give someone something that is expired, they don't have a

18  sense of safety or security, and so, you know, to promote, you

19  know, you don't want to serve the individuals expired foods.

20  It does -- it's not good for the overall running of the

21  facility or the morale of the facility.

22  Q.   Ms. Skipworth, I won't go through the remainder of the

23  form here because I know you've reviewed it.  In your opinion,

24  do you find this to be a very thorough and complete form and

25  process for evaluating compliance?

DIRECT EXAMINATION OF SKIPWORTH
JANUARY 17, 2020 (DAY 5, PART 1)

1  A.   Yes, I believe it's a -- I believe it's a good and

2  thorough form, yes.

3          THE COURT:  All right, counsel.  That's probably a

4  good place to stop now for a noon recess.  So we'll be at

5  recess until 1:15.

6          Ms. Skipworth, you'll be back on the stand, 1:15, so

7  don't get lost.

8          All right.  We'll be at recess.

9          (End of Day 5, Part 1.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JANUARY 17, 2020 (DAY 5, PART 1)                    106

1                    C E R T I F I C A T E

2

3          I, Erica R. McQuillen, Federal Official Realtime

4    Reporter, in and for the United States District Court for the

5    District of Arizona, do hereby certify that, pursuant to

6    Section 753, Title 28, United States Code, the foregoing is a

7    true and correct transcript of the stenographically reported

8    proceedings held in the above-entitled matter and that the

9    transcript page format is in conformance with the regulations

10   of the Judicial Conference of the United States.

11          Dated this 17th day of January, 2020.

12

13                      s/Erica R. McQuillen
                   Erica R. McQuillen, RDR, CRR
14                 Federal Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

                    UNITED STATES DISTRICT COURT