1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF ARIZONA

3   Jane Doe #1; Jane Doe #2; Norlan Flores   )
    on behalf of themselves and all others    )
4   similarly situated,                       )
                                              )
5           Plaintiffs,                       )
                                              )   CV-15-0250-DCB
6        vs.                                  )
                                              )   Tucson, Arizona
7   Chad Wolf, Acting Secretary of            )   January 17, 2020
    Homeland Security; Mark A. Morgan,        )   1:16 p.m.
8   Acting Commissioner, U.S. Customs and     )
    Border Protection; Carla L. Provost,      )
9   Chief of United States Border Patrol,     )
    in her official capacity; Roy D.          )
10  Villareal, Chief Patrol Agent-Tucson      )
    Sector, in his official capacity,         )
11                                            )
            Defendants.                       )
12  _____  )

13

14            REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                  BENCH TRIAL DAY FIVE

16         BEFORE:  THE HONORABLE DAVID C. BURY
                UNITED STATES SENIOR DISTRICT JUDGE
17

18

19

20

21  Cheryl L. Cummings, RDR-CRR-RMR-CRC-CRI
    Official Court Reporter
22  Evo A. DeConcini U.S. Courthouse
    405 West Congress, Suite 1500
23  Tucson, Arizona 85701
    (520)205-4290
24
    Proceedings Reported by Stenographic Court Reporter
25  Transcript Prepared by Computer-Aided Transcription

APPEARANCES

**For the Plaintiffs:**
        Morrison & Foerster, LLP
        By:  JACK W. LONDEN,  ESQ.
        425 Market Street, 32nd Floor
        San Francisco, California 95105

        Morrison & Foerster, LLP
        By:  COLETTE R. MAYER, ESQ.
        755 Page Mill Road
        Palo Alto, California 94304

        Morrison & Foerster LLP - Tokyo Japan
        By:  PIETER S. DeGANON,ESQ.
        Shin-Marunouchi Bldg.
        5-1 Marunouchi 1-Chome, 29th Fl.
        Tokyo, Japan

**For the Defendants:**
        United States Department of Justice
        By:  SARAH B. FABIAN, ESQ.
        By:  CHRISTINA PARASCANDOLA, ESQ.
        P.O. Box 868 Ben Franklin Station
        Washington, D.C., 20044

        United States Department of Justice
        By:  WILLIAM C. SILVIS
        Civil Division Office of Immigration Litigation
        450 5th St NW
        Washington, D.C., 20001

```
 1                        EXAMINATION INDEX

 2   WITNESSES CALLED ON BEHALF OF THE DEFENSE

 3   DIANE SKIPWORTH

 4        DIRECT BY MS. PARASCANDOLA                    4
          CROSS BY MS. REINER MAYER                    24
 5

 6

 7                        EXHIBIT INDEX

 8                                                    ADM
 9    862                                             10

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2        (Proceedings commenced at 1:16 p.m., as follows:)

 3              THE COURT:  All right, Counsel.  Go ahead.

 4              MS.  PARASCANDOLA:  Ms. Kershaw, would you please

 5    show us joint Exhibit 844?

 6              Thank you.

 7         DIANE SKIPWORTH, DEFENSE WITNESS, PREVIOUSLY SWORN

 8                    DIRECT EXAMINATION (Continued)

 9    BY MS. PARASCANDOLA:

10    Q.   So, Ms. Skipworth, do you recognize this document?

11    A.   Yes.  It looks like a memo regarding a compliance

12    evaluation for the Nogales facility.

13    Q.   And what -- on what date was the facility compliance

14    evaluation completed?

15    A.   It states November 7th, 2019.

16    Q.   Okay.  And so, would you please look down to the last

17    paragraph of the page.  This is page 2 of joint Exhibit 844.

18         And a couple of sentences in, it says that the lead

19    evaluator noted three record documentation discrepancies in 2

20    of the 30 e3DM events sampled.  The three findings were of

21    snack times which exceeded the interval standard of every

22    four hours.

23         Do you see where I read that?

24    A.   Yes.

25    Q.   Okay.  So would that be a reason to do some follow up or
```

 1  corrective actions?

 2  A.   Yes.

 3  Q.   And in your experience, is it -- would it be reasonable

 4  to expect perfection?

 5  A.   No.  This has to do with entering snack times into the

 6  detention module.  I would say it doesn't necessarily mean

 7  that the individuals did not receive snacks.  It wasn't

 8  entered into the e3DM; hopefully, they did receive the snacks.

 9  The individuals, it's my understanding, can also ask for

10  snacks at other times besides the snack times.  And in the

11  testimony yesterday, it was also stated that in instances like

12  this they can follow up with the video recordings, and go back

13  and check to see if the individuals did, in fact, get their

14  snacks or meals if it were a meal.

15  Q.   And yesterday I believe that Mr. Alexander testified that

16  he will -- when he makes a note of discrepancies like this, he

17  brings it with him on his subsequent compliance evaluations

18  and then looks to see that any problems like this have been

19  fixed.  Did I remember that correctly?

20  A.   Yeah.  That's -- yes.  That's what he said, was that

21  he -- he takes the previous compliance evaluation with him on

22  subsequent inspections and checks not only for new

23  discrepancies, but he also follows up with previous

24  discrepancies.

25  Q.   Is this a recommended practice?

1   A.   Yeah.  It's definitely a recommended best practice.

2            MS. PARASCANDOLA:  Ms. Kershaw, you may remove that

3   exhibit from the screen.

4   BY MS. PARASCANDOLA:

5   Q.   So do the Tucson Sector stations have showers?

6   A.   Some of them have showers.  And it's my understanding

7   that showers -- when I was -- when I did my inspections in

8   2017, showers were being added to several of the stations.  I

9   believe that that has been completed at this point.

10  Q.   So where there is no shower, is a paper shower or body

11  wipe sufficient to clean oneself in your opinion?

12  A.   Yes.

13  Q.   And during your on-site inspections, did you look to see

14  whether the people in custody had access to soap in the hold

15  rooms where the sinks or faucets were?

16  A.   During my inspections, I did check all of the soap

17  dispensers to see if they contained soap by going around to

18  each soap dispenser and checking it.  And the soap dispensers

19  I checked did contain soap.

20  Q.   And did you find that this was an acceptable practice to

21  keep soap and make sure that that -- or, that there are

22  systems in place to make sure that was always provided to

23  people in custody?

24  A.   It is my understanding that the janitorial contractor

25  refills the soap dispensers.

1   Q.   So is it your understanding with the paper showers, just

2   going back to that, that if a person would like an additional

3   paper shower or body wipe, that they can ask for one?

4   A.   Yes.  That's my understanding.

5   Q.   And it's one thing for the agents to say that, you know,

6   someone in custody could always ask for another body wipe or

7   soap or shampoo.  But if people don't know about it, they

8   don't know that they can ask for it or they might not feel

9   comfortable asking for it; correct?

10  A.   That's correct.

11  Q.   So how would Tucson Sector overcome that?

12  A.   Tucson Sector has implemented signage.  One of the -- one

13  of the practices that I did observe was that they put up large

14  poster-size signs that said, you know, if you need additional

15  food or hygiene supplies, you can ask for them.  The sign was

16  in Spanish and it actually had pictures of various items, you

17  know; and related to diapers, wipes, various food items.  So I

18  think that was -- I was told that was in -- you know, to help

19  the individuals know that, you know, you can ask for these

20  things in addition.  And would also be a good visual to -- you

21  know, it had a large picture of the items, so someone could

22  even possibly point to it if they needed to.

23  Q.   And would this be -- is this an accepted practice?

24  A.   I mean, I think it's a good practice.  I think that these

25  are not normal circumstances, so I don't know that -- I

1   haven't encountered this, you know, anywhere else, but I think

2   that that is a very good practice on their part.

3   Q.   And, Ms. Skipworth, in your opinion are the people in

4   custody provided adequate drinking water?

5   A.   Yes, they are.

6   Q.   And how are they provided the water?

7   A.   Well, there's -- I observed two different sources of

8   water.  They either -- well, for the most part, two sources.

9   Actually, three different sources.

10       So there was the bubblers in the holding cells,

11  five-gallon water containers, Igloo-style water containers, if

12  you will.  And then, in some instances, I have seen

13  individuals with bottled water.  And they also do provide

14  bottled water for them to -- individuals that need to prepare

15  infant formula from the packets for their babies.  They

16  provide bottled water for that purpose, which you would need

17  to provide bottled water for preparation of infant formula.

18  Q.   Ms. Skipworth, do the Tucson Sector stations have a food

19  preparation area that has equipment to actually cook food,

20  like an industrial range and an oven and a dishwasher and

21  those types of kitchen equipment that you would see in,

22  perhaps, like a jail that you would supervise?

23  A.   No.  The Border Patrol stations do not have kitchen

24  facilities.

25  Q.   What kind of equipment do they have for preparing food?

1  A.   What I observed in the stations was burrito -- well,

2  institutional food warmers.  They have freezers.  They have

3  equipment that they specifically brought in for the

4  preparation of what they are -- what they are doing, and it's

5  appropriate for what they do.

6  Q.   And do you remember what, generally, Tucson Sector

7  provides for people in custody to eat?

8  A.   Yes, I do.  They provide -- well, it's changed.  I

9  mean -- I mean, well, let me -- let me rephrase that.

10       So they provide burritos, they provide crackers, and

11 juice as a starting point.  And then -- as I started in 2015.

12 When I came back for the second inspections in 2017, they had

13 added additional items.  And then in 2019, they had added even

14 more items.  And then I'm aware that they just implemented a

15 new contract with the new fiscal year for even more items,

16 food items.

17 Q.   And is it your opinion that in 2017, the food that Tucson

18 Sector was providing people in custody was nutritionally

19 adequate?

20 A.   The food -- the food is nutritionally adequate for -- for

21 generally healthy people, yes.

22 Q.   And would it be fair to say that it's unlikely that a

23 healthy person in custody would suffer any long-term

24 deficiencies based on a one- to three-day stay in a hold room?

25 A.   That is correct.

 1            MS. PARASCANDOLA:  Ms. Kershaw, would you please

 2   pull up joint Exhibit 862?

 3   BY MS. PARASCANDOLA:

 4   Q.   And, Ms. Skipworth, if you could look at this and tell me

 5   if you recognize what it is.

 6   A.   Yes.  It is the food contract for the new fiscal year for

 7   the -- for the stations.

 8   Q.   Can you tell me when it was signed?

 9   A.   It says date signed, 8-27 of 2019.

10            MS.  PARASCANDOLA:  And defendants wish to offer

11   this, to have this admitted into evidence.

12            MS. REINER MAYER:  No objection.

13            THE COURT:  It's admitted.

14       (Exhibit 862 entered into evidence.)

15            MS. PARASCANDOLA:  Ms. Kershaw, would you please

16   scroll down to page 5?

17   BY MS. PARASCANDOLA:

18   Q.   So yesterday Agent Davison testified that under this new

19   food services contract, Tucson Sector now offers additional

20   items including egg burritos, skim milk, fruit cups, raisins

21   and other things.  Does this confirm your opinion that Tucson

22   Sector is providing nutritionally adequate food?

23   A.   Yes.  I mean, I think that this is -- it confirms my

24   opinion and it's an improvement.  You know, what they've been

25   providing is nutritionally adequate, but it's not ideal.  And

1  even by my conversations with them, a burrito and a package of

2  crackers and a juice is by no means an ideal meal.  But with

3  the implementation of additional food items, more variety and

4  the ad hoc things that I referenced a minute ago, and that's

5  what I was talking about when I said I had seen additional

6  things, those additional things really helped form my opinion

7  especially when it comes to baby food and toddler food.

8      And before this contract even, they had implemented shelf

9  stable milk, more variety of snacks particularly for children.

10  Those things are extremely important.  And now to have those

11  on not just an ad hoc basis, but to have those on a

12  contractual basis even shores that up further.

13  Q.   And if someone in custody would like some more to eat,

14  can they always ask for additional food?

15  A.   Yes.  That's my understanding.

16  Q.   Did you inspect the food storage areas at the stations?

17  A.   Yes, I did.

18  Q.   And did you find that the conditions there were adequate

19  for food storage?

20  A.   Yes, I found the food storage areas to be clean and

21  sanitary.  I found frozen items and things under temperature

22  control to be within acceptable standards for those items.

23  Q.   And so just breaking it down into nonperishables and

24  perishable items, what assured you that the nonperishables

25  were being -- or, stored in an acceptable way to you?

1   A.   Well, as I talked about earlier, they were labeling

2   things with dates, rotating stock based on those dates.

3   Things were in a clean, very organized manner in general, yes.

4   Q.   And tell us about the frozen items.  What did you do to

5   inspect and to, you know, determine whether they were being

6   stored in a way that would meet, you know, a dietitian's

7   standards?

8   A.   Frozen items, I checked the temperatures with the

9   thermometer.  Everything, you know -- and frozen items are a

10  little easier.  Frozen items have to be frozen to the touch.

11  Things were frozen.  I observed, looked at their written

12  processes for rotation of foods.  Observed that.  They had

13  logs regarding the inventory and logs regarding how they

14  rotate the foods.  I looked at all of that.  I found all of

15  that to meet appropriate standards and all of that was --

16  appeared fine and appropriate to me.

17  Q.   So turning to the mylar blankets, is it your opinion that

18  the mylar blankets are adequate for warmth in the hold rooms?

19  A.   Yes.  Mylar blankets, when an individual wraps a mylar

20  blanket around themselves, it traps in the warmth of the body

21  and it deflects air currents away from the body.

22  Q.   And is there any reason why a mylar blanket would be

23  suitable in this environment?

24  A.   Mylar blankets in this environment are suitable from a

25  sanitation point of view.  There's been discussion about their

1    inability to find someone to process and do their laundry.

2    And so given the fact that they can't find anyone to

3    process -- when I say "process," wash and -- you know, take

4    and wash and dry and return or have an on-site laundry, then

5    the mylar blanket is a -- is a sanitary, suitable, appropriate

6    alternative to a cloth blanket.

7    Q.   Does each person receive a new mylar blanket or do they

8    reuse them in the Tucson Sector stations?

9    A.   To the best of my knowledge, everyone receives a new

10   blanket.  There is no sharing or -- no re -- I shouldn't say

11   there's -- you know, there should not be sharing and there is

12   no reuse.  From what I saw, once the blankets are used, they

13   are discarded.

14   Q.   And that would also make it something more sanitary;

15   right?

16   A.   Oh, absolutely.  Yeah, they should not be reused.

17   Q.   And is it your understanding that anyone who received a

18   mylar blanket but would like another one can request one if

19   necessary?

20   A.   Yes.

21   Q.   And is it your understanding that everyone receives a

22   mylar blanket when they arrive and therefore there's no need

23   to share?

24   A.   Yes.

25   Q.   But wouldn't a cloth blanket be preferable, I mean, for

 1   warmth and for sanitary reasons?

 2   A.    Well, I mean, I think a cloth blanket would be preferable

 3   to the individuals for comfort.  And I think if cloth blankets

 4   are -- you know, if there was a means to properly launder

 5   them.  But absent the means to properly launder them, then the

 6   mylar blankets are probably the best alternative.

 7   Q.    So, I mean, based on the circumstances, a mylar blanket

 8   is an appropriate alternative to cloth blankets; correct?

 9   A.    Yes.

10   Q.    Okay.  So turning to hold room temperature and speaking

11   of warmth, during your 2019 visits did you take temperature

12   readings in the hold rooms that you inspected?

13   A.    Yes, I did.

14   Q.    Could you summarize your findings regarding the hold room

15   temperatures?

16   A.    During 2019, I measured temperatures on average

17   between -- amongst the five facilities between 70 -- on

18   average, between 70 and 72 with the exception of Brian A.

19   Terry.  I had several readings a little over 69 degrees at the

20   Brian A. Terry facility.

21   Q.    And I'm sorry if I misheard you, did you say the

22   temperatures ranged between 70 and 72?

23   A.    I'm sorry, 70 -- they ranged -- several temperatures 70,

24   72 and 74.

25   Q.    Do you think that 72 degrees is excessively cold?

1  A.   I do not believe 72 degrees is excessively cold.

2  Temperatures -- temperatures is one of those things that's

3  highly subjective, and thermal comfort is highly subjective.

4  And that is one of the hardest things to evaluate when you're

5  doing -- when I'm doing inspections.  I can go into a -- just

6  for lack of a better room, I can go, you know, for -- just for

7  comparison sake, I can go into a large cell in, say, a jail

8  and there might be -- let's just say 24 people in there.  And

9  half the people may say that they're comfortable at 72, and

10  half the people may say they're uncomfortable at 72.

11      It's not too much unlike an office where people are

12  comfortable at one temperature and other people are

13  uncomfortable at one temperature.  And, you know, it

14  doesn't really -- you don't have to be an environmental health

15  person or sanitarian to know that; it's just kind of -- of

16  life.  And, you know, it has to do with, you know, I dare say

17  everyone in this courtroom today at the whatever given

18  temperature we're at, you know, I may feel a little more

19  uncomfortable because I'm up here and I'm a little bit

20  nervous.  And, you know, and someone sitting in the back of

21  the room may feel warm and someone on the other side of room

22  may feel cool.

23      It depends on what we're wearing, it depends on our

24  metabolism.  There are so many factors involved in thermal

25  comfort that it's hard to say.  72 is -- has kind of become

1  nationally kind of the setpoint.  Although with the move

2  towards greener buildings and trying to control energy costs

3  and those kinds of things, there's been a movement to actually

4  kind of increase that up a little bit.

5  Q.   Is the 72 degrees based on any public health rationale?

6  A.   Well, there's a variety of different recommendations,

7  depending on which set of standards that you look at.  One of

8  the sets of standards that I looked at and referenced is

9  called an ASHRAE standard, the American Society of Heating,

10 Refrigerating and Air-conditioning Engineers.  And they

11 actually give two different setpoints.  One goes from 68.5 to

12 75 and then from 75 to 80.5.  And the two different standards

13 are one is for summer and one is for winter.  And part of the

14 rationale is basing that on typical clothing that would be

15 worn for those seasons.

16     I kind of extrapolated that you might even kind of want

17 to consider more the summer one for the Tucson area, but

18 that's not necessarily true.  You know, having been here the

19 past few days, it's been a little bit cooler, but it's

20 definitely not as, you know, cool as if you were somewhere

21 like Michigan or Maine.  So you have to take all those factors

22 into consideration.

23 Q.   Ms. Skipworth, when you testified just a few minutes ago

24 that you found the temperature range was between 72 and

25 74 degrees, is that consistent with Agent Davison's testimony

1    yesterday that the rooms are maintained at 74 degrees?

2    A.   I believe that's consistent with her testimony.  There's

3    going to be some variability.  You know, I think she was

4    speaking probably -- well, I can't really put words in her

5    mouth.  But, you know, if it's a setpoint average of 74, a

6    reading of 72 isn't -- isn't that off.  I mean, it sounds

7    significant, but when you're looking at a range of

8    temperatures, you can have some variability, depending on

9    where you are in the room or, you know, what your calibration

10   of your thermometer is.  But I don't -- you know, I don't

11   think that my -- a couple of readings of 72 had -- and that

12   was kind of a random sample of some readings.  Had I taken

13   more readings, I might have had a little -- you know, a little

14   bit different finding.

15   Q.   And on your site inspections, did you see any evidence

16   that Tucson Sector monitors hold room temperatures?

17   A.   Yes, I did.  Several different ways.

18        One of the things that I saw was outside of each hold

19   room, there is, like, a dry erase board.  And each shift the

20   agents take a temperature inside the hold room and write that

21   down on the dry erase board.  And so they're monitoring it and

22   minimally each shift, which is a really good practice, so they

23   can see what's going on kind of in real-time as they go

24   through the 24-hour-a-day periods.  And then, of course, you

25   know, there's building automation systems that are also

 1  monitoring the temperatures in I believe most of the

 2  buildings.

 3  Q.   So, Ms. Skipworth, do the Tucson Sector hold rooms

 4  contain benches where people can sit or lie down?

 5  A.   Yes, they do.

 6  Q.   And what are the surfaces of these benches and of the

 7  hold rooms generally?

 8  A.   Most of them were concrete.  Some of them were wood.

 9  Q.   So from a sanitation perspective, why does that matter?

10  A.   Well, from a sanitation perspective, you want something

11  that's easily cleanable because you've got a lot of turnover

12  of individuals.  And so while it would be probably preferable

13  to a lot of individuals to have something that might be more

14  comfortable, you want something that is readily cleanable for

15  purposes of making sure that there's not, you know, bacteria

16  and viruses and other things growing on it.  So when you have

17  a hard surface, that's going to be easier to clean than if you

18  have, you know, something that's cloth per se.

19  Q.   So this is actually protective of the health of people

20  who are in custody; correct?

21  A.   Yes.

22  Q.   But even though the -- a concrete surface would inhibit

23  the growth of micro-organisms, you still have to keep it

24  clean; correct?

25  A.   Of course.

1  Q.   Okay.  And can you tell us your opinion on whether Tucson

2  Sector does the appropriate level of cleaning?

3  A.   Yes.  I found that the Tucson Sector does an appropriate

4  level of cleaning.

5  Q.   And what is the basis for your opinion?

6  A.   First, I reviewed the -- well, first let me say my first

7  basis of that is observation of the stations and the hold

8  rooms.  I did inspections of them.  They weren't -- you know,

9  as I went through, I did not find them to be, you know,

10  spotlessly clean.  On some occasions I did point out some

11  areas that I thought needed additional cleaning.  I tend to be

12  more picky than the average person, and one -- and let me just

13  kind of talk about that a little more.

14      And when I did my site visit in August, when I was

15  inspecting the shower rooms at TCC, one of the things I

16  noticed was that in the grout, in the sealant on the shower,

17  there was some mildew growing.  And I pointed that out to

18  them.  And they immediately went and found the contract

19  cleaning and they got them in there and they pointed that out

20  to them.  And, of course, there were no individuals in there

21  at the time I was doing my inspection.  And then they got on

22  it and started cleaning and there was discussion about how to

23  clean it.

24      And when I went back to my hotel room that night, you

25  know, and took a shower, you know, lo and behold -- I mean,

1  you know, there was mildew growing, you know, in the grout in

2  the -- you know, in the shower in my hotel room.  And, you

3  know, I find that often.

4       But kind of reflecting on, you know, the testimony

5  yesterday, you know, that is important.  And the testimony

6  yesterday kind of, you know, kind of really drives that home.

7  That -- and I was glad to hear that that was -- you know, that

8  their take on it, too.  Is, you know, it's important because I

9  have a choice of what hotel I stay at.  But, you know, those

10 individuals don't have a choice of, you know, where they are.

11      And so I think it is important to point those things out.

12 And so some people could say, well, that was relatively minor,

13 but it's important.  And the supervisor of the -- you know,

14 the cleaning company was very on top of it and, you know, was

15 very aware of what I was saying once it was pointed out to

16 them.  So I think things like that are extremely important.

17 Q.   And so this contractor I guess works on-site at the TCC.

18 Is that your understanding?

19 A.   Yes.  The contractor -- they -- the contractor was

20 on-site at TCC.

21 Q.   And is it your understanding that Tucson Sector has a

22 contract with a professional cleaning company that cleans the

23 hold rooms twice a day?

24 A.   Yes.

25 Q.   And in your opinion, is that adequate?

1    A.   Yes.  I mean, twice a day cleaning is -- is more than you

2    find -- or more than I find -- I should say more than I find

3    on average at -- well, let me take that back.

4         So, I mean, professional cleaning twice a day given the

5    volume of people and given the activities that are going on

6    there is, in my opinion -- that's adequate.  They're coming

7    in, they're sweeping the floors, mopping the floors with an

8    EPA-registered cleaner/disinfectant.  Wiping down all the

9    horizontal surfaces.  Given that it's a 24-hour-a-day

10   operation, twice-a-day cleaning is appropriate barring any,

11   you know unforeseen circumstances, you know.  You know, should

12   someone vomit or something like that, of course, that would

13   require additional cleaning.  But the contract has in place

14   for emergency circumstances for emergency cleanings and those

15   types of things to be done.

16   Q.   And also, what else did you consider in support of your

17   opinion that the cleaning is adequate?

18   A.   Oh, okay.  Yeah, sorry, I got off track with that.

19        So inspecting the facilities in the hold rooms, looking

20   at the contract, and then the -- the inspection evaluation

21   reports also; the fact that those inspection teams also go

22   inspect the facilities, the hold rooms, and also look at the

23   work being done by those cleaning contractors.  And if the

24   work in their opinion is substandard, also meet with and hold

25   them accountable to their contract.

1    Q.   Do you also, in your on-site inspections, look in the

2    janitorial supply closet and see what kind of products are

3    being used?

4    A.   Yes.  I think I mentioned that before the lunch break.

5    But yes, I do go in there and I do check the janitorial

6    closets and look at the chemicals and check for dispensing and

7    make sure that the -- one of the things that's important is

8    that the cleaning supplies are appropriate for cleaning and

9    that the cleaning supplies are themselves, you know, going to

10   effect cleaning.

11   Q.   Ms. Skipworth, in your opinion, does Tucson Sector have

12   procedures in place for the people in custody to dispose of

13   their trash or trash that accumulates in the hold rooms?

14   A.   Yes, I did observe trash cans, wastebaskets or trash cans

15   in the hold rooms.

16   Q.   And does Tucson Sector clear those trash cans often

17   enough?

18   A.   I did not observe any overflowing trash cans during my

19   visits.  You know, I -- the -- the contracted janitorial

20   people clean them out.  I didn't find any evidence that they

21   were overflowing.

22   Q.   Also, is -- did you ever observe trash on the floor in

23   any of the hold rooms?

24   A.    I -- I did observe in some of the hold rooms.  I mean, I

25   observed some random -- not accumulations of trash, but -- and

1    I don't even know necessarily if you could call it trash.

2    But, I mean, the individuals in the hold rooms had, you know,

3    some food wrappers, small, you know, a random food wrapper or,

4    you know, a package that a blanket came in or something like

5    that.  I would say -- I wouldn't necessarily call that -- it

6    wasn't accumulation of trash, but it was kind of a by-product

7    of the individual being in that hold room.

8    Q.   And lastly, I wanted to ask, do you think that the area

9    of sanitation is one where there can always be improvement?

10   A.   Absolutely.  I mean, it's -- you can always clean more.

11   You can always do more.  As I said earlier, it's a very

12   imperfect environment.  It's a very imperfect world.  And, I

13   mean -- you know, my conversations with the people at Border

14   Patrol, they recognize that and, you know, they've -- they've

15   asked me for, you know, some technical assistance.  And

16   they've -- actually from visit to visit, they've said, you

17   know, last time you were here, you know, you recommended this.

18   You know, we've done this in the interim.  And, you know,

19   they've been open to technical assistance and they've shown

20   that they -- they -- they care and they want to implement

21   things and improve and I think that's important.

22                MS. PARASCANDOLA:  Thank you.

23                THE COURT:  Cross-examine.

24   ///

25   ///

```
 1                        CROSS-EXAMINATION

 2   BY MS. REINER MAYER:

 3   Q.    Good afternoon.  Ms. Skipworth, in your opinion, the food

 4   the defendants provide detainees is unlikely to cause

 5   long-term nutritional deficiencies when consumed by healthy

 6   detainees over a short period of time; right?

 7   A.    Correct.

 8   Q.    And you define a short period of time to be no more than

 9   72 hours; right?

10   A.    That's correct.

11   Q.    But defendants' menu doesn't change for detainees who are

12   held for more than 72 hours; right?

13   A.    Well, I think that depends on -- I mean, are you

14   talking -- be a little more specific.

15   Q.    Are you aware that a large number of detainees are held

16   for more than 72 hours?

17   A.    Correct.

18   Q.    And the --

19   A.    Well -- well, let me rephrase that.  I don't know that

20   I'm aware that a large number of detainees are held for more

21   than 72 hours.

22   Q.    Are you aware that any detainees are held for more than

23   72 hours?

24   A.    Yes.

25   Q.    Okay.  But you don't know how many?
```

1   A.   No.

2   Q.   Would it surprise you if the number was in the thousands

3   per year?

4   A.   No.  I mean, thousands per year, no, that doesn't

5   surprise me.

6   Q.   And the defendants' menu that is offered to the detainees

7   who are held more than 72 hours does not change from those who

8   are held for less than 72 hours; right?

9   A.   For adults, correct?

10  Q.   That's my question.  For adults; correct.

11       I can ask it again.

12  A.   Okay.

13  Q.   To your knowledge, the defendants' menu doesn't change

14  for detainees who are held for more than 72 hours; right?

15  A.   For the adult menu is my understanding.

16  Q.   And the adult menu does not change for detainees who are

17  held for more than 72 hours; right?

18  A.   That's my understanding, yes.

19  Q.   Is it your understanding the children's menu changes

20  after 72 hours?

21  A.   My understanding is that they have other food items for

22  children, yes.

23  Q.   That are available after 72 hours?

24  A.   Well, that are available to children on an ongoing basis

25  is my understanding.

1    Q.    Irrespective of whether or not they're held for 72 hours?

2    A.    Correct.  Correct.

3    Q.    And again, your opinion on food about the long-term

4    effects of this diet on a detainee applies to healthy

5    detainees; correct?

6    A.    That is correct.

7    Q.    For the detainees who the defendants hold longer than

8    72 hours, you have suggested that they look at alternative

9    ways to provide meals including building kitchens; right?

10   A.    I don't think I recommended that they -- well, I did --

11   let me rephrase that.  I have recommended that they look at

12   alternative.  I believe that I -- with the caveat that it's

13   very complicated in terms of -- so I don't know that I

14   specifically -- I can't say I specifically recommended

15   building a kitchen, but looking at alternatives including all

16   the alternatives, yes.

17   Q.    For an alternative diet for detainees who are being held

18   longer than 72 hours; right?

19   A.    For alternative diets, yes.

20   Q.    And you agree that one of the goals for planning a menu

21   for institutionalized individuals is ensuring nutritional

22   adequacy; right?

23   A.    That is correct.

24   Q.    And that goal applies to the defendants' stations as

25   well; right?

1  A.   That applies to all menus, yes.

2  Q.   And generally to determine nutritional adequacy, you

3  would conduct a nutritional analysis; right?

4  A.   Yes.

5  Q.   But you didn't conduct a nutritional analysis in this

6  case, did you?

7  A.   No, I did not.

8  Q.   And you would agree that it's best practice to have a

9  dietitian or a nutritionist review a menu before serving it to

10 detainees; right?

11 A.   As a best practice, yes.

12 Q.   To your knowledge, defendants' menu has not been reviewed

13 by any nutritionist or dietitian; right?

14 A.   To my knowledge, no.

15 Q.   I think I heard you testify earlier that temperature and

16 thermal comfort is highly subjective; right?

17 A.   Yes.

18 Q.   And one way to determine whether or not the temperature

19 is comfortable to a population would be to ask the population;

20 right?

21 A.   You can ask people, but you might get a variety of

22 different responses.

23 Q.   You visited -- I think you said you visited the

24 facilities at question in this lawsuit three times; is that

25 right?

1   A.    That is correct.

2   Q.    Were there detainees present when you visited those

3   facilities?

4   A.    At most of the facilities, but some of the facilities

5   there were no individuals present.

6   Q.    For the facilities where there were detainees present,

7   did you ask them if they were cold?

8   A.    No, we did not.  I did not speak to any detainees.

9   Q.    Was that because you were prevented from speaking to the

10  detainees?

11  A.    I was -- I was -- we were not talking to the detainees,

12  yes.

13  Q.    Another way to determine thermal comfort would be to

14  prepare a survey and have it given to detainees at different

15  Border Patrol stations.  Did you do that?

16  A.    No, I did not do that.

17  Q.    When you were touring the detention facilities, did you

18  observe detainees wrapped in mylar blankets?

19  A.    I observed detainees -- I guess that's a fair statement.

20  Yes, I saw detainees with a mylar blanket generally wrapped

21  around themselves.  That's a fair statement.

22  Q.    Wouldn't that indicate to you that they were cold?

23  A.    Not necessarily.  I don't know if they were cold or not.

24  I don't know if they were cold or if they -- that felt

25  comfortable to them or if they -- I don't know what reason

1  they were doing it, but they might have been cold.

2  Q.   You concluded that the temperature was within an adequate

3  range based on the ASHRAE recommended standard; right?

4  A.   Correct.

5  Q.   But that standard does not apply to sleeping, does it?

6  A.   The specific standard, I do not believe that it -- in the

7  specific -- I think -- I mean, I think that you could apply it

8  to sleeping.  But I think in the standard, I think it does --

9  I think it states something about there's a -- it excludes

10 sleeping.

11 Q.   You're referring to the part of the standard where it

12 says it does not apply to sleeping or bed rest.  Is that what

13 you're talking about?

14 A.   Yes.

15 Q.   And you're aware that detainees sleep in these

16 facilities; right?

17 A.   Yes.

18 Q.   You agree that adequate sanitation is fundamental in

19 safeguarding the health and safety of detainees in Border

20 Patrol and Border Patrol personnel; right?

21 A.   Correct.

22 Q.   And it's very important in preventing the spread of

23 illness or disease; right?

24 A.   Correct.

25 Q.   And you agree with plaintiffs' expert Eldon Vail that

1  paper showers are not as effective as hot showers; right?

2  A.   That is correct.

3  Q.   If defendants were to hold detainees over 72 hours, you

4  would recommend that they issue them new or clean clothing;

5  right?

6  A.   If they're held for over 72 hours, that would be I think

7  a preferable best practice, absolutely.

8           MS. REINER MAYER:  I have no further questions,

9  your Honor.

10          THE COURT:  Any redirect?

11          MS. PARASCANDOLA:  Your Honor, we don't have any

12  questions on redirect.

13          THE COURT:  All right.  Ms. Skipworth, thank you

14  very much for --

15          THE WITNESS:  Thank you.

16          THE COURT:   -- coming to court.  And you may be

17  excused.

18          Next witness.

19          MS. FABIAN:  Your Honor, unfortunately defendants

20  were not able to get any more witnesses to Tucson for today.

21  We have one out of the country and a few had family issues

22  that they couldn't get here earlier than originally planned.

23  So we do have a few more witnesses to put on.  We hope to

24  still finish early, but we're not able to put on any more

25  witnesses today, unfortunately.

1          THE COURT:  How much more do you have?

2          MS. FABIAN:  We have no more than five and I'd

3    expect less.  And I believe -- I'd say we'll -- we would

4    expect to definitely be finished by Wednesday, if not Tuesday.

5          THE COURT:  Okay.  Well, I can't very well be upset

6    with you because you expected your case to go next week;

7    right?

8          MS. FABIAN:  We did, your Honor.  And we've got --

9    Dr. Tarantino was able to get in early and Ms. Skipworth, but

10   unfortunately the rest of our witnesses are not able to do

11   that.

12         THE COURT:  How about any video or deposition?

13         MR. LONDEN:  I can't help today, Judge.  We put in

14   the excerpts that we think are necessary, excluding things

15   that would be cumulative.

16         THE COURT:  Come on.  So you don't have anything

17   else to present in your case; right?

18         MR. LONDEN:  In the case-in-chief, we have completed

19   the evidence.  There may be rebuttal, but that will be

20   rebuttal.

21         THE COURT:  Okay.  Okay.  Well, all right, we'll

22   quit early today.  But have a seat.  Let me ask you a couple

23   of things.  I'm seeking a stipulation or two.

24         I don't know if these numbers -- I just found out

25   where I got these numbers.  They happen to be from the

 1  plaintiffs' trial brief.  And I don't know -- I'm looking

 2  at page 4.  Look at page 4, if you can get your hands on that

 3  trial brief.  I didn't want to say this out loud because I

 4  don't know what's secret and what isn't, I guess, but -- oh,

 5  no, it's proposed findings of fact.  Anyway, I'm looking for

 6  numbers of prisoners and how long they are held in custody on

 7  average.  Can I give these numbers out loud?  Is that a

 8  secret?

 9          MR. LONDEN:  Numbers of prisoners are published for

10  different time frames.

11          THE COURT:  Oh, all right.  Well, I'm looking

12  at page 4 of plaintiffs' proposed findings of fact.  Can I get

13  counsels' stipulation to the following:  That -- and these are

14  Tucson Sector numbers, annual apprehensions.  Those would be

15  organic apprehensions I guess, right?  The total number of

16  apprehensions in the Tucson Sector were 38,657.  In 2018,

17  52,172.  In 2019, 63,490.

18          MS. FABIAN:  Your Honor, officially CBP only

19  calculates the numbers by fiscal year, and so the fiscal year

20  numbers are in our brief.  If you're asking us to stipulate to

21  numbers prepared by Mr. Mis, I could -- now what I could do is

22  we do have someone who's going to testify, one of our

23  statisticians.  I just -- I can't -- I have no way to verify

24  this number.  I can see if it's something that our

25  statistician could run and he could stipulate -- I could then

 1  stipulate to it.  But I don't think -- that's not a way that

 2  CBP calculates numbers, so I don't have a way to stipulate to

 3  that.

 4          MR. LONDEN:  I can help, Judge, you just recited the

 5  fiscal year CBP numbers.

 6          MS. FABIAN:  Okay.  If it's by fiscal year, then

 7  yes, of course, we stipulate to that and it would be in our

 8  brief as well.

 9          MR. LONDEN:  They are in evidence.  I think they are

10  numbers that could be found.

11          THE COURT:  I think you're right, but it would save

12  me a lot of searching.

13          MR. LONDEN:  Well, I'll tell everyone, the other

14  side in their demonstrative Exhibit 1 and 2 to which we

15  stipulated judicial notice, I think you'll find those numbers.

16  Defendant's demonstrative 1 and 2.

17          THE COURT:  All right.  Well, stay with me.  So do I

18  have a stipulation that that's the number of apprehensions for

19  those fiscal years, 2017 through 2019?  Right so far?

20          MS. FABIAN:  Yes, your Honor.

21          THE COURT:  Then what I wanted was -- and I don't

22  know where I got these numbers.  I should have made a note, I

23  guess.  According to some source, the average time in custody

24  in the Tucson Sector in the year 2019 was 53.92 hours.  This

25  is in 2019.  That 3,008 detainees were detained for less than

 1   12 hours or 12 hours or less.  15,238 were detained from 12 to

 2   24 hours.  23,416 were detained from 24 to 48 hours.  9,798

 3   were detained for 48 to 72 hours.  And 12,030 were detained

 4   for 72 hours or more.  And I'm looking for a stipulation.  And

 5   if you don't stipulate, something that's in evidence where I

 6   can find the same thing.

 7          MS. FABIAN:  That's paragraph 10 of defendants'

 8   proposed findings of fact, and we can stipulate to it.

 9          MR. LONDEN:  Well, given that it's fiscal year

10   numbers, the counts won't add up to our calendar year numbers,

11   but we stipulate that those are correct for the fiscal years.

12          I'll be clear, we stipulate that those are correct

13   numbers for the fiscal years cited.

14          THE COURT:  Okay.

15          MR. LONDEN:  They come from defendants.

16          THE COURT:  Okay.  Are we good?  See, I got a

17   stipulation out of you guys.  That's also known as an

18   agreement.

19          MS. FABIAN:  We try -- we try to agree on occasion,

20   your Honor.

21          THE COURT:  Okay.  Is there a clear fact in evidence

22   as to how many detainees can be housed at ICE facilities at

23   any given time?

24          MS. FABIAN:  I don't believe we put anything like

25   that in evidence.  I'm not sure if it's a publicly available

 1   number that we could give you -- I mean, that I could locate

 2   and give you.  I don't have it right now.

 3            THE COURT:  Yeah, I mean, I would understand it

 4   would be fluid.

 5            MS. FABIAN:  My understanding -- and this is not

 6   necessarily directly related, but my understanding is ICE is

 7   funded for a certain number of beds and that's part of

 8   appropriations.  So it should be a number that's -- we're able

 9   to identify.  I just don't have it right now.

10            MR. LONDEN:  It's not in evidence, Judge.  And I

11   would love to know the answer, but I can't give it to you.

12            THE COURT:  Okay.  It's not in any papers that you

13   filed?

14            MR. LONDEN:  Everything we've seen requires some

15   interpolation to answer your question, so I can't give you a

16   number that I expect to stipulate.

17            MS. FABIAN:  There would probably be -- for your

18   purposes, I'd expect some different numbers as well as --

19   because ICE runs both the family residential centers and adult

20   detention centers.

21            So I can see if there are publicly available or

22   otherwise available numbers that we could put into evidence.

23            MR. LONDEN:  And another, we did hear in testimony

24   the statement that ICE distributes people it takes to

25   different locations.  So you can't match up Eloy with Tucson

 1  and compare there.  They can send -- they can send them all --

 2  there are six detention centers that they contract for in this

 3  sector and so it's a harder question to say what the process

 4  is.

 5          MS. FABIAN:  ICE doesn't operate in sectors so it

 6  would be -- I think that's a little apples -- it would be

 7  apples and oranges in terms of ICE.

 8          THE COURT:  I don't care which facility.  What I

 9  would care about is ICE custody.  If, for example, there are

10  12,000 people held in custody for more than 72 hours in a

11  given year, is there enough space in ICE facilities throughout

12  that year to house 12,000 people?

13          MS. FABIAN:  Well --

14          THE COURT:  I'm thinking ICE has a problem.

15          MS. FABIAN:  Your Honor, not to be difficult, but I

16  think one of the questions would be what the breakdown is of

17  that population.  If it's family units or adults, of course,

18  that would be ICE.  It would potentially be two different

19  questions still because you look at family residential space

20  and restrictions on the ability to hold there, you would also

21  then be looking at adult detention.  But the third category,

22  of course, is UACs and that's ORR, which I think, at least --

23  it's publicly known that ORR did for a while have some

24  significant problems.  But they now have a lot -- they have a

25  good number of beds in ORR custody.  So that would be one of

```
 1    the -- one of the issues related to just comparing that 12,000
 2    number to ICE wouldn't really be apples to apples.
 3                THE COURT:  Okay.  All right.  Anything else you can
 4    do today to save any time?
 5                MR. LONDEN:  Nothing from our side, Judge.
 6                MS. FABIAN:  Nothing, your Honor.  I apologize.
 7                THE COURT:  Well, what you're saying is even if we
 8    break obnoxiously early today, we still finish the case within
 9    the time frame that I set.
10                MR. LONDEN:  Sounds like by at least a day.
11                THE COURT:  Right?
12                MS. FABIAN:  I'd agree with that, your Honor.
13                THE COURT:  Okay.  Good.  Let's take a break, then.
14    In fact, we have a long weekend, don't we?
15                MS. FABIAN:  Yes, we do.
16                THE COURT:  So it's Tuesday morning, I have a thing
17    at 9.  So we will be at recess until 9:15 on Tuesday.  Okay.
18                MR. LONDEN:  Have a nice weekend, your Honor.
19                THE COURT:  Thank you, you, too.
20                MS. FABIAN:  Thank you, your Honor.
21          (Proceedings adjourned at 2:15 p.m.)
22
23
24
25
```

1                    C E R T I F I C A T E

2

3            I, Cheryl L. Cummings, certify that the

4   foregoing is a correct transcript from the record of

5   proceedings in the above-entitled matter.

6

7                    Dated this 17th day of January, 2020.

8                    /s/Cheryl L. Cummings

9                    Cheryl L. Cummings, RDR-CRR-RMR-CRC-CRI
                     Federal Official Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25