```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                      DISTRICT OF ARIZONA

 3   Jane Doe #1; Jane Doe #2; Norlan Flores,
     on behalf of themselves and all others
 4   similarly situated,
                                         CV-15-250-TUC-DCB
 5            Plaintiffs,
                                         January 21, 2020
 6   v.                                          9:25 a.m.
                                         Tucson, Arizona
 7   Chad Wolf, Acting Secretary of Homeland
     Security; Mark A. Morgan, Acting
 8   Commissioner, U.S. Customs and Border
     Protection; Carla L. Provost, Chief of
 9   United States Border Patrol, in her official
     capacity; Roy D. Villareal, Chief Patrol
10   Agent-Tucson Sector, in his official
     capacity,
11
              Defendants.
12
     _____
13

14          REPORTER'S OFFICIAL TRANSCRIPT OF PROCEEDINGS

15                        BENCH TRIAL

16                         DAY SIX

17                   (PART ONE OF TWO)

18          BEFORE THE HONORABLE DAVID C. BURY
                UNITED STATES DISTRICT JUDGE
19

20

21

22   Court Reporter:        Erica R. McQuillen, RDR, CRR
                            Official Court Reporter
23                          405 W. Congress Street
                            Tucson, Arizona 85701
24                          (520)205-4267

25        Proceedings Reported by Stenographic Court Reporter
          Transcript Prepared by Computer-Aided Transcription
```

```
 1                    A P P E A R A N C E S

 2    For the Plaintiffs:

 3         Jack Williford Londen
           John Sebastiano Douglass
 4         Elizabeth Gilmore Balassone
           Morrison & Foerster, LLP
 5         425 Market Street
           32nd Floor
 6         San Francisco, California 95105

 7         Colette Reiner Mayer
           Morrison & Foerster, LLP
 8         755 Page Mill Road
           Palo Alto, California 94304
 9

10

11    For the Defendants:

12         Sarah B. Fabian
           Katelyn Masetta-Alvarez
13         Michael Anthony Celone
           Christina Parascandola
14         United States Department of Justice
           P.O. Box 868 Ben Franklin Station
15         Washington, D.C., 20044

16         William Charles Silvis
           United States Department of Justice
17         Civil Division of Immigration Litigation
           450 Fifth Street NW
18         Washington, D.C., 20001

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

1                         EXAMINATION INDEX

2   GERARDO CARRASCO
            DIRECT BY MR. CELONE  . . . . . . . . . . . . . . . 4
3           CROSS BY MS. BALASSONE . . . . . . . . . . . . . . 19

4   JAY VISCONTI
            DIRECT BY MS. PARASCANDOLA . . . . . . . . . . . . 24
5           CROSS BY MR. DOUGLASS . . . . . . . . . . . . . . 75

6   DAVID STRANGE
            DIRECT BY MS. PARASCANDOLA . . . . . . . . . . . . 83

7

8

9                         EXHIBIT INDEX

10  Exhibit Number          Offered                     Admitted

11  007                        18                          18

12  758                         9                           9

13  799                        50                          50

14  866                        20                          20

15  2010                       51                          51

16  2011                       51                          51

17  2012                       61                          62

18  2013                       65                          66

19  2014                       68                          68

20  2015                       70                          70

21  1231                       79                          79

22

23

24

25

 1                       P R O C E E D I N G S

 2              THE COURT:  All right.  Back on the record, and

 3   we're ready for the defendants' next witness.

 4              MR. CELONE:  Good morning, Your Honor.  Defendants

 5   call Gerry Carrasco.

 6              THE COURT:  Over here, sir.

 7              THE CLERK:  If you'd remain standing and raise your

 8   right hand and be sworn.

 9              GERARDO CARRASCO, WITNESS, SWORN

10              THE CLERK:  Thank you.

11              Please be seated.  If you'd state your full name and

12   spell your last name for the record.

13              THE WITNESS:  My name is Gerardo Carrasco.  Last

14   name is C-a-r-a-s -- C-a-r-r-a-s-c-o.

15                         DIRECT EXAMINATION

16   BY MR. CELONE:

17   Q.   Good morning, Mr. Carrasco.

18   A.   Good morning.

19   Q.   What is your job title?

20   A.   I am currently the Operational Medical Advisor for

21   Dr. Tarantino up at Headquarters with Operation Support-CBP.

22   Q.   And how long have you been in that role?

23   A.   I would say approximately a year and a half now.

24   Q.   And prior to that, what was your job title?

25   A.   Prior to that I was running the national medical program

DIRECT OF CARRASCO
JANUARY 21, 2020 (DAY 6, PART 1)

 1  for the Border Patrol.

 2  Q.   And what is that?  What did that role entail?

 3  A.   Coordinating the medical program, training, funding for

 4  the different sectors throughout the Border Patrol, putting

 5  down some protocols and guidance.

 6  Q.   And prior to that, what was your job title?

 7  A.   Prior to that I was running the medical program for

 8  Tucson Sector.

 9  Q.   And what did that role entail?

10  A.   Similar, obviously on a smaller scale, helping to create

11  protocols, guidance, working with the local physician advisor

12  to provide training for EMTs and paramedics, ensuring that

13  they're certified and recertified, get the continuing

14  education that they need.

15  Q.   And how long were you in that position?

16  A.   I'd been in that role approximately -- I was probably in

17  that role about eight years.

18  Q.   And before that, what was your job title?

19  A.   I was an operator and supervisor with the Border Patrol

20  BORSTAR team, Border Patrol Search, Trauma, and Rescue Team.

21  Q.   And what does the BORSTAR team do?

22  A.   BORSTAR team is a specialized unit within the Border

23  Patrol that provides medical capabilities throughout the

24  Border Patrol, both in country, outside of the country, to

25  other agencies within DHS and within CBP.

DIRECT OF CARRASCO                                    6
JANUARY 21, 2020 (DAY 6, PART 1)

1    Q.   And how long were you a member of the BORSTAR team?

2    A.   I've been on the team now for about 20 years.

3    Q.   So you're still currently a BORSTAR --

4    A.   Yes, still an active member.

5    Q.   And are you yourself an EMT?

6    A.   I am currently a Nationally Registered Paramedic.

7    Q.   And in your current job title or current role, what does

8    that job entail?

9    A.   So currently I work with Dr. Tarantino to try and put

10   together, again, policies, directives, on a CBP level for

11   certain medical things, protocols for medical operations, CPR,

12   AED, Fentanyl.  Those are some of the examples of things that

13   we're working on right now.

14   Q.   And is that national in scope?

15   A.   Yes, sir.

16          MR. CELONE:  Ms. Kershaw, could you pull up Joint

17   Trial Exhibit 758, please.

18   BY MR. CELONE:

19   Q.   Mr. Carrasco, have you seen this document before?

20   A.   Yes.

21   Q.   Could you describe what it is.

22   A.   So this document was created in order to provide some

23   guidance for our EMTs and paramedics out in the field when

24   conducting assessments on both adults and juveniles.  It's

25   mostly focused on juvenile assessments.

1      That population has some unique considerations, so we

2   wanted to make sure that our EMTs, because there was an

3   increase in assessments for juveniles, we wanted to make sure

4   that they had some guidance on vital signs, things to look for

5   specifically.

6   Q.   And what is it about juveniles that makes them unique

7   that would require documentation like this?

8   A.   Physiologically, they're just different, smaller, so

9   their bodies don't compensate as well.  Also, because of their

10  age and their ability to communicate, it's sometimes difficult

11  to get information from them, so we have to rely more on vital

12  signs, appearance.

13  Q.   And what was the genesis of this document?

14  A.   Say again, sir?

15  Q.   How did this document come about?

16  A.   So when -- Dr. Tarantino was basically tasked by the

17  Border Patrol, saying, look, our EMTs and paramedics are

18  seeing an increase in encounters with juveniles, so can you

19  please provide us with some guidance so that our EMTs and

20  paramedics are better prepared to deal with these assessments.

21  Q.   And prior to this, this document, was there any type of

22  guidance for juveniles, or was it kind of on a local basis, or

23  did this codify some requirements?

24  A.   So the training, as -- over the past couple years, as

25  we've seen an increase in the encounters with juveniles,

```
 1   locally, our local physician advisor here put together some
 2   training through St. Mary's Hospital for our EMTs and
 3   paramedics specifically for juvenile assessments.  The
 4   American Academy of Pediatrics on a national level put
 5   together a training video in conjunction with Dr. Tarantino to
 6   discuss medical assessments for adults and juveniles but
 7   mostly focused on the juveniles as well.
 8           MR. CELONE:  Now, Ms. Kershaw, could you move to
 9   page 3 of this document, and then actually move to page 5,
10   please.
11   BY MR. CELONE:
12   Q.  So Mr. Carrasco, can you just kind of describe how --
13   what Figure 1 indicates and walk us through some of these, the
14   guidance that's provided in this memo.
15   A.  So when you look at vital signs, for an adult, we -- most
16   of our EMTs and paramedics run into -- we run calls on adults
17   all the time.  Vital signs are pretty standard.  We learn to
18   remember those.
19        With pediatric patients, the vital signs are almost
20   reversed, and so it helps to have something like this, almost
21   like a cheat sheet, so that you can kind of see what normal
22   ranges would be for a pediatric.  Since a lot of times we
23   can't communicate with the pediatric patient, we need to rely
24   heavily on their vital signs, their appearance, to assess what
25   their condition is and where they're at medically.
```

DIRECT OF CARRASCO                                    9
JANUARY 21, 2020 (DAY 6, PART 1)

```
 1  Q.   And within the Tucson Sector, are -- what is the level of
 2  medical assessment for juveniles?
 3  A.   So in Tucson Sector, all juveniles are getting a medical
 4  assessment.
 5          MR. CELONE:  And is that -- Ms. Kershaw, could you
 6  pull up Joint Trial Exhibit 884, please.
 7          Or sorry, before we move to that, we move to have
 8  Joint Exhibit 88 -- 758 admitted to the record, Your Honor?
 9          MS. BALASSONE:  Your Honor, I think it's already
10  admitted, but we have no objection.
11          THE COURT:  Sara, just make sure it's in evidence.
12  If it wasn't admitted, it will be now.
13          MR. CELONE:  Okay.  Thank you.
14  BY MR. CELONE:
15  Q.   And Mr. Carrasco, is this the -- have you seen this
16  document before?
17  A.   Yes.  This is the form that the medical contractor uses
18  when conducting their assessment for juveniles.
19  Q.   And you had indicated that all juveniles receive a
20  medical assessment?
21  A.   Yes.  After they receive the medical questionnaire, all
22  juveniles will receive the actual assessment, medical
23  assessment, which includes vital signs.  It's a more in-depth
24  assessment of their medical condition.
25  Q.   And who conducts the medical assessment?
```

DIRECT OF CARRASCO
JANUARY 21, 2020 (DAY 6, PART 1)

1   A.   So there's several individuals that can conduct this.   If

2   we have a medical contractor in place that can do it, the

3   assessment is conducted by them.   If we do not have them, we

4   can have EMTs and paramedics from the service conduct it as

5   well.   And if need be, we can send them to a hospital or

6   clinic to have those assessments done, if indicated.

7           MR. CELONE:   And Ms. Kershaw, could you pull up

8   Joint Exhibit 881, please.

9   BY MR. CELONE:

10  Q.   And Mr. Carrasco, are you familiar with this document?

11  A.   Yes.

12  Q.   How would you describe this document or what is it?

13  A.   So one of the things that we've done at a Headquarters

14  level is try to standardize the questions, taking into account

15  recommendations from the American Academy of Pediatrics,

16  several other doctors from a DHS level, to try and identify

17  questions that would more accurately identify a condition or

18  an injury that would pose the greatest risk to not only the

19  detainee, but personnel working in the processing center and

20  the community as well.

21  Q.   And what type of training do -- or excuse me for a

22  second.

23       Who conducts the health interview questionnaire?

24  A.   So this questionnaire can be conducted by Border Patrol

25  Agents or CBP Officers, CBP EMTs and paramedics, or contracted

DIRECT OF CARRASCO
JANUARY 21, 2020 (DAY 6, PART 1)

1    medical personnel.  It's designed so it can be done by any

2    individual, even individuals that don't have medical training.

3    Q.   And what type of training do Border Patrol Agents receive

4    in order to conduct a health interview questionnaire like

5    this?

6    A.   So Border Patrol Agents on a yearly basis have to take

7    certain online courses.  Some of the material that's covered

8    in these online courses is transmission of bloodborne

9    pathogens, tuberculosis, recognition of influenza, sexual

10   assault, sexual abuse, recognizing signs and symptoms of

11   psychiatric emergencies or a behavioral crisis, suicide

12   prevention.  Those are some of the things that we have to take

13   on a yearly basis as Border Patrol Agents.  All Border Patrol

14   Agents take this training.

15   Q.   And who decides what type of training is provided to

16   Border Patrol Agents?

17   A.   So this training has been identified as something that we

18   need to do on a yearly basis, but if there is a specific

19   threat that comes out, for example, when ebola was kind of out

20   in the media, we designed courses specifically for agents to

21   be able to recognize signs and symptoms of ebola.  There is

22   currently a threat going on, coronavirus coming in from a

23   China.  We're training CBP Officers at certain ports of

24   entries how to identify signs and symptoms of individuals that

25   could potentially have this.

DIRECT OF CARRASCO
JANUARY 21, 2020 (DAY 6, PART 1)

1   Q.   And did you mention that the CDC provides certain types
2   of training?
3   A.   The CDC will put together the messaging.  It'll come in
4   through DHS and filter down to CBP, and then it will kind of
5   get allocated to a specific target audience.  Either it will
6   go out to everybody, or if there is a specific threat to a
7   specific location or an area, it'll get dialed in on that.
8   Q.   And how is that training disseminated to Border Patrol
9   Agents in Tucson Sector?
10  A.   So the training comes down on a broad level through
11  email, disseminated to everyone.  For example, this medical
12  assessment training that was put together by the American
13  Academy of Pediatrics, this was made available to everyone,
14  but Tucson Sector made it a requirement for all of its EMTs
15  and paramedics to view the video and do a read-and-sign on it
16  stating that they have, in fact, watched it.
17  Q.   Are Border Patrol Agents also trained in first aid?
18  A.   Yes.  All Border Patrol Agents receive first responder
19  training and CPR/AED training as well.  They also now, Tucson
20  Sector, has 100 percent training for agents on individual
21  first aid kit which teaches agents how to use the equipment
22  that's in their kit to negotiate traumatic incidents.
23  Q.   And when agents are asking or completing the health
24  interview questionnaire, what happens if an individual answers
25  "Yes" under the health interview section, questions 7 through

DIRECT OF CARRASCO
JANUARY 21, 2020 (DAY 6, PART 1)

1   13?

2   A.   So if there is a positive response on question 7 through

3   13, it automatically triggers a medical assessment by medical

4   personnel.  That would be either be a Border Patrol EMT or

5   paramedic, we could activate the 911 system, or we can take

6   them directly to a hospital, or contracted medical personnel

7   can conduct this assessment.

8       The other questions are to kind of help the agent get an

9   idea, a picture, of basically this person's state.  We gather

10  information not only from the detainee that's providing the

11  answers to these questions, but the agent is also observing

12  the detainee, looking for things like rashes, is the person

13  limping, how is the person interacting.

14      So there's a lot of different components when filling out

15  this form.

16  Q.   You had testified earlier that you yourself are an EMT;

17  is that correct?

18  A.   Yes, sir.

19  Q.   What is the level of EMT -- or training for a Border

20  Patrol EMT?

21  A.   So a Border Patrol EMT has to go through the initial

22  certification.  For us it's an eight-week course.  Once they

23  graduate that course, they have to take the national registry

24  test.  Once they pass that, they become nationally registered

25  and state-registered EMTs.

DIRECT OF CARRASCO
JANUARY 21, 2020 (DAY 6, PART 1)

1          To maintain that certification, every two years they have

2     to have a certain number of continuing education hours in

3     specific areas, and then they have to take what's called a

4     refresher course, which is a five-day course that is a review

5     of some of the basics.  And on top of that our local physician

6     advisor and Dr. Tarantino will point out some things that they

7     want our EMTs to focus in on depending on what we're seeing,

8     trends, medical trends, what we're coming across in our

9     day-to-day operations.

10    Q.   And in your role as the senior operational advisor to the

11    senior medical officer or advisor, Dr. Tarantino, what level

12    of involvement do you have with the EMT programs?

13    A.   So at the level that I'm at right now, it's more a

14    general overview, putting together some of the these protocols

15    on a more national level.  I don't have direct oversight or

16    administrative oversight over the EMTs at a sector level, but

17    we do provide guidance and some of the medical direction that

18    they're going to need in day-to-day operations.

19    Q.   And are you familiar with the level of -- or you had

20    mentioned the medical contractors --

21    A.   Yes.

22    Q.   -- in place now.  Are you familiar with the contractors

23    that are on-site in Tucson Sector currently?

24    A.   Yes, I am.

25    Q.   And how does the -- having the medical contractors

UNITED STATES DISTRICT COURT

1    provide additional care or operational -- how does it fit into

2    Border Patrol's operational concerns?

3    A.    So we're taking individuals, providers that have a higher

4    level of care that we can provide.  We have nurse

5    practitioners, physician assistants with callback capabilities

6    to physicians, specialized physicians, such as pediatrics, if

7    need be.  So they provide a higher level of care.

8         They also allow for our EMTs, our resources, which are

9    kind of in some places kind of scarce, to be focused out into

10   the field where they're needed more.  We can be able to

11   provide medical care out in the point of apprehension,

12   sometimes in areas that are inaccessible by a local EMT

13   system.

14        So they allow -- they free up our agents to be out in

15   field doing their job and our EMTs to be out in the field to

16   provide care at the point of apprehension.

17   Q.    And do Border Patrol EMTs -- or excuse me.  What's the

18   distinction between a Border Patrol EMT and, say, an EMT who

19   would be in the local community?

20   A.    So because of the areas that we're functioning in, we

21   have a higher level of care.  Our local physician advisor has

22   authorized our EMTs to provide things that, let's say, an EMT

23   here in the city that works for Tucson Fire Department, they

24   cannot do.

25        Our EMTs can do things like intravenous therapy, they can

DIRECT OF CARRASCO
JANUARY 21, 2020 (DAY 6, PART 1)

```
 1  give IVs, they can do advanced airways, they can deliver

 2  certain medications that normal EMTs would not be able to

 3  provide, just because we work in austere environments, and

 4  those are things that are needed to stabilize a patient's

 5  condition before EMS gets there.

 6          MR. CELONE:  Ms. Kershaw, can you pull up Joint

 7  Exhibit 007, please, and I think, if we just scroll down

 8  through -- here we go.

 9  BY MR. CELONE:

10  Q.   Mr. Carrasco, are you familiar with this document?

11  A.   Yes.

12          MR. CELONE:  And actually, Ms. Kershaw, could you

13  just scroll through, just to give the witness more visibility

14  on it.  Could we just go through the subsequent pages, please.

15          And so this is fine right here.

16  BY MR. CELONE:

17  Q.   Mr. Carrasco, you had testified about providing training

18  to Border Patrol Agents.  Is this -- what is this document?

19  Is this the type of training that would be provided?

20  A.   Similar to some of the training that we would get sent

21  out.  Like, for example, at the beginning of the summer, when

22  we start seeing an increase in things like scabies, we would

23  send out some training like this so our agents would be able

24  to differentiate the difference between bug bites and, say,

25  scabies or measles or chickenpox, just some general pictures
```

UNITED STATES DISTRICT COURT

DIRECT OF CARRASCO
JANUARY 21, 2020 (DAY 6, PART 1)

 1  and where we would look for certain things or how would they

 2  look, like, how would the patient present all around.

 3       That's just an example of some of the things that we

 4  would look for.

 5  Q.   Thank you.

 6            MR. CELONE:  Thank you, Ms. Kershaw.

 7  BY MR. CELONE:

 8  Q.   Mr. Carrasco, what occurs when a detainee is apprehended

 9  with prescription medicine on their person?

10  A.   So when an individual is apprehended with medication,

11  when they arrive at the TCC, what our medical contract

12  individuals will do is take a look at the medication.  They

13  want to verify a few things.

14       They want to make sure that it's in the original

15  packaging so we can confirm that the medication is in fact

16  what it says it is, that it is prescribed to this individual,

17  that it is indicated for whatever condition he is presenting

18  with or says that he has.

19       If we can verify all those things, that medication will

20  be tagged and will remain part of his property.  It will be

21  stored in a locker where the medical contract personnel will

22  have access to it, and they will give it to the patient as

23  prescribed.

24       If it's in a package that cannot be identified, the

25  medication cannot be verified, what they'll end up doing is

1  sending the individual to the hospital, and a doctor at the

2  hospital will verify the condition and that the medication is

3  appropriate, and they will issue the individual a new -- new

4  medication that he would come back to the station with.  That

5  medication will be tagged with his property and put into the

6  locker and will be given to him as prescribed.

7          MR. CELONE:  And just -- sorry, Your Honor, for a

8  housekeeping matter, defendants move to have Joint Exhibit 007

9  admitted to the record.

10          MS. BALASSONE:  No objection.

11          THE COURT:  It's admitted.

12  BY MR. CELONE:

13  Q.   Thank you, Mr. Carrasco.

14       And so if a pregnant woman were prescribed a medication

15  for nausea as needed, what would the process be for the

16  individual to receive it?

17  A.   So if the individual is familiar with their medication, a

18  lot of times what the medical -- the contracted medical

19  personnel will do is speak to the individual, tell them what

20  the medication is, what it's for, what are some of the reasons

21  they should ask for it, and that they can ask for it when

22  needed.

23       So if the individual is requesting it, then it'll be

24  brought out and given to the individual, as long as they're

25  requesting it.

Case 4:15-cv-00250-DCB   Document 477   Filed 01/31/20   Page 19 of 101
DIRECT/CROSS OF CARRASCO
JANUARY 21, 2020 (DAY 6, PART 1)

19

1   Q.   So it's upon the individual requesting it?

2   A.   Yes.

3   Q.   And under the current medical care system with Loyal

4   Source Government Services, are there any additional

5   procedures that would occur or be taken with pregnant women?

6   A.   So if a female currently states that she's pregnant, we

7   can do an on-site pregnancy test to confirm.  If she's

8   exhibiting any signs and symptoms that are outside the norm or

9   if she's far along, she'll be sent to the hospital to try and

10  get -- determine the gestational age.

11          MR. CELONE:  And Your Honor, may I just consult with

12  counsel for a second?

13          THE COURT:  Sure.

14          MR. CELONE:  We have no further questions, Your

15  Honor.

16          THE COURT:  Cross-examine.

17                    CROSS-EXAMINATION

18  BY MS. BALASSONE:

19  Q.   Good morning, Mr. Carrasco.

20  A.   Good morning, ma'am.

21  Q.   Mr. Carrasco, you testified that you have been the

22  Operational Medical Advisor for Dr. Tarantino for the past one

23  and a half years, and in that role you were working on

24  policies, directives, and protocols; is that right?

25  A.   Yes, ma'am.

1          MS. BALASSONE:  Mr. Lucero, please show Joint

2   Exhibit 886 -- or excuse me -- 866.  I'll ask you to scroll

3   through the pages so Mr. Carrasco can see them.

4          And Mr. Lucero, if you could please go back to page

5   1 of Joint Exhibit 866.

6   BY MS. BALASSONE:

7   Q.   Mr. Carrasco, the subject of this memorandum is,

8   "Enhanced Medical Efforts;" is that right?

9   A.   Yes, ma'am.

10  Q.   Are you familiar with this document?

11  A.   Yes, ma'am.

12         MS. BALASSONE:  Your Honor, we would request

13  admission of Joint Exhibit 866 into evidence.

14         MR. CELONE:  Without objection.

15         THE COURT:  It's admitted.

16  BY MS. BALASSONE:

17  Q.   Mr. Carrasco, looking at the first paragraph, it says,

18  "The U.S. Border Patrol (USBP) has experienced a prolonged and

19  significant shift in the demographics of the people we

20  encounter and arrest, and this change supports modifications

21  to the procedures we implement during their time in custody."

22         Is that right?

23  A.   Yes, ma'am.

24  Q.   And looking at the second paragraph, it says, "The

25  juvenile detainees under the age of 18 have always been a

CROSS OF CARRASCO
JANUARY 21, 2020 (DAY 6, PART 1)

 1   high-risk population for illness and injury.  Their body's

 2   temperature, regulatory and immune systems may not be fully

 3   developed, and routine vaccinations may not have been

 4   administered."

 5        Is that right?

 6   A.   Yes, ma'am.

 7   Q.   And so is it fair to say that these recent what are

 8   described as "Enhanced Medical Efforts" recognize medical

 9   issues of concern for children who may be detained at Border

10   Patrol Stations in the Tucson Sector?

11   A.   It recognizes that there's an increase in the number of

12   personnel that we're encountering now.

13   Q.   And that those children have unique medical issues that

14   may be of concern?

15   A.   Yes.

16   Q.   Looking at the remaining sentences of that second

17   paragraph, it says, "These deficiencies are further compounded

18   by the large numbers of potentially ill persons traveling in

19   close proximity to them during extended journeys.  These

20   realities are in addition to the physically demanding journey

21   inherent in crossing through remote and desolate areas along

22   our nation's southwest border."

23        So is it fair to say that the large numbers of

24   potentially ill people could include children or adults who

25   may be detained in Border Patrol custody at the Tucson Sector

 1   stations?

 2   A.   Yes.

 3   Q.   You testified that you are familiar with the presence of

 4   medical contractors at Border Patrol stations; is that right?

 5   A.   Yes, ma'am.

 6   Q.   And are you aware that some stations along the southwest

 7   border have medical contractors stationed there in person?

 8   A.   Yes, they do.

 9   Q.   And are you aware that, for other stations along the

10   southwest border, the medical contractors are also available

11   via telemedicine or telesupport in some stations where they're

12   not on-site?

13   A.   That is correct.

14   Q.   Okay.  So for TCC, medical contractors are stationed in

15   person; correct?

16   A.   Yes, ma'am.

17   Q.   And the same is true for Nogales, that they're

18   in-person --

19   A.   Yes, ma'am.

20   Q.   -- medical contractors?

21        And is it right that a typical structure at each Border

22   Patrol station for medical contractors is to have at a given

23   time one advanced practice practitioner and two technicians?

24   A.   They usually have a mid-level provider, a physician's

25   assistant or nurse practitioner, and one to two medical

CROSS OF CARRASCO
JANUARY 21, 2020 (DAY 6, PART 1)

 1  assistants, which are usually EMTs or paramedics.

 2  Q.   Okay.  Is that the structure in place at TCC, that there

 3  is one advanced practice practitioner and two technicians?

 4  A.   Yes.

 5  Q.   And the same is true at Nogales, that there is one

 6  advanced practice -- excuse me -- one advanced practice

 7  practitioner and two technicians?

 8  A.   Yes, ma'am.

 9  Q.   You testified about the kind of training that Tucson

10  Sector EMTs receive; right?

11  A.   Yes, ma'am.

12  Q.   And you testified about the kind of training that other

13  agents in the Tucson Sector who are not EMTs receive; right?

14  A.   Yes, ma'am.

15  Q.   Is it fair to say that EMTs have some medical training

16  that other agents in the Tucson Sector don't have?

17  A.   That is correct.

18  Q.   You also testified that the medical contractors provide a

19  higher level of care and that it allows EMTs to focus on field

20  operations; is that correct?

21  A.   Yes, ma'am.

22       MS. BALASSONE:  No further questions.  Thank you.

23       THE WITNESS:  Thank you.

24       THE COURT:  Any redirect?

25       MR. CELONE:  Nothing further.

1          THE COURT:  You can step down, Agent.  Thank you

2    very much for coming.

3          THE WITNESS:  Thank you, sir.

4          MR. CELONE:  Is the witness excused, Your Honor, or

5    just dismissed?

6          THE COURT:  Yes.  He may be excused.

7          Next witness.

8          MS. FABIAN:  We're just getting him, Your Honor.

9    He's just in the other room.

10          THE CLERK:  If you'd please raise your right hand

11   and be sworn.

12                JAY VISCONTI, WITNESS, SWORN

13          THE CLERK:  Thank you.  If you'd please be seated

14   and then state your full name and spell your last name.

15          THE WITNESS:  Sure.  Jay Visconti, V-i-s-c-o-n-t-i.

16          THE COURT:  Good morning, sir.

17          THE WITNESS:  Good morning.

18                     DIRECT EXAMINATION

19   BY MS. PARASCANDOLA:

20   Q.   Good morning, Chief Visconti.  Would you please tell us

21   your position and where you are based.

22   A.   Yes.  I am currently the Director of the CBP Stat

23   Division within Washington, D.C.

24   Q.   What does the Stat Division do?

25   A.   The CBP Stat Division provides our senior leadership, the

```
 1   Commissioner of CBP, with generally aggregated statistics of
 2   apprehensions and seizure information.
 3   Q.   And when you say you're the director, whom do you direct?
 4   A.   Currently I have one full-time employee, I have two
 5   personnel who are detailed to my division, and then I oversee
 6   four contract staff.
 7   Q.   And are you responsible for maintaining the e3DM data?
 8   A.   I'm not responsible for maintaining it, but we do query
 9   it for particular reports that may have come up.
10   Q.   Is the Stat Division part of the Border Patrol?
11   A.   No, ma'am.  CBP Stat is under Operation Support, which is
12   part of the larger CBP.
13   Q.   So the Stat Division covers Border Patrol and the Office
14   of Field Operations; correct?
15   A.   Yes, ma'am.  We provide information concerning
16   apprehensions from Border Patrol, inadmissible data from the
17   Office of Field Operations, and then also some seizure
18   information from our Air and Marine Operations.
19   Q.   Okay.  So the Border Patrol Office of Field Operations
20   and Admiral (sic) and Marine Operations, are those the three
21   components of CBP?
22   A.   Those are the three main components.  There's three other
23   components of CBP, which is Operation Support, Enterprise
24   Services and our Office of Trade.
25   Q.   And are you, in addition to being the Director of the
```

DIRECT OF VISCONTI
JANUARY 21, 2020 (DAY 6, PART 1)

1    Stat Division for CBP, a Border Patrol Agent?

2    A.   Yes, ma'am.  I am currently -- my title is Director for

3    the CBP Stat Division, but I'm known as an Associate Chief

4    within the Border Patrol.

5    Q.   How long have you been the Director the Stat Division?

6    A.   I was promoted in August of 2019.

7    Q.   What was your position previously?

8    A.   I was an Assistant Chief for the Border Patrol where I

9    was temporarily assigned to the Office of the Commissioner as

10   the Border Patrol advisor to the Commissioner's office.

11   Q.   And for what time period did you have that position?

12   A.   I started that I believe in July of 2016.

13   Q.   And before that, what was your position?

14   A.   Prior to that I was an Assistant Chief within the Border

15   Patrol Headquarters where I oversaw -- I was the Branch Chief

16   for the Statistics and Data Integrity Branch, so I oversaw all

17   the official statistics for Border Patrol at that time.

18   Q.   And when did you start in that position?

19   A.   It was February of 2009.

20   Q.   An prior to that, what was your position?

21   A.   Prior to that I was an Operations Officer with Border

22   Patrol Headquarters where I was one of the program managers

23   for the e3 program.

24   Q.   And did you -- were you an Operations Officer for the

25   rollout of e3?

1   A.   For part of the rollout.  Prior to that I was detailed to

2   Headquarters from San Diego Sector where they detailed me to

3   Headquarters to basically help develop the e3 application that

4   we use to process and then systematically roll that out, but

5   then I was promoted to the Operations Officer when we finished

6   the rollout.

7   Q.   And before you went to Washington, D.C. and Headquarters,

8   were you ever a Border Patrol Agent in the field?

9   A.   Yes, ma'am.  I spent about 12 years out in Temecula

10  California, Murrieta, California, as a Border Patrol Agent,

11  a Senior Border Patrol Agent, and a Supervisory Border Patrol

12  Agent.

13  Q.   Chief Visconti, could you explain to the Court what e3DM

14  is.

15  A.   Sure.  E3DM is the e3 Detention Module, which was

16  designed -- which was primarily designed to capture

17  information of the individuals that we have in custody and to

18  document certain actions, you know, care and feeding and

19  showers, but also to ensure that we have an accurate count of

20  who we have in custody and then also to allow us the ability

21  to transfer them in and out of our custody so we can -- we can

22  facilitate the movement of the individuals from CBP to our

23  external partners, as necessary.

24  Q.   Thank you, Chief Visconti.  You're talking kind of fast,

25  so I'm not sure I got everything down.

DIRECT OF VISCONTI
JANUARY 21, 2020 (DAY 6, PART 1)

1      Does -- does e3DM enable CBP or the Border Patrol to

2   track the location of an individual in custody?

3   A.   Yes, it does.

4   Q.   And is that at any given moment in time?

5   A.   Yes.

6   Q.   So for example, if someone in Tucson Sector custody is

7   being transferred to the hospital, can you look that up and

8   will e3DM tell you that information?

9   A.   Yes, e3DM does provide the ability for what we call a

10  temporary bookout that allows us to document that they are

11  being temporarily booked out of our CBP facility to another

12  location, such as a medical facility, in this example.

13  Q.   Chief Visconti, when does e3DM start to track the person,

14  at what event or time?

15  A.   So when an event is initially created within e3

16  Processing or now e3 Intake, they're what's considered to be

17  booked into the facility, and that's when -- that's when the

18  -- if I may back up.

19      When we start to process somebody, we enter an arrest

20  date, so the official time for CBP starts at time of arrest,

21  but there is a book-in date and time that is utilized within

22  the application to start another clock, if you will.

23  Q.   So e3DM, is it fair to say, starts tracking at the time

24  of arrest?

25  A.   Correct.

DIRECT OF VISCONTI
JANUARY 21, 2020 (DAY 6, PART 1)

1    Q.    And does e3DM track temporary bookouts?

2    A.    Yes, it does.

3    Q.    What is a temporary bookout?

4    A.    So a temporary bookout is utilized to allow the system to

5    recognize that that individual's no longer at a CBP facility

6    but has been moved to another location, such as a medical

7    facility, or if they were being prosecuted and they were

8    brought to a courthouse, or if they were brought to another

9    jail for showers or something of that effect, it shows that

10   they are not in a CBP facility, but they're still in CBP

11   custody.

12   Q.    So why wouldn't you just book the person out?  I mean,

13   they're going to the hospital and they're not going to be in

14   the Border Patrol station.

15   A.    When we do send somebody to the hospital, there's always

16   an agent and either a contract staff or two agents that will

17   accompany the individuals to the hospital, so they're

18   technically still in custody.  But this allows us to track

19   where they've gone or where they are, I should say.

20   Q.    So would it be fair to say the individual being

21   transferred -- transported to the hospital is in the custody

22   of Border Patrol but not in the care of Border Patrol while

23   they're receiving their medical treatment?

24   A.    Yes.  That would be fair to say.

25   Q.    Okay.  And is there an end date to when e3DM stops

1    tracking a person?

2    A.    When we book them out.

3    Q.    Okay.

4    A.    Do a final bookout.

5    Q.    So what if a person is booked out and then later comes

6    into custody again?  Perhaps they were reapprehended, you

7    know, they've crossed the border a second time without

8    presenting themselves for inspection.  Would e3DM kind of

9    pick up that case?  Does e3DM have the ability to track that

10   person?

11   A.    So in the scenario you just described, we would actually

12   create a new event number for that individual because it's a

13   new apprehension.  It's a new process that we're starting

14   again, so the clock would start fresh again.

15   Q.    Does e3DM track all people in Border Patrol custody or

16   just the Tucson Sector?

17   A.    All Border Patrol.

18   Q.    So if someone is in custody in another sector outside of

19   Tucson, say, for example, El Paso or Yuma, and then they're

20   transferred to Tucson, is that information tracked in e3DM?

21   A.    Yes, ma'am.

22   Q.    In e3DM, can you look up an individual and tell how long

23   that individual has been in Border Patrol custody?

24   A.    Yes.

25   Q.    And can you tell how long they were in the custody -- for

1  example, if they were transferred from one sector to another,
2  how long they were in the custody of the other sector before
3  they arrived in Tucson?
4  A.   I believe that you can, yes.
5  Q.   Does e3DM provide any type of alerts when someone has
6  been in custody for more than a certain threshold period of
7  time?
8  A.   I know that there is some visual indicators on a
9  particular section of the Detention Module, but I'm not fully
10 familiar with all of the alerts capable, that's capable of the
11 application.
12 Q.   Okay.  Is there a certain threshold of time, maybe like
13 72 hours, where, I don't know, the system will alert you and
14 say we have, you know, so many people who have been in custody
15 72 hours?
16 A.   I believe so.  I believe there is a visual indicator for
17 that.
18 Q.   Okay.  Does e3DM enable you to determine the times at
19 which someone in custody received a meal?
20 A.   Yes, it does.
21 Q.   Does it enable you to determine the times when someone
22 received a Mylar blanket?
23 A.   Yes, it does.
24 Q.   Does e3DM enable you to determine the times when someone
25 received a shower or a body wipe?

 1   A.    Yes.

 2   Q.    Does e3DM enable someone to determine when a person in

 3   custody was asleep?

 4   A.    No, not that I'm aware of.

 5             MS. PARASCANDOLA:  Ms. Kershaw, would you please

 6   show us Joint Exhibit 799.

 7             And would the clerk please turn off the public

 8   screens?  Because this exhibit contains the name and

 9   personally identifying information of an individual.

10             And for the record, this document is five pages

11   long.  It is a spreadsheet with 15 columns lettered A through

12   Q.

13             Ms. Kershaw, would you scroll through all five pages

14   so we get an idea of what's in this document.

15   BY MS. PARASCANDOLA:

16   Q.    Chief Visconti, do you recognize this document?

17   A.    Yes, ma'am.

18   Q.    Without identifying the person whose name appears in it,

19   could you tell us what it is.

20   A.    So this document is basically a list of all actions that

21   occurred to the individual while he was in the custody of

22   Border Patrol and any transfers that were made to that said

23   individual.

24   Q.    Would it be fair to say that this is a subset of e3DM

25   data?

1   A.   Yes, that's correct.

2   Q.   And does it look like it's been filtered for one person

3   who was in custody?

4   A.   Yes, that's correct.

5   Q.   Okay.  Have you seen this before?

6   A.   Yes, I have.

7   Q.   Okay.  And does it appear to be data pertaining to one

8   individual?

9   A.   That's correct.

10  Q.   Is it possible from these data to determine how long this

11  person was in Border Patrol custody?

12  A.   That is correct.

13  Q.   Okay.  And walk us through how you would do that.

14  A.   So there is a couple different ways.  If you look at line

15  1, or I'm sorry, line 163, which is the top line of data, you

16  see under the "Actions" code, column J, "Arrest,", and then

17  the action date and time, column L, that -- that's where the

18  start of the clock would be for a -- you know, that's when the

19  apprehension was made.

20       And then the next line down, 164, again, column J,

21  "In_BP_ Station," is when they were booked into the station.

22  And then column L, you would see that at 3/26 of 2019, at

23  8 p.m., he was booked into that station.

24       You'll notice column N is a -- column N is the bookout

25  date/time, and then column O has hours in custody, and so that

 1   is showing when he was booked out from that "In_BP_Station"

 2   action, and then all the subsequent rows beneath that are the

 3   different actions until he was either transferred or booked

 4   out that occurred during that time period.

 5   Q.   Chief Visconti, can you tell me whether the date and time

 6   reported in row 164 in column letter N is when this person was

 7   booked out, or was this a temporary bookout?

 8   A.   I would have to --

 9   Q.   Or maybe you can't tell.

10   A.   I can't tell from that particular line.  We would have to

11   scroll through the rest of the report to see what that next

12   movement action was.

13        MS. PARASCANDOLA:  Ms. Kershaw, would you please

14   scroll down to page 5 of this exhibit.

15   BY MS. PARASCANDOLA:

16   Q.   And Chief Visconti, if you look at line number --

17   basically the second to last line, which is 29,548, and

18   there's a value in column letter L.  And then underneath that

19   it says -- the data in the field says, "TCA_E_TCC," and then

20   an arrow to "Florence SPC."

21        Would that be the date and time that -- excuse me.

22   Would -- in column L, would that indicate the date and time

23   that this person was booked out of Tucson Sector custody?

24   A.   Yes, ma'am.

25   Q.   So to calculate the time this person spent in Tucson

1   Sector custody, would you subtract the value in row 163 from

2   the value in row 29,549?

3   A.   If you can scroll back to 163, I just want to verify.

4        Yes, that would be correct.  That would be his total time

5   in custody.

6   Q.   And using this method, could you find out the time that

7   someone spent in custody of anyone else who was in custody?

8   A.   Yes.  You could apply the same methodology.

9   Q.   Okay.  So staying on Joint Exhibit 799, let's look at

10  other actions.  Could you please look at line 169.  And in

11  that line, it reports an action that was completed, so in

12  column letter J, where it says "Action," it says "MLACC."

13       Can you tell us what that is?

14  A.   Meals accepted.

15  Q.   Okay.  And maybe there is a clue to that in the freeform

16  comment that appears in column P --

17  A.   Correct.

18  Q.   -- where it says, "Hot meal, burrito."

19       And can you tell us what time that action took place and

20  the date?

21  A.   It occurred on 3/26/2019 at 8:05 p.m.

22  Q.   So in e3DM, are all of these events supposed to be

23  recorded?

24  A.   Yes, ma'am.

25  Q.   Okay.  So while we're on Exhibit 799 on the screen, can

 1   you tell me what an event number is?  And that's column C in
 2   this spreadsheet.
 3   A.   Sure thing.  The event number is a system number that is
 4   assigned to either an individual or a group of individuals who
 5   were apprehended at the same time.  It's broken down into four
 6   parts.  The first three characters are the station identifier
 7   of who made the apprehension.  The next two digits are the
 8   fiscal year of which the apprehension occurred.  The following
 9   two digits after that are the month in which the apprehension
10   occurred.  And then the last six digits are a random generated
11   system number that sequentially increases as, you know, more
12   apprehensions are processed.
13   Q.   So could an event number be associated with more than one
14   individual?
15   A.   Yes, ma'am.
16   Q.   Could an event number be associated with only one
17   individual?
18   A.   Yes, ma'am.
19   Q.   Is the event number assigned automatically, or does the
20   Border Patrol Agent have to assign it and/or look up something
21   and assign it?
22   A.   It's a system-generated number.
23   Q.   Okay.  So is there any threshold for what would be like a
24   large or a significant event?
25   A.   So the Border Patrol classifies a large -- large group

1    any group of apprehensions of 100 people or more at a time.

2    Q.    And why does Border Patrol do that?

3    A.    So this past fiscal year we've seen unprecedented numbers

4    arriving on the southwest border, and they wanted a better way

5    to track these large groups, because the large groups do put a

6    strain on the overall immigration system by inundating

7    stations with a lot of individuals who need to be processed

8    all at once.

9          Typically, you know, the agents will be working, and they

10   would have, you know, they'd catch a group of five or a group

11   of ten, and that's very manageable to a degree.  But when you

12   got a group of 150 at a time, that takes a lot of resources

13   for travel to the station and then to process and to provide,

14   you know, any other amenities that are required at the time.

15   Q.    So tell me who records data in e3DM.

16   A.    It's usually the frontline agents.

17   Q.    And how do you know that the data are being reported

18   correctly?

19   A.    The agents are trained on what to do.  They're provided,

20   you know, mustergrams, they're provided training materials,

21   and there's some policies out there, I believe, that tell what

22   needs to be done during these, you know, during the

23   processing.

24   Q.    So is there any way to check that?

25   A.    So Border Patrol Headquarters has a Statistics and Data

DIRECT OF VISCONTI
JANUARY 21, 2020 (DAY 6, PART 1)

1  Integrity Branch.  They do run data quality reports throughout

2  the month and throughout the year.  The individual sectors

3  keep an eye on the data as well.  Some sectors do their own

4  data quality initiatives to ensure that they're getting the

5  best data possible.

6  Q.   So what if there's something unusual, you know, that

7  looks like it has to be a mistake, like a person in custody

8  for a thousand hours?

9  A.   Right.  So, you know, for instance, you know, my group,

10  we sometimes see that a lot, and so we'll reach out to the

11  field or to our Migration Crisis Action Team, which is a group

12  at Headquarters, who will then reach out to the field and say,

13  hey, listen, we're seeing this person's in custody for a

14  thousand hours, seems odd, can you double-check?

15       And so then the station will do some research, and most

16  likely it's usually a data entry issue where the date of

17  arrest was incorrect, so they put, like, you know -- you know,

18  we see this a lot around the change of the new year where

19  they'll start putting, you know, January 1, 2019, because

20  they're so used to doing it, when it should have been 2020.

21       And so things like that are usually easily fixed and

22  remedied.

23  Q.   What if there is a systemic problem, like one station or

24  one person who's repeatedly recording something in the wrong

25  way?  How would you find that and how would you fix it?

DIRECT OF VISCONTI
JANUARY 21, 2020 (DAY 6, PART 1)

1   A.   So the system does capture who made the action within --

2   within e3DM, so it's logged by their -- what they call the

3   agent ID, and so it's easy to track who is making or who is

4   inputting those specific data elements.  And so if you do a

5   query over time, you would be able to see, you know, if that

6   person is doing that systemic, you know, data quality issues,

7   and then a supervisor -- you know, we can notify a supervisor

8   who would then, you know, educate and train as necessary.

9   Q.   Do you ever find that there's a systemic problem at a

10  particular sector or station that needs to be fixed?

11  A.   Not recently, no.

12  Q.   Okay.  So if we could turn to some off the data summaries

13  that plaintiffs have submitted in this litigation.

14        MS. PARASCANDOLA:  Ms. Kershaw, would you please

15  pull up Plaintiffs' Exhibit 1215.01.

16  BY MS. PARASCANDOLA:

17  Q.   Chief Visconti, I'll represent to you that this is the

18  first page of eight similar graphs, one for each station in

19  the Tucson Sector, reporting the maximum number of people in

20  the station between 10 p.m. and 6 a.m. as measured in

21  15-minute intervals by month between September 2016 and

22  November 2019.  And plaintiffs submitted eight of these

23  graphs.  They're numbered Exhibits 1215.01 through 1215.08.

24  But let's just stick with this one.

25        Does this look familiar to you?

DIRECT OF VISCONTI
JANUARY 21, 2020 (DAY 6, PART 1)

1   A.   Yes, ma'am.

2   Q.   Okay.  Based on your review of these graphs, do they

3   provide a census of people in custody at the station at any

4   given time?

5   A.   I think the challenge with, excuse me, with this

6   particular graph was that they took a count based off of, you

7   know, a 15-minute interval that where, if a person was only in

8   there for one minute, we don't know.  So we don't know whether

9   he was counted, you know, was he there for a minute, or was

10  there he there for the whole 15 minutes?

11       And so I think it's a little misrepresenting of what it

12  could be, you know.

13  Q.   So in other words, would it be fair to say that Exhibit

14  1215.01 does not provide any information about how long an

15  individual spent in custody?

16  A.   That is correct.  It does not.  It's just a count of who

17  at that 15-minute mark or how many at that 15-minute mark were

18  in custody, not their length in custody.

19  Q.   And does this exhibit and the seven that follow provide

20  sufficient information to make even a reasonable inference

21  about how long a particular individual spent in custody?

22  A.   No, it does not.

23  Q.   Does this exhibit provide sufficient information about

24  how long any individual spent in custody in a station where

25  the number of people exceeded the sleeping mat capacity in the

1    hold rooms?

2    A.   No.

3    Q.   Does it provide sufficient information to even make any

4    inferences?

5    A.   I don't think so.

6    Q.   Does this exhibit provide sufficient information to tell

7    you whether any individual spent the night in the hold room

8    where -- in a hold room where the number of people exceeded

9    the sleeping mat capacity?

10   A.   No.

11   Q.   And does this exhibit provide you any information on the

12   number of people in the station who were there for under 12

13   hours?

14   A.   No.

15   Q.   Does this exhibit provide you enough information to make

16   even a reasonable inference as to how many people were in the

17   station for under 12 hours?

18   A.   No.

19   Q.   Was e3DM ever intended to be a system for collecting data

20   to be aggregated for the purpose of historical reporting like

21   this?

22   A.   No, ma'am.

23          MS. PARASCANDOLA:  Ms. Kershaw, would you please

24   pull up Plaintiffs' Exhibit 1216.01.

25   BY MS. PARASCANDOLA:

1  Q.   Chief Visconti, this is the first exhibit of 75 that

2  plaintiffs have submitted.  They're all similar graphs, one

3  for each hold room that plaintiffs selected, reporting the

4  maximum number of people in the hold room as measured in

5  15-minute intervals by week between the first week of January

6  2018 and week 48 of 2019, and these graphs are numbered

7  Exhibits 1216.01 through 1216.75.

8       So let's just stick with the first page.  Does this look

9  familiar?

10 A.   Yes.

11 Q.   Based on your review of these graphs, do they provide a

12 census of people in the hold room, in the given hold room, at

13 any given period of time?

14 A.   No.  What it provides is, again, similar to the last

15 graph, this one is just broken down by week, to a particular

16 cell versus the overall station.

17 Q.   And does this graph provide any information about how

18 long a single individual spent in the hold room?

19 A.   No.

20 Q.   Does the information on this graph provide -- is there,

21 sorry, sufficient information in this graph to even make a

22 reasonable inference about how long a particular individual

23 spent in this hold room, Ajo Station cell number 1214?

24 A.   No.

25 Q.   Does this graph provide sufficient information about how

DIRECT OF VISCONTI
JANUARY 21, 2020 (DAY 6, PART 1)

 1    long an individual spent in a hold room where the number of

 2    people exceeded the sleeping mat capacity?

 3    A.   Can you repeat that again, please.

 4    Q.   Does this graph provide sufficient information about how

 5    long any individual spent in the hold room or in a hold room

 6    where the number of people exceeded the sleeping mat capacity?

 7    A.   No.

 8    Q.   And does this graph provide even enough information to

 9    make a reasonable inference about how long someone spent in a

10    hold room where the sleeping mat capacity was exceeded?

11    A.   I don't believe so, no.

12    Q.   So it's possible that someone spent, I don't know, 12

13    hours or less in the hold room?

14    A.   Correct.

15    Q.   Does the information on this graph tell us whether any

16    individual spent the night in a hold room where the number of

17    people exceeded the sleeping mat capacity?

18    A.   No.

19    Q.   Does this graph provide enough information to make even a

20    reasonable inference about that, about whether someone spent

21    the night in a hold room where the sleeping mat capacity was

22    exceeded?

23    A.   No.

24    Q.   So again, these graphs just show you that, at certain

25    times, the number of people in a hold room exceeded the

DIRECT OF VISCONTI
JANUARY 21, 2020 (DAY 6, PART 1)

 1  sleeping mat capacity at some point?

 2  A.    Correct.

 3          MS. PARASCANDOLA:  Ms. Kershaw, would you please

 4  pull up Plaintiffs' Exhibit 1217.01.

 5  BY MS. PARASCANDOLA:

 6  Q.    And Chief Visconti, could you tell me what is depicted in

 7  this graph.

 8  A.    So it's showing cell 1 at Casa Grande station.  It looks

 9  to be the median square foot per individual that was

10  aggregated at 15-minute intervals between 10 p.m. and 6 p.m.

11  Q.    Chief Visconti, I'll represent to you that this is the

12  first of 12 exhibits that plaintiffs submitted in this

13  litigation.  They're numbered 1217.01 through 1217.12.

14      But let's stick with this one, which is representative of

15  this group of exhibits.  Does it look familiar to you?

16  A.    Yes, ma'am.

17  Q.    And based on your review of this graph, does it provide a

18  census of the number of people in custody in the hold room at

19  any given time?

20  A.    No.

21  Q.    Does it provide any information about how long a single

22  individual spent in the hold room?

23  A.    No.

24  Q.    Does it provide sufficient information to make even a

25  reasonable inference about how long a particular individual

1    spent in a hold room?

2    A.   No.

3    Q.   Does this graph provide any information about whether an

4    individual spent the night in the hold room for which

5    plaintiffs are reporting the square footage available to each

6    person?

7    A.   No.

8    Q.   And does this graph provide sufficient information to

9    make even some kind of reasonable inference about that?

10   A.   No.

11   Q.   So do the graphs in Exhibit 1217.01 and the remainder of

12   them -- and I'll tell you they're basically similar -- tell

13   you if any of the people here were released in under 12 hours?

14   A.   No.

15   Q.   So again, was e3DM data ever intended to be aggregated

16   for the purpose of showing historically how many square feet

17   were available per person in 15-minute intervals?

18   A.   No.

19        MS. PARASCANDOLA:  Ms. Kershaw, would you please

20   pull up Plaintiffs' Exhibit 1219.01.

21   BY MS. PARASCANDOLA:

22   Q.   Chief Visconti, could you please describe for us the

23   information in Plaintiffs' Exhibit 1219.01.

24   A.   Sure.  The title states, "Number of Detainees Served a

25   Meal Between 3 a.m. and 5 a.m. Despite Leaving After 8 a.m.

DIRECT OF VISCONTI
JANUARY 21, 2020 (DAY 6, PART 1)

1   that Morning and Arriving 10 p.m. the Previous Night."  It

2   looks like it's broken down by -- from calendar years 2015 to

3   2019 by week.

4   Q.   So should we assume that a person who received a meal

5   between the hours of 3 a.m. and 5 a.m. and who arrived at the

6   station before 10 p.m. and didn't leave until after 8 a.m. was

7   woken up so that they could be given a meal?

8   A.   The data does not allow you to make that assumption at

9   all.

10  Q.   Why not?

11  A.   One, e3DM does not track whether somebody was sleeping.

12  You know, it tracks whether a meal was offered and accepted or

13  offered and refused, but it also doesn't track whether

14  somebody asked for a meal.

15       So, I mean, if the individuals are traveling all day, and

16  they get to the station, you know, say, nine o'clock, you

17  know, as they are unwinding, they may get hungry between 3:00

18  and 5 a.m, so the data here doesn't allow you to make those

19  assumptions that they were sleeping or that they were woken up

20  to have a meal served.

21  Q.   But is it your understanding that it's a practice in

22  Tucson Sector that, when people arrive in the station, they're

23  given a hot meal?

24       Right?

25  A.   I'm not familiar with all of Tucson Sector's policies.

DIRECT OF VISCONTI
JANUARY 21, 2020 (DAY 6, PART 1)

1  Q.   Okay.  Well, let's assume that they are.  So they're

2  given a hot meal.  Why, you know, would they -- you know,

3  let's say they arrived before 10 p.m.  Why would they have

4  another meal at 3 a.m.?

5  A.   Again, if they were out traversing in the desert for a

6  long period of time, they may be hungry again.  You know, as

7  these individuals are, you know, coming up this way, they

8  don't have a regular sleeping pattern anymore.  I mean,

9  they're moving through the night.  They're sleeping through

10  the day sometimes, you know, because it's cooler at night to

11  travel.  You know, during the day they try and find shade and

12  rest.

13      So their body may still be on that type of rhythm where

14  they still may be awake during 3 a.m. and 5 a.m.

15  Q.   In your experience, are most apprehensions on the

16  southwest border during the night hours?

17  A.   Yes.

18          MS. PARASCANDOLA:  Ms. Kershaw, would you please

19  pull up Plaintiffs' Exhibit 1219.03.

20  BY MS. PARASCANDOLA:

21  Q.   Chief Visconti, does this look familiar?

22  A.   Yes.

23  Q.   And can you tell us what it shows.

24  A.   Yes.  The title states, "The Number of Detainees Served a

25  Meal Between 3 a.m. and 5 a.m. Despite Leaving After 8 a.m.

1    that Morning and Arriving Before 10 p.m. the Previous Night."

2        It looks like they also added in another line to the

3    chart that says, "Number of Detainees Held Overnight."

4    Q.   And what can we infer from this, if anything?

5    A.   Just the amount of aliens or individuals that were held

6    overnight, I mean, during -- an aggregate total for that week.

7    Q.   Uh-huh.

8    A.   And I would not be able to say that, you know, that all

9    those people who were sleeping during the time were awoken to

10   be provided a meal.

11   Q.   So again, I mean, could we assume that a person who

12   received a meal between 3 a.m. and 5 a.m., despite arriving

13   before 10 p.m. and leaving after 8 a.m. that morning, was

14   woken up, and we know that they spent the night in the

15   station?

16   A.   I can't make that from this, from this data chart.

17              MS. PARASCANDOLA:  So Ms. Kershaw, would you please

18   put on the screen Plaintiffs' Exhibit 1208.

19   BY MS. PARASCANDOLA:

20   Q.   Chief Visconti, have you seen this bar graph before?

21   A.   Yes, ma'am.

22   Q.   Can you tell me what it shows to you?

23   A.   It's displaying the number of detainees held for a given

24   length of detention by calendar year, by month, and then it's

25   broken down into six categories where it appears it's, you

DIRECT OF VISCONTI
JANUARY 21, 2020 (DAY 6, PART 1)

1   know, what I would refer to as, like, a time bucket, for lack

2   of a better term.

3   Q.   So is it fair to say that it shows you the number of

4   detainees who spent time in custody for 12 hours or less and

5   by month since January 2015 through the period ending November

6   2019 and also the number of detainees held for 12 to 24 hours

7   and those held 24 to 36 hours, those held 36 through 48 hours,

8   those held 48 to 72 hours, and people held more than 72 hours?

9   A.   Correct.

10  Q.   Does this bar chart provide any breakdown by

11  demographics?

12  A.   No, it does not.

13  Q.   And in the terminology of Border Patrol, what does

14  "demographics" refer to?

15  A.   Sure.  So when we refer to "demographics," we're breaking

16  the individuals into those that are part of a family unit,

17  those that are unaccompanied alien children, and those that

18  are single adults, so three separate categories.

19  Q.   Chief Visconti, does Plaintiffs' Exhibit 1208 provide any

20  breakdown by country of citizenship?

21  A.   No, it does not.

22  Q.   And do the data here include any breakdown according to

23  whether the person in custody was at a Border Patrol sector

24  other than Tucson and later transferred to Tucson Sector?

25  A.   There's nothing on this chart to indicate that to me.

DIRECT OF VISCONTI
JANUARY 21, 2020 (DAY 6, PART 1)

1           MS. PARASCANDOLA:  Ms. Kershaw, would you please put

2  on the screen Defendants' Demonstrative 1.

3           THE COURT:  Before we get to that, why don't we take

4  a recess for 10 minutes.  We'll be at recess for 10 minutes.

5           (Recess taken.)

6           THE COURT:  Go ahead, counsel.  We're back on the

7  record.

8           MS. PARASCANDOLA:  Ms. Kershaw, would you please put

9  back on the screen Exhibit 799?

10          And I would ask the clerk not to make this public,

11  not to make this exhibit public.

12  BY MS. PARASCANDOLA:

13  Q.   And Chief Visconti, do you, again, recognize this

14  spreadsheet?

15  A.   Yes, ma'am.

16  Q.   And could you tell me what it is.

17  A.   It is data provided to the plaintiffs from the e3

18  Detention Module for all subjects booked into a TCC facility.

19  Q.   And are you familiar with the source of these data?

20  A.   Yes, ma'am.

21          MS. PARASCANDOLA:  Defendants' move to admit Joint

22  Exhibit 799 into evidence.

23          MR. DOUGLASS:  No objection, Your Honor.

24          THE COURT:  It's admitted.

25          MS. PARASCANDOLA:  Ms. Kershaw, would you please put

UNITED STATES DISTRICT COURT

1   up on the screen Defense Exhibit 10.

2   BY MS. PARASCANDOLA:

3   Q.   Chief Visconti, would you please tell us how many people

4   in Tucson Sector were apprehended in fiscal year 2019?  And by

5   "people," I mean noncitizens or aliens who are removable or

6   deportable from the United States.

7   A.   Yes, ma'am.  For fiscal year '19, 63,490 individuals were

8   apprehended by the Tucson Sector Border Patrol.

9   Q.   And looking at this exhibit, Defendants' Exhibit 10, can

10  you tell me the source of this information?

11  A.   So this -- this information was derived from both e3 and

12  e3 Detention Module.

13  Q.   And did you prepare this exhibit?

14  A.   Yes, ma'am.

15  Q.   And do you attest to the accuracy of the summary, of the

16  information in this summary?

17  A.   Yes, ma'am.  If you'll notice in column "Less Than 12,"

18  the original submission, we had -- we updated it to 3,008.  It

19  was a typo originally for the 2008.

20  Q.   Thank you.

21          MS. PARASCANDOLA:  So defendants move to admit their

22  Exhibit Number 10 into evidence.

23          MR. DOUGLASS:  No objection, Your Honor.

24          THE COURT:  It's admitted.

25          Sara, excuse me.

DIRECT OF VISCONTI
JANUARY 21, 2020 (DAY 6, PART 1)

```
 1              (A discussion was had off the record between the
 2              Court and the Clerk.)
 3              THE COURT:  Go ahead.
 4    BY MS. PARASCANDOLA:
 5    Q.   So Chief Visconti, what is the average time in custody
 6    that the people who were apprehended by Tucson Sector in
 7    fiscal year 2019 spent in custody?
 8    A.   It came out to 53.92 hours.
 9    Q.   And how many were in custody from 12 to 24 hours?
10    A.   15,238.
11    Q.   And how many from 24 to 48 hours?
12    A.   23,416.
13    Q.   And how many from 48 to 72 hours?
14    A.   9,798.
15    Q.   And how many were in custody for more than 72 hours?
16    A.   12,030.
17    Q.   How did you calculate time in custody?
18    A.   So for purposes of CBP, we calculate it from the time of
19    apprehension to the time of bookout, and, you know, the math
20    is the math.
21    Q.   Okay.  Now, does it make a difference when the clock for
22    time in custody starts?  And -- I mean, does it make a
23    difference whether it's time of arrest or time of book-in at
24    the station?
25    A.   So the main difference would be that any data provided
```

1    where the clock starts at the time of station, at the book-in,

2    it would be less than what we're depicting here as time of

3    apprehension to time of bookout.

4    Q.    And why is that?  Why is it less?

5    A.    Because you're, you know, if you start by book -- at the

6    time of book-in, you're omitting that arrest, from time of

7    arrest to time of transfer to the station, and then the

8    book-in.  So you're missing, depending on where the

9    apprehension was occurred, if it occurred out in Ajo -- and so

10   for example, sir, if I may, this past fiscal year, Ajo had 19

11   large groups out in remote areas, so that accounted for I

12   think approximately 3,500 individuals.  It was on average 186

13   per group.

14        If you apprehend that many people all at once in a remote

15   area, that drive time, you know, because we only have so many

16   resources of buses and whatnot, to go and pick them up to

17   transport them to a station, is being omitted, and so we like

18   to capture that information so we know exactly how long we've

19   had them in our custody.

20        If you start at the time of book-in to the station,

21   you're omitting all of that, that time.

22   Q.    Chief Visconti, is it also possible that someone

23   apprehended in the field was apprehended at a point a couple

24   hours drive from the nearest station?

25   A.    Yes, absolutely.

1  Q.   So you have to include the transportation time?

2  A.   CBP likes to include that time, yes.

3  Q.   Okay.  Does -- do these time in custody numbers include

4  temporary bookouts?

5  A.   Yes, they do.

6          MS. PARASCANDOLA:  Okay.  Ms. Kershaw, would you

7  please show Defendants' Exhibit 11.

8  BY MS. PARASCANDOLA:

9  Q.   Chief Visconti, did you prepare Defendants' Exhibit 11?

10  And let's wait for it to be put up on the screen.

11  A.   Yes, ma'am.

12  Q.   And what is the source of the information in Defendants'

13  Exhibit 11?

14  A.   As noted on the slide, the CBP data warehouse, which is a

15  data warehouse where the data from e3DM and the EID, which is

16  the Enforcement Integrated Database, is then pushed to and

17  updated into our data warehouse so that we can provide

18  statistical reports.

19          THE COURT:  How do we know that's Exhibit 11?  For

20  the record, how -- it's not marked as 11.

21          MS. PARASCANDOLA:  Thank you, Your Honor.  It's

22  currently marked as Defendants' Demonstrative Exhibit 2.  And

23  this is my fault.  I inadvertently, mistakenly labeled these

24  as demonstrative exhibits, but we will seek to have them

25  admitted as regular exhibits, and I will just state on the

1  record that the number --

2              THE CLERK:  And you're actually in the 2000s, so

3  your exhibits would be 2010, 2011.

4              MS. PARASCANDOLA:  Thank you.

5              THE CLERK:  They misnumbered everything.

6              THE COURT:  Well, Sara, if you can keep track of it,

7  that's all I need.

8              THE CLERK:  I can.

9              THE COURT:  Okay.

10  BY MS. PARASCANDOLA:

11  Q.   And just so we have a clear record, Chief Visconti, we

12  were discussing the first exhibit, the first defendants'

13  exhibit, in which you testified that total apprehensions were

14  63,490, and that would be Defendants' Exhibit I think 2000 --

15  2010.  So -- and now we have on the screen Defendants' Exhibit

16  2011, but it is labeled Defendants' Demonstrative Number 2.

17       Chief Visconti, is this a fair and accurate summary of

18  information recorded in e3DM?

19  A.   Yes, ma'am.

20              MS. PARASCANDOLA:  And defendants move to admit

21  their Exhibit Number 2011 into evidence.

22              MR. DOUGLASS:  No objection, Your Honor.

23              THE COURT:  It's admitted.

24  BY MS. PARASCANDOLA:

25  Q.   Chief Visconti, could you tell us what is in this

1   exhibit.

2   A.   Yes, ma'am.  This particular slide is showing, for FY

3   2019, the average time in custody of all subjects that were

4   booked into a Tucson facility.

5        So you'll notice that the total number of 70,733 is

6   higher than the previous exhibit of 63,490 because this number

7   includes other sectors who Tucson agreed to help out and

8   process their bodies.  For example, El Paso was very

9   inundated, and so a lot of those individuals were sent over to

10  Tucson to be processed in an expedited manner.

11       So that's why this number is higher than the previous

12  slide.  It included all individuals who were booked into a

13  Tucson facility for FY 2019.

14  Q.   So Chief Visconti, just to put you on the spot to do some

15  math, about how many people did Tucson Sector transfer from

16  other sectors in fiscal year 2019?

17  A.   Actually other sectors transferred into Tucson just over

18  7,000.

19  Q.   Okay.  Is it useful to look at time in custody by

20  demographic?

21  A.   Absolutely.

22  Q.   Why is that?

23  A.   So the Border Patrol prioritizes how we process

24  individuals in our custody.  Unaccompanied alien children are

25  first, family unit aliens are second, and then single adults.

1   The reason why we prioritize is because, you know, with the

2   interests of the children in mind, we want to get them to a

3   more secure and caring facility that can adequately provide

4   the support and amenities that they need, you know, such as

5   that HHS can provide.

6   Q.   Does it take a longer period of time on average to

7   process someone based on demographic?

8   A.   Yes.  For instance, a family unit, which can range

9   anywhere from two to, you know, X, would take significantly

10  longer to process than a single individual or a single

11  unaccompanied child.

12  Q.   So if Border Patrol is processing a family unit, must the

13  adult be -- or must the children be present?

14  A.   Typically the adult will answer for the child if they're,

15  you know, depending on their age and they're unable to --

16  unable to answer the questions.  However, you know, if the

17  child is, you know, 13 or 14, they most certainly can answer.

18  However, the family is kept together.

19       And each individual's asked the same questions.  It's not

20  one question is asked to the adult that applies to everyone,

21  you know, so they have to go through the process for each form

22  for each individual.

23  Q.   Okay.  And so -- and again, is this because e3DM keeps

24  records according to individual?

25  A.   Correct.  e3DM keeps actions according to each

DIRECT OF VISCONTI
JANUARY 21, 2020 (DAY 6, PART 1)

1  individual, not as a group.

2  Q.   So may the adult be processed for the child, or does the

3  child have to be processed separately?

4  A.   The child has to be processed separately --

5  Q.   Okay.

6  A.   -- usually together with the adult, you know, standing

7  next to each other, but individual records.

8  Q.   So if Border Patrol took into custody a large number of

9  family units or UACs or some combination thereof, would that

10 potentially delay the processing of the single adults?

11 A.   Yes, ma'am.

12 Q.   And why is that?

13 A.   Again, Border Patrol prioritizes our processing to try

14 and transfer out of our custody children, so that would be the

15 UACs and the family units, as they have children with them.

16 Q.   So the children always come first?

17 A.   Absolutely.

18 Q.   And then after that the family units?

19 A.   Yes.

20 Q.   Okay.

21 A.   Yes.

22 Q.   So would it make a difference in processing times if

23 there was a large group?

24 A.   Yes, ma'am.

25 Q.   And why is that?

1   A.   As I indicated earlier, when you have -- encounter a

2   large group, and what we've seen especially in Tucson Sector,

3   the majority were family units, transporting them to the

4   station, you know, is a Herculean effort.  You know, it takes

5   a lot of resources to do that.

6        But once they're at the station, trying to get to

7   everybody to process them, you know, is going to take time.

8   We don't have -- you know, say we apprehend a group of 186.

9   We don't have 186 terminals at a single station where we could

10  do everybody at the same time.

11       So that's why we prioritize the children first and then

12  family units, so that we can, you know, effectively move them

13  through the process to get them, you know, transferred out of

14  our custody.

15  Q.   So if you had a large group, for example, if 300 people

16  show up at Ajo, would it take longer to process each one of

17  those individuals than if they had trickled in slowly

18  throughout the week?

19  A.   Yes.

20  Q.   So I think earlier you had testified that, in fiscal year

21  2019, there were some significant events in Tucson Sector.

22  A.   Correct.  Ajo specifically had 19 large groups in a

23  remote area.

24  Q.   And how many people were apprehended as part of those 19

25  large groups?

DIRECT OF VISCONTI
JANUARY 21, 2020 (DAY 6, PART 1)

1  A.    It was over 3,500.

2  Q.    And so what would that be on average?

3  A.    On average, about 186 per group.

4  Q.    Okay.  So what about events that are significant but

5  don't meet that large group threshold?  And so I mean, like,

6  what if you have three groups of 50?  Would that delay

7  processings?

8  A.    Absolutely.  If three groups of 50 were caught within a

9  similar amount of time, whether it be an hour, half-hour, two

10 or three or four hours, that's absolutely going to cause a

11 delay in processing, you know, again, just because you have a

12 large amount of people coming into the station, minimal amount

13 of processing workstations, and so it takes time to work

14 through that, the flow.

15 Q.    So just looking at Defendants' Exhibit 2011, is it fair

16 to say, when you break it down by demographics, does the

17 person's status as part of a family unit appear to make it

18 more likely that they will be in custody for more than 72

19 hours?

20 A.    I mean, looking at this chart, it's evident of that,

21 absolutely.  But again, you know, depending on where they're

22 apprehended and the resources there to process them, but yes,

23 you know...

24 Q.    Because here it shows you that, out of the 70,733 total

25 individuals, 16,747 spent more than 72 hours in custody, and

DIRECT OF VISCONTI
JANUARY 21, 2020 (DAY 6, PART 1)

1  of those 16,747, half of them were family units.

2  A.   Correct.

3  Q.   So that would -- is it fair to say that that's possibly

4  attributable to family units taking longer to process?

5  A.   Yes, ma'am.

6  Q.   Okay.  Does being in a family unit also correlate with a

7  higher TIC time, that's T-I-C, Time in Custody?

8  A.   Yes, ma'am.

9  Q.   Why is that?

10  A.   Again, you know, it takes more time to process those

11  groups together, you know, those families together, you know,

12  as they're being processed for their immigration cycle.

13          MS. PARASCANDOLA:  Ms. Kershaw, would you please

14  show us Defendants' Exhibit Number 2012.

15          And for the record, this exhibit is currently marked

16  as Defendants' Demonstrative 3.

17  BY MS. PARASCANDOLA:

18  Q.   Chief Visconti, did you prepare this summary?

19  A.   Yes, ma'am.

20  Q.   And do you attest to the accuracy of the information in

21  this summary and that it reflects e3DM data?

22  A.   Yes.

23          MS. PARASCANDOLA:  Defendants hereby move to have

24  their Exhibit 2012 admitted into evidence.

25          MR. DOUGLASS:  No objection, Your Honor.

DIRECT OF VISCONTI
JANUARY 21, 2020 (DAY 6, PART 1)

1           THE COURT:  It's admitted.

2  BY MS. PARASCANDOLA:

3  Q.   Chief Visconti, when determining time in custody, is it

4  useful to look at temporary bookouts?

5  A.   Yes, ma'am.

6  Q.   What are the reasons for a temporary bookout?

7  A.   As I alluded to earlier this morning, when an individual

8  is sick, we like to get them medical attention, so we take

9  them to a medical facility.  Another reason would be for, if

10 they're being prosecuted, we take them to court.  You know,

11 here within Tucson, it's my understanding that they've also

12 taken them to some local jails to get showers and stuff like

13 that.

14      So although they're still in physical Border Patrol

15 custody, they're not within the station itself.

16 Q.   And what is the most common reason for a temporary

17 bookout?

18 A.   I believe it's going to be medical at this time.  I

19 haven't looked one way or the other, but I believe it's

20 medical.

21           MS. PARASCANDOLA:  Ms. Kershaw, if it's possible,

22 could you juxtapose Defendants' Exhibit Number 2011 with this

23 Exhibit 2012?

24 BY MS. PARASCANDOLA:

25 Q.   And Chief Visconti, is it fair to say that approximately

DIRECT OF VISCONTI
JANUARY 21, 2020 (DAY 6, PART 1)

1    five percent of people who enter Tucson Sector custody are

2    temporarily booked out to receive medical treatment off-site?

3    A.    Yes, ma'am.

4    Q.    Could you summarize the impact of a medical visit

5    off-site on time in custody?

6    A.    Sure.  So again, with a medical bookout, we're physically

7    taking the individuals to a medical facility for whatever

8    medical ailment is upon that individual, and so they're still

9    in custody, so there's usually either two agents or an agent

10   and a contract security staff that accompanies them.

11        They wait there the whole time.  So they're still in

12   custody, just not in detention, you know, within our station.

13   And then, you know, then we bring them back to our CBP

14   facilities.

15        So all that time, you know, when they're at the hospital,

16   we're not providing, you know, the food or anything like that,

17   that's incumbent upon the hospital, so that's why we do a

18   temporary bookout, so that we know that, number one, they're

19   in custody, but two, we're not giving them those type of

20   amenities at that time.

21   Q.    Chief Visconti, could you please tell us the difference

22   here between the summaries you prepared in Defendants' Exhibit

23   2011, which is marked Demonstrative Number 2, and Defendants'

24   Exhibit 2012, which is marked as Defendants' Exhibit 3?

25   A.    Yes, ma'am.  2012, the one on the right, is a subset of

1  2011.  Basically we backed out those that had a medical

2  bookout so we could see what their overall time in custody

3  was.

4  Q.   And would it be fair to say that a medical bookout is

5  correlated with an increase in the average time in custody?

6  A.   Yes, ma'am.

7  Q.   Could you explain that for us?  Can you tell us --

8  A.   Sure, yes.  If you look on 2012, on the right, you will

9  see that the average time in custody is 92.87 hours for that

10  population that was taken to a medical facility.  Looking at

11  2011, on the left, of everybody in custody within Tucson

12  Sector, it's 58.75 hours.

13  Q.   So if one person in a family unit must be temporarily

14  booked out for medical treatment and they go to the hospital,

15  would the normal course be for the rest of the family to also

16  be booked out to the medical facility?

17  A.   Absolutely.  Border Patrol likes to keep the families

18  together, so in that instance, you know, if you had a family

19  of three, you know, a mother and two children, and any one of

20  those three was going to the doctor for whatever illness, all

21  three of them would be transported to the hospital to keep

22  that family unity.

23  Q.   And Chief Visconti, would all three of those individuals

24  be recorded in e3DM as a temporary bookout?

25  A.   Yes, ma'am.

1    Q.   And so just to be clear, what if the mother of a family

2    unit had to go to the hospital?  Would the children normally

3    go with her?

4    A.   Yes, ma'am.

5    Q.   So why would you not just record the time spent in the

6    hospital visit as not in Border Patrol custody, because it

7    would certainly get your numbers down?

8    A.   Because they technically are under our custody.  You

9    know, we -- you know, we're responsible for them, maybe not as

10   far as, you know, the amenities at the hospital, but, you

11   know, they're still going through the immigration process, and

12   so they're still in our custody, just not at our facility.

13           MS. PARASCANDOLA:  Ms. Kershaw, would you please

14   pull up the next exhibit on the screen, which is Defendants'

15   Exhibit 2013.

16           And for the record, it will be labeled Defendants'

17   Demonstrative 4.

18   BY MS. PARASCANDOLA:

19   Q.   Chief Visconti, did you create this summary?

20   A.   Yes, ma'am.

21   Q.   And do you attest that it is a true and accurate summary

22   of e3DM data?

23   A.   Yes, ma'am.

24           MS. PARASCANDOLA:  Defendants' hereby move to have

25   their Exhibit 2013 admitted into evidence.

1          MR. DOUGLASS:  No objection, Your Honor.

2          THE COURT:  It's admitted.

3    BY MS. PARASCANDOLA:

4    Q.   Chief Visconti, when determining time in custody, is it

5    useful to look at the country of citizenship of the person?

6    A.   Yes, ma'am.

7    Q.   Why is that?

8    A.   As with the demographic, you know, processing somebody

9    from other than Mexico is -- takes a little bit longer.  There

10   is a little bit more paperwork that's involved, depending on

11   the disposition process that they're going through, whereas

12   with somebody from Mexico, you know, if we were to do a VR,

13   it's really two pieces of paper, but putting somebody through

14   an actual immigration process is a lot more, so there's a lot

15   more involved in it.

16   Q.   What does "VR" stand for?

17   A.   I'm sorry.  Voluntary return, basically same day or next

18   day repatriation.

19   Q.   So it looks like roughly a third of people from countries

20   other than Mexico spend more than 72 hours in custody in

21   Tucson Sector while about only four percent of Mexican

22   citizens do.

23        Would that be a fair reading of your summary?

24   A.   Yes, ma'am.

25   Q.   And why is that?

UNITED STATES DISTRICT COURT

 1  A.   Again, you know, with the Mexican citizens, you know, we

 2  can repatriate them sooner.  The ones that are 72 hours are

 3  most likely ones that we've prosecuted, and so, you know, they

 4  were temporarily booked out to the court, you know, to go

 5  through a prosecution and then came back to us and then

 6  adjudicated after that.

 7       But as far as, you know, the other-than-Mexicans, it's --

 8  there's more involved paperwork.  It takes longer to process

 9  them.

10  Q.   And Chief Visconti, can you tell me off the top of your

11  head the percentage of people apprehended in Tucson Sector in

12  2019 who were not Mexican citizens?

13  A.   Yes.  So the apprehensions for Tucson Sector for FY '19

14  was about a 60/40 split, so 60 percent or 59 percent were from

15  other than Mexico.  I believe it was 41 percent were from

16  Mexico.

17  Q.   So that would significantly add to processing times;

18  correct?

19  A.   Yes, ma'am.

20          MS. PARASCANDOLA:  Okay.  Ms. Kershaw, would you

21  please pull up the next exhibit, which will be Defendants'

22  Exhibit 2014, although it's marked here as Defendants'

23  Demonstrative Number 5.

24  BY MS. PARASCANDOLA:

25  Q.   Chief Visconti, did you create this summary?

DIRECT OF VISCONTI
JANUARY 21, 2020 (DAY 6, PART 1)

1    A.    Yes, ma'am.

2    Q.    And what is the source of these data?

3    A.    Again, it's the CBP data warehouse, which is fed by both

4    e3 Processing and e3DM.

5    Q.    Is this a fair and accurate summary of the e3DM data?

6    A.    Yes, ma'am.

7          MS. PARASCANDOLA:  Defendants' hereby move to admit

8    their Exhibit Number 2014 into evidence.

9          MR. DOUGLASS:  No objection, Your Honor.

10         THE COURT:  It's admitted.

11   BY MS. PARASCANDOLA:

12   Q.    Chief Visconti, we had looked earlier at Exhibit 1208,

13   which was Plaintiffs' colored bar graph of people in custody

14   broken down into the six buckets.

15         Do you recall that?

16   A.    Yes, ma'am.

17   Q.    Okay.  Did that include people transferred from other

18   sectors?  Do you know?

19   A.    I'm unaware.

20   Q.    Okay.  The fact that someone was transferred from another

21   sector, is that significant at all when determining time in

22   custody?

23   A.    Absolutely.  You know, if somebody's transferred, say,

24   from El Paso or from Yuma Sector, that drive time is factored

25   into their time in custody.  So El Paso is, I believe, four to

DIRECT OF VISCONTI                          69
JANUARY 21, 2020 (DAY 6, PART 1)

1    five hours from here, so that would be included into that time

2    in custody.

3    Q.    Okay.  So I'm looking at Defendants' Exhibit 2014, and

4    can you describe for us what this shows.

5    A.    Sure.  This is a chart showing, for FY 2019, the time in

6    custody of those citizens of Mexico that were, by demographic,

7    again, family units, single adults, and unaccompanied

8    children, who were booked into Tucson Sector, split out by

9    both time in custody and by whether or not the apprehension

10   originated in Tucson, indicated by the "TCA" column, or if

11   they were from outside of Tucson, indicated by the "NonTCA"

12   column.

13   Q.    It seems to me that there were not very many who were

14   transferred from outside --

15   A.    Right.

16   Q.    -- Tucson Sector?

17   A.    For the Mexican citizens, it was about 36.

18   Q.    36 total Mexican citizens who were transferred from other

19   sectors to Tucson Sector out of a total of 29,231 Mexican

20   citizens apprehended by -- or who were in Tucson Sector

21   custody at some point during fiscal year 2019; correct?

22   A.    Yes, ma'am.

23         MS. PARASCANDOLA:  Okay.  Ms. Kershaw, would you

24   please show us the next exhibit, which will be Defendants'

25   Exhibit 2015.

UNITED STATES DISTRICT COURT

1             And for the record, it is marked as Defendants'

2    Demonstrative Number 6.

3    BY MS. PARASCANDOLA:

4    Q.   Chief Visconti, did you create this summary?

5    A.   Yes, ma'am.

6    Q.   And is it a fair and accurate summary of e3DM data?

7    A.   Yes, ma'am.

8             MS. PARASCANDOLA:  Defendants' move to admit their

9    Exhibit Number 2015 into evidence.

10             MR. DOUGLASS:  No objection, Your Honor.

11             THE COURT:  It's admitted.

12   BY MS. PARASCANDOLA:

13   Q.   Chief Visconti, could you please tell us what information

14   is in this summary.

15   A.   Sure thing.  So similar to -- similar to the last chart,

16   this one is actually portraying information for

17   other-than-Mexican citizens, whereas the last chart was

18   Mexican citizens, but all the other information is the same.

19   So the time intervals, whether somebody was from Tucson Sector

20   apprehension or a non-Tucson-Sector apprehension and their

21   demographic breakdown.

22   Q.   And how many people who were not Mexican citizens were

23   transferred from outside Tucson Sector to Tucson in fiscal

24   year 2019?

25   A.   7,107.

DIRECT OF VISCONTI
JANUARY 21, 2020 (DAY 6, PART 1)

1   Q.   So that's significantly more than the number of Mexican

2   citizens; correct?

3   A.   Yes, ma'am.

4   Q.   And why did Border Patrol transfer these particular

5   individuals to Tucson Sector?  Did they say, hey, we want

6   everybody who's not from Mexico to go to Tucson?

7   A.   No, ma'am.  Most likely it was that was the type of

8   population that was coming across within those other sectors,

9   and so Tucson offered to help process those individuals, and

10  that was what was sent over to Tucson.

11  Q.   And what other sectors did these people come from?

12  A.   From the data I saw, there was El Paso, Yuma, I believe

13  Big Bend, to name a few.  There may have been a few others.

14  Q.   So if someone's transferred from El Paso, how long is

15  that trip?

16  A.   I want to say it's about four to five hours.

17  Q.   And is that included in the time in custody?

18  A.   Yes, ma'am.

19  Q.   So is it plausible that somebody who spent several days

20  in custody in El Paso and then was transferred to Tucson could

21  have spent maybe only an hour or two in a Tucson Sector

22  station before being released or transferred out of Border

23  Patrol custody?

24  A.   It's possible.

25  Q.   So is it fair to say that some of the people here

DIRECT OF VISCONTI
JANUARY 21, 2020 (DAY 6, PART 1)

1  recorded in the second-to-last column as having been in

2  custody for more than 72 hours actually may have spent a

3  relatively short period of time in a Tucson Sector station?

4  A.   Yes, that's possible.

5  Q.   So in other words, is it fair to say that time in custody

6  would not necessarily reflect time spent in a Tucson Sector

7  hold room?

8  A.   Correct.

9  Q.   So do the factors that we just looked at, temporary

10  bookouts, demographics, other-than-Mexican citizenship, and

11  transfer from another sector, correlate with longer processing

12  and hold times?

13  A.   Absolutely.

14  Q.   Did you observe any correlation of any of these factors

15  with each other?

16  A.   Absolutely.  If you look at, you know, this particular

17  chart, you'll notice in the last column, 6,288 family units,

18  which this chart is showing all other-than-Mexicans were -- I

19  apologize.  3,801 in the 72-hour-plus category is over half of

20  the 6,200 family units that were over 72 hours.

21  Q.   Did you observe any other correlations?

22  A.   The one thing is that, of all those that were transferred

23  from outside of Tucson, you know, looking at the distribution

24  amongst the different time intervals, you'll see that the

25  majority, you know, the majority were 48 to -- or I'm sorry --

DIRECT OF VISCONTI
JANUARY 21, 2020 (DAY 6, PART 1)

1    were 72-hours-plus.

2         So that in and of itself is showing that, you know,

3    coming from outside of Tucson, being an other-than-Mexican,

4    you're going to be in custody longer.

5    Q.   And did you observe any correlation between some of these

6    factors?  For example, would other-than-Mexican citizenship be

7    correlated with something in demographics, like more family

8    units?

9    A.   Correct, yeah.  3,800 were family units that were over 72

10   hours.

11   Q.   So these two factors, right, other-than-Mexican

12   citizenship and being part of a family unit, both individually

13   would increase processing and hold times; correct?

14   A.   Yes, ma'am.

15   Q.   So do these two factors compound the increase in the time

16   it takes to process someone?

17   A.   Yes.

18   Q.   So I think you testified earlier that it doesn't take as

19   much time, generally, to process a single individual as a

20   family unit; correct?

21   A.   Yes, ma'am.

22   Q.   Okay.  So if it takes a shorter time to process a single

23   individual, why are there still single adults who were in

24   custody for more than 72 hours?  And I'm looking at the second

25   row, where it says, "Single Adults," and I'm going over to

1  where it says more than 72 hours.  Still there were 5,973.

2      What would explain that?

3  A.   Yes, ma'am.  Again, as I testified to earlier, the Border

4  Patrol prioritizes processing by demographic, so we would try

5  to process all of the children first, whether that's UACs or

6  family units, first and then the single adults.

7  Q.   So no matter what, the single adults have to wait their

8  turn, essentially?

9  A.   For the most part.  There are instances where we do

10 prosecute, and right now we're prosecuting the single adults,

11 so we try and fill up a docket for single adults.  So that's

12 why you'll see some of those, you know, in earlier time

13 intervals.

14 Q.   So is the e3DM system that you rely upon for updating the

15 Commissioner on how many individuals are in custody, is it

16 reliable for that purpose?

17 A.   Yes, ma'am.

18 Q.   Do you rely on e3DM data to provide statistical reports

19 to the Commissioner on how many people in custody received a

20 meal or a shower or when they received them?

21 A.   No, ma'am.

22 Q.   And do you aggregate data on any of those areas?

23 A.   No, ma'am.

24 Q.   Is e3DM a statistical reporting system?

25 A.   No, ma'am.

1  Q.   Thank you.

2         MS. PARASCANDOLA:  Ms. Kershaw, you may take this

3  down from the screen.

4         Thank you.

5         THE COURT:  Cross-examine.

6         MR. DOUGLASS:  Yes.

7         MS. PARASCANDOLA:  Your Honor, if I may, I'm sorry,

8  I just have one point.  In the Defendants' Exhibit, there was

9  some red text, and I just would like to ask Chief Visconti to

10  explain --

11  A.   Yes, ma'am.  On the one by country of citizenship, the

12  last row for all other countries, this morning, when I was

13  doing a final review of the deck, I noticed that, when I

14  copied the table into the PowerPoint, that bottom row didn't

15  copy over the formulas, and so we had to adjust the numbers to

16  be the accurate, correct numbers.

17         MS. PARASCANDOLA:  Thank you.

18         THE COURT:  All right.  Counsel, go ahead.

19                        CROSS-EXAMINATION

20  BY MR. DOUGLASS:

21  Q.   Good morning, Mr. Visconti.

22  A.   Good morning.

23  Q.   Or Chief Visconti?

24  A.   (No verbal response.)

25  Q.   If an agent wanted to get a list of every detainee in a

CROSS OF VISCONTI
JANUARY 21, 2020 (DAY 6, PART 1)

 1   given station, at a given time, he could get that information

 2   from e3DM; correct?

 3   A.   Correct.

 4   Q.   Are you aware that CBP publishes monthly apprehension

 5   numbers on its web site?

 6   A.   Yes.

 7   Q.   Have you seen the monthly apprehension numbers for fiscal

 8   year 2019?

 9   A.   I'm familiar with them, yes.  I don't have them

10   memorized.

11          MR. DOUGLASS:  Mr. Lucero, could you please pull up

12   the web site showing CBP's apprehensions by sector for fiscal

13   year 2019.

14          Now, Mr. Lucero, could you please scroll to the

15   bottom of the page where it shows the monthly apprehension

16   numbers.  That's it.

17   BY MR. DOUGLASS:

18   Q.   Mr. Visconti, do you see the tabs showing the FY number

19   and then the month?

20   A.   Yes.

21   Q.   And do you agree that these tabs show the monthly number

22   of apprehensions along the southwest bored?

23   A.   Yes.

24   Q.   Do you agree that there's a row showing the monthly

25   apprehensions for Tucson Sector in particular?

CROSS OF VISCONTI
JANUARY 21, 2020 (DAY 6, PART 1)

1  A.   Yes.

2  Q.   Do you agree that the Tucson Sector numbers show values

3  for family units?

4  A.   Yes.

5  Q.   And that is designated by the acronym FMUA; correct?

6  A.   Correct.

7  Q.   And do you agree that the table shows the number of UACs

8  apprehended in Tucson Sector by month?

9  A.   Yes.

10  Q.   And UACs are defined as unaccompanied alien children;

11  correct?

12  A.   Correct.

13  Q.   And do you agree that this table shows the number of SAs

14  or single adults apprehended in Tucson Sector by month, right,

15  where SAs are single adults?

16  A.   Yes.

17  Q.   Do you agree that the data in this table accurately shows

18  the number of apprehensions in Tucson Sector for each month in

19  FY 2019?

20  A.   I would have to see each individual month and then

21  compare it, but yes, I believe that's what it's trying to

22  depict.

23  Q.   So if I click through every month, you could confirm that

24  they're accurate?

25  A.   I wouldn't be able to right at this moment, but that's --

CROSS OF VISCONTI
JANUARY 21, 2020 (DAY 6, PART 1)

1  yeah, I would go back and compare it to what I have, but yes.

2  Q.   Do you have any reason to believe that the numbers on

3  this chart are inaccurate?

4  A.   No, I don't.

5          MR. DOUGLASS:  Mr. Lucero, could you please pull up

6  the web site showing CBP's apprehensions by sector for FY

7  2020.

8          And again could you scroll down to the bottom.  We

9  should get a similar table.  There we go.

10  BY MR. DOUGLASS:

11  Q.   Mr. Visconti, do you agree that these tabs show the

12  monthly apprehension numbers along the southwest border for FY

13  2020?

14  A.   Yes.

15  Q.   Do you agree that there's a row showing apprehensions for

16  the Tucson Sector in particular?

17  A.   Yes.

18  Q.   Do you agree that, like the last table, this table shows

19  how many of the total apprehensions in the Tucson Sector were

20  family units, how many were UACs, and how many were single

21  adults in FY 2020?

22  A.   Yes.

23  Q.   Do you have any reason believe that the data presented in

24  this table is inaccurate?

25  A.   Not at this time.

1          MR. DOUGLASS:  Your Honor's already taken judicial

2    notice of some of the numbers in this table in Defendants'

3    Exhibit I think it was 2008.  We've prepared an exhibit

4    summarizing the data in both of these tables so that the Court

5    could have access to FY 2019 and 2020 numbers by month.

6          The exhibit number is Plaintiffs' Exhibit 1231.  May

7    I place that exhibit on the screen?

8          THE COURT:  Yes.

9          MR. DOUGLASS:  Your Honor, plaintiffs move the

10   admission of Plaintiffs' Exhibit 1231 into evidence.

11         MS. PARASCANDOLA:  No objection.

12         THE COURT:  All right.  It's admitted.

13         MR. DOUGLASS:  I have no further questions, Your

14   Honor.

15         THE COURT:  Any redirect?

16         MS. PARASCANDOLA:  No, Your Honor.

17         THE COURT:  All right.  Well, Agent Visconti, while

18   I've got you here, and since you're into numbers and

19   statistics, there's a distinction, is there not, between the

20   amount of time a detainee is processed and the amount of time

21   the detainee is held beyond processing?

22         THE WITNESS:  Yes.

23         THE COURT:  You with me?

24         THE WITNESS:  Yep.

25         THE COURT:  Do you have the average number of hours

1    it takes to simply process someone?

2              THE WITNESS:  Not on me.  It's something that we

3    could possibly provide.  There is an indicator within the

4    database called "Processing Complete."  I believe it's "PRCMP"

5    under the action codes.  So the way that we would calculate

6    that is from book-in to processing complete, so that would

7    give us that time.

8              THE COURT:  In an ideal world, you would want a

9    person moved on at the end of that processing period.

10             THE WITNESS:  Yes, sir.

11             THE COURT:  Right?

12             But there's a considerable period of time that the

13   detainee is held because he cannot be moved on.

14             THE WITNESS:  Correct.

15             THE COURT:  Is that fair to say?

16             THE WITNESS:  Absolutely.

17             THE COURT:  He's not been picked up by ICE.  He's

18   not been picked up by the Marshal Service.  He's not been,

19   what, we repatriated.  That is a hold period of time; correct?

20             THE WITNESS:  Correct, sir.

21             THE COURT:  And all processing has been completed?

22             THE WITNESS:  Yes.

23             THE COURT:  How do I find out a number associated

24   with the hold time of a detainee as opposed to a process time?

25             THE WITNESS:  So, again, we could take from the

COURT EXAMINATION OF VISCONTI
JANUARY 21, 2020 (DAY 6, PART 1)

1    process complete date/time stamp to the bookout time stamp,

2    because effectively, the way the Border Patrol uses that

3    processing complete, it's indicating that that file has been

4    signed off by a Border Patrol or CBP supervisor and that that

5    individual is ready for transfer.

6              THE COURT:  Can you tell me off the top of your head

7    how much time it usually takes to process an individual,

8    bearing in mind there's a difference based on demographics?

9    Say a single adult, how long does it take to simply process

10   that individual, if I don't hold you to it?

11             THE WITNESS:  If you don't hold me to it, based on

12   my experience when I was processing, you know, years ago, you

13   know, for a Mexican adult, I mean, I was a fairly adept typer,

14   so I could get it done within, you know, two hours.  For

15   somebody from, say, Guatemala or other than Mexico, it was

16   significantly longer, maybe, you know, four to five, four to

17   five hours to process.

18             That's if I didn't have any -- you know, if I was

19   just dealing with that one person.  You know, if I have a

20   group of 20 individuals, you know, it's going to take me, you

21   know, four to five hours for the one, four to five hours for

22   the next, if I'm doing all the processing.  But if we have

23   multiple agents, then, you know, we could get through that

24   group quicker.

25             THE COURT:  How much control does the Border Patrol

COURT EXAMINATION OF VISCONTI
JANUARY 21, 2020 (DAY 6, PART 1)

1   have over moving a detainee after processing, or is it

2   dependent upon these other agencies?

3          THE WITNESS:  Moving them within Border Patrol

4   custody or outside of Border Patrol custody?

5          THE COURT:  Out -- well, outside of a detention

6   center.

7          THE WITNESS:  We really rely on our external

8   partners for that.  You know, they control their incoming

9   flow.  We can tell them how many we have, how many are ready

10  to go, how many are waiting, how long we've had them, but it's

11  really incumbent on them to say, yes, we're going to take X

12  number, you know, at this certain time.

13         THE COURT:  Okay.  Thank you for coming.

14         Any other questions?

15         MS. PARASCANDOLA:  No, Your Honor.

16         THE COURT:  Thank you.

17         MS. PARASCANDOLA:  We do have another witness.

18         THE COURT:  Sure.

19         Where did you come from?

20         THE WITNESS:  Washington, D.C., sir.

21         THE COURT:  Ah, okay.  Well, have a good trip.

22         THE WITNESS:  Thank you, sir.

23         THE COURT:  Thank you.

24         MS. PARASCANDOLA:  Your Honor, defendants call their

25  next witness, Agent David Strange.

DIRECT OF STRANGE
JANUARY 21, 2020 (DAY 6, PART 1)

 1          THE CLERK:  If you'd raise your right hand to be
 2   sworn.
 3              DAVID STRANGE, WITNESS, SWORN
 4          THE CLERK:  Thank you.  Please be seated and then
 5   state your name and spell your last name for the record.
 6          THE WITNESS:  Okay.  David Strange, S-t-r-a-n-g-e.
 7                  DIRECT EXAMINATION
 8   BY MS. PARASCANDOLA:
 9   Q.   Agent Strange, what is your current position and your
10   responsibilities?
11   A.   My current position right now is in Fort Myers, Florida,
12   as a resident agent, which is basically a Border Patrol Agent
13   working down there in that area.
14   Q.   And how long have you been in Fort Myers as an agent?
15   A.   I've been in Fort Myers since December of 2018.
16   Q.   And what was your position before that?
17   A.   My position before that was the Assistant Chief over the
18   e3 program at Washington, D.C. Headquarters.
19   Q.   And how long were you the Assistant Chief of the e3
20   program?
21   A.   It was a little over three years.  It was around November
22   2015 until December of 2018.
23   Q.   And what position did you have before that?
24   A.   Prior to that, it was one step below as an Operations
25   Officer from February '14 until November 2015, when I promoted

DIRECT OF STRANGE
JANUARY 21, 2020 (DAY 6, PART 1)

1  there.

2  Q.   And what did you -- what was your position before

3  February '14?

4  A.   I was a supervisor in the Falfurrias, Texas Border Patrol

5  Checkpoint Station.  I was there from February of 2008 until

6  February of 2014.

7  Q.   And what was your position before that?

8  A.   Before that I was a Border Patrol Agent in Burke, New

9  York, in the Swanton Sector, and that was from December 2003

10  until February 2008.

11  Q.   And what was your position before that?

12  A.   I was also a Border Patrol Agent in what was the Port

13  Isabel Station and became Fort Brown Border Patrol Station.

14  That was June of '98 until December 2003.

15  Q.   And are you -- so you're currently a Border Patrol Agent;

16  correct?

17  A.   Correct.

18  Q.   And how long have you been a Border Patrol Agent?

19  A.   It's been over 21 years.

20  Q.   And tell me what you know about the e3DM system.

21  A.   e3DM is a system that the Border Patrol uses to track

22  actions or custodial actions that we take upon the aliens or

23  any other subject in our custody.  Also it gives us the

24  ability to track movements of them, whether it's different

25  cells or different stations.  Then we also are able to track

DIRECT OF STRANGE
JANUARY 21, 2020 (DAY 6, PART 1)

1  certain amenity reports, conditions of cells, et cetera.

2      This was created in 2012 originally, before I got there

3  to the Headquarters, but it was created originally as a

4  Juvenile Detention Module to help track the Flores case, to

5  make sure we were complying with that, and then later, about

6  six months, it was realized that we should just be not doing

7  this only for juveniles, but we should also be doing it for

8  everybody else that was in our custody so we could show those

9  tracking of the different actions taken.

10  Q.   So in the terminology of the Border Patrol, is a bookout

11  when a person leaves Border Patrol custody?

12  A.   Yes and no.  We've discussed a bookout is either a

13  temporary or permanent bookout.  If it's a temporary bookout,

14  they leave our custody for a temporary period of time and then

15  they come back into our custody, such as if I send somebody to

16  the hospital or if I take somebody out for a custodial

17  interview, that would be a temporary bookout.

18      And then a permanent bookout would be when I am sending

19  somebody out of the station and sending them off to another

20  facility, such as ERO or ORR, or if I'm returning them to a

21  port of entry.

22  Q.   So you have temporary and permanent bookouts, and those

23  are two basically different things; correct?

24  A.   Correct.

25  Q.   Okay.  So why is it that, when someone is in a temporary

DIRECT OF STRANGE
JANUARY 21, 2020 (DAY 6, PART 1)

1   bookout, you still include that person as being in Border
2   Patrol custody?  I mean, for example, if they're going to the
3   hospital for medical treatment, I mean, is Border Patrol
4   responsible for their care?
5   A.   We are responsible for their care at the time, but we
6   don't want to track any actions that might be taken at a
7   station level on those people, so meaning, if somebody was
8   getting fed at the cell and we want -- or at the station and
9   the agent is giving an action of serving that meal, accepted
10  to everybody in the station, if that person is still showing
11  in our station and not temporarily booked out somewhere else,
12  he would be receiving that action, and we don't want to show
13  that, because that person is not in our, I guess, physical
14  care or physical building to do such.
15        But ultimately, that alien or subject is still in the
16  custody of the Border Patrol, meaning that the Border Patrol
17  is going to be responsible for that person at that time.
18  Q.   And also Border Patrol needs to track where that person
19  is; right?
20  A.   Correct.
21  Q.   And does e3DM enable you to do that in realtime?
22  A.   Yes, it does.
23  Q.   And that's actually one of its purposes; correct?
24  A.   Correct.
25  Q.   Okay.  So how do you know or how does e3DM tell you when

1   someone has not had a meal within a certain threshold period

2   of time?

3   A.   So in roughly I think September of 2015, I had built out

4   a program within e3DM called Status Checks, and what that

5   enabled to us do, it was more like, if the agent's looking at

6   it like a traffic light, green, yellow, red.

7        Green meant that, within a certain amount of time,

8   everything had been taken care of for that person.  Yellow

9   started meaning it was caution, like, something's getting

10  ready to happen.  You need to start looking into doing

11  whatever you need to do to fix this problem.  And then red

12  meant you were at the time that the meal was supposed to be

13  served in this instance.

14       So Status Checks was built out in a way that, when the

15  agents have it up on their screen and they're looking at it,

16  they can see at any given time, realtime, at that station, who

17  has already been fed, who is still in the need of being fed,

18  and then it gives that varying time, whether it's within an

19  hour of being fed or I need to feed this person now.

20  Q.   And can you tell us, if you remember, what that threshold

21  is for service of a meal?  Is it, like, 10 hours?  Four hours?

22  A.   So when we built out Status Checks, it was built out to

23  TEDS policy standards, so it's every eight hours for the

24  adults, and so the green light on that would have been, like,

25  zero to seven, I believe it was, and seven to eight would be

DIRECT OF STRANGE
JANUARY 21, 2020 (DAY 6, PART 1)

 1  the yellow or caution, and then eight would be the red

 2  threshold.  It's eight hours at that point.

 3  Q.   And is this some type of alert that pops up on the

 4  computer screen that the agent is using?  How does that work?

 5  A.   So the alert is not something where it pops up on your

 6  computer monitor in front of you at that time, like, blinking

 7  red, saying fix this.  So as long as the agent has the

 8  Detention Module up in front of them, even if they're looking

 9  at -- it doesn't matter what screen they're on, per se, for

10  the Detention Module, because there's like five or six

11  different tabs we have.  There is always a little button on

12  the right-hand side for the tab, and when it hits an indicator

13  or warning where the person's in the red, it starts -- it

14  shows up in red on that tab, and the agent can see that tab

15  and see that there is an issue, and then all they have to do

16  is click on the Status Checks tab to see who is pending some

17  kind of necessity.

18  Q.   So when somebody is temporarily booked out to a hospital,

19  is that eight-hour alert going to light up in red?

20  A.   It is not.

21  Q.   Okay.

22  A.   They're not going to be taken to account for any of those

23  custodial actions at that time.

24  Q.   So the system automatically accounts for the fact that

25  the person is off-site in, I guess, another entity's care;

DIRECT OF STRANGE
JANUARY 21, 2020 (DAY 6, PART 1)

1    right?

2    A.    Correct.

3    Q.    Okay.  So -- and we talked about meals, I guess because

4    we're approaching lunchtime.  What are the other items that

5    Status Checks cover?

6    A.    So we broke it down to three different sections or tabs.

7    One is for juveniles, one was for adults, and then we had a

8    more important-type tab, and that was for medication or

9    suicide or high-risk detainee checks.  The juveniles contained

10   the FOJC ORR notification, which is what we have to sent off

11   to get requests or request space from ORR for any UAC that's

12   in our custody.

13       Then we had another one for ORR placement receipt, and

14   that was we were able to track whether we had gotten placement

15   back from ORR yet for those.  We had another one for juvenile

16   showers.  We had another one for a UAC video that the juvies

17   are supposed to see by policy.  Juvenile meals, which later,

18   under this injunction, we added pregnant females to that.

19   Then we had adult meals and adult showers, and then, like I

20   said, we had the medication and the suicide risk.

21       And then at a later point we added specifically for

22   Tucson Sector and the stations here the bodily cleansing

23   product showed up also on that Status Check.

24   Q.    So walk me through what happens if there is a red box

25   showing that someone has not had a meal in eight hours.  What

DIRECT OF STRANGE
JANUARY 21, 2020 (DAY 6, PART 1)

1   happens next?

2   A.    So the agent sees the red box or the supervisor sees the

3   red box and would tell the agents, this person needs to be

4   fed or whatever the issue was.  At that point, the agent

5   should be feeding them or whatever the action was needed to be

6   taken.  If it's medication to be given, then the agent would

7   give the subject the medication, and then they would go in and

8   complete that custodial action.

9        So going back just a little bit, when -- when somebody is

10  in red, it would give the number of people that are needing

11  that action.  So if it's only one person, the agent simply

12  clicks on that one -- one spot in that red box, and it shows

13  the alien or the person that's in custody, that person's need.

14       And from there, instead of having to go into another tab,

15  they could actually click that custodial action from that spot

16  and say, yes, this has been taken care of.

17  Q.    So what if it's just a mistake in recordkeeping, for

18  example, the agent failed to record providing the meal?

19  A.    So we do give the ability for the agent to go in and

20  backdate and time stamp a custodial action, if that's what

21  you're referring to.  So if an agent forgot to do it or at the

22  time didn't have -- it wasn't operationally feasible to go in

23  and record that action at that given time, the agent can go in

24  and click it then and say, I gave the meal at this specific

25  time.

DIRECT OF STRANGE
JANUARY 21, 2020 (DAY 6, PART 1)

1      Now, anything over an hour back, we do require them to

2   give a reason why that was unable to be done.  Sometimes it

3   can be an outage.  We have an outage usually once a month for

4   the whole database, and of course when that database is out,

5   nobody's able to input things into the e3 Detention Module, so

6   they would not be able to do it then.  If there is a system

7   outage, of course nobody would be able to input it at that

8   time, or if it's just operationally infeasible to do it at

9   that time, but you could record that and track it.

10  Q.    And so it's correct to say that an agent can record and

11  backdate, but only as far back as one hour; correct?

12  A.    They can record and backdate as far as they need to

13  backdate.  The only thing about the hour is we're going to

14  require a reason why it was done.  So anything over an hour

15  would require a reason.  Anything below that does not require

16  a reason.

17  Q.    Okay.  Thank you.

18      And so if the agent is recording and backdating, will

19  there be a record made that the agent was backdating?

20  A.    Yes.

21  Q.    Can a supervisor make changes to what an agent recorded?

22  A.    For the custodial action purposes, no, they can't just go

23  in and record -- make the change.  The agent or a supervisor

24  could delete an action, if that action wasn't taken or for

25  whatever reason they needed to delete an action, and then they

DIRECT OF STRANGE
JANUARY 21, 2020 (DAY 6, PART 1)

1    could go back in and correct that with a new recordation of a

2    custodial action.

3         But the -- once that action has been taken, it's in the

4    system as being taken, and then you would have to delete it.

5    But no, it isn't any other specific privilege of the

6    supervisor to be able to change that.

7    Q.   Okay.  And then getting back to the purpose of e3DM, is

8    it fair to say it's to track the status or location of an

9    individual?

10   A.   Yes, track the location and movement of that person.

11   Q.   Okay.  And also what -- I guess what actions Border

12   Patrol is taking with regard to that individual; correct?

13   A.   Correct.

14   Q.   Okay.  And is there any other, like, purpose for e3DM?

15   A.   I would say that would be the main purposes of e3DM, to

16   be able to track that and monitor different things.  With

17   Status Checks, it gave the ability for supervisors, anybody

18   above, to be able to monitor certain pieces of it too.

19        But that would be the main functions of e3 Detention

20   Module.

21   Q.   And it's supposed to provide you up-to-the-minute

22   realtime information; correct?

23   A.   Yes.

24   Q.   Okay.  And so is it fair to say that this information is

25   constantly changing?

1  A.    Yes.  I would say it's constantly evolving.

2  Q.    So the e3DM interface, is it the same as it was when you

3  started with this in 2012?

4  A.    It would be very close.  There might be some minor

5  changes, but the actual user interface looks pretty close to

6  the same.

7  Q.    Okay.  Have there been changes in e3DM in terms of what

8  things you're tracking?

9  A.    Yes.  Like I said, in 2012, when it first started, it was

10  very minimum and basic, and then as things go, let's say,

11  things change, people in the field give feedback to us up at

12  D.C. to say it would be great if we had this functionality or

13  if we could do this or that, things would change from that,

14  and then based on other audits or other lawsuits that might

15  come up, things might change.

16  Q.    So have you added custodial actions, like different

17  kinds, you know, since the inception of e3DM in 2012?

18  A.    Yes.  Other pieces were added.  As I was saying earlier,

19  due to the Flores case, there were a couple of items added for

20  custodial actions that weren't -- the judge didn't feel was

21  all the way in there, so we added in those.  Then we added

22  various custodial actions specific to the Jane Doe lawsuit

23  case, such as the ability to track personal hygiene products,

24  bodily products, toothbrushes, dental hygiene, diapers,

25  sleeping cots or mats.  We provided those custodial actions in

DIRECT OF STRANGE
JANUARY 21, 2020 (DAY 6, PART 1)

1    there as well.

2    Q.   And at some point did you add tracking and manifesting

3    and routing?

4    A.   So the manifesting/routing, some of that would have been

5    at the very beginning.  That was part of the whole e3

6    Detention Module, was to be able to track that movement.

7         There were a lot of other pieces probably added that some

8    of that I probably wouldn't remember what all had been added

9    for the manifest.  But like one of them that I remember with

10   the manifest part, what we broke up, and this is all just,

11   like, nuanced stuff, but we broke up, like, we were sending

12   juvies to ORR and not ERO, so we broke up the manifest to be

13   able to show that we were sending juvies straight to ORR

14   instead of to ERO.

15        That would have been that kind of little stuff for

16   manifests that we would have changed.

17   Q.   So were there any changes made after the preliminary

18   injunction in this case which was entered in November 2016?

19   A.   So, yes.  I was hinting at that a little bit ago with the

20   addition of the personal hygiene products provided.  We added

21   those four custodial subgroups underneath the personal hygiene

22   products.  Scaling back just a little bit, we had -- back in

23   2015, we had included the ability to track amenity reports,

24   and amenities would be the adequate temperature, adequate

25   ventilation, water fountains working, toilets

1    working/functioning.

2         So part of that we included just a few months after the

3    injunction, and I'm not sure of the exact date, we actually

4    included, like, the number of toilets and not just one toilet

5    per cell, to show whether it was working or not, and that way,

6    if only one -- if we had an issue with one, we still could

7    show there was three or four others in a cell that were

8    working properly.

9    Q.   So under this change in e3DM, if, in a cell with four

10   toilets, and one of them is not working, does that mean that,

11   I don't know, the station is not in compliance with the

12   preliminary injunction?

13   A.   In my opinion, it would not, unless that toilet was

14   overflowing and raw sewage was flowing out.  But other than

15   that, if it's just not working, then no, it would not stop

16   that cell from being able to be used.

17   Q.   So it's more of an alert to say that, you know, something

18   needs to be fixed here?

19   A.   Right.  So the amenity report, the supervisor is the one

20   signing off on it.  He's the one that's checking that.  So it

21   would be up to him or her to say that that cell doesn't need

22   to be used.  And then from there I believe it's the PIC's

23   responsibility to say that, yes, that cell is not going to be

24   used at this point.

25   Q.   So at any point was there a function called Cell History

DIRECT OF STRANGE
JANUARY 21, 2020 (DAY 6, PART 1)

1    added to e3DM?

2    A.    Yes.  I don't remember the exact date.  I want to say it

3    was either -- it was in 2017, but Cell History gave us the

4    ability to -- one of the main functions behind it was we had a

5    lot of -- I won't say a lot.  We had quite a few phone calls

6    from various states when they would find out maybe an alien

7    had tuberculosis or another contagious disease, and so they

8    would call and ask who all was this person potentially

9    infecting.

10       And we really never had the ability, other than to say,

11   for a given period of time, that that alien or subject was in

12   our custody, that this was the amount of people that was in

13   the facility at the same time, but we were never really able

14   at that point to dive down and say that, here's the list of 20

15   people that the alien was in the same cell with for, like, a

16   given period of time that might make them more contagious to

17   that person to get that communicable disease.

18       So Cell History, that was the main function or purpose

19   behind it, but it gave us the ability really to track not

20   only, like I was saying, not only that David Strange was moved

21   from cell 1 to cell 2, but I could show that, while I was in

22   cell 1, alien X, Y, and Z was in the same cell, and then, once

23   I got moved to cell 2, these were the people that were in the

24   same cell with me.

25   Q.    So this could be, like, to track someone's exposure to a

DIRECT OF STRANGE
JANUARY 21, 2020 (DAY 6, PART 1)

1   possibly contagious individual?

2   A.   Correct.

3   Q.   So it would be like epidemiological data?

4   A.   Correct.

5   Q.   Okay.  So was there ever anything added to show that

6   clean clothing is being provided?

7   A.   Yes.  We did add that also as a subcategory under

8   personal hygiene product as a custodial action.  I don't

9   remember a specific date.  I think it would have been in late

10  2017 or sometime in '18.

11  Q.   Okay.  And was that also when -- or did Tucson Sector add

12  the provision of feminine hygiene products?

13  A.   So I believe that was added roughly May of 2017, just a

14  few months after the injunction.  It was brought to my

15  attention that it probably would be easier for everybody

16  involved to track the fact that we placed the feminine hygiene

17  products in a cell, and that way every shift or at least every

18  day doing the amenity report the supervisor could ensure that

19  those were placed in the cell for anybody to reach, as opposed

20  to -- I guess the worry was some females would feel a little

21  more uncomfortable asking a male for one.

22       So the idea was to be able to place it in the cell for

23  them, and so then we were able to track that specific amenity

24  for that cell.

25  Q.   And did you also add a function to track whether cups

DIRECT OF STRANGE
JANUARY 21, 2020 (DAY 6, PART 1)

1  were being provided for water?

2  A.   Yes.  We actually added that to the header of the amenity

3  reports to say that cups with water jugs, I believe it was

4  water jugs, cups with water jugs were in the same cell.

5  Q.   Did you provide any training to Border Patrol Agents in

6  how to use e3DM?

7  A.   Yes.  Over the several years that I was up there, that

8  was part of my responsibility, was to give training, whether

9  that was specific to e3DM or to other issues.  So -- but

10  specific to your question, yes, I've provided training for

11  e3DM to a lot of the southwest border sectors over a given

12  period of time.

13      I would say that training usually could just be like

14  helping the agents out, or some of it could be more

15  train-the-trainer-type thing where I try to explain to the

16  ones that were there for that training so they could go out

17  and tell -- train the other agents in their station how to use

18  e3 Detention Module also.

19  Q.   And did you provide this training in person at the

20  station?

21  A.   I provided it to Tucson Sector.  I don't recall if most

22  of the training was at sector and they would bring the agents

23  to sector from the other stations or -- I think that was the

24  way we did it for Tucson Sector, was most of them came to the

25  sector from their various stations to there.

DIRECT OF STRANGE
JANUARY 21, 2020 (DAY 6, PART 1)

1    Q.   And how often did you provide this in-person training in

2    Tucson Sector?

3    A.   I would say it probably was one to two times a year.

4             THE COURT:  Counsel, are you at a stopping point

5    or --

6             MS. PARASCANDOLA:  May I -- I just have a couple

7    more questions, and then perhaps that would be --

8             THE COURT:  Sure.  Go ahead.

9    BY MS. PARASCANDOLA:

10   Q.   Okay.  So -- and also, were you on-call 24/7 to answer

11   questions?

12   A.   Yes, I was.

13   Q.   Okay.  Can anyone enter information in e3DM?

14   A.   Anyone if they are a Border Patrol Agent can enter

15   information in e3DM.

16   Q.   So the contractor who cleans the hold room cannot enter

17   information in e3DM; correct?

18   A.   That is correct.

19   Q.   Okay.  So would you consider e3DM to be a law enforcement

20   database?

21   A.   I would consider it to be a law enforcement database.  It

22   is used by agents to record arrests, cases, seizures, et

23   cetera, and therefore, Border Patrol Agents are the ones that

24   are inputting the information.

25   Q.   And was there any way for agents and supervisors to

DIRECT OF STRANGE
JANUARY 21, 2020 (DAY 6, PART 1)

1   provide feedback?

2   A.   Yes, and that was part of my responsibilities as an

3   Operations Officer and also as an Assistant Chief, making many

4   trips out to the field, not just specifically here in Tucson,

5   but to other stations and sectors, get feedback also.  And

6   that was for a myriad of different modules into the e3 suite,

7   if you want to say, whether that was just Processing or e3

8   Detention Module.

9   Q.   And were the improvements you made in response to

10  feedback you received from the field?

11  A.   A lot of times improvements were made based on feedback

12  from the field.

13          MS. PARASCANDOLA:  Thank you.

14          THE COURT:  Are you going to have a cross?  We'll

15  break for lunch.

16          Well, if there's no cross-examination, I can excuse

17  the witness, but if you're going to --

18          MR. DOUGLASS:  We have no cross-examination.

19          THE COURT:  Oh, all right.

20          Mr. Strange, thank you very much for coming.

21          All right.  We'll break until 1:15.  All right.

22          (End of Day 6, Part 1.)

23

24

25

1                        C E R T I F I C A T E

2

3           I, Erica R. McQuillen, Federal Official Realtime

4    Reporter, in and for the United States District Court for the

5    District of Arizona, do hereby certify that, pursuant to

6    Section 753, Title 28, United States Code, the foregoing is a

7    true and correct transcript of the stenographically reported

8    proceedings held in the above-entitled matter and that the

9    transcript page format is in conformance with the regulations

10   of the Judicial Conference of the United States.

11           Dated this 21st day of January, 2020.

12

13                        s/Erica R. McQuillen
                   Erica R. McQuillen, RDR, CRR
14                 Federal Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

                    UNITED STATES DISTRICT COURT