```
 1                IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF ARIZONA

 3  Jane Doe #1; Jane Doe #2; Norlan Flores  )
    on behalf of themselves and all others   )
 4  similarly situated,                       )
                                              )
 5          Plaintiffs,                       )
                                              )       CV-15-0250-DCB
 6      vs.                                   )
                                              )       Tucson, Arizona
 7  Chad Wolf, Acting Secretary of           )       January 21, 2020
    Homeland Security; Mark A. Morgan,        )       1:18 p.m.
 8  Acting Commissioner, U.S. Customs and    )
    Border Protection; Carla L. Provost,      )
 9  Chief of United States Border Patrol,    )
    in her official capacity; Roy D.          )
10  Villareal, Chief Patrol Agent-Tucson     )
    Sector, in his official capacity,         )
11                                            )
            Defendants.                        )
12  _____)

13

14            REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                   BENCH TRIAL DAY SIX
                      SESSION 2 OF 2
16
              BEFORE:  THE HONORABLE DAVID C. BURY
17             UNITED STATES SENIOR DISTRICT JUDGE

18

19

20

21  Cheryl L. Cummings, RDR-CRR-RMR-CRC-CRI
    Official Court Reporter
22  Evo A. DeConcini U.S. Courthouse
    405 West Congress, Suite 1500
23  Tucson, Arizona 85701
    (520)205-4290
24
    Proceedings Reported by Stenographic Court Reporter
25  Transcript Prepared by Computer-Aided Transcription
```

```
 1   APPEARANCES

 2   For the Plaintiffs:
          Morrison & Foerster, LLP
 3        By:  JACK W. LONDEN,  ESQ.
          425 Market Street, 32nd Floor
 4        San Francisco, California 95105

 5        Morrison & Foerster, LLP
          By:  COLETTE R. MAYER, ESQ.
 6        755 Page Mill Road
          Palo Alto, California 94304

 7

 8

 9   For the Defendants:
          United States Department of Justice
10        By:  SARAH B. FABIAN, ESQ.
          P.O. Box 868 Ben Franklin Station
11        Washington, D.C., 20044

12   United States Department of Justice
          By:  WILLIAM C. SILVIS
13        Civil Division Office of Immigration Litigation
          450 5th St NW
14        Washington, D.C., 20001

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        EXAMINATION INDEX

 2   WITNESSES CALLED ON BEHALF OF THE DEFENSE

 3   BRADLEY SIMON

 4        DIRECT BY MR. SILVIS                        4
          CROSS BY MR. LONDEN                        23
 5

 6

 7                          EXHIBIT INDEX

 8
                                                   ADM
 9     693                                          26

10     818, 912                                      32

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        P R O C E E D I N G S

2              (Proceedings commenced at 1:18 p.m., as follows:)

3                    THE COURT:  All right.  Back on the record.  Good

4       afternoon.  We have a new person up there.

5                    MR. SILVIS:  Yes, your Honor.  The defense calls

6       Chief Bradley Simon.

7                    THE COURT: All right.

8                    BRADLEY SIMON, DEFENSE WITNESS, SWORN

9                    THE CLERK:  Thank you, please be seated and then

10      state your full name and spell your last name for the record.

11                   THE WITNESS:  Robert Bradley Simon, S-i-m-o-n.

12                   THE COURT:  Go ahead, Counsel.

13                         DIRECT EXAMINATION

14      BY MR. SILVIS:

15      Q.   Good afternoon, Chief Simon.

16      A.   Good afternoon, sir.

17      Q.   Could you give us your current assignment?

18      A.   I'm currently an associate chief at headquarters Border

19      Patrol in Washington, D.C.

20      Q.   And how long have you been in that position?

21      A.   Since February of 2019, sir.

22      Q.   And can you tell me what the responsibilities of that

23      position are?

24      A.   I currently cover operations central so I work with the

25      central corridor of the operations section, and I report

1    directly to the deputy chief of the law enforcement operations

2    director.

3    Q.   And how long have you been in the Border Patrol?

4    A.   About 17 and a half years, sir.

5    Q.   Can you briefly give us sort of your background, not date

6    by date, but your responsibilities and positions you've held

7    in the Border Patrol?

8    A.   Certainly, sir.  I started my career in Presidio, Texas

9    in 2002.  I was a Border Patrol agent there.

10        And then transferred to Uvalde station, also served as a

11   Border Patrol agent.  Promoted to supervisory Border Patrol

12   agent in Uvalde, Texas.  Transferred to Sandusky Bay station,

13   Sandusky, Ohio, where I served as a supervisory Border Patrol

14   agent and field operations supervisor, a watch commander, and

15   then later the patrol agent in charge.  I transferred from

16   there to Carrizo Springs, Texas, where I served as the patrol

17   agent in charge.  Then I was lateraled to Eagle Pass station

18   also as a patrol agent in charge.  And then to my current

19   position.

20   Q.   And could you -- what is a patrol agent in charge?

21   A.   Excuse me, sir?

22   Q.   What is a patrol agent in charge?

23   A.   The patrol agent in charge is the person that runs a

24   particular station, so it handles all the administrative and

25   operational aspects of a single Border Patrol station.

1    Q.   And so how many stations have you run as the patrol agent

2    in charge?

3    A.   Three, sir.

4    Q.   Three.  So you have experience both in the field as a

5    Border Patrol agent and also at headquarters?

6    A.   That's correct, sir.

7    Q.   Are you familiar with a soft-sided structure?

8    A.   Yes.

9    Q.   And in the Border Patrol parlance or understanding, what

10   is a soft-sided structure?

11   A.   The soft-sided facilities were used this year based on

12   the crisis that we encountered, the overwhelming number of

13   individuals that were in our custody.  And it was a stopgap

14   measure trying to expand our capacity to safely handle the

15   influx that we experienced on the southwest border.

16   Q.   All right.  And in your current role, is there any part

17   of your current role that makes you sort of knowledgeable

18   about the use of soft-sided structures?

19   A.   Yes, sir.  As the -- the agents that work at headquarters

20   transfer in and out, responsibilities get shifted amongst the

21   level -- the associate chief level.  And as such, I've become

22   the primary point of contact for all facilities and asset

23   management who helps us with the contractual and construction

24   of things like the soft-sided facilities.  So I've been

25   working with them on soft-sided facilities that we currently

1  have.

2  Q.   And where are they currently in use, the soft-sided

3  structures or facilities?

4  A.   Yes, sir.  We have Rio Grande Valley Sector where there

5  are three soft-sided facilities.  We have El Paso Sector where

6  there is now one.  We had two previously, but we're now down

7  to one there.  And then we have one in Yuma Sector.

8  Q.   And can you give us some idea what it costs to operate a

9  soft-sided facility?

10  A.   Yes, sir.  The -- the soft-sided facilities that we have

11  now, we have two different sizes.  We have 500 capacity and

12  then we have 2,000 capacity.  The 500 capacity in Texas, it's

13  about $3 million a month.  The one that we have in Arizona is

14  about $4 million a month.  And then when you go up to the

15  larger sizes, the 2,000 capacity is a little over $10 million

16  a month.

17  Q.   Okay.  And where was the one in Arizona?  I'm sorry, I

18  didn't hear if you said.

19  A.   I apologize, sir, it's in Yuma.

20  Q.   Yuma, Arizona.

21  A.   Yes, sir.

22  Q.   Okay.  And can you describe essentially what it is, a

23  soft-sided facility?

24  A.   So it's a large soft-sided structure, so it's a building

25  but it's soft sided.  It was something that during the crisis

1    that we experienced on the southwest border last year, it was

2    the most expeditious way that we could increase capacity at

3    the time.  Because of the fact that it was a state of

4    emergency, we had some flexibility in doing sole source

5    selections and things of that nature.  We're continuing to

6    work through that as far as in Yuma moving -- because we've

7    got to move forward with other construction projects to

8    provide more of a long-term solution.  But the -- it's taken

9    us a little longer with these now that we're no longer in the

10   state of emergency, it gets us -- the process is just longer,

11   sir.

12   Q.   Okay.  Can you -- what services are provided with this,

13   with this soft-sided facility?

14   A.   It depends on what the contract says.  And I didn't write

15   or wasn't involved in the writing of those contracts, but

16   security, the cleaning, food, things of that nature are often

17   rolled into the contract for the soft side.

18   Q.   Now, is this something that the Border Patrol could roll

19   out in times when there's an influx or a surge and then just

20   kind of pack up and put into a warehouse until there's times

21   when it's not so busy?

22   A.   We don't own them, sir.  So they're rented.  As I said,

23   it's longer now to work through that process.  Right now the

24   acquisition phase is about four to six months, and then the

25   construction or the standup, so to speak, is another about two

1  months.  And then once the contract is over, it's another

2  30 days to take that down.

3      So your initial standup is about the same cost as a month

4  of running the facility.  So if it's costs 3 million to run

5  the facility per month, then it costs about that to stand it

6  up.  And that's after that four- to six-month acquisition

7  phase.  And that -- it's that 60-day standup phase.  And then

8  we go into the monthly recurring expense.

9      And that's one of the reasons why we're trying to move

10 away from it.  We don't own them.  And so for us, it's that

11 recurring cost on a facility that we don't own, and it is a

12 relatively short-term solution, so we're trying to move away

13 from the soft-sided facilities.

14 Q.  Does it cost money to set up these soft-sided facilities?

15 A.  Yes, sir.  As I mentioned, it costs about the same as it

16 would for one month of running a facility.

17 Q.  And where does that money come from?

18 A.  That money was coming from the supplemental bill that was

19 passed in the middle of 2019.  There was money allocated by

20 the appropriations committees in those -- in the supplemental

21 bill that allowed us to use those.

22 Q.  I believe you testified that it's a contractor that sets

23 up these facilities?

24 A.  Absolutely, sir.  So we find a contractor that has the

25 capacity to provide that requirement.  We bring them in, they

1   set it up, they manage it as far as the structure.  And then

2   at the end of the contract, then they would take it back down.

3   Q.   And that was contracting on that part, is this

4   something -- what's that process?  Do you -- does this go out

5   to bidders when you have done this before or how would that

6   work?

7   A.   So again, last year because of the state of emergency, it

8   moved a little more quickly than it is for us this year.

9   Right now, like I said, we're working on a project in Yuma and

10  it's four to six months.  And that's just for the acquisition

11  phase because you have to go through the contract bidding

12  process and making sure that the contract can meet the

13  requirements laid out in the contract.

14  Q.   Why didn't you have to do that before?  Why didn't you

15  have to go through the contracting phase during the last

16  surge?

17  A.   Well -- and understand, sir, I'm -- I don't work in the

18  contracting department so this is just to the best of my

19  understanding, was that the fact that it was declared a state

20  of emergency allowed some flexibility in the contracting

21  process and allowed them to do sole source.  So if they were

22  able to identify somebody who could rapidly meet that

23  requirement, they could -- they could award those contracts

24  more quickly than they can outside of those circumstances.

25  Q.   Okay.  But is it your understanding that you can't -- the

 1   Border Patrol couldn't always utilize sole source contracting

 2   to build soft-sided facilities?

 3   A.   Well, and that surge -- what we're encountering now, so

 4   we're going from that relatively short process of awarding the

 5   contract to the acquisition that's four to six months right

 6   now for soft side.

 7   Q.   Okay.  And I believe you testified earlier that the

 8   Border Patrol is no longer planning to use these soft-sided

 9   facilities?

10   A.   Well, again, it's -- the soft sides were a short-term

11   solution.  And so we're trying to move away from that

12   soft-sided facility into more of the long-term facilities, the

13   hard sided that, one, we're not paying that recurring monthly

14   cost to a contractor and that the Border Patrol owns.  We've

15   got projects ongoing where we're moving to modular facilities.

16   And although they're not brick and mortar, they still wouldn't

17   have the same life span as a regular building, it does give us

18   some extended life cycle for the facility and it allows us to

19   repurpose if we have another solution that comes along.

20   Q.   Can you explain to us what a -- I believe you said

21   modular facility is?

22   A.   Yes, sir.  So a modular is similar to -- just for

23   layman's terms, it's kind of like a mobile home in concept.

24   But where a facility that may be a thousand square feet for a

25   home, these would be 80- to 100,000 square feet.  And they're

1    brought in in sections that are able to be easily moved, and

2    then they're connected once they're on-site.

3    Q.   So is this something that you can take, you can build,

4    say, in Tucson.  And then if the needs were different

5    somewhere else along the border, you could pick it up and move

6    it to, say, Yuma or a different station?

7    A.    In theory.  But understanding that when you get them

8    there, unlike mobile homes, like a doublewide, for instance,

9    where you bring them in two separate pieces and fit them

10   together, these are a lot of different facilities, a lot of

11   different buildings that are brought in that are designed by

12   the contractor to serve a purpose.  So they may have large

13   open spaces where you would have intake or something like

14   that.  But once they're brought in, then they all have to be

15   connected.  And so in a facility like this where you're going

16   to be housing people in custody, that's a lot of welding and

17   things of that nature.

18        The one we have now, we've continued to push that

19   delivery date further and further out because of those

20   contracting pieces to make sure that it meets the standard

21   before we accept it.  So when we expected it late last year,

22   we're looking at later this year before the project is going

23   to be completed.  And that was one that was, like I said -- it

24   was as quick as we could move through the process at that

25   time.

 1        But relatively speaking, you're looking at probably

 2   14 months, give or take, for a project like that to work

 3   through the process.  And that's -- that's with the

 4   understanding that the contractor has the supply available to

 5   meet the need.

 6   Q.   Okay.  And how were those funded?  Is it the same method

 7   that you do for the soft-sided facilities?

 8   A.   I believe that the funding came for -- for the modular

 9   through the supplemental as well, yes, sir.

10   Q.   And why did the Border Patrol, to your knowledge, look

11   towards use of soft-sided facilities and the modules?

12   A.   Again, it was expedience is my understanding of the

13   soft-sided decision, because we had a crisis.  We had a lot of

14   people in custody, and we were working as hard as we could to

15   make sure that we had the appropriate space for the folks that

16   we had in custody.

17   Q.   Are you aware of any currently funded construction

18   projects, Border Patrol construction projects along the

19   southwest border?

20   A.   Yes, sir.  So we have -- in Rio Grande Valley Sector, we

21   have a renovation of the central processing center.  And

22   that's -- we've still got soft-sided facilities there.  Those,

23   at least to some extent, we're trying to keep in place while

24   we do the renovation of the current central processing center.

25   Again, it takes awhile for that renovation, so we're probably

 1  looking at 14 to 18 months for that renovation.  And so as we

 2  get the central processing center, the brick and mortar

 3  building back online, then we'll move away from those

 4  facilities.

 5       And then we have the central processing center that we're

 6  working towards in El Paso.  I know that it was initially

 7  funded and we're continuing to work through that process.  And

 8  then there was construction of a modular in Yuma Sector and

 9  renovation here in Tucson Sector.

10  Q.   You said there's projects within the Tucson Sector?

11  A.   Yes, sir.

12  Q.   And what projects is that?

13  A.   It's renovation of the Nogales processing center.

14  Q.   Could you talk about that a little bit, explain what that

15  is?

16  A.   Yes, sir.  Nogales processing center is actually attached

17  to the Nogales station.  It's the facility there on the same

18  footprint.  And part of the money that we received was

19  directed toward that project.  We were trying to get that --

20  that facility back up to standard, back up to code because it

21  hasn't been used.  Again, it's a funding issue and so we're --

22  we're working through that process now as some of the money

23  that was initially allocated on the supplemental bill has been

24  rescinded.  So we're looking at other funding sources to

25  execute on those projects.

Q.   Can you explain briefly what you mean when you're saying

"the process," your familiarity with the appropriations

processing, getting money for these constructions to the

extent that you know?

A.   Yes, sir.  So any time that you're dealing with the

appropriations committees, you're telling them what you want

to do and how much you think you're going to need in order to

fulfill that -- that requirement.  So it's kind of like when

you're doing your home budget, you have your wants and your

needs.  And so we're trying to convince them to fund the needs

that we have and then as much of the wants as we can.

       So as particularly to the supplemental bill, that money

was funded again during the middle of the crisis and a lot of

it was for humanitarian care.  And so the projects were in

line with that.  Some of that money has been rescinded.  A

significant amount of that money has been rescinded as far as

the construction portion, and so we're trying to work through

the process to identify other funding lines that we could use

to complete that project.

Q.   What do you mean by the money has been rescinded?  By

whom?

A.   So to my understanding it was the appropriators.  And

again, it's -- I went through our budget office when I found

out working with the soft sided and things of that nature.

That's part of the stuff that comes across my desk and we work

1   through.  And so we had 85 million that was allocated in that

2   bill for the construction of the modular in Yuma and the

3   Nogales facility.  And then 30 million of that was rescinded.

4       So it's left us short and we're working through the

5   process now.  And actually, that's what I was working on last

6   week.  And when I return back to D.C., I'll continue to work

7   on that.

8   Q.   And that appropriation, are you referencing the fiscal

9   year, the 2019 fiscal year supplemental appropriation?

10  A.   That was the supplemental that was passed in 2019, yes,

11  sir.

12  Q.   And that funding has impacted the Nogales processing

13  center?

14  A.   That's -- it's impacted the process moving forward, yes,

15  sir.

16  Q.   Okay.  And do you have any sense or estimate of the

17  timing for when the Nogales processing center will be

18  complete?

19  A.   I don't, sir.  Again, it goes back to the appropriators

20  have a lot of control as far as when and how money is

21  disbursed.

22  Q.   The examples that you provide testimony about, these

23  construction projects, are these projects initiated as a

24  result of litigation or are these projects that the Border

25  Patrol has identified based on the needs of the patrol and the

1  greatest need?

2  A.   It goes back -- I don't know -- to answer your first

3  question, I don't know of any litigation that's mandated any

4  project like this; but what I can tell you is that, again, it

5  goes back to what our requirements are.  What is the most

6  pressing need and trying to meet those needs through funding

7  requests.

8  Q.   If there were to be a court order, something of that

9  nature, what would the Border Patrol have to do in order to

10  get funding to comply with that?

11  A.   Again, sir, it would be going back to the appropriators.

12  We ask for money based on specific requirements, and the

13  appropriators are then the ones that decide how much, if at

14  all, we receive for -- for those requests.

15       For instance, if we had a project that we asked for

16  $100 million for and we laid out why we needed it, they could

17  give us the $100 million, they could give us 50 million, they

18  could give us nothing.  It is completely dependent upon what

19  the appropriators feel is the accurate amount or if they think

20  the project needs to move forward.

21  Q.   Do you have any sense of timing of approximately how long

22  that would take?  I mean, have the appropriations already gone

23  in for the next fiscal year?

24  A.   For 2021?

25  Q.   I meant 2020, I guess.  But you're saying 2021 is the

1  next one?

2  A.   Yes, sir.  And again, I deal with the appropriators on

3  the operational side, and so I answer a lot of the questions

4  they have about what we're doing.  But as far as the budgeting

5  for the oncoming years, I don't deal with them on a regular

6  basis on that, sir.

7  Q.   Okay.

8       MR. SILVIS:  Ms. Kershaw, could you pull up joint

9  Exhibit No. 914?  And then specifically page 197.  If you

10  would highlight Section 212(a)(2), the second paragraph.

11  BY MR. SILVIS:

12  Q.   Mr. Simon -- Chief Simon, I apologize.  Do you see the

13  text that's been highlighted under 2 there?

14  A.   Yes, sir.

15  Q.   Do you have any understanding of what this is?

16  A.   No, sir, I don't.  Again, it would be something that --

17  that the appropriators have been advised that we needed or a

18  project that they've decided to fund.

19  Q.   Well, this has been an exhibit that's been admitted into

20  evidence in this case, and it's the fiscal year 2020 budget --

21  or, the bill, the appropriations bill for 2020.  Pardon me.

22  And the portion we've highlighted said that there's

23  $30 million to address health, life, and safety issues at

24  existing Border Patrol facilities including construction.

25       In your experience working with appropriations, is that

1    money just free to spend anywhere?  Or has that already been

2    earmarked for specific projects in your experience?

3    A.   Well, in my experience -- and again, I didn't work on

4    this bill so I can't speak to it specifically.  But in my

5    experience, it would have been something that was already

6    allocated for a specific project.

7    Q.   Would you expect that this is $30 million to spend as the

8    Border Patrol sees fit?

9    A.   I haven't seen that yet where there's just a large sum of

10   money where there wasn't an expectation that it was going to

11   be spent on something in particular.

12   Q.   Yeah.  In your personal experience and professional

13   experience, what does that process usually entail when you're

14   working with the appropriators?

15   A.   Well, again, it would be laying out the requirement, what

16   we need and why we need it and asking for a specific amount of

17   money to meet that need.

18   Q.   And now, is that usually done at the sector level or the

19   project level?  I mean, how far down the appropriators, in

20   your experience, drill down when it comes to these numbers?

21   Because I don't -- I'm looking at this and I don't see any

22   specific projects.

23   A.   In my experience, it's been site specific.  So, for

24   instance, when we were working on the El Paso central

25   processing center, the money was allocated specifically for

1   the El Paso central processing center.

2   Q.   I have a similar question on a different part of this

3   bill.

4              MR. SILVIS:  Ms. Kershaw, could you go to page 195?

5   And near the bottom where it says Section 209(a).  May have to

6   go up a little more.  Just slightly more, please.  209(a).

7   There you go.

8   BY MR. SILVIS:

9   Q.   And part of the same bill which is joint Exhibit 914, it

10  says Section 289 -- I'm sorry, 209.  And under (a)(3), do you

11  see an amount of money allocated there?

12  A.   Yes, sir.

13  Q.   And could you just read what that is allocated?

14  A.   It says 62,364,000 for facility construction and

15  improvements.

16  Q.   Okay.  And actually I should have had you read this other

17  part before, but under 2, the top part where it says Section

18  209(a), "Of the total amount," would you read that for us?

19  A.   Of the total amount made available under U.S. Customs and

20  Border Protection procurement construction and improvements,

21  1,904,468,000 shall be available only as follows.

22  Q.   So referring back to 3 below, and that's the $62 million

23  figure, same question that I asked before but just curious

24  still.  Again, is that something that the Border Patrol has

25  been earmarked for specific projects in your experience?  Or

1   is that something that the Border Patrol could just use as

2   they see fit?

3   A.   My understanding is it would have been something that we

4   justified to appropriators for a specific project.

5   Q.   Okay.

6         MR. SILVIS:  Ms. Kershaw, you can take it down,

7   please.  Thank you.

8   BY MR. SILVIS:

9   Q.   Based on your experience as a Border Patrol agent, both

10  in the field and at headquarters, do you have any concerns

11  about requiring the Border Patrol to accommodate longer term

12  custody or detention?

13  A.   Yes, sir, I do.

14  Q.   What are those concerns?

15  A.   Well, it's twofold, really.  One is that our primary

16  mission is to secure the border between the points of entry.

17  So anything that takes the men and women of the Border Patrol

18  away from that primary mission in essence increases

19  vulnerability along the border.

20      Two is that our partner agency Immigration and Customs

21  Enforcement Removal Operations or ICRO, that's their

22  responsibility is to provide long-term detention of subjects

23  in the immigration process.  The Border Patrol has that first

24  minor piece as far as the apprehension and the processing, and

25  then we turn those folks in our custody over to either

1    Immigration and Customs Enforcement, Enforcement Removal

2    Operations.  Or if they're unaccompanied alien children, we

3    would turn them over to Health and Human Services Office of

4    Refugee Resettlement to take them through the rest of the

5    immigration process.

6         So there's an agency that does the long-term detention,

7    and it -- Border Patrol conducting long-term detention would,

8    again, take our men and women away from that primary focus on

9    border security.  So those would be my concerns.

10   Q.   Okay.  Would it have any impact on the time individuals

11   spent in custody potentially of the Border Patrol?

12   A.   Anything that -- that expands that would increase time in

13   custody.  Because you're going to have to move people.  The

14   transportation takes time.  And then bringing folks back to a

15   central location in order to turn them over to ICRO or Health

16   and Human Services ORR extends time in custody.

17        So again, our portion is to try to detect illegal entry

18   of persons or things, make that apprehension as quickly as

19   possible, do the appropriate documentation to begin the

20   immigration proceeding if it's a person or the seizure

21   documentation if it's an item, and then get those to the

22   appropriate agency to take through to a successful law

23   enforcement disposition whether that's in immigration court or

24   through the seizure process or in a criminal trial.

25   Q.   Thank you.

 1          MR. SILVIS:  Your Honor, may I confer briefly with

 2   my colleagues?

 3          THE COURT:  Sure.

 4          MR. SILVIS:  That's all I have for direct,

 5   your Honor.

 6          THE COURT:  Cross?

 7          MR. LONDEN:  Yes, your Honor.

 8                      CROSS-EXAMINATION

 9   BY MR. LONDEN:

10   Q.   Chief Simon, my name is Jack Londen.  I'm one of the

11   plaintiffs' lawyers.  Nice to meet you.

12   A.   Nice to meet you, sir.

13   Q.   Your work has focused on the central corridor since you

14   your agency present position in February of 2019?

15   A.   That's correct, sir.

16   Q.   Tucson Sector is not in the central corridor; correct?

17   A.   That's correct, sir.

18   Q.   What's the extent of your knowledge about how Tucson

19   Sector Border Patrol stations have been fulfilling their

20   official duties?

21   A.   I have very little information on how Tucson Sector is

22   specifically doing their work.

23   Q.   And processing detainees is part of the Border Patrol's

24   mission; right?

25   A.   That's correct.

```
 1   Q.    Should be short-term, not long-term; right?

 2   A.    Yes, sir.

 3   Q.    Based on your knowledge as a Border Patrol agent, a

 4   typical length of time required to process an individual

 5   detainee depending on the case and the technology used is

 6   between half an hour or several hours; is that right?

 7   A.    That sounds appropriate, sir.

 8   Q.    And Border Patrol facilities that exist now, the

 9   permanent ones generally were designed mainly for single

10   adults; right?

11   A.    That is correct, sir.

12   Q.    Not for families?

13   A.    That's correct, sir.

14   Q.    Or children?

15   A.    Yes, sir.

16   Q.    And they're more like police stations than shelters;

17   right?

18   A.    I'm sorry, could you repeat the question?

19   Q.    The Border Patrol stations that exist now are more like

20   police stations than shelters?

21   A.    That's correct, sir.  They're intended for short-term

22   holding.

23   Q.    Right.  One of the factors determining the length of

24   detention is how long it takes to get the agency where the

25   detainee should go to accept that transfer; right?
```

```
 1   A.    That is correct, sir.

 2   Q.    And that has been getting longer in recent -- during the

 3   time you have been in your present job; right?

 4   A.    Well, that's actually fluctuated, sir, depending on the

 5   traffic flows.

 6            MR. LONDEN:  Could we put up joint trial Exhibit

 7   693, please?

 8   BY MR. LONDEN:

 9   Q.    This is a transcript from March of this year.  It is a

10   transcript of a statement made by Chief Hastings.  Who is

11   Chief Hastings?

12   A.    Chief Hastings is the chief of the law enforcement

13   operations director at U.S. Border Patrol headquarters.

14   Q.    He is your boss' boss; is that right?

15   A.    That's correct, sir.

16   Q.    Is he authorized to speak for the agency?

17   A.    I believe he is, sir.

18   Q.    And this is a public statement made to the press?

19   A.    It appears to be, yes, sir.

20   Q.    All right.

21            MR. LONDEN:  I offer 693 into evidence.

22            MR. SILVIS:  I would just object as this is outside

23   the scope of the direct examination unless it's going to

24   connect up at some point.

25            MR. LONDEN:  This is background, your Honor.
```

 1              THE COURT:  I don't know what it says, so I don't

 2    know how it's -- what's the purpose of the offer?

 3              MR. LONDEN:  He addresses a number of subjects

 4    including alternatives available when stations are crowded.

 5              THE COURT:  Oh, okay.  No, overruled.  I'll admit

 6    it.

 7         (Exhibit 693 entered into evidence.)

 8    BY MR. LONDEN:

 9    Q.   Look, please, at page 3.  And at the second paragraph, it

10    says, "Generally we want to see our custody numbers around

11    4500 across the southwest border."

12         I'll stop there.  Is that a number of -- is that an

13    occupancy number for the stations, not limited to Tucson but

14    along the southwest border?

15    A.   Can you give me just a moment to read this?

16    Q.   I -- I'm sorry.

17    A.   Can you give me just a moment to read this, sir?

18    Q.   Of course.  Read it.  Tell me when you're ready.

19    A.   Yes, sir.  It appears that he's talking about overall

20    across the southwest border.

21    Q.   And it says, However, two weeks ago we saw our own -- our

22    in-custody numbers up to critical levels of 13,000 in custody.

23    Our partners at ICE and HHS do not have the bed space to

24    address this crisis we're experiencing, and that's

25    particularly true for family units as ICE is only able to

1  place a fraction of those family units into family residential

2  centers.  They release the others with a notice to appear

3  before an immigration judge.  I'll end my quote there.

4      Did he accurately describe the situation at that time?

5          MR. SILVIS:  I'm going to object to foundation.

6          THE COURT:  Well, he's just reading from the

7  document.

8          MR. LONDEN:  My question is whether these statements

9  by Chief Hastings are accurate based on conditions at the

10 time.

11         THE COURT:  Overruled.  He can answer if he knows.

12         THE WITNESS:  At the time as the law enforcement

13 operations director chief, I believe he would be the one to

14 speak to it, yes, sir.

15 BY MR. LONDEN:

16 Q.  And was the situation at that time part of the reason for

17 the acquisition of the soft-sided facilities?

18 A.  That was part of the process, yes, sir.

19 Q.  And look at the paragraph -- well, let's just continue.

20     "The system backups have resulted in individuals spending

21 additional time in Border Patrol custody in increasingly

22 crowded conditions."  I'll end reading there.

23     System backups, that's a reference to ICE and HHS not

24 having the ability to accept detainees at the rate needed to

25 avoid crowded conditions.  Is that -- is my statement fair?

 1          MR. SILVIS:  Your Honor, I object.  He's asking the

 2   witness to speculate on what another official meant.

 3          THE COURT:  If he knows, he can answer.  Overruled.

 4          THE WITNESS:  I would assume that's what he's

 5   referring to.

 6   BY MR. LONDEN:

 7   Q.   Look down to the paragraph that says, "As a last resort

 8   scenario, on March 19 the Border Patrol began releasing

 9   noncriminal processed family units to NGOs directly."

10        You were involved in a project after you joined in

11   February for own recognizance release.  Right?

12   A.   Yes, sir.

13   Q.   And there was a new policy in which the authority to

14   approve release to NGOs on own recognizance for appropriate

15   detainees was delegated to a lower level of authority; is that

16   right?

17   A.   Yes, sir.

18   Q.   And that was in response to overcrowded conditions?

19   A.   That was in response to the totality of the

20   circumstances, yes, sir.

21   Q.   And so was the purpose of that delegation to lower level

22   to increase own recognizance releases a part of a response to

23   high levels of detainees at the time?

24   A.   It was in response to the exorbitant amount of people

25   that we were apprehending, yes, sir.

1  Q.   And do you know how the levels -- are you able to compare
2  the detainee levels at that time in Tucson Sector to detainee
3  levels today?
4  A.   No, sir.  I don't have those numbers in front of me.  I
5  know that overall nationwide, the numbers are down
6  dramatically.
7  Q.   Do you know what the manageable level of detainees in
8  Tucson Sector is?
9  A.   Not specific to Tucson, no, sir.
10 Q.   And do you know whether the manageable level exceeds --
11 the manageable level is below current levels of detainees in
12 Tucson Sector?
13 A.   Not specific to Tucson Sector, no, sir.
14 Q.   But under that policy, delegation to local officials
15 allowed them to keep the detainees at a manageable level;
16 right?
17 A.   To the best of their ability and what we saw that was in
18 March.  And as we moved into May, those numbers continued to
19 increase as far as our apprehensions went.  We stopped that
20 process and the numbers have come back down.  And we're --
21 overall, across the southwest border, we're at a manageable
22 level at this point.
23 Q.   But you can't say what the manageable level is for
24 Tucson?
25 A.   No, sir.

1           MR. LONDEN:  Mr. Lucero, please put up Plaintiffs'

2    Exhibit 1232 for identification.

3    BY MR. LONDEN:

4    Q.   I want to describe this before I ask you a question.

5    It's a news article about a new immigration tent shelter in

6    Yuma dated June 27, 2019.  And I'm going to call your

7    attention to the photograph which is an updated photo.  It

8    says, "Released by the U.S. Department of Health and Human

9    Services, showing the inside of the HH facility at Tornillo,

10   Texas," ending my quote there.

11          Does this resemble the inside of what you were calling a

12   soft-sided structure?

13   A.   No, sir, not that I've seen.

14   Q.   And what's the difference?

15   A.   This looks -- to be blunt, it looks like a bunkhouse kind

16   of setup and it's a very small structure.  And the soft-sided

17   facilities that we have referenced earlier are large

18   facilities that have multifaceted sections to them.  So you'll

19   have a section for processing in it, a section for holding

20   rooms and then restrooms and things of that nature, sir.  But

21   I hadn't seen this facility before or one like this.

22   Q.   Are you aware that Health and Human Services as well as

23   the Customs and Border Protection used soft-sided facilities

24   in Texas?

25   A.   I don't know much about Health and Human Services and

1  their facilities, sir.  I see the picture and it's the first

2  picture that I've seen of a Health and Human Services

3  facility, whether it be in Texas or somewhere else.

4  Q.   Mr. Hasting -- Chief Hastings' public statement said that

5  ICE and HHS did not have bed space.  Is it your understanding

6  when detainees are accepted by ICE/ERO or by ORR or by Health

7  and Human Services, they get beds?

8  A.   I believe that they're moved to long-term detention, yes,

9  sir.

10 Q.   But if they have to wait for a period of time until those

11 agencies can accept them, they don't get beds at Border

12 Patrol; right?

13 A.   Well, we don't have beds in our facilities, no, sir.

14 Q.   You talked about the appropriations bill for fiscal 2020.

15 Is information about the intent of the funding for that bill

16 available in Congressional Reports?

17 A.   Honestly, sir, I don't know.  All I can speak to is my

18 understanding of the way the process works, is that we're

19 asking for a specific -- specific projects.  But I don't know

20 if that's in Congressional Reports or how that's documented,

21 sir.

22        MR. LONDEN:  Your Honor, we've marked as joint trial

23 Exhibit 818 and joint trial Exhibit 912, the Senate and House

24 reports for the current appropriations bill which we think is

25 appropriate for judicial notice as a legislative fact.

1              MR. SILVIS:  No objection.

2              THE COURT:  Admitted.

3          (Exhibits 818 and 912 entered into evidence.)

4              MR. LONDEN:  May I consult with my partner?

5              THE COURT:  Sure.

6              MR. LONDEN:  Pass the witness, your Honor.

7              THE COURT:  Any redirect?

8              MR. SILVIS:  No, your Honor.

9              THE COURT:  All right.  Chief, is there any concern

10   at all on the part of Border Patrol to have individuals,

11   detainees sleep on the floor of your fatalities for three and

12   four days?

13             THE WITNESS:  Sir, obviously our concern is about

14   taking care of the people in our custody, but also getting

15   them processed and out of our custody as expeditiously as

16   possible.  Obviously as quickly as we can do that, the less

17   time they spend in our custody.  And it allows them to go to a

18   long-term detention facility, and it allows our agents to

19   focus on the Border Patrol security mission.

20             THE COURT:  Well, that's not really answering my

21   question.  You would move them out much quicker if somebody

22   could take them.

23             THE WITNESS:  Yes, sir.

24             THE COURT:  For example, if ICE had the beds, they'd

25   go to the ICE facility once they're processed in your

 1  facility; right?

 2          THE WITNESS:  Yes, your Honor.

 3          THE COURT:  But that's not happening.  They're held

 4  in your facilities for a longer period of time after

 5  processing, which is your job and they're not accepted so

 6  they're sleeping on the floors.  That's not a concern to

 7  Border Patrol?

 8          THE WITNESS:  Well, your Honor, those numbers, as

 9  the overall detention numbers have gone down, the expediency

10  of us transferring into ICRO custody has improved.  When the

11  apprehensions decreased, they're able to take them more

12  quickly.

13          Yes, it's a concern that the conditions are

14  appropriate.  But again, it's short-term holding.  And if the

15  concern for, at least in my opinion, would be if it

16  transitions into a long-term detention, then it's two agencies

17  doing or conducting the same job.  And again, it's taking our

18  folks away from doing their border security mission.  So if

19  ICRO had the appropriate bed space and the funding was

20  available for them to do this, it meets everyone's needs.

21          THE COURT:  Agreed.  But that's not what's

22  happening, is it?

23          THE WITNESS:  Well, again, your Honor --

24          THE COURT:  You have people -- maybe you don't know

25  these numbers, but you have folks in the Tucson center here

 1  sleeping on a floor with a mat and a Mylar blanket sometimes

 2  for three and four days.  That's not desirable, is it?

 3          THE WITNESS:  It's not the best case scenario,

 4  your Honor.  However, again --

 5          THE COURT:  Well, it wouldn't happen at all if these

 6  other agencies, specifically ICE, had space for them.

 7          THE WITNESS:  Absolutely, your Honor, and the

 8  funding that goes along with that.

 9          THE COURT:  They need to build the building.

10          THE WITNESS:  Yes, sir.  They do.  Because it's --

11  at the end of the day, your Honor, they're already trained and

12  practiced in all of the pieces and parts that go along with

13  that long-term detention.  And it makes sense that they're the

14  ones that -- that should be performing those -- those duties.

15  Like I said, they already do it, they're knowledgeable about

16  how to do it.  They deal with the contracts required to handle

17  those kind of situations on a regular basis.  They're kind of

18  the built-in set.  So you're absolutely right, your Honor.

19          THE COURT:  Okay.  Thank you.

20          THE WITNESS:  Yes, sir, your Honor.

21          THE COURT:  Anything else?

22          MR. SILVIS:  No, your Honor.  Is the witness

23  excused?

24          THE COURT:  Thank you very much, Chief.

25          THE WITNESS:  Thank you, your Honor.

 1          MR. SILVIS:  Is he excused, your Honor?

 2          THE COURT:  Yes.

 3          MR. SILVIS:  Thank you.

 4          Your Honor, defense has no further witnesses.

 5          THE COURT:  Rebuttal?  Well, you act surprised.  You

 6  folks do talk to each other, don't you?

 7          MR. LONDEN:  My gesture was about the time of day.

 8          We have a plan for rebuttal from Mr. Vail who is

 9  arriving at 2 something today and had the same illness that

10  your Honor had.  But he's ready for tomorrow morning.  It will

11  be a brief rebuttal, I think maybe an hour.  But he's not here

12  now.

13          THE COURT:  And is that the extent of your rebuttal?

14          THE WITNESS:  Yes, your Honor, as we anticipate it

15  now.  If there's any clean-up exhibits to offer, we'll notify

16  the other side as soon as we can this evening, but I don't

17  think so.

18          THE COURT:  So the case will be submitted by noon

19  tomorrow?

20          MR. LONDEN:  I can't imagine otherwise, your Honor,

21  it won't be because of us.

22          THE COURT:  I'm just trying to think of a timetable

23  here because I want us to have an opportunity to have a chat.

24          MR. LONDEN:  We would welcome that opportunity,

25  your Honor, and we'd be ready whenever you are including right

 1   after the rebuttal ends.  But we also have another day

 2   before -- we're ready when you are, Judge.

 3              THE COURT:  Well, I'm sick anyway, so, you know,

 4   recessing early is -- today is fine with me.  But the

 5   timetable then would be to have your witness tomorrow morning.

 6   We have all the evidence.  And then you would argue the case.

 7              THE WITNESS:  We're ready when you are, Judge.

 8              MS. FABIAN:  Your Honor, we would defer to you as

 9   far as how you would like closing arguments, whether you'd

10   like written closings or us to submit -- do oral closings

11   tomorrow.

12              THE COURT:  Oral arguments tomorrow morning with

13   some questions from me.

14              MS. FABIAN:  Sounds great, your Honor.

15              MR. LONDEN:  Got it.

16              May I raise one record issue I discussed with the

17   clerk this morning?  During the testimony of Witness B,

18   your Honor saw a set of photographs and said, "I can't make

19   out any faces."  And I said if the faces aren't visible, no

20   problem with their being admitted.  The only thing that was

21   shown to your Honor or the public was -- it was all redacted.

22   There is an unredacted version that wasn't shown that very

23   clearly shows the face of Witness B.  And the only problem is

24   our record reflects that the unredacted version was admitted.

25   We propose to deal with this in the sealing order that we have

 1   to work out, but no harm is done.  It wasn't shown publicly.

 2   It's just the record inaccurately shows that what was shown

 3   was unredacted and it was redacted.

 4            THE COURT:  Well, okay.  You can agree.

 5            MS. FABIAN:  Sounds like I agree.  I don't quite

 6   understand the problem, but I'm happy to talk it over.  It

 7   sounds like we can agree on this.

 8            MR. LONDEN:  The problem is I misspoke on the record

 9   about what was being shown.  I said I thought it was the

10   unredacted version.  It was the redacted version.  So we

11   can work it out in the -- we have to work out the sealing

12   provisions for the confidential documents that were submitted

13   and we will do that.  This will be solved as part of it.  The

14   transcript reference is incorrect.

15            THE COURT:  Okay.

16            MS. FABIAN:  Sounds workable.

17            THE COURT:  All right.

18            9:15 tomorrow.  We'll recess until 9:15 tomorrow.

19   We'll take one witness, relatively short witness and then I

20   would ask for argument from counsel.  All right.  Okay.

21            MR. LONDEN:  Yes, your Honor.

22            THE COURT:  We'll see you tomorrow morning.

23        (Proceedings adjourned at 2:07 p.m.)

24

25

1                       C E R T I F I C A T E

2

3               I, Cheryl L. Cummings, certify that the

4    foregoing is a correct transcript from the record of

5    proceedings in the above-entitled matter.

6

7                       Dated this 21st day of January, 2020.

8                       /s/Cheryl L. Cummings

9                       Cheryl L. Cummings, RDR-CRR-RMR-CRC-CRI
                        Federal Official Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25