**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Unknown Parties, et al.,<br><br>             Plaintiffs,<br><br>v.<br><br>Kirstjen M Nielsen, et al.,<br><br>             Defendants. | No. CV-15-00250-TUC-DCB<br><br>**FINDINGS OF FACT AND CONCLUSSIONS OF LAW** |

## BACKGROUND

Plaintiffs filed this action on June 8, 2015, seeking injunctive relief related to alleged inhumane and punitive treatment of civil immigration detainees by Customs and Border Patrol (CBP) in the Tucson Sector at the Brian A. Terry Station/Naco Station, Casa Grande Station, Douglas Station, Nogales Station, Sonoita Station, Tucson Station, Why/Ajo Station, Willcox Station, and Three Points Station. The Tucson Station and Three Points Station process detainees at the Tucson Coordination Center (TCC), which serves as a hub for coordinating the movement of the majority of detainees out of CBP custody. Plaintiffs charge the Defendants with violating the Due Process Clause of the Fifth Amendment based on alleged deprivations of sleep, of hygienic and sanitary conditions, of adequate medical screening and care, of providing inadequate food and water, and of a lack of warmth in CBP holding cells. (Doc. 1 ¶¶ 184-218.) The case is a class action lawsuit. (Order (Doc. 117)).

Following a seven-day trial, the Court grants Plaintiffs' request for a Permanent Injunction because CBP's mission is to arrest, process, and turn detainees over to United States Immigration and Customs Enforcement (ICE), Office of Enforcement and Removal Operations (ERO), the Office of Refugee Resettlement (ORR); the United States Marshals Service; or another agency (OA), as appropriate. CBP stations and holding facilities are designed within the context of this mission for short-term holds, lasting hours not days. There is no legitimate governmental interest to hold detainees longer than the time needed to complete this mission.

The evidence reflects that the extended detentions currently occurring at CBP facilities are, in large part, caused when receiving agencies, including ICE, ERO, ORR, the United States Marshals, and other agencies, are unable, usually due to capacity constraints, to accept CBP transfers. The Plaintiffs, who are civil detainees in CBP holding cells, face conditions of confinement after 12 hours which are substantially worse than detainees face upon commitment to either a civil immigration detention facility or even a criminal detention facility, like a jail or prison. The Court finds that the conditions of detention in CBP holding cells, especially those that preclude sleep over several nights, are presumptively punitive and violate the Constitution. The Defendants have overcome this presumption to a limited extent, and the Court limits its injunctive relief, accordingly. CBP shall be enjoined from holding detainees, who are "processing complete," i.e., meaning the detainee has been processed by CBP and the appropriate receiving agency has been identified, longer than 48 hours from book-in time. Detention may not extend into a third night under the "no longer than 48 hours" rule, unless and until CBP can provide conditions of confinement that meet detainees' basic human needs for sleeping in a bed with a blanket, a shower,[1] food that meets acceptable dietary standards, potable water, and medical assessment performed by a medical professional.

---

[1] A shower is a bath in which water is showered (as in to wet with a spray, fine stream, or drops) on the body. *Webster's Dictionary* (1979). A "paper-shower" or "shower-wipe, by definition, is not a shower.

The Court shall afford the parties an opportunity to be heard regarding any express terms necessary for the effectuation of the Permanent Injunction not contained herein.

### A.  Conditions of Confinement and Civil Detainees

""When the State takes a person into custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being: Under this rationale, the State must provide for a detainee's 'basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—.'" (Order (Doc. 244) at 6 (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.,* 489 U.S. 189, 199-200 (1989)). "'The more basic the particular need, the shorter the time it can be withheld.'" *Id.* at 20 (quoting *Hoptowit v. Ray*, 682 F.2d 1237, 1259 (9th Cir. 1982)). Less critical needs may be denied for reasonable periods of time when warranted by exceptional circumstances such as an emergency or disciplinary need. *Id.* (citing *Hoptowit* citing *Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979)). The Court's task is to "determine whether a challenged punishment comports with human dignity," *Furman v. Georgia*, 408 U.S. 238, 282 (1972) (BRENNAN, J., concurring), and the Court must carefully scrutinize the challenged conditions and application of realistic yet humane standards, *Rhodes v. Chapman*, 452 U.S. 337, 361 (1981).

It is undisputed that CBP holds the Plaintiffs as civil detainees, pursuant to civil immigration laws.[2] "Pretrial detainees cannot be punished because they have not yet been convicted," *Lynch v. Baxley*, 744 F.2d 1452, 1461 (9th Cir. 1984) (citing *Bell v. Wolfish,* 441 U.S. 520 (1979); "[civil] detainees cannot be subjected to conditions of confinement substantially worse than they would face upon commitment," *Lynch*, 744 F.2d at 1461.

As civil detainees, Plaintiffs are protected under the Fifth Amendment from being

---

[2] "Plaintiffs are civil detainees awaiting civil commitment; some may be awaiting criminal commitment." (Order (Doc. 383) at 9 (citing (Reply (Doc. 359), Ex. 1: 11/15/16 Evidentiary Hearing George Allen, Assistant Chief Patrol Agent-Tucson Sector at 107)). According to Defendants, the Plaintiffs are detained as civil detainees pursuant to 8 U.S.C.A. § 1225 (an alien arriving at the United States border is deemed to be an applicant for admission, subject to being determined inadmissible and subject to removal); § 1226 (detention pending a decision on whether the alien is to be removed); § 1231 (subsequent to an order of removal, an alien is detained pending deportation), and § 1252 (detention as a result of expedited removal proceedings). (Ds' Proposed Findings of Facts (Doc. 441) ¶ 12.)

held without due process of law under conditions that amount to punishment. *Wong Wing v. United States,* 163 U.S. 228, 237 (1896). The Eighth Amendment's prohibition against cruel and unusual punishment requires prison officials to provide humane conditions of confinement, including adequate food, clothing, shelter, sanitation, and medical care, and take reasonable measures to guarantee the safety of the inmates. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Under the Eighth Amendment, a prison official must act with deliberate indifference to an inmate's health or safety. *Id.* at 834. Therefore, conditions of confinement that violate the Eighth Amendment will necessarily violate the Fifth Amendment.

Because Plaintiffs are civil detainees and <u>not</u> prisoners, the Fifth Amendment, mirrored by the Fourteenth Amendment Due Process Clause,[3] apply; both protect a non-convicted detainee from punishment prior to an adjudication of guilt**.** *Bell v. Wolfish*, 441 U.S. 520, 534–35 (1979). "'This standard differs significantly from the standard relevant to convicted prisoners, who may be subject to punishment so long as it does not violate the Eighth Amendment's bar against cruel and unusual punishment.'" (Order (Doc. 244) at 7 (quoting *Pierce v. County of Orange*, 526 F.3d 1190, 1205 (9th Cir. 2008)). Fourteenth Amendment due process claims are evaluated under an objective deliberate indifference standard. *Gordon v. County of Orange*, 888 F.3d 1118, 1124-35 (9th Cir. 2018) (applying *Castro v. Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (en banc), *Kinsley v. Hendrickson*, 135 S. Ct. 2466 (2015). The "more protective" Fourteenth Amendment standard requires more than minimal necessities, *Jones v. Blanas*, 393 F.3d 918, 931 (9th Cir. 2004),[4] but does not require conditions of confinement free from discomfort, *Bell*, 441 U.S. at 537. "[D]ue process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Jackson v. Indiana*, 406

---

[3] The Due Process Clause of the Fourteenth Amendment bars any State from depriving <u>any person</u> of rights secured under the Bill of Rights (the first eight amendments). Therefore, the Court relies equally on cases applying the Fourteenth and Fifth Amendment Due Process Clauses.

[4] Overruled in part by *Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014) (holding monetary damages as a retroactive remedy is unavailable against an official capacity defendant who lacks authority over budgeting decisions, but may factor into assessing subjective intent for deliberate indifference analysis in Eighth Amendment case).

U.S. 715, 738, (1972). The Court evaluates the conditions in light of contemporary standards of decency "in reference to their severity and duration," with any "resulting injury being merely one factor that may suggest an unjustified infliction of harm compared to being plausibly necessary." (Order (Doc. 383) at 6-7 (citing *Darnell v. Pineiro,* 849 F.3d 17, 30 (2ndh Cir. 2018) (citing *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)), *see also Martinez v. Stanford*, 323 F.3d 1178, 1184 (9th Cir. 2003) (citing same).

To evaluate the constitutionality of a pretrial detention condition under the Fifth Amendment, a district court must determine whether those conditions amount to punishment of the detainee. *Bell*, 441 U.S. at 535; *Pierce*, 526 F.3d at 1205; *Demery v. Arpaio*, 378 F.3d 1020, 1029 (9th Cir. 2004). In the absence of evidence of express intent, a court may infer that the purpose of a particular restriction or condition is punishment if the restriction or condition is not reasonably related to a legitimate governmental objective or is excessive in relation to the legitimate governmental objective. *Pierce*, 526 F.3d at 1205 (citing *Bell*, 441 U.S. at 539); *Demery*, 378 F.3d at 1028 (citing *Bell*, 441 at 538). There is no evidence in this case of any intent by CBP to create punitive conditions of confinement. The evidence reflects that CBP has stretched existing resources to provide the best conditions of confinement available under the circumstances. A presumption, however, exists that the challenged conditions of confinement are punitive because in the context of CBP operations, there is no legitimate governmental interest for the extended detentions currently occurring at CBP facilities, and the Plaintiffs, who are civil detainees, face conditions of confinement in CBP stations, Tucson Sector, which are more restrictive than they will face upon commitment to either a civil or criminal detention facility. The Ninth Circuit recognizes an exigent circumstances exception for constitutional violations, but this is a narrow exception *Oliver v. Baca,* 913 F.3d 852, 858 (9th Cir. 2019) and does not apply here because by all accounts the detainee demographics currently existing in the Tucson Sector have existed since at least 2015 and are expected to continue into the future.

In considering assertions of legitimate governmental objectives and interests,

"maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." *Bell*, 441 U.S. at 546; *Pierce*, 526 F.3d at 1205. In the absence of substantial evidence that indicates officials have exaggerated their responses, courts should ordinarily defer to the expert judgment of correction officials to determine whether detention restrictions or conditions are reasonably related to maintaining security and order and operating the institution in a manageable fashion. *Bell*, 441 U.S. at 540 n. 23. The government does not need to show an "exact fit" or proof that the policy in fact advances the legitimate governmental objective, or even that it is the "least restrictive alternative." *Valdez v. Rosenbaum*, 302 F.3d 1039, 1045 (9th Cir. 2002). The correction official must have reasonably thought that the policy would advance a legitimate governmental objective. *Id.* Such legitimate non-punitive justifications must, however, be specific to the penological interests involved in the Plaintiffs' detention, which here is for commitment as civil detainees in immigration-type civil facilities. (Order (Doc. 383) at 10 (citing *King v. Los Angeles County,* 885 F.3d 548, 554-555 (9th Cir. 2018)).

In summary, a condition of confinement for an inmate who has not been convicted violates the Fifth and Fourteenth Amendments if it imposes some harm to the detainee that significantly exceeds or is independent of the inherent discomforts of confinement and is not reasonably related to a legitimate governmental objective or is excessive in relation to the legitimate governmental objective. *Kingsley v. Hendrickson,* 135 S. Ct. 2466, 2473-74 (2015). Under the Fourteenth Amendment, the Court makes an objective assessment whether there is a reasonable relationship between the government's conduct and a legitimate purpose. *Id.* at 2469. The civil nature of Plaintiffs' confinement provides an important gloss on the meaning of "punitive"; Plaintiffs must be afforded "more considerate treatment" than even pretrial detainees, who are being criminally detained prior to trial. *Cf. Estelle v. Gamble*, 429 U.S. 97, 104, (1976); *Youngberg v. Romeo*, 457 U.S. 307, 321–22, (1982). Constitutional rights in respect to conditions of confinement for prisoners establish a floor for the constitutional rights of the Plaintiffs. *Padilla v. Yoo*, 678

F.3d 748, 759 (9th Cir. 2012) (citations omitted). The Court must presume detainees are subjected to punishment if they are confined in conditions identical to, similar to, or more restrictive than those under which the criminally convicted are held. *See Sharp v. Weston*, 233 F.3d 1166, 1172–73(9th Cir. 2000) (finding that *Youngberg* required that individuals civilly confined at a commitment center receive "more considerate" treatment than inmates at the correctional center in which the commitment center was located).

The evidence is undisputed that conditions of confinement at Tucson Sector CBP stations are substantially worse than conditions afforded criminal detainees at the Santa Cruz County jail or other jail facilities, where detainees are medically screened by medical professionals; have a bed with cloth sheets, blankets, and pillows, and an opportunity for uninterrupted sleep; have clean clothing, including second layers for warmth; showers, toothbrushes and toothpaste, and warm meals with a variety of food choices, including fruits and vegetables, accommodating food allergies and religious beliefs. Likewise, the conditions of confinement for civil immigration detainees similarly improve once they are transferred from CBP holding cells to detention centers operated by the United States Marshals, ICE, ERO, Health and Human Services (HHS), and other immigration detention agencies and organization. Accordingly, there is a presumption that the conditions of extended confinement at the Tucson Sector stations violate the Plaintiffs' constitutional rights.

When the Court denied the Plaintiffs' Motion for Summary Judgment, it held that the Defendants had to be afforded an opportunity at trial to rebut the presumption that the challenged conditions of confinement are punitive by presenting evidence that the severity and duration of the conditions of confinement are rationally related to the CBP's interdiction mission. (Order (Doc. 383) at 5-11.)

### B.  Conditions of Confinement under the Preliminary Injunction

On November 18, 2016, when the Court issued the preliminary injunction, the Court considered the constitutionality of the conditions of confinement given the nature, purpose, and duration, of the detainees' time in a CBP station. The Court found: "Border Patrol

stations are twenty-four-hour operations, and in fact a significant number of individuals who are detained in Border Patrol stations are apprehended during the evening and night-time hours." (Order (Doc. 244) at 11.) Defendants then described the following:

> Border Patrol processing begins in the field, but on arrival at the detention facility intake begins in the "sally port" where detainees' outer-clothing is removed for security reasons, leaving detainees without sweatshirts, jackets, or second layers of clothing for warmth. Detainees are placed into group-holding rooms based on age, gender, family units, or criminal suspects. Processing consists of obtaining biographical information and biometrics and submitting this information through the e3Nex Generation Identification system to determine prior criminal and immigration arrests. Fully processing a detainee includes preparing an arrest report, immigration processing, service of immigration forms, consular notifications, and communication with family members and attorneys as appropriate. If uninterrupted and if there is no remarkable criminal or immigration history, processing would take between two and two and one-half hours.

(Order (Doc. 244) at 11 (citations to the record omitted.) The evidence reflected that there were, however, interruptions "caused by a large number of prior apprehensions and the criminal background of the detainees awaiting processing, the need to dispense meals, medical or health care, to arrange consular communications, phone calls to family members or attorneys, to conduct investigations, and computer system outages." *Id.* The evidence also revealed "that detention in Border Patrol holding rooms is also extended because of delays by the receiving agencies ICE, ERO, and the United States Marshal in accepting the Border Patrol transfers." *Id.*

The Court summarized: "between June 10, 2015 and September 28, 2015, only about 3,000 of approximately 17,000 detainees were processed out of CBP station detention within 12 hours: [o]f these 17,000 detainees, 8,644 people were held at CBP stations up to 23 hours, 6,807 were held up to 47 hours, 1,207 were held up to 71 hours, and 476 were held for 72 hours or more." *Id.* at 12. The expert testimony at the evidentiary hearing for the preliminary injunction was: "CBP tries diligently to process detainees promptly, and generally does so within 24 hours," *id.* (quoting Skipworth Decl. ¶ 154)); "nearly all detainees were processed within 48 hours," *id.* (quoting Bryce Decl. ¶ 38.) The Court understood this evidence in the context of processing to mean the transfer of detainees by CBP to receiving agencies, ICE, ERO, the United States Marshals.

The Court found the Plaintiffs were likely to prevail on the constitutional claims related to alleged cell conditions as follows: overcrowding, with concrete hard and cold floors and bench surfaces, cold temperatures, no blankets or mats, precluding sleeping; unsanitary cell conditions, with lack of waste receptacles and insufficient housekeeping, lack of personal hygiene products and showers, insufficient food and lack of potable water. The Court was concerned about the lack of a universal medical questionnaire designed by medical professionals for use by CBP agents, especially because medical screening was being performed by agents without any medical training.

The Court ordered full and immediate compliance "with CBP's 2008 Hold Rooms and Short-Term Custody Policy (2008 Policy) and the National Standards on Transport, Escort, Detention, and Search (TEDS) standards and that the standard requiring clean bedding includes mats for detentions exceeding 12 hours." (Order (Doc. 383) at 1.) The Court clarified that 12 hours begins to run when a detainee is booked-in at a station, not when he or she is detained in the field. After 12 hours of detention, CBP must provide bedding, including a sleeping mat and Mylar blanket, and showers or a body-wipe where showers were not available. The Court reasoned that conditions of confinement in the field and for the first 12 hours of detention at the Station were rationally related to the CBP's 24-7 operations and governmental interests, including: interdiction, arrest, detention and processing. The Court reasoned that Defendants could not side-step the reality that over half the detainees were being held longer than 12 hours and, therefore, physiologically had the human need to lie down and sleep. (Order (Doc. 244) at 12-17, 27-28.) For purposes of granting the permanent injunction the Court affirms these findings.

The Court adds to the 12-hour sleeping mat requirement, that floor mat-sleeping is only acceptable outside the toilet areas of the holding cells. The Court understands that holding cell design and floor sleeping, with mats, creates capacity issues, but the alternative of detainees lying directly on cold floors, covered only by Mylar sheets does not resolve the capacity issues caused by sleeping in holding cells. The capacity issues are not caused by the sleeping mats; the capacity issues are caused by holding cell designs that do not

accommodate sleeping, with or without a mat. Prior to sleeping mats, detainees were sleeping directly on the floor in the toilet areas of the holding cells when cells were overcrowded. Regardless of whether a detainee is sleeping on a mat or directly on the concrete floor, being forced to sleep in a toilet area due to overcrowding offends the notions of common decency; it is unsanitary and degrading for all detainees who either have to sleep in the toilet area or try to use the toilet when others are sleeping there. Regardless of the duration of overcrowding, CBP is enjoined from overcrowding holding cells to the extent that detainees are sleeping on the floor in toilet areas of the holding cells.

### C.  Purpose of Plaintiffs' Pre-commitment Detention by CBP

Under both the Fifth Amendment and the Fourteenth Amendment Due Process Clause, the Court must consider the penological interests of the pre-commitment conditions of confinement, i.e., the purpose of the detention. For purposes of issuing the permanent injunction, the Court considers legitimate non-punitive justifications specific to the penological interests involved in detaining the Plaintiffs for commitment as civil detainees in immigration-detention type facilities, not prisons. In the context of such civil detention, the Tucson Sector is part of CBP and responsible for: "[f]undamentally securing our nation's borders, operating in between the ports of entry to ensure that illicit narcotics, contraband, undocumented aliens, terrorists and [] don't enter the United States." (TR 1/15/2020 (Day 3) (Doc. 471): Defraitas at 30) at 30.) Hold-room detentions beyond the time needed for CBP to process a detainee for transport to a receiving agency, like ICE, ERO, or the United States Marshals, are not related to the CBP's interdiction mission.

The Court, based on the Finding of Facts and Conclusions of Law set out below, grants Plaintiffs a permanent injunction enjoining Defendant CBP, Tucson Sector, from detaining individuals under existing conditions for periods of time unrelated to the CBP mission to interdict, process and transport detainees to receiving agencies ICE, ERO, HHS, United States Marshals, and others. The injunction issues because CBP operations and facilities are not designed to meet a detainees' basic human needs, including sleeping, warmth, food, water, personal hygiene, and medical care for extended periods

of time. The evidence reflects that CBP processing, generally, takes between a couple of hours and 12 hours and may involve at least one night-time detention in a CBP holding cell due to: 1) processing when an arrest occurs at night or in the evening or 2) transportation to a receiving agency cannot occur at night because the receiving agency does not have 24 hour operations, i.e., it is closed at night, or because Mexico will not receive detainees for repatriation at night or because judicial operations are closed at night and on weekends and holidays.[5] The logistics of being unable to transport detainees to receiving agencies at night extend the time necessary for CBP to process and transfer a detainee for approximately 12 hours during the night-time detention. To accommodate the logistics of night-time precluded transportation operations, the Court adopts a "no longer than 48-hours" rule based on the finding that detentions beyond 48 hours are, generally, not related to CBP operations. Detentions longer than 48 hours for detainees who have been designated "processing complete" are because receiving agencies fail to green-light the CBP detainee transfers. This forces CBP to step into the ill-fitting shoes of a detention facility and perform the detention responsibilities of such agencies as ICE, ERO, ORR, HHS, and other civil immigration detention agencies. It is undisputed that all of the receiving agencies afford detainees a bed, with real cloth sheets, blankets, and pillows, provide warmth by dispensing second layers of clothing, have shower facilities, offer hot meals prepared pursuant to professional dietary standards, have clean potable water readily available, and have medically trained staff who conduct medical screenings of the detainees and provide care as appropriate.

In 2019, the average time spent in CBP custody in the Tucson Sector was 53.92 hours, with 34 percent of 63,490 detainees being held longer than 48 hours: 9,798

---

[5] The Court treats the weekend and holiday closures by the judiciary the same as the night-time logistic impediment CBP faces in carrying out its duty to transfer detainees to receiving agencies. The Court intends that the Permanent Injunction will accommodate the logistical impossibility for CBP to transport a detainee to a receiving agency due to court closures during the night, weekends and holidays, with CBP making every possible effort to provide such detainees with conditions of confinement meeting basic human needs to sleep in a bed, have a shower, etc., if it becomes logistically impossible for CBP to transfer a detainee pursuant to the "no longer than 48 hours" rule because the courts are only open on weekdays and closed holidays.

individuals were held up to 72 hours and 12,030 individuals were held longer than 72 hours. Therefore, the Court finds that Defendant Chad Wolf, Acting Secretary of United States Department of Homeland Security,[6] and the other Defendants administer a detention system that deprives detainees, who are held in CBP stations, Tucson Sector, longer than 48 hours, of conditions of confinement that meet basic human needs because CBP holding cells are designed so as to preclude beds, with detainees being forced over a period of several nights (more than 2) to sleep on mats on concrete floors or benches in fully-lit holding cells. CBP does not provide a second layers of clothing and the holding cells are uncomfortably cold even with floor mats, especially at night because body temperature drops due to inactivity and the Mylar blankets are not effective to provide warmth as they are designed to prevent the loss of body heat. (Order (Doc. 244) at 15 (referencing preliminary injunction testimony reflecting efficacy of Mylar blanket depends on comfortable room temperatures because it does not provide insulation but merely prevents evaporation of approximately 80% of body heat). Sleeping is constantly interrupted because CBP operations include 24-7 processing that continuously moves detainees in and out of holding cells where other detainees are attempting to sleep. This is especially disruptive, when detainees, who have been fully processed, i.e., "processing complete," occupy the same holding cells that new arrivals are being moved in and out of during processing. Disruption is compounded by intermittent overcrowding, especially at TCC, when detainees are forced to step over each other, step on each other's mats, and even sleep in toilet stall areas, thereby, making it impossible to move about the cell to get water or use the bathroom without disrupting other detainees who are trying to sleep.

The Plaintiffs ask the Court to enjoin the Defendants from holding detainees in these conditions for more than one night. The Court's permanent injunction is more limited. The "no longer than 48-hours" rule allows a third night detention only when it is necessary due to incomplete processing or the logistic impossibility of making an agency transfer at night. The Court limits the permanent injunction to detainees that are transfer

---

[6] ICE is an agency within the Department of Homeland Security; CBP is an agency within the Department of Homeland Security.

ready, i.e., the detainee has been processed by CBP and the appropriate receiving agency has been identified—the detainee is "processing complete."

The Court finds that each of the conditions of confinement existing in the CBP holding cells described above, and all of them together, are presumptively punitive because they are more restrictive than the conditions of confinement described above as existing for pretrial detainees held in jails or prisons and for civil detainees held in ICE, ERO, HHS or other civil detention facilities. Considering the conditions of confinement in CBP holding cells in the context of holding these detainees for the purpose of civil immigration proceedings, the conditions of confinement are especially harsh and unrelated to the purpose of their confinement. In the context of CBP's legitimate government interests, CBP admits that detention responsibilities lasting beyond the time period necessary to process detainees takes away from its ability to carry out its patrol duties along the border. *See* (Joint Exhibit (JE) 759: Memorandum from Kevin K. McAleenan, Commissioner, U.S. CBP, <u>Southwest Border Security and Humanitarian Crisis: U.S. Customs and Border Protection Immediate Action Plan</u> (April 9, 2019) 2-3 (explaining objective of Action Plan is to restore USBP in-custody numbers to safely managed thresholds, allowing USBP to return our law enforcement resources to our border and national security priorities as quickly as possible.") Once CBP has processed detainees, identified the receiving agency, and had a reasonable time to make the transfer (the time needed to transport the detainee to the receiving agency), the governmental interests that warrant the existing conditions of confinement end. The 48-hour rule accommodates this governmental interest. Under the "no longer than 48-hours" rule, a detainee, who is processing complete, may not be held into a third night or longer, unless CBP can provide conditions of confinement that provide for basic human needs, especially uninterrupted sleeping in a bed, warmth, showers, food that meets acceptable dietary standards, potable water, and a medical assessment made by a medically trained professional.

## **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

On January 13 through 17, and 21 through 22, 2020, this action was tried before this

Court, sitting without a jury. Having heard the testimony and having examined the proofs offered by the parties, and having heard the arguments of counsel and being fully advised herein, the Court now finds generally in favor of Plaintiff and against the Defendant, and hereby makes the following special Findings of Fact and Conclusions of Law pursuant to the Federal Rules of Civil Procedure, Rule 52(a) which constitutes the decision of the Court herein:

## A. Findings of Fact

To the extent these Findings of Fact are also deemed to be Conclusions of Law, they are hereby incorporated into the Conclusions of Law that follow.

1.      The CBP's primary mission is detecting and preventing the entry of terrorists, weapons of mass destruction, and unauthorized aliens, as well as interdicting drug smugglers and other criminals entering the United States between the ports of entry. (Ds' Proposed Findings of Fact (Ds PFOF) (Doc. 441) ¶¶ A.1-A.2); (TR 1/15/2020 (Day 3) (Doc. 471): Defraitas at 30) (describing CBP mission: "[f]undamentally securing our nation's borders, operating in between the ports of entry to ensure that illicit narcotics, contraband, undocumented aliens, terrorists and [] don't enter the United States.")

2.      In carrying out this "interdiction mission," a CBP agent in the Tucson Sector apprehends an individual and brings him or her to one of eight Tucson Sector stations—Ajo, Brian A. Terry, Casa Grande, Douglas, Nogales, Sonoita, Tucson Coordination Center ("TCC") or Willcox. Agents at the Tucson Station and Three Points Station bring individuals directly to the TCC. (DPFOF (Doc. 441) ¶ A.3.)

3.      Once an individual arrives at a station, CBP agents ascertain the individual's identity, and immigration and criminal history. The individual is processed to determine whether he or she may be repatriated, transferred into the custody of another agency, referred for prosecution in accordance with the law, or, in rare circumstances, released on his or her own recognizance. *Id.* ¶ A.4.

4.      Individuals awaiting the completion of processing and transfer out of CBP custody wait in hold rooms within the CBP station. CBP stations, like CBP itself, operate

1  twenty-four hours a day, seven days a week. A significant number of Tucson Sector CBP

2  apprehensions occur at night. *Id.* ¶ A.6.

3       5.    Once detained, individuals are often transferred from one hold room to

4  another as operational demands require including, but are not limited to, the Prison Rape

5  Elimination Act ("PREA"), Pub. L. No. 108-79, 117 Stat. 972 (Sept. 4, 2003) (codified at

6  42 U.S.C. §§ 15601, *et seq*.); United States Customs and Border Protection ("CBP")'s

7  National Standards on Transport, Escort, Detention, and Search ("TEDS") detainee and

8  occupational safety requirements, and to maintain facility cleanliness. *Id.* ¶ A.7.

9       6.    Tucson Sector CBP aims to maintain a safe environment both for

10 individuals in custody and for its agents, other employees, and on-site contractors. There

11 is no evidence of any express intent to punish detainees. *Id.* ¶ A.9.

12      7.    CBP stations are intended and designed for short-term holding during

13 processing and are not long-term detention facilities. Processing generally takes between

14 2 and 2.5 hours. (JE 121 ¶ 5 (Allen Decl 2/24/16)). CBP operations, such as bedding

15 accommodations, food, and personal hygiene, are designed to move detainees out of CBP

16 custody within 12 to 24 hours and detention exceeding 24 hours is "extended" (Plaintiffs'

17 Exhibit (PE) 1234 (4/7/17 Allen Dep. at 155:13-21)) or "prolonged" *id.* at 162:19-163:3.

18 *See also* Deposition Video (PE 1234) (8/23/17 Raleigh Leonard (describing CBP as not

19 being in business of detaining people longer than 24 hours); Deposition Video (PE 1234)

20 (7/14/16 George Allen (describing food standards, cell capacities and sleeping

21 accommodations being based on 12-24 holds). Agent Carrie Davison, Special Operations

22 Supervisor, described holding time beyond 72 hours to be an extended time. (TR Day 4:

23 Davison (questioned by the Court) (Doc. 473) at 90.)

24      8.    CBP's hold room design standards mandate at least 7 square feet of

25 unencumbered square feet per detainee. (JE 4 at USA000089-90.) These standards

26 assume detainees will not lie down, since "a hold room is not designed for sleeping." (*Id.*

27 at USA-0000091.)

28

9.     ICE hold room standards also mandate at least 7 square feet of unencumbered square feet per detainee. (JE 910: National Detention Standards for Non-Dedicated Facilities Revised 2019 at 38.) ICE's standards are clear that hold room capacities are based on seating capacity, with no accommodations for sleeping apparatuses; detainees "may not be held in a hold room for more than 12 hours." (JE 910 at 38.)

10.     The memorandum, *Hold Rooms and Short Term Custody*, dated June 2, 2008 (2008 Memorandum Policy), is the national guiding policy on short-term custody pertaining to CBP Tucson Sector hold-rooms. (JE 9.) Another national level policy was also published, U.S. Customs and Border Protection National Standards on Transport, Escort, Detention and Search (TEDS), dated October 2015. (JE 74.) TEDS is the comprehensive CBP policy related to the safety, security, and care of detainees, which reinforces the Hold Rooms and Short Term Custody policy. Where the two policies differ, the more restrictive policy takes precedence. (JE 863: Memorandum, October 3, 2019.)

11.     Under the 2008 Memorandum Policy: "Detainees will be promptly processed and turned over to United States Immigration and Customs Enforcement (ICE), Office of Detention and Removal Operations (ERO), the Office of Refugee Resettlement (ORR); the United States Marshals Service; or another agency (OA), as appropriate." CBP Policy: Hold Rooms and Short Term Custody § 5.2. "Whenever possible, a detainee should not be held for more than 12 hours. Every effort will be made to promptly process, transfer, transport, remove, or release those in custody as appropriate and as operationally feasible." *Id.* § 6.2.1. The senor shift supervisor must be notified of a detention that reaches or exceeds 24 hours and shall make every effort to promptly move the detainee, *id.* § 6.2.2; the Sector Staff Duty Officer shall be notified when a detention period reaches or exceeds 72 hours and shall make every effort to promptly move the detainee, *id.* § 6.2.3. The same durational limits apply to UACs, and the *Flores* Settlement requires that UACs must be placed in an ORR-approved facility within 72 hours, but the maximum

time allowed under extenuating circumstances for placing UAC in an ORR approved facility is five days. *Id.* §§ 6.24-6.2.4.2.

12.     Under TEDS: "Detainees should generally not be held for longer than 72 hours in CBP hold rooms or holding facilities. Every effort must be made to hold detainees for the least amount of time required for their processing, transfer, release, or repatriation as appropriate and as operationally feasible." (JE 74 § 4.1.)

13.     Neither the 2008 Memorandum Policy nor the TEDS reflect the constitutional standard, but both establish that CBP holding cells and station operations are not designed to hold detainees, routinely, longer than 12 hours.

14.     In FY 2015, Tucson Sector CBP apprehended 63,397 individuals; in 2016, CBP apprehended 64,891 individuals; in 2017, CBP apprehended 38,657 individuals, and in 2018, CBP apprehended 52,172 individuals. In FY 2019, Tucson Sector CBP apprehended 63,490 individuals, an increase in 22 percent from the previous fiscal year. Of the 63,490 individuals apprehended in FY 2019 by Tucson Sector, 5,105 were unaccompanied alien children (UAC), 16,199 were members of family units (FMUA), and 42,186 were single adults. (DPFOF (Doc. 441) ¶ A.8.) The 2019 apprehensions reflect the general demographics for detainees since at least the inception of this case. (TR Day 3: DeFrieitas (Direct) (Doc. 471) at 79-89 (describing demographic consistencies with slight variations since 2016 in numbers of Mexican nationals and other-than Mexico, UACs, FMUAs, and single adults; explaining  increases in UACs and FMUAs is national problem being experienced more dramatically in other sectors but nevertheless affecting Tucson Sector's ability to place UACs and FMUAs because all sectors compete nationally for limited ICE detention space).

15.     In FY 2019, the average time an individual spent in custody in Tucson Sector was 53.92 hours. More specifically, the times in custody for the 63,490 individuals apprehended by Tucson Sector in FY 2019 were as follows: 3,008 individuals (5%) were held for fewer than 12 hours; 15,238 individuals (24%) were held for 12 to 24 hours; 23,416 individuals (37%) were held for 24 to 48 hours; 9,798 individuals (15%) were

held for 48 to 72 hours; and 12,030 individuals (19%) were held for longer than 72 hours. (DPFOF (Doc. 441) ¶ A.10.)

16.     Time in custody has increased over previous years. "Discovery in this case reflects that in 2015, between June 10, 2015 and September 28, 2015, about 3,000 [18%] of approximately 17,000 detainees were processed out of CBP station detention within 12 hours. (Gaston Decl. ¶ 20.) Of these 17,000 detainees, 8,644 people [51%] were held at CBP stations up to 23 hours; 6,807 [40%] were held up to 47 hours; 1,207 [7%] were held up to 71 hours, and 476 [2%] were held for 72 hours or more. [] Defendants' expert, Diane Skipworth, indicated that based on her review 'CBP tries diligently to process detainees promptly, and generally does so within 24 hours.' (Skipworth Decl. ¶ 154.) Defendants' other expert, Richard Bryce, believe[d] that nearly all detainees were processed within 48 hours. (Bryce Decl. ¶ 38.)" (Order (Doc. 244) at 12.)

17.     Time in detention for purpose of this case means: time in custody at a CBP station, calculated from book-in at a station, not apprehension in the field, therefore, detention times underestimate the extent to which detainees are deprived of sleep and hygiene. The long transportation times between field apprehension and book-in at a station mean that detainees are in grave need of a facility that can accommodate the basic human needs for sleep, food, and a shower.

18.     The custody of individuals apprehended by Tucson Sector CBP is governed by applicable immigration detention statutes. *See* 8 U.S.C. §§ 1225, 1226, 1231, 1252. An individual may also be detained by Tucson Sector CBP pending referral for criminal prosecution. In most instances, Tucson Sector must keep individuals in its custody for the time that it takes to complete their individual processing and to arrange transportation to each individual's next destination: United States Marshals Service, ICE, ERO, HHS, etc. (DPFOF ¶ A.12.)

19.     The Commissioner of the United States Customs and Border Protection has acknowledged the significant increase in the numbers of aliens remaining in custody over 72 hours. "These volumes of apprehensions and aliens in custody have created

1    unprecedented humanitarian and safety concerns which we must continue to urgently

2    address." The delivery of soft-sided and modular structures could address immediate

3    capacity needs." (JE 759: Memorandum from Kevin K. McAleenan, Commissioner, U.S.

4    CBP, <u>Southwest Border Security and Humanitarian Crisis: U.S. Customs and Border</u>

5    <u>Protection Immediate Action Plan</u> (April 9, 2019) at 1).

6         20.    The Immediate Action Plan for CBP, April 9, 2019, set out by the

7    Commissioner, includes actions to be undertaken by CBP along the Southwest Border to

8    address "increasing throughput challenges associated with processing unprecedented

9    numbers of Unaccompanied Alien Children (UAC) and Family Unit Aliens (FMUA); and

10   [the] significant challenges transferring these aliens to other appropriate entities, . . .

11   "specifically . . a significant increase in UAC and FMUA- as well as total numbers of

12   aliens- remaining in custody over 72 hours." (JE 759: Memorandum from Kevin K.

13   McAleenan, Commissioner, U.S. CBP, <u>Southwest Border Security and Humanitarian</u>

14   <u>Crisis: U.S. Customs and Border Protection Immediate Action Plan</u> (April 9, 2019) at 1).

15   The 2019 Actions include: 1) increase processing capacity, 2) efficiently implement

16   limited Own Recognizance (OR) releases of FMUA, to reduce in custody populations all

17   round, especially moving FMUAs out of CBP custody creates more room for other

18   detainee classifications, *id.* at 2-3, and 3) add soft-sided modular structures to address

19   immediate capacity needs, *id.*  at 5-11. The objective of the 2019 Action Plan is "to

20   restore USBP in-custody numbers to safely managed thresholds, allowing USBP to return

21   our law enforcement resources to our border and national security priorities as quickly as

22   possible." *Id.* at 2-3.

23        21.    The length of time individuals spend in the custody of Tucson Sector

24   depends on a number of factors, including, but not limited to: age; gender; family status;

25   criminal history; country of origin; immigration history; the number of individuals

26   apprehended together; overall CBP apprehension numbers; and the ability of the ICE,

27   ERO, HHS, or the United States Marshals Service, to take custody. (DPFOF (Doc. 441)

28   at ¶ A.11.)

22.     The number of individuals in any given station or hold room within Tucson Sector will depend on a number of factors that are constantly changing. These factors include, but are not limited to: the number of individuals apprehended in the Tucson Sector in a given day or night; the breakdown of those apprehended by age, gender, family group, and criminal status; an individual's destination; any safety or health concerns that may arise related to individuals at the station; and the pace of processing, which may itself depend on each individual's criminal and immigration history. Additionally, temporary issues with station facilities impacting detention conditions— such as temperature, availability of potable water, functioning toilets, and sanitation needs—may impact the number of individuals in a given hold room or station. *Id.* ¶ A.13.

23.     Many of these factors are further dependent on a variety of other factors such as the time of year, weather, conditions in other countries, and the custody space available with other agencies whose participation is needed to transfer individuals out of CBP custody. There is no basis on which CBP can accurately predict on any given day whether tens or thousands of individuals will show up at a specific location or at a specific time along the border, even if the CBP is monitoring the movement of large groups towards the United States border. *Id.* ¶ A.14.

24.     The number of individuals in a given hold room is never intended to create discomfort or challenges for those in custody, but rather is determined by operational concerns. Food, water, sanitation, hygiene items, bedding, medical care, etc., are not withheld as a punitive measure, and station temperatures are not set for punitive purposes. *Id.* ¶ A.15.

25.     Tucson Sector has internal review processes in place to ensure that it is complying with policies and procedures (e.g., PREA, TEDS, 2008 Hold Rooms and Short-Term Custody memorandum), as well as any court orders, including the preliminary injunction issued in this case. In addition, every quarter, the Tucson Sector Policy and Compliance Division conducts "no-notice" compliance evaluations of each Tucson Sector station where individuals are held in custody and provides the results of

that evaluation to the Tucson Sector Chief Patrol Agent. The Chief Patrol Agent then sends a memorandum to the respective location's leadership that documents the compliance evaluation results as well as any remedial steps that need to be taken. Among other things, these evaluations assess both physical layout and data input, and the evaluators have the authority to suggest recommended actions. Where these review processes result in a finding that Tucson Sector is out of compliance, Tucson Sector takes steps to return to compliance. *Id.* ¶ A.16.

26.    Overcrowding is intermittent. There was no evidence presented as to how many of the 63,490 individuals apprehended by Tucson Sector in FY 2019 were held in overcrowded cells or for how long the overcrowding lasted. Routine intermittent overcrowding occurs at the TCC because both Tucson Sector and Three Points Sector book detainees, directly, into the TCC. Most detainees spend a short time at Tucson Sector stations before being transported to the TCC for further processing and/or they await transfer to a receiving agency.

27.    Overcrowding is especially acute at night when cell capacity is cut almost in half to accommodate sleeping mats. (Motion for Reconsideration (Doc. 252) at 5 (reporting that cell capacity, previously calculated as seating capacity cut in half to accommodate lying down to sleep on a floor mat after 12 hours of detention). Overcrowding is especially acute at TCC because it is the transportation hub and point of coordination for detainees requiring further detention for processing and/or transfer to a long-term detention facility like ICE and ERO; bus routes and detainee transportation, sector-wide, are set up around the TCC. When the TCC is at maximum capacity, stations are forced to hold detainees longer. (Ds' Motion for Reconsideration (Doc. 252) at 5-6.)

28.    The majority of all detainees, including those who will be criminally prosecuted, are likely at some point to be processed through the TCC. *Id.* Overcrowding at the TCC at night occurs because detainees are routinely routed through TCC holding cells at 4 a.m. Monday through Thursday for morning court appearances.

29.     Surveillance video reveals overcrowding so severe that, at times, detainees have no place to sit, much less lie down on mats; detainees (including children) sleep in toilet stalls for lack of space; detainees (including mothers holding children) are forced to climb over benches to reach toilets and drinking water; and detainees are forced to sleep sitting up. *E.g.*, JE 507.143 at VTCC000762, JE 507.149 at VTCC000790-794 (no place to sit or lie down); JE 507.46, JE 507.55, JE 507.80, JE 507.99, JE 507.143, JE 507.160 (sleep in toilets, including children); JE 507.80 at VTCC000386, JE 507.108 at VTCC000525, JE 507.151 at VTCC000811, JE 507.85 at VTCC000407-409 (climbing); JE 507.157 at VTCC000872-873 (sleep sitting); JE 507.143 at VTCC000756-758.

30.     Overcrowding exacerbates other deprivations, including sleep, as well as access to toilets and potable water, and compounds personal hygiene needs. Floor sleeping in toilet areas is humiliating to both the detainee sleeping there and any detainee needing to use the toilet, and it also poses a risk to a detainee of infection or contamination with fecal matter and other bodily fluids.

31.     A large number of detainees in Defendants' custody are detainees designated in CBP records as "processing complete" —*i.e.*, the detainee has been processed by CBP and the receiving agency has been identified, and the detainee is detained by CBP waiting for transfer due to the inability of a designated receiving agency, such as the United States Marshals Service, ICE, ERO, HHS, etc., to take custody. (*E.g.*, JE 857 at 5 (DHS data shows many, if not most, detainees are "processing complete")). It may be possible to identify "processing complete" detainees pursuant to information logged in e3DM, Defendants' database, as "PRCMP." (JE 22.)

32.     Hold time due to detention after processing is complete is unrelated to any legitimate custodial governmental interests related to CBP operations, except as it is necessary to accommodate day-time logistics necessary for transporting and transferring detainees to facilities that are not open at night, including repatriation to Mexico.

33.     Hold time due to detention after processing is complete is unrelated to any legitimate custodial governmental interests related to CBP operations, except as it is

necessary to logistically accommodate court scheduled judicial proceedings for pretrial detainees that do not occur on weekends and holidays.

34.     Overcrowding due to detention after processing is complete, when detainees have been processed, the appropriate transfer has been determined, and the detainee is awaiting transfer because a receiving agency cannot accept the transfer, is unrelated to any legitimate custodial governmental interests related to CBP operations or mission.

35.     The "no longer than 48 hours" rule is rationally related to, and necessary, for CBP to carry out its governmental interests to interdict and process detainees, and to account for the logistical need for daytime hours to transport detainees to receiving agencies, ICE, ERO, HHS, etc., to Mexico for repatriation, or for court appearances.

36.     Individuals in Tucson Sector custody are permitted to sleep and do sleep. (DPFOF (Doc. 441) ¶B1.) Detainees held longer than 12 hours after being booked-in at a Tucson Sector station have the basic human need to sleep. (Order (Doc. 244) at 16, 27.)

37.     Tucson Sector hold rooms have built-in concrete or metal benches that are fastened to the ground, on which individuals can sit and lie down. Concrete and metal surfaces are used in CBP stations because they can be cleaned easily and quickly, and inhibit the growth of microorganisms that cause disease, thereby protecting the health of individuals in custody. These hard surfaces are cold and disruptive of sleeping. CBP provides a sleeping mat and a Mylar blanket to each detainee upon arrival at a Tucson Sector station. Individuals can place these mats on the floor or on any of the benches in a hold room, providing a more comfortable, including warmer, surface on which an individual can rest or sleep. *Id.* ¶ B.2.)

38.     Tucson Sector will provide an individual in custody a new Mylar blanket upon request. Mylar blankets are not effective to provide warmth as they are designed to prevent the loss of body heat because it does not provide insulation but merely prevents evaporation of approximately 80% of body heat, therefore, the efficacy of Mylar blanket depends on comfortable room temperatures. (Order (Doc. 244) at 15.)

39.     For safety reasons, Tucson Sector confiscates adults' outer layer(s) of clothing and permits them to keep one layer of their own clothing. Tucson Sector maintains all clothing it confiscates while its owner is in custody and returns the clothing to the individual when he or she leaves Border Patrol custody. Children are generally permitted to keep an additional layer of clothing while in Tucson Sector custody. (DPFOF (Doc. 441) ¶ F.12.)

40.     Except for a single washer and dryer in the TCC, Tucson Sector stations do not have laundry facilities on site, making the use of cloth blankets that must be cleaned after each use impractical. Moreover, the location of the stations and the large volume of individuals in custody would make the use of cloth blankets prohibitively expensive to clean. Finally, providing cloth blankets or other cloth bedding poses a health risk, because cloth can transmit diseases if shared by individuals who are being held in close proximity during their custody. (DPFOF (Doc. 441) ¶ B.5.)

41.     Tucson Sector maintains hold rooms at temperatures between 66 and 80 degrees. This temperature range is reasonable. Tucson Sector checks hold room temperatures once per shift and records the temperatures for each station hold room in e3DM, and work orders are issued to address hold rooms with temperatures beyond that range and the affected hold room may be deemed temporarily out of use until the temperature issue is remedied. *Id.* ¶ F.1.

42.     For safety reasons, Tucson Sector confiscates adults' outer layer(s) of clothing and permits them only one layer of their own clothing. Tucson Sector maintains all clothing it confiscates while its owner is in custody and returns the clothing to the individual when he or she leaves CBP custody. Children are generally permitted to keep an additional layer of clothing while in Tucson Sector custody. *Id.* ¶ F.4.

43.     Tucson Sector station hold rooms do not contain movable beds because beds or pieces of furniture can be used as weapons, and also because placing beds in hold rooms would greatly reduce the amount of available space in the hold room—thus

making it difficult for individuals in custody, agents, employees, and contractors, to move quickly and easily within the hold room as needed. *Id.* ¶ B.3.

44.    Tucson Sector has established hold room capacities that are based on the number of sleeping mats that can be fully unfolded on the floor of the hold rooms with minimal or no overlapping, and with a sufficient area of the floor clear for walking into and out of the hold room and to and from the hold room toilet(s) and water. Tucson Sector makes every effort to not exceed these hold room capacities, and if it must do so— out of operational necessity—it makes every effort to limit the time period in which such capacities are exceeded.  *Id.* ¶ B.4.

45.    There are intermittent periods of overcrowding in holding rooms when detainees are forced to sleep in toilet areas and when access to water and the toilets is impeded because detainees cannot move around the holding cell without stepping over and on sleeping mats. *E.g.*, JE 507.143 at VTCC000762, JE 507.149 at VTCC000790-794 (no place to sit or lie down); JE 507.46, JE 507.55, JE 507.80, JE 507.99, JE 507.143, JE 507.160 (sleep in toilets, including children); JE 507.80 at VTCC000386, JE 507.108 at VTCC000525, JE 507.151 at VTCC000811, JE 507.85 at VTCC000407-409 (climbing); JE 507.157 at VTCC000872-873 (sleep sitting); JE 507.143 at VTCC000756-758.

46.    Tucson Sector keeps station hold rooms illuminated at all hours to maintain the continuity of operations, and to ensure the safety and security of individuals in custody as well as the safety and security of agents, other employees, and on-site contractors. Turning lights off in hold rooms would make it difficult for agents to monitor activity in those rooms, which would in turn create a risk to the safety of individuals held there as well as to the safety of employees and on-site contractors who enter the hold rooms. (DPFOF (Doc. 441) ¶ B.6. Dimming lights within safety standards is not done because Tucson Sector stations are not equipped to dim holding room lights. (TR Day 2: Eldon Vail (Direct) (Doc. 469) at 14-15, Eldon Vail (Cross) (Doc. 469) at 90-92) (describing prevailing practices of jails to dim lights during typical sleeping hours and

1  unusual to keep them on all night); (TR Day 4: Carrie Davison (Doc. 473) at 23

2  (explaining lights remain on because it is not possible to urn them off because there is no

3  dimming capability at the stations).

4      47.    The numbers of toilets in Tucson Sector station hold rooms are adequate,

5  and include privacy walls which are consistent with, toilet facilities used in correctional

6  facilities where individuals are held and are positioned at a height that affords a

7  reasonable level of privacy while still providing enough visibility to minimize safety and

8  security risks. Tucson Sector also blocks the view of the toilet on its surveillance cameras

9  to ensure privacy. (DPFOF (Doc. 441) ¶ C.1.)

10     48.    Tucson Sector CBP has cleaning contracts with professional cleaning

11  companies for each of its stations. These contracts provide for at least daily cleaning of

12  the hold rooms (although in practice, cleaning is ordinarily performed twice daily). Hold

13  rooms also are inspected by CBP personnel multiple times each day (generally by a

14  supervisor at the beginning of each shift) for a variety of things, including cleanliness,

15  ventilation, temperature, and presence/absence of pests. The results of these checks are

16  required to be placed into e3DM (e.g., "amenity reports"), and responses indicating that

17  something is out of compliance are tracked to assure a remedy was sought. *Id.* ¶ C.3.

18     49.    Tucson Sector's general practice is to provide trash cans inside station hold

19  rooms. When trash cans cannot be provided inside the hold rooms, they are made

20  available outside the rooms, cleaning personnel collect the trash during each hold room's

21  cleaning. Trash sometimes accumulates in between regular cleanings. Additionally, dirt

22  may be tracked in when individuals enter the hold rooms. CBP agents inspect hold rooms

23  for insects, rodents, and vermin, and report any such findings through the e3DM system.

24  Tucson Sector addresses such issues promptly. Sleeping mats placed on the floor are

25  subject to contamination from being in contact with the floor, especially when placed

26  near the toilet facilities. *Id.* ¶ C.4.

27     50.    All individuals who remain in Tucson Sector custody for longer than 12

28  hours are provided an opportunity to clean themselves. Most stations provide body wipes

to meet this human need for personal hygiene. Until recently, only two Tucson Sector stations had showers: TCC and Nogales. More recently, other Tucson Sector stations have signed contracts to build shower facilities. Ajo, Willcox, and Douglas stations will each have a single shower, and the Brian A. Terry station will have two showers. *Id. ¶* C.5.

51.    A universal policy of providing showers to all individuals upon their arrival to a Tucson Sector station—or when they have only been in CBP custody for a short time period—would significantly slow the processing of every individual, and would in many cases extend the time the individual spends in custody at a station. At a minimum, Tucson Sector makes reasonable efforts to provide showers for juveniles approaching 48 hours in custody and for adults who are approaching 72 hours in custody, including transporting such individuals to facilities with showers in order to accomplish this goal. *Id. ¶* C.6.

52.    In addition to body-wipes, Tucson Sector generally provides personal hygiene items, including toothbrushes and toilet paper in hold rooms. Tucson Sector makes sanitary napkins, diapers, diaper cream, and baby wipes readily available. In the section of the TCC where children and families are generally held, many of these items are readily accessible on a cart immediately outside—and in view of—this population's unlocked hold rooms or in the case of holding rooms where females are routinely held, female hygiene items s are placed in the toilet area. *Id. ¶* C.7-8.

53.    All of the Tucson Sector hold rooms have been fitted with soap dispensers, which provide individuals with the ability to wash their hands in the hold rooms. Tucson Sector uses the "air-drying method" for handwashing, which the Centers for Disease Control and Prevention recognizes as an effective hand drying method. Tucson Sector has determined that providing paper towels is operationally problematic as individuals in custody would frequently throw the paper towels on the floor or put them into the toilet, creating clogs. *Id. ¶* C.9.

54.     Clean, potable, drinking water is always available to individuals in Tucson Sector hold rooms. Each hold room in Tucson Sector has a bubbler, water fountain, or faucet with clean paper cups. Tucson Sector regularly tests the water flow and arc of the drinking water portion of the bubbler to ensure that water is suitable for drinking directly, or filling a cup, from the fountain. In addition, Tucson Sector may provide five-gallon Igloo coolers of clean water (as well as clean paper cups) for drinking. *Id.* ¶ D.2-3.

55.     Tucson Sector provides a meal or snack to each individual upon their arrival to a station. For hot meals, Tucson Sector offers bean (vegetarian) or meat burritos. For snacks, Tucson Sector has generally offered cheese- and peanut butter-filled crackers, as well as juice. Tucson Sector offers at least two hot meals at regularly scheduled mealtimes per day and provides snacks in between meal times. Tucson Sector is in the process of implementing a new food contract that provides additional variety in the meals of an egg/breakfast burrito and snacks, such as raisins, applesauce, and fruit cups. Additionally, juveniles at the TCC have open access to all of the above items, as well as granola/cereal bars, animal crackers, and dairy-free (i.e., soy/almond) milk. When an adult in custody requests additional food in between mealtimes, a CBP agent may grant the request. *Id.* ¶¶ D.5-D.6, D.8.

56.     Tucson Sector provides children and pregnant, or nursing, individuals with meals every six hours and snacks are available at all times. In the section of the TCC where children and families are generally held while in Tucson Sector custody, snacks are readily accessible on a cart immediately outside—and in view of—this population's unlocked hold rooms so that individuals may take the items as needed. Tucson Sector also uses signage, in English and Spanish, and pictures to demonstrate that snacks and hygiene items are available upon request. *Id.* ¶ D.9.

57.     Tucson Sector stations keep in stock and provide age-appropriate food, such as formula, baby food, and toddler food. Tucson Sector's practice of providing packaged foods that are served in their original, unopened packages is a safe food-handling practice that serves to protect the health of individuals in custody. Food

1   expiration dates are noted, and food is discarded if it is not used by the expiration date.

2   Food, and its expiration date, is specifically tracked in multiple different review

3   processes, including by the Tucson Sector's "no-notice" quarterly compliance evaluations

4   and the Management Inspection Division's unannounced evaluations. *Id.* ¶¶ D.10-11.

5      58.   The food Tucson Sector provides individuals is nutritionally adequate for

6   relatively short periods of time spent in custody, no longer than 48 hours. *Id.* ¶ D.12.

7      59.   Tucson Sector CBP employs a multi-layered approach to identify and treat

8   medical concerns for individuals in its custody. *Id.* ¶ E. 1.

9      60.   First, individuals have contact with agents in the field who begin assessing

10   detainees visually and through oral communications. Agents actively screen individuals

11   by asking them about their health and medical needs and passively screen them by

12   observing for any medical concerns. If an agent has a medical concern about an

13   individual, the agent may arrange for the detainee to be taken to the hospital for medical

14   care prior to being transported to a CBP station for processing. (TR Day 5: Dr. Tarantino

15   (Doc. 475) at 22: ln14-23: ln 18.)

16      61.   Second, when an individual arrives at a Tucson Sector station other than the

17   TCC, the detainee is given a health intake interview by a CBP agent who completes a

18   universal screening form, which has been approved by medical experts. The CBP agent

19   asks each detainee a series of questions and records the individual's answers. If this

20   screening identifies any medical concerns, the detainee is referred for a medical

21   assessment by either an in-house medical professional or sending the detainee to a local

22   hospital for care. In some cases, a CBP agent, who is also a certified Emergency Medical

23   Technician ("EMT") or paramedic, may provide applicable medical care to individuals.

24   (TR Day 5: Dr. Tarantino (Doc. 475) at 23: ln 25-27:ln 3.)

25      62.   The health intake interview form includes questions that are designed to

26   identify suicide risk, and agents will refer individuals for medical care or take other

27   appropriate action if such risks are identified. (JE 881.)

28

63.     Third, a medical assessment is performed by medical personnel, who provide in-house medical examinations and/or applicable medical care. Most individuals are transferred from Tucson Sector stations to TCC related to processing and/or transport to receiving agencies like ICE or ERO. Therefore, medical personnel are strategically located at the TCC, and soon to be located at the Nogales Station, to be available to provide medical assessments and medical care as an alternative to referring a detainee to a local hospital. (TR Day 5: Dr. Tarantino (Doc. 474) at 26: ln 16-27: ln 10.) The in-take processes at TCC includes the health intake interview, even if previously completed at another station, with a medical assessment by a medical professional to follow shortly thereafter.  *Id.* at 28: ln 18-29: ln 2.

64.     Tucson Sector agents and medical professionals are proficient, if not fluent, in the Spanish language and are able to converse with and obtain necessary information from more than ninety percent of individuals in custody for purposes of providing medical screening. For individuals who do not speak English or Spanish, Tucson Sector relies on a contract service that provides foreign language speakers who interpret conversations between agents/medical professionals and individuals in custody via the telephone. *Id.* ¶ E.5.

65.     In all cases where an agent or medical professional identifies a medical condition in need of medical attention, the agent will refer the individual for medical care, or on-site care will be provided as appropriate. In most cases, medical care is provided by transporting the individual to a local hospital. In some cases, a CBP paramedic or EMT may provide medical care consistent with his or her level of training and certification. At the TCC, on-site medical personnel may provide non-emergency medical care, and Tucson Sector has an arrangement with St. Mary's Hospital emergency department, in Tucson, Arizona, where a physician advisor is on call twenty-four hours a day to provide Tucson Sector with medical advice. *Id.* ¶¶ E.7, E.13.

66.     Tucson Sector agents regularly receive health-related training and guidance. Tucson Sector agents receive policy updates and training concerning infectious diseases.

These materials are updated periodically to reflect changes in epidemic and endemic situations. *Id.* ¶¶ E.8-E.10.

67.     Tucson Sector agents constantly interact with and observe individuals throughout their time in custody. Such interaction and observation provide many opportunities to identify signs and symptoms of health conditions and may lead to agent-initiated communications regarding potential health concerns, including some mental health concerns. *Id.* ¶ E.11.

68.     Individuals may request medical care while in custody at any time, even after they have completed their screening and processing. Tucson Sector agents will convey an individual's request to seek medical attention to a supervisor, and Tucson Sector will transport individuals to local medical care facilities or provide on-site care as appropriate in response to such requests. *Id.* ¶ E.12.

69.     If an individual arrives with medication prescribed by a United States physician, the CBP, Tucson Sector, stores the medication, and make it available to the individual to take consistent with the prescription, throughout their time in Tucson Sector custody. *Id.* ¶ E.14.

70.     If an individual arrives in Tucson Sector custody with a medication that is not prescribed by a United States physician, or states that he or she needs a particular medication while they remain in Tucson Sector custody, then Tucson Sector will refer the individual to a medical professional to obtain a United States prescription for the medication. *Id.* ¶ E.15

71.     Tucson Sector's policy of confiscating non-United States medications that individuals have in their possession at the time of apprehension is necessary to protect against the introduction of contraband at the CBP stations. *Id.* ¶ E.16.

72.     It is undisputed that all of the receiving civil immigration detention agencies and jails and prisons, afford detainees better conditions of confinement as follows: a bed, with cloth sheets, blankets, and pillows; provide warmth by dispensing second layers of clean clothing; have shower facilities; have hot meals prepared pursuant

to professional dietary standards, with a variety of food choices; have clean potable water readily available, and have medically trained staff who conduct medical screenings of the detainees and provide medical care when needed.

73.     Detainees in CBP stations face substantially worse conditions of confinement which in the aggregate, include: holding cell conditions which impede sleeping because the cells are fully lit, with floor sleeping on hard cold surfaces, even with the 12-hour provision for sleeping mats and Mylar blankets; no clean or second set of cloths for warmth; sleep is interrupted by CBP 24-7 operations, especially when overcrowding occurs, detainees must walk over, around, and on each other and sleeping mats to navigate the holding room and sometimes sleep on the floor in the toilet area of the holding cell. There is no variety in hot food choices, except between bean, meat or egg burritos; there is some snack variations.  There is limited to no availability for showers or clean clothes. At 12 hours or before, body wipes are provided and help with personal hygiene but are ineffective to meet the full personal hygiene needs of detainees, who have been traversing the desert for days, and the smell in holding cells reflects human unwashed bodies until detainees can shower. Generally, non-medical staff performs medical screening by using a universal medical questionnaire, which was developed by medical professionals for this purpose.  Recently, CBP has place medical professionals at TCC to conduct medical assessments and provide onsite medical services.  These conditions of confinement are necessary for CBP to effectively and efficiently carry out their 24-7 CBP operations, which is to interdict, detain for processing to determine the appropriate civil or criminal detention path for detainees, and transfer detainees to receiving agencies ICE, ERO, the United States Marshals Service, and any other agency.

74.     Once CBP has processed detainees, identified the receiving agency, and had a reasonable time to make the transfer (the time needed to transport the detainee to the receiving agency), the governmental interests that warrant the existing conditions of confinement end. The reasonable time for processing and transferring a detainee is no

1   longer than 48 hours, which accounts for logistical realities caused by CBP detentions

2   that extend over 12-hour nighttime periods when CBP cannot transfer detainees at night.

3   Under the "no longer than 48-hours" rule, a detainee, who is processing complete, may

4   not be held into a third night or longer, unless CBP can provide conditions of

5   confinement that provide for basic human needs, especially uninterrupted sleeping in a

6   bed, warmth, showers, food that meets acceptable dietary standards, potable water, and a

7   medical assessment made by a medically trained professional.

8   ### B. Conclusions of Law

9        To the extent these Conclusions of Law are also deemed to be Findings of Fact,

10  they are hereby incorporated into the preceding Findings of Fact.

11       1.    This is a class action lawsuit brought pursuant to 28 USCA § 1331, which

12  grants this Court original jurisdiction over all civil actions arising under the Constitution,

13  laws, and treaties of the United States. Plaintiffs allege a deprivation of their Fifth

14  Amendment constitutional rights. To prevail, Plaintiffs must prove the alleged

15  constitutional violation by a preponderance of the evidence. *Johnson v. Houser,*  704 F.2d

16  1049, 1051 (8th Cir. 1983); *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1072 (9th Cir.

17  2016).

18       2.    To obtain injunctive relief, the Plaintiffs have the burden to establish that

19  they were wronged and, must also, establish that there is a sufficient likelihood that they

20  will again be wronged in a similar way. *City of Los Angeles v. Lyons,* 461 U.S. 95, 111

21  (1983). Plaintiffs satisfy the preconditions for the equitable relief they seek because

22  existing immigration demographics will not change in the future, the existing conditions

23  of confinement are likely to remain in the future, and Plaintiffs face future irreparable

24  injury which is both great and immediate should they or any other member of the Plaintiffs'

25  class be detained by CBP, Tucson Sector. (Order (Doc. 118) (denying Motion to Dismiss

26  for lack of standing.)

27       3.    The Court adopts by reference the law as set out in its prior Orders, relevant

28  to establishing that basic human needs include sleeping and sleeping in beds, without

lights and in a warm environment; sanitation, including personal hygiene needs for showers; food, including potable water, and medical screening and care provided by medical professionals. (Order (Doc. 244) at 12, 13 n.7, 16, 20, 21, 23.); (Order (Doc. 383) at 4-10.)

4.    "[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.,* 489 U.S. 189, 199-200 (1989)) (citing *Estelle v. Gamble*, 429 U.S. 97, 103–104 (1976).

5.    Plaintiffs are civil detainees, protected under the Fifth Amendment, mirrored by the Fourteenth Amendment Due Process Clause, which precludes pretrial detainees from being held without due process of law under conditions that amount to punishment prior to an adjudication of guilt**.** *Bell v. Wolfish*, 441 U.S. 520, 534–35 (1979); *Wong Wing v. United States,* 163 U.S. 228, 237 (1896). Constitutional rights in respect to conditions of confinement for prisoners establish a floor for the constitutional rights of the Plaintiffs. *Padilla v. Yoo*, 678 F.3d 748, 759 (9th Cir. 2012) (citations omitted).

6.    A condition of confinement for an inmate who has not been convicted violates the Fifth and Fourteenth Amendments if it imposes some harm to the detainee that significantly exceeds or is independent of the inherent discomforts of confinement and is not reasonably related to a legitimate governmental objective or is excessive in relation to the legitimate governmental objective. *Kingsley v. Hendrickson,* 135 S. Ct. 2466, 2473-74 (2015) (citing *Bell v. Wolfish,* 441 U.S. at 561)).

7.    Civil detainees cannot be subjected to "conditions of confinement substantially worse than they would face upon commitment," *Lynch v. Baxley*, 744 F.2d 1452, 1461 (9th Cir. 1984) (citing *Bell v. Wolfish,* 441 U.S. 520 (1979)). The civil nature

- 34 -

of Plaintiffs' confinement provides an important gloss on the meaning of "punitive," requiring that the Plaintiffs be afforded "more considerate treatment" than even pretrial detainees, who are being criminally detained prior to trial. *Cf. Estelle v. Gamble*, 429 U.S. 97, 104, (1976); *Youngberg v. Romeo*, 457 U.S. 307, 321–22, (1982). The Court must presume detainees are subjected to punishment if they are confined in conditions identical to, similar to, or more restrictive than those under which the criminally convicted are held. *See Sharp v. Weston*, 233 F.3d 1166, 1172–73 (9th Cir. 2000).

8.     The Plaintiffs are civil detainees, who are confined under conditions substantially worse than those imposed on detainees who are criminally convicted or confined in immigration detention facilities. There is a presumption that the conditions of confinement in CBP stations, Tucson Sector, are punitive.

9.     In the absence of evidence of express intent to punish, the Court may infer that the purpose of a particular restriction or condition is punishment if the restriction or condition is not reasonably related to a legitimate governmental objective or is excessive in relation to the legitimate governmental objective. *Pierce*, 526 F.3d at 1205 (citing *Bell*, 441 U.S. at 539); *Demery*, 378 F.3d at 1028 (citing *Bell*, 441 at 538). Legitimate non-punitive justifications must, however, be specific to the penological interests involved in the Plaintiffs' detention, which here is for commitment as civil detainees in immigration-type facilities. (Order (Doc. 383) at 10 (citing *King v. Los Angeles County,* 885 F.3d 548, 554-555 (9th Cir. 2018)).

10.     The Court evaluates the conditions of confinement at issue in this case in light of contemporary standards of decency "in reference to their severity and duration," with any "resulting injury being merely one factor that may suggest an unjustified infliction of harm compared to being plausibly necessary." (Order (Doc. 383) at 6-7 (citing *Darnell v. Pineiro,* 849 F.3d 17, 30 (2ndh Cir. 2018) (citing *Hudson v. McMillian,*

503 U.S. 1, 8 (1992)), *see also Martinez v. Stanford*, 323 F.3d 1178, 1184 (9th Cir. 2003) (citing same).

11.   "Maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." *Bell*, 441 U.S. at 546; *Pierce*, 526 F.3d at 1205.

12.   In the absence of substantial evidence that indicates officials have exaggerated their responses, courts should ordinarily defer to the expert judgment of correction officials to determine whether detention restrictions or conditions are reasonably related to maintaining security and order and operating the institution in a manageable fashion. *Bell*, 441 U.S. at 540 n. 23. The government does not need to show an "exact fit" or proof that the policy in fact advances the legitimate governmental objective, or even that it is the "least restrictive alternative." *Valdez v. Rosenbaum*, 302 F.3d 1039, 1045 (9th Cir. 2002). The correction official must have reasonably thought that the policy would advance a legitimate governmental objective. *Id.*

13.   The government cannot assert a lack of resources defense against an injunction because it is prospective relief, and the government may be compelled to expand the pool of resources to remedy a constitutional violation. *Peralta v. Dillard,* 744 F.3d 1076, 1083 (9th Cir. 2014).

14.   The Ninth Circuit views floor-sleeping, with or without a mattress, as offending 'basic' concepts of decency, as well as reasonable respect for constitutional rights.'" *Thomas v. Baca,* 514 F.Supp.2d 1201, 1216 (9th Cir. 2007) (citing *Thompson v. City of Los Angeles*, 885 F.2d 1439 (9th Cir. 1989), *Rutherford v. Pitchess*, 457 F. Supp. 104 (C.D. Cal. 1978)). "Quite simply, that a custom of leaving inmates nowhere to sleep but the floor constitutes cruel and unusual punishment is nothing short of self-evident." *Thomas,* 514 F. Supp.2d at 1216.

15.   In *Thomas,* the court excluded processing time from its mandate to provide a bunk for the night immediately following the inmate's initial processing within the

facility or transfer to a medical center or other place of screening or treatment, and for every night thereafter and held; a reasonable amount of time should not take more than 24 hours.  *Id.* at 1219.

16.     The Ninth Circuit recognizes an exigent circumstances exception for constitutional violations, but this is a narrow exception and overcrowding or regular classification considerations do not constitute exigent circumstances that would justify floor-sleeping." Exigent circumstances could justify floor-sleeping in response to "[a] sudden, extreme rise in inmate population caused by an acute event, such as a civil disturbance, may affect the length of time that is reasonable for processing.  *Oliver v. Baca,* 913 F.3d 852, 858 (9th Cir. 2019). The periodic surges occurring along the border is a chronic condition and not an exigent exception to justify unconstitutional conditions of confinement.

17.     The Ninth Circuit instructs that the Court should look at the circumstances, nature, and duration of an alleged deprivation.  *Johnson v. Lewis,* 217 F.2d 726, 731 (9th Cir. 2000).  This approach is explained by the Second Circuit in *Darnell v. Pineiro,* 849 F.3d 17 (2nd Cir. 2018).  *See Turano v. County of Alameda,* 2018 WL 5629341 *5 (N.D. Cal. Oct. 30, 2018) (finding *Darnell* persuasive). "The more basic the particular need, the shorter the time it can be withheld." *Hoptowit v. Ray*, 682 F.2d 1237, 1259 (9th Cir. 1982).

18.     There is no "static test" to determine whether a deprivation is sufficiently serious to violate the Constitution.  The Court evaluates the conditions themselves in light of contemporary standards of decency.  *Darnell,* 849 F.3d at 30 (citing *Blissett v. Coughlin*, 66 F.3d 531, 537 (2d Cir. 1995); *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981)).  The Court analyzes allegedly unconstitutional conditions of confinement in reference to their severity and duration, and resulting injury is merely one factor that may suggest an unjustified infliction of harm compared to being plausibly necessary.  *Darnell,* 849 F.3d at 30 (citing *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)), *see also Martinez v. Stanford*, 323 F.3d 1178, 1184 (9th Cir. 2003) (citing same).

19.     The Court follows the approach taken by the Second Circuit in *Darnell,* wherein the court considered a temporary (between 10 to 24 hours) holding facility and held that occasional and temporary deprivations of sanitary and temperate conditions, without more, do not constitute a sufficiently serious deprivation to constitute punishment, "'but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise.'" *Darnell,* 849 F.3d at 30 (quoting *Wilson v. Seiter*, 501 U.S. 294, 304 (1991)).  Conditions of confinement are analyzed in combination, not in isolation, at least where one alleged deprivation has a bearing on another. *Darnell,* 849 F.3d at 32 (citing *Wilson*, 501 U.S. at 304 (noting the synergy between cold temperatures and the failure to provide blankets in establishing an Eighth Amendment violation)).

20.     The Court looks through the lens of severity and duration to balance the conditions of confinement at CBP facilities in the Tucson sector with the operational needs of the CBP Tucson Sector.  The severity of the exposure to sleeping on floor mats in sometimes overcrowded cells that force detainees to sleep in the toilet area, coupled with the alleged lack of warmth, clean clothes, showers, etc., may be less quantifiable than duration "'but [] qualitative offense to a [detainee's] dignity [is] given due consideration.'"  *Darnell,* 849 F.3d at 31 (quoting *Willey v. Kirkpatrick,* 801 F.3d 51, 68 (2ndh Cir. 2017)).

21.     Conditions of confinement, as they currently exist, in CBP holding rooms that are worse than conditions of confinement in criminal and civil detention facilities are reasonably related to CBP's legitimate governmental interests in protecting the United States border through interdiction and 24-7 processing operations to determine the appropriate detention, civil or criminal, facility and transfer a detainee no longer than 48 hours. To the extent that the conditions of confinement are related to CBP's legitimate governmental interests, Defendants overcome the presumption that the conditions of confinement are punitive because they are harsher than the conditions of confinement

faced by criminal, pretrial, and civil detainees held in jails, prisons, or ICE detention facilities.

22.     The severity of the existing conditions of confinement, separately and aggregately, do not violate the Fifth Amendment to the extent that the duration of confinement does not exceed the time necessary for CBP to process a detainee to determine the appropriate transfer for either criminal detention to a jail or prison or civil immigration detention at an ICE, ERO, HHS or other agency facility. The Court finds that the reasonable time from book-in at a CBP station to "processing complete" is no longer than 48 hours. As for this duration of time, Defendants have established that the challenged conditions of confinement, separately and aggregately, are not excessive in relation to the legitimate government interests of CBP 24-7 operations or the penological interests involved in Plaintiffs civil detention in immigration facilities.

**Accordingly,**

**IT IS ORDERED** that the Court finds in favor of Plaintiffs and against Defendants and GRANTS Plaintiff's request for a permanent injunction. The Clerk of the Court shall enter Judgment for Plaintiffs.

**IT IS FURTHER ORDERED** that CBP shall be enjoined from holding detainees, who are "processing complete," as defined herein, "no longer than 48 hours, unless CBP provides conditions of confinement that meet basic human needs for sleeping in a bed with a blanket, a shower, food that meets acceptable dietary standards, potable water, and medical assessments performed by a medical professional.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1    **IT IS FURTHER ORDERED** that within 7 days of the filing date of this Order,

2   the Plaintiffs shall file a proposed Order for Permanent Injunction. The Defendants shall

3   have 7 days, thereafter, to file an Objection.

4    Dated this 19th day of February, 2020.

Honorable David C. Bury
United States District Judge