JACK W. LONDEN (Bar No. 006053)
JOHN S. DOUGLASS*
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105-2482
Telephone: (415) 268-7000
Facsimile: (415) 268-7522
Email: JLonden@mofo.com
Email: JDouglass@mofo.com

COLETTE REINER MAYER*
PIETER S. DE GANON*
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA 94304-1018
Telephone: (650) 813-5600
Facsimile: (650) 494-0792
Email: CRMayer@mofo.com
Email:  PdeGanon@mofo.com

Attorneys for Plaintiffs
* *Admitted pursuant to Ariz. Sup. Ct. R. 38(a)*
Additional counsel listed on next page

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jane Doe #1; Jane Doe #2; Norlan Flores, on behalf of themselves and all others similarly situated, | Case No. 4:15-cv-00250-TUC-DCB |
| *Plaintiffs*, | **PLAINTIFFS' RESPONSE TO DEFENDANTS' COMMENTS & OBJECTIONS TO PLAINTIFFS' PROPOSED ORDER FOR PERMANENT INJUNCTION** |
| v. | |
| Chad Wolf, Acting Secretary of Homeland Security; Mark A. Morgan, Acting Commissioner, U.S. Customs and Border Protection; Carla L. Provost, Chief of United States Border Patrol, in her official capacity; Roy D. Villareal, Chief Patrol Agent-Tucson Sector, in his official capacity, | **CLASS ACTION** |
| | **(Assigned to the Honorable David C. Bury)** |
| *Defendants*. | Action Filed: June 8, 2015 Trial Date:  January 13, 2020 |

1   LINTON JOAQUIN*
    ALVARO M. HUERTA*
2   NATIONAL IMMIGRATION LAW CENTER
    3450 Wilshire Boulevard #108-62
3   Los Angeles, CA  90010
    Telephone: (213) 639-3900
4   Facsimile: (213) 639-3911
    Email: joaquin@nilc.org
5   Email: huerta@nilc.org

6   MARY KENNEY*
    KAROLINA J. WALTERS*
7   AMERICAN IMMIGRATION COUNCIL
    1331 G Street NW, Suite 200
8   Washington, DC 20005
    Telephone: (202) 507-7512
9   Facsimile:(202) 742-5619
    Email: mkenney@immcouncil.org
10  Email: KWalters@immcouncil.org

11  ELISA MARIE DELLA-PIANA*
    BREE BERNWANGER*
12  LAWYERS' COMMITTEE FOR CIVIL RIGHTS
    OF THE SAN FRANCISCO BAY AREA
13  131 Steuart Street, Suite 400
    San Francisco, CA  94105
14  Telephone: (415) 543-9444
    Facsimile: (415) 543-0296
15  Email: edellapiana@LCCR.com
    Email: bbernwanger@LCCR.com
16
    YVETTE BORJA (Bar No. 035470)
17  ACLU FOUNDATION OF ARIZONA
    3707 North 7th Street, Suite 235
18  Phoenix, AZ  85014
    Telephone: (602) 650-1854
19  Facsimile: (602) 650-1376
    Email: yborja@acluaz.org
20

21  Attorneys for Plaintiffs
    * Admitted pursuant to Ariz. Sup. Ct. R. 38(a)
22

23

24

25

26

27

28

1    The Court issued Findings of Fact and Conclusions of Law (Order (Doc. 482
2    ("Order")) and entered judgment in favor of Plaintiffs (Doc. 483).  Pursuant to the Court's
3    Order, Plaintiffs filed a Proposed Order for Permanent Injunction.  (Doc. 484 ("Proposed
4    Order").)  The Proposed Order hews, as closely as possible, to the Court's Order, mindful
5    that the intent is to remedy conditions that have existed since 2015 and will continue
6    absent Court intervention.  Defendants filed Comments and Objections to the Proposed
7    Order.  (Doc. 485 ("Comments").)  Plaintiffs respond as follows.

8    # I.    DEFINITIONS

9    ## Adequate Food

10   Defendants object to the phrases "long term detention" and "maintaining detainee
11   health."  (Comments at 2.)  Plaintiffs propose the following amended definition, which
12   eliminates these phrases and which is drawn from the Court's Order (*id.* at 2, 7, and 39):

13   "Adequate Food" shall mean food that has been evaluated and approved by a
14   registered dietitian and/or nutritionist to meet acceptable dietary standards, and shall
     include warm meals with a variety of food choices, including fruits and vegetables,
15   accommodating food allergies and religious beliefs.

16   ## Bed

17   Defendants ask the Court to define "Bed" as a "raised platform with a Mat."
18   (Comments at 2; *id.* 3–4 (objections to "Mat").)  This is not consistent with the Order,
19   which held that Defendants deprive detainees of basic human needs in part because
20   "detainees [are] forced over a period of several nights (more than 2) to sleep on mats on
21   concrete floors or benches."  (Order at 12.)  By contrast, detainees held in jails and
22   receiving agencies like ICE "have a bed with cloth sheets, blankets, and pillows, and an
23   opportunity for uninterrupted sleep."  (Order at 7, 11.)  Defendants' proposal to put a floor
24   mat onto a raised platform and call it a "Bed" does not meaningfully improve on
25   conditions that this Court found unconstitutional after 48 hours.

26   ## Exigent Circumstances

27   Plaintiffs' proposed definition is not, as Defendants claim, "inconsistent with the
28   Court's Order" (Comments at 2); it is directly drawn from the Order.  The Court defines

PLAINTIFFS' RESPONSE TO DEFENDANTS' COMMENTS & OBJECTIONS TO PLAINTIFFS' PROPOSED ORDER FOR
PERMANENT INJUNCTION;
CASE NO. 4:15-cv-00250-TUC-DCB
sf-4206535

1

1    "exigent circumstances" as the "sudden, extreme rise in inmate population caused by an

2    acute event, such as a civil disturbance."  (Order at 37 ¶ 17 (citing *Oliver v. Baca*, 913

3    F.3d 852 (9th Cir. 2019).)  Neither "overcrowding [n]or regular classification

4    considerations" nor "periodic surges occurring along the border" constitute exigent

5    circumstances.  (*Id.*)  Plaintiffs' definition tracks this verbatim.

6          Defendants would have "exigent circumstances" include "any such occurrences

7    that may affect receiving agencies and their ability to take custody of individuals from

8    CBP."  (Comments at 3.)  But this happens frequently and regularly.  (*See, e.g.*, Order at 2

9    ("[E]xtended detentions currently occurring at CBP facilities are, in large part, caused

10   when receiving agencies . . . are unable, usually due to capacity constraints, to accept CBP

11   transfers.")  Defendants' proposed definition would strip "exigent circumstances" of all

12   meaning, and the unconstitutional conditions presented at trial would persist.

13         Plaintiffs do not object to including federally declared "Acts of God/natural

14   disasters," "full or partial government shutdown[s]," and "emergencies," but only if they

15   directly affect Tucson Sector Border Patrol or receiving agencies.  (Comments at 3.)

16   Plaintiffs do, however, object to including "public health concerns at a particular facility."

17   (*Id.*)  This definition—capacious enough to encompass, for instance, lice or scabies at an

18   ICE facility—strays too far afield from the Ninth Circuit's definition of "exigent

19   circumstances."

20         **<u>Logistical Impossibility</u>**

21         Defendants propose amending Logistical Impossibility to mean inability to transfer

22   because the receiving "agency is operationally closed *for intake*."  (Comments at 3

23   (emphasis in original).)  Defendants contend that some agencies "may only intake during

24   specific hours, i.e. 10am-2pm."  (*Id.*)  After half-a-decade of litigation, Defendants raise

25   this purported "operational reality" for the first time now.

26         Defendants' proposal conflicts with the Court's explanation for why and when the

27   "logistical impossibility" exception is permitted.  The Court "intends that the Permanent

28   Injunction will accommodate the logistical impossibility for CBP to transport a detainee to

PLAINTIFFS' RESPONSE TO DEFENDANTS' COMMENTS & OBJECTIONS TO PLAINTIFFS' PROPOSED ORDER FOR
PERMANENT INJUNCTION;
CASE NO. 4:15-cv-00250-TUC-DCB
sf-4206535

2

a receiving agency *due to court closures during the night, weekends and holidays* . . . ."
(Order at 11 n.5 (emphasis added).)  "Logistical impossibility" cannot mean, as
Defendants would have it, all hours Monday to Friday except for 10 A.M. to 2 P.M., which
turns the exception into the rule.  (*See id.* at 23 ¶ 35 (noting "logistical need for *daytime
hours* to transport detainees.").)  And because receiving agencies like ICE are under
Defendants' control (Order at 12 & n.6), Defendants are able to lengthen intake times
beyond 10 A.M. to 2 P.M.  It is no "impossibility."

<u>**Medically-Trained Professional**</u>

Defendants seek to expand this definition to include any "*certified Emergency
Medical Technician*[s], *paramedic*[s], *licensed practical nurse*[s], *and licensed vocational
nurse*[s]."  (Comments at 4) (emphasis in original).  Defendants' expanded definition
finds no support in the record and cannot be squared the Court's Order or with trial
testimony.

The Court observed that "*medical personnel* are strategically located at TCC, and
soon to be located at the Nogales Station, to be available to provide medical assessments
and medical care as an alternative to referring a detainee to a local hospital."  (Order at 30
¶ 63 (emphasis added).)  The Court contrasted "medical personnel" and "in-house medical
professionals" with EMTs and paramedics.  (*Id.* at 29 ¶ 61; *accord id.* at 30 ¶ 65
(contrasting paramedics and EMT's with "on-site medical personnel" at TCC).)

Defendants' Senior Medical Advisor Dr. Tarantino drew the same distinction.
Asked about the makeup of the medical contractors at TCC, Dr. Tarantino said that a
"typical team would be an *advanced practice provider*, which is a physician assistant or a
nurse practitioner, and then they would have two *technicians*, might be an EMT, might be
a medical assistant, but a medical -- a medical technician, a medical assistant."  (Doc. 475
at 14:8-14 (emphasis added).)  Dr. Tarantino further testified that EMTs may only conduct
medical assessments in "quote/unquote exigent circumstances."  (*Id.* at 55:21-56:9.)

The definition of "Medically-Trained Professional" should reflect this distinction,
itself reflecting the higher standard of care that individuals receive in, say, county jails.

PLAINTIFFS' RESPONSE TO DEFENDANTS' COMMENTS & OBJECTIONS TO PLAINTIFFS' PROPOSED ORDER FOR
PERMANENT INJUNCTION;
CASE NO. 4:15-cv-00250-TUC-DCB
sf-4206535

3

1  (Doc. 470 at 38:18-39:13; 57:23-58:5 (Dr. Goldenson's unrebutted testimony that EMT's

2  do not perform medical assessments in jails because it exceeds their scope of practice).)

3      The record does not mention "licensed practice nurses" (LPN) or "licensed

4  vocational nurses" (LVN), much less support Defendants' proposal to include them within

5  the definition of Medically-Trained Professionals.  LPNs and LVNs are no more capable

6  (or legally authorized) than EMTs to screen.  For instance, under Arizona law registered

7  nurses may "[d]iagnos[e] and treat[] human responses to actual or potential health

8  problems," but LPNs may not.  *Compare* Ariz. Rev. Stat. § 32-1601(23) (registered

9  nursing), *with id.* § 32-1601(19) (practical nursing).  LPNs may, it follows, practice "only

10  under the supervision of a registered nurse or licensed physician."  Ariz. Admin. Code

11  § R4-19-401.

12      **Time in Detention**

13      Defendants' proposed definition—"time in custody at a Tucson Sector Border

14  Patrol station, calculated from book-in at a Tucson Sector Border Patrol station"—is not

15  consistent with the Order, including the very page Defendants cite.  (Comments at 5

16  (citing Order at 18).)  On page 18, this Court wrote: "Time in detention for purpose of this

17  case means: time in custody at *a CBP station*, calculated from book-in at *a station*, not

18  apprehension in the field, therefore, detention times underestimate the extent to which

19  detainees are deprived of sleep and hygiene."  (Order at 18 ¶ 17 (emphasis added).).  This

20  is as it should be: It ensures that detainees held in CBP custody for over 48 hours are

21  treated as if they were detained by ICE or HHS.

22      Defendants' proposal, on the other hand, could lead to intra-CBP transferees

23  spending many days without a bed, shower, proper food, or medical care.  On Defendants'

24  reading, a detainee held by Yuma or Rio Grande Sector border patrol for 72 hours who is

25  then transferred to the Tucson Sector could be detained for an additional 48 hours—or a

26  total of five days—before her basic human needs are met.  The countdown should start

27  when CBP detains, because that it when processing starts and when detainees are first

28

PLAINTIFFS' RESPONSE TO DEFENDANTS' COMMENTS & OBJECTIONS TO PLAINTIFFS' PROPOSED ORDER FOR
PERMANENT INJUNCTION;
CASE NO. 4:15-cv-00250-TUC-DCB
sf-4206535

4

1    confined under conditions that deprive them of their basic human needs.[1]

2         Plaintiffs do not oppose Defendants' proposal to exclude from Time in Detention

3    "[t]emporary book-outs to a hospital, jail, or any other facility where beds and showers are

4    available," but only if detainees actually get a bed and a shower.  Availability alone means

5    little.  A brief and temporary visit to the Emergency Room, for example, does nothing to

6    address "detainees' basic human needs for sleeping in a bed with a blanket, a shower,

7    [and] food that meets acceptable dietary standards" unless detainees actually receive these

8    things.  (Order at 2.)

9    **II.    CONDITIONS OF CONFINEMENT**

10        **<u>Sections 2 and 9</u>**

11        Section 2 and 9 together require Defendants to track and document when and why

12   a given detainee is not Processing Complete at 48 hours, which the Court determined is

13   "reasonable time from book-in at a CBP station to 'processing complete.'"  (Order at 39 ¶

14   22 (internal quotation marks omitted).)  These paragraphs also require Defendants to track

15   and document their efforts to complete processing and provide the detainee held over 48

16   hours with his or her basic human needs.

17        If Defendants do not track and document this information, neither the Court nor

18   Plaintiffs will have any way of knowing whether Defendants are abiding by the Order.

19   Tracking also ensures that Defendants are better equipped to understand when and why

20   detainees are not Processing Complete by 48 hours in detention, and to make necessary

21   changes to process faster.

22        Defendants' proposed language simply reiterates what Defendants are already

23   required to do and, Plaintiffs presume, are already doing: "[T]rack[ing], and

24   document[ing] in e3DM, the time that an individual detainee is booked in to a Tucson

25   Sector Border Patrol station and the time that the detainee becomes Processing

26

27   _____

28   [1] Plaintiffs note that "Book In"—a definition to which Defendants do *not* object (C&O at
     2) and which is based on current CBP practice—is calculated from a person's first arrival
     at *any* CBP station as entered in the e3 Detention Module.

Plaintiffs' Response to Defendants' Comments & Objections to Plaintiffs' Proposed Order for
Permanent Injunction;
Case No. 4:15-cv-00250-TUC-DCB
sf-4206535

5

1   Complete." (Comments at 11.)  The same applies to Defendants' promise to "ensure that

2   detainees who have reached 48 hours in custody from book-in are Processing Complete as

3   soon as reasonably possible." (*Id.*)  Defendants should be doing this already:  "CBP tries

4   diligently to process detainees promptly, and generally does so within 24 hours."  (Order

5   at 18 ¶ 16 (quoting Skipworth Decl. ¶ 154).)

6          Defendants' stations are closed to the public.  Aside from surveillance video

7   (discussed below at 10–11), the only visibility into Defendants day-to-day compliance is

8   e3DM.  Defendants complain that requiring tracking "would take agents' time away from

9   tasks necessary to complete processing" (Comments at 11), but that proves too much.

10  Doing much of anything for Plaintiffs—feeding them, distributing wipes—"would take

11  agents' time away from . . . processing."  Defendants made much the same argument

12  before in the context of complying with the Preliminary Injunction.  (*See* Doc. 252 (Mot.

13  for Reconsideration) at 2 (arguing that complying with preliminary injunction caused

14  "longer processing times")).  The Court rejected it.  (Doc. 261 (order denying Motion for

15  Reconsideration).)

16         Defendants already have a "tracking mechanism in e3DM that . . . utilizes existing

17  data fields."  (Comments at 11.)  CBP agents are able to (and already do) enter

18  "Comments" associated with an "Action" taken in e3DM.  Agents are duty-bound to

19  conduct welfare checks regularly and frequently.  (*See* JE 74 at 16, Ex. B

20  ("Officers/Agents will physically check hold rooms on a regular and frequent basis").)  If

21  they do so at 48 hours, they can enter the required information into the Comments section.

22  (*See id.* ("Physical inspections must be recorded in the appropriate electronic system(s) of

23  record as soon as practicable.")).  Nonetheless, to allay Defendants' concerns, Plaintiffs

24  propose adding "or elsewhere" to the first sentence of Section 9:  "Defendants shall track

25  and document in e3DM *or elsewhere* when and how often a Detainee is <u>not</u> Processing

26  Complete at 48 hours."

27

28

**Section 3**

Defendants seek to strike the term "bedding" (Comments at 6), but fail to replace it with something else that would account for the Court's finding that jails and receiving agencies provide "a bed with *cloth sheets*, blankets, and *pillows*." (Order at 7 (emphasis added); *accord id.* at 11.) Plaintiffs are not wedded to the term "bedding," but Defendants must provide more than just a Blanket. (Comments at 6.) Otherwise, conditions in Tucson Sector Border Patrol stations will remain "worse than conditions of confinement in criminal and civil detention facilities." (Order at 38 ¶ 21.)

**Section 4**

Defendants seek flexibility to allow toilet sleeping. (Comments at 7.) But the Court was clear that "floor mat-sleeping is *only* acceptable outside the toilet areas of the holding cells." (Order at 8 (emphasis added).) Defendants speculate that "a detainee may *choose* to place his or her mat in the toilet area" even where there is enough space not to. (Comments at 7 (emphasis added.)) Defendants cite no evidence supporting their speculation—e.g., video showing detainees sleeping in toilets despite space elsewhere—and elicited no such testimony at trial.

Defendants' proposed "reasonable efforts" standard is, moreover, inconsistent with Agent Davison's testimony that agents must constantly monitor hold rooms and take action in "a very short period of time" to remedy mats in the toilet area or toilet sleeping. (Doc. 473 at 101:8-102:4.) Defendants' pliable standard will not remedy what everyone agrees is "humiliating" and "poses a risk to a detainee of infection or contamination with fecal matter and other bodily fluids." (Order at 22 ¶ 30.)

**Section 5**

Defendants lodge several objections to Section 5. *First*, Defendants seek to clarify that they need not adhere to mat capacities at all times, and propose adding this language to the beginning of the Section: "When Mats are in use inside a hold room . . . ." (Comments at 7.) Plaintiffs do not object in principle to the clarification, but propose rewording it as follows: "*When one or more Detainees inside a hold room is entitled to a*

PLAINTIFFS' RESPONSE TO DEFENDANTS' COMMENTS & OBJECTIONS TO PLAINTIFFS' PROPOSED ORDER FOR PERMANENT INJUNCTION;
CASE NO. 4:15-cv-00250-TUC-DCB
sf-4206535

7

1   *Mat under this Order*, Defendants shall make every effort not to exceed hold room Mat

2   capacities . . . ."  (Edited language italicized.)

3      *Second*, as described in Plaintiffs' Motion for Leave (at 2), Defendants seek

4   discretion to confiscate mats from Plaintiffs to address "overcrowding."  (Comments at 7.)

5   In the name of "flexibility," Defendants seek permission to repossess mats at the 24-hour

6   mark.  (*See id.* at 7 ("To prevent overcrowding, Defendants may retrieve Mats from

7   detainees so long as no detainee is deprived of a Mat for more than twelve hours in any

8   twenty-four hour period.").)  Because most detainees are apprehended at night, this would

9   mean that most detainees will spend their second night in detention without mats.

10      Defendants' proposal sacrifices Plaintiffs' basic human need for warmth and

11   sleep—neither of which evaporate at 24 hours in detention—so Defendants can "manage

12   overcrowding."  But "[t]he capacity issues" this Court found "are not caused by sleeping

13   mats; the capacity issues are caused by holding cell designs that do not accommodate

14   sleeping, with or without a mat."  (Order at 9-10.)  Defendants' argument, moreover,

15   rehashes one made—and rejected—in Defendants' Motion for Reconsideration.  (*See*

16   Order (Doc. 261) at 2 (rejecting Defendants' argument that the Court should not order

17   sleeping mats because "cell capacity" would be "substantially reduced.").)

18      *Third*, Defendants' allege that Plaintiffs' third sentence—requiring redistribution of

19   detainees during periods of overcrowding—is internally inconsistent and that the phrase

20   "empty or underused hold rooms" is unclear.  Not so.  Agent Davison testified that she

21   ordered an unnamed TCC shift supervisor pulled from his duties and retrained because, as

22   she put it, "cell utilization was not what it should have been."  (Doc. 473 at 81:10-11.)  In

23   that situation, TCC cell 19 was overcrowded even though "cell 16 was not utilized" and

24   "low numbers were kept in cell 18."  (*Id.* at 81:2-6.)  Even under Defendants' "cell

25   utilization" policy, overcrowding in one cell is not permitted when other cells are not

26   utilized or underutilized.

27

28

**Section 6**

Defendants admit that "[t]he Court's Order permanently extends the requirements of the preliminary injunction." (Comments at 8.) But Defendants assert, without support, that the requirements in Section 6 "go significantly beyond what is required by the Court's Order." (*Id*.) Untrue. When the requirements are not drawn from the Preliminary Injunction itself, they are drawn from the 2008 Hold Rooms and Short Term Custody Policy and TEDS.

Defendants also assert, again without support, that the Court "specifically declined to conclude that Defendants are in violation of the Due Process Clause with regard to the conditions identified within this [Section] during the first 48 hours of confinement" and did not "express any intent to order Defendants to provide conditions that the Court found it is already providing during the first 48 hours of confinement." (Comments at 8.) Untrue. The Court recited its Preliminary Injunction findings, including the conditions identified in Section 6—"overcrowding, with concrete hard and cold floors and bench surfaces, cold temperatures, no blankets or mats, precluding sleeping; unsanitary cell conditions, with lack of waste receptacles and insufficient housekeeping, lack of personal hygiene products and showers, insufficient food and lack of potable water" and "lack of a universal medical questionnaire." (Order at 9.) The Court ordered "full and immediate compliance" with the 2008 Policy and TEDS, as well as the provision of mats and showers/wipes at 12 hours. (*Id*.) "For purposes of granting the permanent injunction," the Court then "affirm[ed] these findings." (*Id*.)

Plaintiffs do not object, however, to Defendants' proposal that, in addition to the Preliminary Injunction's specific requirements, Defendants' compliance with TEDS, the 2008 Policy, and any other applicable policies be made explicit. To that end, Plaintiffs propose replacing the first sentence of Section 6 of the Proposed Order with the following:

> The sleeping, personal hygiene, medical, food, and water provisions of the Preliminary Injunction (Order (Doc. 244) at 28 ¶¶ 1-4) are hereby made permanent. Defendants are also ordered to comply with the National Standards on Transport, Escort, Detention and Search policy (JE 74), and the Hold Rooms and Short Term Custody policy (JE 9 as implemented by JE 863). To the extent these policies are

PLAINTIFFS' RESPONSE TO DEFENDANTS' COMMENTS & OBJECTIONS TO PLAINTIFFS' PROPOSED ORDER FOR
PERMANENT INJUNCTION;
CASE NO. 4:15-cv-00250-TUC-DCB
sf-4206535

9

not superseded by more restrictive provisions of this Order, they are incorporated by reference.

(*See* JE 9 (Ex. A); JE 74 (Ex. B); JE 863 (Ex. C).)

### Section 7

"Defendants object to the requirement that they make 'every possible effort'" and request a more elastic standard: "reasonable efforts consistent with operational necessities." (Comments at 10.)  Not only is the "every possible effort" language the Court's own (Order at 11 n.5), there is no need to deviate from it because the "no longer than 48 hours" rule already accommodates operational necessities given that "[p]rocessing generally takes between 2 and 2.5 hours" (*id.* at 15 ¶ 7).

### Section 8

Defendants ask for a "reasonable amount of time following the conclusion of Exigent Circumstances for Defendants to return to compliance." (Comments at 10 (emphasis removed).)  Plaintiffs agree to some leeway, but propose replacing "reasonable amount of time" with "48 hours, unless good cause is shown why more time is required."

## III.   MONITORING AND E3DM DOCUMENTATION

### Section 9

Plaintiffs response is addressed above (at 5-6) in the context of Section 2.

### Sections 11 and 12

After a two-week bench trial, the Court determined that Defendants have long deprived and, until they remediate, continue to deprive thousands of people of their constitutionally guaranteed Due Process rights.  Monitoring is required to ensure that remediation happens and is maintained.  The Court also determined that "the government may be compelled to expand the pool of resources to remedy a constitutional violation." (Order at 36 ¶ 13 (citing *Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014).)  While video preservation may be costly, it is the *only* way for the Court, Plaintiffs, or a monitor to determine whether overcrowding, toilet sleeping, and other unsafe and unsanitary conditions persist.

PLAINTIFFS' RESPONSE TO DEFENDANTS' COMMENTS & OBJECTIONS TO PLAINTIFFS' PROPOSED ORDER FOR PERMANENT INJUNCTION;
CASE NO. 4:15-cv-00250-TUC-DCB
sf-4206535

10

1    Defendants' proposed alternatives—e3DM, class access visits, and internal

2    compliance evaluations—do not and cannot provide visibility into the conditions inside

3    Defendants' stations.  e3DM cannot track toilet sleeping.  Class access visits are short,

4    infrequent, and happen during the day; they offer no insight into nighttime conditions

5    when the need for sleep is at its highest.  Defendants' own compliance evaluations capture

6    only a tiny sliver of activity.  This was demonstrated at trial when surveillance video

7    showed that the only TCC cell that the compliance evaluators inspected did not exceed

8    mat capacity at the time of inspection, but had been overcrowded just hours before.  (Doc.

9    479 at 10:21-15:10.)  Video preservation is necessary until Defendants come into

10   compliance and remain compliant with the Order.

11   **IV.    EFFECTIVE DATE, BURDEN, AND NOTICE**

12       <u>**Section 14**</u>

13       Defendants ask Plaintiffs to bear the burden to prove Defendants' non-compliance,

14   but object to giving Plaintiffs the tools to do so: monitoring and video preservation.

15   (Comments at 12.)  If Plaintiffs are to shoulder the burden, they must be given the means

16   to do so.

17       //

18       //

19       //

20       //

21       //

22       //

23       //

24       //

25       //

26       //

27

28

1   Dated: March 16, 2020              By:    /s/ Jack W. Londen
2                                              Jack W. Londen

3                                       MORRISON & FOERSTER LLP
4                                       Jack W. Londen (Bar No. 006053)
                                        Colette Reiner Mayer*
5                                       Pieter S. de Ganon*
                                        John S. Douglass*
6
7                                       NATIONAL IMMIGRATION LAW CENTER
                                        Linton Joaquin*
8                                       Alvaro M. Huerta*

9                                       AMERICAN IMMIGRATION COUNCIL
10                                      Mary Kenney*
                                        Karolina Walters*
11
12                                      LAWYERS' COMMITTEE FOR CIVIL RIGHTS
                                        OF THE SAN FRANCISCO BAY AREA
13                                      Elisa Marie Della-Piana*
                                        Bree Bernwagner*
14
15                                      ACLU FOUNDATION OF ARIZONA
                                        Yvette Borja (Bar No. 035470)
16
17                                      Attorneys for Plaintiffs

18                                      *Admitted pursuant to Ariz. Sup. Ct. R. 38(a)

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on this 16th day of March, 2020, I caused a PDF version of the foregoing document to be electronically transmitted to the Clerk of the Court, using the CM/ECF System for filing and for transmittal of a Notice of Electronic Filing to all CM/ECF registrants and non-registered parties.

- **PLAINTIFFS' RESPONSE TO DEFENDANTS' COMMENTS AND OBJECTIONS TO PLAINTIFFS' PROPOSED ORDER FOR PERMANENT INJUNCTION [*LODGED*]**

- **DECLARATION OF PIETER S. DE GANON IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS' COMMENTS AND OBJECTIONS TO PLAINTIFFS' PROPOSED ORDER FOR PERMANENT INJUNCTION [*LODGED*]**

- **INDEX OF EXHIBITS TO THE DECLARATION OF PIETER S. DE GANON IN SUPPORT OF RESPONSE TO DEFENDANTS' COMMENTS AND OBJECTIONS TO PLAINTIFFS' PROPOSED ORDER FOR PERMANENT INJUNCTION [*LODGED*]**

| Jack W. Londen | */s/ Jack W. Londen* |
|:---:|:---:|
| (typed) | (signature) |

PLAINTIFFS' RESPONSE TO DEFENDANTS' COMMENTS & OBJECTIONS TO PLAINTIFFS' PROPOSED ORDER FOR PERMANENT INJUNCTION;
CASE NO. 4:15-CV-00250-TUC-DCB
sf-4209376

13